**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ISIAH M. DOOLEN,

                *Plaintiff*,

        v.

MARK ESPER, in his official capacity as
Secretary of the Army,[1]
LT. GEN. ROBERT CASLEN, JR., in his official
capacity as Superintendent of West Point,

              *Defendants*.

No. 16 Civ. 8606 (VB)

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel..: (212) 637-2697

*Of Counsel:*

PETER ARONOFF
Assistant United States Attorney

---

[1] Substituted for Erik K. Fanning pursuant to Fed. R. Civ. P. 25(d).

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT .......................................................................................... 1

REGULATORY FRAMEWORK ......................................................................................... 2

    A.    Proceedings under Article 10 of the Cadet Disciplinary Code ............................... 3

    B.    Conduct Review ...................................................................................................... 4

    C.    Conduct Investigations and Separation Actions .................................................... 4

    D.    Recoupment Actions ............................................................................................... 6

FACTUAL BACKGROUND ............................................................................................... 7

    A.    Doolen Is Processed for Separation, But Later Recalled to the Academy .............. 7

        1.    Doolen Enters the Academy .......................................................................... 7

        2.    Doolen is Punished at an Alcohol Board ..................................................... 8

        3.    First Conduct Investigation .......................................................................... 8

        4.    Doolen Commits Another Alcohol Policy Violation .................................... 9

        5.    The Superintendent Recommends Separation But Later Recalls Doolen ...................................................................................................... 10

    B.    Doolen's Second Alcohol Policy Violation Triggers Separation Proceedings .......................................................................................................... 11

        1.    Doolen Is Punished at Another Article 10 Proceeding .............................. 11

        2.    Doolen's Alcohol Policy Violations Triggers a Conduct Investigation ............................................................................................... 12

        3.    The Conduct Investigating Officer Rejects Doolen's Arguments and Recommends Separation ............................................................................. 12

        4.    Additional Misconduct is Brought to USMA's Attention ......................... 13

        5.    After Consideration of All Rebuttal Matters, Doolen Is Separated .......... 14

STANDARDS OF REVIEW ............................................................................................. 15

A.    Motion to Dismiss Standards ................................................................ 15

B.    Summary Judgment Standard ............................................................... 16

C.    Review of Agency Action Under the APA ........................................... 16

ARGUMENT .................................................................................................... 17

A.    The Court Lacks Jurisdiction Over Doolen's Challenges to the Conduct of His Separation Proceedings ............................................ 17

1.    Military Personnel Decisions are Nonjusticiable .................... 18

2.    Doolen's Claims Do Not Fall into the Mandatory Regulation Exception to Nonjusticiability and Are Otherwise Meritless .................. 19

3.    Doolen Must Exhaust Claims that the Army Failed to Follow Regulations ............................................................. 23

B.    Doolen's Facial Challenges Fail ......................................................... 25

1.    Due Process Claims Relating to a Hearing ............................... 25

2.    Due Process Claims Relating to Supposed Conflicts of Interest ............. 27

C.    The Army's Separation Decision Is Supported by the Record ............................. 29

CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Am. Rd. & Transp. Builders Ass'n v. EPA,*
    865 F. Supp. 2d 72 (D.D.C. 2012) ........................................................... 1

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................... 16

*Andrews v. Knowlton,*
    509 F.2d 898 (2d Cir. 1975) ..................................................... 25, 26, 27

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2008) ....................................................................... 15, 16

*Bechtel v. Admin. Review Bd.,*
    710 F.3d 443 (2d Cir. 2013) .................................................................. 17

*Beharry v. Ashcroft,*
    329 F.3d 51 (2d Cir. 2003) ................................................................... 24

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................... 15, 16

*Brezler v. Mills,*
    220 F. Supp. 3d 303 (E.D.N.Y. 2016) .................................................. 23

*Buckingham v. Mabus,*
    772 F. Supp. 2d 295 (D.D.C. 2011) ..................................................... 27

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ........................................................................... 16

*Chappell v. Wallace,*
    462 U.S. 296 (1983) ........................................................................... 17

*Erie Cty. v. Chaudhuri,*
    802 F.3d 267, 279 (2d Cir. 2015) ........................................................ 16

*Crowley v. United States Merchant Marine,*
    *Acad.*, 985 F. Supp. 292 (E.D.N.Y. 1997) ........................................... 26

*Davis v. Harvey,*
    No. 04-CV-1051, 2006 WL 2794318 (E.D.N.Y. Sept. 27, 2006) ............. 17

*Dibble v. Fenimore*,

    339 F.3d 120 (2d Cir. 2003) ............................................................................ passim

*Dibble v. Fenimore*,

    545 F.3d 208 (2d. Cir. 2008) ............................................................................ 17, 23

*EEOC v. Peabody Western Coal Co.*,

    610 F.3d 1070 (9th Cir. 2010) .............................................................................. 1

*Espinosa v. Immigration & Customs,*

    *Enf't*, 181 F. App'x 89 (2d Cir. 2006) .................................................................. 17

*Falk v. Secretary of the Army*,

    870 F.2d 941 (2d Cir. 1989) ...................................................................... 16, 17, 23

*Feres v. United States*,

    340 U.S. 135 (1950) ............................................................................................ 24

*Ford v. D.C. 37 Union Local 1549*,

    579 F.3d 187 (2d Cir. 2009) ............................................................................... 15

*Guitard v. United States Sec'y of the Navy*,

    967 F.2d 737, 740 (2d Cir. 1992) ...................................................................... 23, 24

*Hagopian v. Knowlton*,

    470 F.2d 201 (2d Cir. 1972) ........................................................................... passim

*Janniere v. United States Army*,

    34 F. Supp. 850 (E.D.N.Y. 1999) ...................................................................... 23

*Jones v. 106th Rescue Wing*,

    859 F. Supp. 2d 381 (E.D.N.Y. 2012) .............................................................. 19

*Jones v. New York State Div. of Military & Naval Affairs*,

    166 F.3d 45 (2d Cir. 1999) ................................................................ 18, 19, 23, 24

*Karpova v. Snow*,

    497 F.3d 262 (2d Cir. 2007) ............................................................................... 17

*Kreis v. Sec'y of the Air Force*,

    866 F.2d 1508 (D.C. Cir. 1989) ...................................................................... 17, 18

*Lebrun v. England*,

    212 F. Supp. 2d 5 (D.D.C. 2002) ...................................................................... 26

*Leicht v. McHugh*,

    No. 13-60015-CIV, 2013 WL 11971266 (S.D. Fla. May 24, 2013)........................................ 25

*Locurto v. Safir*,

    264 F.3d 154 (2d Cir. 2001) .......................................................................................... 29

*Lujan v. Nat'l Wildlife Fed'n*,

    497 U.S. 871 (1990).......................................................................................................... 16

*Fed. Deposit Ins. Corp. v. Mallen*,

    486 U.S. 230, 247-48 (1988). ............................................................................................ 27

*Mathews v. Eldridge*,

    424 U.S. 319 (1976)................................................................................................... 25, 27

*N.J. Carpenters Health Fund v. Royal Bank of Scotland, PLC*,

    709 F.3d 109 (2d Cir. 2013) .......................................................................................... 15

*Orloff v. Willoughby*,

    345 U.S. 83 (1953).................................................................................................. 17, 18

*Patsy v. Board of Regents*,

    457 U.S. 496 (1982)........................................................................................................ 24

*Residents for Sane Trash Solutions, Inc. v. United States Army Corps of Engr's*,

    31 F. Supp. 3d 571 (S.D.N.Y. 2014) ................................................................................ 16

*Richardson v. Perales*,

    402 U.S. 389 (1971)........................................................................................................ 28

*Rivera-Powell v. New York City Bd. of Elections*,

    470 F.3d 458 (2d Cir. 2006) .......................................................................................... 29

*Spadone v. McHugh*,

    842 F. Supp. 2d 295 ...................................................................................................... 25

*Spitalieri v. New York City Transit Auth.*,

    No. 94 Civ. 3305 (LAP), 1996 WL 254980 (S.D.N.Y. May 14, 1996).................................... 29

*United States v. Simpson*,

    205 F.3d 1326 (2d Cir. 2000) ........................................................................................ 21

*Wasson v. Trowbridge*,

    382 F.2d 807 (2d Cir. 1967) ............................................................................. 26, 27, 29

*Wilhelmus v. Geren*,
    796 F. Supp. 2d 157 (D.D.C. 2011) .................................................................. 27

*Withrow v. Larkin*,
    421 U.S. 35 (1975)............................................................................................. 28

*Yarusso v. 106 Rescue Wing, New York Air Nat. Guard*,
    511 F. App'x 13 (2d Cir. 2013) ......................................................................... 24

