

000206

# BURRELL BEH...IORAL HEALTH
## KINGSLEY CLINIC

## PSYCHOLOGICAL EVALUATION

| | |
|---|---|
| Client Name: | ISIAH DOOLEN |
| Client DOB: | June 1, 1988 |
| Date of Evaluation: | November 28, 2014 |
| Date of Report: | December 13, 2014 |

## IDENTIFICATION AND REFERRAL

Isiah Doolen is a twenty-six year old, Caucasian male, self-referred for a psychological evaluation because "I was returned back to the Academy, I was ordered back by the Assistant Secretary of the Army. I was told that I would have to go back and complete one summer assignment and one cadet field training called Camp Buckner. Halfway through the process, I was notified that I would receive a Brigade Level Board. It was from May 13 which was an issue from an argument I had with my girlfriend; I had consumed alcohol that night...I had all my privileges so I was allowed to go down there...It said that you were believed to engage in a physical and verbal altercation while intoxicated... " The purpose of this evaluation was to determine if Mr. Doolen was fit to remain in the United States Military Academy and be allowed to graduate. In addition, I was asked to determine if Mr. Doolen is a danger to those around him, and if he has made the necessary changes since my last evaluation. There were also concerns that Mr. Doolen is "a danger to everyone around me. He (investigating officer) also believes that I am disingenuous and have not changed at all."

According to a memorandum dated August 30, 2014, authored by CPT Nicholas R. Forlenza, it was recommended Mr. Doolen be dismissed from the United States Military Academy because "The CI investigated Cadet Doolen's pattern of behavior and finds him deficient in conduct."

Mr. Doolen was informed about the purpose of the evaluation and the limits of confidentiality. He was specifically told that the information he shared with me and any information I learned about him would be included in this report, and a copy of the report would be shared with his attorney and any other individuals potentially involved in the decision to allow him to remain in the United States Military Academy.

1350 E. BRADFORD PARKWAY • SPRINGFIELD, MISSOURI 65804 • 417/761-5850 • TDD 417/761-5002 • FAX 417/761-5851
An Equal Opportunity Employer / Services provided on a nondiscriminatory basis.

Psychological Rept    Page 2
DOOLEN, Isiah
December 13, 2014

## SOURCES OF DATA

The following corroborating sources were reviewed:

**The following documents were reviewed during my February 21, 2014, evaluation:**

1. A copy of the memorandum dated March 25, 2013, referencing the investigation of Mr. Doolen including the Summarized Report of Proceedings
2. Character reference memorandums dated February 2013
3. A copy of the allegations made by Isiah Doolen, including supporting documents (50 pages)
4. Explanation of circumstances that led to Mr. Doolen's separation from West Point (63 pages)
5. Chronological records of medical care authored by Joshua Hain, M.D.
6. Memorandum authored by Elizabeth S. Eaton-Ferenzi, CPT, AV, Tactical Officer, B1, USCC, dated April 1, 2013, Recommendations for Final Disposition on Conduct Investigation for Cadet Isiah M. Doolen
7. A copy of a letter dated May 3, 2013, authored by Eric L. Mayer
8. A copy of the memorandum that outlines expectations of Cadets with respect to academics
9. Copies of Developmental Counseling Forms
10. Copies of evaluations of Cadet Isiah Doolen, dated February and March 2013
11. Major Carignan's typed written notes from his interview of LTC Jeffrey Cunningham, CDT Lauren Helliger, CDT Ashli Carlson, and Mr. and Mrs. Carl and Connie Doolen
12. A copy of the Legal Review of Conduct Investigation dated March 29, 2012, authored by Anthony O. Pottinger, CPT, JA
13. Mr. Doolen's Rebuttal to Separation from the United States Military Academy
14. A copy of the Adult Psychosocial History form completed by Mr. Doolen on January 22, 2014
15. Results of the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) administered on January 22, 2014
16. Results of the Personality Assessment Inventory (PAI) administered on January 22, 2014

**The following documents were reviewed during the present evaluation:**

17. Email correspondences between Isiah Doolen and myself

Psychological Rep.      Page 3
DOOLEN, Isiah
December 13, 2014

18. Email correspondences between Mr. Doolen's attorney, Edward Williams and myself
19. A copy of the transcript of the investigation on August 15, 2014
20. A copy of the Greenbook
21. A copy of a memorandum dated March 31, 2014, regarding the Greenbook
22. The statement of Cadet N▮▮▮ D▮▮▮ dated May 8, 2013
23. The statement of Cadet Austin Hunt (undated)
24. A timeline provided by Mr. Doolen from September 11, 2012, to the present
25. A copy of Mr. Doolen's current grades
26. A copy of the Disciplinary action NO 186 dated June 23, 2014
27. Copies of text messages allegedly from Cadet N▮▮▮ D▮▮▮
28. Numerous records provided by Mr. Doolen documenting his history with the Academy
29. A copy of a memorandum dated July 16, 2014, authored by Daniel Lorenzen, Instructor/Director of Combatives
30. A copy of a memorandum dated February 22, 2013, and July 16, 2014, authored by Thomas Sherlock, Ph.D.
31. A copy of a memorandum dated July 10, 2014, authored by Katrina Stamp

**The following documents were provided by Mr. Edward Williams, Mr. Doolen's attorney:**

32. A copy of a memorandum dated October 9, 2014, authored by Delroy A. Patrick and Mr. Doolen's response to this memorandum
33. A copy of a memorandum dated September 14, 2014, authored by Kevin McAninch
34. A copy of a memorandum dated September 11, 2014, authored by P.J. Snyder
35. A copy of a memorandum dated September 11, 2014, authored by Eric J. Lawless
36. A copy of a memorandum dated September 11, 2014, documenting the legal review of the Conduct Investigation of Cadet Isiah Doolen
37. A copy of a memorandum dated August 30, 2014, documenting the transmittal of the conduct investigation
38. The summarized report of proceedings
39. A copy of a memorandum dated August 21, 2014, authored by Mike Ziegelhofer
40. A copy of a memorandum dated August 19, 2014, authored by Theodore S. Lipsky

Psychological Rep      Page 4
DOOLEN, Isiah
December 13, 2014

41. A copy of a memorandum dated August 19, 2014, authored by Joseph Mr. Frullaney
42. A copy of a memorandum dated August 20, 2014, authored by John L. Beck
43. A copy of a memorandum dated August 19, 2014, authored by Jason David
44. A copy of a memorandum dated August 19, 2014, authored by Gunnar W. Miller
45. A copy of a memorandum dated August 19, 2014, authored by Elliot D.C. Chal
46. A copy of a memorandum dated August 19, 2014, authored by Christian E. Mapes
47. A copy of a memorandum dated August 19, 2014, authored by Alfred L. Mcquirter Jr.
48. A copy of a memorandum dated August 19, 2014, authored by Andrew N. Fargo
49. A copy of a memorandum dated August 19, 2014, authored by Bertrand H. DeForest
50. Copies of evaluations of Cadet Isiah Doolen including two dated July 14 and 16, 2014
51. Several emails sent by Isiah Doolen
52. An email to Edward Williams, Mr. Doolen's attorney, dated May 5, 2014, authored by Keith Well
53. Numerous other documents referencing the issue

**BACKGROUND INFORMATION**

The following information was obtained from an interview with Mr. Doolen on February 21, 2014.  As noted, Mr. Doolen provided several corroborating documents to confirm some of the information he provided.  I interviewed Mr. Doolen again on November 28, 2014.  During this interview, Mr. Doolen and I reviewed the background information included in the February 2014 report, and I provided him an opportunity to correct any discrepancies.  The following is based on Mr. Doolen's report in February and November 2014.   He was considered a reliable historian.

*Childhood History*

Mr. Doolen was born on ▉Redacted PII▉ 1988, in ▉Redacted PII▉ New Mexico.  He is the only child born to Carl and Connie Doolen.  He has two older half-brothers.  His parents remained married and reside in ▉Redacted PII▉ Missouri.  When asked his father's occupation, Mr. Doolen said, "He's retired, but he was in construction."

Psychological Rep.     Page 5
DOOLEN, Isiah
December 13, 2014

His mother is also retired.  Prior to her retirement, she was an administrator for social security.  He described a good relationship with both parents.

When asked to describe his childhood he stated, "It was good.  No issues.  My parents always cared about me."  During his childhood, his household included his parents and his middle brother.  His family frequently moved to accommodate his mother's employment.  He added, "She worked for them (social security) for forty years and was often promoted.  We moved when she got a promotion."  He spent his adolescence and most of his adulthood in Chillicothe, Ohio.  Four months ago, his family moved to [Redacted PII] Missouri.  He denied any physical or sexual abuse during his childhood.  Collateral sources noted that his father had anger issues, but Mr. Doolen never shared this with me.

### Educational History

In regard to education, Mr. Doolen graduated from high school in 2006.  He maintained a "B" average while attending high school.  He was enrolled in a few advanced placement classes.  Throughout school, he ran cross country and track.  During his senior year, his family moved to [Redacted PII] New Mexico, and he enrolled in the New Mexico Military Institute.  He completed his senior year of high school at the Institute and two years of college.  Mr. Doolen described easily establishing friendships during school and stated, "I had a lot of friends."

In 2008, Mr. Doolen graduated from the New Mexico Military Institute with an Associates Degree.  Following, in 2009, he enrolled in the United States Military Academy, West Point.  He attended four years at this school, but was prematurely separated from the school two weeks shy of graduation.  Regarding this incident he said, "I exceeded my demerit amount by 18 demerits.  Thus, a conduct investigation was started, and they found that I was deficit in conduct based on the results of the investigation and the conduct hearing that was held."  Consequently, he was dismissed from the school on May 17, 2013.

### Relationship issues

During the November 2014 interview Mr. Doolen informed me that he was in a relationship; he began dating M[Redacted PII] in May 2014.  It is noteworthy that she is not in the military academy. As noted, Mr. Doolen has never been married.  He does not have any children.

Mr. Doolen confirmed that he has been in two long term relationships; he dated someone for five years.  He ended this relationship because "I met another cadet, and we started dating.  I definitely had a lot of problems with that

Psychological Rep.    Page 6
DOOLEN, Isiah
December 13, 2014

relationship (referencing the cadet)." He elaborated that they frequently fought. He added, "She would get really mad if I made friends with someone. That's why we broke up, she got mad because I added someone to my Facebook. She sent me some really mean text messages over spring break leave. She threatened to turn me in for an honor offense…She made a lot of threats against me, and this was while we were still together. I have text messages that are awful. I saved them."

### Employment History

Mr. Doolen has never held formal employment. His parents have financially supported him through all of his schooling. He was awarded a scholarship and stipend at New Mexico Military Institute. He also received a stipend at the United States Military Academy. Since his dismissal from the United States Military Academy, he has spent free time attempting to get reinstated in the Academy. He is determined to return to the United States Military Academy and complete his education.

### Substance Abuse History

Regarding use of illicit substances, Mr. Doolen denied ever using any illicit substances. He candidly said that he has consumed alcohol and added, "I don't drink anymore. I just don't want to drink anymore." He has never used tobacco products.

During the November 2014 interview, Mr. Doolen informed me that he has not consumed alcohol since October 2013. He also stated, "I will never consume alcohol again, and it's an adamant stance on that. I know that the use of the term never is an absolute statement but I feel I can use that term because I will never consume alcohol again." I queried Mr. Doolen about making such a strong statement and he said, "I'm taking a strong stance because of one the trouble that can ensue regardless of the amount of alcohol consumed. Two, family history. My parents don't drink but both grandfathers were alcoholics, and I don't want to have any issues with that. Lastly, I don't have to drink to have a good time. I think that some people think you have to drink to have a good time, and I don't. Personally, I don't have to drink to have a good time."

### Mental Health History

In 2010, Mr. Doolen was diagnosed with attention deficit disorder without hyperactivity. He was prescribed Strattera. This medication was not helpful, and it was changed to Concerta. Because he could not tolerate the Concerta, it was

Psychological Rep.      Page 7
DOOLEN, Isiah
December 13, 2014

changed to Adderall XR.  Initially, he was prescribed 5 mg of Adderall twice a day, and that was changed to 10 mg twice a day.  He continues to take 10 mg of Adderall twice a day.

In May 2013, Mr. Doolen began experiencing anxiety and panic attacks.  He was also having "really bad nightmares."  He sought treatment from his general physician, and was prescribed Xanax for his anxiety and temazepam for sleep difficulties.  The temazepam was discontinued because he was allergic to it.  The Xanax was changed to Xanax XR.  However, the Xanax XR was changed to Xanax in April 2014.  Currently, he is taking 1 mg of Xanax three times a day.  He also began individual therapy; he saw two different therapists to address his anxiety.  He stopped attending individual therapy in June 2014 because "I went to summer training and then returned to school.  I decided to stop attending because of the stigma associated with attending therapy."  He maintains that his anxiety is related to his current experiences at the Academy, and the decision to separate him from the Academy.  He also noted that his anxiety has lessened because "I think it's less stressful at school rather than being at home…I'm back in school, and I feel I am meeting all of their expectations and then some…"

During the November 2014 interview, Mr. Doolen informed me that he no longer takes the temazepam for sleep.  He added, "I don't take anything for sleep anymore" and he indicated he experiences no difficulty sleeping.

## INFORMATION FROM COLLATERAL SOURCES

**Given that the current concerns stem from the May 2013 incident, I felt it was imperative to include information from collateral sources from my February 2014 report.  As noted, following the November 2014 report, Mr. Doolen was allowed to return the Academy.**

Available for my review was a memorandum dated March 25, 2013, prepared by Timothy R. Carignan, MAJ MI, DPE Instructor.  Based on his investigation, Major Carignan recommended suspended separation through a delayed graduation (December 2013).  He also recommended that Mr. Doolen attend anger and emotional management training, be assigned a military position (PL) to "showcase his improvements), and provide robust, directed mentorship opportunities."  The reader is referred to the Summarized Report of Proceedings for a full account of Major Carignan's investigation.  I have highlighted some areas of interest from this report.  Major Carignan interviewed Mr. Doolen's mother.  He noted that she said "…her son would always be the one to defend the underdog regardless of the consequences, and that he would always jump in to the defense of the weaker."  Major Carigan interpreted this comment as "The

Psychological Rep.      Page 8
DOOLEN, Isiah
December 13, 2014

more I learn of CDT Doolen, the more I feel this statement fits him to a
tee...making emotionally-driven decisions 'regardless of the consequences' and
'jumping in' to his own peril." Major Carignan also noted that three of Mr.
Doolen's references "provided testimony that did his character more harm than
good."

According to the memorandum authored by Elizabeth S. Eaton-Ferenzi, CPT,
AV, Tactical Officer, B1, USCC, dated April 1, 2013, she recommended Mr.
Doolen be separated from the United States Military Academy and discharged
from the Army with recoupment.   Captain Eaton-Ferenzi described Mr. Doolen
as "selfish, impulsive, and devoid of accountability and personal responsibility.
He consistently demonstrates a lack of desire to follow basic instructions or take
ownership of his actions."  She added that Mr. Doolen reacts to discipline with
"apathy, at a minimum, often blaming his immediate peers and supervisors for
holding him accountable to accepted standards.  His accusations are often
interlaced with deceptive personal agendas and attacks rather than valid claims."
Captain Eaton-Ferenzi voiced concerns about Mr. Doolen's anger management,
poor decision making skills, and impulsive behavior.  She also noted that Mr.
Doolen had ample opportunities to address these issues through counseling but
was "unreceptive."  She added, "The aforementioned issues have stunted Cadet
Doolen's ability to learn, grow, and mature as a cadet and future officer.  I firmly
believe that Cadet Doolen lacks the fundamental makings of a professional and
competent officer."  She indicated that during the period from November 2012 to
February 2013, Mr. Doolen committed "more than one major error in judgment,"
yet she did not list these errors.  She also commented that because of these
errors, Mr. Doolen is not prepared to be a commissioned officer and allowing him
to become one and "lead Soldiers in combat would be a dereliction of duty that
would surely endanger the lives of those he would be responsible for."

CDT Edwin Lee said this about one of the incidents in question "I personally
observed the incidence which result him a battalion board during the 1st
semester. From my perspective, his argument with BN CSM was not a respect
issue.  He attempted to defend my classmates who tried to inform BN CSM why
our company fall out and returned to the barrack for company activity.  BN
CSM's response on my classmate was negative that my classmate was
defenseless because of CSM's position and authority.  CDT Doolen approached
professionally, but his approach provoked BN CSM to put him in trouble."

I reviewed several character references provided by Mr. Doolen.  These
references used descriptors such as "he (Mr. Doolen) generally exhibited the
respect due to the officers and other cadets involved in our training...I have
never seen any behavior or attitudes that would lead me to question Cadet

Psychological Rep.      Page 9
DOOLEN, Isiah
December 13, 2014

Doolen's ability to lead soldiers in the Army...His leadership ability was very noticeable during class exercises.  He has been decisive when he needed to be and supportive of his classmates when they were in charge...I believe that despite CDT Doolen's previous errors in judgment, he will make a good professional officer.  He has learned from his mistakes and will be able to use the lessons learned in the future, whether for himself or his soldiers...Cadet Doolen's critical thinking skills and logical thought combined with motivation produce significant developmental results.  Cadet Doolen will be a good Army officer, and has demonstrated this potential by displaying his leadership abilities inside and outside the classroom...I believe CDT Doolen is ready to lead this nation's most precious resource today...Cadet Doolen is fully aware of his own shortcomings, and he has committed himself to developing his character and proving that he can become a fine officer once he graduates."

Medical records from the United States Army indicated that Mr. Doolen was diagnosed with attention deficit disorder (ADD) by Joshua Hain, M.D.  Prior to this, he had no psychiatric history.  He initially presented to the clinic because of difficulty concentrating and irritability.  He was prescribed three medications for the ADD but responded most favorably to Adderall.  Once stabilized on the Adderall, he reported feeling significantly better.  He was more focused, less irritable, and improved overall general mood.  Interestingly, medical records noted he was not impulsive and described him as "motivated, intelligent, and dedicated to self-improvement."

In response to the allegations, Mr. Doolen provided two documents which he provided for my review.  The first document was a response to the allegations made against him.  This document spans 63 pages.  For the sake of brevity, I am not going to provide a synopsis of this entire document.  However, I encourage the reader of my report to review this document.  It provides several pieces of supporting evidence prepared by Mr. Doolen to demonstrate he was wrongly separated from the United States Military Academy.  The second document references his concern about "an abuse of authority and discretion, retaliation, and reprisal by my CTO, CPT Eaton-Ferenzi; my company tactical NCO SFC Rowley; and my regimental tactical officer, LTC Cross."  Again, for the sake of brevity, I will not provide a synopsis of this information.  In this 50 page document, Mr. Doolen supports his allegations with various documentation.

Available for my review were copies of Developmental Counseling Forms.  Based on my review of these documents, Mr. Doolen was referred for developmental counseling.  Each session addressed a separate issue.  An example of an issue addressed was to delineate what the term flagged means or what privileges you may or may not lose as a result of being flagged.

Psychological Rep    Page 10
DOOLEN, Isiah
December 13, 2014

In February and March 2013, Mr. Doolen was evaluated by his supervisors and instructors. For the most part, these individuals positively rated Mr. Doolen. A few offered negative comments. Below is a brief summary of some of those evaluations. Mr. Doolen's evaluation completed by Josiah T. Grover MAJ indicated that Mr. Doolen was performing adequately in every area he was assessed. In response to potential, Major Grover stated, "I have seen nothing to suggest that CDT Doolen would not serve with distinction in the Army and consequently would raise no objection to having him serve in my battalion." He was also evaluated by Thomas Sherlock, Ph.D., and the results were the same. Regarding potential, Dr. Sherlock stated, "CDT Doolen has significant potential which often remains latent. He must consistently apply himself to reach his potential. For example, he must engage in substantive classroom discussions more frequently that (sic) is now the case." Daniel Lorenzen also rated Mr. Doolen as average. He stated, "CDT Doolen is simply another student in my class. He's neither stellar nor a problem...he may not follow instructions all that well." Dr. Chaco rated Mr. Doolen as "has not demonstrated an impressive performance thus far..." Regarding performance, she indicated that he was last in her class. Her evaluation included a few negative comments about Mr. Doolen. Regarding potential she said, "...Cadet Doolen has not shown me evidence of potential for service as an exemplary officer. My observations of both his academics and leadership performance as a trip CIC do not offer grounds for many positive comments. Based on this, I would hesitate to see him as a lieutenant in my battalion." However, she added that she had only observed Mr. Doolen for six weeks. Lt Col John Hagen, Ph.D., described Mr. Doolen as "...I find him to be an average cadet who has the potential for solid service as an officer in the Army. He has not stood out in my assessments as being exemplary or as being significantly deficient in the characteristics of an officer. I would not have a problem with him serving as a lieutenant in my squadron or group but I would not be actively seeking him out to serve me." On March 12, 2013, Lt Col John Hagan sent an email to MAJ Carignan indicating that Mr. Doolen was late turning in an assignment for his class and was at risk of failing his class. He also noted that he had contacted Mr. Doolen, and Mr. Doolen assured him that he would turn in the assignment that day. There is no follow up indicating if Mr. Doolen ever completed the assignment. Major Ruth Mower provided an evaluation of Mr. Doolen dated March 18, 2013. Overall, her evaluation was very complimentary of Mr. Doolen and she said, "...he has unlimited potential...I absolutely would be glad to have him as one of my subordinates on day...That being said, I understand he is young and young cadets can and do make mistakes...Hopefully, if Isiah is found to be in the wrong he can (and I believe will) learn from his mistake and will become a better, future officer for it."

Psychological Rep      Page 11
DOOLEN, Isiah
December 13, 2014

**The following was reviewed for the November 2014 evaluation.**

According to an email directed to Edward Williams, Mr. Doolen's attorney, dated May 5, 2014, authored by Keith Well, the United States Military Academy was directed to bring back Cadet Isiah Doolen because "the investigating officer questioned the Tactical Team outside the presence of CDT Doolen. It is likely that some variation of a separation action will be initiated upon his return."

According to information provided by Mr. Doolen, in August 2014, Mr. Doolen returned to school and enrolled in five classes. Although only one class was required for his degree, he is required to register for minimally 15 hours; thus he enrolled in five classes. At the writing of this report, Mr. Doolen's grades are as follows: Special Operations and Low Intensity Conflict-B, Policy, Generalship, and Strategy-C+, International Law-A-, Military Development-A, American Presidency-B+, and Political Anthropology-B. To reiterate, Mr. Doolen was only required to complete the Political Anthropology class for his anticipated graduation date of December 2014.

I reviewed several memorandums discussing Mr. Doolen's performance. Dr. Sherlock noted that although Mr. Doolen received a B in his class, his performance was described as below average compared to his classmates; his rank was 13th of 16 students. Mr. Lorenzen described Mr. Doolen as below average in PE360. He earned an F on the pop quiz, C+ on the midterm, and a C- on the final examination. He also noted "His ability to compete against his peers in hand to hand combat was in the bottom 12% of the 636 Cadets..." However, he also noted that Mr. Doolen "worked diligently with his peers..." He added, "Based on my experience...I have reservations about CDT Doolen." Mr. Lorenzen based these reservations on the fact that he suggested Mr. Doolen drop the class, and Mr. Doolen did not heed to his recommendations and instead completed the class and "having to resort to daily COR's to get him to do his duty, his underwhelming performance when he did take the class, his track record of having C's out of seven Physical Education classes and his 18 month's worth of medical excusals coinciding with this IOCT test dates."

According to Dr. Tania Chacho, Mr. Doolen's performance in the SS486 capstone course for his major was not impressive ranking last out of 13 cadets in this class. In addition, "his performance as the CIC during a class trip was below standard." It was also noted "...Cadet Doolen has not shown me evidence of potential for service as an exemplary officer. My observations of his academics, classroom participation, and leadership performance as a trip CIC do not offer grounds for many positive comments. Based on this, I would hesitate to see him as a lieutenant in my battalion..."

Psychological Rep      Page 12
DOOLEN, Isiah
December 13, 2014

A memorandum from MAJ AR Mike Ziegelhofer dated August 21, 2014, noted the following: "CDT Doolen was a great platoon leader at Cadet Field Training. He was very clearly one of the top two best in our company, and stood out amongst the rest of his peers at Camp Buckner. He earned words like this from me, all while operating under tremendous pressure and angst. I could tell he was struggling with these feelings (brought on by his questionable standing with West Point) only when we spoke one on one. He selflessly put those emotions and troubles to the side to the benefit of his platoon at all other times." Mr. Ziegelhofer went on to say that Mr. Doolen earned the trust of his peers, superiors, and subordinates. Last, he said "An assessment based solely on his performance this summer would suggest that CDT Doolen has incredible potential to be a great officer – the kind of officer I would be proud to serve with."

In memorandums dated August 19, 2014, the following were noted:  CDT Sergeant Joseph Frullaney stated, "Cadet Doolen has an incredibly bright future in the Army. His leadership style is one that I aspire to have. On of a hardworking, respectful, knowledgeable, and understanding leader."
CDT Sergeant Theodore Lipsky stated "...I must conclude with full confidence that CDT Doolen is worthy of being an officer in the U.S. Army. His humility, empathy, technical expertise, resilience and physical fitness combine such that if given the chance, CDT Doolen will no doubt succeed as an Army officer. He will not only succeed tactically, but he will succeed as a leader of men and women, deserving of his commander's confidence and his subordinates' trust. He may have an imperfect history, and imperfect self control, but I know of few people more dedicated to improving and redeeming themselves..."    CDT Captain Elliot D.C. Chai stated, "CDT Doolen had to overcome a great deal during the time I spent with him. He showed that he is resilient and a hard working individual. CDT Doolen has a great deal of potential and will be a proficient leader for the Army. His calm demeanor, willingness to learn, and hard work ethic will allow him to inspire soldiers." CDT Sergeant Mapes noted, "If the Army misses the opportunity of retaining Cadet Doolen as a cadet and potentially as an officer, then the army will be missing out on a good man. CDT Doolen is a leader that his honorable, caring, approachable, and compassionate. From my experience with CDT Doolen, I have no reason to believe that he will be anything but beneficial to the Army." CDT Sergeant McQuirter echoed similar comments noting "One event that demonstrates CDT DOOLEN's character is when he went above and beyond what was required of him during individual squad missions...His composure, the way he approaches situations and the way he communicates with others is extremely effective and inspires in me nothing but the desire to follow him. As a future officer, CDT DOOLEN would do the same with his subordinates." CDT Corporal Fargo said, "His probable contribution to

Psychological Rep.   - Page 13
DOOLEN, Isiah
December 13, 2014

the Army as an officer is immeasurable and I whole heartedly believe that I couldn't think of a better character to become a Second Lieutenant in the U.S. Army. Cadet Doolen is a remarkable leader who's ability to contribute limitlessly to the Corps and the Army is only limited by the opportunities provided by him." CDT Sergeant Bertrand H. DeForest stated, "After my experience with Cadet Doolen, I see him as a person who holds the utmost respect for the Army and displays a high level of leadership potential. In regard to the board, Cadet Doolen has handled himself better and stayed more professional than any other cadet I have seen facing disciplinary board during my brief time at USMA."

## BEHAVIORAL OBSERVATIONS

Mr. Doolen presented as a neatly dressed, polite, Caucasian male. His parents drove him to the appointment, and they waited for him in the parking lot. He arrived 20 minutes early for his appointment.

Mr. Doolen appeared his stated age of 26. Throughout my interview with him, he appeared calm. He was very polite. There was no evidence of anxiety or depression. He easily and comfortably answered questions posed to him.

Facial expressions were normal. For the most part, he maintained a serious demeanor. As noted, his mood was normal and affect congruent to his mood. He established good eye contact. His speech was organized and goal directed. He appropriately elaborated on most responses. Intelligence was judged to be average based on his use of vocabulary and responses to questions. Thoughts were logical and organized.

When asked to describe his sleep Mr. Doolen said, "I sleep much better than before." Regarding his appetite he said, "No problems, I eat fine." He denied past and current suicidal thoughts. He also denied any homicidal thoughts.

## INCIDENT

Regarding the incident that led to the initial decision to separate Mr. Doolen from the Academy he said, "The 19th of January went by. I was the duty officer so I had to go by and check the rooms and make sure everyone was in their room. I was in charge of taps. It's when everybody, essentially had to be in their room, and they weren't allowed to leave until 5 am. I was in my dress uniform. It's important to know that because I had my dress gray uniform on, and the top portion zips, and underneath are suspenders and a white t shirt. I went to talk to my girlfriend. I was mad at my classmates for going down there after they had been drinking. One of them was essentially telling her that she shouldn't be with

me. He liked her, and he was intoxicated when he was telling her this. His friend was also there, and I thought he was out of line. I was going down there to tell him I thought he was out of line. I was preparing for an altercation so I took my dress gray top off. Before that happened, my girlfriend, N████ said, I don't think it's a good idea for you to go down there. She went and got her squad leader, and her squad leader approached me and told me to go back to my room. I wasn't argumentative. I wasn't disrespectful. I simply said, N████ is this what you want? What I meant by that was are you sure everything is okay now. Then I went to my room. They thought it was inappropriate for me to take off my dress gray top. They thought I was going over there to get in an altercation. That's not what I was going to do. I was simply going over there to say this is out of line to go there, intoxicated. My chain of command said there were other actions I could have taken. My chain of command said I was impulsive." As a result of this incident, Mr. Doolen was given thirty days loss of privileges, thirty days room restrictions, and 30 demerits. Up until March 7, Mr. Doolen had been restricted to his room for a total of 60 days.

During the February 2014 evaluation, Mr. Doolen candidly talked about his anger. He stated, "Part of the reason I was diagnosed with ADD was because I got irritated easily. That's why I self-referred myself to Behavioral Management to address this. I have in the past thrown things, hit things. I've never hurt anyone, but I have broken my hand by hitting a wall." The incident he was referencing occurred while he was enrolled in the Academy, and a plate was placed in his hand from this incident. Mr. Doolen also noted that when angry, he does use offensive language and makes sarcastic comments which sometimes provokes others to lash out. He added, "I realize my sarcasm upsets others. I don't think I do it on purpose, and I think sometimes others don't understand me and tend to take it the wrong way."

### *November 2014 Interview*

Subsequently, Mr. Doolen's case was reviewed by the Superintendent of West Point, and he was reinstated. In other words, he was allowed to return to school with two conditions; he was required to complete Summer Garrison Regiment and Cadet Field Training. To the best of his knowledge, there were no other conditions imposed on him. He completed the Summer Garrison Regiment from June 3 to June 17, 2014. Mr. Doolen indicated "I was supposed to receive a grade, I never did…I asked multiple people why I didn't receive a grade, and I was never given an answer. I think it's an issue that I never received a grade…I think not receiving a grade has been a hindrance in this process." From June 17 to July 26, he attended Cadet Field Training. On July 26, 2014, Mr. Doolen

Psychological Rep.      Page 15
DOOLEN, Isiah
December 13, 2014

successfully completed the Cadet Field Training with a military development of
an A. Mr. Doolen noted "I completed the conditions. In my opinion, I exceeded
their expectations. My brigade tactical officer told me to go out to Cadet Field
Training and get an A. He told me that if I went out and got an A, it would reflect
well on me and my retention at the Academy."

On June 23, 2014, Mr. Doolen was notified of his alcohol related brigade board,
and he was accused of having a second alcohol policy violation. On July 9,
2014, Mr. Doolen was notified that he would be required to undergo a second
conduct review for allegedly having two alcohol policy violations. On August 21,
2014, Mr. Doolen attended his conduct hearing. On September 11, 2014, Mr.
Doolen was notified of the recommendation of immediate separation from the
Academy with full recoupment. MAJ AD P.J. Snyder, in a memorandum dated
September 11, 2014, stated "If a decision had to be made today, I would not be
comfortable with Cadet Doolen graduating from and/or commissioning out of the
United States Military Academy. His history displays a pattern of poor, impulsive
decisions and behavior. That being said, my exposure to Cadet Doolen since
summer training show me a young man that is dramatically different from the
individual reviewed in the conduct investigation."