**Statutes**

10 U.S.C. § 1552................................................................................................... 23, 24

10 U.S.C. § 2005................................................................................................... 6, 7, 15

10 U.S.C. § 2005(g)(1) (2005).................................................................................... 15

10 U.S.C. § 4333........................................................................................................... 4

10 U.S.C. § 4333(a)....................................................................................................... 4

10 U.S.C. § 4334(c)....................................................................................................... 4

10 U.S.C. § 4349........................................................................................................... 3

37 U.S.C. § 303a........................................................................................................... 7

5 U.S.C. § 702............................................................................................................. 16

5 U.S.C. § 703............................................................................................................... 1

5 U.S.C. § 706............................................................................................................. 17

5 U.S.C. § 706(2)........................................................................................................ 16

**Rules**

Fed. R. Civ. P. 25(d) ..................................................................................................... 1

Fed. R. Civ. P. 56........................................................................................................ 16

**Regulations**

32 C.F.R. § 581.3 ....................................................................................................... 27

**Other Authorities**

Rule for Courts-Martial 1103(b) ................................................................................ 20

Defendants Mark Esper, in his official capacity as Secretary of the Army, and Lt. Gen. Robert Caslen, Jr., in his official capacity as Superintendent of West Point (collectively, the "Defendants" or the "government"),[2] by their attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion to dismiss, or, in the alternative, for summary judgment.

## **PRELIMINARY STATEMENT**

Plaintiff Isiah Doolen seeks to set aside his administrative separation from the United States Military Academy ("USMA" or the "Academy" or "West Point"), his discharge from the Army, and order to pay recoupment of his educational expenses.

Due to repeated disciplinary infractions, Doolen, a West Point cadet, was placed in formal disciplinary proceedings in early 2013, months before he would otherwise graduate and become a commissioned officer. While the findings were under review by West Point's Superintendent, "a clearly intoxicated Isiah Doolen" stumbled uninvited into the barracks room of his ex-girlfriend and fellow cadet. AR 496.[3] Doolen drew the attention of fellow cadets as he raised his voice, called his ex-girlfriend and fellow cadet disparaging names, and then "proceeded to grab her and become physical to keep her from leaving the room." *Id*.

Because this was Doolen's second alcohol policy violation, he was punished and placed in further disciplinary proceedings. After a thorough hearing, the Investigating Officer concluded that, based on the total of Doolen's behavior during his years of training, he had not "developed to

---

[2] Secretary Esper is the only proper defendant to the Administrative Procedure Act ("APA") action. *See* 5 U.S.C. § 703. The same is true of Doolen's "Due Process" claims. Although Doolen does not assert the APA as the waiver of sovereign immunity for the "Due Process" claims, the APA is the only possible vehicle for bringing this action. Relief under *Ex parte Young*—*i.e.*, direct causes of action for equitable relief under the Constitution—is no longer available against federal officials following the amendments made to Section 702 of the APA in 1976. *See*, *e.g.*, *EEOC v. Peabody Western Coal Co.*, 610 F.3d 1070, 1085 (9th Cir. 2010); *Am. Rd. & Transp. Builders Ass'n v. EPA*, 865 F. Supp. 2d 72, 83 (D.D.C. 2012).

[3] "AR" refers to the Administrative Record. "RA" refers to the Regulatory Appendix. Both are filed contemporaneously with this motion as exhibits to the Declaration of Peter Aronoff.

be able lead soldiers in the United States Army." The findings were forwarded through the chain of command to the Deputy Assistant Secretary of the Army, who concurred and directed separation from USMA, discharge from the Army, and recoupment of Doolen's education costs.

Doolen now seeks to challenge the personnel decisions made by his superior officers. Yet the majority of his claims are barred by the doctrine of intramilitary immunity. "[S]uits by enlisted soldiers bypassing the hierarchy of the armed services seeking injunctions to overturn personnel decisions of their superiors in civilian courts could substantially alter and interfere with the peculiar and special relationship of the soldier and his superiors." *Dibble v. Fenimore*, 339 F.3d 120, 128 (2d Cir. 2003) (citation omitted). Furthermore, his claims that USMA did not follow mandatory procedural regulations are not justiciable because Doolen has not exhausted his administrative remedies. Ultimately, Doolen's claims seek to second-guess military decisionmaking about fitness for duty, which the Second Circuit and Supreme Court have repeatedly made clear are not for the courts to decide. Thus, for the reasons below, the government's motion should be granted.

## REGULATORY FRAMEWORK

Army Regulation ("Army Reg.") 210-26, *United States Military Academy*, "provides for the policy and procedure for the general government and operation of the United States Military Academy." Army Reg. 210-26 ¶ 1-1 (RA 104). It includes provisions for misconduct, honor, and disciplinary grounds for separation. *Id.*, ch. 6 (RA 106-108). West Point has adopted two more detailed regulations relevant to this case: United States Corps of Cadets ("USCC") Regulation ("USCC Reg.") 351-2, *The Cadet Disciplinary System* (RA58-101), and USCC Reg. 351-1, *Procedures for Conduct Investigations Under the Cadet Disciplinary System* (RA7-57)*.* The Academy has also published a "USCC Standing Operating Procedure ("SOP")," which "governs the USCC, and is written to foster an environment in which each cadet's concept of duty will be

further developed and strengthened through self-discipline." USCC SOP (RA 115).

### A. Proceedings under Article 10 of the Cadet Disciplinary Code

USMA cadets must follow the Cadet Disciplinary Code ("CDC"), which is composed of ten articles. USCC Reg. 351-2 ¶ 104 (RA 62); *accord* USCC Reg. 351-1 ¶ 119 (RA 18-19). Article 10 allows commanders to impose disciplinary punishment upon cadets for infractions, while Articles 1-9 list and describe offenses under the CDC.[4] *Id.* Offenses include, for example, "Failure to comply with Regulations, Orders, Instructions," Art. 1, "Unsatisfactory Behavior," Art. 6, and "Error in Judgment," Art. 7. *Id.*

A commander may initiate Article 10 proceedings to formally discipline a cadet for a CDC violation. The commander notifies the cadet of the alleged violations of the CDC using USMA Form 2-3. *See* USCC Reg. 351-2, p. 3-27 (RA 87). The notice informs the cadet that no decision has yet been made, and that punishment will not be imposed unless the commander is convinced by a preponderance of the evidence that she committed the offense; it also informs her of other rights. *Id.* After time to prepare, the cadet elects whether to present matters in defense, mitigation, or extenuation at a hearing. *Id.* If the commander finds her guilty, the commander imposes punishment. The commander imposes punishment and advises of the right to appeal. *Id.*

The commander may award extra duty tours, among other punishments. *Id.* Cadets are automatically awarded one demerit for each tour of extra duty. USCC Reg. 351-2 ¶ 105 (RA 69). Cadets may only accumulate a specified number of demerits during any six consecutive calendar months. *Id.* The total number of demerits allowed is dependent on the cadet's status at the academy.

---

[4] Each company in the Corps of Cadets is commanded by a commissioned officer, who is referred to as a "Tactical Officer." Army. Reg. 210-26 ¶ 1-19 (RA 105); *see* 10 U.S.C. § 4349. Tactical officers "provide command, control, and administrative support to the Corps of Cadets." *Id.* They are "not an adversary of the cadet but an educator who shares an identity of interest with the cadet, whom he counsels from time to time as a future leader." *Hagopian v. Knowlton*, 470 F.2d 201, 205 (2d Cir. 1972). Tactical Officers command at the Company, Battalion, Regimental, and Brigade levels. *See* USCC Reg. 351-2, Tbl. 1-2 (RA 72).

*See* USCC Reg. 351-2, Table 1-4 (RA74). Generally, cadets are allowed to accumulate more demerits when they first enter USMA, and fewer as they proceed toward graduation. *Id.* A cadet who exceeds the maximum allowance of demerits within a six month period may be subject to a conduct review and recommendation for a conduct investigation. *Id.* ¶ 105 (RA 69).

### B.    Conduct Review

At the Academy, a "cadet's standing in conduct is either proficient or deficient." USCC Reg. 351-2 ¶ 501 (RA 96). In order to graduate, a cadet must be proficient in conduct, as determined by the Commandant.[5] *Id.*

Cadets are considered proficient in conduct unless determined otherwise by the chain of command. *Id.* Certain events—such as exceeding a demerit allowance, or committing two alcohol policy violations—trigger a written conduct review to determine whether a cadet's status should be investigated. *Id.* ¶ 502, 504 (RA 96-97). The conduct review consists of recommendations from the cadet's chain of command on whether the cadet's standing should be changed to deficient in conduct, and if the cadet should be retained or referred to a conduct investigation for action by the Commandant or Superintendent.[6] *Id.* ¶ 502 (RA 96). After review by several levels of authority, a negative conduct review results in the cadet's referral to a conduct investigation.