During the November 2014 interview, Mr. Doolen told me that he feels better
able to manage his anger because of his involvement in Behavioral
Management. He also told me that he has not consumed alcohol for the past
year.

## PSYCHOLOGICAL TESTING

During the February 2014 evaluation, Mr. Doolen was administered the MMPI-2
and the PAI as a measure of his personality and emotional functioning. During
the November 2014 evaluation, I chose not to re-administer these tests. Below
is my interpretation from the tests administered in February 2014.

Review of the validity scales of the MMPI-2 indicated that the profile should be
considered valid and interpretable. The MMPI-2 Administration and Scoring
Manual states that a T score below 80 on the VRIN and TRIN, and T score
below 120 on the F-r, in inpatient or outpatient settings, should be considered
valid. First, the results of the test did not indicate the presence of a mental
illness. Second, Mr. Doolen produced a profile typical of someone interested in
law enforcement which include military personnel. He endorsed items
suggestive of impulsivity and a tendency to be a risk taker. His profile was also
indicative of narcissistic tendencies. Again, this is a characteristic often seen in

Psychological Rep      Page 16
DOOLEN, Isiah
December 13, 2014

protocols of law enforcement officers.  Individuals that produce profiles similar to Mr. Doolen's are viewed as likable and personable.

The results of the PAI were valid and consistent with the MMPI-2 results. The results of the PAI also did not indicate the presence of any psychopathology. Interestingly, the results of the testing did suggest some evidence of a low self-esteem while tending to blame himself for failures.   Sometimes it's helpful to review significant items. Although the results of the testing indicated no significant problems with anger management, Mr. Doolen answered true to the following statement, people are afraid of my temper.  I questioned Mr. Doolen about this and he said, "In my numerous chain of command reports, there are statements that my chain of command fears I will put soldier's lives at risk as a result of their perceptions of my anger and impulsivity, which is why I answered true to that question."

## DIAGNOSTIC FORMULATION

### *Attention Deficit Disorder*

Based on Mr. Doolen's report and records available for review, he meets the criteria for attention-deficit/hyperactivity disorder (ADHD).  Medical records indicated that Mr. Doolen was diagnosed with attention deficit disorder at the United States Military Academy.  Prior to this, he had no psychiatric history.  He initially presented to the clinic because of difficulty concentrating and irritability. He was prescribed three medications for the ADHD but responded most favorably to Adderall.  Once stabilized on the Adderall, he reported feeling significantly better.  He was more focused, less irritable, and improved overall general mood.  During my interview with Mr. Doolen, he endorsed problems with inattention, poor concentration, increased distractibility, and global learning problems.  Thus, in my opinion, he also meets the criteria for ADHD.

## DIAGNOSIS

According to the criteria set forth in the *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition, Mr. Doolen's diagnoses are as follows:

Attention-Deficit/Hyperactivity

## OPINION

According to the information provided to me by Mr. Doolen, it was again

Psychological Rep      Page 17
DOOLEN, Isiah
December 13, 2014

recommended he be permanently separated from the United States Military
Academy. According to the Memorandum dated August 30, 2014, authored by
CPT (P), SC Nicolas R. Forlenza, investigating officer, "The CI investigated
Cadet Doolen's pattern of behavior and finds him deficient in conduct."

First, CPT (P), SC Nicolas R. Forlenza, noted concerns about Mr. Doolen's
consumption of alcohol. Specifically, he was referencing the May 2013 incident.
Mr. Doolen informed me that he has not consumed alcohol since October 2013.
He also stated, "I will never consume alcohol again, and it's an adamant stance
on that. I know that the use of the term never is an absolute statement but I feel
I can use that term because I will never consume alcohol again." I queried Mr.
Doolen about making such a strong statement and he said, "I'm taking a strong
stance because of one the trouble that can ensue regardless of the amount of
alcohol consumed. Two, family history. My parents don't drink but both
grandfathers were alcoholics, and I don't want to have any issues with that.
Lastly, I don't have to drink to have a good time. I think that some people think
you have to drink to have a good time, and I don't. Personally, I don't have to
drink to have a good time." Mr. Doolen admitted his consumption of alcohol has
been a problem. Because of this, he has chosen to abstain from using alcohol,
and has done so for the past year.

CPT (P), SC Nicolas R. Forlenza also stated "Cadet Doolen has not
demonstrated that he possesses the attributes essential to lead as an officer in
the United States Army." I reviewed numerous memorandums that suggested
otherwise including one written by MAJ, AD P.J. Snyder, Tactical Officer. A
memorandum from MAJ AR Mike Ziegelhofer dated August 21, 2014, noted the
following: "CDT Doolen was a great platoon leader at Cadet Field Training. He
was very clearly one of the top two best in our company, and stood out amongst
the rest of his peers at Camp Buckner. He earned words like this from me, all
while operating under tremendous pressure and angst. I could tell he was
struggling with these feelings (brought on by his questionable standing with West
Point) only when we spoke one on one. He selflessly put those emotions and
troubles to the side to the benefit of his platoon at all other times." MAJ, AR
Mike Ziegelhofer went on to say that Mr. Doolen earned the trust of his peers,
superiors, and subordinates. Last, he said "An assessment based solely on his
performance this summer would suggest that CDT Doolen has incredible
potential to be a great officer – the kind of officer I would be proud to serve with."
These character statements describe an effective leader that was committed to
improving himself and defending the honor of his subordinates.

It was also noted that "Academically, Cadet Doolen has been cited as "below

Psychological Rep    Page 18
DOOLEN, Isiah
December 13, 2014

average," whose performance was "underwhelming." I reviewed several evaluations of Mr. Doolen prepared by his supervisors and instructors. For the most part, these evaluations were not very positive. There were some classes in which Mr. Doolen performed better in than others. According to information provided by Mr. Doolen, in August 2014, he returned to school and enrolled in five classes. He provided me a transcript of these grades. At the writing of this report, Mr. Doolen's grades were as follows: Special Operations and Low Intensity Conflict-B, Policy, Generalship, and Strategy-C+, International Law-A-, Military Development-A, American Presidency-B+, and Political Anthropology-B. I understand that his instructors described him as "below average." However, the only class he was required to complete was Political Anthropology, and he received a B in this class.

There were concerns cited by the investigating officer that Mr. Doolen has made no changes in the last year. This is not supported by existing documents. First, as noted above, Mr. Doolen has not consumed alcohol for the past year. Since May 2013, I am unaware of Mr. Doolen engaging in any behavior suggestive of him being dangerous to others. Based on my review of records, this concern is based on the May 2013 incident in which Mr. Doolen, after consuming alcohol, entered his ex-girlfriends room and engaged in a verbal argument with her. There are also accusations that Mr. Doolen engaged in a physical altercation with his ex-girlfriend by grabbing her arm and/or preventing her from leaving the room. He denies this account of the incident. My review of witnesses of this incident noted conflicting reports. He candidly said that he was standing in front of her, but was not trying to block her way. Mr. Doolen and Cadet N███ D████ had a volatile relationship which is part of the reason the relationship ended. It appears that the investigating officers are taking a single incident and generalizing Mr. Doolen's behavior to all instances. Again, based on my review of Mr. Doolen's records and his report, since May 2013, he has not engaged in any behavior suggesting he is dangerous to others.

MAJ, AD, P.J. Snyder noted that Mr. Doolen has made improvements since being reinstated into the United States Military Academy and recommended a suspended suspension until May 2015 be considered. I concur with this. As noted above, Mr. Doolen has made considerable improvements since the May 2013 incident, and he should be allowed to demonstrate these improvements.

As noted in my February 2014 evaluation, although I do not purport to be familiar with the United States Military Academy's policies for discharge from the Academy, based on my review of the available corroborating sources, there are no grounds for this final decision. Given the above, it remains my opinion that

Psychological Report - Page 19
DOOLEN, Isiah
December 13, 2014

Mr. Doolen is fit to remain in the United States Military Academy.  He should be provided an opportunity to continue and complete his education.

If you need further assistance, please contact me at 417-761-5850.


Christina A. Pietz, Ph.D., ABPP
Licensed Psychologist
Board Certified in Forensic Psychology



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MACC-RD                                                                                      9 October 2014

MEMORANDUM FOR Cadet Isiah Doolen, Company H, Second Regiment, Class of 2014, USCC, West Point, New York 10996

SUBJECT:  Commandant's and CoC Recommendations and Legal Review Regarding the Conduct Investigation on Cadet Isiah Doolen.

1.  The attached Commandant's and COC recommendations, legal review, and a copy of your Conduct Investigation (CI) are provided to you for comment.

2.  Should you desire to provide comment on the review, please do so by_0930_ hours, on__19 October 2014__.

3.  I waive the 10 day preparation period to provide comment on the review, so packet can be expedited to the Superintendent for final action.  Date_____
Signature_____

4.  Failure to provide comments by the above- stated time will be deemed a waiver of your right to submit comment.  You may request an extension to submit your request; any such request should be in writing.

5. The Superintendent may consider matters from your personnel, disciplinary, and academic records without referral to you for comment; you may review these files upon request to the appropriate custodian at USCC and the Office of the Dean.

Encl                                                          DELROY A. PATRICK
                                                             Regulation & Discipline Officer


I hereby acknowledge receipt of Commandant's and COC recommendations, legal review and CI at_0930 am_hours, on_09OCT14 am_.

                                ISIAH DOOLEN
                                Respondent
                                Company H-2, Class of 2014



**DEPARTMENT OF THE ARMY**
UNITED STATES MILITARY ACADEMY
646 SWIFT ROAD
WEST POINT, NY 10996-1905

MACC-O-RD                                                           7 October 2014

MEMORANDUM FOR Cadet Isiah M. Doolen, Class of 2014

SUBJECT: Notification pursuant to 10 USC § 2005

1. You are currently facing separation from the United States Military Academy (USMA). As a result of your possible separation, you are being notified of the potential recoupment of educational expenses incurred during your attendance at USMA. Section 2005 of Title 10 United States Code and Department of Defense Directive 1332.23 requires USMA cadets to sign a service agreement in return for advanced education benefits provided by the Government. You signed such an agreement on 29 June 2009. Typically, obligated cadets that are disenrolled prior to completing the course of instruction at USMA are ordered to active duty in an enlisted status for a period of not less than two years and not more than four years. If, however, the separation authority determines that a call to active duty would be inappropriate, the separated cadet may be ordered to reimburse the Government the cost of their education incurred during their attendance at USMA. The cost of your education at USMA and debt to the Government has been calculated at $226,662.00

2. Enclosed you will find the following documents: a memorandum from the Directorate of Resource Management which calculates the cost of you education to be $226,662.00 (Enclosure 1); a copy of the service agreement you signed when you began your career as a cadet (Enclosure 2); and an acknowledgment memorandum for you to execute and return to me (Enclosure 3). These documents and any matters you submit will be provided to the separation authority prior to final decision on your separation.

3. The separation authority will consider any matters you wish to submit. You have ten (10) calendar days from receipt of this memorandum to submit matters. You can submit your matters in-person to me or you can mail your matters to ATTN: Regulations & Discipline Officer, 646 Swift Road, USMA, West Point, NY 10996 within 10 calendar days of your receiving it. If I do not receive your response by this date, a statement to that effect will be entered in your separation packet. If submitting your matters by mail, I recommend mailing your matters using USPS Certified Mail or a similar service (ex. FedEx) to avoid delay.

4. You may seek counsel from an attorney at the Office of the Staff Judge Advocate, Bldg. 606, in preparing your response to this memorandum.

Encls                                              DELROY PATRICK
as                                                 Regulations & Discipline Officer
                                                   United States Corp of Cadets
                                                   646 Swift Road
                                                   West Point, NY 10996-1905

MARM-PMM

MEMORANDUM FOR SGS                                              7 October 2014

SUBJECT: Recoupment of Educational Assistance Costs – CDT Isiah Doolen, Class of 2015
(SSN: Redaction PII *Originally USMA Class of 2013

1. Public Law 96-357 establishes the requirement that an individual who receives assistance for
advanced education from "funds appropriated for an armed force" reimburse all or part of that
assistance, if the active duty requirements specified in his/her agreement are not completed
because of voluntary separation or misconduct.

2. As **CDT Doolen's** first day of class was **17 August 2009** and last day of class was **31
October 2014,** the amount owed is **$226,662.** Please Note: CDT Doolen originally belonged to
USMA class of 2013. He attended classes at USMA for the full 2013 Academic Year (AY). He
did not attend classes in AY 2014. He returned to classes on 18 August 2014, his last day of class
was 31 October 2014.. Costs included are derived from USMA's Cost of Education Report
(available upon request). For example, academic costs associated with tuition and board are included
in the Cost of Education. Public Law excludes pay and allowances cadets are authorized to receive
under Title 37, US Code and costs associated with "*military skills.*" Excluded costs include cadet
pay, cadet ration allowance, cadet quarters allowance, and cadet travel expenses associated with
reporting to or release from USMA.

3. In compliance with the United States Military Academy's Recoupment Standard Operating
Procedures, the cessation of a cadet's advanced education program is their last day in class. In
addition, the academic year (AY), rather than the fiscal or calendar year is used as the basis for
prorating the final year. Proration by year and calculation follows:

    a. Detail amount to be collected and accounting classification:

| | | | |
|---|---|---|---|
| **2010** | **$51,459** | 2102020 17-6725 311721 4630 DOO7694PL96357 RCUPL2S30145 |
| **2011** | **$49,072** | 2112020 17-6725 311721 4630 DOO7694PL96357 RCUPL2S30145 |
| **2012** | **$56,003** | 2122020 17-6725 311721 4630 DOO7694PL96357 RCUPL2S30145 |
| **2013** | **$54,030** | 2132020 17-6725 311721 4630 DOO7694PL96357 RCUPL2S30145 |
| **2014** | **N/A** | |
| **2015** | **$16,098** | 2152020 17-6725 311721 4630 DOO7694PL96357 RCUPL2S30145 |
| **Total** | **$226,662** | |

    b. The costs displayed for 2010-2013 are derived from USMA's Cost of Education reports.
The cost for 2015 is calculated below. Inflation index is published by the Assistant Secretary of
the Army for Financial Management and Comptroller.

**000228**

MARM-PMMD
SUBJECT: Recoupment of Educational Assistance Costs – CDT Isiah Doolen, Class of 2015
(SSN: ⬛⬛⬛⬛7694)

   c.  The 2015 cost calculation:

    Computation of 2015 Time Factor:

        Start of Academic Year 2014 – 2015 – 18 August 2014
        End of Academic Year (Last day of class) 2014 – 2015 – 8 May 2015
        Full Academic Year = 264 Calendar Days
        Last Day of Classes – 31 October 2014 = 75 Calendar Days
        Time Factor = 75/264 = .2840

    Computation of 2015's cost:

| 2013 Cost | | Time Factor | | Inflation Factor | | 2015 Cost |
|-----------|---|-------------|---|------------------|---|-----------|
| $54,030 | X | .2840 | X | 1.0491 | = | $16,098 |

4. POC for this action is Ms. Sarah Murphy, (845) 938-0302 or DSN 688-0302.

CARDONA.MELI
SSA.⬛⬛⬛⬛⬛

Digitally signed by
CARDONA.MELISSA ⬛⬛⬛
DN: c=US, o=U.S. Government, ou=DoD,
ou=PKI, ou=USA,
cn=CARDONA.MELISSA ⬛⬛⬛
Date: 2014.10.07 10:10:56 -04'00'

MELISSA CARDONA
Deputy G8, Resource Integration Officer

**UNITED STATES MILITARY ACADEMY**
**WEST POINT, NEW YORK**

### I. Oath of Allegiance

I, ISIAH MATTHEW DOOLEN , ▮▮▮▮7694  do solemnly swear that I will support the Constitution of the United States, and bear true allegiance to the National Government; that I will maintain and defend the sovereignty of the United States, paramount to any and all allegiance, sovereignty, or fealty I may owe to any State or Country whatsoever; and that I will at all times obey the legal orders of my superior officers, and the Uniform Code of Military Justice.

### II. Agreement to Serve

I, having been appointed a cadet of the United States Military Academy, do hereby agree, with the consent of my parents or guardian if I am a minor:

a. To complete the course of instruction at the United States Military Academy;

b. If tendered an appointment as a commissioned officer in one of the armed services upon graduation from the United States Military Academy, to accept such appointment and to serve under such appointment on active duty for at least five consecutive years immediately after such appointment; if my initial appointment hereunder is in a Reserve Component, to accept a commission in a Regular Component if subsequently tendered during the five consecutive years immediately after my initial appointment, and to serve on active duty for the remainder of such period under such appointment.

c. If I am permitted to resign my commission in a Regular Component of one of the Armed Services prior to the eighth anniversary of my graduation, to accept an appointment as a commissioned officer in a Reserve Component of one of the Armed Services and remain therein until such eighth anniversary.

d. To serve a total of eight (8) years from graduation from the United States Military Academy. Any part of that service not completed on active duty must be served in a Reserve Component (not on active duty), unless I am discharged from the Reserve Component by proper military authority.

e. That if I fail to complete the course of instruction of the United States Military Academy, breach my service agreement as defined in paragraph 1.g.(4), Statement of Policies on the next page, or decline to accept an appointment as a commissioned officer, I will serve on active duty as specified in paragraphs 1.b. through 1.f., which are contained in the Statement of Policies on the next page;

f. That if I voluntarily fail, or because of misconduct fail, to complete the period of active duty specified in paragraphs II.b., c., d. or e. above, I will reimburse the United States in an amount that bears the same ratio to the total cost of advanced education provided me as the unserved portion of active duty bears to the total period of active duty I have agreed to serve;

g. If I am obligated to reimburse the United States for the cost of my advanced education, any subsequent enlistment in an Armed Service will not relieve me of this debt.

h. Further, that if I am separated from the United States Military Academy for breach of this service agreement, as defined in paragraph 1.g. (4), Statement of Policies on the next page, and the Army decides that I should not be ordered to active duty because such service would not be in the best interests of the Army, I shall be considered to have either voluntarily or because of misconduct failed to complete the period of active duty and may be required to reimburse the United States as described above;

i.   For the purpose of this paragraph:

(1) The term "voluntarily fail" includes, but is not limited to, failure to complete the period of active duty because of conscientious objection, because of resignation from the United States Military Academy or United States Army, and marriage while a cadet.

(2) The term "because of misconduct" includes, but is not limited to, termination by the United States Army of my service because of homosexual conduct, criminal conduct, conduct violating the Cadet Honor Code, conduct deficiency under the Cadet Disciplinary System, and conduct violating regulations for the discipline of the Corps of Cadets.

(3) The term "course of instruction" is synonymous with the term "educational requirements" as the term is used in 10 USC 2005.

### III. Marital Status

I am unmarried, do not presently have custody of a child, do not have a legal obligation of support from a prior marriage, and have no legal obligation to support a child or a former spouse. Furthermore, I understand that a cadet who marries, has custody of a child, incurs a legal obligation of support from a prior marriage, or incurs a legal obligation to support a child or former spouse while a United States Military Academy cadet will be separated from the United States Military Academy. Divorce, annulment, or other dissolution of a cadet's marriage does not affect or preclude separation under this provision.

My signature constitutes the taking of the Oath of Allegiance, execution of the agreement to serve, my affirmation as to my marital status, the absence of child custody or a court-ordered child support obligation and my acknowledgment that I have read, understand, and agree to abide by the statement of policies on the next page. For all male cadets, signing this form also constitutes registration with the Selective Service System in accordance with the Military Selective Service Act. Incident thereto the Department of Defense may transmit my name, permanent address, Social Security Number, and birth date to the Selective Service System for recording as evidence of the registration.

_____ (sign your full name as it appears in paragraph I above)

*Sworn to and subscribed before me at West Point, New York, this 29th day of June, two thousand and nine.*

_____

AGNES JORDAN
CPT. 1A

*Statement of Policies*

1.    Department of Defense Directive 1332.23, dated 19 February 1988, as implemented by Army regulations, provides the following direction concerning separation of cadets prior to the completion of the course of instruction or subsequent to graduation on refusal to accept an appointment as a commissioned officer.

a. A cadet who enters the United States Military Academy (USMA) directly from civilian status assumes a military service obligation of eight years (10 USC 651).

b. A cadet who is separated from the USMA because of demonstrated unsuitability, unfitness, or physical disqualification for military service will be discharged in accordance with the applicable Army regulations. Where such a discharge is caused by voluntary action or misconduct on the part of a cadet subject to an active duty obligation, the reimbursement provision of paragraph II.f. of the Agreement to Serve will apply.

c. A cadet who enters the USMA directly from a civilian status and resigns or is separated from the USMA prior to the commencement of the Second Class academic year will be discharged from the U.S. Army. A resignation tendered by a Fourth or Third Class cadet will be accepted when found to be in the best interest of the service. A cadet who tenders a resignation will be required to state a specific reason for the action.

d. A cadet who enters the Military Academy from the Regular or Reserve Component of any military service and who resigns or is separated from the USMA prior to the commencement of the Second Class academic year will revert to his or her former status for the completion of any prior service obligation. As an exception, Invitational Reservists (cadets who entered the United States Military Academy Preparatory School from a civilian status) who resign or are separated from the USMA prior to commencement of his or her second class academic year will be discharged from the Army. A cadet who entered the USMA from the Regular Army or any Reserve Component of the Army and who has at the time of separation a remaining prior service obligation of less than one year, may, upon the approval of the Secretary of the Army or his designee, be discharged with waiver of any prior service obligation. All service as a cadet is counted in computing the unexpired portion of the enlistment or period of obligated service.

e. A cadet who has commenced his or her Second Class academic year and who resigns or is separated prior to completing the course of instruction, except for physical disqualification, unfitness, or unsuitability, will normally be transferred to a Reserve Component in an enlisted status and, if deemed to have breached his or her service agreement, may be ordered to active duty for not less than two years (10 USC 4348(b)) but no more than four years. The Secretary of the Army or his/her designee will retain final authority to order the individuals to active duty. Completion or partial completion of service obligation acquired by prior enlistment in no way exempts a separated cadet from being transferred to a Reserve Component and ordered to active duty under these provisions.

f. Any First Class cadet who completes the course of instruction and declines to accept an appointment as a commissioned officer will be transferred to a Reserve Component in an enlisted status and ordered to active duty for four (4) years (10 USC 4348(b)).

g. The foregoing provisions will be applied in accordance with the following guidance:

(1) The Second Class academic year shall be deemed to have commenced at noon on the first day of regularly scheduled academic classes following the summer training period. As an exception, the Second Class year for a cadet who is designated a potential mid-year graduate will commence at noon on the first day of regularly scheduled classes in the term following the advancement of that cadet into the second class.

(2) In cases where it is necessary to determine whether a cadet resigned prior to or following the commencement of the Second Class year, the critical date is the date the resignation action is initiated by the cadet.

(3) In cases in which the Academy discovers an incident giving rise to separation in one academic year, but separation is not initiated (or a resignation in lieu of the same is not forwarded by the chain of command) until the following year, the separation action will be deemed to have "started" on the date of discovery for purposes of computing the service obligation and pay grade under AR 612-205, table 3.

(4) "Breach of service agreement" includes separation resulting from resignation, for any of the bases for separation listed in AR 210-26, **Table 7-1**, including all additions to **Table 7-1** subsequent to the date of this agreement or from other willful acts or omissions (AR 210-26, paragraph 7-9).

2. Normally, all graduates of the USMA will be appointed by the President as commissioned second lieutenants on active duty in the United States Army. However, cadets may state a preference for appointment, upon graduation, as a commissioned officer in either the U.S. Navy, U.S. Air Force, or U.S. Marine Corps (10 U.S.C. 541 (a)). Such appointment will be contingent upon the approval of both the Secretary of the Army and the Service Secretary of the gaining military department.

3. Any First Class cadet, including potential mid-year graduates, in either of the two terms prior to their anticipated graduation, who resigns or is separated, if fully qualified, may be recommended by the Superintendent and approved by the Secretary of the Army, and may be commissioned in a Reserve component. Such action may be appropriate in cases of administrative resignations, including cases of separation for marriage, or child support or similar circumstances. The effective date of rank in the Reserve component will be no earlier than the graduation date of the individual's class at the time of resignation or separation. These cadets may:

(a) Be commissioned in the USAR for service with a Reserve Component unit. There will be an eight-year military service obligation associated with this appointment; or

(b) After receipt of a baccalaureate degree, be commissioned in the USAR and compete with Reserve Officer Training Corps graduates for active duty or active duty for training. The military service obligation for those selected for active duty under this provision will be eight years, three of which will be on active duty.

**000231**

I hereby acknowledge receipt of a copy of the Memorandum of Notification, SUBJECT: Notification Pursuant to 10 USC §2005, dated 7 October 2014, and all documents listed in paragraph two of the notification (Enclosures 1 through 3), pertaining to the debt for recoupment of educational expenses while at USMA, and a copy of my Conduct Investigation delivered to me at West Point, New York, _09.30_ hours, this 9th day of October 2014.


Isiah M. Doolen
CDT, USCC
Class of 2014

MEMORANDUM THRU SUPERINTENDENT, UNITED STATES MILITARY ACADEMY, WEST POINT, NEW YORK 10996

FOR ASSISTANT SECRETARY OF THE ARMY FOR MANPOWER AND RESERVE AFFAIRS (SAMR-HR), 111 ARMY PENTAGON, WASHINGTON, DC 20310

SUBJECT:  Notification pursuant to 10 USC § 2005

1.  I, Cadet Isiah M. Doolen, hereby acknowledge receipt of the notification of potential debt owed to the United States Government for the cost of my education while attending the United States Military Academy.  I understand that if I dispute the validity of the debt, that I have ten (10) calendar days from receipt of this notice to submit matters that I would like the separation authority to consider.  Finally, I understand that the separation authority may order that I repay the Government in the above amount, which would result in a lawful debt owed to the United States.

2.  Check one (1) of the following:

(a) _____ I do not dispute the validity of this debt.

(b) _____ I do dispute the validity of this debt, but do not desire to submit statements, testimony, or evidence, either physical or documentary.

(c) _____ I do dispute the validity of this debt, and do desire to submit statements, testimony, or evidence, either physical or documentary, which is enclosed.

_____

Signature

_____

Date

Please return this memorandum within ten (10) days of receipt to the following address:

    MACC-O-RD
    UNITED STATES MILITARY ACADEMY
    OFFICIAL MAIL & DITRIBUTION CENTER
    REGULATIONS & DISCIPLINE OFFICER, UNITED STATES CORPS OF CADETS
    646 SWIFT ROAD
    WEST POINT, NY 10996-1905

2

**000233**



**OFFICE OF THE COMMANDANT**
**UNITED STATES MILITARY ACADEMY**
**WEST POINT, NEW YORK 10996**

MACC

MEMORANDUM FOR Superintendent

SUBJECT:  Commandant Recommendation for Disposition of the Conduct Investigation
for Cadet Isiah M. Doolen, Class of 2014, Company H-2

I have considered the transcript, findings, and recommendations in the above-titled
Conduct Investigative Hearing.  My recommendation is below:

_JT_ **I approve the findings that the Respondent is deficient in conduct and
recommend:**

_____ I recommend retention and the following sanction(s):

_____ Graduate on time with current class.
_____ Delay graduation with current class.  (December graduate)
_____ Graduate with Class of _____ .  (Turn-back)
_____ Conduct probation until: _____.
_____ To be immediately suspended from the Academy until: _____.
_____ Enrollment in the SLDP Mentorship Program.
_____ Other: _____.

_JT_ I recommend separation from USMA.
_JT_ Type of Discharge:  _Hon_____.

If a First-Class or Second-Class cadet, one of the following apply:
_____To be enlisted in the US Army.
_____With enrollment in Academy (Army) Mentorship Program.
_JT_ To be financially charged recoupment for time spent at USMA.

_____ **I disapprove the findings.  I find that the Respondent is proficient in
conduct.**

_5 Oct 2014_
DATE

JOHN C. THOMSON III
BG, USA
Commandant of Cadets

MACC-O

MEMORANDUM FOR Commandant, United States Military Academy, West Point, New York 10996

SUBJECT:  Recommendation for Disposition of the Conduct Investigation for Cadet Isiah Doolen, Class of 2014, Company H-2

1.  I have considered the transcript, findings, and recommendations in the above-titled Conduct Investigative Hearing.  My recommendation is below:

_XXXX_ I recommend approval of the findings that the Respondent is deficient in conduct and recommend:

       \_\_\_\_\_ I recommend retention and the following sanction(s):

            \_\_\_\_\_ Graduate on time with current class.
            \_\_\_\_\_ Delay graduation with current class. (December graduate)
            \_\_\_\_\_ Graduate with Class of _____ (Turn-back)
            \_\_\_\_\_ Conduct probation until: _____.
            \_\_\_\_\_ To be immediately suspended from the Academy until: _____.
            \_\_\_\_\_ Enrollment in the SLDP Mentorship Program
            \_\_\_\_\_ Other: _____.

     _XXXX_ I recommend separation from USMA.
        _XXX_ Type of Discharge:  _HON_____.

     If a First-Class or Second-Class cadet, one of the following apply:
          \_\_\_\_\_To be enlisted in the US Army.
              \_\_\_\_\_With enrollment in Academy (Army) Mentorship Program.
     _XXXX_ To be financially charged recoupment for time spent at USMA.

_____ I recommend disapproval of the findings and recommend a finding that the Respondent is proficient in conduct.

2.  POC is the undersigned at 845-938-6004.

_25 Sep 14_
DATE

STEVEN M. MERKEL
COL, FA
Brigade Tactical Officer



**DEPARTMENT OF THE ARMY**
UNITED STATES MILITARY ACADEMY
WEST POINT, NY 10996

MADA-O-2                                                    14 September 2014

MEMORANDUM THRU

Brigade Tactical Officer, United States Corps of Cadets, West Point, New York 10996-
1692

FOR Commandant of Cadets, United States Corps of Cadets, West Point, New York
10996-1692

SUBJECT: Recommendation for Separation for CDT Isiah Doolen, H2/2014

1. Based upon the overall body of work while a cadet at the United States Military
Academy which includes numerous incidents of egregious misconduct, coupled with a
finding of a deficient status by a Conduct Investigation, I recommend CDT Doolen be
separated immediately.

2. CDT Doolen's overall record is not indicative of a leader of character. He had a
choice in how he behaved, and the choices he made manifested themselves in his
actions. His actions indicate he lacks the character of an officer in the profession of
arms and as such does not demonstrate an ability to lead others effectively.

KEVIN A. McANINCH
LTC, MI
Regimental Tactical Officer

**000236**



**DEPARTMENT OF THE ARMY**
UNITED STATES MILITARY ACADEMY
WEST POINT, NY 10996

MACC-O-2-H                                                    11 September 2014

MEMORANDUM THRU Regimental Tactical Officer, Second Regiment, United States Corps of Cadets, West Point, New York  10996

FOR Brigade Tactical Officer, United States Corps of Cadets, West Point, New York 10996

SUBJECT: Recommendation for Suspended Separation of CDT Isiah Doolen, H2/2014

1.  After considering my experiences with Cadet Isiah Doolen over the past five months, including multiple conversations and receiving feedback from his SLDP Mentor, I recommend that Cadet Doolen be separated from the Academy, but that action be suspended until May of 2015 in order to allow for consideration of his development through both SLDP and his Academy experience.

2.  If a decision had to be made today, I would not be comfortable with Cadet Doolen graduating from and/or commissioning out of the United States Military Academy.  His history displays a pattern of poor, impulsive decisions and behavior.  That being said, my exposure to Cadet Doolen since summer training show me a young man that is dramatically different from the individual reviewed in the conduct investigation.