### C.    Conduct Investigations and Separation Actions

A conduct investigation, or "CI," "is convened by the Commandant to provide cadets a hearing, which is informal and nonadverserial in nature." USCC Reg. 351-1 ¶ 101 (RA 10). During the conduct investigation, an Investigating Officer, or "IO," "makes a finding regarding the

---

[5] The Commandant is detailed to his position by the President, and is the immediate commander of the Corps of Cadets. *See* 10 U.S.C. § 4333(a), 4334(c). The Commandant "is responsible to the Superintendent for the administration and discipline of the Corps of Cadets." Army Reg. 210-26 ¶ 1-19(b)(2).

[6] The Superintendent is also detailed to his position by the President. 10 U.S.C. § 4333. "The immediate government of the Academy is under the Superintendent, who is also the commanding officer of the Academy and of the military post at West Point." 10 U.S.C. § 4334(c).

deficiency or proficiency" of conduct and recommends a disposition to the chain of command. *Id.*

The Investigating Officer is responsible for determining whether: (1) the awards of demerits were consistent with CDC guidelines, (2) the award of demerits exceeded the maximum authorized under the CDC, (3) Article 10 proceedings were properly constituted, reviewed, and approved, and (4) whether the "conduct or pattern of conduct is a departure from the standards expected of Cadets." *Id.* ¶ 102(c) (RA 10). The IO must also examine "any issue or challenge raised by the cadet to ensure procedural due process." *Id.* ¶ 102(d) (RA 10). However, the Investigating Officer must be mindful that cadets are given the opportunity for a hearing and appeal during the Article 10 process, and so issues or challenges a cadet raises to an Article 10 proceeding during the conduct investigation must be "substantive in nature." *Id*.

Conduct investigation are conducted by procedures outlined in USCC Reg. 351-1. The cadet is given a copy of all of the documents to be presented during the conduct investigation, and notified of the date for a hearing and her rights. *Id.* ¶ 203. (RA 23) These rights include: (1) to receive written notice of the reported conduct deficiency and a list of all disciplinary actions being investigated; (2) to consult with legal counsel to advise and assist in the preparation of the cadet's presentation, (3) to be present during the hearing, except during deliberations; (4) to testify or remain silent; (5) to challenge the investigating officer for cause; (6) to examine all records and documents to be considered during the conduct investigation; (7) to call reasonably available witnesses to support the challenges of demerits; (8) to question and cross-examine witnesses; (9) to present relevant written evidence or documentation; (10) to present his or her own oral and/or written arguments relative to the Investigating Officer potential findings and recommended disposition; and (11) to receive a complete copy of the findings and report of proceedings and recommendation. USCC Reg. 351-1 ¶ 105 (RA 12-13).

At the conclusion of the conduct investigation, the Investigating Officer "will document their findings. The findings will either confirm the deficiency in conduct and render a recommendation for disposition to the chain of command or will find the cadet proficient in conduct." *Id.* ¶ 102(f) (RA 10). This documentation includes a "summarized report of proceedings." *Id.* ¶ 502(a)(1) (RA 57).

The Commandant will review the IO's findings and the entire record. USCC Reg. 351-2 ¶ 509 (RA 98)*.* If the cadet is found deficient in conduct, the Commandant may place the cadet on conduct probation or he may forward a report to the Superintendent. *Id.* The Superintendent may then direct retention, transfer to a lower class, suspension from USMA, suspended separation, or recommend separation of the cadet to Army Headquarters. *Id.* If the Superintendent recommends separation, he may immediately suspend the cadet from USMA. *Id.*

Only Army Headquarters may ultimately separate a cadet. After a cadet enters her Second Class Year (junior year), the Secretary of the Army is the separation authority. *See* AR 210-26, Tbl. 7-2, rule 5 (RA 110). The Secretary has delegated this authority to the Assistant Secretary of the Army (Manpower & Reserve Affairs), and further delegated again to the Deputy Assistant Secretary of the Army (Military Personnel and Quality of Life). *See* RA 1-6.

### D.    Recoupment Actions

Under 10 U.S.C. § 2005, the Secretary of the Army is authorized to require any person who receives advanced educational assistance to enter into a written agreement. *Id.* The agreement may require that such person agree to being called to active duty if she does not complete an educational program, and that she may be required to repay the educational assistance if a period of active duty

is not completed. *Id.* Doolen's signed agreement is in the record at AR 230-31.[7]

By regulation, cadets who are separated from USMA for "conduct deficiency" are "deemed to have breached their service agreement." AR 210-26 ¶ 7-9(a) & Tbl. 7-1 (RA 109). Accordingly, unless ordered to active duty to satisfy the agreement, cadets separated for conduct deficiency "shall repay to the United States an amount equal to the unearned portion of the bonus or similar benefit if the member fails to satisfy the eligibility requirements." 37 U.S.C. § 303a.

To determine the amount a cadet must reimburse the government after a service agreement is breached, the Academy follows its "Standard Operating Procedures – United States Military Academy Cadet Recoupment & Reimbursement "SOP – Recoupment." *See id.* (RA 172-181). It also publishes an annual "Cost of Education Report." *See, e.g.,* 2010-2014 Cost of Education Reports (RA 128-167).

## FACTUAL BACKGROUND

**A.    Doolen Is Processed for Separation, But Later Recalled to the Academy**

**1.    Doolen Enters the Academy**

Doolen's military training began in 2006 when he enlisted in the Army National Guard for a period of six years. AR 889-90. Around the same time, Doolen enlisted in the Army Reserve as a Cadet in the New Mexico Military Institute's Reserve Officer Training Program. AR 891-92. After approximately two years at the New Mexico Military Institute's college program, Doolen was nominated for attendance at the Academy. *See* AR 745. Before entering the Academy, Doolen was placed in the USMA Preparatory School for one year. AR 887. In 2009, Doolen began at USMA as a member of the class of 2013. *See* AR 228.

---

[7] By direction from the Department of Defense, the Secretary of the Army is required to enter into the written agreement proscribed by 10 U.S.C. § 2005. Department of Defense Instruction 1332.22, Service Academies (Sept. 24, 2015), ¶ E3.P6 (RA 124). This Directive incorporates and cancels DODD 1332.23, Service Academy Disenrollment (Feb. 19, 1988), which was in effect when Doolen entered USMA; there is no substantive change. *See* DODD 1332.23 ¶ 6.2.1 (RA 121). The Academy has designated USMA Form 5-50 as the "written agreement." *See, e.g,* RA 153.

### 2.    Doolen is Punished at an Alcohol Board

In Doolen's second semester at the Academy, he snuck alcohol into the barracks using a Taco Bell cup and a water bottle. AR 554-56, 560-61. Drinking or even possessing alcohol without authorization is a violation of the Academy's rules and considered "major misconduct." *See* Army Reg. 210-26 ¶ 6-7 (RA 106-07). He then drank alcohol in the barracks with several underage cadets. AR 554-56, 560-61. This too is a violation of Academy rules. Army Reg. 210-26 ¶ 6-7; *see* CARD 600 (RA 117-18). Doolen underwent disciplinary proceedings pursuant to Article 10 at the Brigade level and was found guilty of various offenses by the presiding officer. *Id.*

### 3.    First Conduct Investigation

Doolen committed a few minor rules infractions after his alcohol board, but continued on his course of study and entered his First Class Year (senior year) at the Academy. *See* AR 834. However, by February 2013, Doolen had accumulated 90 demerits, more than the allowable six-month demerit maximum of 72, AR 829, triggering a conduct investigation. AR 805.

Maj. Timothy Carignan, appointed as an Investigating Officer, found that Doolen was deficient in conduct, AR 756, and recommended that Doolen's graduation be delayed. *Id.* He concluded that that "despite [a] collection of rather minor infractions over [a] short period of time," Doolen was "resistant, rather than totally committed, to taking full responsibility for his actions," which was "troubling, especially for a [First Class Cadet] two months from commissioning." AR 762. Maj. Cariganan continued that Doolen "has expressed to me . . . that he feels that this entire investigation is a farce and that he is fully ready now to enter the force as a Second Lieutenant[,] expressions with which I do not agree." *Id*.

The Company Tactical Officer, Capt. Eaton-Ferenzi, agreed that Doolen was deficient in conduct, but based on her "personal observations of his comprehensive performance," she recommended that Doolen be immediately separated instead. AR 742. Capt. Eaton-Ferenzi

observed that "Doolen demonstrates an unacceptable level of maturity for the officer corps, especially since he is 24 years old and has already participated in approximately 8 years of officer development training" at various institutions. *Id.* Doolen's Brigade Tactical Officer also recommended that Doolen be separated. AR 741. Brigadier General ("Brig. Gen.") Richard D. Clarke, the Commandant of Cadets, also recommended that Doolen be separated, discharged from the Army, and that Doolen be required to pay recoupment for his educations expenses. AR 739. Doolen was provided the report, recommendations, and a legal review for comment. *See* AR 744-751. Doolen submitted a rebuttal, in which he stated that while he "t[ook] responsibility" for his actions, he had not harmed anyone. AR 748.