3.  I believe that a suspended separation until May of 2015 would allow the Academy to determine if Isiah has truly developed from his experiences, and would allow me to observe him after his restriction and loss of privileges has expired.  From my position, it is vital to receive feedback at the conclusion of his SLDP enrollment (ending in December of 2014) and to observe him when he has first class privileges before making a determination of his fitness to commission.  Suspending his separation allows a tool for the Academy to quickly remove him and prevent commissioning if he proves to be unfit for military service as an officer.

4.  The point of contact for this memorandum is the undersigned at (845) 938-5058 or via email at patrick.snyder@usma.edu.

P.J. SNYDER
MAJ, AD
Tactical Officer

**000237**

SUMMARIZED
RECORD OF PROCEEDINGS
CONDUCT INVESTIGATION

Pertaining to

**CADET ISIAH DOOLEN, CLASS OF 2014**

Held at

United States Military Academy
West Point, New York

Before

CPT NICHOLAS R. FORLENZA
Investigating Officer

AUTHENTICATION OF RECORD OF
PROCEEDINGS AND CERTIFICATION
OF FINDINGS AND RECOMMENDATION


I, the undersigned Investigating Officer, authenticate that the following transcript is an accurate representation of the proceedings held at West Point, New York, July 2014 in the case of Cadet Isiah Doolen, Company H-2, Class of 2014, United States Corps of Cadets, and certify that the findings and recommendations are correct.


NICHOLAS FORLENZA
CPT(P), SC
Investigating Officer
Date: _____

I hereby acknowledge receipt of a copy of the record of proceedings delivered to me at West Point, New York, 1600 hours, this 13th day of November 2014.


ISIAH DOOLEN
Respondent
Company H-2, Class of 2014

000240

# T E S T I M O N Y

**Name of Witness**                                    **Page**


Cadet Isiah Doolen, Respondent                     77-89

COL Nick Mauldin                                   71-76
CDT William Majors                                 90-103
CDT Elliot Chal                                    104-116
CDT Edward Jenkins                                 117-127
CDT Theodore Lipsky                                129-141
MAJ Jonathan Knoedler                              142-147
CDT Veronica Bryant                                147-155
MAJ Patrick Snyder                                 155-160
CDT Brandon Roy                                    160-165
CDT John Barnes                                    165-171

TRANSCRIPT OF INVESTIGATION
UP PARAGRAPH 6-15, AR 210-26

IO:  Today is 15 August 2014.  The time is 1500.  I am Captain Nick Forlenza, and present with me in the office is Cadet Doolen.

As you probably know, I am the IO charged with the review of your board proceedings and the assessment of your status.  Before we get started, I just want to ensure that you understand your rights as a Cadet per USCC Regulation 351-1.  I will furnish you with a copy real quick.  Have you seen these before?  Are you familiar with them?

RESP: (Inaudible).

IO:  Yeah, so take a look at it.  It starts at paragraph 405 and goes (a) to (o).  So just look over them real quick and then just acknowledge that you've read and you understand them.

RESP: It all looks familiar to me.

IO:  Yeah.  Do you have any objections to any of the things on there?

RESP: I just have a question about Subsection (g), to examine all records and documents to be considered by the CI, including the entire file.  So I was just--I asked Mr.

1    Patrick in the note for his notes from the brigade board I

2    received.

3         IO:  Sure.

4         RESP: (Inaudible) several times, and he hasn't provided

5    this, so I'm just wondering if there's any way I could get a

6    copy of those.  And I also asked him for an electronic

7    submission of the notes or the actual documents that he gave

8    me on 17 July 2014, and he hasn't e-mailed those to me yet.

9    I asked for the binder, so I'd just like to get a copy of

10   those.

11        IO:  Yes.  I believe they're I this packet right here.

12        RESP: Okay.

13        IO:  And the other note in his packet, I will make sure

14   you have a copy of it prior to us separating today.

15        RESP: Yes, sir.

16        IO:  I think those are probably--so we will verify that

17   and if it's not, just raise it as an issue.

18            First, what I want to discuss with you is the

19   memorandum for record in which you are disputing the board

20   proceedings.  All right?

21        RESP: Yes, sir.

2

1       IO:  So right here--it is--this is what's wrote here.

2   I'm not disputing any punishments or rulings.  Again, I'm

3   disputing the board proceedings and statements submitted.

4       RESP: Exactly.

5       IO:  Okay.  So that is what you're disputing.  The

6   issues specific to your disputes are found in your rebuttal

7   of the conduct investigation, which is this top memorandum,

8   correct?

9       RESP: Yes, sir.

10      IO:  Okay.  So I have reviewed your rebuttal, and I

11  have reviewed everything in this packet and I found your key

12  disputes to be--would be--well, the first one being the most

13  recent Article 10 board was not an alcohol board.

14      RESP: I don't believe it was.  No, sir.

15      IO:  Okay.  So that's one of your key disputes, right?

16      RESP: Yes.  That's one of my primary ones.

17      IO:  Okay.  And the second being that the USCC was

18  predisposed to find you responsible at your Article 10

19  board.

20      RESP: I believe that the 08 November 2013 memorandum

21  written by the Commandant of Cadets to the Superintendent

22  prior to me receiving any kind of board or hearing, I think

3

1    that influenced the board without a doubt, because he stated

2    as facts that I was, one that I was inebriated.  There

3    were--there were three different things that he stated.  I

4    can't recall off the top of my head.  It was found at my--at

5    my brigade board that I was not inebriated, so some of the

6    things that he stated in that memorandum and some of the

7    things that he stated as facts, they weren't facts.  They

8    shouldn't have been stated.  In the memorandum, he would

9    have me separated with recoupment because, I mean, there was

10    no hearing or proceeding that was given to me.

11        IO:  Are you talking about a memorandum?

12        RESP: I don't know if you've seen it.  It's attached to

13    the rebuttal that I submitted, sir.

14        IO:  That the Commandant wrote?

15        RESP: Yes, sir.  And I'm sure the brigade tactical

16    officer saw that, and if not, then whenever I have a conduct

17    hearing, I hope that's the way it is, I'll ask him about

18    that.

19        IO:  Okay.

20        RESP: Because I would have to--I would have to believe

21    that he was influenced by that memorandum.

22        IO:  Colonel Mauldin?

23        RESP: Yes, sir.

4

1          IO:  Okay, so--all right.  Got it.  So again, the two

2     things that we're disputing are whether it was an alcohol

3     board being run, and the second being predisposition of

4     USCC, Colonel Mauldin, specifically.

5          RESP: I'm sorry; there's another quick thing.  Colonel

6     Well, he sent an e-mail out to--to my attorney, Mr. Edward

7     Williams.  He stated, to the effects of, there are three

8     different things that could happen to me if I were to return

9     to West Point.  Among the three things that he stated

10    included the possibility of being retained at the Academy or

11    graduate; one of them included being charged with two field-

12    grade Article--or three field-grade Article 10s, being

13    charged with alcohol--or two alcohol boards, and then the

14    other one was, I think it's attached in there.  I don't

15    remember all of them verbatim, so I could be off on--on some

16    of them.

17         IO:  Okay.  But the bottom line is the board could've

18    had a decision made prior to the board taking place----

19         RESP:  Yes, sir.

20         IO:  --because of this and because of this memorandum

21    that Colonel Mauldin could take a look at before.

22         RESP: Yes, sir.  And also, I wanted to--I was

23    challenging Captain Eaton-Ferenzi, as her investigating

5

000246

1    officer for the 08 May 2013 obligation.   It says that--that

2    I can I (inaudible).

3         IO:   Now challenge--you have the opportunity to examine

4    witnesses.

5         RESP: So I can call Captain Eaton-Ferenzi?

6         IO:  So let's finish this----

7         RESP: Yes, sir.

8         IO:   ----so we'll go through it.  And then we'll go

9    over your options.  I just wanted to make sure that I had

10    your correct disputes before  we move forward.

11        RESP: Yes, sir.

12        IO:  So the two key disputes that we talked about was

13    potential mischaracterization at your last board----

14        RESP: Yes, sir.

15        IO:   ----as being an alcohol board, where you think it

16    may not be, is the first one I have.  And the second one was

17    that USCC was predisposed to find you responsible at the

18    board----

19        RESP: Yes, sir.

20        IO:   ----prior to you obtaining it.

21             All right.  So there are two disputes.  Okay.  My

22    primarily investigation--not final, just preliminary--I find

23    that these two objections to the hearing are not sufficient

6

1    for me to end the proceedings at this point.  Therefore, I

2    will proceed with the conduct investigation.  However, I

3    will allow you to call witnesses, and we'll solidify those

4    witnesses here shortly, to present evidence, you can cross-

5    examine them at a hearing, just so we can get to the bottom

6    of the board proceedings.

7           Yeah, so you will have the opportunity to present

8    evidence, and cross-examine them on the two issues, one

9    being the Article 10, and two, that USCC, specifically

10   Colonel Mauldin, was predisposed to find you responsible at

11   your Article 10 board.  And I will not make a final decision

12   as to the board proceedings until I hear those.  Okay?

13          RESP: Yes, sir.

14          IO:  So we will now--under USCC Regulation 351,

15   paragraph 105, the Cadet has the right to reasonably call

16   available witnesses to support the challenges of demerits,

17   as well as witnesses to files and information on your

18   performance, as a Cadet who had direct observations of you.

19          So there are two different lists.  First I want to

20   go over the folks who you want to call in support of your--

21   of the disputes of the board.  All right?  So again, folks

22   who can reasonably attest to the board proceedings.  So

23   going through your file here, I saw you have a list of folks

                              7

1    here that you request to appear in support of your challenge

2    of the brigade board.

3        RESP: Yes, sir.

4        IO:  So let's solidify this list.  Do you know who

5    you're calling?

6        RESP: I do.  Jillian Collins.  I mean, it's not in

7    persuasive order, but I didn't--I had Jillian Collins,

8    N Redacted PII D Redacted PII .

9        IO:  Who is Jillian Collins?

10       RESP: The roommate of Cadet N Redacted PII D Redacted PII , her old

11   roommate.

12       IO:  Okay.  How is--how is this portion going to

13   contribute to the board proceedings?

14       RESP: Well, she--she wrote a statement regarding my

15   state of what her perceptions were of me the night of 08 May

16   2013.  So, I mean, she--at one point she writes that she's

17   texting on her phone the entire night, and then at another

18   point, she states that she didn't even hear me knock on the

19   door to her room.  So I just--I'm--I'm having trouble

20   understanding how, if she was awake the entirety of the

21   night, how she didn't hear me knock on the door when Cadet

22   ███████ did hear me knock on the door, when--when she also

23   was awake the entire--the entirety of the night texting, as

8

1    she wrote in her statement.  So I just want to--I just want

2    to clarify that.  There's ambiguities in the statements, and

3    I think that's something that should have been cleared up.

4    If she was awake the entire time when she said she was, then

5    there are--there are some things that I would--would be made

6    more clear.

7         IO:  Okay, so----

8         RESP: I mean, she states that--she states that I--I

9    walked in, that she saw me stumble--stumble into the room,

10   but yet she didn't even hear me knock on the door.  She

11   stated that she had a pillow over her head.  I mean, to me,

12   I don't--I don't see how that's--how it's even a

13   possibility.

14        IO:  Sure, and----

15        RESP: So I----

16        IO:  Well, go back to--to my role here is not to

17   determine what happened that night at all.  What my role

18   here is, to determine whether the board proceedings were to

19   standard.  Are they going to help dispute that?  So talking

20   to USCC previous disposition to the board?

21        RESP: Probably not.

22        IO:  Is our first dispute?

9

000250

1      RESP: I would say--I'd say what would help is the fact

2      that a text from Cadet Collins to one of my friends saying

3      that Captain Eaton-Ferenzi threatened her with a regimental

4      board and--and punitive and legal action if she spoke to me

5      at any point.  So, in that regard, I think that Jillian

6      Collins would be--would be an essential witness to--to the

7      board proceedings, to the conduct hearing itself.

8      IO:  So the conduct hearing.  We're not doing a conduct

9      hearing for those witnesses.  So two disputes, right?  We'll

10     talk about it in a second.  But I want to talk first, the

11     USCC's predisposition to the decision of your Article 10

12     board.  That's what I'm talking about.

13     RESP: I don't think that--I don't think that she would

14     be--would be a key witness to a predisposition.

15     IO:  Okay.

16     RESP: I don't believe that.  No, sir.

17     IO:  Okay.  That's what I want to talk about.  Who have

18     you got here?

19     RESP: All right.  So I believe General Clarke would

20     definitely be a key witness.  Colonel Mauldin.

21     IO:  Okay.  Let me ask you a question.  Do you think

22     General Clarke is a reasonably available witness?

10

000251

1          RESP: I believe that he can be called upon.  I read in

2     the USCC regulations that it could be done.  And I just want

3     to know on how is he basing this evidence that I was

4     inebriated and that such and such happened on the night of

5     08 May 2013.  So, I mean it is kind of--he is kind of a

6     crucial witness to the predisposition of the case.

7          IO:  Okay.  So do you know what constitutes an alcohol

8     board?

9          RESP: I mean, I would like to hear what you believe

10    constitutes----

11         IO:  Well, I believe what the regulation states.

12         RESP: What the regulation states.  Yes, sir.

13         IO:  In reference to the characterization of the board,

14    for the purpose of the United States Corps of Cadets,

15    Disciplinary Regulation 351-1, alcohol board, is any

16    proceeding under Article 10 where a Cadet violated a

17    specific rule under the consumption of alcohol, including

18    any offense caused by, as a result of, or occurring after

19    the intoxication of alcohol.  So basically, any misconduct

20    that takes place after the consumption of alcohol.  The

21    amount of inebriation----

22         RESP: As the result of alcohol consumption, right?

23         IO:  Roger.  So the amount of inebriation is not

11

000252

1    quite----

2         RESP: How can you make a determination that something

3    was done as a result of alcohol consumption?  Like, that's--

4    I'm not--I mean, I'm not trying to nit pick here, but----

5         IO:  Sure.  And I'm just saying you've got the

6    (inaudible).

7         RESP: Right.

8         IO:  So any misconduct that takes place after the

9    consumption of alcohol.

10        RESP: So what I'm saying is that I don't--I don't agree

11   with the fact that they're saying that the occurrences of

12   the night was the result of the consumption of alcohol.

13        IO:  And I'm not investigating that.  But in terms of

14   the board proceedings, alcohol was consumed, misconduct took

15   place, the Article 10 was appropriate.

16        RESP: It was appropriate because it was the belief that

17   the result of the night was the direct occurrence of what's

18   in the alcohol.  I mean, anybody could say that--because

19   anybody can have a different opining in regards to why that

20   night happened.

21        IO:  Sure.  And, I mean, that's not up to me to decide

22   and make a decision on.

12

000253

1     RESP: Right.  And then there are other points.  There

2    are no findings from the board, sir.  I also requested the

3    findings from the board on numerous occasions, and Mr.

4    Patrick assured me that they were findings from the board,

5    and there aren't.  The article--the 2-3 states that he was

6    believed to be under the influence of alcohol.  That's not a

7    finding, unless I'm wrong.

8     IO:  So I'm not investigating--I am looking for two

9    things.  The fallout continuing.

10    RESP: Right.

11    IO:  Right.  Were the board proceedings conducted

12    correctly?  Did you receive more punishment, demerits than

13    you should have for these two items?  Everything was allowed

14    under regulation.  So you weren't over punished for what was

15    deemed to be an alcohol board.

16     What I have in question, and I'm going to give you

17    the opportunity to examine witnesses, whether USCC was

18    predisposed to making a decision.

19    RESP: I believe that they were predisposed.

20    IO:  Okay.

21    RESP: Absolutely.

22    IO:  Sure.  So that's what I want to solidify.  Those

23    people who are going to help you present evidence and/or

13

1   that you can question to help make that--because I mean, at

2   this time, in my preliminary findings, the facts were not

3   sufficient for me to go ahead and stop it right now.

4       RESP: I read it through by the (inaudible), and I

5   probably didn't do as good a job as I should have, and I'll

6   devote more time to that, and I think after this next

7   rebuttal, it'll--it'll be abundantly clear it was

8   predisposed.  If that's the case, I absolutely, a hundred

9   percent, believe Colonel Well should be called as a witness.

10  I a hundred percent believe the BTO should be called.  He

11  should be called, Colonel Mauldin.

12      IO:  Yeah.  Let's talk about that.  Colonel Mauldin.

13  Colonel Well.

14      RESP: The Commandant of Cadets should be called.

15      IO:  The past or present?

16      RESP: The past Commandant of Cadets, Richard--the

17  Commandant of Cadets, Richard E. Clarke.

18          I would call the Superintendent.  I believe the

19  Superintendent should be called, as well.  And Captain

20  Eaton-Ferenzi should be called.  In terms of the

21  predisposition, I believe any judge advocate who dealt with

22  the proceeding should--should be called as a witness.  So

23  Captain Pottinger should be called, as well.

14

1    IO:  Can you spell it?

2    RESP: P-o-t-t-i-n-g-e-r.  And his first name is

3    Anthony.  I think Captain Eldredge should be called, as

4    well.  She's a prosecutor for the--the Superintendent.

5    She--she added statements that weren't even submitted in--in

6    the packet that was--that was supposed to be submitted at my

7    brigade board.  So Captain Eaton made it seem as though I

8    had only submitted one statement to her when, in fact,

9    multiple, numerous statements had been submitted here,

10   probably just a (inaudible); I would say six, and she only

11   included one, and she made it seem as though only one

12   statement was included.

13   IO:  And to the previous disposition of the board?

14   RESP: Yeah.  And it's in her preliminary inquiry.  Yes,

15   sir.  She wrote--only Cadet Alex Alpert wrote to the effect

16   that I only drank that night from twenty to twenty-three.

17   IO:  What does that have to do with the board

18   proceedings?

19   RESP: Because she states that I also had three or four

20   drinks in her preliminary inquiry, yet she questioned one

21   person, and that one person said that I only drank--that he

22   only saw me order one drink.  So that's kind of a

15

1    predisposition, stating that I had three to four drinks,

2    when somebody else said that I had one drink.

3    　　　IO:  You did drink.  I mean----

4    　　　RESP: Right.  But there's a difference between having

5    one and three to four.

6    　　　IO:  There is.

7    　　　RESP: Right.

8    　　　IO:  But not according to regulation.

9    　　　RESP: It's still--it's still a pre--a predisposition to

10   the case.  I mean, they're trying--they're making a

11   determination on the board whether or not I was inebriated.

12   That was not one of the questions that came up.  So they're

13   trying to make a determination, and their enumeration is

14   based on the amount that I drank, and that kind of impacts

15   the issue.

16   　　　IO:  No.  Now, I mean, reading--this is why I did not

17   find it sufficient, you know, the predetermined portion.

18   And just because I didn't find it as sufficient, these

19   people you believe are going to make--make me believe it's

20   sufficient, correct, your predisposition?  So I'll read this

21   again.  So, for the purpose of USCC Disciplinary Regulation

22   351-1, alcohol board, is any proceeding, Article 10 where a

23   Cadet violated a specific rule under the consumption of

16

1    alcohol, including any offense caused by, as a result of, or

2    occurring after the intoxication of alcohol, which can be--

3    which is a single drink, according to OTJAG.  So one drink,

4    any misconduct can be considered an alcohol board.

5        RESP: So my rebuttal was reviewed by the OTJAG, and

6    then you were advised on my rebuttal?

7        IO:  Yeah, I found your two disputes, one,

8    misclassification of the board----

9        RESP: So you found that the judge advocate come to the

10   conclusion that I was (inaudible)?

11   [Ringtone sounds.]

12       IO:  Say that again, please?

13       RESP: I mean, I'm--I'm just asking if--if they reviewed

14   my rebuttal and you said you'd come to your own conclusions

15   based on a review of my rebuttal, and they reviewed my

16   rebuttal?

17       IO:  My preliminary findings, yes.  These are my

18   preliminary findings, that your rebuttal is not sufficient

19   to halt a conduct investigation.

20       RESP: So you reviewed my rebuttal before JAG reviewed

21   it?

22       IO:  Yeah.  I mean, JAG had to review this packet as

23   soon as it went up.  So yeah, I take a look at it.  It went

17

1    through Regs and Discipline, and then it comes down to me.

2    So the packet was reviewed.

3         RESP: And then Mr. Delroy Patrick (inaudible)

4    predisposed this, as well.  He has literally no role in

5    that--in the board proceeding at all.  When he met with my

6    attorney and my attorney's wife, he assured them that the

7    board proceedings would be fair.  At no point during the

8    board proceeding did he take notes.  He then--and I don't

9    understand how he could ensure that the board was fair when

10   he--he didn't even take notes, and he didn't ensure that

11   there were any findings that came from the board.  So I'm

12   not--I'm not sure what his role at the board was, other than

13   to influence it.

14        IO:  Well, he works in Regs and Discipline.

15        RESP: He's the Regs and Discipline officer and sits in

16   every board proceeding.

17        IO:  So m role is to determine whether the board

18   proceedings were conducted correctly.

19        RESP: Yes, sir.

20        IO:  So they appear to be conducted correctly.  I'm

21   not--I did not do any research into--were they conducted

22   correctly?  I believe that they were.  Okay.  So with that,

23   I want to give you the opportunity--I mean, we can start the

                                18

1    conduct investigation now, but I do want to give you the

2    opportunity to dispute it.

3          So of this list, we will--is this on yet?

4      RESP: As of now.  (Inaudible) or is it--is it finalized

5    (inaudible).

6      IO:  So I'm going to reach out to these people.  And

7    then, you know, the problem with this is--not the problem,

8    but the difficulties is syncing all of these folks'

9    calendars and getting all of them.  Whether we do this

10   telephonically, whether we do it in person, because you have

11   the right to be present, how will we do it?  As you can

12   probably imagine, a lot of these--well, not a lot of these--

13   a few of these won't be possible to do in person.

14         RESP: They'll be pretty busy.

15     IO:  Well, number one, they're not even physically

16   present.

17         RESP: Well, I know General Clarke's not.

18     IO:  He's not.  Colonel Well's not.  Some of these

19   other folks, we'll track down.

20         RESP: Actually, Mr. Dell D[Redacted PII].

21     IO:  Who is what?

22         RESP: He--he's the father of N[Redacted PII] D[Redacted PII]   He's a

23   distinguished grad at West Point.

                          19

1    IO:  How--how is he going to dispute the predisposition

2    of the board?

3    RESP: Well, he's also friends with Lieutenant General

4    Caslen.  I mean, he could--he could have an influence over

5    the board, and that's the question.  I mean, that's why he's

6    being called in as a witness.

7    IO:  What is his name?

8    RESP: Mr. Dell D[Redacted PII].

9    IO:  Dale?

10   RESP: Dell.  Like Dell Computer.

11   IO:  D-e-l-l?

12   RESP: Yes, sir.

13   IO:  Last name?

14   RESP: D[Redacted PII].

15   IO:  D----

16   RESP: a-i-l-e-y.

17   IO:  And you believe that because of his relationship

18   with General Caslen, they could have--General Caslen didn't

19   sit on this board.

20   RESP: Well, I know--I know Cadet N[Redacted PII] D[Redacted PII] is

21   actually friends with Jeff Caslen, who is the son of Robert-

22   -or Lieutenant General Robert Caslen.

20

000261

1       IO:  But you are aware that he didn't sit on this

2 board?

3       RESP: No, he didn't sit in on the board, but he can

4 still influence the board.  Because there were no board--I

5 was--I apparently ordered back by the Assistant Secretary of

6 the Army.  I asked for the orders that brought me back to

7 West Point.  There were no orders that brought me back to

8 West Point.  So, I mean, the order to bring me back to West

9 Point was made by General Caslen, with the advisement of

10 Colonel Well.  He was the Chief Judge Advocate.

11       IO:  For USMA?

12       RESP: Yes, sir.  So, sir, that was the rationale

13 concerning the assignment.

14       IO:  Okay.  So we have a list of folks that you have

15 that you'd like to call to help you dispute the alleged

16 predisposition of the board.  So we'll make contact with

17 these folks.  It's your responsibility, obviously, to--to

18 ensure that they're present.

19       RESP: Will I have to ensure that they're present,

20 because the R&D officer said that that would be--that would

21 be your responsibility.

22       IO:  I'll make contact with them.

23       RESP: Right.

000262

1       IO:  And then the witnesses are your responsibility, to

2    make sure that they're present.

3       RESP: Okay.

4       IO:  We'll go over the witnesses in a second.

5       RESP: Yes, sir.

6       IO:  So I'll make contact with these people.  I will

7    keep you in the correspondence, as well.  But you feel that

8    you have, or can get information to help or to present to

9    prove your case from these people?

10      RESP: Absolutely.  Absolutely, yes.

11      IO:  Okay.

12     RESP: I think the (inaudible) whether, you know,

13   (inaudible) that that case was decided.  Anybody--anybody

14   reading the actual recoupment file that was submitted up, I

15   mean, they saw--they saw the Commandant's memorandum.  I

16   mean to say it's a--it's a confirmation of the violation,

17   just to read the fact that he said I was inebriated and that

18   such and such happened.

19      IO:  Well, the bottom line is an Article 10 for an

20   alcohol violation.

21     RESP: But if it's predisposed, it's not a fair

22   proceeding.

<div align="center">22</div>

000263

1   IO:  They have met requirements.  Alcohol was consumed,

2 misconduct took place, right?

3   RESP: My rebuttal is it was not a fair proceeding.

4   IO:  Okay.  So we will talk to these people and you

5 will have the opportunity to cross-examine the reasonable

6 witnesses here, in order to help prove your case.  Okay?

7   RESP: All right.

8   IO:  At that time, if the preponderance of evidence

9 suggests that it was predisposed, then we'll drop it.  If

10 not, we're going to continue.  All right?  So if, in fact,

11 we will need to continue, we will also have witnesses who

12 can attest to your performance, folks who have had direct

13 observation of you.

14   RESP: There's an understanding that I have; it's with

15 our discussion.  Even though there's a possibility it was

16 predisposed, just the answer it's an alcohol board, it

17 wouldn't matter if it's predisposed?  I mean, that's kind of

18 the understanding I had.

19   IO:  Say it again.

20   RESP: Based on our discussion, I said that these

21 witnesses would have--have an impact on how the disposition

22 of the board turned out, and you said that it was an alcohol

23

000264

1    board.  And I--and I said well, regardless, it wasn't a fair

2    proceeding, and you said, but yeah, it was an alcohol board.

3         IO:  It was an--it was upgraded to be an alcohol board.

4         RESP: Right.  So, I mean, I guess my understanding is

5    no matter what is found, if there was a predisposition, it

6    will be relevant if you consider that to be an alcohol

7    board.

8         IO:  My preliminary findings suggest that it was an

9    alcohol board, and there was no predisposition to the

10   outcome of the board.  That was my preliminary findings.

11        RESP: Can I see how you arrived at the evolution?  Can

12   I see that, or----

13        IO:  I mean, did you consume alcohol?  Yes or no?  If

14   the answer is yes, then it's an alcohol board.

15        RESP: But I just wanted to see how you--how you

16   actually arrived at that.  I mean, that was my alcohol

17   policy violation.  It was also a regulation saying you have

18   to have two alcohol policy violations.

19        IO:  Sure.  And the first one was----

20        RESP: The first one was blatantly clear, and I am--I am

21   in no way disputing that alcohol board.  I mean, that was a

22   clear cut case.  I am without a doubt going to say that was

23   blatantly--blatantly obvious alcohol case.

                              24

1          IO:  So that was the first case.

2          RESP: With the second one, I'm not sure when my alcohol

3     policy violation was.

4          IO:  Okay.  So USCC Disciplinary Regulation 351-1, an

5     alcohol board, is any proceeding, under Article 10, where a

6     Cadet violated a specific rule under the consumption of

7     alcohol policy, including any offense caused by, as a result

8     of, or occurring after the intoxication of alcohol.

9          RESP: Right.  And what offense was that?

10         IO:  What offense took place?  Articles 1, 6, and 7,

11    being error in judgment, being unsatisfactory behavior,

12    being failure to comply with regulations, orders, and

13    instructions.

14         RESP: So if I wasn't inebriated, then I don't

15    understand what role alcohol played in that.

16         IO:  Do you want me to read it again?

17         RESP: Yes, please.

18         IO:  Okay.  United States Corps of Cadets Disciplinary

19    Regulation 351-1, an alcohol board, is any proceeding under

20    Article 10 where a Cadet violated a specific rule under the

21    consumption of alcohol, including any offense caused by, as

22    a result of, or occurring after the intoxication of alcohol.

25

000266

1              So, following the consumption of alcohol, there

2      were three articles which you violated.

3          RESP: I was believed to have violated.

4          IO:  Well, I'm here to do the investigation of were

5      these alcohol boards conducted correctly.  I believe the

6      board proceedings were conducted correctly.  I'm not part of

7      any of this.  I will, however, give you the opportunity to

8      prove that they might not have been conducted correctly.

9      But for me, the IO, the first thing I need to do is decide

10     whether or not the board proceedings were conducted

11     correctly, right?

12         RESP: Right.

13         IO:  I do believe, in my preliminary investigation,

14     that they were conducted correctly.  That's it.  That's it.

15     So I don't dig into the facts.  What's my role?  To decide

16     whether the board--your proceedings were conducted

17     correctly.  You had two alcohol boards.  Yes.  According to

18     regulation, they were.  Did you receive maximum, minimum--

19     were--were the guidelines set for--you know, did you receive

20     a more harsh punishment than was authorized?  That's what I

21     am to determine.

22         RESP: And it's--it's--if you're--if somebody

23     (inaudible) a board, where are the--where are the findings?

26

**000267**

1    I was given 80 hours with a max punishment being 100 hours

2    by a brigade board, so at some point, for whatever reason,

3    the BTO determined that he would give me 80 hours, and not

4    100 hours.

5        IO:  He can do that.

6        RESP: Right.  And I understand that, for one reason.

7    What were his specific findings regarding why he gave me 80

8    hours instead of 100 hours?  And then he also has notes in

9    there of questions he was going to ask Sergeant Rowley.  I

10   mean, it never states whether or not he actually had those

11   questions answered.  I mean, there--there is--ambiguity.  He

12   tried to say I was on room restriction the night I went down

13   to the First Class Club.  I wasn't on room restriction.

14       IO:  That's not even--that's not even a part of this.

15       RESP: It was part of it.  It's in his notes.

16       IO:  I mean it wasn't part of--I'm not considering--the

17   board proceedings is what I'm focused on.

18       RESP: So I just don't understand, then, why was that

19   part of the board?  I'm trying to understand.  I'm not

20   trying to argue with you.

21       IO:  Okay.  I'm going to go over it again.  My duty

22   right now is to decide whether or not the board proceedings

23   were conducted correctly.

27

1        RESP: Right.

2        IO:  Right?

3        RESP: Yes, sir.

4        IO:  I believe they were.  And that's it.  My

5    preliminary findings, I find that they were conducted

6    correctly.  But we're not even at that right now.  We're

7    about to make contact with this list of people right here

8    that we came up with, right?  And then bring them in, and

9    then that will be your opportunity to dispute the board

10   proceedings with these people, and present your evidence.

11   Okay?  After that, if we--if you are able to prove you

12   point, then we--we will stop.  Right?  If not, the conduct

13   investigation will begin.  At that point, I'll conduct an

14   assessment, including a list of folks that you presented on

15   Page 2 of your memorandum and bring them in and do an

16   assessment of where you are at right now.

17       RESP: Well, I mean, I think that's a specific point

18   that I--that I kind of hit on here because at some point,

19   the OTJAG, they said hey, he (inaudible) and I wouldn't be

20   given this opportunity to speak about it if there wasn't a--

21   if there wasn't a valid point there, and I believe there is,

22   and I (inaudible).

28

1    IO:  And that's your duty.  That's your duty.  Which is

2    why I do not have a--that's why it is a preliminary finding

3    and not my final.  I'd love to hear something outside of

4    this because right here, to me, the board proceedings were

5    conducted correctly.