### 4.    Doolen Commits Another Alcohol Policy Violation

Five days after Doolen submitted his rebuttal, on May 8, 2013, "a clearly intoxicated Isiah Doolen" stumbled into the barracks room of Cadet Jillian Collins and Cadet ND,[8] his former girlfriend. AR 496. As Cadet Collins explained, she was "lying in bed about to go to sleep" when Doolen entered their room and approached Cadet ND, who was in her bed. *Id.* Cadet Collins "covered [her] head in hopes it was just one of the typical 'arguments' that they are known for throughout this school year and that they would go away quickly. It then proceeded by him questioning her why she stopped talking to him and returned his things." *Id.* Cadet Collins explains that Cadet ND "just shrugged her shoulders and tried to get rid of him by telling him to 'F@#$ing Leave' and he then proceed to start telling her 'I hope you whore around during TEE[9] week because you['re] nothing but a 'F$o/o#ing Whore' and was beginning to raise his voice." *Id.* Cadet ND "tried to take the argument outside. As she got up to approach the door he proceeded to grab

---

[8] Cadet ND's initials are substituted for her full name pursuant to the Court's January 26, 2018 protective order, ECF No. 44.

[9] "TEE" refers to "Term End Examinations," which are normally scheduled the third week of December and May. *See* http://www.usma.edu/academics/SitePages/FAQs.aspx.

her and become physical to keep her from leaving the room to get him." *Id.*

The altercation continued as

CDT [ND] was then able to push him off of her and he hit the rifle rack and she was able to escape the room to try and talk to him outside. He then began to raise his voice and block the door so she could not get back into the room. She then proceeded to raise her voice to yell at him to 'get the F#@K out of the room' and then asked bystanders in the hallway for help. At first they turned around and walked away, then after she called one by name he came to help which caused CDT Isiah Doolen to storm off in an angry rage down the hall while becoming physical with inanimate objects.

*Id.*

Cadet Collins explained that she believed Doolen was intoxicated because he "was stumbling and slurring his words when speaking and also had a strong stench of alcohol that filled the room." AR 496. Cadet ND also explained that when Doolen entered the room, she "assumed he had been drinking I saw him walking to the Firstie Club that evening around 1900. I asked if he had been drinking and he said 'I'm not drunk' a few more times." AR 498. Cadet ND further explained that Doolen "slurred his words, talked slowly, walked carefully, and his eyes drooped. I also smelled alcohol on his breath." AR 499. Cadet Austin Hunt, the individual who intervened, also stated that Doolen "was obviously intoxicated and kept refusing to leave." AR 507.

As a result of this incident, a commander's inquiry was conducted. AR 493-94.

### 5.    The Superintendent Recommends Separation But Later Recalls Doolen

Five days after the altercation with Cadet ND, the Superintendent, Lt. Gen. David H. Huntoon, completed his review of the initial conduct investigation (which did not contain information about the May 8, 2013, altercation) and approved the finding that Doolen was deficient in conduct for exceeding his six-month demerit allowance. AR 737. Lt. Gen. Huntoon determined that a call to active duty would not be appropriate, and placed Doolen on an authorized leave of absence pending separation. *Id.* He also recommended an investigation whether Doolen breached

his service agreement, and whether he should be required to reimburse his educational costs; and he suspended Doolen from the Academy pending the final action by Headquarters. *Id.*

Following a determination of the amount of Doolen's liability, *see* AR 634, Brig. Gen. Richard Clarke, the Commandant of Cadets, and Lt. Gen. Robert Caslen, the Superintendent, both agreed that Doolen should be separated and ordered to repay $203,160. AR 627, 630-31.

Doolen submitted a request for a delay on his separation action, so that he could include a report from a forensic psychologist and so that his "attorney can confer with Academy officials regarding procedural issues involving [his] case." AR 611-12. His attorney also sent a memorandum to Lt. Gen. Caslen. AR 603-10. In these matters, Doolen argued, *inter alia*, that Doolen's separation action was defective because of procedural irregularities. AR 606.

After reviewing Doolen's concerns, the Office of the Judge Advocate General raised a procedural objection to the conduct investigation, and Doolen was recalled to the Academy. *See* AR 11 ¶ 1(d). USMA personnel cautioned, however, that on Doolen's return, new disciplinary actions could be taken for the May 2013 incident, including a possible CI for a second alcohol-related incident. AR 587. On June 2, 2014, Doolen's status was changed to "return to duty to the class of 2014 (AUG)." AR 893.

**B.    Doolen's Second Alcohol Policy Violation Triggers Separation Proceedings**

**1.    Doolen Is Punished at Another Article 10 Proceeding**

On his return, the command placed Doolen in Article 10 proceedings for the May 8, 2013, incident, which had not previously been addressed because Doolen had been absent from the Academy. *See* AR 432. The proceedings occurred on June 10, 2014, at the Brigade level. Doolen was notified that he was alleged to have violated Article 1, CDC, for "failure to comply with regulations, orders, instructions," Article 6 for "unsatisfactory behavior," and Article 7, CDC, for "error in judgment." *Id.* Under questioning during the hearing, Doolen acknowledged that he had

been drinking. AR 315-17. *Id*. Doolen was found guilty and elected not to appeal. AR 432.

### 2. Doolen's Alcohol Policy Violations Triggers a Conduct Investigation

On July 9, 2014, Doolen's Tactical Noncommissioned Officer recommended that Doolen "be declared deficient in conduct and be referred to a Conduct Investigation for receiving two alcohol-related Field Grade Article 10 violations." AR 482. The Regimental Executive Officer agreed. AR 481.

By memorandum dated July 17, 2014, Doolen was informed that as a result of receiving two alcohol boards, the Commandant had referred Doolen to a conduct investigation. AR 476-77. Doolen elected to appear, and indicated that he would dispute the second Article 10 proceeding. AR 478. Doolen requested witnesses to substantiate his dispute and to provide information on his performance as a cadet. AR 479. Doolen also sent a "rebuttal" to the Brigade Tactical Officer requesting that he "drop" the investigation, AR 584, and argued that his second alcohol board had not been fair. AR 578-81.

### 3. The Conduct Investigating Officer Rejects Doolen's Arguments and Recommends Separation

On August 11, 2014, Capt. Nicholas Forlenza was appointed "to make findings concerning the reported conduct deficiency" of Doolen. AR 473. Later that month, he conducted a hearing. AR 238-417. During the hearing, Doolen challenged whether his second Article 10 proceeding was an "alcohol board" and claimed that the Commandant was "predisposed to find [him] responsible at [the] Article 10 Board." AR 244, 246. Doolen requested Col. Mauldin, the Article 10 imposing commander, as a witness. AR 312-317. However, when given the chance, Doolen did not question Col. Mauldin on whether he had been biased. *Id.*; *see also* AR 465. Col. Mauldin did confirm that the second Article 10 proceeding was an "alcohol board." AR 315.

During the hearing, Doolen called numerous wtinesses, who were permitted to provide live

-12-

testimony about his character. AR 318-417.

On August 30, 2014, Capt. Forlenza found Doolen deficient in conduct and made a summarized report of proceedings. AR 422-24. First, Capt. Forlenza rejected Doolen's argument that his second Article 10 was not an alcohol board, in part based on Col. Mauldin's testimony. AR 423. Next, he noted Doolen's "underwhelming" academic performance. *Id*. Capt. Forlenza then went on to evaluating Doolen's character, explaining that "[e]xcept for one person, all the character witnesses called by Cadet Doolen have known him for less than three months since his return to West Point," and "[t]he one witness, who knew Cadet Doolen prior to his time away from the Academy, stated that she did not trust him, nor would she willingly go to combat with him." *Id.* Based on all the evidence, Capt. Forlenza also found that Doolen lacked "the attributes essential to lead as an officer in the United States Army," including "self-control," and observed that Doolen's "tone and attitude when communicating with others indicate an unwillingness to control his emotions and treat others with dignity and respect." AR 423-24. He judged that Doolen's "impulsivity and lack of self-control will put Soldiers, mission and the Army at great risk. Cadet Doolen is immature, selfish, and exhibits an attitude that is not compatible with good order and discipline, the basic foundation for service in the United States Army." AR 424. He therefore recommended immediate separation. *Id*.