6    RESP: Yes, sir.

7    IO:  Okay?

8    RESP: Yes, sir.

9    IO:  This is going to be your opportunity to present

10   evidence on part of your case.  Okay?  And we will make

11   contact with these people.

12   So, in the meantime, we have to coordinate for the

13   assessment piece of the conduct investigation.

14   RESP: Is it okay if I got a copy of the--for this

15   assessment?

16   IO:  Yeah.

17   RESP: Okay.  (Inaudible).

18   IO:  Sure.

19   RESP: It might be a lot easier.

20   IO:  Sure.  You take a picture of it and then--and

21   going back, it is reasonable attendance, as well.  Okay.

29

000270

1            Secondly, we need to solidify who you'd like to

2      call as far as witnesses on behalf of, you know, folks who

3      can talk to your positive character, right?

4           RESP: Right.

5           IO:  So that's the second issue that you've got to look

6      at.  So do you want to use this list, or do you have a new

7      list, or what?

8           RESP: I'll go ahead and use that list, sir.

9           IO:  Okay.  So go ahead and give me those names that

10     you all know.

11          RESP: Sergeant First Class Moore.

12          IO:  Okay.

13          RESP: Major Ziegelhofer.

14          IO:  Okay.

15          RESP: Major Knoedler.

16          IO:  Okay.

17          RESP: Cadet Elliot Chal.

18          IO:  Okay.

19          RESP: Major Patrick Snyder.

20          IO:  Okay.

21          RESP: Cadet Brandon Roy.

22          IO:  Okay.

23          RESP: Cadet Harrison Majors.

                              30

1          IO:  Okay.

2          RESP; Major Todd Cheney.

3          IO:  Okay.

4          RESP: And there's Cadet Theo Lipsky.

5          IO:  Spell that for me?

6          RESP: Theo, T-h-e-o.  And the Lipsky, L-i-p-s-k-y.  And

7     then Cadet Joe Frullaney.

8          IO:  Spell that for me.

9          RESP: Joe, J-o-e.  Frulanney, F-r-u-l-l-a-n-e-y.  And

10    Cadet John Barnes.

11         IO:  Okay.

12         RESP: And I believe that's it for now.

13         IO:  You can have a seat.  And these--and these folks

14    are going to speak on your behalf?

15         RESP: Yes, sir.

16         IO:  Okay.  Do you have a particular order you want to

17    speak to these, or examine these witnesses?

18         RESP: I guess I would go with Major Ziegelhofer as

19    number one.  Number two would be Cadet Elliot Chal.

20         IO:  Okay.

21         RESP: Number three would be Harrison Majors, Cadet

22    Harrison Majors.

23         IO:  Okay.

31

1          RESP: Actually, I'd like to add one more, the fourth

2     one being Cadet Eddie Jenkins.  He was my first sergeant

3     during CLDT.

4          IO:  Can you spell his first name?  Edward?

5          RESP: Edward.  Yes, sir.

6          IO:  Okay.  That's number four.

7          RESP: No specific order after that.

8          IO:  Okay.  So your top four are Ziegelhofer, Chal,

9     Majors, Jenkins, and then whoever else after that?

10         RESP: That's fine.

11         IO:  Okay.  Okay.  So now, as we proceed into the

12    investigation, I just want to explain to you my role, and I

13    kind of did it a couple of times as we--as we went through

14    this initial process was I am charged with finding your

15    standing, whether it is being proficient or deficient.

16    Right?  That's the first piece.  The second piece is make a

17    recommendation to the Commandant.  If found proficient, case

18    dismissed, that's it.  I'm not going to use anything in the

19    past to determine the outcome.  If you are found deficient,

20    then a recommendation will be sent to the Commandant and he

21    will make a decision.

22              Okay.  So again, in order for me to determine your

23    standing, I will form an assessment, and that will be based

                              32

000273

1   off of mostly the witnesses, and then I couple that I call.

2   I believe the additional that I will call is N[Redacted PII] D[Redacted PII]

3   from C-3.  Is she in C-3?

4        RESP: As a character witness or----

5        IO:  Yeah, just someone I need to talk to, to gain a

6   perspective.  Have you--have you been in contact with her?

7        RESP: I have not.

8        IO:  When is the last time you got in contact with her?

9        RESP: Wednesday, May 8th, 2013.  That was the last time

10  I spoke with her.

11       IO:  Any (inaudible) whatsoever?

12       RESP: No, sir.

13       IO:  Okay.

14       RESP: Actually, (inaudible) can you--can you add Cadet

15  Veronica Bryant?

16       IO:  To?

17       RESP: To the witness list; to my character witnesses.

18       IO:  What's her name?

19       RESP: Veronica.  Last name Bryant.  She's also friends

20  with Cadet D[Redacted PII].

21       IO:  And why do you want to speak to her?

33

1          RESP: I'd like her to speak before Cadet D[Redacted PII] speaks.

2      Actually, I'm sorry.  One more.  Cadet Gregory Williams, as

3      well.

4          IO:  To speak on your character?

5          RESP: Yes, sir.  She's also friends with----

6      [Audio ends.]

7      [Audio resumes.]

8          IO:  Our conversation, Captain Forlenza again, Cadet

9      Dooley in the room--Doolen.  Time: 1545.  I guess that tape

10     is a little bit shorter than we thought, and it's--what's

11     today?

12         RESP: It's the 19th.

13         IO:  Nineteenth of August.  Okay.

14             So continuing on our witness list, so our plan for

15     this is to get an assessment of you, of your character.

16         RESP: Yes, sir.

17         IO:  Right?  We're not talking about anybody else or

18     their characters; you and your character.

19         RESP: Yes, sir.

20         IO:  The last witness that you requested was Cadet

21     Raymond Mooves (phonetic).  Is that correct?

22         RESP: Yes, sir.

34

1    IO:  Okay.  All right.  So the goal, going to this

2    route, will be just to ascertain your character, which will

3    help me assess whether you can or have the potential to

4    serve as an officer in the United States Army, and to state

5    my recommendation to the Commandant and assessment.

6            Okay.  Do you have any questions on all that so

7    far?

8        RESP: I guess I'm having trouble understanding why

9    Cadet Dailey is being called as a character witness.

10       IO:  This is an individual that I would like to talk

11   to.

12       RESP: But I'm having trouble understanding for what

13   reason.

14       IO:  I would like to talk to her.

15       RESP: All right, sir.

16       IO:  Okay?

17       RESP: Yes, sir.

18       IO:  So do you have any other questions?

19       RESP: No, sir.

20       IO:  Okay.  So at this point, you have a list of

21   individuals you want to talk to, to dispute the

22   predisposition of the board, which is this list of folks

23   here, and then you have a list of folks you want to call,

35

1    basically, character witnesses, who have observed you.

2    Right?

3         RESP: Yes, sir.

4         IO:  Okay.  So after this meeting concludes, we just

5    need to basically organize a hearing where we can bring all

6    these folks in and you could present your case, the first

7    being this and second, if necessary, we'll go into this.

8         RESP: Now who can I have present at the hearing?

9         IO:  What do you mean?

10        RESP: Who can I have--when we have the hearing, who can

11   I have present?

12        IO:  It will be one at a time.  Me, you, and whoever we

13   can get in order from this list.  We'll decide whether we

14   need to move forward.  At this point we are.  And it's me,

15   you, and your witnesses one at a time.

16        RESP: Any idea when my records that I requested o be

17   present, when we have our hearing?

18        IO:  Say again?

19        RESP:  Do you have a copy of all of my records, or can

20   I request that those be present whenever we have the

21   hearing?

22        IO:  Do you have the academic records?

23        RESP: Not academic, but they would be in the file.

                              36

1      IO:  Is that the memorandum?

2      RESP:  I just wanted the--the file in its entirety,

3 please.  It's the (inaudible) file that was submitted to the

4 Assistant Secretary of the Army.  It was submitted through

5 the chain of command, up to the Superintendent.

6      IO:  I think we can request that through Regs and

7 Discipline.

8      RESP: Okay.  Thank you very much.

9      IO:  You can request that.

10     RESP:  Mr. Patrick doesn't want to do that.  He told me

11 to request everything through you.

12     IO:  Really?

13     RESP: Yes, sir.

14     IO:  What do you want?

15     RESP: Their entire work in the packet that was

16 submitted.

17     IO:  And what is that going to help you accomplish at

18 this board?

19     RESP: It's--it's going to help prove predisposition,

20 their reliance to the board.  It may not seem like it, but

21 it's--it's--it's critical to what I'm trying to prove.

22     IO:  Okay.  I will request that for you.

37

000278

1      So going forward from there, I will send out an e-

2    mail and then we'll figure out a date and a time to start

3    knocking these out.

4      RESP: I don't know if I need to submit a FOIA or not,

5    but if I do, I would consider taking it out, but is there

6    any way possible, in regards to this hearing, get an e-mail

7    exchange between Colonel Well and my attorney and Colonel

8    Well and the BTO?  Is there any way I can request that

9    (inaudible)?

10     IO:  Well, I mean, I don't--I don't have it.

11     RESP: I'd like to have you request it.

12     IO:  Not through me.

13     RESP: Why can't it be requested through you, sir?

14     IO:  I'm not an investigator.  I'm not investigating

15   this.  You are going to call all these people to help prove

16   your case.  So if you're going to request a Freedom of

17   Information Act, it should probably--probably your lawyer.

18     RESP: I thought you were the investigating officer.

19     IO:  I'm not an investigating officer.  I will be

20   conducting a conduct investigation, pending this.

21     RESP: Right.  Okay.  Well, I have the e-mail, sir.

22   That's fine.  I just wanted to see (inaudible) the Academy

23   that I have a copy of them (inaudible).

<center>38</center>

1        IO:  If you think this is going to help your case,

2    bring it.

3        RESP: I will.

4        IO:  I am simply hearing evidence that you're going to

5    present.

6        RESP: Yes, sir.

7        IO:  Do you not--do you understand?

8        RESP: No, I completely understand.

9        IO:  I mean, I'm not--I'm--I'm hearing.  That's all I'm

10   doing.  You're going to bring evidence.  I'm not going to

11   dig it out for you and say, "Here, present this to me."  You

12   know what I mean?

13       RESP: Right.

14       IO:  So you present to me.  I listen.  And then I'll

15   make a final determination whether the board proceedings

16   were conducted correctly.

17       RESP: Can my attorney be present at this, or--because

18   this is not a typical conduct investigation, okay?  So----

19       IO:  I gave you that answer.

20       RESP: But if he can be present, that would--that would

21   be amazing.

22       IO:  Where's he at?

39

000280

1          RESP: He's (inaudible).  He works in Manhattan, so he

2     can be here in about an hour.

3          IO:  I am unsure.  I can't give you that answer.

4          RESP: I'm not trying to be rude, but if the answer is

5     no, certainly I can give (inaudible).

6          IO:  It is going to be 100 percent according to

7     regulation.  If the regulation says yes, then show up.  If

8     it says no, then no.  All right?  So I'm not (inaudible).

9     If the regulation says it's fine, then it's fine.  I just

10    have to take a look at the regulation and see what it

11    allows.

12         RESP: All right.  Thank you, sir.

13         IO:  Okay?  So get that e-mail.  I'm going to reach

14    out.  I've got to keep you in all correspondences.

15         RESP: I mean, if that's (inaudible).  I guess I'm not

16    explaining it--argumentative or I'm not causing any trouble

17    for you; that wasn't my intention.  I'm basing it on the

18    last investigation that took place.  So that's why I'm just

19    trying to clear the bases for you, sir.

20         IO:  Sure.

21         RESP: I'm not trying to cause you any trouble.  I

22    didn't want you to----

40

1      IO:  No.  Yeah, I understand.  You are--how you're

2  feeling.  I just want you to understand, it's not to

3  determine anything.  It's to--to gather facts and it is to

4  make an assessment.  Right?

5      RESP: Yes, sir.

6      IO:  So two things.  One, determine whether the board

7  proceedings were conducted correctly.  All right?  That's

8  the first thing.  Were they?  It appears that they were.  So

9  maybe I'm missing something.  So you have the opportunity to

10  call these people.  And then you can talk about it and then

11  we move forward.  And then we'll talk to, if necessary,

12  these other witnesses, to determine where you're at right

13  now.

14      RESP:  I mean I'm at (inaudible).  Is there anything

15  that shows why--why you think that the board proceedings

16  were conducted correctly?

17      IO:  Why?

18      RESP: Yes, sir.

19      IO:  So I see two alcohol boards.

20      RESP: Right.

21      IO:  One, alcohol in the barracks.  Right?  Alcohol

22  policy violation.  The second one, you consumed alcohol and

23  a misconduct took place.  Alcohol violation.

000282

1          RESP: So that happens every time?  Every time there's

2     alcohol involved and then there's some kind of violation of

3     a regulation, it's automatically an alcohol violation?

4          IO: Yes, yes.  Which led me to my preliminary findings,

5     after talking to OTJAG.

6          RESP: Is there any way to go through West Point

7     precedence and find cases where that's not been the case?

8          IO:  Captain Forlenza handed packet.  Were board

9     proceedings conducted correctly?  According to the

10    regulation, he finds that they were conducted correctly.

11         RESP: (Inaudible).

12         IO:  What?

13         RESP:  I mean the--the fact that there's precedence

14    would help with the predisposition that he is--there is--

15    there is precedence; the rugby incident, the rugby case.  I

16    mean, I'll--I'll establish that.

17         IO:  Yeah, I'm not--I'm not familiar with precedence.

18         RESP: I'll establish it.

19         IO:  You can.  You can present your evidence, which is

20    perfectly fine.  I'm all ears.

21         But what I am reading to you, which led me to my

22    preliminary decision, was the regulation, which I read about

23    four times.  Alcohol, followed by misconduct, equals

                                42

000283

1      alcohol-policy violation, times two; the one from 2010,

2      whatever the alcohol in the barracks policy.

3          RESP: Right.

4          IO:  So two, did you deserve a harsher punishment than

5      is allowed by regulation?  No, you didn't.  Were board

6      proceedings conducted correctly because of those?  Yes.

7      That's all I had to determine.  That's all that is required

8      for me to determine.  Right?

9          RESP: Yes, sir.

10         IO:  So that is how I found them to be correct.

11        RESP: Now I'm in no way disputing that first board, so

12      I don't (inaudible).

13        IO:  Sure.  And I understand.  And the reason we're

14      going to bring these people in is because you're disputing

15      the second one, and there's character.

16        RESP: That first one, there's no doubt, it's clear cut.

17        IO:  Sure.

18        RESP: I appreciate (inaudible).

19        IO:  Okay.  So we'll go ahead and end this tape now,

20      and I will reach out through e-mail, and then we'll begin to

21      coordinate for the second meeting.  You're a day-one guy.

22      So I'm going to try to figure out day-two meetings, right?

23        RESP: That would be great.  Yes, sir.

<div align="center">43</div>

000284

1       IO:  Or telephonic.  Do you plan on being present for

2  all the hearings?

3       RESP:  For every single one I will be present.  Yes,

4  sir.

5       IO:  Okay.  So start thinking about evidence that you

6  want to present.

7       RESP:  I've already been thinking about it.

8       IO:  Do you have any questions you want to ask these

9  folks?

10       RESP: Sir, no, no problem, sir.

11       IO:  All right.  Hey, thank you.

12  [Audio ends.]

13  [Audio resumes.]

14       IO:  This is Mr. Williams?

15       MR. WILLIAMS:  Yeah, Ed Williams.

16       IO:  Okay.  Hi, how are you?

17       MR. WILLIAMS:  Good, good.  I hope I'm not

18  interrupting?

19       IO:  No.  I'm actually free.  One moment.  Let me shut

20  my door real quick.

21       MR. WILLIAMS:  Okay.

22       IO:  How can I help you, sir?

23       MR. WILLIAMS:  Well, I want to talk with you about

                          44

000285

1    tomorrow's hearing, and I'm not quite sure what this hearing

2    is, whether it's a prelude to the conduct hearing, or

3    whether this is the conduct hearing itself, number one.  And

4    number two, I understand from an e-mail that you sent Isiah,

5    I think on Monday, you said that your--that counsel can

6    assist in the preparation of the cross-examination of

7    witnesses, but may not be present during the hearing, if you

8    may recall that.

9        IO:  Yes.

10       MR. WILLIAMS:  So I'm calling--I haven't read the reg

11   myself.  I assume you read it correctly.  I would be

12   interested in coming up and assisting Isiah in the

13   preparation of cross-examination.  I won't be present inside

14   the hearing room, and I just wanted to talk to you about

15   that, and see if you have any objection to that.

16       IO:  No, and that is his right as a Cadet, yeah, to

17   assist in his preparation.  And you are correct, yes.  You

18   can assist him in the preparation.  You just cannot be

19   present during the hearing.  It is the same with me.  The

20   attorney who's assisting me can assist me in my preparation;

21   however, he cannot be present during the hearing, either.

22       MR. WILLIAMS:  Okay.  So I could be outside the door or

23   whatever, to talk with him and--and consult with him at that

45

1    time.  Is that correct?

2        IO:  Between--yeah.  Until we begin the board

3    proceedings.  That's correct.

4        MR. WILLIAMS:  Well, I mean, what about during the

5    proceeding?  Can he come out and consult with me during the

6    proceeding, as long as I'm not inside like in--and I've done

7    a number of criminal grand jury work.  You know how a grand

8    jury works.  The lawyer's not permitted to be in the grand

9    jury, but their witness can come out and consult with the

10   attorney in preparation for--in connection with the hearing,

11   but not be inside.

12       IO:  Sure.  And I believe that is to be correct.

13   However, I can get clarification on that for you.

14       MR. WILLIAMS:  Okay.  That's great.  So could you tell

15   me where this hearing will take place and when?

16       IO:  This hearing is going to take place beginning at

17   1300 tomorrow in Building 606, on the fourth floor.

18       MR. WILLIAMS:  Building 606.  Is that the Staff Judge

19   Advocate's Office?

20       IO:  Exactly.

21       MR. WILLIAMS:  Okay.  I think I've met Colonel Emanuel

22   there.  I think I've been in.

23       IO:  Sure, yeah.  I'm not sure of the entire staff.

                                46

000287

1   MR. WILLIAMS:  She's a colonel.  And I think Colonel

2 Well is there, as well.

3   IO:  I believe he PCS'ed.

4   MR. WILLIAMS:  What is PCS?

5   IO:  He is--it stands for permanent change of station,

6 and he is not physically here.  I don't know his new duty

7 station.

8   MR. WILLIAMS:  All right.  But anyway, goodness

9 gracious.  I'm over 60, so I forgot Colonel Emanuel's--maybe

10 it's her first name or the last name.  So she's a colonel,

11 lieutenant colonel in JAG.  All right.  Building 606.  And I

12 would take the--I would take the shuttle bus from down below

13 the parking lot, correct?

14   IO:  So, yeah.  Parking here can be rather----

15   MR. WILLIAMS:  Is a challenge.  You know, I've met with

16 Colonel Mauldin a couple times, and Delroy Patrick, and I've

17 normally taken the shuttle bus up and I've been good.

18   IO:  Yeah.  And parking at Buffalo Soldier Field,

19 inside there, there's a shuttle bus that runs back and

20 forth, I believe it's every 15 minutes.

21   MR. WILLIAMS:  Yeah.  The shuttle bus is nothing to

22 speak of, as you know.  It's--it's kind of rickety, but it

23 makes it.

000288

1      IO:  It does the trick.

2      MR. WILLIAMS:  All right.  1 p.m.  Now, just for

3  clarification, this proceeding that's taking place tomorrow

4  is not the conduct investigation hearing itself.  Is that--

5  is that correct?

6      IO:  It is part of it.  So--and it's twofold, really.

7  One, my--I have to determine whether the law proceedings

8  were conducted correctly, and provide an assessment as to

9  the character of the Cadet.

10      MR. WILLIAMS:  Okay.

11      IO:  So the very first of the proceedings is going to

12  be addressing Cadet Doolen's dispute to specifically hear

13  Colonel Mauldin.

14      MR. WILLIAMS:  Dispute as to what?

15      IO:  To be--his witness that he is calling upon to

16  dispute the board proceedings is Colonel Mauldin.

17      MR. WILLIAMS:  Right.  And I've met Colonel--Colonel

18  Mauldin several times.  I know Colonel Mauldin.  Yeah.  And

19  the issue, you may know, is no longer whether or not Colonel

20  Mauldin was predisposed.  He's not going to argue that.  And

21  he's not going to argue, as you know, whether or not the

22  proceedings were fair or not.  It's my understanding that

48

1    the issue is--is whether or not there had been two alcohol

2    policy violations which would trigger the----

3        IO:  The conduct investigation.

4        MR. WILLIAMS:  Would it trigger a conduct review or a

5    conduct investigation?

6        IO:  It would--it would trigger a conduct

7    investigation.

8        MR. WILLIAMS:  Right.  So this is really--this is

9    really prior to the--what I call the big enchilada, the

10   conduct investigation, correct?

11       IO:  This is--let me king of--I'm trying to choose my

12   words carefully here.

13       MR. WILLIAMS:  Yeah.  I'm curious what you're doing

14   with an attorney.

15       IO:  Yeah, exactly.

16       MR. WILLIAMS:  I mean, if the conduct investigation is

17   being bifurcated, that this is like part one, as to whether

18   you go forward with part two?

19       IO:  If--if--if the time we speak to Colonel Mauldin

20   and his dispute is valid that, in fact, a conduct

21   investigation should not have been triggered, if, in fact,

22   he has a valid claim.

49

1       MR. WILLIAMS:  Right, right.  So could I suggest this,

2    Captain?  Could I suggest that this is--this is preliminary

3    to a conduct investigation, because it's Isiah's position,

4    our position, I'm assisting him, as you know, that there

5    needs to be something that happened before a conduct

6    investigation is triggered, as I understand it.

7     IO:  In this case, it was the violation of two alcohol

8    policies.

9       MR. WILLIAMS:  Right, right.  So that--that is the--

10    that is the threshold issue, or as I call it, threshold

11    issues.  So unless there's a finding that there's two

12    alcohol policy violations, then there's no basis of going

13    forward with--with the conduct investigation.

14     IO:  So as I reviewed these two board proceedings,

15    there were two alcohol policy violations.

16     MR. WILLIAMS:  Well, Isiah--Isiah, in his prior e-

17    mails, has asked for an explanation, what was the--what was

18    the second he admits--because I think when he was a first-

19    year Cadet, I think he snuck in some booze or something, and

20    there was an alcohol violation which is not contested.  The

21    question is whether or not this--this latest incident, which

22    was the subject of the board in July, whether that was the

50

1    policy--if that was an alcohol policy violation, correct?

2        IO:  So that is his contention.

3        MR. WILLIAMS:  But he has asked, as I have--as I have

4    seen the e-mails, and I may not have seen them, I think he

5    asked you, "What was the--what was the second--what is it

6    that West Point is contending or Delroy Patrick is

7    contending is the second alcohol policy violation."  I don't

8    think he's ever gotten an answer to that.

9        IO:  So--and I have answered it.  And then in his board

10   packet, from the second board, the findings that Colonel

11   Mauldin had showed that he was under the influence, and I'm

12   trying to pull up the e-mail so I could read it to you

13   specifically here.

14       MR. WILLIAMS:  I did not see any findings.

15       IO:  So----

16       MR. WILLIAMS:  I mean, I've read--I've read the

17   decision.

18       IO:  Let me pull it up here.

19       MR. WILLIAMS:  And maybe you could forward it to me,

20   because maybe you and I don't have the same document.

21       IO:  So are you looking at the 2-3?

22       MR. WILLIAMS:  Well, I don't have it on my screen right

23   now, but if you could read it to--what is the date of it?

                            51

1    IO:  So the USMA Form 2-3.  The date on this document

2    is the date of his hearing, which was 10 June 2014.

3    MR. WILLIAMS:  That was the date of the hearing?

4    IO:  Yes.

5    MR. WILLIAMS:  And--and the--and the decision of

6    Colonel Mauldin, which awarded him, what, 35 demerits?

7    IO:  Imposition of punishment was 80 extra duty hours,

8    60 days of restriction, reduction of rank to PFC, other

9    being SLDP, withdrawal of privileges, all, for 90 days.

10   MR. WILLIAMS:  And did I--is that the one that had 35

11   demerits?

12   IO:  I do not see demerits.  I think the demerit policy

13   is----

14   MR. WILLIAMS:  The document that I read, that

15   specifically said 35 demerits.  Maybe you and I are looking

16   at two different documents, and I haven't seen what you

17   have.

18   IO:  Okay.  So I'm going back up to the top, to his

19   notification, paragraph two.  I will consider everything you

20   present in deciding whether I will impose punishment, and

21   the type and amount of punishment I will impose.  Two max

22   punishments equals 35 demerits, 100 hours, 90 days of

23   withdrawal, 60 days of restriction, reduction in rank to one

52

**000293**

1    or more lower ranks.  I think that was just what he can

2    provide.  But after the hearing, the imposition was

3    different.

4        MR. WILLIAMS:  I'm not following.  And I guess I'm

5    handicapped because I don't have the document.  Would it be

6    possible for you to forward the--the document that you're

7    referring to to me?

8        IO:  Sure, yeah.  If you would, just--because Cadet

9    Doolen should be read in on the correspondence, you know,

10   that I have regarding this case.

11       MR. WILLIAMS:  All right.  Well, I'm not so sure I have

12   that.  I mean, I have a lot of documents, but I'm not so

13   sure which one it is.

14       IO:  No worries.  So if you were to write me an

15   e-mail----

16       MR. WILLIAMS:  Sure.  Just shoot me a copy of that.

17       IO:  With Cadet Doolen on it?

18       MR. WILLIAMS:  I'm sorry?

19       IO:  If you just send me an e-mail and if Cadet Doolen

20   is----

21       MR. WILLIAMS:  Oh, sure, sure, sure, sure.

22       IO:  ----cc'ed on it, asking for this document----

                                 53

1        MR. WILLIAMS:  Yeah, no.  So what I'm asking for is the

2    decision on the board that took place in June, correct?

3        IO:  Yes.

4        MR. WILLIAMS:  All right.  Now I have a memory of

5    reading such a document, and it talks about the allegations,

6    the charge, and then it has a decision, which I think you

7    read.

8        IO:  Yes.

9        MR. WILLIAMS:  But I don't see any--I don't recall

10   seeing any findings on that document.

11       IO:  Okay.  If you send me an e-mail with--with Cadet

12   Doolen cc'ed on it, asking for this findings, you know, just

13   to formalize the process a little bit----

14       MR. WILLIAMS:  Yeah, yeah, yeah, yeah.

15       IO:  ----I will say Cadet Doolen, do you authorize me

16   to release this document?  If he says yes, I will scan it

17   and send it to you.

18       MR. WILLIAMS:  Okay, good.  I will do that, as soon as

19   I get online here.

20       IO:  Perfect.

21       MR. WILLIAMS:  Let me just ask you one more thing.

22   Have you published the list of witnesses that you were

23   calling?  Are you calling witnesses?

                                 54

000295

1        IO:  I am not.

2        MR. WILLIAMS:  So the only witness will be Colonel

3    Mauldin?

4        IO:  For the board proceedings, and then the witnesses

5    to attest to his character.

6        MR. WILLIAMS:  Oh, plus the character witnesses, right?

7        IO:  Roger.

8        MR. WILLIAMS:  Right.  So it'll be--it'll be Colonel

9    Mauldin plus character witnesses?

10       IO:  Yes.  I was actually in the process of writing an

11   e-mail to him regarding his character witnesses.  I've only

12   got confirmation from a couple of his folks so far.

13       MR. WILLIAMS:  All right.  Will they be appearing in

14   person or in writing?  Do you know?  Or both, or----

15       IO:  So it can be both.  So I have blocked off about 20

16   minutes, you know, spanning from 1300 to--I have the last

17   one here at 1825, for them to show up.  A couple of them

18   have written back saying they're not going to be able to

19   make it, but they'll provide a memorandum on his behalf.

20       MR. WILLIAMS:  Okay.  And that includes, hopefully,

21   people who--who observed his performance at Buckner this

22   summer?

55

1          IO:  I have put on his witness list everyone that he

2     has requested.

3          MR. WILLIAMS:  Okay.  Very good.  Well, great.  Well, I

4     will--I will send you and Cadet Doolen an e-mail right now.

5     I understand he's in class, but I'm available for a while.

6     But I will send an e-mail and hopefully he will authorize it

7     and you can then send me Colonel Mauldin's decision.   I

8     believe there's only one document that Colonel Mauldin

9     signed and issued as a result of the board, unless there are

10    two.

11         IO:  It's the 2-3.

12         MR. WILLIAMS:  Form 2-3?

13         IO:  Yeah.  And that's the one, once he gives the okay,

14    I'll send to you.

15         MR. WILLIAMS:  Okay.

16         IO:  Which----

17         MR. WILLIAMS:  Okay.  No more questions.  You have been

18    very helpful.  And I hope you don't regard this as

19    adversarial in nature, because I'm old enough to realize

20    that people need to cooperate in these types of proceedings,

21    and not be aggressive and adversarial or counseled.

56

1    IO:  Yeah, I--I completely concur, and I am the mutual

2    party here, and I believe both sides need a fair handshake,

3    so----

4    MR. WILLIAMS:  And--and--and to be very candid with

5    you, I have counseled Cadet Doolen very, very strongly about

6    the language that he used in addressing you earlier, and it

7    was totally inappropriate, and he understands that now.  And

8    so I hope you will take that into consideration going

9    forward.  There is no--no intention to go forward with an IG

10   inspection or whatever he alleged.  That was just stupid.

11   IO:  Yeah.  You know, IG is a right--to all of this,

12   whether it's a Cadet or----

13   MR. WILLIAMS:  He has a right to do a lot of stuff, but

14   he also has an obligation to be civil.  But there's a lot at

15   stake here for him, as you can understand.

16   IO:  Sure, absolutely.  And, you know, if at any time I

17   had a question regarding procedures and guidelines, those

18   are the experts, and I would go to them, as well, if I had a

19   question or concern.

20   MR. WILLIAMS:  I appreciate it.  You have to understand

21   there's a long history here, and I'm not so sure you're

22   aware of it.  He was previously recommended for suspension

23   by the Superintendant and the Commandant and the

57

000298

1    Superintendent, and that was overturned by the

2    Undersecretary of the Army.  And the reason it was

3    overturned was because he did not get a fair hearing.  He

4    did not get due process.  I'm not sure you're aware of that.

5         IO:  Not really.  Yeah, I was--once--once the two

6    alcohol board violations were--were flagged in the system,

7    it automatically triggers this thing, so I was----

8         MR. WILLIAMS:  Well, he was previously flagged and he

9    was denied a fair hearing, denied due process, and--and the

10   recommendation of the Superintendent to suspend was

11   overruled, and that's rather extraordinary.  And so there's

12   a lot of water under the dam that you're not aware of.  And

13   part of it below is from the heavy hand of Mr. Delroy

14   Patrick who, I should add, is he going to be present at

15   tomorrow's hearing?

16        IO:  He will not.

17        MR. WILLIAMS:  All right, because if he were, I would

18   object strongly.  He did not help that process and did not

19   help West Point, and I'm glad that he will not be there.

20        IO:  Sure.  He was originally on the list and Cadet

21   Doolen wanted to, but recently he----

58

000299

1    MR. WILLIAMS:  Yeah, no.  On my--on my counsel he--he--

2    he will not.  I was just wondering whether he will deem

3    himself so self important that he has to appear himself.

4        IO:  I am not calling him as a witness.  And like I

5    said before, my duty at this point is to decide as to

6    whether these board proceedings occurred according to

7    regulation and if so, provide an assessment and a

8    recommendation, if necessary.

9        MR. WILLIAMS:  Could I--could refine that, to suggest a

10   refinement?  No one is--no one is contesting that the board

11   went forward between Colonel Mauldin.  No one is contesting

12   that--that Colonel Mauldin was predisposed.  The only thing

13   that's being contested, which is preliminary to triggering a

14   conduct investigation, is whether or not there were two

15   alcohol policy violations.