### 4.    Additional Misconduct is Brought to USMA's Attention

In October 2014, a copy of the investigation, legal review, chain of command recommendations, and updated recoupment paperwork were provided to Doolen for comment. AR 227-33. In November 2014, upon request of Doolen's counsel, a verbatim transcript of the proceedings was provided. AR 211.

After being granted extensions, Doolen submitted, through counsel, a response to the investigating officer's findings and recommendations. AR 29-225. Doolen's counsel asserted that

-13-

Capt. Forlenza was not a "neutral" investigating officer, and that he had "failed to accurately and faithfully prepare summaries of the oral testimony" or "summarize, or consider in any substantive way in his finding of the written memoranda for the record." AR 30-33. Doolen's counsel asserted that these alleged errors invalidated "the 'findings' of the IO" and any "endorsement . . . by the chain of command." *Id.* Doolen also asserted that that Capt. Forlenza's findings were not supported by the oral and written testimony, and that Doolen was "not guilty" of violating USMA alcohol polices in connection with the May 8, 2013, incident. AR 43.

While the separation process was pending, Maj. Patrick Snyder, Doolen's Tactical Officer, received an email from Ms. MD[10], a civilian from New Windsor, New York, who alleged that Doolen was abusive toward her in the January 2014 timeframe, and that Doolen informed her that he used heroin with another cadet.[11] AR 16-17. (A family court case based on the allegation was dismissed on consent of all parties, and Doolen's counsel informed West Point of this fact. AR 21-25.) The matter was referred to the U.S. Army Criminal Investigation Command ("CID") for investigation. During the investigation, CID uncovered that in August 2013, Doolen was arrested in Springfield, Missouri, on suspicion for driving while intoxicated. AR 18-20.

5.    **After Consideration of All Rebuttal Matters, Doolen Is Separated**

In March 2015, the Staff Judge Advocate completed a legal review of the conduct investigation and Doolen's submissions. AR 11-14. The Staff Judge Advocate determined, among other things, that the two alcohol policy violations merited a finding that Doolen was deficient in conduct, and that the finding was supported by the evidence. AR 14. The Superintendent approved the finding, and recommended that Doolen be separated from the Academy and discharged from

---

[10] Ms. MD's initials are substituted for her full name pursuant to the Court's January 26, 2018 order.
[11] A prosecutor the Academy later found probable cause that Doolen assaulted Ms. MD, but that there was insufficient evidence for the heroin allegation. AR 16.

the Army with an honorable characterization of service. AR 2-6. Further, the Superintendent found that "[a] call to active duty would not be appropriate," and recommended that Doolen be required to reimburse the government for his educational costs. AR 5-6. By memorandum dated October 21, 2015, Anthony J. Stamilio, the Deputy Assistant Secretary of the Army for Military Personnel and Quality of Life, acting as the Secretary's designee, approved the Superintendent's recommendations and directed that Doolen repay the United States Government for the cost of the advanced education assistance expended on his behalf in the amount of $226,662.00.[12] AR 1.

## STANDARDS OF REVIEW

### A.     Motion to Dismiss Standards

The government moves to dismiss for lack of subject matter jurisdiction and for failure to state a claim. "Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper when the district court lacks the statutory or constitutional power to adjudicate it." *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009) (internal quotation marks omitted).

On a motion to dismiss under Federal Rule of Civil 12(b)(6), "a court must assess whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *N.J. Carpenters Health Fund v. Royal Bank of Scotland, PLC*, 709 F.3d 109, 119 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008)). Allegations that are "'merely consistent with'" a defendant's liability do not state a claim, and the "sheer possibility" that a defendant acted unlawfully does not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). While well-pleaded factual allegations are assumed

---

[12] During Doolen's initial separation action, USMA directed an investigation pursuant to Army Regulation 15-6, *Procedures for Investigating Officers and Boards of Officers* (Oct. 2, 2006), and 10 U.S.C. § 2005. *See* AR 853-883. It appears that this action was based on a stale understanding of 10 U.S.C. § 2005 and AR 210-26. Prior to the National Defense Authorization Act of 2006, 10 U.S.C. § 2005 required a recoupment investigation to determine the validity of a debt against a disenrolled cadet. *See* 10 U.S.C. § 2005(g)(1) (2005). However, because Doolen was separated under the procedures contained in table 7-1 of AR 210-26, no investigation was required, and no recoupment investigation was conducted during the second separation action.

true on a motion to dismiss, legal conclusions are not entitled to a presumption of truth. *See id*. at 678-79. Thus, a well-pleaded complaint may not simply recite the legal elements of a cause of action, but instead must allege the facts that, if assumed true, give rise to a claim. *See id*.

### B.     Summary Judgment Standard

Where a party seeks judicial review of agency action, "summary judgment is appropriate, since whether an agency action is supported by the administrative record and consistent with the APA standard of review is decided as a matter of law." *Residents for Sane Trash Solutions, Inc. v. United States Army Corps of Engr's*, 31 F. Supp. 3d 571, 586 (S.D.N.Y. 2014) (citations and internal quotation marks omitted). Summary judgment is appropriate when "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Because the Court need not and, indeed, may not, "find" underlying facts in an APA matter, there are no material facts essential to the Court's resolution of this action. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883-84 (1990).

### C.     Review of Agency Action Under the APA

The APA authorizes judicial review of federal agency action for any person "suffering legal wrong because of agency action." 5 U.S.C. § 702. A court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2). And "[w]here a final agency action is presented for review, 'intermediate actions leading up to that final action are reviewable as well." *Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri*, 802 F.3d 267, 279 (2d Cir. 2015) (quotation marks omitted) (citing 5 U.S.C. § 704)).

"[W]hen applying the arbitrary and capricious test, a court may not assess the wisdom of an agency's choice; inquiry is limited instead to whether the [agency] has made a clear error of

-16-

judgment." *Falk v. Secretary of the Army*, 870 F.2d 941, 944–45 (2d Cir. 1989). Moreover, agency actions are afforded a presumption of regularity. *Espinosa v. Immigration & Customs Enf't*, 181 F. App'x 89, 91 (2d Cir. 2006). A court must uphold agency action so long as the agency has provided "a satisfactory explanation including a rational connection between the facts found and the choice made." *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007). Further, the Court must apply "the same kind of harmless-error rule that courts ordinarily apply in civil cases." *Bechtel v. Admin. Review Bd.,* 710 F.3d 443, 449 (2d Cir. 2013) (citations and quotations omitted); 5 U.S.C. § 706.

Courts give must give even greater deference to administrative decisions made within the military context. *Dibble v. Fenimore*, 545 F.3d 208, 216 (2d. Cir. 2008) ("*Dibble II*"); *Falk*, 870 F.2d at 944–45 (2d Cir. 1989). As the Supreme Court has recognized, judicial deference in the military context "is greater than [in] any other area," *Chappell v. Wallace*, 462 U.S. 296, 301 (1983), because the military is a "separate community" from civilian society, *Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953). Accordingly, courts review military matters under an "unusually deferential application of the 'arbitrary or capricious' standard" of the APA. *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989). Such deference "ensure[s] that the courts do not become a forum for appeals by every soldier dissatisfied with his or her ratings, a result that would destabilize military command and take the judiciary far afield of its area of competence." *Davis v. Harvey*, No. 04-CV-1051, 2006 WL 2794318, at *13 (E.D.N.Y. Sept. 27, 2006).

## ARGUMENT

### A.    The Court Lacks Jurisdiction Over Doolen's Challenges to the Conduct of His Separation Proceedings

This Court lacks jurisdiction to adjudicate Doolen's claims challenging the Secretary's separation decision. *Dibble*, 339 F.3d at 128. As set forth below, challenges to military personnel decisions are generally nonjusticiable. Moreover, the narrow exceptions to this rule require

-17-

exhaustion before a civilian review board, which Doolen has not sought.

### 1.    Military Personnel Decisions are Nonjusticiable

The justiciability of military personnel decisions "is limited by the fundamental and highly salutary principle that: '[J]udges are not given the task of running the Army.'" *Kreis*, 866 F.2d at 1511 (quoting *Orloff*, 345 U.S. at 93-94). Accordingly, "courts will not normally review purely discretionary decisions by military officials which are within their valid jurisdiction." *Jones v. New York State Div. of Military & Naval Affairs*, 166 F.3d 45, 52 (2d Cir. 1999) (quotation marks omitted). The rule of non-justiciability "is based on the common-sense notion that allowing service members to sue their superiors would unacceptably compromise military discipline and readiness for combat." *Id.*

Specifically, the Second Circuit has held that claims for equitable relief based on military personnel decisions are generally nonjusticiable. *Dibble*, 339 F.3d at 127-28. In *Dibble*, a member of the Air National Guard who was honorably discharged brought suit, alleging that he was "unlawfully denied re-enlistment in retaliation for his constitutionally and statutorily protected activities as union steward." *Id.* at 122. The Second Circuit held that Dibble's complaint must be dismissed as nonjusticiable under the intramilitary immunity doctrine. *Id.* at 128.