16       IO:  Roger.

17       MR. WILLIAMS:  And if there were no policy--and if

18   there were not two alcohol policy violations, then there's

19   no basis to go forward with a conduct investigation.  Am

20   I--Are you and I on the same page?

21       IO:  We are--in terms of my scope, we are on the same

22   page.

59

1      MR. WILLIAMS: All right.  All right.  Well, good,

2   Captain.  I will try to get an e-mail off to you in the next

3   few minutes, and when Cadet Doolen gets done with the class,

4   hopefully he will respond, and I will try to be here at like

5   maybe 12:30.

6      IO:  Yes, yes.

7      MR. WILLIAMS:  I realize that the shuttle bus doesn't--

8   doesn't work, you know, every five minutes, so I have to

9   time my presence.  Do you understand?

10      IO:  Certainly, certainly.

11      MR. WILLIAMS:  All right.

12      IO:  He is pretty quick to reply, as well.  I'm going

13   to--I'm going to drop him a line now, and then there we're

14   good.  I've only had contact with a couple of his character

15   witnesses, so I--just to give him, you know, time to kind of

16   track these people down and/or get, you know, memorandums on

17   his behalf from them.

18      MR. WILLIAMS:  Yeah, yeah, yeah.  Okay.  Not to--not to

19   fluff me up or anything, but I am military for ROTC,

20   infantry officer of two years.  I still have my dog tags.

21      IO:  Nice.  Well, thank you for your service.

22      MR. WILLIAMS:  Well, thank you.  I did not have a bad

23   time.  I had a--I had a good experience in the military,

60

000301

1    although it was during a bad time, I happily did not get

2    killed in Vietnam.  I was--I volunteered to go, so I'll give

3    myself credit.  But the G3--G3 and operations at brigade

4    declined to accept my rollover, and we exchanged Christmas

5    cards every year until he died.  I was thankful for that.

6    But anyway, that's another story.

7         IO:  Yeah.  Very cool.

8         MR. WILLIAMS:  All right (inaudible), and thank you so

9    much for your assistance.  I appreciate it.

10        IO:  All right.  Have a safe drive up, and we'll talk

11   to you soon.

12        MR. WILLIAMS:  Thank you.

13        IO:  Okay.  Take care.  Bye-bye.

14   [Telephonic connection terminated.]

15        IO:  This was a phone call between myself and Cadet

16   Doolen's attorney on 20 August 2014, ending at approximately

17   11:23.

18   [Audio ends.]

19   [Audio resume.]

20        IO:  Okay.  I have Cadet Doolen here in the room.  This

21   is Captain Forlenza, and we're just going to hit the

22   preliminary before we start bringing folks in.

61

1      RESP: All right, sir.  So from my preliminary

2  statement----

3      IO:  So let me start here?

4      RESP: Oh, sorry.

5      IO:  Okay.  So I'll walk you through the process so we

6  do it correctly.

7          So this investigation, under authority memorandum,

8  Subject:  Conduct Investigation Officer Appointment, dated

9  11 August 2014, Department of the Army Headquarters, United

10  States Corps of Cadets, West Point, New York, is convened to

11  consider your deficiency in conduct.

12          This conduct investigation has been established by

13  the Commandant of Cadets to provide you an informal hearing

14  to investigate your deficient-in-conduct status.  This

15  investigation will consider matters that argue both for and

16  against your continuation in a deficient status, or

17  subsequent recommendation to the chain of command for

18  proficiency.

19          You were advised of your rights in connection with

20  the conduct review process by a letter dated 17 July, when

21  you received it, and then again when we had our initial

22  interview.

62

000303

1          I'm going to ask you if those rights have been

2     observed up to this point, and then ask questions with

3     regard to specifics within those rights.  Before I ask you

4     these questions, I'm going to administer the oath for sworn

5     testimony.  Once you are sworn in, you will remain under

6     oath for the duration of these proceedings, and need not be

7     sworn in again.

8          RESP: Yes, sir.

9          IO:  Okay.  So if you would, raise your right hand.  Do

10    you swear or affirm that the evidence you shall give in this

11    case now in hearing shall be the truth, the whole truth, and

12    nothing but the truth, so help you God?

13         RESP:  I do.

14         IO:  Okay, we're good.  So just a couple more questions

15    for you before we proceed:  To the best of your knowledge,

16    at this time, have any of your rights been not observed and

17    if so, which one of them were not?

18         RESP: No, sir.  They were--they were all observed.

19         IO:  Have you had a reasonable period of time to

20    prepare your case, including adequate time for consultation

21    with legal counsel?

22         RESP: Yes, sir.

63

1   IO:  Do you intend to challenge me as the investigation

2  officer and if so, for what cause?

3   RESP: No, sir.

4   IO:  Do you intend to answer questions with regard to

5  your conduct deficiency, and to testify on your own behalf,

6  or do you intend to exercise your right to remain silent?

7   RESP: I intend to incorporate testimony.  Yes, sir.

8   IO:  Okay.  Have you had the opportunity to examine all

9  documents to be considered by this investigation, including

10  your TAC file?  Would you like the opportunity now to

11  examine or re-examine these documents?

12   RESP: I've had the opportunity.

13   IO:  Do you object to any of these documents?

14   RESP: No, sir.

15   IO:  Have you had the opportunity to arrange for the

16  presence of witnesses on your behalf, or to obtain written

17  evidence from individuals who will not be present?

18   RESP: Yes, sir.  I have.

19   IO:  During the issue resolution phase, you will state

20  the basis of issue, and indicate whether or not you are

21  calling any witnesses in support of the challenge, which I

22  have already went through all that and looked that up.

64

000305

1          I will direct that any witnesses that are to be

2     called, you will introduce your witnesses by name, class,

3     cadet rank, any position, and state the purpose for which

4     the witness is appearing, and the nature of their

5     anticipated testimony.

6          I will state for the record the same information

7     concerning any witnesses I may call.  I'm not calling any

8     witnesses.  All witnesses will be sworn, similar to what we

9     just did prior to speaking.  You will initiate the questions

10    for all your witnesses first, and then followed by myself

11    asking questions, and then if you wish to ask questions

12    after that, you're free to do so.

13         At the completion of the presentation of all your

14    evidence pertinent to your disposition, and our dialogue

15    about your behavior, you'll be excused while I reach a

16    finding.  And this finding could take--it's going to take a

17    couple of days, just to take a look at everything submitted

18    here, everything we talked about today, and then what we

19    have in here, so it'll be a few days before we reach any

20    decision.

21         RESP: It's a pretty thick file.

22         IO:  It is.  It is.  My findings will be forwarded

23    through the chain of command.  My findings will document

65

000306

1    whether or not you are found to be deficient, and also

2    recommend a disposition.  If you are found to be deficient,

3    the Commandant will decide whether to place you on probation

4    or to recommend to the Superintendent that you be separated,

5    suspended, or placed on suspended separation, turned back to

6    a lower class, or subject to other appropriate actions.

7         Do you have any procedural questions at this time?

8         RESP: No, sir, I don't.

9         IO:  Okay.  So the hearing will now proceed.  And the

10   third we're going to do is deal with the board dispute, and

11   that witness being Colonel Mauldin.

12        RESP: Can I--actually, with the preliminary--just a

13   preliminary statement I prepared, or (inaudible)?

14        IO:  If you want, or we can wait until we move into the

15   assessment phase; whatever you feel.

16        RESP: I'll just go ahead and open it up.

17        IO:  Sure.

18        RESP: Do you mind if I stand?  I just prefer to.

19        IO:  Absolutely.

20        RESP: All right.  Thank you.

21        So basically, I just wanted to give you a request

22   that the conduct investigation not proceed forward, that I

23   not be found deficient in conduct, and the reason I request

66

000307

1    that is because the conduct review board for a conduct

2    investigation is initiated based on two Article 10s for

3    alcohol policy violations.  Based on the board on June 23rd,

4    the Form 2-3 that I received, there--I want to include

5    findings of the actual alcohol policy violation, and I want

6    to give you an exhibit of that.  I'll just give you time to

7    take a look at that.

8         IO:  I'm familiar with it.

9         RESP: Also, as I mentioned, there are no completed

10   findings on this form.  Additionally, an alcohol policy

11   violation, according to Card 2, is not defined, but I've

12   also prepared an exhibit for that, as well, which I plan on

13   giving to you.  For the sake of relevancy of this

14   proceeding, I would suspect an alcohol policy violation is

15   related to an alcohol-related offense, as highlighted.  The

16   example given is a DWI, a DUI, DWAI, underage drinking, and

17   I highlighted and underlined serious misbehavior while

18   intoxicated.

19        Colonel Mauldin--the key--the key point being is

20   that a serious misbehavior while intoxicated, Exhibit 3,

21   (inaudible), that's Exhibit 3.  That's what my attorney

22   asked me to prepare.  That's my best recollection of what

67

000308

1   Colonel Mauldin said to me at my brigade board on 23 June

2   14.  I'll give you time to read that.

3   [Pause in proceedings.]

4        IO:  Okay.

5        RESP: Okay.  And so firmly between the no findings and

6   the oral statement from Colonel Mauldin that I was not

7   inebriated, I respectfully request that I not be found

8   guilty of another alcohol policy violation as mentioned,

9   emphasizing that Colonel Mauldin thoroughly told me I was

10  not inebriated.

11        I was not referred to ASAP, and stopped drinking

12  in the October 2013 time frame.  So an additional point,

13  additional point alpha, as mentioned, stopped drinking

14  October 13.  Rather, I received extensive counseling from a

15  psychiatrist, to include a fit-for-duty evaluation in which

16  I was declared fit for duty.

17        My own personal reflection over the course of the

18  past year, I would've known that.  Indeed, my attorney has

19  served as a mentor and a guide, which has been incredibly

20  helpful and--and similar to the form that I have displayed

21  in (inaudible).  And the (inaudible) performance at CFT, as

22  indicated at Exhibit 4.

68

1          Not only will you find character statements from

2     fellow Cadets and Major Ziegelhofer, or Major Z, you will

3     find two attached performance development reports.

4          IO:  Yeah.  I think I have all these, as well.

5          RESP: Right.

6          IO:  Okay.

7          RESP: I just wanted to----

8          IO:  Yup.

9          RESP: Read them for a minute.

10         And then, for all these reasons, if it is found

11    that I committed a second alcohol policy violation, I

12    respectfully request a null result at the second CI, and I'd

13    like to refer back to Card 600.  It says that--it says, "A

14    Cadet who receives two Article 10s for alcohol-policy

15    violations, as defined in this chapter, will undergo a

16    Conduct Review, which could," and that's the word I'd like

17    to emphasize in that card, is saying "could lead to another

18    Conduct Investigation." It could lead to another Conduct

19    Investigation, but it doesn't have to.  And given my--my

20    performance thus far, that's what I'm requesting, that I not

21    be found deficient should this be called a second alcohol-

22    policy violation.

69

000310

1          Another major point that I'd like to point out is

2     on this May 13 occurrence happened 15 months ago.  It's

3     perfectly logical and it's apparent from those statements I

4     submitted that anybody can change, and that it should be

5     apparent that I am a much different person than what I was

6     15 months ago or a year ago.  I am a much different person,

7     and I think that my performance thus far, helping out with

8     the chaplain for the two weeks prior to CLTD, he noted that

9     I did excellent, and that was more of a follower role, doing

10    tasks that but maybe people wouldn't to do; taking out

11    trash, cleaning up.  I had no issue with that.  Then I took

12    on my leadership role, and I did well on that, as well.

13          So on two separate occasions this summer, I've

14    proven that I can, one, I can be a follower, and two, I can

15    be a leader, and I can do excellent work.

16          So that's my----

17    IO:  Okay.  Grab a seat.  Yeah, I will take all the

18    evidence you have submitted here and I will use this in

19    deliberation.

20    RESP: Okay.  Yes, sir.  Thank you.

21    IO:  Okay?  Thank you.

22          So the first thing we're going to do, we're going

23    to call Colonel Mauldin in, and then I'm going to just swear

70

000311

1    him in, and then at that time, I'll turn it over to you to

2    ask whatever questions that you have with him.

3        RESP: Yes, sir.

4        IO:  Okay?

5        RESP: Thank you.

6    **COLONEL NICK MAULDIN, BRIGADE TACTICAL OFFICER, U.S. ARMY,**

7    **was called as a witness by the Respondent, was sworn and**

8    **testified, in substance, as follows:**

9        IO:  So we are restarting on a new tape, as we brought

10    Colonel Mauldin in.  Again, I'll restate why you've been

11    called here.  So you've been requested as a witness by Cadet

12    Doolen in support of his challenge on his most recent board;

13    he disputes specifically is that there were no findings made

14    by you at this board that characterized it as an alcohol

15    board, or that an alcohol-policy violation occurred.

16         Sir, I've provided you with 2-3 from that board;

17    it's a two-page long, 10 June 2014, and I'll turn it over to

18    Cadet Doolen.

19        RESP: Sir, do you mind if I stand here?

20        IO:  Sit, please.

21        RESP: Okay.

22

23

000312

1                         DIRECT EXAMINATION

2    Questions by the Respondent:

3         Q.   All right, sir.  I just want to thank you again

4    for coming here today.

5         A.   Sure.

6         Q.   I appreciate your time.  I know it's valuable.  I

7    gave you an example of Exhibit 2----

8         A.   Correct.

9         Q.   ----and would just-- I ask, will you please

10   confirm that that's the one you actually signed following

11   the board proceeding?

12        A.   Yes.  This is the one that I signed.  That is

13   correct.

14        Q.   Thank you, sir.  At the conclusion of the board,

15   we had an oral conversation regarding the outcome.  Did we--

16   we had that conversation, right?

17        A.   Correct.

18        Q.   Yes, sir.  Okay.  So I want to hand you an exhibit

19   of example-- or Exhibit 3.  It what I've prepared.  It's my

20   best recollection of what I recall of you saying from the

21   brigade board.  I'll ask you to please read that.

22        A.   This is what you're saying we said?

23        Q.   That was my best recollection.  Yes, sir.

                              72

1     A.    Okay.  And you found that I was not inebriated the

2     night of 8 May 2013?

3     Q.    Yes, sir.

4     A.    And I did not lock Cadet N[Redacted PII] D[Redacted PII] in her

5     room?  This is not what I recollect at all.  So I'm not sure

6     whether this is based on the evidence presented, I do not

7     believe that you were inebriated.  I never said that.  But

8     you did admit consuming alcohol.  I said--you may have said

9     that you are not admitting that you prevented Cadet N[Redacted PII]

10    D[Redacted PII] from leaving her room, but I never said that I did

11    not think you did not block her.

12    Q.    Okay.

13    A.    So I'm not--this isn't what I--

14    Q.    So (inaudible)?

15    A.    I don't think so, that I can recall at all.  I

16    believe the evidence in the packet clearly supported the

17    fact that you did prevent her from leaving the room.  As I

18    look at the witness statements in this board, the two people

19    inside the room clearly indicated that you blocked her from

20    leaving the room.  Both Cadet D[Redacted PII] and her roommate gave

21    sworn statements to that fact.  And so it's essentially two

22    people who live in the room against one person who was not

73

000314

1    invited gave a statement.  So based on that, I would not

2    have said this.

3        Q.    Okay.

4        IO:  Cadet Doolen, further questions?

5        RESP: That's it.  That's it, sir.

6                    CROSS-EXAMINATION

7    Questions by the Investigating Officer:

8        Q.    I have a question for you.

9        A.    Sure.

10        Q.    When you conducted this board, was it an alcohol

11    board?

12        A.    Absolutely.  There were three questions at the

13    end--you'll remember at the end of the board that I asked

14    Cadet Doolen.  I said, "One, were you drinking that night?"

15    And he said, "Yes."  He immediately acknowledged that he was

16    drinking.  The second question, "Did you go into N█Redacted PII█

17    D█Redacted PII█'s room uninvited?"  I believe he said to the fact of

18    "Well, I thought they said 'enter.'"  I said, "Was the door

19    shut?" which is a violation of a regulation, which Cadet

20    Doolen acknowledged that it was shut.  And then I asked him,

21    "Did Cadet D█Redacted PII█ ask you to leave the room?" and you did

22    not leave the room, is that correct?" and he said, "Yes,

                              74

000315

1    that was correct."  Eventually, he did leave the room, but

2    after people came in.

3        Q.   Sir, was it the preponderance that led you to

4    believe that he was intoxicated?

5        A.   I wouldn't necessarily say he was intoxicated.  I

6    will say that alcohol was a contributing factor.  He did

7    admit that he consumed alcohol.  As you go through the

8    witness statements in your packet, there are multiple

9    witness statements from individuals saying that they smelled

10   alcohol on him.  The level of intoxication, I do not know,

11   but alcohol was involved in this incident.  Therefore, it

12   relates to (inaudible).

13       IO:  Yes, sir.

14            I have no further questions.  You have one last

15   opportunity to engage.

16       RESP: I'm good (inaudible).

17       IO:  Sir, thank you for your time.

18       RESP: My intention was not to argue with you, sir..

19       COLONEL MAULDIN:  Oh, I don't want you to argue.  I

20   mean, you know, I guess if we go there, I mean, this is what

21   I would say.  You know, on the phone conversation, I look at

22   the evidence of the board, of the statements that were

23   given, and so the inebriation, I don't know what level you

                              75

000316

1   were.  There's no way I could ever tell..  I wasn't there.  I

2   go off of reports.  You told me that you drank X and, you

3   know, there's other statements that say they smelled

4   alcohol.  Based on those two, maybe you only had--I don't

5   know how many you had--I think you said maybe two----

6        RESP: I said one and a half drinks over four--four

7   hours.

8        COLONEL MAULDIN:  Okay.  So based on that, there was

9   alcohol.  Based on the witness statements from--from

10  multiple people that are in the--in the packet, in your

11  alcohol--or your board that you received, it was mentioned

12  multiple times about the smelling of alcohol.  And so when

13  you're saying you drank and then the saying from witnesses

14  that alcohol was involved, that there was screaming taking

15  place in Legion Square, those are the things.  I take the

16  preponderance of the evidence that I see, and that's how I

17  can say you did know it was alcohol, there's statements

18  saying alcohol, so alcohol contributed in some manner to

19  this incident.

20       IO:  Okay, sir.  Thank you.

21  [Witness excused.]

76

000317

1        IO:  So, okay.  So now I just want to talk a little bit

2    to you about, you know, just some general questions.  Okay?

3    So--and this will contribute to my assessment of you.

4    **CADET ISIAH DOOLEN, U.S. Army, was previously sworn and**

5    **testified, in substance, as follows:**

6                          DIRECT EXAMINATION

7    **Questions by the Investigating Officer:**

8        Q.    So do you know what the mission of the Army is?

9        A.    The mission of the Army or the United States

10   Military Academy?

11       Q.    The Army--United States Army.

12       A.    The mission of the Army is to train leaders of--

13   leaders of character and develop troops capable of deploying

14   anywhere in the--in the world at any given time within a set

15   amount of hours, and being able to establish land dominance.

16   And to do this, there has to be effective leadership and

17   effective followers, as well.

18       Q.    Can you tell me what the Army values are?

19       A.    Loyalty, duty, respect, selfless service, honor,

20   integrity, personal courage, and--and personal courage.

21       Q.    Well, actually you can identify most of these, as

22   we all can.  Which of these do you identify with the least,

23   and why?

                                77

1      A.   I think I would say--I would say personal courage.

2   Not in the fact that I'm not willing to--I guess I would say

3   there are times when I should've stepped up and perhaps

4   didn't--and there are times I shouldn't stepped down and

5   perhaps shouldn't have.

6      Q.   Do you have any specific examples?

7      A.   I don't have any specifically.  I mean, there

8   are--there are different implications for what's occurred.

9   I mean, I'll take ownership.  But that's also why you seek

10  to refine and develop at the Academy.  It's a--it's a

11  leadership laboratory, and you're constantly refining your

12  style and who you are, and what you want to be, I guess.

13  And that's the purpose of being here, and I believe I've

14  displayed that.

15     Q:   Do you feel that living the Army values is

16  imperative to service as a commissioned officer in the

17  United States Army?

18     A: Absolutely.  Yes, sir.

19     Q:   What does living honorably or honorable living--

20  I'm sure you're familiar with it.  The Superintendant has

21  been talking about honorable living.  Are you familiar with

22  the term?

23     A: Yes, sir.

78

000319

1       Q:    What does honorable living mean to you?

2       A:    I think that honorable living is probably all-

3   encompassing the Army values in general.  To me, if you

4   have--if you have--it goes through all of those values,

5   you're--you're living honorably.  You're--you're giving to

6   the best of your ability.  You're accomplishing the goals

7   and the mission of the Army, and as reflected in statements,

8   I'm doing that.

9       Q:    Yeah.  And part of living honorably is not just

10  when somebody's watching; it's when you're--you're in your

11  house alone, where you're living, are you still living by

12  those values, when nobody's looking?

13      A: Absolutely.

14      Q:    So, you know, not really having any skeletons in

15  your closet, do you always do the right thing?

16      A:    Right.  Well, I mean, to my own accord, I stopped

17  drinking.  That was--that was my decision.  It wasn't--it

18  wasn't a mandated decision.  It was my decision.

19      Q:    Do you feel that living honorably is necessary to

20  the execution of duties as a commissioned officer?

21      A:    Absolutely.  With that incorporated into the Army

22  values, yes.

79

000320

1       Q:   As a platoon leader, you can be expected to face

2    various situations with your Soldiers, and there are going

3    to be a lot; you name it.  How would you handle the

4    following situations: a DUI?

5    [Knocking sound.]

6       A:   Sir, somebody's knocking at--somebody's knocking

7    at the door.

8       Q:   Answer the question.

9       A:   All right.  For instance, if you lie, I guess I

10    would say I would obviously--there would be some reprimand

11    in regards to that.  I guess the common procedure would be

12    Article 15, a counseling, and then a discussion of why

13    that's not contributing to the Army.

14       Q:   Okay.  How would you handle a situation of

15    domestic violence?

16       A:   I think that I would--I would (inaudible).

17    That's--I mean, that's absolutely--that's unacceptable

18    (inaudible), whether it's the husband or the wife.  I mean,

19    there needs to be an established respect between one

20    another.  And it goes both ways.  And once again, that would

21    lead to, obviously, some kind of reprimand.

22       Q:   What reprimand would you recommend?  As a platoon

23    leader, you're not approval authority, so I mean, company

000321

1    commanders have a little bit, battalion commanders a little

2    bit more, brigade commanders, a little bit more, so as a

3    platoon leader, you are recommending authority.

4         A:    I mean, I guess to be fair, I would always want to

5    proceed with an investigation.  That would be the first

6    step, based on the findings of the investigation, which I

7    would establish, in writing.  I would say, based on my

8    findings and state why this is what I recommend as a

9    punishment, and I would say some kind of Article 15 or,

10   based on the level of escalation, some kind of UCMJ action.

11   I'm under the impression that Soldiers can request for

12   Article 15s to be court-martialed.  Is that correct?

13        Q:    They can.

14        A:    They can?

15        Q:    Absolutely.  At that point, there again, it turns

16   into a federal offense, as opposed to non-judicial

17   punishment, but that's neither here nor there.

18              So what are your thoughts on underage drinking?

19        A:    I mean, I guess from an anthropological approach,

20   which is what--I mean, I'm taking that class this semester,

21   and they kind of want us to focus on that, so I mean, it's

22   kind of a maturity-based issue, but because it's not--it's

81

000322

1    not legal in our country, obviously, it's not something I

2    would approve of.

3         Q:   So if you had--for example, two of your brand new

4    privates got to your platoon, went out and got drunk

5    underage, how would you handle the situation?

6         A:   I mean, I hate to refer back to the common answer

7    I've been giving, but, I mean, it's an investigation

8    process.  It's----

9         Q:   That's if the case is complete, found to have

10   drunk illegally under age.

11        A:   Article 15.  Just because I'm saying that, it

12   doesn't mean that it doesn't give them an option to

13   remediate whatever they've done wrong.

14        Q:   Well, Article 15, just for your edification, is a

15   hearing.

16        A:   Right.  So whatever is found there.  I mean,

17   there's always an option of--of giving that person, based

18   on--on their record, an option to--to rehabilitate

19   themselves without an absolute punishment or a maximum

20   punishment.  Giving them an option--the opportunity to

21   redeem themselves and--and prove that they've been redeemed.

22        Q:   Would you recommend a chapter for Soldiers under

23   your responsibility who had used illegal drugs?

                                82

000323

1        A:   So where I mandate that they report to me?  I'm

2    not understanding that question.

3        Q:   So you're the recommender, as platoon leader.  You

4    don't have that authority to make that decision.

5        A:   That's clearly unacceptable.  If they're using

6    drugs illegally, that's to the detriment of military, in

7    general.  I would absolutely disagree with that.

8        Q:   Okay.  What are some things that you do not like

9    to do, just in general?  What are some of the things you

10   just, ah, not really----

11       A:   I guess I don't always like every chore I'm given,

12   but I try to take the best approach I can to it.  Let me

13   tell you, for example, when I was at home, I wasn't always

14   excited to go do the yard, but, I mean, I did.  My dad, he

15   had a stroke; he's 73.  It's just sometimes you do it

16   instead--you don't want to do this; you have to do it.  You

17   do it because you want to do it and help.  And in that case

18   with my dad, I wanted to help.

19       Q:   Sure, okay.  So let's shift gears a little bit.

20   What as the last class or seminar or course or workshop that

21   you have attended, and why did you take it?

22       A:   That's funny you ask that.  I actually have it

23   written down here.  The Mission Command Conference, I think

83

000324

1    that's--I mean, I would say, based on your last word on the

2    seminar, to me, that was a pivotal seminar, and all kind of

3    (inaudible).

4        Q:   Did you go on your own, or was it----

5        A:   I mean, it was for all upperclassmen, but some of

6    the key points I took away was from Lieutenant General Dan

7    Allen.  He was the speaker at the conference.

8        Q:   So it was just a class?

9        A:   Right.  It was a seminar for all the first-class

10    Cadets.

11        Q:   For first-class Cadets?

12        A:   Yes, sir.

13        Q:   Okay.  Was it this one last year?

14        A:   It was 22 April 2013.

15        Q:   Okay.

16        A:   I guess some of the things that--it's okay if I

17    hit on some points that I got from that, or would you rather

18    I not?

19        Q:   I just want to know, I mean, you know, what I'm

20    looking for here is, yeah, specific things that you kind of

21    did on your own to better yourself as an individual.  So a

22    seminar, a workshop, something to that effect.

84

1    A:    So that doesn't apply to West Point, in general.

2    Like over the course of the year, I've done numerous things

3    to better myself.  I've attended counseling to kind of

4    understand how I can maintain composure and still----

5    Q:    What counseling?

6    A:    It's therapy with a counselor.  You could say it's

7    psychological or behavioral health.

8    Q:    Okay.

9    A:    And it was to just talk about my composure, and

10   show how I wanted to better my attitude, better my behavior,

11   and better relate to people in general, I guess.  Not that

12   interpersonal skills were ever really a problem.  It's just

13   that----

14   Q:    What were some other things?  So you just stopped

15   counseling.

16   A:    Right.

17   Q:    (Inaudible)

18   A:    I hit on some of the points.  I have--I know I had

19   my attorney, he was not only my attorney, but he was--he was

20   a mentor.  He oftentimes would--would give me on advice on

21   things that I needed to do differently, and different

22   perspectives that I needed to take.  And then, just over the

23   course of the past year, I wrote numerous documents which I

85

000326

had sent in, other leadership styles, and I kind of incorporated the positives and the negatives throughout into my own personal reflections, and not necessarily for a class or a seminar, but as I mentioned, just personal reflection for sheer desire to change.

Q: Okay. What do you feel is the most important trait of a leader?

A: A leader has to be empathetic, a hundred percent empathetic. You can't understand your Soldiers without putting yourself in their shoes and understanding what they're going through. I don't think you can effectively lead them without, you know, knowing what they're going through. I think that's absolutely a pivotal trait in a leader, is empathy.

Q: That's the most important trait?

A: Empathy and respect.

Q: Which one?

A: It think they tie hand in hand. I would say respect encapsulates empathy, so we'll go with respect.

Q: So you have subordinates who are not making their goal, they're not executing according to the prescribed standards, and they continue to miss performance quotas. How do you--how do you deal with those folks?

1          A:    I have an example of a--of a Cadet who I led this

2     summer.  He came into the company, into the platoon during

3     CFT and he already had a reputation for not performing well

4     in the academic year, and my first--my first indicator

5     really was, that has no relevancy to his leadership while at

6     CFT.  He can completely redefine himself (inaudible) and so

7     that's the first step that I took.  And I even approached

8     Major Ziegelhofer about that.  I said, "This Cadet's

9     academic year performance shouldn't be relative--" and I

10    said, "shouldn't be relative to his performance out at CFT."

11    He--during LTP, he kind of--he was sort of along the draw of

12    he wasn't--he wasn't performing well, kind of gave an

13    attitude, and I gave him an example of personal experience.

14    I said, "Look, man, if you continue to do what you're doing,

15    you're not going to get (unintelligible) from anyone.  Trust

16    me, I know from experience that you have to completely

17    redefine your attitude.  You have this--you have--it's

18    imperative that you pick up the pace."  And I--I spoke to

19    him exactly how we're speaking here right now.  There's no--

20    no hostile demeanor at all.  It was just personal

21    perspective conversation.  And he understood completely.

22    And over the course of CFT, he could see where he's

23    completely--he was redefining himself.  He learned a lot by

                                 87

1    it, and that's also (inaudible) I sent to Major Ziegelhofer,

2    and I wrote him a positive COR.

3        Q:   How have you used leadership to get a team to

4    complete a goal or a project?

5        A:   The first step is (inaudible).

6        Q:   How have you?

7        A:   How have I?

8        Q:   A specific example.

9        A:   I gathered the team and I spoke with them.  I told

10   them exactly what I expected.  I lay the expectations up

11   front and----

12       Q:   Do you have a specific example?

13       A:   The most recent, just because it's completely

14   relevant and it is the most recent CFT. I took my team,

15   during LTP, because, I mean, that's where we were, I told

16   them that we need to build ourselves cohesively, we need to

17   cooperate, we need to develop ourselves tactically and

18   technically, and be interpersonal.  Those were some of my

19   primary goals.  And each day we would focus--we always

20   carried our TACSOPs on us.  We always ensured that we knew

21   what the rules were.  We always went over the 3-21, so the

22   (unintelligible).  And we--we made ourselves aptly

88

000329

1   proficient in that setting.  And then, in turn, we were able

2   to develop our--our subordinates.

3       Q:   How do you handle and resolve situations of

4   conflict?

5       A:   Now I've realized that taking a step back and kind

6   of analyzing the situation is the best approach.  I don't

7   think that diving head in is the right answer.  I think that

8   it's always wise to take a breather and think things

9   through.

10      Q:   And what was the last commitment you failed to

11  keep, and why was that?

12      A:   I guess it was to one of my squad leaders during

13  CFT.  He was a different day, and I guess my commitment to

14  him was I didn't ensure that I was--was always checking on

15  him on all occasions, and I made that commitment up front,

16  that I would be accessible to everyone.  I guess I didn't

17  make myself as accessible to him as I should have.  So that

18  was a commitment that I failed to keep.

19      Q:  Okay.  All right.  So, good.  So I believe we have

20  a Cadet out in the hallway.  We'll go ahead and bring him

21  in.  Hopefully he's still here.  We'll give him the oath.

22  I'll explain to him why we're here and then the floor is

23  yours.  Okay?

89

000330

1    [Pause in proceedings.]

2    [Cadet Majors is seated.]

3         IO:  Moving on; what is this?

4         CDT MAJORS:  It's a character statement I wrote up in a

5    memo template format, sir.