In so holding, the Second Circuit concluded that the intramilitary immunity doctrine extended to claims for equitable relief in discrete individualized personnel actions. *Id.* at 126. The court distinguished between facial challenges to the constitutionality of statutes or military regulations, which requires only "legal analysis," from challenges that "involve[] a fact-specific inquiry into an area affecting military order and discipline and implicating all the concerns on which [the intramilitary immunity doctrine] are premised." *Id.* at 127(quotation marks omitted). The Second Circuit reasoned that "the availability of injunctive relief from a civilian court would undoubtedly affect military discipline." *Id.* at 128. The court further explained that such suits

-18-

would require "a particularized inquiry into the mindset of [the servicemember's] superior officers, determining whether their various disciplinary actions were motivated by proper military concerns or by the unconstitutional desire to stifle Dibble's protected First Amendment activity." *Id.* at 128.[13] "Especially considering the availability of intramilitary review," the Circuit declined "to insert the federal courts into military decisionmaking in such an intrusive manner." *Id.*

### 2. Doolen's Claims Do Not Fall into the Mandatory Regulation Exception to Nonjusticiability and Are Otherwise Meritless

Although the Second Circuit has recognized a narrow exception to the rule of nonjusticiability "where the military has failed to follow its own mandatory regulations in a manner substantially prejudicing a service member," Doolen cannot avail himself of that exception. *Dibble*, 339 F.3d at 127-28 (citing *Jones*, 166 F.3d at 52). Doolen's claims that USMA staff failed to follow mandatory procedural regulations are, in substance, challenges to his superior officers' discretionary judgments about his fitness for duty. This artful pleading cannot evade the clear import of *Dibble*, and should be rejected.

The "mandatory regulations" exception is narrow. At issue in *Jones*, for example, was a claim that a servicemember was entirely denied the right to a hearing mandated under the relevant regulations. 166 F.3d at 52-53. In such a case, the Second Circuit held that review was available, because such review "does not involve any undue interference with the proper and efficient operation of our military forces because we only require that the [military] carry out the procedures and regulations it created itself." *Jones*, 166 F.3d at 52.

The allegations raised by Doolen are a far cry from the denial of a mandatory hearing.

---

[13] *See also Jones v. 106th Rescue Wing*, 859 F. Supp. 2d 381, 386 (E.D.N.Y. 2012) (dismissing claims based on allegations that military servicemember's supervisor "was motivated by ill will and legally improper motives when transferring plaintiff and denying his requests for promotions" because "[t]he military personnel decisions raise[d] by plaintiff involves precisely the type of individualized questions that are prohibited from judicial review").

Rather, Doolen's claims include a failure by USMA staff to "act with integrity," that USMA staff created the appearance that they lacked "independence or impartiality," or unlawfully signed "false record[s] . . . with the intent to deceive," USMA's purported failure to follow the preponderance of the evidence standard, and the bare allegation of unlawful command influence.[14] SAC pp. 39-40. These claims require precisely the sort of fact-intensive inquiry into the mindsets of military commanders that *Dibble* instructs are not subject to judicial review. To give force to the general rule of nonjusticiability of intramilitary claims, the "regulations" exception cannot be construed to encompass such claims. For example, if a cadet may sue claiming the military's findings did not meet the preponderance of the evidence standard, the entire CI proceeding is effectively open to de novo judicial review. Entertaining these claims would involve the Court in a wide-ranging, open-ended inquiry about why Doolen's military superiors determined he was not fit to serve.

Most of the remaining supposed procedural irregularities Doolen claims either do not involve mandatory regulations at all, or do not involve "substantial prejudice" to him:[15]

- Doolen argues USMA failed initially to produce a transcript of the CI, but later did. *Compare* SAC p. 39 *with* SAC ¶ 57 n.6; *see also id.* ¶¶ 80, 125-131. USMA regulations do not require a verbatim transcript, and instead permit a summary, *see* USCC Reg. 351-1 ¶ 502, which was prepared here, *see* AR 425-430.[16] Nonetheless, at Doolen's request, a verbatim transcript was produced, AR 238-417, and Doolen was given additional time to submit a response to the initial recommendation of separation after receiving a transcript, *see* SAC ¶¶ 125-131. Doolen has not alleged how any of this substantially prejudiced him.

- Doolen also argues that the IO did not include all exhibits from the hearing in the record of proceedings. SAC pp. 39-40. Specifically, he alleges that the IO

---

[14] Doolen's only factual allegations of "undue command influence" relate to the previous separation proceedings and are therefore not relevant to this case. *See* SAC ¶¶ 83-85.

[15] Consistent with the informal nature of CI proceedings as recognized by the Second Circuit in *Andrews*, these alleged errors would be properly disregarded even under the USCC itself, which states that "[p]rocedural errors or irregularities in the hearing normally do not invalidate the proceeding or any action of the Commandant or Superintendent based thereon," and recognizes the Commandant's authority to disregard harmless errors or direct the correction of minor errors. USCC 351-1 ¶ 502(a)(5) (RA 57).

[16] As a point of comparison, a summarized report of proceedings is adequate for courts-martial unless a sentence threshold is met. *See* Rule for Courts-Martial 1103(b)(2)(C) (RA 171).

failed to include in the record two of thirteen favorable witness statements—those of Cadets Majors and Barnes, SAC ¶¶ 105-08. But the IO took these witnesses' oral testimony and included it in the record, *see* AR 426 (Majors), 428 (Barnes), and Doolen himself provided that testimony in his rebuttal presentation, *see* AR109-25 (Majors), AR175-87 (Barnes). Doolen has not alleged how the IO's alleged failure to include the two written statements substantially prejudiced him.[17]

- Similarly, the IO's alleged failure to summarize Cadet Jenkins' testimony, *see* SAC ¶¶ 101-03, *id.* p. 39, could not substantially prejudice Doolen, since he himself received a transcript of Jenkins' remarks, AR358-68, and provided a written summary in his rebuttal presentation, *see* AR127-29.

- Doolen claims that the Commandant failed to provide his rationale in support of separation, in violation of USCC Reg. 351-1 ¶ 502(a)(3). Even assuming this is true, given that Doolen was provided (and had the opportunity to rebut) the IO's initial recommendation, AR 422-24, and both the Superintendent's recommendation and the Deputy Assistant Secretary's decision (with rationales) appear in the record, *see* AR 1-6, Doolen cannot show substantial prejudice.

- Doolen also claims that USMA's failure to commence disciplinary proceedings for the May 2013 alcohol incident prejudiced him. *See* SAC p. 40. The USMA regulations Doolen cites, however, do not provide a mandatory timeframe. *See* USCC Reg. 351-1 ¶ 104 (giving timeframes "normally required" to accomplish certain goals, and stating that "failure to meet any of the established goals does not result in negating a case for undue delay," though emphasizing general importance of timely processing). Moreover, the primary reason for the delay in disciplining Doolen for the May 2013 incident was that he was suspended from the Academy until June of 2014. AR893. The disciplinary proceedings commenced within days of his return. AR432.

- Doolen claims that the IO violated USCC Reg. 351-1 ¶ 115(q) by failing to consolidate "alleged related delinquencies." SAC p. 39. Though the SAC is not clear, this may refer to the fact that the CI was initiated for two alcohol policy violations. But the two violations, which occurred years apart, are not "separate, but factually related, delinquencies arising from the same incident." USCC Reg. 351-1¶ 115(q).

Finally, Doolen also contests the adequacy of the notice of the charges against him. *See* SAC p. 39. Though it is not clear what this refers to, other portions of the second amended complaint claim that Doolen was not notified that the proceedings relating to the May 8, 2013

---

[17] Again, as a comparison, even in a criminal trial, the failure to admit an exhibit into evidence is subject to a harmless error standard on appeal. *See, e.g., United States v. Simpson*, 205 F.3d 1326 (2d Cir. 2000) (unpublished).

incident were in fact an "alcohol board," SAC ¶¶ 42-51. This argument is meritless as well.