6    CADET WILLIAM MAJORS, U.S. Army, was called as a witness by

7    the respondent, was sworn and testified, in substance, as

8    follows:

9                        DIRECT EXAMINATION

10   Questions by the Investigating Officer:

11        Q.   Is this memo that you just presented to me already

12   in my file here?

13        A.   I don't think so, sir.

14        Q.   It's not?  Okay.  I will include this.  I assume

15   that you will be kind of reviewing this.

16             Okay, so--all right.  We're here basically to

17   determine Cadet Doolen's status, pending deliberation,

18   whether his status will be proficient or deficient.  Now

19   your function of coming in here to talk, we're just trying

20   to gain an assessment as to Cadet Doolen's character.

21        A.   Yes, sir.

22        Q.   So I'll move this a little bit closer.  Obviously

23   we're recording here.  Please state your name, how long

                              90

000331

1   you've known Cadet Doolen, and the extent to your

2   relationship with him, inside and outside of the workplace,

3   and the workplace being, you know, work, summer training, do

4   you hang out with him on a personal basis is what I'm really

5   trying to get.

6        A.    Yes, sir.  My name is Cadet Harrison William

7   Majors, and I've known Cadet Doolen probably about three

8   months now, quite closely.  And I got to know him through

9   Camp Buckner.  We were both on the leadership detail out

10  there and served in the same company; he as a platoon

11  leader, and I served as a platoon sergeant.  So that's kind

12  of the basis of how I got to know him.

13       IO:   Okay.  Cadet Doolen?

14  **Questions by the Respondent:**

15       Q.    I guess can you kind of cover a brief synopsis of

16  like what my character and performance was like over the

17  course of the summer, over CFT, and since we've known each

18  other?

19       A.    Absolutely.  So I would just start off with saying

20  that Cadet Doolen's character, his performance really stood

21  out to my pretty quickly at Camp Buckner during the

22  leadership train-up.  And one of the reasons for that was

23  just the late-night interactions we had, starting very early

91

1    and preparing for our mission the next day, be it getting

2    ready for range or a ruck march or whatever the training was

3    ahead, and more than just doing the technical and detailed

4    tasks was the substance of our conversations.  Cadet Doolen

5    and I, we spoke about--just about everything from personal

6    to definitely a lot of it focused on professional and

7    military.

8         I'd say one thing I was always impressed with was

9    how zealous he was and intentional about focusing on doing

10   his job right, doing his duty and, you know, accomplishing

11   the mission, which the rest of the summer was to train the

12   Class of 2017 and provide them with great leadership, and

13   empower them to be good leaders, and provide them with the

14   tools to do that.

15        And Cadet Doolen was very, very focused on

16   accomplishing all that.  It wasn't just some mission handed

17   down to him from a handbook or from some high-ranking

18   colonel.  It was a mission that he--he stood behind and

19   believed in.  You'd think it was his mission; that he wrote

20   it.

21        I'd say just the reason I believe that about him

22   is the questions he would ask.  He wouldn't just settle at

23   getting a lot of instruction during the day, but he would

92

000333

1    ask questions about it.  He would stimulate his mind and

2    other peoples' minds, you know, well after training was

3    concluded, to kind of go over some things that were

4    discussed or happened during the training.  So he was very

5    intentional about preparing for all that this summer, is one

6    of the things I immediately took away.

7         Along that, also, you can refer to the memo about

8    it, I'll keep it brief, was this ruck march we did from

9    Range 11 in (inaudible) to Range 7 and 8, and that was one

10   of Cadet Doolen's first major leadership roles this summer

11   that he had to own and lead us (inaudible).  You know,

12   basically, we're on this ruck march and we had to change the

13   route.  He had to think of a safe way to get--to get the

14   company leadership from one range to the next, and he was

15   also aware of all the maybe cynicism or struggle and

16   frustration of the--of the company at the time because of

17   how late it was, and that was stressful, just rucking.

18   Well, he turned out that he made some choices and changes

19   throughout because of some weather concerns, light concerns,

20   and terrain dictates, right.

21        So we get to the range and he doesn't just leave

22   it at that, like I changed my mind, accept it, I'm in

23   charge, but he realized where everyone's attitude and morale

                            93

000334

1    was at, so he took the time to explain why he changed it.  I

2    thought that was incredible effective at the get go, what

3    the changes were.  I thought you were (inaudible).

4        Q.   I'm all ears.  Okay.

5        A.   So, but anyhow, the fact that he was empathetic

6    and sympathetic towards the situation in company and wasn't

7    just thinking about himself or like how--how was he leading,

8    or did he make the right choices, but he was being

9    considerate of the team.  (Inaudible) of just his attitude

10   in general, what he talked about, how he talks about it, how

11   he talks to people with an immense amount of respect.  He's

12   not thinking about himself.  He's thinking about the team.

13       And one more thing to add onto his character was I

14   didn't know right away the circumstances that Cadet Doolen

15   was kind of--the circumstances he had before him with this

16   case, and when I found out, I was actually surprised to hear

17   about this.  You wouldn't--you wouldn't think it, that

18   someone who was going through something major like this

19   could carry himself that way.  I figured he would have a lot

20   to be worried about, and maybe cynical or upset, but he

21   didn't carry himself that way.

22       So when he finally did discuss it with me, his

23   attitude about it was impressive, to say the least.  He was

94

000335

1    calm, collected, and he seemed to be focused the whole time

2    on not letting us stand back, but to like set them up and to

3    move forward.  You know, his goal wasn't to complain about

4    it.  His goal wasn't to, you know, tell someone how much

5    worse he's had it.  Rather, he--he talked about, you know,

6    some things he's learned.  He's acknowledged, like, some--

7    some of the circumstances of the situations that he's been

8    in that lead up to this, that he couldn't avoid, that would

9    bring trouble upon himself or having trouble upon him in

10    both aspects.  And I just thought that was incredibly mature

11    of him, to convey it that way.

12          But again, the reason he conveyed it wasn't so

13    much to tell someone what he's going through or like how

14    hard he's got it.  It's kind of to be able to help others in

15    situations.

16          In particular, we had this SHARP brief that we

17    went on, and we were talking about interactions between men

18    and women, and just different members of the Corps, and he's

19    very open to like sharing, you know, some of the details of

20    his story, how it relates.  And I just thought that was

21    incredibly mature of him, you know, just to be able to share

22    those thoughts, convey those things without feeling alone

23    or, you know, sort of injustice or anything like that.  He

<div align="center">95</div>

1    just--he's a (inaudible) buy who's moving forward at full

2    speed.

3          So I just say it was definitely an honor and

4    privilege to serve with him at Buckner, to continue to get

5    to know him, and discuss things with him, and just hang out,

6    you know, in personal settings.  And I'm pretty excited, and

7    I have to mention this verbally, as well as in the written

8    statement, outside of the Soldiers that Cadet Doolen is

9    going to lead, because they're getting a really good leader

10   out of him, how he's learned through his growth struggles,

11   just the person he is and the quality character that he has.

12   So that's pretty much mostly what I have to say as far as

13   Cadet Doolen.

14        IO:  Good, thanks.

15        WIT:  Anything else?

16        RESP:  No.  I'd say thank you.  I appreciate it.

17        IO:  Okay.  I've got a couple questions for you.

18        WIT:  Yes, sir.

19                        **CROSS-EXAMINATION**

20   **Questions by the Investigating Officer:**

21        Q.   Can you tell me again how long you've known Cadet

22   Doolen?

96

000337

1        A.    About three months.   July--or June.   Most of June

2   through now.

3        Q.    So summer training?

4        A.    Yes, sir.

5        Q.    You've said it, but again, do you believe Cadet

6   Doolen embodies the Army values?

7        A.    Absolutely.   Without a doubt, sir.

8        Q.    And you've been in the Army.   You're a prior-

9   service guy?

10        A.    Yes, sir.

11        Q.    All right.   So otherwise (inaudible) stuff going

12   on here.   Have you seen--witnessed Cadet Doolen perform

13   values and some of the characteristics that is expected of

14   an officer?   Did you see him (inaudible).   Your platoon

15   leader when you were in the Army, your company commander,

16   you know, your company XO, you saw those folks running

17   around.   Do you see those same traits and characteristics in

18   Cadet Doolen?

19        A.    Absolutely, sir.

20        Q.    In terms of Army values?

21        A.    Army values and just quality characteristics that

22   are probably the most--at least in my opinion, the most

97

000338

1    successful Army officers are the ones who make the biggest

2    influence on their Soldiers in a positive direction.

3         Q.   Have you had any interaction with Cadet Doolen

4    outside of this professional leadership?

5         A.   I mean, obviously, we live here at West Point, so

6    I think outside of West Point, no.  Like any clubs or

7    anything?

8         Q.   Yeah.  The Firstie Club, hanging out, off

9    restriction, if you want to go out someplace.  I know you've

10   only known him for about two months or so, so those

11   opportunities are probably limited, but----

12        A.   Right.

13        Q.   But basically outside--outside of the uniform.

14        A.   Not really, sir.  Just definitely a lot of off

15   time, especially at Buckner, and just some casual bypassing

16   conversations since we've been back at the school year so

17   far.  That's about it, yeah.

18        Q.   Can you tell me Cadet Doolen's general

19   interpersonal demeanor when dealing with people, in terms of

20   is he civil, does he treat others with respect?

21        A.   He's a great listener, sir, and I emphasize that

22   because I think it's a (inaudible) intentional respect

23   towards others.  A lot of people are prepared to rapid

                              98

000339

1    response to someone, regardless of the situation, but Cadet

2    Doolen, when you talk to him, he will stop what he's doing

3    and he will just focus on what you are saying.  He's one of

4    the best Soldiers I've ever seen.

5            That said, what's most of what I've got to say as

6    far as treating others with respect, but more than that,

7    it's not just that he listens, tries to be a good listener,

8    but he (unintelligible) and just I know his ability to take

9    what people say and his responses, he really shows that he

10   cares about whatever it is that you (unintelligible), from

11   NFL football to like hey, we have a serious issue right now.

12   And he cares a lot.

13       Q.   Have you ever seen Cadet Doolen treat others with

14   disrespect?

15       A.   Not once, sir.

16       Q.   Are you familiar with the Superintendent's--his

17   thing is living honorably, and honorable living.  Are you

18   familiar with that?

19       A.   I am.  Yes, sir.

20       Q.   Do you expect officers--do you expect your

21   superiors, future leaders, to live honorably?

22       A.   Absolutely.  Yes, sir.

23       Q.   What do you think living honorably is?

99

1          A.    Not to be cliché with what our doctrine or

2    PowerPoint slides say, but it really is just doing the right

3    thing and more of my own personal thoughts on what the right

4    thing means or looks like, that's really just being a good

5    person, if you ask me.  And it's hard to measure that,

6    because we have an Honor Code, which obviously I like the

7    illustration.  That's a small thing, and living honorably is

8    even bigger than the Honor Code.  It's a way you conduct

9    your personal life.  It's the way you interact with others;

10   that respect, that trust.  It encompasses just so many

11   things, and I think there's definitely a lot of external

12   things that are maybe indicators of character, slightly.

13          And then there's definitely a lot that's internal.

14   That person's got to be willing to share what's internal in

15   a personal and professional setting, to kind of really show

16   what their character is.

17          Q.    So you expect leaders to live honorably?

18          A.    Yes.

19          Q.    Okay.  In terms of no-goes, what are some of your

20   no-goes in terms of officership?  There's that fine line,

21   right?

22          A.    Mm-hmm.

100

1      Q.    What do you think is on the other side of that

2   line which is not acceptable?

3      A.    I'd say being unwilling to make corrections or

4   (inaudible) breaking trust permanently.  I'd say, you know,

5   breaking trust even once is kind of--it's definitely a big

6   no-no, but even though circumstances, to be aware and to

7   make that change to--to establish trust, that's the no-go.

8   That's the final line there.

9      Q.    What was the final line?

10     A.    Is to be unwilling to make a corrections or

11  establish trust.

12     Q.    Can you describe to me circumstances that would

13  cause you to lose trust in a supervisor or--or a co-worker?

14     A.    Yes, sir.  To be treated with disrespect would

15  definitely be a type of situation that would kind of break

16  my trust with somebody.  And these are not necessarily a

17  one-time thing, but it's--it's a way of living, it's a way

18  of life, so that's the way it goes.

19     Q.    Would you go to war with Cadet Doolen?

20     A.    Absolutely.

21     Q.    Do you believe that he would do the right thing,

22  even at personal cost?

23     A.    Yes.

101

000342

1    [Audio ends.]

2    [Audio resumes.]

3        IO:   Just to take over again, this is Captain Forlenza.

4    We have Cadet Majors just concluding our first witness in

5    terms of character.

6        Q.   And my final question for you is have you ever

7    observed Cadet Doolen while drinking alcohol?

8        A.   No, sir.

9        IO:  Do you have any further questions?

10   RESP: Yes.

11                    **REDIRECT EXAMINATION**

12   **Questions by the Respondent:**

13       Q.   Typically, we've had discussions about what my

14   take is on drinking.  Do you remember, like kind of

15   specifically, what I--what I said about that?  Like I

16   just----

17       A.   I have--I have an impression, I couldn't recall

18   verbatim, you know, but my impression from you and from my

19   discussions was that you have a mature standpoint, from what

20   I recall.  And one thing, I, you know, I want to say I took

21   from you was that even if, you know, you'd been drinking a

22   little bit, like a drop, or a time, you know, it's just safe

23   to bet, you know, like your interactions with others is

                              102

000343

1    limited.  And yet--and there's--there's definitely a lot of

2    gray area in that I know on what certain amounts of alcohol

3    do to a person.  But I just remember correctly (inaudible),

4    you just--you know, it's better to be safe than sorry.

5        Q.   I said it's probably best--it's always safer just

6    not to drink, in general.  That was always my perspective.

7        IO:  Yeah, you don't want to put words in his mouth.

8        RESP: Yeah, exactly.

9        IO:  Okay.

10       RESP: Yes, sir.

11       IO:  Is that it?

12       RESP:  Yes, sir.  Thank you.

13       IO:  All right.  Thank you for your time.

14       WIT: Thank you, sir.

15       RESP: Thank you, Majors.  Appreciate it.

16       IO:  It is 1426.  So I'm going to go ahead and stop

17   recording.  We have about 19 minutes or so until Cadet

18   McQuirter----

19       RESP: Yes, sir.

20       IO:  ----will be here.  Again, we will resume the

21   hearing.

22   [Audio ends.]

23   [Audio resumes.]

103

1    CADET ELLIOT CHAL, U.S. Army, was called as a witness by the

2    Respondent, was sworn and testified, in substance, as

3    follows:

4                        DIRECT EXAMINATION

5    Questions by the Investigating Officer:

6        Q.   So we are here to determine Cadet Doolen's status

7    as either being proficient or deficient, and I'm going to

8    conclude and deliberate that with all these assessments that

9    we're doing, and you're part of the assessments.

10            So if you would, please state your name, how long

11   you've known Cadet Doolen, and the extent of your

12   relationship with him inside and outside the workplace.

13       A.   Yes, sir.  My name is Cadet Elliot Chal.  I've

14   known Cadet Doolen since June 2014, of this year.  We worked

15   together at Buckner.  We were both cadre, and I was his

16   company commander.  We also had discussions offline, just as

17   friends.  So over the course of the detail, we became pretty

18   close to one another.  Will that suffice?

19       IO:  Yes (unintelligible).

20       RESP: Did you actually have a chance to read his--his

21   statement, sir?

22       IO:  No.

23       RESP: Okay.

104

1      IO:  So this is your opportunity--and all this evidence

2    and memos that you prepared, I'm going to take this,

3    actually, and go into my deliberations.

4    **Questions by the Respondent:**

5      Q.   So I guess I want to ask for the character or

6    performance statement, because I think those statements kind

7    of surmise that, so I guess what I'll ask is, my biggest

8    question is, based on the Army values, where would you say

9    that I was the strongest and where would you say I was the

10   weakest, based on your observations?  And I also

11   (inaudible).

12     A.   Well, the hard thing with that is the weakest

13   thing that I saw from you was just that, and we talked about

14   this before, the general sense of kind of a carefree

15   attitude that some people took as----

16     IO:  You're talking about Cadet Doolen?

17     WIT: Yes, sir.

18     IO:  Okay.

19     A.   It was just kind of a weakness, just you--like a

20   glazed look, you know, spaced out--spaced out.  And it

21   really wasn't a problem because you get the tasks done, but

22   that was the only thing.  I mean, he conducted himself in a

23   very professional manner over the whole summer.  There would

105

000346

1    be multiple instances where his academic year TAC would come

2    and pull him aside to talk about the proceedings that led us

3    to here, and he never let them affect him.

4         Honestly, I would've never guessed that he had any

5    sort of trouble because he was extremely professional,

6    polite to everyone, never lost his temper with anyone, and

7    there were times where tensions were high.  We had deadlines

8    that we needed to meet, and he just got it done.  And I was

9    kind of surprised to hear that this was taking place, just

10   because of the way that he conducted himself over the summer

11   was nowhere near grounds for like a conduct review.

12        RESP: Thanks.  That's about all I had.

13                    **CROSS-EXAMINATION**

14   **Questions by the Investigating Officer:**

15        Q.   Okay.  So various similar questions as before.  So

16   state again how long you have known Cadet Doolen for.

17        A.   Since June.

18        Q.   Since June?  So about three and a half months or

19   so?

20        A.   Yes, sir.

21        Q.   Do you believe--we talked about Army values a

22   second ago.  Do you believe that Cadet Doolen embodies the

23   Army values?

                              106

000347

1      A.    Yes, sir.  He--he does.  And not very many people

2    actually abide by those.  It's kind of like a set of

3    guidelines that people just kind of look at and not conduct

4    themselves with, and he definitely did.  And I'm basing my

5    judgment off of him of what I had seen from his performance

6    and on top of that, I wasn't using anything that I found out

7    of what he did in the past, and from what I've seen, he's

8    definitely changed the way that he conducts himself and

9    definitely learned from anything in his past and from my

10   standpoint, that's really all you could ask from him, is

11   that he definitely realized he had something that he could

12   correct and worked forward from there.

13      Q.    So when he talks about Army values, and he asks

14   you what, you know, which Army values are--would be his

15   strongest, so we kind of just talked about him being aloof--

16   appearing to be aloof at times, but that really didn't

17   affect his performance.  He was professional.  But you were

18   going to talk about specific Army values, and specific

19   situations where you saw these Army values in action.  Do

20   you have any specific examples?

21      A.    Well, I do for living honorably.  His platoon had,

22   I believe they were land nav sheets that were supposed to be

107

000348

1    turned in, and his platoon was the only platoon that hadn't

2    turned them in.

3         Q.   Which Army value are you talking about?

4         A.   Honor, sir.

5         Q.   Okay.

6         A.   And he could've very easily just said no, they got

7    mixed up, because that happened quite a few times, that the

8    regiment, which was the highest command out there; it as

9    just companies and the regiment.  The regiment lost the

10   scorecards, and you know, it was their fault, but he took

11   the time to go hunt down all the cards, but we didn't have

12   time for us to do that.  He could've very easily just

13   brushed it off and be like, oh, that was something that they

14   lost, they're gone, but he took the time to hunt those down,

15   and he did the right thing in that instance and turned those

16   in.  It didn't mean anything just because the cards were

17   already late, but it showed me that even though he had an

18   opportunity to not do the right thing, he did do the right

19   thing.

20        Q.   What did you say his weakness was, that you were

21   able to observe?

22        A.   I didn't--I didn't particularly have one.  I

23   apologized to him during the detail in the sense that--

                              108

1    because I wanted to give everybody their improved thing--

2    there is, that they can improve on, I mean to sustain.

3        Q.    Sustains and improves.

4        A.    Yes, sir.  And I really couldn't identify anything

5    for him, except for that--that facial expression, just

6    trying to change like that--that processing face that he

7    has.  And I know that sounds ridiculous, but that's honestly

8    all I had, sir.

9        RESP: Now with respect to what he was saying----

10       IO:  I'll give you the opportunity (inaudible).

11       Q.    So--and then you said minimal interaction outside

12   of the uniform, for the most part?

13       A.    I wouldn't say minimal, sir.  We went to Buckner a

14   couple times.  We were there for the majority of the summer,

15   which is about a month and a half, so we got to know each

16   other pretty well.  We were in close quarters with each

17   other and we talked about----

18       Q.    Where did you guys--where did you guys live?

19       A.    In the bays at Buckner, sir.

20       Q.    Okay.  Same bay?

21       A.    At the beginning, and then once the platoons

22   arrived--so for three weeks we lived in the same bay, and

23   then once the platoons arrived, the platoon leaders moved

109

000350

1    out with their platoons to the bays that they were living

2    in.  So we talked about a lot of Army things in general, in

3    the sense of like moving forward, because I still have to

4    branch, so I talked to him about like his thought process

5    behind that, and general things of just family related

6    information and--so we got to know each other pretty well.

7        Q.   So you--you know a little bit outside the uniform.

8    Do you have--can you provide any type of general demeanor in

9    terms of, you know, personality with other folks, when

10   dealing with other people?  I mean, is he civil?  Is he

11   respectful?  Have you ever seen him out of line?

12       A.   No.  I've never seen him out of line.  That's kind

13   of what took me off guard, when I heard that he had a

14   conduct investigation, was because he conducted himself in a

15   very professional manner, working and off duty.  I never

16   even saw him cuss.

17       Q.   Okay.  So you've never seen him disrespectful with

18   anybody.  So--and the honorable, you mentioned it earlier

19   today, what does that mean to you?

20       A.   Well that, for me, is doing the right thing when

21   no one's looking.  I know that's cliché, but at the same

22   time----

110

000351

1      Q.   Cliché.  I think that's two for two, the word

2  cliché.  Okay.  And it's correct.  I was just saying.

3      A.   But it's just having the--the moral compass to

4  know what's right and wrong, like the black and white, and

5  not operating in that gray zone that's very easily, you

6  could do it and just (unintelligible), but at the end of the

7  day, it's white and black, whether it was wrong or right.

8  There's always going to be a correct answer and a correct

9  way to conduct yourself.  So if you're doing the wrong

10  things and you're telling yourself that it's okay to do

11  that, you're not doing the right thing.  You're still doing

12  the wrong thing, and----

13      Q.   So doing the right thing, in your opinion, outside

14  of this thing, too?  Outside of these clothes that we wear

15  when we come to work, that means (inaudible)?  Okay.  Do you

16  expect leaders to live honorably?

17      A.   Yes, sir.  In fact, that was a conversation that

18  you and I had with--it was about the military in general,

19  about the Army, and the scandals that the generals had been

20  in.  Because the Army is--we always are told, as Cadets,

21  that the Army is changing, there's going to be a lot of

22  changes out there, and he and I were both sitting there.  It

23  was towards the end of the detail, and we had a little bit

111

000352

1    of free time, and we just--we talked for a good 30 minutes,

2    45 minutes, just about how like professionalism, and it's

3    surprising that these generals were able to make it up

4    through the ranks, and then conduct themselves in such a

5    dishonorable manner.  That not only shames the person

6    themselves, but the whole--the whole unit, the whole Army.

7    People see that and they're like, okay, I can act like that,

8    but in reality, no, you can't.  It's just one bad egg that--

9    that's conducting themselves in a dishonorable manner.

10        Q.    So do you have any specific circumstances which

11   would cause you to lose confidence in a supervisor of yours?

12        A.    Yes, sir.  If they were to lie to me about, like a

13   category or inventory, I've noticed that that's a big thing

14   within the Army, and a lot of people overlook it in the

15   sense that okay, we haven't used that equipment in three

16   months, it's all there and they just sign off on it, and in

17   reality, you don't know for sure that it's there.

18        Q.    Are you (inaudible).

19        A.    No, sir. I'm just trying to keep my (inaudible).

20        Q.    Yeah.  It sounds familiar.  We do that a lot.  Not

21   we, but that takes place.  So go ahead.

22        A.    So something along those lines that lead to--and

23   I'm not saying micromanage, but I'm just saying, knowing

                                  112

1    that you have all of your equipment because if you were to

2    do that with personnel, then you have somebody that's, yeah,

3    okay, we haven't moved anywhere in 30 minutes so everybody's

4    here, but you don't know that for a fact unless you like go,

5    get out of (unintelligible), and I would be just confident

6    in that leader, just because that would show me that they're

7    not caring enough to make sure to do little things, and so

8    why should I follow them if they're--if they're not going to

9    look out for my well being?  And that would be my biggest

10   pet peeve, if you will.

11       Q.    So trust, care.

12       A.    Yes.

13       Q.    ----you would say if you lost trust, so you feel

14   that they do not--they're not caring for you, you would--

15   that's your----

16       A.    Yes, sir.

17       Q.    That's your (inaudible).  Do you have any other

18   examples of things that are no-goes for you?  Care.  We

19   heard care.  Then the turn--what are some things that would

20   turn you off to your company commander?

21       A.    An inability to do your job.  If you're not fit to

22   be in that position, then you shouldn't be in that position.

23   If you are incompetent and you were put in that position

113

000354

1    because you played the right cards or you knew the right

2    people, I wouldn't want to follow that person, just because

3    of--using politics to get into the position.  There's been a

4    lot of--in the Cadet world, there's a lot of Cadets that are

5    placed into high-ranking positions just because they can

6    answer the questions correctly and a lot of hard-working

7    Cadets that don't make great grades are overlooked for those

8    positions, and they could fill those positions much better.

9    And the Corps would be a lot better if that were to happen,

10   but people, they look at the paper, and they don't take the

11   time--they don't care enough to take the time to get to know

12   the individuals and put them in spots they need to be put

13   in.  So just--that would be my two areas where I would----

14        Q.   So you expect your supervisor to live honorably,

15   as we discussed before?

16        A.   Yes, sir.  To know--to know their job and to be

17   able to conduct themselves honorably.

18        Q.   So do you believe that Cadet Doolen will do the

19   right thing, despite even personal class?

20        A.   Yes, sir.  I honestly do.  He--he impressed me

21   this summer, and I'm not impressed very easily.  He's

22   overcome a lot, and the attitude that he had towards the

23   summer detail was--was very impressive.  He's already done

114

000355

1    his grad requirement for the summer detail, the leadership

2    detail, and I didn't know that until pretty much halfway

3    through, when we were just talking--just talking about stuff

4    in general.

5         Q.   When you--when you were speaking with Cadet

6    Doolen, did he inform you of his predicament?

7         A.   A little bit.  Just--he told me just enough that I

8    needed to know.  He didn't fill me in on all of the nitty

9    gritty details and what happened.

10        Q.   What did he inform you of?

11        A.   He informed me of--that he would need to be

12   talking to his academic year TAC because of situations that

13   were ongoing back at West Point.

14        Q.   But nothing specific as to that?

15        A.   I want to say that was the gist of it, sir, just

16   because he was telling me, one, so that I knew where he

17   would be going when he would be called away, and two, I

18   wouldn't be blindsided by the fact that----

19        Q.   Okay.  Anything he told to you about the tactical

20   proceedings that's taken place?

21        A.   I think he told me--I want to say--and he said

22   that it was looking like a conduct investigation was taking

23   place.

115

000356

1    IO: Okay. Do you have any further questions?

2    RESP: No, sir, I don't.

3    IO: Okay. All right. Well, thank you for your time.

4 Take care. Have a good day.

5    RESP: Thanks, Elliot. I appreciate it.

6    WIT: Of course.

7    IO: Okay. So now McQuirter should be outside, right?

8    RESP: Let's hope so.

9    IO: Hey, Chal, is McQuirter out there?

10    WIT: I don't see him.

11    IO: He said he would be here at 1445.

12    WIT: Yes, sir. No one is there.

13    IO: Okay. I appreciate it.

14 [Witness excused.]

15    IO: I'm going to stop the tape now while we wait

16 and we'll give him--he should've been here ten minutes ago.

17 Maybe we'll give him a couple more minutes. We'll give him

18 five minutes and then we'll begin again.

19 [Audio ends.]

20 [Audio resumes.]

21    IO: Start recording again. We just completed Cadet

22 Chal, and you want to go ahead and knock out Cadet Jenkins,

000357

1     and then we'll talk about this, because everybody should be

2     tracking.  This is the last one I set out.

3     CADET EDWARD JENKINS, U.S. Army, was called as a witness by

4     the Respondent, was sworn and testified, in substance, as

5     follows:

6                         DIRECT EXAMINATION

7     Questions by the Investigating Officer:

8          Q.   We are here as part of an assessment to determine

9     Cadet Doolen's status as either being proficient or

10    deficient.  So if you would, by starting, just state your

11    name, how long you've known Cadet Doolen, and the extent to

12    your relationship with him, in the uniform, outside the

13    uniform, and then I will leave it open for Cadet Doolen to

14    ask you some questions.

15         A.   All right, sir.  I am Cadet Edward Jenkins.  I met

16    Cadet Doolen over the summer.  We were CLDT cadre together.

17    Originally, there was another platoon leader who was

18    supposed to come in, and then something happened to him and

19    then Cadet Doolen came in.  So he was one of the platoon

20    leaders while I was the first sergeant.  We knew each

21    other--well, the first time I met him was during that detail

22    and we knew each other all the way up until now.

23

                                117

000358

1    Questions by the Respondent:

2        Q.   I guess my biggest thing is that--is I kind of

3    know about the facts in the case, but do you know--I guess

4    my first question is do you kind of know why I'm having a

5    conduct investigation, based on anything you've heard or

6    anything?

7        A.   I know that you had a relationship with a female

8    that's in my academic company, but I--I don't fully know all

9    the facts.

10       Q.   I guess based on the relationship that you had

11   heard--I'm sure you had heard something about it, so based

12   on what you had heard and what you had seen, would you say

13   that there was a difference between that and what I

14   displayed at CFT?

15       A.   Yes, there was a big difference.

16       IO:  What was the question?

17       RESP: So he--he knew--he's actually in the same

18   academic year company as Cadet D███████ and so he--obviously,

19   he's very--heard--everybody has heard stuff.  The rumors

20   around West Point kind of go around pretty fast.  So I guess

21   one of my questions for him was is there a difference

22   between he heard and what he--like what he was told versus

23   what he saw at CFT.

118

1      IO:  Well, if you want him to answer that, we need to

2  establish the rumors that you heard.

3      A.   Okay.  I didn't know Cadet Doolen by name.  I just

4  knew that Cadet D[Redacted PII] had a boyfriend who was--who was a

5  little more than aggressive at times, and that's--that's

6  about--pretty much it.  I didn't know anything else about

7  it.  I didn't know what he looked like or, you know, what

8  anything was up until he started, until maybe like the last

9  week of our Buckner training, I was talking to one of the--I

10  believe I was talking to Elliot about Cadet Doolen, it was

11  getting close to grading, and then everything just kind of

12  came out at that point.

13      IO:  Go ahead.

14      RESP: Yes, sir.  As to the events that occurred?  Is

15  that what you're asking about, sir?

16      IO:  Well, I'm just trying to figure out where you're

17  going with this here.  Go ahead.

18      RESP:  So you've been asking questions about has

19  anybody had prior knowledge, I guess, of me before CFT.

20  Well, you're asking it's the duration that people have known

21  about me, or known of me, I guess.  And so it's the

22  relevancy I'm trying to establish, is that because Cadet

23  Jenkins has been in that same company as Cadet D[Redacted PII].

<center>119</center>

1    That--and given the fact that knowledge travels fast here,

2    we can't deny that, but I just wanted to establish, you

3    know, kind of what--what he may have heard versus what he

4    saw.  I don't know if that's--that's a fair question.

5        IO:  Yeah.  I mean, that is (inaudible).  Yeah.  I just

6    want to understand.

7        RESP:  Sorry I wasn't clear about that.

8        IO:  So this is--you've heard rumors.  Now are you

9    asking him to compare your performance compared to his

10   preconception being the rumors?