While U.S. Corps of Cadets Regulations do not list a specific definition for an "alcohol board," a "board" is discipline under Article 10 of the Cadet Disciplinary Code. *See* USCC Reg. 351-1 ¶ 119; *see, e.g.*, RA81 (referring to Article 10 proceedings as "board action"). And USMA takes alcohol use and abuse very seriously. Under the Academy's General Alcohol Policy, "[a]lcohol related misconduct, (e.g. DWI, DUI, DWUI, underage drinking, serious misbehavior) may be considered for appropriate action under the CDC," or even under the UCMJ. SOP CARD 600(3) (RA 117). And while "serious misconduct" is not defined, the regulation is clear that "[m]isconduct associated with any alcohol-related offense is a serious issue." *Id.*; *see also* Army. Reg. 210-26 ¶ 6-7 (RA106-07) (listing alcohol violations as "Major Misconduct."). Furthermore, "cadets will at no time drink to the point that their judgment is impaired." SOP CARD 602 (RA 120). Accordingly, the Academy has interpreted this policy to define an "Alcohol Board," as Capt. Forlenza explained to Doolen:

> In reference to the characterization of the board, for the purpose of the United States Corps of Cadets, Disciplinary Regulation 351-1, alcohol board, is any proceeding under Article 10 where a Cadet violated a specific rule under the consumption of alcohol, including any offense caused by, as a result of, or occurring after the intoxication of alcohol. So basically, any misconduct that takes place after the consumption of alcohol.

AR 252.

Factually, the record demonstrates that the June 23, 2014 "Brigade Board" was always an "Alcohol Board." Doolen was notified well before the hearing (and before his return to the Academy) that he may be subject to an "alcohol board" to answer for the incident that occurred on May 8, 2013. AR 587. Doolen acknowledged this possibility. AR 607. In addition, the presiding officer, Col. Mauldin understood it was an Alcohol Board. AR 676. To the extent any ambiguity

remains in the regulation, it is well settled that the court must "defer to an agency's interpretation of its own regulation unless the interpretation is plainly erroneous." *Falk*, 870 F.2d at 946.

### 3.    Doolen Must Exhaust Claims that the Army Failed to Follow Regulations

In any event, the Court lacks jurisdiction over any mandatory regulation claim for the independent reason that Doolen has failed to exhaust his administrative remedies.[18] Second Circuit precedent makes clear that exhaustion is a jurisdictional prerequisite to suit in federal district court.

A servicemember who has been separated may seek review of the decision before a civilian review board—here, the Army Board for Correction of Military Records ("ABCMR"). *See Jones*, 166 F.3d at 54-55; 10 U.S.C. § 1552. Civilian review boards allow limited review and correction of military records, and therefore avoid undue interference in military affairs. Judicial review of ABCMR decisions is available under the APA. *See, e.g.*, *Dibble II*, 545 F.3d at 216. But a plaintiff claiming that the military failed to follow its own mandatory regulations must exhaust his ABCMR remedies before coming to federal court. *Jones*, 166 F.3d at 52, 54-55; *see Janniere v. United States Army,* 34 F. Supp. 850, 852 (E.D.N.Y. 1999) ("The exhaustion doctrine . . . is strictly applied in military discharge cases.").[19]

In *Jones*, the Second Circuit held that administrative exhaustion is required for a claim based on the "regulations" exceptions to the nonjusticiability rule. 166 F.3d at 54-55; *see also Guitard v. United States Sec'y of the Navy*, 967 F.2d 737, 740 (2d Cir. 1992) (emphasizing "the particular importance of administrative exhaustion in circumstances implicating military discipline"). In *Jones*, a major in the Army National Guard sought to challenge his removal from

---

[18] A district court in this circuit recently found that a Marine did not have to exhaust administrative remedies before bringing suit to challenge his discharge from the military. *Brezler v. Mills*, 220 F. Supp. 3d 303 (E.D.N.Y. 2016). The United States submits that this was in error.

[19] While there are exceptions to the exhaustion requirement, they are applied narrowly. *Se*e *Guitard*, 967 F.2d at 741. Furthermore, none of them apply here.

service based on the Guard's alleged failure to comply with its regulations. 166 F.3d at 52. The

Second Circuit held that exhaustion of all administrative remedies was a prerequisite to his claim

for injunctive relief under Section 1983. *Id.* at 54. The court acknowledged that in *Patsy v. Board*

*of Regents,* 457 U.S. 496, 516 (1982), the Supreme Court held that "policy considerations alone

cannot justify [a] judicially imposed exhaustion" requirement for section 1983 claims where the

statute imposes no such requirement. But the Second Circuit held that exhaustion was required

notwithstanding *Patsy. Id.* at 54. Requiring exhaustion did not create "an exception to the general

rule that § 1983 does not have an exhaustion requirement," but rather clarified "the contours of the

'regulations' exception to the well established rule" of nonjusticiability. *Id.*; *see also Yarusso v.*

*106 Rescue Wing, New York Air Nat. Guard*, 511 F. App'x 13, 15 (2d Cir. 2013) (exhaustion

required before challenging military decision based on alleged failure to regulations).[20]

Here, to the extent that Doolen seeks to challenge his separation on the basis that the Army

allegedly failed to comply with its own guidelines, Doolen was required to first exhaust

administrative remedies by seeking relief before ABCMR. *Jones*, 166 F.3d at 54-55; 10 U.S.C.

§ 1552. If dissatisfied by a decision by the ABCMR, he may seek judicial review of that decision.

*Guitard*, 967 F.2d at 741. Judicial interference prior to complete administrative review is

particularly inappropriate because the Army's administrative process is both necessary and

competent to determine disputed factual and legal issues. *See Beharry v. Ashcroft*, 329 F.3d 51, 62

(2d Cir. 2003), *as amended* (July 24, 2003). Because Doolen has failed to exhaust his

---

[20] The exhaustion requirement is also consistent with *Feres v. United States*, 340 U.S. 135, 146 (1950). In *Feres*, service members brought claims under the Federal Tort Claims Act ("FTCA"), which provided for an express waiver of sovereign immunity for injuries sustained as a result of Government action. *See id*. The FTCA did not distinguish between military and civilian persons and, instead, expressly provided for judicial involvement in any claims brought under the act. *See Feres*, 340 U.S. at 138-39. But, despite the express grant of judicial involvement, the Supreme Court acknowledged that the adjudication of military claims may implicate serious separation of powers concerns and impair the military in its vital mission to fight and win the nation's wars. *Id*. at 139. The Court therefore declined to extend the FTCA remedies to service members for injuries incident to military service despite the express text of the act. *Id*.

administrative remedies, his claims are nonjusticiable for that additional reason.

## B.    Doolen's Facial Challenges Fail

The second amended complaint also purports to raise facial challenges to the Army's process for separating cadets. These counts fail to state a claim.

### 1.    Due Process Claims Relating to a Hearing

Counts I and II of the SAC purport to raise due process and APA challenges to the regulations governing cadet separation. Doolen claims that the Constitution and the APA demand that, before a cadet may be separated and ordered to repay the cost of his education, he must be given a "fair hearing before impartial decision-makers at the Academy" to determine if he "will be separated or retained," at which he "can personally appear and call witnesses and present other evidence in support of [] retention and defend against being separated." SAC ¶ 151; *see also id.* ¶ 159. He terms this a "Hearing on Separation."[21] Yet Army procedures plainly provide constitutionally sufficient process.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). To evaluate the constitutional adequacy of a given procedure, a court must balance three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." *Id.* at 335.

---

[21] Although the Second Circuit has applied the due process framework to military separation before, *see, e.g.*, *Andrews v. Knowlton*, 509 F.2d 898 (2d Cir. 1975), those cases did not identify the property or liberty interest that triggered procedural due process. Here, because Doolen was required to repay his tuition and assessed a debt, the government assumes for the sake of argument that Doolen has identified a property interest triggering due process. Recent decisions from other courts have recognized, however, that there is no property right to continued military service; thus, separation on its own does not trigger due process. *See, e.g.*, *Spadone v. McHugh*, 842 F. Supp. 2d 295 (D.D.C. 20212); *see also Leicht v. McHugh,* No. 13-60015-CIV, 2013 WL 11971266, at *4 (S.D. Fla. May 24, 2013).

In *Andrews v. Knowlton*, 509 F.2d 898 (2d Cir. 1975), the Second Circuit examined the "flexible" concept of due process in the military separation context and held:

> [B]efore a cadet can properly be dismissed or separated from his service academy, he must have a hearing, be apprised of the specific charges against him, and be given an adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence. A military proceeding conducted within these bounds of procedural due process would be proper and immune from constitutional infirmity.

*Id.* at 904, 905; *accord Lebrun v. England*, 212 F. Supp. 2d 5, 16 (D.D.C. 2002); *Crowley v. United States Merchant Marine Acad.*, 985 F. Supp. 292, 297 (E.D.N.Y. 1997). The "full dress standards" required in other contexts are not required for the separation of a cadet, *Crowley*, 985 F. Supp. at 297 (quoting *Hagopian v. Knowlton*, 470 F.2d 201, 208 (2d Cir. 1972)), since "historically the military has been permitted greater freedom to fashion its disciplinary procedures than the civilian authorities," *Wasson v. Trowbridge*, 382 F.2d 807, 812 (2d Cir. 1967).