11       RESP:  Right, exactly.  I guess my--my character, my

12   performance, how I--I interact with people, versus maybe

13   what, you know, the aggressiveness that--that you've heard

14   of or maybe anything else.

15       A.   It was a while ago, so I don't remember everything

16   that I was told.  Basically, I just heard that Cadet Doolen

17   was aggressive.  But when I met him over the summer, he

18   didn't seem that way at all.

19       Q.   Can you comment--can you kind of just give like a

20   breakdown of whether or not--like I guess in terms of Army

21   values, what you thought was like my--my strongest point and

22   maybe my--my weakest?  Because I kind of --as I ask that

23   question, I struggle with that, and maybe people have

120

1    perceptions of me that can help me improve and realize what

2    I'm retaining when I'm stronger.

3    A.    So as to what you're strong at, I would say

4    selfless service, because you did a lot for your platoon.

5    Whenever we had meetings, you asked all the right questions

6    that we hadn't even thought of yet.  And, I mean, it even

7    showed in your cadre and your platoon's motivation.  You had

8    one of the top performances in the company.  So, I mean,

9    that clearly shows that you put everything you could

10   forward.  Your--not only us, your superiors, but also for

11   your subordinates and your cadre and your (inaudible), so

12   selfless service, definitely.

13        As for the weakest, I'm honestly not sure.

14   Maybe--maybe respect, only because the only time I could

15   think of any time that you were disrespectful was when--you

16   know, an incident where--that incident, but a little moment

17   when the LPLs took your--took your (inaudible), I believe,

18   and that was it.  And then that was just in a matter of

19   minutes.  That wasn't a huge issue.  It didn't cause

20   anything.  Nothing came about that.  I guess that's the

21   only--that's the only piece of my take on that.

22        RESP: I agree.  That was probably one of the weaker

23   points I had.  That's really all I have.

121

1                      CROSS-EXAMINATION

2     Questions by the Investigating Officer:

3          Q.    So again, can you tell me how long you have known

4     Cadet Doolen?

5          A.    Since we started CLTD, LTD, and on that day,

6     everybody came in for the first--for the first day.

7     Inprocessing was when I first--is when I first met him face

8     to face and shook hands (inaudible).

9          Q.    Have you had any interaction outside of the

10    uniform with Cadet Doolen?

11         A.    No, sir.

12         Q.    Have you ever seen Cadet Doolen (inaudible)?

13         A.    No.

14         Q.    Have you ever seen Cadet Doolen disrespect others?

15         A.    No, sir.

16         Q.    Do you understand what it is to live honorably?

17         A.    Yes, sir.

18         Q.    What do you believe that to be?

19         A.    From my understanding, living honorably is taking

20    pride in what you do, doing everything that you can to the

21    best of your abilities, not doing stuff for the benefit of

22    yourself.  Helping others.  Stuff of that nature.


                              122

000363

1      Q.   So yeah, not finding skeletons in your closet.  It

2   kind of hinges on integrity; doing what's right when

3   nobody's looking.  So if anybody were to ever, you know, go

4   into your--the basement of your house three years from now,

5   five years from now, you should never be concerned with

6   whatever they find.  You are always doing the right thing.

7   Right?

8      A.   Right, sir.

9      Q.   That is, in a nutshell, what it is.  But it

10   expands.  I mean, you've got living honorable umbrella.

11   There's many more things and it's--part of it is the Code of

12   Cadets, it is the Army values, right?  Do you feel that your

13   superiors and Army officers should live honorably and

14   amongst the Army values?

15      A.   Yes, sir.

16      Q.   Do you think that you can lead, if you don't live

17   honorably, Soldiers, and be responsible for their welfare?

18      A.   Can you say that one more time?

19      Q.   So can a leader--say you're a company commander--

20   he or she is not living up to your expectations in terms of

21   Army values.  Right?  Is there some that you can kind of

22   say, okay, yeah, I can still follow this individual because

23   I can give a little (inaudible) or whatever.  There's more

123

1    to be desired.  When--where--where's the point where you say

2    no, I cannot follow this person any longer because he or she

3    has crossed this fine line.  Where--what is your no-go?

4    When do you stop having trust and faith, and stop following?

5         A.   I would say I would, you know, if it was one of my

6    leaders, I would just say when they started using their

7    power for the wrong reasons.  I mean even I've make

8    mistakes, clearly, but nothing--nothing that I did would say

9    that I would not have been suitable for being a first

10   sergeant over the summer.  So I would say if, you know, that

11   person made some mistakes or intentionally--until that

12   person stops intentionally doing wrong, then that's when I

13   would decide that I couldn't--I couldn't follow that person

14   any longer.

15        Q.   Okay.  Do you have any other, you know, specific

16   circumstances--although I kind of asked you specifically,

17   but what--what are--do you have any other circumstances that

18   would cause you to lose faith in a leader, in that you could

19   no longer trust them as a leader?

20        A.   Are you saying--just to clarify, do you mean like

21   actions of the leader, or----

124

000365

1       Q.   Yeah.  I mean anything.  Saying, you know, my

2   company commander, I--I lost complete trust in him because

3   he or she does----

4       A.   Okay.  Yeah, whatever.

5       Q.   Speeds.

6       A.   (Inaudible.)

7       Q.   Speeds.  Drives over the speed limit.

8       A.   Oh, okay.  And incidents like that, yeah, it would

9   be an issue.  I would try to talk to the person to fix that,

10   but I would say so.  I mean, like I said, (inaudible).  Like

11   as soon as they started using their power for the wrong

12   reasons, or they're not, you know, doing their job

13   effectively, then that's where--that's where I would find an

14   issue.

15       IO:  Okay.  I don't really have any more questions for

16   him.  Do you have anything else?

17                  REDIRECT EXAMINATION

18   **Questions by the Respondent:**

19       Q.   I guess I have a question.  Would--I mean, would

20   I--it's a statement and a question.  So I guess my statement

21   will be, I don't think that living honorably is necessarily

22   perfection.  I think that it's understanding that you're not

23   always perfect, like might honestly be (inaudible) had

000366

1    issues, but not--not with each other, but just disciplinary.

2    But I think that we obviously--he did a great job as first

3    sergeant, and honestly, I don't know what he did.  I don't

4    care.  He is a clearly good guy, a good leader, and I think

5    that my question is, do you feel that it's possible for

6    people to redeem themselves, even if there are skeletons,

7    because I don't think living honorably is necessarily

8    perfection, it's maybe a little bit more than that.  What is

9    your perspective on that?

10        A.   I would say--I would say leaders can redeem

11   themselves.  I mean, people make mistakes and people can

12   change, change mentalities, change habits, change

13   perceptions.  So I don't want to believe that me getting a

14   reg board, getting demoted to PFC says anything about my

15   leadership, just that I made a mistake.  And that's what I--

16   that's what I look for in all of the NCOs during summer

17   training.  I didn't try and look too--I didn't try to look

18   at, you know, what their rank is during the academic year,

19   if they made any mistakes, or if they were--how often they

20   get in trouble with, you know, disciplinary issues, because

21   it was how they trained their squad that allowed us to clear

22   our mission.

23        RESP: That's all I've got, sir.

-126-

<div align="center">RECROSS-EXAMINATION</div>

**Questions by the Investigating Officer:**

Q.   Well, I have one more question for you.  Do you think it is important for a leader to be able to control their emotions?

A.   I would say in some situations, yes, sir.  I myself have--I've also been told that I have somewhat of a temper, but I try to be as patient as I can with people.  I don't blow up on people, but sometimes incompetency does get to me a little bit.

IO:  Okay.  I have no more questions.  Do you have anything else?

RESP: No.  I'm--I'm good, sir.

IO:  Okay.  Thank you.  So you're good.

[Witness excused.]

IO:  So this is our list, right?

RESP: Yes, sir.  That's--I mean (inaudible).

IO:  Yeah.  So this is--this is definitely (inaudible). Just to confirm, so we've got Colonel Mauldin, both proceedings, good, whatever.  So Cadet Majors has been here. Ziegelhofer is not going to be here because----

RESP: He wrote a statement.

<div align="center">127</div>

000368

1       IO:  He wrote a statement because he has something

2  going on.  Chal was here.  McQuirter might be

3  (unintelligible).  He wrote last night and said that he

4  could fit it at 1425.  That's why he's not here.  Jenkins we

5  just hit up.  Blank spot.  So after that, the only person

6  who's confirmed was Major Snyder.

7       RESP: So no other confirmations?  I know Cadet Lipsky

8  said that he would--he--

9       IO:  He may or may not come, but I do have a memo.  I

10  just annotated that I have a memo.

11       RESP: Cadet Barnes is probably a non-arriving, as well.

12       IO:  Okay.

13       RESP: It was a bad assumption on my part that day.  He

14  would've e-mailed you as well.  I should have sent you one

15  letting you know.

16       IO:  Okay.

17       RESP: I apologize.

18       IO:  That's all right.  Okay, good.  So we're not

19  missing anybody else from here.

20       RESP: (Unintelligible).

21       IO:  Okay, good.  So now----

22       RESP: Major Knoedler actually said that he was coming.

23  I texted him, and he did say he was coming.

000369

1    IO:  Okay.  Yeah, that's fine, but this is----

2    RESP: This is correct.  That's a correct list.

3    That's--that's what I--I've--I've seen, sir.

4    IO:  Good, yeah, okay.  So I'm going to--I'm going to

5    stop this, and then, do you need a couple minutes to go talk

6    to----

7    RESP: Yes, sir.  I need to--I was going to grab my

8    phone, as well, just to see what Cadet Chal was reporting.

9    IO:  Okay.  So Jenkins is complete.  If McQuirter is

10   out there, we can do him.  Otherwise, I might schedule a

11   person at maybe 1525 or so.  Then First Class Moore appears,

12   which is 25 minutes from now.  So we'll come back together

13   in about ten minutes.

14   RESP: That's good, sir.

15   IO:  Okay.

16   [Audio ends.]

17   [Audio resumes.]

18   IO:  Okay.  All right.  We're recording again.  Back to

19   the character witnesses on behalf of Cadet Doolen.  We have

20   Cadet Lipsky here.

21   CADET THEODORE LIPSKY, U.S. Army, was called as a witness by

22   the Respondent, was sworn and testified, in substance, as

23   follows:

129

000370

1                          DIRECT EXAMINATION

2        Questions by the Investigating Officer:

3            Q.   We are in a hear again to gain (inaudible) and

4        provide, really, evidence to help determine Cadet Doolen's

5        status as either being proficient or deficient.  So I guess

6        just go ahead and begin by stating your name, how long

7        you've known Cadet Doolen, the extent of your relationship,

8        and then we'll start.

9            A.   Sure.  My name is Cadet Theodore Lipsky.  I've

10       known Cadet Doolen since the 17 June 2014, but we worked

11       together pretty closely, as I was his Cadet platoon sergeant

12       when he was a Cadet platoon leader during Cadet Field

13       Training this summer.

14       Questions by the Respondent:

15           Q.   The first question I have is, in your--in your

16       definition of (inaudible) living honorably, would you say

17       that there's--there is room for people to have, I guess,

18       some imperfections, like past or present, like in regards to

19       things that they've done or have been done, or things that

20       they, I guess, have done wrong?  I don't know if that's a

21       clear question.

22           A.   Well, sure.  So, I mean, absolutely, that's the

23       case.  But it's possible for someone to live honorably,

                                   130

1      despite past transgressions and present imperfections, as

2      long as he demonstrates real and genuine (inaudible) to

3      remedying those past transgressions and improving their

4      character such that the likelihood of those transgressions

5      to occur again is low, they're worth a shot.  And, in fact,

6      most great heroes of our society and most people who keep

7      our society going and--and who make us happy are those

8      imperfect people.  I think if we accepted nothing but the

9      perfect model, for either a Soldier or a functioning member

10     of society, you'd have a very small Army, and a very small

11     country.

12          Q.   All right.  I guess based on your observations of

13     me and what you know of the Army values, what would you say

14     my strongest value is, and my weakest value is, just based

15     on--on your perceptions at CFT?

16          A.   I don't know about the time before you picked this

17     (inaudible), but what jumps to mind in terms of your

18     strongest values was the--I found that throughout Cadet

19     Field Training, I would say you were extremely loyal, at

20     once to the company leadership and to his peers, who were

21     also leading platoons in company, and to his subordinates,

22     such that he would represent his subordinates' best interest

23     to the company whenever he thought they were being treated

131

1   unfairly, or the expectations were unnecessarily harsh on

2   them.   But he would also be loyal to the mission by

3   demanding the most that he could from his subordinates and,

4   as a result, his subordinates trusted him greatly throughout

5   Cadet Field Training, and especially by the end, when it

6   mattered most, where we were conducting the field exercises

7   around which the whole summer is oriented, and his

8   leadership had full confidence in him to execute whatever

9   they tasked him with.   And----

10   [Audio ends.]

11   [Audio resumes.]

12       IO:   Cadet Lipsky is a character witness.   We just had

13   to flip sides again.   Okay, all right.   Continue with what

14   you were saying.

15       A.   Okay.   So what I was saying is that everyone's--

16   probably the area in which he seems most true is of loyalty,

17   and that was evidenced throughout the summer by the fact

18   that he represented the best interests of his subordinates

19   consistently and adamantly to the company leadership.   He

20   would (inaudible) his subordinates, but never to an

21   inappropriate extent, never to a point of insubordination.

22   And he was loyal to company leadership and to the mission of

23   the training by always demanding that his subordinates

132

000373

1    exceed the standard, instead of just meeting.  And by the

2    end of the summer, during the Cadet--by the final exercise,

3    the small unit leadership development exercise, this was

4    seen very clearly in the performances that were to his

5    expectations, but also in the confidence that his company

6    leadership had in him when they indicated to us that our

7    platoon, given that (inaudible) best platoon and so that's

8    why I'm very comfortable saying that Isiah is an

9    extraordinarily loyal person, fitting of a Soldier and an

10   officer.

11        If I had to--if I had to name a value to which

12   Isiah would be the least out of the seven, and I really do

13   think he is honorable; a pretty extraordinary fellow, so I

14   don't mean to suggest that he is like negligent in some way,

15   but he perhaps could benefit from more personal courage.  I

16   think he has been a bit cowered by a year of fighting a

17   case, and as a result, lacks confidence when he sometimes

18   needs it.  And if he can find a balance between being

19   confident in himself and respecting others and controlling

20   any residual anger, that will serve him really well when

21   he--when he becomes an officer.

22        So I would urge him to seek out more personal

23   courage within him, but not to become overly confident or

133

1    overly assisted because, you know, we could all use some

2    self restraint.

3         RESP: That's all I have.  Thank you.

4                        CROSS-EXAMINATION

5    Questions by the Investigating Officer:

6         Q.   Okay.  So tell me again how long you have known

7    Cadet Doolen, please?

8         A.   Sure.  So, sir, I first met him on 17 June 2014.

9    I trained with him for six weeks.  That training obligation

10   ended around----

11        Q.   So June 2014?

12        A.   Yes.  And then that was essentially the starting

13   point, but we've been out of touch over the (inaudible).

14        Q.   Sure.  Do you hang out with him outside of uniform

15   at all?

16        A.   I can't say that I ever have, no.

17        Q.   Okay.  So what do you think regulations are in

18   place for?  Do you believe that you guys run your

19   organization according to regulation?

20        A.   Yes.

21        Q.   Why do these things exist, in your opinion?

22        A.   Why do regulations exist, sir?

23        Q.   Yeah.

                              134

1         A.    Regulations exist for several reasons, one of

2    which is safety.  If we don't have regulations, especially

3    concerning the profession that we specifically are in, many

4    people do things their own way, and when we're dealing with

5    certain types of equipment and regarding certain situations,

6    like (inaudible).

7              Another is discipline.  It's important to have

8    instilled discipline in an Army because it can very quickly

9    spin out of control otherwise, and be (inaudible).  And so

10   discipline is a stumbling block from that happening.

11             And a third is to promote ethical behavior because

12   unethical behavior can sew distrust and not to mention

13   bodily harm, and that's not good for our mission capability.

14   So I say promote mission capability, promote discipline, and

15   to promote safety.

16        Q.    Positive answer.  So do you think we, as off--

17   future officers, you guys need--need to adhere to the same

18   values, Army values, specifically, in order to lead?  Are we

19   above regulation?

20        A.    No.  An officer is certainly not above regulation,

21   nor is the issue of any of the Army values and should, at

22   all times, adhere to it also, in addition to the regulation

23   system.

135

000376

1       Q.    Sure.  Do you think--you know, some states have,

2    like, you know, three strikes, you're out, one strike you're

3    out.  Do you think there's a certain point where if any of

4    these Army values are crossed, that we should--that we have

5    lost our ability to lead?

6       A.    It depends on what type--at what point you are in,

7    in development as an officer, as a Soldier.  I think that

8    there's a reason why we do not get accepted into a place

9    like West Point on an ROTC program or OCS, and upon

10   acceptance get commissioned, but instead there are four

11   years, in the case of the Academy, before we get a

12   commission.  That's specifically because Cadets need to be

13   developed before they can become officers.  In that period

14   of time which we dedicate to that development, I think

15   there's more leeway for mistakes, even serious mistakes,

16   because that is time specifically dedicated to learning, and

17   mistakes help us learn.

18         Now after commissioning and becoming an officer

19   and assuming the full responsibility of officership, I think

20   the degree in which we should forgive egregious mistakes

21   shrinks a lot because you should no longer be so much

22   developing, as executing the responsibilities entrusted in

23   you as an officer.

136

000377

1       Q.   At what point in your Cadet career do you feel

2   that that transition should kind of be at the tipping point?

3       A.   Towards the end, I'd say.  It depends on what you

4   did, but as far as--if we want to treat the firsties, for

5   example, as officers, if you want to apply the letter of the

6   law in addition to just more generally, then we might as

7   well commission them.  So I don't think it's fair to hold a

8   firstie to the exact standard of officership until they

9   receive that commission.

10          I understand that Cadet Doolen may have been--may

11  have behaved in a way that was unbecoming an officer towards

12  the end of his Cadet career, from what conversations I've

13  had with him, that's really the focus of why we're here, but

14  I don't think that necessarily means that he was a failure

15  as a Cadet, nor that he is, at this time, unworthy of

16  officership, especially given the additional development

17  he's had since May of 2013.

18      Q.   What development has he had?

19      A.   Specifically, the work that he's done at home.

20  Though I can't speak to what he did every day for the latter

21  half of 2013 and winter of 2014, but also----

22      Q.   He worked on what at home?

137

000378

A.   I understand that he taught himself a lot about regulations, a lot about the law.  I don't mean to imply that he became a lawyer or that he is now a student of the legal profession, but in doing so, he probably experienced a good deal of introspection about why we have regulations and why we have laws, just as you were (inaudible) earlier, sir, in addition to development that occurred over the summer, which, from what I understand, was extraordinary.  There was a squad leader of ours, in our platoon, Fourth Platoon, Sixth Company, who was in B-1 at the time that Isiah was in B-1, and he was rendered speechless by the end of the summer by the transformation that he had witnessed; that is, how Isiah in spring 2013 because Isiah of late July 2014. Speechless in a good way, I should add.

Q.   What's his name?

A.   That would be J.G. Barnes or John Barnes, or Sergeant Barnes, if you were (inaudible).

RESP: We still call him Sergeant Barnes.

Q.   What do you feel--what is your opinion on hypocrisy within leadership?

A.   I think it's unbecoming a leader in every instance.  I was guilty of it at times, during Cadet Field Training sometimes, by living area was not to the standard

138

000379

1    that I set my subordinates, and they--they would call me out

2    on it, and I had to own up to it, and even that stung.  And

3    it certainly undermined my credibility as a platoon

4    sergeant.  So from personal experience, I can say that it

5    directly affects how effective you are at leading your

6    Soldiers in the direction that a commission demands.

7        Q.   Do leaders, officers, require credibility in order

8    to stay in front of the formation, they have to trust their

9    subordinates?

10       A.   Literally, by definition, yes.  That is what

11   credibility is.

12       Q.   Do--do we require to have that to effectively lead

13   subordinates?

14       A.   Yes, we require credibility.  From my limited

15   experience as a Cadet, you require credibility to lead

16   subordinates, so I agree.

17       Q.   If your company commander lacked credibility for a

18   past transgression, would you, Cadet Lipsky, be able to

19   follow that individual?

20       A.   It depends on whether or not they've demonstrated

21   growth since that last transgression.  I trust that Soldiers

22   in the United States Army at once understand why credibility

23   is important, and understand how people grow from mistakes.

139

1    I imagine that a lot of Soldiers have made mistakes, too.

2    The question is credibility is truly undermined when no

3    growth occurs.  That is what's damning about mistakes.  In

4    some ways, you can come back more credible than--in some

5    ways you can come back more credible than you were prior to

6    the transgression if you demonstrate the type of growth that

7    is becoming of a leader, and that amends for that character

8    flaw that led to that transgression.  I would add, because

9    we are at this hearing, that Isiah has demonstrated that

10    growth.

11        Q.    So you know, there's this big argument in the Army

12    now, a lot of discussion, especially with the downsizing of

13    the Army----

14        A.    Tom Ricks' blog.

15        Q.    It's what?  It's what?

16        A.    The one where a military jury ruled that his DUI

17    was irrelevant to his separation.

18        Q.    Sure, absolutely.  I mean, perhaps not--you're

19    not--they're not-- that is way above our heads, but----

20        A.    I was just thinking about (inaudible).

21        Q.    Yeah, yeah.  He likes to write a lot about this

22    place.  So yeah.  Okay.  So for you, where is the line in

23    the sand in terms of your no-goes for your superiors?  When

140

**000381**

1    would you stop following or at least trust in your first-

2    line supervisor?

3          A.    The moment I recognize that having a behavior that

4    speaks to negligence was in there, I'd touch on the

5    training, and then their general character of their

6    Soldiers, I would lose confidence in them.

7          Q.    Patterns of behavior?

8          A.    Yes.   Patterns of behavior that extend into the

9    present.  There are people who, at one time (inaudible).  So

10   I wouldn't try to hold that against them if they

11   demonstrated growth, but that would be a pattern of

12   behavior.  Alcoholism is a behavior currently debilitating

13   the alcoholic, I wouldn't trust them.

14         Q.    Yeah, I wouldn't either.

15         A.    No, sir.

16         IO:   Do you have any other questions?

17         RESP: Those were--I think they were all great questions

18   that you asked.  I don't have any further questions.

19         IO:   Thank you.   You're excused.

20   [Witness excused.]

21         IO:   Our next scheduled is Sergeant First Class Moore.

22   It's 1525.  I have not gotten any confirmation (inaudible)

141

000382

1    if he's on the same schedule.  So yeah, you can check

2    (inaudible) is out there.  I'm going to stop the tape.

3    [Audio ends.]

4    [Audio resumes.]

5        IO:  Okay.  We're back, 21 August.  We are resuming

6    Cadet Doolen's character witness testimony with Major

7    Knoedler.

8    **MAJOR JONATHAN KNOEDLER, U.S. Army, was called as a witness**

9    **by the Respondent, was sworn and testified, in substance, as**

10   **follows:**

                    DIRECT EXAMINATION

12   **Questions by the Investigating Officer:**

13       Q.   You're here, really, to use you as part of Cadet

14   Doolen's assessment to determine his status, whether it

15   would be deficient or proficient.  So if you would, sir,

16   just for the record, state your name, and then inform

17   (inaudible) your relationship with Cadet Doolen.

18       A.   Okay.  My name is Chaplain Joe Knoedler, and I'm

19   the (inaudible) chaplain at the USCC chapel right now.

20   Cadet Doolen, our relationship happened because he came to

21   my office for about two weeks this summer and helped us out

22   as part of his SGR duties.  He was assigned to us.  We asked

                            142

1    for someone that was responsible and personable, and so he

2    showed up, and here we are.

3        IO:  Okay, great.  This next part, the floor is open to

4    you.

5    **Questions by the Respondent:**

6        Q.   Sir, I guess my first question is based on your--

7    your definition of--of living honorably, would you say that

8    that definition allows for some past transgressions and--and

9    imperfections; if you have witnessed that there's been a

10    remedy to the transgression or the person who's made that

11    transgression has truly refined what they've done wrong?

12        A.   Well, we all have some baggage.  We've all got

13    something wrong, and hopefully someone's been gracious with

14    us, depending on--I mean, actions speak louder than words,

15    so if--if someone is truly sorrowful or repentant, then

16    there will be action that follows.  And--and so yes--so,

17    yes, someone can live honorably, even after having some

18    infraction or done something wrong.

19        Q.   I guess my next question, I know, is probably

20    going to be the most difficult, because we only interacted

21    for two weeks, but I've been asking everybody this.  Based

22    on your observations of me, what would you say my--my

143

**000384**

1    strongest value is in regards to the Army values, and I

2    guess my--my weakest, as well?

3        A.   Give me a second to think about that.  [Pause.]  I

4    think the time that we interacted, for those--for those two

5    weeks, there was nothing that questioned--that I questioned

6    your character or your--any Army values.  There was nothing

7    that--that I can say oh, yeah, that's your weakness.

8            And as far as strongest, probably respect, which

9    came in, I think, partly because of my--my rank over you,

10   but also just in how you carried yourself in carrying out

11   every--every request/order that was given, you did it

12   without--without question, you clarified, it happened, and

13   so that was--that was a big thing for me, because I never

14   once had to follow up or question anything that--that you

15   did.

16       RESP: Sir, thank you.  That's all I have for questions,

17   sir.

18                        CROSS-EXAMINATION

19   Questions by the Investigating Officer:

20       Q.   Sir, when--when again did you say you first met

21   Cadet Doolen?

22       A.   It was in, I believe, June.

23       Q.   June?

                              144

1          A.   Right.  I can--I could give you specific dates,

2     but it was----

3          Q.   No, that's fine.

4          A.   Right at the beginning of summer training.  Before

5     he went off to the CFT?

6          RESP: Yes, sir.  Around the June 1st timeframe,

7     probably.

8          Q.   Did you witness, obviously, the whole reg thing is

9     going to come into play.  He's going to respect you.

10         A.   Sure.

11         Q.   Did you see any other Army values or

12    characteristics which we desire in the officer corps that he

13    specifically exhibited in certain situations during your

14    time with him?

15         A.   You know, the--the thing that stood out about

16    Isiah is that he didn't bash anyone.  I know there's, you

17    know, issues from the past.  He didn't--he didn't bash

18    anyone, didn't--didn't dwell on it, didn't try to work an

19    angle with me or the other chaplain he was working with to

20    try to get something done or a favor asked, and this is the

21    biggest favor he's asked, you know, and I would gladly do

22    this.


                              145

1          And also, I asked him to do some pretty not fun

2     tasks as far as cleaning out underneath--this closet

3     underneath the mess hall filled with a bunch of junk that--

4     that three chaplains ago was there and is still there, and

5     so--and, you know, came out full of sweat, had it done, and

6     said, "What else can I do?"  So that type of thing is what I

7     saw in him.

8          And then also, he was going to be--have an issue,

9     like every couple people I would meet with, he was always

10     asking, "Is there something I need to do?  Can I do it?"

11     And so it was never a question of him, "Well, where is he?"

12     (Inaudible).

13        Q.   Have you ever hung out with him outside of the

14     uniform, or any relationship outside of work?

15        A.   No.

16        Q.   Nothing?  Have you ever seen him drink alcohol?

17        A.   No.

18        Q.   Have you witnessed Cadet Doolen treat anybody with

19     disrespect or in an uncivil manner?

20        A.   No, I never saw that.

21        Q.   That would be kind of silly if he did it in front

22     of you, I guess, right?

23        A.   Right.

146

000387

1      IO:  Okay.  Well, sir, that's all I have, unless you

2   have any other questions?

3      RESP: No, I think that's good, sir.  Thank you.  Thank

4   you for your time.

5      IO:  Yeah.  Thanks for taking the time.  I know it's

6   quick.  Thank you much.

7   [Witness excused.]

8   [Audio ends.]

9   {Audio resumes.]

10     IO:  Cadet Bryant is here.  We'll resume the character

11  assessment for Cadet Doolen.

12  **CADET VERONICA BRYANT, U.S. Army, was called as a witness by**

13  **the Respondent, was sworn and testified, in substance, as**

14  **follows:**

15                      DIRECT EXAMINATION

16  Questions by the Investigating Officer:

17     Q.   Do you know why we're here right now?

18     A.   I do.

19     Q.   Why are we here?

20     A.   Because Cadet Doolen is reinstated, I guess, and

21  for character.

22     Q.   So yeah.  A character assessment so that we can,

23  you know, deliberate and make a determination.

147

000388

1        So please just state your name, when you have

2   met--when you first met Cadet Doolen, and any relationship

3   with him inside and outside of the workplace, if one

4   actually exists.

5        A.   State my name first?

6        Q.   Yeah.

7        A.   I am Cadet Veronica Chase Bryant.  I met Cadet

8   Doolen the summer of 2012.  I was his command plebe in B-1,

9   and then I knew him to be a supply officer (inaudible) and

10  training officer, and he dated my best friend, N Redacted PII

11  D Redacted PII

12       Q.   Okay.

13  **Questions by the Respondent:**

14       Q.   Okay.  Have we ever had any recent interactions?

15       A.   No.

16       Q.   I guess I can ask you, though, based on your

17  definition of--of living honorably, do you think that

18  someone could have past imperfections and come back and

19  redeem themselves, and establish credibility, even though

20  there have been past transgressions?

21       A.   Yeah, (inaudible).

22       Q.   Okay.  I guess my next question is based on what

23  you observed me in and what you've heard, what would you

148

000389

1    say, in terms of Army values, would you say my strongest

2    characteristic is or value, and then my weakest?

3        A.   Can I take a moment just to think about that?

4        Q.   Yes.

5        A.   Okay.  [Pause.]  So like you said, I don't really

6    ever have any interaction with you since you left the

7    Academy the first time. However, Theo Lipsky is one of my

8    very good friends, and he was returning from Buckner, and

9    from what I heard, you did, like, an outstanding job, just

10    like being a good team leader and doing well.  So I guess

11    I'd say, for whatever reason, duty is probably the best of

12    those Army values.  You seemed to really impress him and

13    done a good job.

14        Again, I don't want to (inaudible) interacted with

15    you in a year, but this isn't necessarily like an Army

16    value--but the thing that concerned me most about your

17    character when I did know you, is that you're just sort of

18    like a loose cannon.  I know you got upset and you lost it,

19    and (inaudible).

20        Q.   I completely understand.  I guess when you--when

21    you did know me, besides the loose cannon aspect, which I

22    totally agree, were there any--any positives that you would

23    say?

<div align="center">149</div>

1       A.   Yeah.  You were a nice guy.  Like I believe a lot

2   of people, when they interact with you, (inaudible) a little

3   harsh, but you were always nice.  You always tried to go the

4   extra mile, like you if you saw me outside you'd say, "Hey

5   have a good time," and (inaudible).

6       Q.   And in terms of the loose cannon comment, did you

7   particularly see that?

8       A.   Yeah, I think--I don't want to like imply

9   (inaudible) that's the way it was, but whenever you were

10  drunk or angry, you were (inaudible).  There were times when

11  you were like shouting out the windows (inaudible) N̲Redacted PII̲

12  D̲Redacted PII̲ is a whore, which one, is completely inappropriate,

13  not to mention whatever was going on with you.  Like, the

14  fact that people had wanted to get involved, like come

15  downstairs and other companies to see what was going on,

16  things like that?  Yeah.  I'd say there's was a lot of that

17  going on.

18      RESP: Okay.  That's it.

19                     CROSS-EXAMINATION

20  Questions by the Investigating Officer:

21      Q.   So you said you haven't had too much interaction

22  as to Cadet Doolen since he's been back.

23      A.   No, sir.

                          150

1      Q.   But you heard duty was one of them.  So have you

2  actually observed any of these values that he has asked you

3  to provide?