The Army's procedures for making a separation and recoupment decision well exceed the minimum standards of due process articulated in *Andrews* and *Hagopian*. To review, the decision to separate a cadet, such as plaintiff, is the result of a conduct investigation, at which the cadet has a plethora of procedural protections. Furthermore, the CI follows Article 10 disciplinary proceedings that themselves include hearings and the right to appeal. USCC Regulation 351-1 provides the cadet will receive notice of the investigation; may prepare a defense, which may be presented orally and in writing; and appear at (or absent himself from) a hearing, at which he may be represented by counsel, and may introduce reasonably available witnesses and present written evidence, cross adverse witnesses, and testify himself. *See generally id.* ¶ 105(a)-(o) (RA12-13). Following this hearing, the IO will make a recommendation as to whether the cadet is proficient or deficient, and if deficient, a recommendation to USMA administration as to the appropriate sanction, of which separation is the most significant. *Id.* ¶ 117 (RA17). If the IO recommends a

finding that the cadet is deficient, the cadet is entitled to submit written evidence about his character and his performance at West Point; this evidence informs the decision of whether he should be separated. *See id.* ¶ 105(l), (m) (RA13); *id.* ¶¶ 111(b), 113(d)-(e) (RA 13-14); *see also id.* Fig. 2-6, ¶ 4 (RA 33).[22]

Thus, the relevant regulations provide precisely the type of process that Doolen claims is required. To the extent that Doolen is arguing that a second full hearing is required in addition to the CI, on the specific issue of separation, there is no authority for the proposition the due process requires multiple live hearings. *Andrews*, 509 F.2d at 905.

Finally, a cadet who is separated and ordered to repay the costs of his tuition may still seek review of that decision with the civilian review board.[23] In this post-deprivation proceeding, the board may order an evidentiary hearing and take new evidence or request new opinions. *See* 32 C.F.R. § 581.3 ("The ABCMR may, in its discretion, hold a hearing . . . or request additional evidence or opinions."). The availability of further post-deprivation procedures, including conceivably the ability to provide live testimony, defeats any due process claim. *See Mathews*, 424 U.S. at 349 (absence of pre-deprivation oral testimony did not violate due process in part because post-deprivation procedures permitted live testimony and judicial review). That the Board has discretion whether to take evidence does not violate due process. *See Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 247-48 (1988).

### 2.    Due Process Claims Relating to Supposed Conflicts of Interest

---

[22] Doolen made a 180-page written submission in support of his retention as a cadet. AR 29-225. Furthermore, although live character testimony is not generally permitted, Doolen was allowed to introduce live character testimony from a number of witnesses during his CI hearing. *See, e.g.*, AR 57-58, 60-65, 69-70, 72-77, 81-83, 85-108.

[23] *See, e.g.*, *Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 159 (D.D.C. 2011); *Buckingham v. Mabus*, 772 F. Supp. 2d 295, 301 (D.D.C. 2011).

In Counts III and IV of the SAC, Doolen also claims that the Army's separation procedures are tainted by conflicts of interest, but this argument is meritless. In the Army's system, a single individual—the Investigating Officer, or IO—first investigates a cadet's conduct, then holds a hearing at which he may introduce and weigh evidence, and ultimately makes a recommendation as to whether a cadet should be found deficient in conduct (and if so, whether to be separated). *See* USCC Reg. 351-1 ¶ 103 (RA11); *id*. ¶¶ 115-17 (RA15-17). Doolen argues that having the same person in these roles violates due process. Additionally, the IO may consult with the Staff Judge Advocate or the Regulations and Discipline Officer during the investigation. *See, e.g.*, USCC Reg. 351-1 ¶ 115(b)(3). Doolen claims this too violates due process, since the Regulations and Discipline Officer plays a role in initiating and administering conduct investigations.[24]

Yet the fact that individuals both investigate and adjudicate a claim does not suggest bias, since government personnel are "presume[ed]" to carry out their duties with "honesty and integrity." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). For example, the Supreme Court held a single administrative judge may both develop facts relating to an individual's disability claim, and also adjudicate that claim. *Richardson v. Perales*, 402 U.S. 389, 408-09 (1971).

Thus, even if the IO were solely responsible for investigating and adjudicating a conduct investigation, that would not violate due process. But here, the IO does not make a final decision—instead, he makes a recommendation, which is then reviewed and must be rejected or adopted by a chain of superior officers. *See* USCC Reg. 351-1 ¶ 118 (further review of IO recommendation by Commandant, Superintendent, and ultimately, the Secretary). If the IO recommends separation, the affected cadet has the right to review the finding and to submit rebuttal material to the decision

---

[24] Contrary to Doolen's suggestion, the Regulations and Discipline Officer does not commence a CI himself. Rather, the Regulations and Discipline Officer will initiate a CI only when "both the Company and Regimental Tactical Officers have recommended referral to a CI." USCC Reg. 351-1 ¶ 201(e).

-28-

authority. *See id.* ¶ 105(l), (m) (RA13). The Commandant will not make a further recommendation to the Superintendent without first reviewing "the CI findings and other 'whole person' information regarding the cadet." *Id*. ¶ 118(a)(1). Because the IO's findings are not themselves dispositive, due process concerns are further mitigated. *See, e.g.*, *Spitalieri v. New York City Transit Auth.*, No. 94 Civ. 3305 (LAP), 1996 WL 254980, at *8 (S.D.N.Y. May 14, 1996).

Furthermore, the Second Circuit has expressly held that a hearing for a military cadet's expulsion "'may be procedurally informal and need not be adversarial.'" *Hagopian,* 470 F.2d at 211 (quoting *Wasson*, 382 F.2d at 812). Following this rule, West Point's regulations confirm that the CI process is "informal and nonadversarial in nature." USCC Reg. 351-1 ¶ 101. The CI is not a prosecutor, but instead seeks to find facts and make a recommendation. *Id*. This informal arrangement fits squarely within Second Circuit law.

Finally, the availability of further post-deprivation process defeats any due process claim. The civilian review board is entirely separate from the Army, and a party may also seek further judicial review of ABCMR decisions. The availability of independent administrative post-deprivation review and further judicial review defeats any claim of bias. *See, e.g.*, *Locurto v. Safir*, 264 F.3d 154, 175 (2d Cir. 2001) (holding that availability of state Article 78 proceeding to challenge removal from public employment eliminated due process challenge to facially adequate pre-deprivation procedures that did not provide a pre-deprivation neutral adjudicator); *see also Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 466-68 (2d Cir. 2006) (similar).

## C.    The Army's Separation Decision Is Supported by the Record

Finally, to the extent any doubt remains, substantial evidence supported the Secretary's decision to separate Doolen and order recoupment.

First, the decision to separate Doolen under Army Regulation 210-26 ¶ 6-17 for conduct deficiency is supported by the record. *See* AR 1. Despite years of military officer training, Doolen

accumulated two alcohol offenses at USMA, which triggered a mandatory conduct investigation. One of Doolen's offenses occurred when he was "clearly intoxicated," AR 496, and "without authorization, entered a barracks room known by [Doolen] to be occupied by female cadets and thereafter became engaged in a verbal and physical altercation with one of the female cadets and attempted to physically prevent her from existing her room." AR 432. After a thorough investigation, the Investigating Officer found Doolen deficient in conduct. Lt. Gen. Caslen approved the finding after his "review of the entire case file." *See* AR 6. In addition, Lt. Gen. Caslen noted that while his recommendation to separate Doolen was not based on Doolen's August 10, 2013, arrest for driving while intoxicated, Doolen's failure to disclose the arrest to his chain of command were considerations in the recommendation to separate. AR 3.

Second, the decision that Doolen is unsuited for military service pursuant to Army Reg. 612-205, table 3, rule 7, note 3, is also supported by the record. *See* AR 1. Under this regulation, "if the separation authority determines that the cadet is being separated from the Academy because of demonstrated unsuitability unfitness, or physical disqualification from military service, the cadet will be discharged from the Army." *Id.* (RA 113). Here, for the same reasons Doolen was separated from the Academy, it follows he is unsuited for military service.

Finally, the Academy's recoupment calculation is not arbitrary, capricious, an abuse of discretion, or contrary to law. To the contrary, the calculation is based off a methodical Standard Operating Procedure and Cost of Educational report which details the methodology for the amount of the debt, in addition to the annual Cost of Education Report. *See* RA 143-151, 128-167.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant the government's motion.

Dated: January 26, 2018
        New York, New York

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:     */s/ Peter Aronoff*
        PETER ARONOFF
        Assistant United States Attorney
        Telephone: (212) 637-2697
        Facsimile: (212) 637-2717
        E-mail: peter.aronoff@usdoj.gov