4      A.   Not recently.  No, sir.

5      Q.   Okay.  So we're just going back to the two

6  thousand----

7      A.   Twelve, sir, 2013.

8      Q.   2012, 2013.  When you knew him, you would describe

9  him as a loose cannon, right?

10     A.   Yes, sir.

11     Q.   Okay.  Were there any other observations made,

12  positive things that he has done?

13     A.   Oh, yes.  I think he was really helpful in the

14  company.  We were on the orienting team together, I forgot

15  about that coming in, and we always (inaudible).  I would

16  see a positive attitude (inaudible).

17     Q.   Okay.  Would you say it weigh more positively or

18  negatively?

19     A.   I think, unfortunately, just because especially my

20  interaction with N[Redacted PII] and like the problems they had, but

21  my interactions with Cadet Doolen were more negative.

22     Q.   And Cadet N[Redacted PII] is your friend, you said?

23     A.   Cadet D[Redacted PII]   N[Redacted PII]

151

1      Q.    Okay, yeah.  Do you believe, personally, that

2  Cadet Doolen embodies the Army values?

3      A.    Again, maybe I'm not a good person to ask because

4  I haven't interacted with him for a year, but if I were to

5  say, based on my experience with him, unfortunately, no.

6      Q.    Have you had any--you mentioned a little bit--

7  interaction outside the workplace with Cadet Doolen?

8      A.    Yeah.  I went with him and Cadet D[Redacted PII] a couple

9  places.  Nothing (inaudible).

10     Q.    Sure.  But outside the uniform?

11     A.    Yeah.  I would go on pass sometimes as a plebe and

12  N[Redacted PII] and Doolen would show up to get lunch or whatever.

13     Q.    Okay.  Did you guys ever drink together?

14     A.    No.

15     Q.    Have you ever seen him drink?

16     A.    I've never seen him drink.  I've seen him come

17  back from the barracks--like from the Firstie or something

18  like that.  Never like outside of that.

19     Q.    Have you ever seen Cadet Doolen, aside from Cadet

20  D[Redacted PII], treat others uncivil or in a disrespectful manner?

21     A.    I mean, there were a couple times he, and again,

22  this was with alcohol involved, so I mean, not necessarily

23  when he's in his right mind, but there were a couple times

152

1    (inaudible) when people had to break up shouting matches

2    between him and other (inaudible).

3        Q.   Okay.  Do you recall what those incidents were

4    about?

5        A.   I mean, one time--one time with N[Redacted PII] when they

6    got into a big fight, he started making a scene, and other

7    people came down the hallway to see what was going on and

8    that sort of escalated from there.

9        Q.   Okay.  Would--if you were a Soldier amongst Cadet

10   Doolen's company, or if you were in his platoon, would you

11   feel comfortable serving as one of his subordinates?

12       A.   Strictly from my experiences, no.  I don't really

13   feel like he did a good job as a supply officer or training

14   officer.  I know that he had a lot of things going on, like

15   I said, and from what I've heard he did a good job, but from

16   my interactions, I don't really feel like he accomplished

17   his duties (inaudible) and I felt like just the fact that

18   whenever he was upset or it involved N[Redacted PII] or something

19   else and getting in trouble, he couldn't not--like under

20   pressure, I don't want an officer who can't function under

21   pressure.

22       Q.   Do you have any examples of him unable to function

23   under pressure?

153

000394

1    A.    So thinking about him and N Redacted PII getting into a

2    fight, and so just being able to like have a conversation,

3    and this is probably her fault, too, I'm sure she instigated

4    a lot of this as well, but like glasses that end up being

5    broken, windows would end up being punched out.  Or even if

6    you're having an interaction with a TAC officer, and then

7    afterwards, him just screaming and yelling and losing it.

8    Like those are the sort of things that concern me.

9    Q.    So knowing what you know of Cadet Doolen, you

10   mentioned combat earlier.  Would you go into combat with

11   this man?

12   A.    With the man I know from 2013, unfortunately, no.

13   I might change my mind from what I hear from Buckner, but

14   from what I know, no.

15   Q.    And do you believe that Cadet Doolen would do the

16   right thing, even at personal cost?  If he had to give up

17   something he really wanted to do, do you think he would do

18   the right thing?

19   A.    To be honest with you, what I hear from now, yeah,

20   it sounds like, from with my interactions with other people,

21   but (inaudible).  So from word of mouth, I think that he's

22   (inaudible).

23   IO:   Do you have any questions you'd like to ask?

154

000395

1        RESP: No.  I think that I'd like to sustain it that I

2   actually think that this feedback was necessary just for a

3   comparing and a contrasting purpose.  Thank you for showing

4   up.

5        IO:  That's it.  Thank you so much for coming.

6   [Witness excused.]

7   {Audio ends.]

8   [Audio resumes.]

9        IO:  Again, we're just resuming the character testimony

10  on behalf of Cadet Doolen.  We have Major Snyder here

11  currently with us.

12  **MAJOR PATRICK SNYDER, U.S. Army, was called as a witness by**

13  **the Respondent, was sworn and testified, in substance, as**

14  **follows:**

15                    **DIRECT EXAMINATION**

16  **Questions by the Investigating Officer:**

17       Q.   So we are here this afternoon just to kind of make

18  an assessment of Cadet Doolen through a series of witnesses

19  that he has called, in order to help determine his status as

20  a Cadet being either deficient or proficient.

21       A.   Okay.

22       Q.   And again, if need be, make a recommendation to

23  the Commandant.  So with that, the floor is yours.

                              155

**000396**

1    **Questions by the Respondent:**

2         Q.   Sir, based on your--based on your definition of

3    living honorably, is it--is it possible to have past

4    transgressions and not necessarily be perfect, but if

5    there's redemption involved, if--if you've truly shown that

6    you're redeeming yourself, is that (inaudible)?  Can there

7    be past transgressions, I guess, and you still move on?

8         A.   I believe so.  I believe we can have

9    transformative experiences.  I believe we develop and grow

10   as individuals, and I do believe it's possible for people to

11   either go through the path of ethical development, where

12   they start small and become big ethically, or I also believe

13   it's possible for people that are ethical giants to have a

14   lapse and make a mistake and to recover from that.

15        Q.   Yes, sir.  I guess based on--I guess--we haven't

16   had a whole lot of interaction, but I think it's increased.

17   Based on what you've observed and what you've seen and

18   witnessed, what would you say my strongest Army value is,

19   and perhaps my weakest, as well?

20        A.   Oh, it's not even--I feel confined by putting it

21   in the Army values (inaudible) leadership strength and any

22   leadership weakness?

23        Q.   Yes, sir.

156

**000397**

1          A.   I think you're very tenacious.  I believe that you

2     are very mission-focused at the size of all the tasks that

3     I've been able to see over the past.  I think we probably

4     met in July--I think you got assigned to me in June, but I

5     was out at Buckner.  I believe we initially met in July.  I

6     would have to go back and look, but it was certainly around

7     CFT time.

8               I've seen you be very focused, not only on this,

9     which is a personal mission of yours, but also on the

10    missions that were assigned to you, including the one that

11    you're doing right now with the regs, but also getting some

12    feedback from Major Ziegelhofer during CFT.  So I definitely

13    see that as a strength.

14              My observation of a weakness, at this point, I

15    just want to offer the observations that I've made.  I don't

16    know--I really have not had a lot of interaction with you.

17    You were assigned to my company, but now you're up at the

18    regiment.  You were in another company during CFT.  So for

19    better or for worse, the majority of your work I get to see

20    is the work that I think, most of the time, you want to

21    filter up to me, and it's good.  So I don't really have an

22    observation right now to give you on a weakness, just

23    because I don't have a lot of exposure.

                                157

000398

1        RESP: I think, actually--I'll reiterate some things

2    with my job as battalion S-1 and my communication, I need to

3    focus on that a little bit more, but I think that I'm trying

4    to regain that, and maybe--but I guess this may or may not

5    be called a weakness, when I'm being judged whether I'm

6    going to be proficient or deficient in conduct, but that is

7    something I need to focus on.  I'll end with that.  I don't

8    have any--any further questions.  No, sir.

9                        CROSS-EXAMINATION

10   Questions by the Investigating Officer:

11       Q.   Sir, how long have you said you've known him?

12       A.   He was assigned, I believe, in June.  He was

13   (inaudible) assigned to H-2.  Sergeant First Class Haynes

14   was the--so just let me paint a picture (inaudible).

15       Q.   Sure.

16       A.   Sergeant First Class Haines was my TAC NCO.  He

17   was the SGR sergeant major this summer.  He initially met

18   Doolen and assigned him to a detail for SGR 1, I believe,

19   (inaudible) at the chapel.  Right around the time that SGR2

20   would've kicked off, he came out to CFT, and that was when I

21   first had a face-to-face, I believe, with Isiah Doolen, was

22   out at Camp Buckner.  He was assigned--I was Charlie Company

23   and you were in Delta.  His office was next to ours.  Major

                                158

000399

1    Ziegelhofer's pad was next to us.  I would probably have

2    interaction with him twice a week throughout the duration of

3    CFT for approximately an hour each time.  That was focused

4    on either me serving him with papers, one was being notified

5    of his brigade board; other times were him coming in and

6    using the computer, or asking how to get those memoranda for

7    record and things of that nature.

8          During some of those times, it moved from a

9    strictly me providing instruction on AR 25-50 to having a

10   conversation.  And during those conversations, I'd say

11   probably, like I said, about two hours a week, we had some

12   dialogue.  Then so, I would say, early to mid July, that's

13   when CFT started.

14        Q.    So a couple of months, but very limited

15   interaction, you say, between that.  During that time, did

16   you observe any significant character traits that you would

17   like to provide?

18        A.    Again, I'd say he's very decisive, and something

19   that impressed me, he, in my opinion, had the specter of

20   separation hanging over him throughout CFT, and I don't know

21   if he needed the advice that I gave to him, but I gave it to

22   him anyway.  You know, the best thing for you to do, no

23   matter what, is to focus on being a good platoon leader

159

1    throughout CFT, and perform your mission well.  The feedback

2    that I got from his TAC was that he did that.  And so I do

3    think, to a certain extent, it speaks to his maturity, at

4    least, to be able to separate his personal problems from his

5    professional ones, to be able to not only perform, but

6    evidently so, I think he got an A out of that detail.  Major

7    Ziegelhofer can give you much more context as his TAC this

8    summer.

9       IO:  Do you have anything else that you'd like to ask?

10      RESP: No, sir.  I think that pretty much covers it.

11      IO:  Well, thank you for your time.  Sorry for bringing

12   you in here for only a couple of minutes.

13      WIT: No.  It gets me out of drill practice.  Now I've

14   got to get back out there and do some drill.

15   [Witness excused.]

16   [Audio ends.]

17   [Audio resumes.]

18      IO:  We are back now with a Cadet Roy to develop an

19   assessment--character assessment for Cadet Doolen.

20   **CADET BRANDON ROY, U.S. Army, was called as a witness by the**

21   **Respondent, was sworn and testified, in substance, as**

22   **follows:**

23                    **DIRECT EXAMINATION**

                              160

1    Questions by the Investigating Officer:

2        Q.    So we're here to gather an assessment so we can

3    make a recommendation as to whether he is proficient or

4    deficient.  So please just state your name, how long you've

5    known Cadet Doolen, and then the extent of your

6    relationship, and then we'll turn it over to Cadet Doolen to

7    ask you some questions.

8        A.    Cadet Brandon Roy.  I've known Cadet Doolen since

9    the beginning of--the end of June, early July, when we

10   started CFT.  I was the 6 Company XO, and Cadet Doolen was

11   one of the platoon leaders, so I got the opportunity to work

12   with him pretty much on a daily basis, made sure our company

13   ran--ran well.  So I feel like I've--I've got a pretty good

14   grasp of who he really is because that puts a lot of stress

15   on people, being out in that environment, where we're all in

16   there learning.

17       Q.    Got it.

18       A.    So that's a good snapshot.

19   Questions by the Respondent:

20       Q.    Okay.  I guess the question I've been asking

21   everybody right off the bat is based on your--your

22   definition of living honorably, is it possible to have past

161

000402

1 transgressions, redeem yourself, and to be able to live

2 honorably and have credibility and leadership?

3   A. I absolutely think it's possible. Everybody's

4 going to--to have areas where they--where they're weak or

5 maybe messed up and make mistakes, and even when it's

6 something so large as honor, there--there could be a time

7 where--where honor is compromised, but I believe that--that

8 human beings are capable to overcome that if they so choose.

9 If they truly want to live correctly and get themselves back

10 on the right track, there's--I don't think that there's any

11 limitations that would keep them from doing that.

12   Q. From your experiences with me this summer and I

13 guess like based on my character and performance, what--what

14 would you say my strongest Army value is, and my weakest, as

15 well?

16   A. Definitely very strong on loyalty and just you

17 worked for the company harder than--by far, harder than any

18 other platoon leaders that were out there, and you were

19 always, you know, wanting to--wanting to make--make your

20 platoon better and make the company better and look good.

21   The weakest--it's hard for me to say. I saw

22 absolutely nothing wrong with your performance out there in

23 the field, day in and day out. I mean, you were always on

162

1    top of everything in--in your platoon, definitely.   It

2    showed in your platoon.   Your--your yearlings were the most

3    squared away and ready to accomplish tasks, and I think that

4    was a direct result of you and your work with your platoon

5    sergeant, and how you ran your--ran all your people.

6         RESP: I guess that's--that's all I've got for now, sir.

7                        CROSS-EXAMINATION

8    Questions by the Investigating Officer:

9         Q.   So you're saying you saw a lot of positives?

10        A.   Absolutely.

11        Q.   Give me some specific examples.

12        A.   Coming into the detail during LTP, he--he had

13   approached me and the CO and told us, okay, I have some past

14   things that are going to be taking me away from training

15   here at Buckner.   We were like, okay, and he would--he would

16   have to leave to come take care of stuff back here, and he

17   would always, you know, make sure that he left his platoon

18   sergeant with all the information that he had to make sure

19   that his platoon sergeant could--could lead in his absence.

20   When he came back, he was very, very quick to pick things

21   back up.   And just any--any time a task was put out or

22   something needed to be done, the CO, myself, and the first

23   sergeant, we didn't even have to think about whether Cadet

                              163

**000404**

1    Doolen would get his platoon on a task.   If there was a

2    company-wide thing, 99 percent of the time, his platoon was

3    the first one to get it done.

4         Q.   Do you have any specific examples?

5         A.   We were--we were raising money for like a big

6    cookout at the very end, as like a culminating thing.

7    We--we couldn't get rations because we were out there in the

8    field, so we went around and collected money from each

9    individual person, and the platoon leaders were kind of

10   slacking off on this, but Isiah turned in his money before

11   everybody else, and even used some of his own money to take

12   care of people that couldn't have it at the time.   I thought

13   that was really, really admirable, and he was taking care of

14   his people before--before himself.   And just constantly, he

15   was always--always the latest--up the latest, making sure

16   that all his squad leaders were ready to go for the next

17   day.   And when he read his sights out there, the----

18   [Audio ends.]

19   [Audio resumes.]

20        A:   I could definitely tell, just by the CO's attitude

21   whenever he had different platoon leaders on different

22   tasks, and whenever he--he had Cadet Doolen in charge of

23   something, he was more relaxed, he didn't have to worry

                              164

**000405**

1    about checking up on him.  He was--he trusted him, and I

2    trusted Cadet Doolen with--with anything that I needed to

3    get done.  We became very good friends throughout the

4    whole--whole experience of Buckner.

5         IO:  Okay.  I have no questions for you.

6              Do you have anything else?

7         RESP: No, sir.  That's good.  Thank you.

8         IO:  Okay.  Thank you.

9    (Witness excused.]

10   [Audio ends.]

11   [Audio resumes.]

12        IO:  All right.  We are now recording, a continuation

13   of character witnesses for Cadet Doolen.

14   **CADET JOHN BARNES, U.S. Army, was called as a witness by the**

15   **Respondent, was sworn and testified, in substance, as**

16   **follows:**

17                      **DIRECT EXAMINATION**

18   **Questions by the Investigating Officer:**

19        Q.   Okay.  Just relax.  Why we're here, we're just

20   having an assessment of Cadet Doolen.  Please, if you would,

21   state your name, how long you have known Cadet Doolen, and

22   then the extent to your relationship with him.

                              165

000406

1     A.   My name is John Gordon Barnes.  I've known of

2    Cadet Doolen since August of 2012.  I have formally

3    interacted regularly with Cadet Doolen as of June 2014.

4     IO:  Okay.

5    **Questions by the Respondent:**

6     Q.   All right.  First question, I'm asking everybody;

7    based on your definition of honorable living, would you say

8    that it's possible to have trans--past transgressions and

9    imperfections, and still live honorably and have credibility

10    as a leader, as long as there's redeeming factors involved

11    with that?

12     A.   Oh, absolutely.  So after I wrote my character

13    statement, and like I just said, I had known of Cadet Doolen

14    since August of 2012.  That's when I was a plebe and he was

15    a firstie.  I never really interacted with him that much,

16    and I just heard hearsay from, you know, people on the

17    Sandhurst team or other people like that, and they were

18    generally all negative comments.  So in June, when I had an

19    e-mail from Cadet Doolen saying he was going to be my PL, I

20    was concerned, because I was thinking of all those memories

21    of all those people telling me about him my plebe year came

22    back.

166

**000407**

1           However, throughout Buckner, he was my Buckner

2      platoon leader and I was one of his squad leaders, so--and

3      throughout Buckner, I was completely--had an absolutely

4      incorrect of my initial--my initial (inaudible) towards him.

5      He was an outstanding platoon leader (inaudible) completely

6      have redeemable qualities from whatever he had done in the

7      past.  Just interacting with--interacting with him during

8      Buckner, I knew that he was a changed person.

9           Q.   I guess, sort of based on that, on the Army

10      values, what would you say that we could--or my strongest

11      value is and my weakest value?

12           A.   Based on the Army values?  Personal courage.  I

13      think personal courage is going to be your strongest

14      attribute because the story that you had told all of--all of

15      the squad leaders at the beginning of Buckner about how you

16      got separated--separated two weeks before graduation and

17      then (inaudible) run off to (inaudible) workings of the

18      processes and the law behind it, and then you were able to

19      overturn that by the Assistant Secretary of the Army--that

20      took a lot of personal courage.  You didn't just sit back--

21      you didn't just sit back and take what was given to you, and

22      it showed a dedication and commitment and what all of the

23      instructors and the officers here say, as long as you want

                                   167

1    to be here, then you should be here, and that fighting for a

2    year to get back, I couldn't think of a better indication of

3    how much he wants to be here.

4          Weakest, I mean, he's strong in all of them, but I

5    suppose because of his lapse--lapses in judgment his first

6    year, maybe--maybe honor.  He stopped living honorably but,

7    like I said, and which goes back to your first question, you

8    completely redeemed from that and throughout Buckner, also,

9    you were trying to uphold every, single one of the values.

10        RESP: Sir?

11                **CROSS-EXAMINATION**

12    **Questions by the Investigating Officer:**

13       Q.   Okay.  I was just confused, just going back to a

14    couple of minutes ago.  You said that--did Cadet Doolen tell

15    you that he got separated and then he went back and did

16    what?

17       A.   Yeah, so Cadet Doolen told me that he was

18    separated from the Academy and when he went back home, he

19    had to write proposals and arguments to people back at West

20    Point in order to fight his separation, and be given another

21    opportunity to graduate.

22       Q.   You said something about the Undersecretary of the

23    Army.

000409

A.    I thought that he had gotten his separation

overturned by the Assistant Secretary of the Army.

Q.    I didn't understand what you were saying.  Okay.

Did he tell you that it got overturned by the Undersecretary

of the Army?

RESP: That's--that's what I had--that's what I was told

by Colonel--Colonel Well, sir.  He e-mailed Mr. Williams and

he said that the ASA decided to--he said he declined the

decision for separation and he admitted me--he had me return

to West Point under the (inaudible) of the leadership.

IO:  Okay.  Yeah.  I just wanted clarify that.  Okay.

Q.    So he--he explained to you his current situation

as he knew it.  Okay.  So do you believe Cadet Doolen

embodies the Army values?

A.    Now I do, yes.

Q.    Now you do?

A.    Now I do.

Q.    And your impression before?

A.    Like I said, I didn't even know him before.  The

only time that I saw him was walking through the hallways on

my way back to my room and I said, "Hey, sir."  But other

than that, I didn't know him.  The only time I truly got to

know him was when he was my leadership for (inaudible).

169

000410

1      Q.   So you highlighted personal courage as being his

2   most--the standout to Army values----

3      A.   Correct.

4      Q.   ----to his current situation.  Do you have

5   specific examples of him, or attributes or Army values,

6   specific examples of him living up to some Army values,

7   aside from personal courage (inaudible).

8      A.   One was loyalty, especially to our platoon.  At

9   the end of Buckner, when everything was winding down and,

10   you know, and everyone had that, I don't--I don't want to

11   say lackadaisical, but they wanted to get out of there, he

12   took the time with me to go administer a few more tests for

13   people in my squad who were--who didn't get their combat--

14   their combat done.  We were a few short.  And I tell people

15   it's the option of redoing the APFT, so on a day where we

16   have off and can do anything we want, we came out with just

17   me and this one person in my squad and re-administered the

18   whole APFT.

19        For other things in loyalty, just what--the basic

20   thing that you hear about officers, like last to eat, you

21   know, putting--putting the people in his platoon before him.

22      Q.   Have you ever seen Cadet Doolen treat anyone in

23   less than a civil way?

<div align="center">170</div>

000411

1        A.    Absolutely not.  And going by my last statement, I

2    just thought of this, we were visited, on our last day of

3    (inaudible), day of admissions, basically, the chaplain, the

4    head chaplain of West Point came out to--came out to see us

5    and take pictures with us and talk to us, and she had a coin

6    with her, and she asked the entire platoon--she said, "Who

7    do you think, in this platoon, treats everyone the nicest,

8    the best, and with the most respect?"  And it was unanimous,

9    everyone was saying, "That's Doolen," and that's when the

10   head chaplain gave him her coin.

11       Q.    Is there--is there anything else that you'd like

12   to add pertaining to his character?

13       A.    I think he's--it's evident that he's super

14   dedicated and tenacious and he's committed to West Point and

15   the Army.  Otherwise, he wouldn't be sitting in that chair

16   right now.  And everything he's done--I mean, he deserves

17   everything that he can get from fighting this.

18       IO:  Do you have anything else for him?

19       RESP: No, sir.  I think he did a really good job of

20   bringing that up.

21       IO:  Okay.  Thank you for your time.

22   [Witness excused.]

23   [Audio ends.]

171

**000412**

1    [Audio resumes.]

2        IO:  All right.  Resuming recording.  We are--we have

3    completed the witness list.  I just want to confirm the

4    memorandums for record submitted on your behalf.  We have

5    Ziegelhofer, Lipsky, Frullaney, Beck, David, Miller, Chal,

6    Mapes, McQuirter, Fargo, DeForest, Majors, Barnes, and then

7    additional exhibits submitted today, Exhibits 1, 2, and 3,

8    and those are tied to the board proceedings.  So these have

9    all been added as evidence to your file and will be used

10   during the deliberation.

11       I just need to confirm that we have sufficed your

12   witness list and evidence submitted.

13       RESP: Yes, sir.  Can I include a closing--a closing----

14       IO:  Sure.  Let me go through this first----

15       RESP: Yes, sir.

16       IO:  ----and then I'll give you a chance to say

17   whatever you want to say.

18       So board proceedings, we had Colonel Mauldin and

19   that's all you wanted?

20       RESP: Yes, sir.

21       IO:  For character witnesses, we had Majors;

22   Ziegelhofer, who submitted the memo; Chal; McQuirter;

172

000413

1    Jenkins.  We had a Sergeant First Class Moore, but they did

2    not appear.

3         RESP: She--she actually shot me an e-mail, I would say

4    an hour or two ago.  I guess she, I don't know, where--maybe

5    she was on leave, but she would like to submit a statement,

6    if that's--if that's permissible.  I don't--I don't know if

7    that's going to be allowed or not.

8         IO:  It will.

9         RESP: Okay.  I appreciate that.

10        IO:  If you get that to me today.

11        RESP: Oh, today?  Okay.

12        IO:  Is that possible?

13        RESP: I--I--I told her just--because she asked when,

14   and I didn't give her your e-mail.  I had told her tomorrow,

15   if possible--if at all possible.

16        IO:  Major Knoedler, Major Snyder, Cadet Roy, Major

17   Chancy----

18        RESP: It was Major Cheney.

19        IO:  Oh, okay.  Chaplain?  Roger.

20        RESP: Yes, sir.

21        IO:  Lipsky, Frullaney, Barnes, Bryant, and Williams.

22        RESP: Yes, sir.

23        IO:  Okay.  So is there anybody else?

173

000414

1        RESP: No, sir.  There is not.

2        IO:  Okay.  And the only other evidence that you want

3    to submit would be on behalf of Sergeant First Class Moore?

4        RESP: Yes, sir.

5        IO:  Okay.

6        RESP: She--she was a tactical officer for our NCO, for

7    CFT, as well.  So, I mean, I think she would have some--some

8    insight.

9        IO:  Have her provide me with evidence and I will

10   include it.

11       RESP: Yes, sir.

12       IO:  Okay?

13       RESP: Absolutely.

14       IO:  And so if you have anything you want to say prior

15   to closing here?

16                        **CLOSING STATEMENT**

17       RESP: Just for the closing, I know--I kind of want to

18   touch on--on one--one statement in particular.  I know the

19   positives were--were obvious.  For the positive statements,

20   the positive witnesses were blatantly obvious, and it was

21   plainly obvious.  And I want to--I want to focus on the fact

22   that I--I don't have any grudge about that.  I think that

23   that's--that's feedback that will help add to the personal

                              174

1    growth--my own personal growth that I told you that I had

2    focused on over the course of that year.  And I hope that

3    the witnesses today have--have provided you enough insight

4    to show you that that remediation was--was effective, and

5    the year off was--was a necessity.  I--I agree on that.

6          I do absolutely want to be here, or else I

7    wouldn't have spent the time trying to get back in.  I--I do

8    want to be here.  So I hope that's apparent, and that's all

9    I have to say, sir.

10        IO:  Okay.  All right.  I appreciate your time.  If we

11   have met all your witnesses, which I believe we have----

12        RESP: Yes, sir.

13        IO:  I have all your evidence, minus one memorandum

14   which you'll get me tomorrow----

15        RESP: Yes, sir.

16        IO:  ----I will include Sergeant First Class Moore's in

17   here, and we will effectively close the hearing.  I will go

18   into deliberation over the next few days.  I have to go back

19   and listen to these recordings, go back through this giant

20   folder here and your memorandum.  Once I have come to a

21   conclusion, you'll obviously be notified.

22        RESP: Yes, sir.

23        IO:  Okay?

000416

1       RESP: Appreciate it.

2       IO:  All right.  Well, thank you for your time.  I'm

3   glad we didn't run out of tapes this time.

4   [End of proceeding.]

5                          [END OF PAGE]

6

176

000417



**DEPARTMENT OF THE ARMY**
UNITED STATES MILITARY ACADEMY
646 SWIFT ROAD
WEST POINT, NY  10996-1905

MAJA-MJ                                                             11 September 2014

MEMORANDUM THRU Regulations & Discipline Officer, United States Corps of Cadets, United States Military Academy, West Point, New York  10996

FOR Commandant of Cadets, United States Corps of Cadets, United States Military Academy, West Point, New York  10996

SUBJECT:  Legal Review of Conduct Investigation – Cadet Isiah Doolen, Company H-2, Class of 2014

1.  Purpose.  To provide a legal review of the Conduct Investigation (CI) of Cadet Isiah Doolen, Company H-2, Class of 2014.

2.  Discussion.

    a.  The Investigating Officer (IO), CPT(P) Nicholas Forlenza, found Cadet Doolen (Respondent) deficient in conduct after reviewing two field grade Article 10s for alcohol policy violations, and character statements, evaluations, and the Cadet's service record. The disciplinary awards affirmed by the IO are as follows:

| DATE OF OFFENSE (Date of Award) | DELINQUENCY | AWARD |
|---|---|---|
| 17 APR 10 (06 MAY 10) | Art. 1 – Failure to comply with regulations<br>Art. 7 – Error in Judgment<br>(alcohol in the barracks) | 35 demerits |
| 08 MAY 13 (23 JUN 14) | Art. 1 – Failure to comply with Regulations<br>Art. 6 – Unsatisfactory Behavior<br>Art. 7 – Error in Judgment<br>(Entered barracks room of female Cadet against her will, while intoxicated) | 35 demerits |

    b.  The CI was held on 11 August 2014.  The IO found that the two field grade Article 10 actions were properly constituted, reviewed, and approved, and the IO affirmed the awards.

    c.  The IO recommended that Cadet Doolen be separated from the United States Military Academy (USMA).

MAJA-MJ
SUBJECT:  Legal Review of Conduct Investigation – Cadet Isiah Doolen, Company H-2, Class of 2014

3.  Rules and Analysis.

    a.  All demerit awards are within the limits established by USCC Regulation 351-1.

    b.  There was no error that had a material adverse effect on the Respondent's rights.

    c.  The conduct deficiency is supported by substantial evidence and by a greater weight of evidence than supports a contrary conclusion.

    d.  The proceedings were conducted in accordance with law and regulation, and complied with legal requirements.

    e.  You are not bound by this determination.  You must reach your own conclusions based upon your independent evaluation of the record.

4.  Commandant Responsibilities.

    a.  You should review the entire case file, including chain of command recommendations and any matters offered by the Respondent, in accordance with AR 210-26, paragraph 7-3, before taking action in this case.

    b.  You may approve the finding that the Respondent is deficient in conduct if you determine that it is supported by a greater weight of evidence than supports a contrary conclusion.

    c.  You may disapprove the deficiency finding for any reason you deem appropriate.

    d.  In making your determination, you may consider any relevant information, as long as the information is provided to the Respondent for consideration and rebuttal.

    e.  If you approve the finding that the Respondent is deficient in conduct, you may:

        (1)  Decide that the cadet's record of performance warrants retention and direct the cadet to be placed on conduct probation; or

        (2)  If you decide the cadet's record of performance does not warrant retention, you may recommend to the Superintendent the appropriate disposition.

    f.  A copy of the case file, including this legal review and your recommendation, will be provided to the Respondent for comment.

5.  Authorized Sanctions.

    a.  IAW AR 201-26, paragraph 6-17(c) and USCC Regulation 351-1, paragraph 118, if the Respondent is deficient in conduct, the Superintendent may:

**000419**

MAJA-MJ
SUBJECT:  Legal Review of Conduct Investigation – Cadet Isiah Doolen, Company H-2, Class of 2014

    (1)  Direct Retention with or without Conduct Probation; and/or

    (2)  Direct transfer to the next lower class (for one academic term or two); or

    (3)  Direct suspension from the Academy; or

    (4)  Recommend to the Assistant Secretary of the Army (Manpower & Reserve Affairs) that the Respondent be separated from the Academy, transferred to the US Army Reserve as an E-4 for three years, and called to active duty for three years, with or without enrollment in the Academy (Army) Mentorship Program; or

    (5)  Recommend to the Assistant Secretary of the Army (Manpower & Reserve Affairs) that the Respondent be separated from the Academy and discharged from the Army (with either an Honorable or General (Under Honorable Conditions Discharge), with possible recoupment.

    b.  If the Superintendent recommends separation, he may immediately suspend the cadet from the Academy, without pay, pending final action in the case by HQDA.

6.  Recommendation.  I recommend that you review the record of proceedings and all of the documentary evidence considered by the Investigating Officer and withhold making your recommendation on this case pending receipt of the Respondent's reply (if any). The requisite documents for your action and/or recommendation will be provided at the appropriate time.

FOR THE STAFF JUDGE ADVOCATE:

Encls
as

ERIC J. LAWLESS
MAJ, JA
Chief, Military Justice

3

**000420**