

DEPARTMENT OF THE ARMY
2nd Battalion, 4th Regiment, United States Corps of Cadets
United States Military Academy
West Point, New York 10996

REPLY TO
ATTENTION OF

MACC-O-E4 27 April 2010

MEMORANDUM FOR RECORD

SUBJECT: Commander's Inquiry – Cadets Colleng, Doolen, Elphee, Herina, Langley, Toal, Tyree, and Webb

1. **Findings.** Cadets John Colleng, Isaiah Doolen, Jacob Elphee, John Herina, Daniel Langley, Sean Toal, Peter Tyree, and William Webb all consumed alcohol in the barracks on 17 April 2010. Of the eight, Cadet Doolen is the only one of drinking age. Additionally, four individuals, Cadets Toal, Langley, Tyree, and Doolen departed post to purchase the alcohol in Newburgh. Of those four, Cadet Langley was the only one authorized to depart post; he was on OPPs. Cadet Langley borrowed a Firstie's (D4) POV without completing or submitting the appropriate paperwork.

2. **Recommendation.** All eight cadets should have their actions adjudicated by a Brigade Board and referred to the Army Substance Abuse Program for screening. All eight should be enrolled in either SLDP or SLDP-A.

3. **Discussion.**
a. Sequence of events. On the afternoon of 17 APR 2010, CDT Langley borrowed an upperclass Cadet's POV and he, CDTs Doolen, Toal, and Tyree drove to Newburgh to purchase alcohol. Cadets Colleng and Elphee knew about the beverage run and gave them money to put towards the purchase. While out, they made stops at Wal-Mart and Taco Bell. Before returning to West Point around 1900 hrs, the alcohol was transferred into Nalgene bottles and a plastic Taco Bell cup. The driver, CDT Langley did not drink while driving. Room M1114 (CDT Colleng, Toal, and Doolen's room) was the central alcoholic beverage distribution point for the evening.

At a point, CDT Webb entered room M1114 to hang out. He asked what was in the bottles and was informed that it was alcohol. He asked for some then went to his room to get a bottle to put it in. CDT Elphee entered the room and posed the same question. He initially declined to drink, but eventually elected to consume 3 shots of Bacardi 151. Around 2030 hrs the five decide to go to the dayroom. On the way, CDTs Toal, Colleng, Doolen, and Webb heard laughter coming from CDT Currie's ('12) room so they knocked and went in. After a quick hello, Cadets Webb and Colleng departed and Doolen and Toal stay behind. The Third Class Cadets asked them if they had been drinking and they responded with "Don't worry about it." (taken from CDT Toal's statement)

Cadets Webb, Colleng, Toal, and Doolen then proceeded to the dayroom to watch a movie. Shortly after entering the dayroom, CDT Elphee, completely inebriated, was escorted

back to his room by a classmate. The others departed the dayroom around 2330 hrs. CDT Doolen is the only one who took his alcoholic beverage to the dayroom.

After several hours of deliberation and movie watching, the Yearlings determined it was best to report the incident up the chain of command. At 0130 on 18 APR 2010, CDT CPL Kevin Lusted went to the company commander's room and informed him of the situation.

b. **Performance.**

i) CDT Colleng. With the exception of this incident, CDT Colleng has been a middle of the road Fourth Class Cadet who has not stood out - good or bad. He seems to be one of the many honorable members of his class. His platoon leadership rates him as one of their better cadets. He is respectful, "always does what he's supposed to," and participates well in platoon activities.

ii) CDT Doolen. CDT Doolen, up to this point, has been an upstanding plebe and member of E4. Prior to attending West Point, CDT Doolen was close to completing an ROTC scholarship program at a civilian university before deciding to attend West Point. CDT Doolen was a member of the Company Sandhurst Team and was one of two Plebes competing for a spot on game day. For Plebe Parent Weekend, CDT Doolen was selected by his Cadet Chain of Command to serve on Battalion Staff. However, his current leadership does not feel that this is an isolated incident due to his unwillingness to cooperate with them when they were first made aware of his exploits.

iii) CDT Elphee. With the exception of this incident, CDT Elphee has been a middle of the road Plebe who has not stood out for being remarkable - good or bad. He seems to be one of the many honorable members of his class. In the company he is known for his hard work and dedication to the Sprint Football team. His Team Leader added that CDT Elphee is constantly working to improve academically and physically, and has taken the time to assist some of his classmates become better at PT.

iv) CDT Herina. CDT Herina is a middle of the road Forth Class Cadet. He has had several infractions, including an insolent and bad-mannered interaction with one of his instructors first semester and with me over Plebe Parent Weekend. It is difficult to say if this is an isolated incident or not for CDT Herina at this point.

v) CDT Langley. With the exception of this incident, CDT Langley has been one of the stronger Plebes in E4. This is the first infraction on CDT Langley's part serious enough to be recorded this semester. Previously he had a security violation, but has mostly received positive Cadet Observation Reports. Based on reports from his chain of command this incident seems entirely out of character for CDT Langley.

vi) CDT Webb. CDT Webb is arguably the best Plebe in E4. Exceptionally hardworking and a great attitude, CDT Webb was a member of the Company Sandhurst Team and was selected to be on the Parachute Jump Team. Based on CDT Webb's contributions to the company and interaction with his Chain of Command, I believe this to be an isolated incident on his part.

vii) CDT Toal. CDT Toal is a mediocre Cadet who has an air of arrogance and negative attitude about him. As this event surfaced, several individuals in the company indicated that this does not surprise them as they have heard rumors of his drinking habits before, both off-post while on

weekend pass and in the barracks. If this is true, the probability of this being an isolated incident for CDT Toal is unlikely.

viii) CDT Tyree. With the exception of this incident, CDT Tyree has not had any infractions serious enough to be recorded. He has always been a very respectful Plebe. Although he struggled with Plebe duties for a while he has improved drastically over the year. He has also shown an increased dedication to physical fitness and worked hard to make the Sprint Football team this semester. This incident seems out of character for CDT Tyree.

4. POC for this memorandum is the undersigned at x2009 or Allison.marschean@usma.edu.

ALLISON MARSCHEAN
CPT, MI
Company Tactical Officer

4 Encls
1. List of Exhibits
2. Exhibit A
3. Exhibit B
4. Exhibit C

List of Exhibits

Commander's Inquiry – CDT Doolen, Isiah
27 April 2010

Exhibit A – DA 3881 Rights Warning Procedure/Waiver Certificate

Exhibit B – DA 2823 Sworn Statement by CDT Doolen (2 pages)

Exhibit C – DA 2823 Sworn Statement by CDT Doolen (2 pages)

# RIGHTS WARNING PROCEDURE/WAIVER CERTIFICATE

For use of this form, see AR 190-30; the proponent agency is ODCSOPS

## DATA REQUIRED BY THE PRIVACY ACT

AUTHORITY: Title 10, United States Code, Section 3012(g)

PRINCIPAL PURPOSE: To provide commanders and law enforcement officials with means by which information may be accurately identified.

ROUTINE USES: Your Social Security Number is used as an additional/alternate means of identification to facilitate filing and retrieval.

DISCLOSURE: Disclosure of your Social Security Number is voluntary.

| 1. LOCATION | 2. DATE | 3. TIME | 4. FILE NO. |
|---|---|---|---|
| MacArthur Short Barracks, West Point, NY 10996 | Adm 23 APR 2010 | 0557 | |

| 5. NAME (Last, First, MI) | | 8. ORGANIZATION OR ADDRESS |
|---|---|---|
| Dorlen, Esiah M | | MacArthur Short Barracks<br>Company E4<br>USCC, West Point, NY 10996 |
| 6. SSN XXX-XX-7694 | 7. GRADE/STATUS CDT/STUDT | |

## PART I - RIGHTS WAIVER/NON-WAIVER CERTIFICATE

### Section A. Rights

The investigator whose name appears below told me that he/she is with the United States Army USCC, Company E-4 Tactical Officer and wanted to question me about the following offense(s) of which I am suspected/accused: Violating USCC Regulations by drinking alcohol in the barracks.

Before he/she asked me any questions about the offense(s), however, he/she made it clear to me that I have the following rights:

1. I do not have to answer any question or say anything.
2. Anything I say or do can be used as evidence against me in a criminal trial.
3. *(For personnel subject to the UCMJ)* I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. This lawyer can be a civilian lawyer I arrange for at no expense to the Government or a military lawyer detailed for me at no expense to me, or both.

   - or -

   *(For civilians not subject to the UCMJ)* I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. I understand that this lawyer can be one that I arrange for at my own expense, or if I cannot afford a lawyer and want one, a lawyer will be appointed for me before any questioning begins.
4. If I am now willing to discuss the offense(s) under investigation, with or without a lawyer present, I have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if I sign the waiver below.

5. COMMENTS *(Continue on reverse side)*

### Section B. Waiver

I understand my rights as stated above. I am now willing to discussthe offense(s) under investigation and make a statement without talking to a lawyer first and without having a lawyer present with me.

| WITNESSES *(If available)* | |
|---|---|
| 1a. NAME *(Type or Print)* Daniel G. Prial | 3. SIGNATURE OF INTERVIEWEE [signature] |
| b. ORGANIZATION OR ADDRESS AND PHONE Mac Short E-4 | 4. SIGNATURE OF INVESTIGATOR [signature] |
| 2a. NAME *(Type or Print)* Chad Pierce | 5. TYPED NAME OF INVESTIGATOR Allison Marschean |
| b. ORGANIZATION OR ADDRESS AND PHONE Mac Short E-4 | 6. ORGANIZATION OF INVESTIGATOR Company E-4 Tactical Officer |

### Section C. Non-waiver

1. I do not want to give up my rights

☐ I want a lawyer ☐ I do not want to be questioned or say anything

2. SIGNATURE OF INTERVIEWEE

ATTACH THIS WAIVER CERTIFICATE TO ANY SWORN STATEMENT *(DA FORM 2823)* SUBSEQUENTLY EXECUTED BY THE SUSPECT/ACCUSED

## PART II - RIGHTS WARNING PROCEDURE

### THE WARNING

1. WARNING - Inform the suspect/accused of:
   a. Your official position.
   b. Nature of offense(s).
   c. The fact that he/she is a suspect/accused.
2. RIGHTS - Advise the suspect/accused of his/her rights as follows: "Before I ask you any questions, you must understand your rights."
   a. "You do not have to answer my questions or say anything."
   b. "Anything you say or do can be used as evidence against you in a criminal trial."
   c. (For personnel subject to the UCMJ) "You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. This lawyer can be a civilian you arrange for at no expense to the Government or a military lawyer detailed for you at no expense to you, or both."

   \- or -

   *(For civilians not subject to the UCMJ)* You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. This lawyer can be one you arrange for at your own expense, or if you cannot afford a lawyer and want one, a lawyer will be appointed for you before any questioning begins."
   d. "If you are now willing to discuss the offense(s) under investigation, with or without a lawyer present, you have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if you sign a waiver certificate."

Make certain the suspect/accused fully understands his/her rights.

### THE WAIVER

"Do you understand your rights?"

(If the suspect/accused says "no," determine what is not understood, and if necessary repeat the appropriate rights advisement. If the suspect/accused says "yes," ask the following question.)

"Have you ever requested a lawyer after being read your rights?" "NO"

(If the suspect/accused says "yes," find out when and where. If the request was recent *(i.e., fewer than 30 days ago)*, obtain legal advice whether to continue the interrogation. If the suspect/accused says "no," or if the prior request was not recent, ask him/her the following question.)

"Do you want a lawyer at this time?" NO

(If the suspect/accused says "yes," stop the questioning until he/she has a lawyer. If the suspect/accused says "no," ask him/her the following question.)

"At this time, are you willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer and without having a lawyer present with you?" yes *(If the suspect/accused says "no," stop the interview and have him/her read and sign the non-waiver section of the waiver certificate on the other side of this form. If the suspect/accused says "yes," have him/her read and sign the waiver section of the waiver certificate on the other side of this form.)*

### SPECIAL INSTRUCTIONS

WHEN SUSPECT/ACCUSED REFUSES TO SIGN WAIVER CERTIFICATE: If the suspect/accused orally waives his/her rights but refuses to sign the waiver certificate, you may proceed with the questioning. Make notations on the waiver certificate to the effect that he/she has stated that he/she understands his/her rights, does not want a lawyer, wants to discuss the offense(s) under investigation, and refuses to sign the waiver certificate.

IF WAIVER CERTIFICATE CANNOT BE COMPLETED IMMEDIATELY: In all cases the waiver certificate must be completed as soon as possible. Every effort should be made to complete the waiver certificate before any questioning begins. If the waiver certificate cannot be completed at once, as in the case of street interrogation, completion may be temporarily postponed. Notes should be kept on the circumstances.

PRIOR INCRIMINATING STATEMENTS:

1. If the suspect/accused has made spontaneous incriminating statements before being properly advised of his/her rights he/she should be told that such statements do not obligate him/her to answer further questions.
2. If the suspect/accused was questioned as such either without being advised of his/her rights or some question exists as to the propriety of the first statement, the accused must be so advised. The office of the serving Staff Judge Advocate should be contacted for assistance in drafting the proper rights advisal.

NOTE: If 1 or 2 applies, the fact that the suspect/accused was advised accordingly should be noted in the comment section on the waiver certificate and initialed by the suspect/accused.

WHEN SUSPECT/ACCUSED DISPLAYS INDECISION ON EXERCISING HIS OR HER RIGHTS DURING THE INTERROGATION PROCESS: If during the interrogation, the suspect displays indecision about requesting counsel (for example, "Maybe I should get a lawyer."), further questioning must cease immediately. At that point, you may question the suspect/accused only concerning whether he or she desires to waive counsel. The questioning may not be utilized to discourage a suspect/accused from exercising his/her rights. (For example, do not make such comments as "If you didn't do anything wrong, you shouldn't need an attorney.")

COMMENTS *(Continued)*

REVERSE OF DA FORM 3881 APD PE v2.01ES

# SWORN STATEMENT

For use of this form, see AR 190-45; the proponent agency is PMG.

PRIVACY ACT STATEMENT

AUTHORITY: Title 10, USC Section 301; Title 5, USC Section 2951; E.O. 9397 Social Security Number (SSN).

PRINCIPAL PURPOSE: To document potential criminal activity involving the U.S. Army, and to allow Army officials to maintain discipline, law and order through investigation of complaints and incidents.

ROUTINE USES: Information provided may be further disclosed to federal, state, local, and foreign government law enforcement agencies, prosecutors, courts, child protective services, victims, witnesses, the Department of Veterans Affairs, and the Office of Personnel Management. Information provided may be used for determinations regarding judicial or non-judicial punishment, other administrative disciplinary actions, security clearances, recruitment, retention, placement, and other personnel actions.

DISCLOSURE: Disclosure of your SSN and other information is voluntary.

| 1. LOCATION | 2. DATE (YYYYMMDD) | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| West Point, New York | 2010/04/18 | 2054 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| Doolen, Isiah, Matthew | Redacted PII 7694 | CDT |

8. ORGANIZATION OR ADDRESS
MAC Shorts Barrack

9.

I, Isiah Matthew Doolen, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

On the night of 17 April 2010, I was drinking in the barracks. I purchased the alcohol in Newburgh. Once the alcohol was purchased Cadets Toal, ~~[illegible]~~ IMD Langley, Tyree, and myself transferred the alcohol to Nalgene bottles and brought the alcohol into the barracks by means of a back pack. Before coming back to West Point, we stopped at Taco Bell and I ordered the #6. I used the soda cup to put alcohol in and I drank it through a straw. Once back to the school we got the alcohol out, At this point, we is defined as Cadets Toal, Colling, Webb, Elphee, and myself. We played card games until around 2000 in which we proceeded down the hallway IMD heading towards ~~towards~~ IMD the dayroom. Cadet Webb stopped by ~~the~~ Corporal Currie's room. In this room were Corporals Currie, Lusted, Murphy & Pederson. I don't remember for sure who else was in there so I won't mention any names I'm unsure of. ~~Pederson~~ IMD ~~asked us if a joking manner if we had~~ ~~Then Corporal~~ IMD Following Webb, came Toal and myself. In my hand I had my Taco Bell cup which had alcohol in it. Corporal Pederson had asked if I was boozing (he also asked Toal), ~~we~~ I said nothing. Afterwards, I remember Corporal Murphy smelling the cup and asking ~~[illegible]~~ what the ratio of booze to

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF 2 PAGES |
|---|---|---|
| | IMD | |

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF ____ TAKEN AT ____ DATED ____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED.

STATEMENT OF Isiah Dooley TAKEN AT 2054 DATED 2010/04/19

9. STATEMENT *(Continued)*

coke was in the cup. ~~[illegible]~~ DMD Corporal Currie proceeded to drink out of the cup, but in his defense he probably thought it was a joke that alcohol was in the cup because Corporal Murphy made that statement in a joking manner. ~~[illegible]~~ Toal and I left the room together and went to the dayroom and watched a movie in there. The movie was over at around 2300 or 2330. To the best of my recollection, ~~[illegible]~~ I made no stops between the dayroom and my room and went straight to my room. Once in my room, at around 0100, Corporal Lusted came in and got Toal. Toal then came in and got me and took me outside. When we were outside, Corporal Lusted told Toal and me that he would have to turn us in. At 0200 according to ~~the corpora~~ DMD Corporal Lusted, he turned us in to "Captain Dan Hall." Details of this aren't being left out ~~[illegible]~~ DMD, I've included what I have been able to think of. I am not purposefully withholding information. Any questions that arise after this I will answer to the best of my ability.

DMD DMD DMD DMD

AFFIDAVIT

I, Isiah Matthew Dooley, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE 2. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

[signature]
*(Signature of Person Making Statement)*

WITNESSES:

Daniel G. Prial
Mac Short E-4
ORGANIZATION OR ADDRESS

Chad Pleige
Mac Short E-4
ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 23 day of APR, 2010 at West Point, NY

[signature]
*(Signature of Person Administering Oath)*

ALLISON MARSCHEAN
CPT, MI
*(Typed Name of Person Administering Oath)*

TACTICAL OFFICER E-4
*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING STATEMENT DMD

PAGE 2 OF 2 PAGES

DA FORM 2823, NOV 2006 APD V1.00

# SWORN STATEMENT

For use of this form, see AR 190-45; the proponent agency is PMG.

## PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10, USC Section 301; Title 5, USC Section 2951; E.O. 9397 Social Security Number (SSN).

**PRINCIPAL PURPOSE:** To document potential criminal activity involving the U.S. Army, and to allow Army officials to maintain discipline, law and order through investigation of complaints and incidents.

**ROUTINE USES:** Information provided may be further disclosed to federal, state, local, and foreign government law enforcement agencies, prosecutors, courts, child protective services, victims, witnesses, the Department of Veterans Affairs, and the Office of Personnel Management. Information provided may be used for determinations regarding judicial or non-judicial punishment, other administrative disciplinary actions, security clearances, recruitment, retention, placement, and other personnel actions.

**DISCLOSURE:** Disclosure of your SSN and other information is voluntary.

| 1. LOCATION | 2. DATE (YYYYMMDD) | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| West Point, NY | 20100423 | 0556 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| Dooler Isiah Matthew | XXX-XX-7694 | CDT |

8. ORGANIZATION OR ADDRESS
MAC Short - E4

9.

I, Isiah Matthew Dooler, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

How old were you on 17 APR 2010? 21 IMD

Were you authorized to depart post that same night?
NO IMD

Who contributed money to the purchase of the beverages? Were they all with you? If not who was?
Elphee, Toal, Tyree, Collins; No; Tyree & Toal IMD

How did you get to Newburgh? Whose car? Who drove?
Cadet Langley borrowed a car from a firstie. Not sure. Cadet Langley. IMD

You indicate that you consumed alcohol before returning to West Point. Who else was drinking in the car?
My sworn statement was unclear. I should've mentioned I only transferred alcohol to the taco bell cup, and didn't drink until back at school. Cadet Tyree was the only one who drank before coming back to school. IMD

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF 2 PAGES |
|---|---|---|
| | IMD | |

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF ____ TAKEN AT ____ DATED ____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED.

STATEMENT OF Isiah Matthew Doolen TAKEN AT ~~23 April 2010~~ DMD DATED 23 April 2010 D550

9. STATEMENT *(Continued)*

Why did you feel comfortable or relatively at ease going in the hallway and to a 3° CDT room with your alcoholic beverage? Which 3° CDTS have you witnessed with your own eyes, not hearsay, being under influence? I've seen some of the corporals drunk before and I also heard that they had been drinking earlier that day. Cadet Langley said that he had smelled alcohol on Corporal Murphy. I have personally witnessed Corporal Lusted drunk before. DMD

DMD DMD DMD DMD

**AFFIDAVIT**

I, Isiah Matthew Doolen, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE 2. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

DMD
*(Signature of Person Making Statement)*

WITNESSES:

Daniel G. Prial
Mac Short E-4

ORGANIZATION OR ADDRESS

Chad Pierce
Mac Short E4

ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 23 day of April, 2010 at West Point, NY

*(Signature of Person Administering Oath)*

ALLISON MARSCHEAN
CPT, MI
*(Typed Name of Person Administering Oath)*

TACTICAL OFFICER E-4
*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING STATEMENT DMD

PAGE 2 OF 2 PAGES

DA FORM 2823, NOV 2006 APD V1.00

# CADET OBSERVATION REPORT

For use of this form, see Annex A and D, USCC SOP; Proponent Agencies are LDB and R&D, USCC

## PART I - ADMINISTRATIVE DATA

| a. Name of Cadet Observed: **DOOLEN ISIAH M** | b. Grad Yr: **2013** | c. Company/Regt: **E4** |
|---|---|---|
| d. Task/Situation/Course: *(e.g., "inspection in ranks" or "Classroom Participation EV203")* **Alcohol** | | e. Date Observed: **4/17/2010** |

## PART II - OBSERVATION DATA

Cite **specific observed behavior** in a concise manner (100 characters or less) *(e.g., "unshined shoes" or "excellent performance on quiz")*

**Bringing alcohol into the barracks**

Observer Comments: *Details concerning the observed behavior as well as observer's judgment on its impact on the situation or task/mission accomplishment. (Mandatory for marginal or unsatisfactory assessments)*

**CDT Doolen and three of his classmates entered an upperclassman's room at approximately 2030 hours on 17 april. At the time there were 5 upperclassmen in the room. Two of the plebe classmates left the upperclassman's room, leaving CDT Doolen and his friend in the room. Shortly after all of the upperclassmen discovered that the two plebes that remained in the room were in the possesssion of a mixed drink of alcohol in a Taco Bell container. CDT Doolen was holding onto the container, but he was present when it was in the room, and made it obvious he knew of its prescence. No consumption of alcohol was witness in the room. As far as I know, this is the first Reg's violation CDT Doolen has committed requiring a board. He did not consume any alcohol from what I witnessed but he did have it in the barracks**

| PRINTED NAME: **CDT LUSTED KEVIN A** | DEPT/UNIT: **E4** | DATE: **4/19/2010** |
|---|---|---|

## PART III - UNIT ACTION DATA

TAC Officer signature: ______________________ Date: __________

| No further action required | Record of counseling required and attached | Refer to higher authority for disposition/disciplinary action | Refer to lower authority for disposition/disciplinary action |
|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ |

Tactical Officer Comments: (Required when referring to higher level for action)

CO CDR signature: ______________________ Date: __________

| No further action required | Record of counseling required and attached | Refer to higher authority for disposition/disciplinary action | Refer to lower authority for disposition/disciplinary action |
|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ |

PLT LDR signature: ______________________ Date: __________

| No further action required | Record of counseling required and attached | Refer to higher authority for disposition/disciplinary action |
|---|---|---|
| ☐ | ☐ | ☐ |

## PART IV - SUMMARIZED PROCEEDINGS (CO CDR or TAC) (if needed)

| INFRACTION ARTICLE # | ______Admonition/Reprimand<br>______Extra-Duty (hours)<br>______Restriction (days) | Withdrawal of Privileges: _____<br>Suspension: _____<br>Demerits: _____ | Accept SUM ART 10 (Waive 24 hour period) ☐ | Request Formal ART 10 ☐ |
|---|---|---|---|---|

Comments: (Specify offense or required when referring to a higher level for action)

| PRINTED NAME | SIGNATURE | DEPT/UNIT | DATE |
|---|---|---|---|
| | | | |

**PERMANENT TACTICAL FILE CONTENTS (RIGHT SIDE)**

Privacy Act (USMA FL 722 Rev Feb 92)

**TAB**

E/P **PERFORMANCE REPORTS**

- Cadet Performance Reports (USMA Form 2-543) (CPRs)
  **Academic Instructors CPRs should be filed here**
  **NO PEER OR SUBORDINATE CPR REPORTS IN TAC FILE**

F/Q **INTERVIEW RECORDS**

- Record of Counseling (USMA Form 2-210). Signed by cadets only

G/R **CONDUCT RECORDS (MINOR OFFENSES)**

- USMA Form 2-3-1, Summarized Article 10
- USMA Form 2-3, Company / Battalion Article 10
- Miscellaneous documents pertaining to Article 10

H/S **MISCELLANEOUS/CORRESPONDENCE**

I/T **CADET AWARDS**

J/U **ACADEMICS**

- Grade Reports (Computer Printout)
- Miscellaneous Academic Correspondence

**NOTE: Documents will be filed under the appropriate TAB, in chronological order regardless of the type of document.**

USMA FL 41 (Rev Apr 99)

# CADET AUTHORIZATION FOR RELEASE OF INFORMATION

IAW AR 340-21, The Army Privacy Program

This form will be used to authorize the release of cadet personal information

PRIVACY ACT STATEMENT

**Authority:** 5 USC 522a.

**Purpose:** To allow the cadet to control the release of personal information.

**Routine Use:** A copy of this completed form will be provided to those offices that maintain files containing cadet personal data.

**Voluntary Disclosure:** SSN must be provided to ensure these instructions get into the correct cadet files.

The provisions of 5 USC 522a, The privacy Act of 1974, and AR 340-21, The Army Privacy Program, prohibit the release of personal information maintained in a System of Records to agencies or individuals outside the federal government (or government employees requesting the information in a non-official status) without the subject individual's consent. I understand that I am under no obligation to authorize the release of such information for any reason: and should I withhold such authorization, the information will not be released to third parties and no consequences of any kind will result,

**Select from the options below to designate how you wish your personal information to be released.**

1. ____ I **DO NOT** authorize the release of any personal information.
2. IMD I authorize the release of information regarding administrative action initiated by me and of medical conditions or emergencies, and hospitalization.
3. IMD I authorize the release of my academic grades, and academic performance to the following individuals only:

| PERSON | RELATIONSHIP |
|---|---|
| Redaction PII Doolen | Father |
| Redaction PII Doolen | Mother |

4. IMD I authorize the release of information concerning any adverse action against me to the following individuals only (Check here if same as above ✓):

| PERSON | RELATIONSHIP |
|---|---|
| | |
| | |

5. This authorization is in effect from this date until new authorization is submitted.

Signature: Isiah M. Doolen

Printed Name: Isiah Doolen

Company: H-1 Class Year: 2013

Date: 07 July 09 SSN: Redacted PII 7684

CF:
Personal File O/Dean Records TAC File Individual
USMA FL, 722 (Rev Jun 09) (All previous versions are obsolete)



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
West Point, New York 10996

REPLY TO
ATTENTION OF

MACC-O-CBT

10 July 2009

MEMORANDUM FOR RECORD

SUBJECT: AR 600-20 Accommodating Religious Practices

1. I Dooley, Isiah M, Company H, CBT, have been briefed on the Army's Accommodating Religious Practices policy as outlined in AR 600-20 dated 13 May 2002. An excerpt from this regulation is given below:

2. Department of Defense policy is to accommodate religious practices when accommodation will not have an adverse impact on military readiness, unit cohesion, standards, health, safety, or discipline. The Army places a high value on the rights of members to observe the tenets of their respective religions. Unit commanders are authorized to initially approve or deny requests for accommodation of religious practices. Conditions of accommodation may change based on military need. Policy guidelines are contained in AR 600-20 and AR 165-20. I understand that the Army cannot guarantee accommodation of religious practices.

3. I understand the Army's policy, and I know that I should ask my chain of command if I have any questions.

4. The point of contact for this memorandum is the undersigned.

[signature] (Signature)

Isiah M. Dooley (Print Name)

23 July 09 (Date)

New Cadet

United States Military Academy

# Board Proceedings and Punishment

Cadet: Dooten, Isaiah M.
Company: E4
Class: 2013
Board DTG: Brigade

Punishment Awarded:

| | Punishment | Suspend |
|---|---|---|
| Hours | 100 | |
| Withdrawal of Privileges | 60 | |
| Restriction | 80 | |
| Reduction in Rank | yes pfc | |

Additional Remarks:

Page 1 of 1

# REGS & DISCIPLINE

Home | Software Change Request | Manage Users | Manage Days | Staff/Fac Portal | Log Off

## Demerit Review

Record for: DOOLEN ISIAH (E4 '13, USMA ID: C39038851)
As of: 19 Apr 10

| DATE | OFFENSE | ORIGINATOR | Award | | | | | SUSP | RMKS |
|---|---|---|---|---|---|---|---|---|---|
| | | | LTR | DEM | TOURS (A/R/F) | RSTR (R/P) | RED | (HRS/R/P/RIR) | |

https://apps.usma.edu/uscc/regs_disc/dmrvw-3.cfm?tgtcdt=%291%3B%2F%3CS%5FC%2... 4/19/2010

000563

# REGS & DISCIPLINE

Home | Software Change Request | Manage Users | Manage Days | Staff/Fac Portal | Log Off

## MILSUM Report

### as of 19 Apr 10

| Name: DOOLEN ISIAH M | Class: 2013 | Co/Regt: E4 | Prior Co/Regt: | Current CS: |
|---|---|---|---|---|
| USMA ID: C39038851 | RedCat: OTHER/UNKNOWN | Gender: MALE | Status: ACTIVE | |

| SUMMER TRAINING | | | MILITARY PROGRAM RECORD | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Acad Yr | Activity | Completed | Term Period | Military Activity | Position | Rtr | Int Rtr | Sr Rtr | Tac Rtr | Ltr Grd | Activity Weight | MPS Term | MPS Cum |
| 10 | CBTNC | | 10-0 | MD100 | CBT MOS | | | | | B+ | 2.0 | 3.33 | 3.33 |
| 11 | AA | | 10-1 | MD101 | MOS | A | A | | A- | A- | 2.5 | 3.67 | 3.52 |
| | CFTYR | | | | | | | | | | | | |

| MAJOR AWARDS | | | CONDUCT RECORD (Demerits / Tours) | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Offense Code | Offense Date | Demerits/ Tours | AcadYr | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
| | | | 10 | | | | | | | | | | | | |

| CONDUCT STATUS | | | |
|---|---|---|---|
| Hearing Type | Date | Action Taken | Ending Date |
| | | | |

| CPR PROFILE | ACOM-UH | ACOM-LH | CtrOfMass | BCOM-Rtn | BCOM-NoRtn |
|---|---|---|---|---|---|
| All CPRs (written ON this cadet:) | 3 | 2 | 1 | 0 | 0 |
| Chain of Command CPRs: | 3 | 1 | 1 | 0 | 0 |
| Peer & Subordinate CPRs: | 0 | 0 | 0 | 0 | 0 |
| Staff & Faculty CPRs: | 0 | 0 | 0 | 0 | 0 |
| Other CPRs: | 0 | 0 | 0 | 0 | 0 |

PRIVACY ACT DATA - FOR OFFICIAL USE ONLY

Close

Print File CRB

| | Entrance Data | Notification Information |
|---|---|---|

**DOOLEN, ISIAH MATTHEW**
**USMA ID:** C39038851
**Class:** 2013  (R-Day: 29 Jun 09)
**Acad Yr Co:** B4
**Curr Posn:** MOS
**Building:** 745E (MacArthur Barracks (Mac-Short))
**Room:** 1114 **Phone:** 2318
**Sex:** M
**Race:** HISPANIC
**Redcat:** OTHER/UNKNOWN
**Relig:** ROMAN CATHOLIC CHURCH
**Birthday:** ███ 88
**Birthplace:** Redacted PII NM
**Dom:** NM

**USMAPS:** Y
**College:**
**HS:** ROSWELL NM (29 / 118)

**Prior Service:** N

**CEER:** 457          **ACT-Math:** 21
**PAE:** 0            **ACT-Engl:** 20
**LPS:** 467          **ACT-Sci:** 21
**Whole Cand:** 4643  **ACT-Read:** 20
**R-Day Ht/Wt:** /    **SAT-Math:** 450
**Ath Code:**         **SAT-Ver:** 540
**Nom Src:**          **SAT-TSWE:**

**Name:** Mr. and Mrs. Redaction PII and Redaction PII Doolen
**Address:** Redaction PII
**Phone:**
**Send Grades:** Y

| ACAD YR | CUM CDT PERF | | ACADEMIC PROGRAM | | | | | MILITARY PROGRAM | | | | PHYSICAL PROGRAM | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TERM | CPS CQPA | AWD | APST | APSC | DL | DC | UNIT | POSN | MD MS | MPSC | APFTs | IOCT PPSY PPSC |
| 2010 0 | 0.000 | | 0.000 | 0.000 | | | H 14 | CBT MOS B+ | | 3.330 | 1-Jul: D 6-Aug: C+ | |
| 2010 1 | 2.687 2.489 | | 2.488 | 2.488 | | | E4 34 | MOS | A- | 3.519 | | 2.475 |
| 2010 2 | | | | | | | E4 22 | MOS | | | | |

**MAJOR DISCIPLINARY RECORD**
Lights: 0 Doors: 0 Late: 0 Absent: 0

Code  Date  Dem  **Punishment**
**A/R/F - R/P/R**

Show All Disc Details

**CONDUCT STATUS**
Type Brd Date Brd Action End Date

**SUMMER DETAIL HISTORY**
Acad Yr      Details
2010  CBTNC
2011  AA      CFTYR

**ATHLETIC & EXTRACURRICULAR ACTIVITIES**

| Start | End | Type | Name | Posn | Sqd | Authos |
|---|---|---|---|---|---|---|
| 26 Aug 09 | 28 Sep 09 | IM | FOOTBALL (CA) | P | | |
| 28 Sep 09 | 22 Dec 09 | IM | BIATHALON (CA) | P | | |
| 19 Jan 10 | | IM | SANDHURST (CA) | P | | |

**Tac Comments:**
NONE

**RTO Comments:**

RTO Comments: To include RTO Comments, enter your comments in the text box and click the "Submit" button.

Submit

000565

File CRB

**File CRB**

1 / 1+ Main Report 100%

DOOLEN, ISIAH MATTHI

Name: DOOLEN, ISIAH MATTHEW

FOR OFFICIAL USE ONLY - PRIVACY ACT DATA

Status: ACTIVE Class: 2013 Co/Regt: E4 Prior Co/Regt: Current CS:

RedCat: OTHER/UNKNOWN Gender: MALE Prior Service: US Army Regular USMAPS: YES

ACT-MATH: 21 ACT-ENGL: 25 ACT-SCI: 25 ACT-READ: 30 SAT-MATH: 450 SAT-VERB: 540 SAT-TSWE: 0

Rank in Company CQPA: 27/39 APSC: 28/39 MPSC: 3/39 PPSC: 29/39 Major/Field of Study:

| CPR Profile (AY03 forward) | ACOM-UH | ACOM-LH | CtrOfMass | BCOM-RTN | BCOM-NORTN |
|---|---|---|---|---|---|
| All written on this cadet | 3 | 1 | 1 | 0 | 0 |
| Chain of Command | 3 | 1 | 1 | 0 | 0 |
| Other | 0 | 0 | 0 | 0 | 0 |
| Peer and Subordinate | 0 | 0 | 0 | 0 | 0 |
| Staff and Faculty | 0 | 0 | 0 | 0 | 0 |

Date Desc

| Course Nbr | Position | Rtr | Tac Rtr | Grade | MPS Cum |
|---|---|---|---|---|---|
| MD100 | CBT MOS | | | B+ | 3.33 |
| MD101 | MOS | A | A- | A- | 3.52 |
| MD102 | MOS | B | B | | |

| TERM | 100 | 101 |
|---|---|---|
| CQPA | 0.00 | 2.49 |
| MPSC | 3.33 | 3.52 |
| PPSC | 0.00 | 2.48 |

Conduct Record (Demerits/Tours)

| AY | Jul | | Aug | | Sep | | Oct | | Nov | | Dec | | Jan | | Feb | | Mar | | Apr | | May | | Jun | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

1/ 1+

https://usmareports.usma.edu/USCC/mrb.aspx?session_id=USMhHF0SS1BeRj9oaok7Rg==&pn_id=C39038851

File CRB

File CRB

2 / 2 Main Report 100% BusinessObjects

DOOLEN, ISIAH MATTHI Name: DOOLEN, ISIAH MATTHEW

FOR OFFICIAL USE ONLY - PRIVACY ACT DATA

APFT Scores

| Test | Date | PU Raw | PU Pts | SU Raw | SU Pts | Run Raw | Run Pts | Total Pts | APFB | Grade | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CBT Initial | 07/01/2009 | 50 | 71 | 63 | 76 | 14:10 | 83 | 230 | | D | |
| PLEBE FALL | 08/06/2009 | 48 | 68 | 75 | 95 | 12:55 | 100 | 263 | | C+ | |

Athletic & Extracur

| Start | End | Type | Name |
|---|---|---|---|
| 08/26/2009 | 09/28/2009 | IM | FOOTBALL (CA) |
| 09/28/2009 | 12/22/2009 | IM | BIATHALON (CA) |
| 01/19/2010 | | IM | SANDHURST (CA) |

IOCT Scores

| Test | Date | IOCT Time Raw | IOCT Time Pts | Total Pts | Grade |
|---|---|---|---|---|---|

2/ 2



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
West Point, New York 10996

REPLY TO
ATTENTION OF

MADN-SOC

14 July 2014

MEMORANDUM FOR RECORD

SUBJECT: Evaluation for Cadet Isiah Doolen, Company B-1, Class of 2013

1. Overall, Cadet Isiah Doolen did not demonstrate an impressive performance in SS486, the capstone course for his major (Comparative Politics). Academically, he ranked last out of the 13 cadets in the class, earning a 70% (C-) for the course, and his performance as the CIC during a class trip was below standard.

2. **Performance:** Throughout the course, Cadet Doolan's class participation was minimal. Over the first 20 lessons, he participated in class discussions on three occasions. He is quiet, which makes it hard to know his grasp of the material. He stays alert during the discussion, but is not a regular contributor to the seminar. On several occasions, I have observed that he just has a pen and a blank piece of paper in class; he neglected to bring the required readings, or any notes that he took previously. This limited his ability to participate, and made me question whether he had done the preparatory work needed to engage in our seminar discussion. His participation improved toward the latter part of the course, but consisted primarily of observations taken from other courses rather than from class readings. His test and research papers reflected an incomplete grasp of the material, a questionable understanding of concepts, and a weak foundation for future work. Based on my discussions with him, I believe that CDT Doolan has the capability for greater academic achievement, but he has not dedicated time or effort to this pursuit.

2. **Conduct:** As mentioned above, Cadet Doolen is quiet in class. There have been no issues with his in-class conduct, although I have spoken with him about his need to participate more in our discussions. As mentioned above, he did make an effort to speak more in class – but did not tie this to reading and preparing the material to make his comments substantively meaningful.

3. **Leadership:** Cadet Doolen was the CIC for two classes during a daylong academic trip to the United Nations that occurred on 13 February 2013. In three separate lessons prior to the trip, I offered him the opportunity to address the class in order to provide administrative information about the trip, but he said he had nothing to discuss. He did email the class the day's itinerary, which he received from Lt Col John Hagan, the SS476 instructor on the trip. In class, I discussed the day's events, including the CGR meeting time. Lt Col Hagan also met with Cadet Doolen the day prior to the trip to go over all of the details. At about 0600 on the morning of the trip, I received a text from Cadet Doolen asking me what time to meet at CGR. Coming from the CIC, this surprised and dismayed me; clearly, he had not remembered or copied down

the information from me or Lt Col Hagan. When asked, Cadet Doolen performed headcounts to provide us with accountability. Cadet Doolen did not have the rations money available to provide his classmates on the day of the trip; he was able to provide the funds about two weeks later. All in all, while there was nothing egregious about his performance as CIC that derailed the trip, there was certainly opportunity for improvement. He did not meet our expectations for basic cadet leadership and responsibility.

4. **Teamwork and Selflessness:** In class, there have been a few opportunities for group work, and Cadet Doolen's performance has been unremarkable. While he has not hindered teamwork, he has not offered contributions either; from my observations, his presence has been neutral.

5. **Interpersonal Skills:** From my observations, Cadet Doolen has no issues interacting with his classmates. His dealings with me have also been professional. I have no issues with his attitude or interactions.

6. **Sense of Duty:** Based on his class performance, CDT Doolen could improve in this area. He has not provided consistent evidence of class preparation, and needs to work on taking initiative when placed in a leadership role. I have seen nothing that indicates his dedication to the class or organizational mission.

7. **Appearance:** Cadet Doolen has always been in the correct uniform, and I have not noticed any negative issues with his appearance.

8. **Potential:** Unfortunately, Cadet Doolen has not shown me evidence of potential for service as an exemplary officer. My observation of his academics, classroom participation, and leadership performance as a trip CIC do not offer grounds for many positive comments. Based on this, I would hesitate to see him as a lieutenant in my battalion. At this point in his education and leader development, it is disappointing that he has not shown us more evidence of behavior expected of an officer. Based on this, I harbor doubts about his potential for future distinguished service.

Tania M. Chacho

TANIA M. CHACHO, Ph.D.
LTC, MI/FA47
Academy Professor
Director of the Comparative Politics Program



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
West Point, New York 10996

REPLY TO
ATTENTION OF

Department of Physical Education

July 16, 2014

MEMORANDUM FOR RECORD

SUBJECT: Evaluation for Cadet Isiah Doolen, Company H2, Class of 2014

1. **Performance**: CDT Doolen was a below average performer in PE 360. He earned an F on the pop quiz, a C+ on his midterm exam and a C- on his final exam. His ability to compete against his peers in hand-to-hand combat was in the bottom 12% of the 636 Cadets who took PE 360 last year.

2. **Conduct**: CDT Doolen was well mannered and respectful in class. However, I did have an issue with him the first time he took this class. He was supposed to drop the course around lesson six as he was diagnosed with Mono. I contacted him several times to complete this task and continued to mark him as absent until lesson 17. At that time I gave him a COR daily for failing to perform his duties. I ended up giving him two as he dropped after the second COR.

3. **Leadership**: I was unable to evaluate Cadet Doolen in this area.

4. **Teamwork and Selflessness**: CDT Doolen worked diligently with his peers and stayed on task when the class was given training time.

5. **Interpersonal Skills**: I was not able to observe much about CDT Doolen in this area other than he asks pertinent questions when appropriate.

6. **Sense of Duty**: CDT Doolen understood that his place of duty was in the classroom. He reported to class as performed to standard while there.

7. **Appearance**: CDT Doolen's manner of appearance was in accordance with USMA standards.

8. **Potential**: Based on my experience as a former career Army Officer I have reservations about CDT Doolen. These reservations stem from the repeated requests I made to him to drop the class and having to resort to daily COR's to get him to do his duty, his underwhelming performance when he did take the class, his track record of having four C's out of seven Physical Education classes and his 18 month's worth of medical excusals coinciding with his IOCT test dates. I question his dedication to duty and his ability to accomplish the mission.

Daniel Lorenzen, Instructor/Director of Combatives
Department of Physical Education



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
West Point, New York 10996

REPLY TO
ATTENTION OF

Department of Physical Education

February 22, 2013

MEMORANDUM FOR RECORD

SUBJECT: Evaluation for Cadet Isiah Doolen, Company B1, Class of 2013

1. **Performance:** CDT Doolen currently has a C in the course. He earned an F on his pop quiz and a C+ on his midterm exam. in the course. He is currently 6% points below the course average.

2. **Conduct:** CDT Doolen has been well mannered and respectful in class this round. I also had Cadet Doolen last round. He was supposed to drop the course around lesson 6 for his illness and finally dropped the course on lesson 17 after two consecutive COR's for Failure to perform his duties.

3. **Leadership:** I have not evaluated CDT Doolen in this area.

4. **Teamwork and Selflessness:** CDT Doolen worked diligently with his peers and stayed on task when the class was given training time.

5. **Interpersonal Skills:** I was not able to observe much about CDT Doolen in this area other than he asks pertinent questions when appropriate.

6. **Sense of Duty:** CDT Doolen understood that his place of duty was in the classroom. He reported to class as performed to standard while there.

7. **Appearance:** CDT Doolen's manner of appearance was in accordance with USMA standards.

8. **Potential:** CDT Doolen is simply another student in my class. He's neither stellar nor a problem. However, based on my experience with him last round and his failure to drop the class despite repeated emails to him and one to his TAC my observations of CDT Doolen lead me to believe that he may not follow instructions all that well.

D Lorenzen

Daniel Lorenzen, Instructor/Director of Combatives
Department of Physical Education



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO ATTENTION OF

MACC-O-RD

10 July 2014

MEMORANDUM FOR

Education Technician, Office of the Dean, ORD, West Point, New York, NY 10996
Executive Officer, Department of Military Instruction, West Point, New York, NY 10996
Executive Officer, Department of Physical Education, West Point, New York, NY 10996

SUBJECT: Request for an Evaluation for Cadet Isiah Doolen, Company H-2, Class of 2014

1. Request that you provide our office with an evaluation on the performance of Cadet Isiah Doolen. ***This evaluation can be sent to Mrs. Katrina Stamp via email, NLT 1500 hours, 16 July 2014.***

2. The Commandant referred Cadet Doolen to a Conduct Investigation (CI) under the provisions of USCC Regulation 351-1 (Conduct Investigations Under the Cadet Disciplinary System). The regulation requires academic instructors (Office of the Dean, DMI, and DPE) to complete performance evaluations on cadets referred to a CI. These evaluations may be favorable, unfavorable, or neutral. The Commandant will use the evaluations to assess Cadet Doolen's overall performance and to help make a decision regarding the final disposition of the cadet.

3. Instructors may complete a performance evaluation using a memorandum format. The evaluations may be submitted hard copy or via electronic mail to the undersigned. The Regulations and Discipline Officer will provide the cadet a copy of all performance evaluations received from this request.

4. POC for this action is the undersigned.

*//original signed//*
KATRINA N. STAMP
Regulations and Discipline Assistant



OFFICE OF THE DEAN
UNITED STATES MILITARY ACADEMY
WEST POINT, NEW YORK 10996-5000

MADN-ARS

14 July 2014

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Request for an Evaluation for Cadet Isiah Doolen USMA I.D. C39038851 CO. H2 Class of 2014

HQDA, O/Dean, AARS, USMA, West Point, NY 10996-5000

THRU EXECUTIVE OFFICER

1. Request the instructor who has taught the above cadet in the course/courses listed below, Term 2, AY 12-13, comply with the provisions of the basic correspondence.

2. USMA Form 2-543R (Cadet Performance Report Support Form) or a standard memorandum format (sample also enclosed) should be sent IAW the directions in para 3. of the enclosed correspondence.

/s/
JAMES B. DALTON Jr., Ph. D.
Associate Professor and Associate Dean for Academic Affairs & Registrar Services

Encl 1

DISTRIBUTION:
Department of

HISTORY – HI302
LAW – LW403
DMI - MX400
DPE – PE360
SOC SCI – SS375, SS476, SS486

PRIVACY ACT DATA - FOR OFFICIAL USE ONLY

2014-5 Schedule | 2014-5 TEE Sched | 2014-5 Grades | Acad Summary | 8 TAP | Absences | Physical | Military | Admin Info | Close

Register | Add/Drop

Print Schedule | Print 8TAP | Print Transcript

## Cadet Admin Data

**Name** DOOLEN, ISIAH MATTHEW **USMA ID** C39038851 **Status** C **Class** 2014 Co H2

**Email** Isiah.Doolen@usma.edu **Major** PCP1 **Eng Seq** EV

**Acad Year-Term** 2013 - 2 **TQPA** 1.743 **APST** 1.583

**CUM Stats** **CQPA** 2.201 **APSC** 2.165

| TACS | ADVISOR | CODE | DESCRIPTION |
|---|---|---|---|
| MAJ SNYDER | MAJ CUMPSTON | PCP1 | Political Science: Comparative Politics |
| SFC HAYNES | | | |

**Not Eligible For Travel (See TAC)**

Print PRB

**Physical Education Coursework**

| AYT | COURSE | COURSE TITLE | CREDITS | GRADE | INSTRUCTOR |
|---|---|---|---|---|---|
| 2010 1 | PE116 | BOXING | 0.50 | B | MAJ TENACE |
| 2010 1 | PE150 | FUNDAMENTALS/PERSONAL FITNESS | 1.50 | C+ | MS HABERBUSCH |
| 2010 2 | PE117 | MILITARY MOVEMENT | 0.50 | D | MR GOETZ |
| 2011 1 | PE232 | EMERGENCY WATER SAFETY | 0.50 | B- | MR MCVAN |
| 2012 2 | PE322 | SURVIVAL SWIMMING - HIGH | 0.50 | C+ | MAJ MCKENNA |
| 2013 1 | PE450 | ARMY FITNESS DEVELOPMENT | 1.50 | B- | MAJ MACON |
| 2013 2 | PE360 | COMBAT APPLICATIONS | 0.50 | C- | MR LORENZEN |

**Competitive Sports Grades**

| AYT | SPORT | POSITION | GRADE |
|---|---|---|---|
| 2010-1 | DPE DIRECT-ASSIGN AP GRADE | | B+ |
| 2010-1 | BIATHALON (CA) | P | B+ |
| 2010-1 | FOOTBALL (CA) | P | B+ |
| 2011-1 | WRESTLING (CA) | P | B |
| 2011-2 | FLAG FOOTBALL (CA) | P | A- |
| 2012-2 | FLAG FOOTBALL (CA) | O | B- |
| 2013-1 | ULTIMATE FRISBEE (CA) | P | C+ |
| 2013-2 | ORIENTEERING (CA) | P | B |

**Physical Program Scores[PPS]**

| Data since AY 2003: | AY | TERM | PPS Term | PPS Year | PPS Cum |
|---|---|---|---|---|---|
| | 2010 | 0 | | | 0.000 |
| | 2010 | 1 | 2.672 | | 2.672 |
| | 2010 | 2 | 1.526 | 2.315 | 2.315 |
| | 2011 | 0 | | | 2.315 |
| | 2011 | 1 | 2.576 | | 2.375 |
| | 2011 | 2 | 2.670 | 2.609 | 2.408 |
| | 2012 | 0 | | | 2.408 |
| | 2012 | 1 | | | 2.408 |
| | 2012 | 2 | 1.179 | 1.179 | 2.033 |
| | 2013 | 0 | | | 2.033 |
| | 2013 | 1 | 2.596 | | 2.119 |
| | 2013 | 2 | 1.895 | 2.091 | 2.272 |

**APFT**

| PUSH-UP | SIT-UP | CARDIO |
|---|---|---|

| TEST | DATE | RAW | PTS | RAW | PTS | RAW | PTS | | TOTAL | GRADE | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PLEBE FALL | 08/06/2009 | 48.00 | 68.00 | 75.00 | 95.00 | 12:55 | 100.00 | 2 MILE RUN | 263.00 | C+ | |
| PLEBE SPRING | 04/26/2010 | 71.00 | 100.00 | 80.00 | 100.00 | 14:04 | 85.00 | 2 MILE RUN | 285.00 | B | |
| YEARLING FALL | 10/22/2010 | 63.00 | 86.00 | 66.00 | 81.00 | 13:51 | 90.00 | 2 MILE RUN | 257.00 | C | |
| YEARLING SPRING | 04/07/2011 | 53.00 | 75.00 | 58.00 | 71.00 | 13:27 | 94.00 | 2 MILE RUN | 240.00 | C- | |
| COW FALL | 02/15/2013 | 53.00 | 75.00 | 78.00 | 97.00 | 12:38 | 100.00 | 2 MILE RUN | 272.00 | B- | |
| COW SPRING | 02/25/2013 | 61.00 | 84.00 | 76.00 | 95.00 | 12:13 | 100.00 | 2 MILE RUN | 279.00 | B- | |
| FIRSTIE FALL | 02/28/2013 | 64.00 | 87.00 | 72.00 | 89.00 | 12:09 | 100.00 | 2 MILE RUN | 276.00 | B- | |
| FIRSTIE SPRING | 03/23/2013 | 54.00 | 76.00 | 78.00 | 97.00 | 12:19 | 100.00 | 2 MILE RUN | 273.00 | B- | |

(Birthdate: 06/01/1988)

**Other APFTs**

| | | PUSH-UP | | SIT-UP | | CARDIO | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TEST | DATE | RAW | PTS | RAW | PTS | RAW | PTS | | TOTAL | GRADE | REMARKS |
| CBT Initial | 07/01/2009 | 50.00 | 71.00 | 63.00 | 76.00 | 14:10 | 83.00 | 2 MILE RUN | 230.00 | D | |
| CBT SWIM | 07/02/2009 | | | | | | | | 182.00 | | |

**IOCT**

| | | IOCT TIME | | | | |
|---|---|---|---|---|---|---|
| TEST | DATE | RAW | PTS | TOTAL | GRADE | REMARKS |
| IOCT | 09/23/2011 | 0.00 | 0.00 | 0.00 | NC | CDT MED EXCUSAL |
| IOCT | 10/21/2011 | 0.00 | 0.00 | 0.00 | NC | CDT MED EXCUSAL |
| IOCT | 11/18/2011 | 0.00 | 0.00 | 0.00 | NC | CDT MED EXCUSAL |
| IOCT | 01/30/2012 | 0.00 | 0.00 | 0.00 | NC | CDT MED EXCUSAL |
| IOCT | 02/24/2012 | 0.00 | 0.00 | 0.00 | NC | CDT MED EXCUSAL |
| IOCT | 03/30/2012 | 0.00 | 0.00 | 0.00 | NC | CDT MED EXCUSAL |
| IOCT | 04/27/2012 | 5.10 | 410.00 | 410.00 | F | ROPE/HOR.LAD. |
| IOCT | 08/27/2012 | 0.00 | 0.00 | 0.00 | NC | CDT MED EXCUSAL |
| IOCT | 09/28/2012 | 0.00 | 0.00 | 0.00 | NC | CDT MED EXCUSAL |
| IOCT | 10/26/2012 | 0.00 | 0.00 | 0.00 | NC | CDT MED EXCUSAL |
| IOCT | 11/30/2012 | 0.00 | 0.00 | 0.00 | NC | CDT MED EXCUSAL |
| IOCT | 01/28/2013 | 4.17 | 510.00 | 510.00 | F | Shelf |
| IOCT | 03/01/2013 | 3.21 | 690.00 | 690.00 | D | 10 sec TC |

**Height/Weight Data**

| DATE | HEIGHT | WEIGHT |
|---|---|---|
| 01/07/13 | 70" | 158 lbs |
| 08/19/10 | 71" | 171 lbs |
| 08/20/09 | 70" | 165 lbs |

**Competitive Sports:**

**Corps Squad Athletics:**

| START DATE | END DATE | ACTIVITY | PSN |
|---|---|---|---|
| NO DATA | | | |

**Company Athletics & Competitive Club Athletics:**

| START DATE | END DATE | ACTIVITY | PSN |
|---|---|---|---|
| 08/26/09 | 09/28/09 | FOOTBALL (CA) | P |
| 09/28/09 | 12/22/09 | BIATHALON (CA) | P |
| 01/19/10 | 05/18/10 | SANDHURST (CA) | P |
| 08/15/10 | 08/16/10 | TEAM HANDBALL (CA) | P |
| 08/16/10 | 12/21/10 | WRESTLING (CA) | P |
| 01/21/11 | 04/28/11 | FLAG FOOTBALL (CA) | P |

| | | | |
|---|---|---|---|
| 04/28/11 | 05/17/11 | FLAG FOOTBALL (CA) | O |
| 08/15/11 | 12/20/11 | Reconditioning | P |
| 01/12/12 | 01/16/12 | ORIENTEERING (CA) | P |
| 01/16/12 | 01/18/12 | ORIENTEERING (CA) | O |
| 01/18/12 | 05/22/12 | FLAG FOOTBALL (CA) | O |
| 09/05/12 | 12/22/12 | ULTIMATE FRISBEE (CA) | P |
| 01/21/13 | 01/31/13 | ORIENTEERING (CA) | P |
| 01/31/13 | 02/15/13 | SWIMMING (CA) | P |
| 02/15/13 | 05/18/13 | ORIENTEERING (CA) | P |

**Extracurricular Activities**
NO DATA

**Old Competitive Sports**
NO DATA

**Old Physical CourseWork**
NO DATA

**Graduation Check**
NO DATA

**Course Waivers**
NO DATA



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
West Point, New York 10996

REPLY TO ATTENTION OF

July 16, 2014

Department of Social Sciences

MEMORANDUM FOR RECORD

SUBJECT: Evaluation for Cadet Isiah Doolen

1. **Performance**: CDT Doolen received a grade of B-/80.70% in my class (ss375, Russia). Despite this relatively adequate grade, his performance was below average in comparison to his peers in the class: his rank was 13th of 16 students. With greater personal motivation and more effective time management, CDT Doolen could have performed at a higher academic level in class. Nevertheless, he did complete assignments on time and with sufficient quality to justify the final grade of B-.

2. **Conduct**: In all respects, CDT Doolen adhered to regulations and policies in the class room.

3. **Leadership**: I would characterize CDT Doolen's performance in the dimension of leadership as sufficient to meet average standards of participation in the classroom.

4. **Teamwork and Selflessness**: CDT Doolen performed adequately in the classroom in terms of teamwork.

5. **Interpersonal Skills**: During my period of observation, CDT Doolen interacted with others (professor and peers) in an appropriate manner.

6. **Sense of Duty**: CDT Doolen gave me no reason to think that his actions were not consistent with his words.

7. **Appearance**: CDT Doolen's personal appearance was appropriate during the graded period in question.

8. **Potential**: My assessment of potential is based entirely on my observation of CDT Doolen in a single course. On this basis, I would restate the obvious: CDT Doolen performed below the middle of the group. On the other hand, the group/class in question comprised for the most part particularly strong students. Although he did not display significant enthusiasm, focus, or leadership in the course, CDT Doolen's performance was sufficient by the metrics discussed above.

Thomas Sherlock, Ph.D.
Professor of Political Science
Department of Social Sciences
United States Military Academy
West Point, New York 10996



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
WEST POINT, NY 10996

MACC-O-2-H 29 July 2014

MEMORANDUM THRU

Tactical Officer, Hotel Company, Second Regiment, United States Corps of Cadets, West Point, New York 10996

Regimental Tactical Officer, Second Regiment, United States Corps of Cadets, West Point, New York 10996

FOR Brigade Tactical Officer, United States Corps of Cadets, West Point, New York 10996

SUBJECT: CDT Doolen rebuttal to Conduct Investigation

1. The purpose of this memorandum is to request that the BTO drop my current conduct investigation; this request is based on several outlying facts (ie. unfair treatment upon my return to USMA and predetermined outcome to my board proceedings on June 23, 2014). Should the conduct investigation proceed, it is my request that I be declared proficient in conduct and allowed to serve out the punishment I received at my brigade board on June 23, 2014, without any further action that could potentially lead to separation.

2. Mr. Delroy Patrick, Regulations and Discipline Officer for the United States Corps of Cadets (USCC), assured my attorney, Mr. Edward Williams, that I would be treated fairly upon my return to the United States Military Academy. The brigade board I received on June 23, 2014 was not a fair board because of the following:

a. The tone of the board and decisions made were influenced by the recommendation for separation submitted by the Commandant of Cadets, Brigadier General (BG) Richard D. Clarke to the Superintendent, Lieutenant General (LTG) Robert Caslen Jr, on November 08, 2013. There were preconceptions already formed and decisions made prior to the hearing that influenced the outcome. (See enclosures 1 and 2)

b. CPT Elizabeth Eaton-Ferenzi was the investigating officer for the May 08, 2013 allegations. I believe CPT Eaton-Ferenzi intentionally left out statements submitted to her corroborating how much or how little I drank the night of May 08, 2013 (See enclosure 3). She (CPT Eaton-Ferenzi), states "Cadet Doolen claims he was not drunk and has attempted to request several Cadets to vouch for him. No facts, other than a singular email stating what he had to drink between 2000 – 2030, have been substantiated by any witnesses." I am having trouble understanding why the additional

statements/emails I submitted to CPT Eaton-Ferenzi were not immediately incorporated into her preliminary inquiry memorandum, dated May 13, 2013. Additionally, I am at a loss as to why CPT Eaton-Ferenzi would indicate I "consumed a minimum of 3 to 4 drinks, possibly more," when there is no corroborating evidence supporting that flawed conclusion. In fact, CDT Alpert explicitly states that he saw me order only one drink. CPT Eaton-Ferenzi's excuse, when I sent her an email regarding why only CDT Alpert's statement was included in the evidence packet, for my pending brigade board, can be found in enclosure 4.

c. On May 05, 2014, I was informed, prior to returning to West Point, that I would be charged with additional incidents and more than likely separated again; this information was conveyed to me and to my attorney by COL Keith Well, Office of the Judge Advocate General (OTJAG). (See enclosure 5)

3. The treatment I have received, since returning to USMA, has not been fair.

a. A new conduct investigation has been initiated, as promised by COL Well (preemptive my return to USMA). For a cadet to be declared deficient in conduct, and for a conduct investigation to be initiated, any one of the following four stipulations must be met:

i. A violation of the terms of conduct probation

ii. Those demerits awarded in a six-month demerit with tour period in which a cadet exceeded his or her demerit with tours allowance.

iii. Two alcohol policy violations

iv. Three Field Grade Article 10 actions of 35 demerits

b. I have done nothing that meets the annotated stipulations according to, Chapter 5, USCC Regulation 351-2, Section 504 "Determining a Cadet Deficient in Conduct," Paragraph (b) "Basis for Determining a Cadet is Deficient in Conduct." However, there is an alleged belief that I have two alcohol policy violations. With that being said, what was my alcohol policy violation? There is ambiguity surrounding the very nature of the board I received.

i. Mr. Patrick has injected his opinion, regarding the June 23, 2014 board I received on numerous occasions – often stating that the board I received was an "alcohol board."

ii. Several witnesses in the room have disagreed with Mr. Patrick. SFC Aaron Haynes, H2 tactical NCO, explicitly stated the board I received was not an alcohol board. MAJ Handke, acting RTO for the day (June 23, 2014), also attested to the fact that the board I received was not an alcohol board.

iii. All of the facts surrounding the board I received indicate that the board was not an alcohol board (i.e. not enrolled in ASAP or SLDP-A). MAJ Patrick Snyder, H2 tactical officer, in an email exchange dated July 04, 2014, stated "I am tracking your board was **NOT** an alcohol board." His conclusion is based on the fact that he questioned both SFC Haynes and MAJ Handke. (See enclosure 6)

c. The procedural issues regarding the June 23, 2014 board are numerous. According to Chapter 3, USCC Regulation 351-2, Section 311 "Publication of Results," "In order to be effective, the Cadet Disciplinary System must not only function properly, but it must also appear to function properly." In my case, the Cadet Disciplinary System is not functioning properly:

i. No findings from COL Nick S. Mauldin, the Brigade Tactical Officer (BTO), have ever been released regarding the board I received. Without a proper accounting of what was found at the brigade board on June 23, 2014, then it seems reasonable to conclude that a conduct investigation is being conducted whimsically. . A conduct investigation has been initiated against me based on a scintilla of evidence, hearsay submissions from others, and a biased preliminary inquiry report written by CPT Eaton-Ferenzi.

ii. On July 17, 2014, Mr. Delroy Patrick gave me notice I would be subjected to another conduct investigation. When Mr. Patrick gave me notice of a new conduct investigation, the following occurred:

(a) I told Mr. Patrick that I did not have two alcohol policy violations.

(b) I requested the BTO's findings from my brigade board – Mr. Patrick assured me that the BTO's findings were included in my conduct file.

(c) I requested the notes of Mr. Patrick, who was sitting in the back of the room during the June 23, 2014 board proceedings taking notes – these notes have not yet been received.

iii. The BTO's handwritten notes, from my brigade board, dated June 23, 2014, were included in my conduct file, and are what I believe Mr. Patrick considers being findings (see enclosure 7). Clearly, COL Mauldin annotated some key points from the board I received, however, he did not submit findings answering his own questions (i.e. *SFC Rowley – Did they lift the flag) – a key question that would provide insight as to whether or not I was actually on room restriction May 08, 2013. It is not overly clear to anyone, not even those who were in the room for the brigade board, what the BTO found to be completely evident based on a preponderance of evidence.

iv. BG Clarke, is one of the deciding authorities on whether or not I am declared deficient in conduct. Consequently, his decision to declare me deficient in conduct, as a result of allegedly having two alcohol boards, led to another conduct investigation (CI).

BG Clarke's involvement in initiating a new conduct investigation is suspect for a few reasons:

(a) On 08 November 2013, BG Clarke wrote a memorandum recommending me for separation, with full recoupment, from the United States Military Academy, in which he addressed 08 May 2013 allegations as fact (prior to me receiving any kind of board/hearing for the said allegations).

(b) It is my reasonable belief that BG Clarke, along with COL Well, have inappropriately influenced the brigade board I received on 23JUN14.

(c) The declaration of the brigade board I received was predetermined. (See enclosures 1,2,6)

v. CPT Eaton-Ferenzi's impartiality, as the investigating officer for the May 08, 2013 allegations, is questionable. On March, 20, 2013, I notified CPT Eaton-Ferenzi that I was reporting her to the Office of the Inspector General for an abuse of discretion and authority, which then led to her frequently imposing excessively harsh punishments. As a result, it is my firm belief that she should have recused herself from handling the May 08, 2013 investigation that took place, handing off the role of investigating officer to MAJ Rutnarak, CDT N[Redacted PII] D[Redacted PII]'s company tactical officer.

vi. CPT Eaton-Ferenzi's analysis and work as the investigating officer for the May 08, 2013 allegation is similar to many other disciplinary issues she has handled. She makes conclusions and presumes roles that she is incapable of supporting through facts and expertise.

4. On an end note, my performance since I have returned to the United States Military Academy has been outstanding; thereby, warranting a declaration of proficient in conduct status. However, the basic legalities of a new conduct investigation warrant my declaration of proficient in conduct status as well (i.e. evidence of potential unlawful command influence and violations of UCMJ Article 134 – Wrongful Interference with an Adverse Administrative Proceeding). (See enclosures 8,9,10)

5. I am reserving the right to amend and add to this rebuttal as necessary

6. Point of contact for this memorandum is the undersigned at 214-455-4907 or via email at Isiah.Doolen@usma.edu.

ISIAH DOOLEN
CDT, 2014
Company H, 2nd Regiment, USCC

10 Encls
1. Comm Memo pg. 1
2. Comm Memo pg. 2

MACC-O-2-H
SUBJECT: CDT Doolen rebuttal to Conduct Investigation

3. CPT E-F Prelim inquiry pg. 2
4. CPT E-F email correspondence
5. COL Well email correspondence
6. MAJ Snyder email correspondence
7. COL Mauldin Brigade Board handwritten notes
8. CFT PDR – MAJ Ziegelhofer
9. CFT PDR – CDT Chal
10. COL Sherer – leader award

5

000582

OFFICE OF THE COMMANDANT
UNITED STATES MILITARY ACADEMY
WEST POINT, NEW YORK 10996

MACC

MEMORANDUM FOR Lieutenant General Robert L. Caslen, Jr., Superintendent, United States Military Academy, West Point, New York 10996

SUBJECT: Recommendation for Final Disposition of Recoupment Investigation for Cadet Isiah Doolen, Class 2014

1. The purpose of this memorandum is to recommend Cadet Isiah Doolen's separation from USMA and the recoupment of his educational expenses.

2. On or about 21 February 2013, a Conduct Investigation (CI) was initiated based on Cadet Doolen exceeding his six-month demerit limit. These demerits were received between 15 September 2012, and 19 January 2013, for Cadet Doolen's errors in judgment, failing to comply with regulations, and delinquency in accountability. On or about 26 March 2013, an investigating officer found Cadet Doolen deficient in conduct. The chain of command recommended Cadet Doolen be separated from USMA based on a comprehensive review of his conduct and performance while at the Academy.

3. Both during the CI and after its completion, Cadet Doolen committed several major disciplinary infractions. On 10 April 2013, Cadet Doolen received a Battalion-level board for his destruction of Government property in his barracks room. He received 30 hours, 30 demerits, 30 days restriction, and 30 days loss of all privileges for his actions. Then on 8 May 2013, while still on restriction and serving the punishment from his 10 April 2013, board, Cadet Doolen reportedly was at his ex-girlfriend's barracks room and entered without permission. He was inebriated and used profane language, refused to leave when asked, and allegedly assaulted his ex-girlfriend.

4. Cadet Doolen performed below average in all three developmental areas of the West Point Leader Development system during the second term of AY 12-13. Overall, he was meeting minimal standards academically. He had a 2.20 overall Grade Point Average with a 2.165 Academic Program Score (cumulative), a 2.43 Military Program Score (cumulative), and a 2.27 Military Program Score (cumulative). However, most recently during Term 13-2, his overall Grade Point Average for the Term fell to 1.74 with an Academic Grade Point Average of 1.58, a Military Program Score of 1.29, and a Physical Program score of 1.90. These averages all fall below the minimum standard of 2.00. Cadet Doolen also received a grade of "F" in Military Development. That failing grade, and his performance overall, would have been reviewed by the Academic Board to determine if he was academically deficient.

MACC-O-2-H
SUBJECT: CDT Doolen rebuttal to Conduct Investigation

MACC
SUBJECT: Recommendation for Final Disposition of Recoupment Investigation for Cadet Isiah Doolen, Class 2014

5. I've personally met with Cadet Doolen and discussed the nature of his separation and potential for future service. While Cadet Doolen exhibits a desire to serve in the Army in any capacity, I do not support this course of action. Cadet Doolen's well documented pattern of misconduct, impulsivity, and anger management issues are not in keeping with the Army values and have the potential to put others at risk. Cadet Doolen had multiple developmental opportunities in his forty-seven months at USMA and ample time to address his shortcomings. He repeatedly failed to do so. A call to active duty would not be appropriate.

6. I have carefully reviewed the findings and recommendations of the investigating officer and concur with the recommendation to hold Cadet Doolen liable for recoupment of his educational expenses.

7. Please feel free to contact me with any questions or concerns at 845-938-3103.

8 Nov 13
DATE

RICHARD D. CLARKE
Brigadier General, US Army
Commandant of Cadets

2

7

000584

MACC-O-2-H
SUBJECT: CDT Doolen rebuttal to Conduct Investigation

MACC-O-2-H
SUBJECT: CDT Doolen rebuttal to Conduct Investigation

From: "Eaton, Elizabeth S CPT MIL USA USMA" <Elizabeth.Eaton@usma.edu>
Date: June 12, 2014 at 2:31:58 PM EDT
To: Isiah Doolen <idoolen13@me.com>
Subject: RE: Witness Statements

Isiah,

I don't have any additional emails or statements other than what R&D has; my hard drive was fried just prior to Spring Break.

You can re-engage w/the folks you listed below to see if they can assist you.

CPT E-F

-----Original Message-----
From: Isiah Doolen [mailto:idoolen13@me.com]
Sent: Wednesday, June 11, 2014 7:58 PM
To: Eaton, Elizabeth S CPT MIL USA USMA
Subject: Witness Statements

CPT Eaton-Ferenzi,

I was going through the statements and evidence against me, regarding the allegation of 08 May 2013, and noticed that out of several statements I had submitted to you, only one was included for some reason (former CDT Alpert). Would you by any chance have the other statements, if so, can I please come by and pick them up?

I submitted statements from the following people:

MACC-O-2-H
SUBJECT: CDT Doolen rebuttal to Conduct Investigation

-----Original Message-----
From: Well, Keith C COL MIL USA USMA [mailto:Keith.Well@usma.edu]
Sent: Monday, May 05, 2014 11:26 AM
To: Edward Williams
Subject: FW: Cadet Isiah Doolen - Class of 2013 (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Williams; the decision would be up to the chain of command. Although not exclusive, some potential options include:

(1) Conduct a new CI hearing. Set aside the findings of Cadet Doolen's CI and refer the case to a new CI to be conducted by a new IO.

(2) Initiate separation under a different basis. Set aside the findings of Cadet Doolen's CI and initiate separation under a different provision of AR 210-26, such as the additional misconduct he committed shortly after his CI (i.e., may warrant separation UP AR 210-26, paragraph 6-14 for "major misconduct", or AR 210-26, UP paragraph 6-23 for "lack of qualification for further service as a cadet or as an officer in the U.S. Army").

(3) initiate an Article 10 procedure for drinking alcohol and going into another Cadets room without permission, and if found, have a CI for 2 alcohol related incidences in his Cadet career. Respectfully, COL Keith Well

MACC-O-2-H
SUBJECT: CDT Doolen rebuttal to Conduct Investigation

**RE: Board**

Snyder, Patrick J MAJ MIL USA USMA

You replied on 7/4/2014 3:23 PM.

Sent: Fri 7/4/2014 12:16 PM
To: Doolen, Isiah M. CADET MIL USA USMA
Signed By: patrick.j.snyder6.mil@mail.mil

Answers to these questions:

1. I am tracking your board was NOT an alcohol board.

2. You are to complete SLDP, not SLDP-A.

3. You are not enrolled in ASAP.

V/R,

P.J. Snyder
MAJ, AD
patrick.snyder@usma.edu
CFT 5th Co Tactical Officer
H2 Company Tactical Officer
Bradley Barracks, Room 676
845.938.7867 (Camp Buckner Office)
845.938.5058 (O)
915.309.1484 (C)

MACC-O-2-H
SUBJECT: CDT Doolen rebuttal to Conduct Investigation

12

000589

MACC-O-2-H
SUBJECT: CDT Doolen rebuttal to Conduct Investigation

CDT Doolen - TAC PDR.pdf - Reader

UNITED STATES MILITARY ACADEMY
WEST POINT.

# Periodic Development Review

Not Observed (NOO) ... Effective (3) ...

| | | | | | | |
|---|---|---|---|---|---|---|
| 2014 | H2 | MD300 | CFT Co 8 Plt 4 | CFT PL | DOOLEN, ISIAH MATTHEW | 2015-0 |
| Graduating Class | AY Co | Course / Detail | Unit (ie. CO/PLT/SQD) | Position | CDT's Last Name, First Name | Acad Year/Term |
| Tac | Final | MADN-BSL | | MAJ | ZIEGELHOFER, MICHAEL | 20140714 |
| Report Type | Initial / Mid-term / Final | Evaluator Unit / Department | Evaluator Position | Evaluator Rank | Evaluator (Last Name, First Name) | Report Date |

Attributes: Traits that enable the core leader competencies to be performed with greater effect | Competencies: Traits that provide a clear and consistent way of conveying expectations

| Attribute | NO | 1 | 2 | 3 | 4 | Competency |
|---|---|---|---|---|---|---|
| **Character: Factors internal to a leader that constitute an individual's core.** | | | | | | |
| Army Values (AV) | | | | | X | S-AV |
| Empathy (EM) | | | | | X | |
| Warrior Ethos/Service Ethos (ET) | | | | | X | I-EM |
| Discipline (DI) | | | | | X | |
| **Presence: Leader's outward appearance, demeanor and actions** | | | | | | |
| Military and Professional Bearing (MB) | | | | | X | S-RE |
| Physical Fitness (PF) | | | | X | | |
| Confidence (CF) | | | | | X | I-PF |
| Resilience (RE) | | | | | X | |
| **Intellect: Leader's conceptual abilities and effectiveness** | | | | | | |
| Mental Agility (MA) | | | | X | | S-SJ |
| Innovation (IN) | | | | X | | |
| Expertise (EX) | | | | X | | I-MA |
| Sound Judgment (SJ) | | | | | X | |
| Interpersonal Tact (IT) | | | | | X | |
| **Leads: Application of character, presence, intellect and abilities toward a common goal** | | | | | | |
| Leads by Example (LE) | | | | X | | S-EI |
| Leads Others (LO) | | | | X | | |
| Builds Trust (BT) | | | | X | | I-BT |
| Extends Influence Beyond CoC (EI) | | | | | X | |
| Communicates (CM) | | | | | X | |
| **Develops: Fosters team work, initiative, and accepts personal responsibility** | | | | | | |
| Creates a Positive Environment (PE) | | | | X | | S-PS |
| Prepares Self (PS) | | | | | X | |
| Develops Others (DO) | | | | X | | I-DO |
| Stewards the Profession (SP) | | | | X | | |
| **Achieves: Sets objectives / focuses on mission accomplishment** | | | | | | |
| Gets Results (GR) | | | | | X | |

General Comments (Optional)

Most Qualified [X]
Qualified [ ]
Not Qualified [ ]

Evaluator Signature | Rated Cadet Signature

Reference ADRP 6-22, Army Leadership, August 2012

000590

MACC-O-2-H
SUBJECT: CDT Doolen rebuttal to Conduct Investigation

UNITED STATES MILITARY ACADEMY
WEST POINT

**Periodic Development Review**

| 2014 | H2 | MD3G8 | CFT Co 6 Plt 4 | CFT PL | DOOLEN, ISIAH MATTHEW | 2015-0 |
|---|---|---|---|---|---|---|
| Graduating Class | [illegible] | [illegible] | [illegible] | Position | [illegible] | Acad Year/Term |
| CoC | Final | B3 | CFT CO CDR | CDT | CHAL, ELLIOT DRYDEN COLE | 20140724 |
| Report Type | [illegible] | [illegible] | Evaluator Position | Evaluator Rank | Evaluator (Last Name, First Name) | Report Date |

S-AV

I-ET

S-RF

I-CN

S-EX

I-MA

S-LE

I-CM

S-PR

I-SP

Most Qualified

Qualified

Not Qualified

General Comments (Optional)

Evaluator Signature

Rated Cadet Signature

MACC-O-2-H
SUBJECT: CDT Doolen rebuttal to Conduct Investigation

## West Point - The U.S. Milit...

**USMA Command Chaplain Visit**

United States Militray Academy at West Point Chaplain, Col. Barbara Sherer presents a coin to Cadet Lt. Isiah Doolen for his outstanding leadership and dedication to his fellow Soldiers following a field exercise, July 22, 2014. Cadet Field Training is conducted during the summer at West Point in order to learn and hone both Soldier and leadership skills of the cadets. (U.S. Army photo by Sgt. Jeremy Bratt, 138th PAD)

15

000592



Attorneys and Counselors at Law

One Exchange Plaza
55 Broadway, Suite 1501
New York, NY 10006
Tel: (212) 239-5500
Fax: (212) 239-7030

March 27, 2014

**Via Email and First Class Mail**
Robert.caslen@usma.edu

Lt. Gen. Robert L. Caslen, Jr.
Superintendent
United States Military Academy
West Point, NY 10996

**Re: Isiah Doolen, Class of 2013**

Dear General Caslen:

As you know, we are attorneys for Isiah Doolen, Class of 2013.

I trust that my now, you have had the opportunity to study my letters to you dated March 13 and 18, 2014. In that regard, I would like to make an appointment to personally meet with you or your designee at West Point on either April 3 or 4 of next week, or on a mutually convenient date the week of April 7, to discuss this matter.

As I indicated in my letter of March 18, we would much prefer to resolve this matter without the need to resort to judicial intervention, and we look forward to proceeding in a cooperative manner with the Academy, with that in mind.

I would appreciate being advised of your (or your designee's) availability to meet on any of the dates I have suggested.

Very truly yours,
Edward G. Williams
Edward G. Williams

Cc: Office of the Staff Judge Advocate
*Attn:* LTC Jacqueline Emanuel, Esq.

Hon. Claire McCaskill
U.S. Senator for Missouri

A. L.



Attorneys and Counselors at Law

One Exchange Plaza
55 Broadway, Suite 1501
New York, NY 10006
Tel: (212) 239-5500
Fax: (212) 239-7030

March 18, 2014

**Via Email and First Class Mail**
Robert.caslen@usma.edu

Lt. Gen. Robert L. Caslen, Jr.
Superintendent
United States Military Academy
West Point, NY 10996

**Re: Isiah Doolen, Class of 2013**

Dear General Caslen:

As you know, we are attorneys for Isiah Doolen, Class of 2013. This is a corrected and revised copy of my letter to you dated March 13, 2014.

Your predecessor as Superintendent, Lt. Gen. David H. Huntoon, Jr., by memorandum to the Secretary of the Army dated May 13, 2013, recommended that Isiah Doolen, Class of 2013, be separated from the United States Military Academy ("USMA" or "the Academy"). This was done without the benefit of a separation Hearing being afforded to Mr. Doolen.

By your memorandum dated November 13, 2013, to the Assistant Secretary of the Army for Manpower and Reserve Affairs, you approved: (1) a "determination" made by a Major Brian Miller without the benefit of a hearing provided to Mr. Doolen, that Mr. Doolen had "willfully breached" his service agreement; and (2) Major Miller's recommendation that Mr. Doolen be required to reimburse the Government in the amount of $203,160.00.

The purpose of this letter is to request that, on account of the failure of the Academy to comply with settled case law pertaining to the due process requirements of the Fifth Amendment to the US Constitution, in connection with Cadet Doolen's proposed separation, as well as the gross violations of the USMA's self-imposed rules and regulations applicable to Conduct Hearings, discussed more fully below, you promptly and *sua sponte*, advise the Secretary of the Army that you are withdrawing the previously transmitted recommendations to separate Mr. Doolen, with recoupment.

Further to that, we ask that you take such other actions to permit Mr. Doolen to be permitted to rejoin the Academy, and to provide him the opportunity to do whatever may further be required of him to graduate and be commissioned as an officer in the United States Army.

**A. Fifth Amendment and Case Law Due Process Requirements:**

The due process requirements of the Fifth Amendment of the US Constitution, as applied to the USMA are set forth in a number of cases decided the US Court of Appeals for the Second Circuit and presumably are well known to the Academy. Hagopian v. Knowlton, 346 F. Supp 29 (SDNY 1972), aff'd., 470 .F2d 201 (2d Cir. 1972); see also, Wassen v. Trowbridge, 382 F.2d 807 (2d Cir. 1967). These cases, and others (e.g., Andrews v. Knowlton, 509 F.2d 898 (2d Cir. 1975), not only require that the Cadet be afforded a hearing, but that the hearing be a "fair hearing" (Hagopian, supra. at pp. 204 and 211). That includes the right to personally appear, to present evidence, as well as to call, question and cross-examine witnesses. Id.

As detailed fully below, Cadet Doolen did not get a "fair hearing."

**B. USMA's Own Separately Self-Imposed Requirements:**

A number of documents set forth the responsibilities/ obligations of the Academy, through the Investigating Officer and / or Conduct Hearing Officer, and others, to provide the requisite due process to a Cadet in connection with an award of excessive demerits.

Those documents include, but are not necessarily limited to, the following:

(1) Chapter 1, USCC Regulation 351-1, dated 15 May 2001;

(2) A three page (undated) "Instructions [to] Conduct Investigating Officer" setting forth a "checklist" of things the Investigating Officer must do in connection with conducting a Conduct Investigation and Hearing; and

(3) A Memorandum to Cadet Isiah Doolen dated 21 February 2013, from Regulations and Discipline Officer Delroy A. Patrick, which sets forth certain rights to be afforded Cadet Doolen in connection with a Conduct Investigation.

We have asked the Academy, through FOIA Requests, for other rules, regulations and / or writings which may set forth additional requirements to be followed by the Academy relative to its Conduct Investigations and Hearings, but have not yet received responses to all of our FOIA Requests relative to this topic. Accordingly, we may supplement this list of USMA self-imposed requirements if and when we receive additional documents.

We will not recount here all the requirements the USMA and its personnel must follow in a Conduct Investigation and/or hearing. They are set forth in the above listed documents and the relevant rules and regulations (and others which may be produced in response to our FOIA Requests).

Suffice to say at this point, however, where military "regulations prescribe [ ] specific steps to be taken to insure due process, they must be substantially observed." Friedberg v. Resor, 453 F.2d 935, 938 (2d Cir. 1971; United States ex rel Donhum v. Resor, 436 F.2d 751 (2d Cir. 1971); Smith v. Resor, 406 F.2d 141, 145 (2d Cir. 1969); see also, Hagopian v. Knowlton, 470 F.2d 201 at Fn. 23 (2d Cir. 1972).

C. **USMA's Failure to Comply**

Cadet Doolen was never provided an in-person Hearing, with all the due process safeguards as required by the Fifth Amendment and applicable case law, with respect to his proposed separation from the US Military Academy. In fact, he was never provided notice of his proposed separation until after his 20 March 2013 Conduct Hearing; and was never provided a due process hearing with respect to the same. → (not required IAW AR210-26)

Furthermore, Cadet Isiah Doolen did not get a fair Hearing when he challenged the demerits awarded him, which was to be the subject of the Conduct Hearing administered by Major Timothy Carignan on March 20, 2013. It was from this unfair Hearing, which was convened for the purpose to permit Cadet Doolen to challenge demerits given him, that the subsequent recommendation to separate, with recoupment, flowed. But, again, no hearing was ever noticed or provided to Cadet Doolen with respect to separation and / or recoupment.

The Conduct Investigation and 20 March 2013 Hearing, according to the USMA's own rules and regulations, pertained to Cadet Doolen having received 90 demerits for the period September 2012 through January 2013, which surpassed the 72 demerits allowed for that period for a first class (*i.e.*, senior year) cadet. (See Memo dated 4 February 2013 from Captain Elizabeth Eaton-Ferenzi to the Brigade Tactical Officer). By Memorandum dated 19 February 2013, Colonel Jeffrey Lieb, Deputy Commandant, appointed Major Timothy R. Carignan, a Major in the Physical Education Department of the Academy, to serve as the Investigating Officer for a Conduct Investigation. According to that same memo, the purpose of the Conduct Investigation was to "make findings concerning the reported conduct deficiency of Cadet Isiah M. Doolen, Company B, First Regiment, class of 2013."

There is no mention in this, or any other memo, that the subject of the 20 March 2013 Conduct Hearing was to make a determination (or recommendation) as to whether Cadet Doolen should be separated from the Academy.

Cadet Doolen challenged the award of some 20 demerits which he received in connection with the system - wide breakdown of a computerized battalion maintenance tracker system, which resulted in his inability to update the electronic tracker in a timely fashion. For this, Cadet Doolen was awarded 20 demerits, even though every maintenance issue had already been submitted to the TACNCO for action. If the challenged award of 20 demerits were set aside, as sought in this Hearing by Cadet Doolen, he would not exceed the demerit

allowance for the applicable period and would, therefore, not be found to be deficient in conduct.

As noted, the 20 March 2013 Conduct hearing, according to the 21 February 2013 Memorandum provided Cadet Doolen by Regulations and Discipline Officer, Delroy A Patrick, was to give Cadet Doolen the opportunity, at the Hearing, to "challenge issues with respect [his] conduct history." As explained to Cadet Doolen in that same memorandum, "Witnesses *may not* (emphasis supplied) be called either by you or by the CI with regard to whether you should be retained or separated; nor will witness statements [on that subject] be introduced." In a March 1, 2013 response, Cadet Doolen wrote he intended to challenge the 20 demerits he was awarded for an alleged "maintenance tracking" offense that took place on 11 January 2013.

Thus, it is clear, from the USMA's own documents, that the subject matter of the 20 March 2013 Conduct Hearing was to pertain to Cadet Doolen's challenge to demerits that had been awarded him during the relevant period, and not to whether he should be separated or not.

In short, the 20 March 2013 Hearing was not, nor can it be deemed, a "separation hearing."

But, in violation of the Academy's rules, and without notice to Cadet Doolen, the 20 March 2013 Hearing, such as it was (discussed in detail below), morphed into forbidden territory, upon which the Commandant (and then your predecessor Superintendent) relied to recommend to the Secretary of the Army, without the requisite due process hearing with respect thereto, that Cadet Doolen be separated and to repay the Government over $200,000 in "educational expenses."

It must be conceded by the USMA that Cadet Doolen received no Notice of, or opportunity for, an in-person due process hearing on his proposed separation. That, by itself, renders the recommendation to the Secretary to the Army subject to be overturned upon judicial review. Hagopian v. Knowlton, 470 F.2d 201 (2d Cir. 1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694 (1972).

The fact that USMA Regulations provide that a Cadet found deficient in conduct are subject to various sanctions, including separation, does not permit the USMA to so act. The Cadet must still be afforded notice and opportunity to be heard on any proposed separation. Army regulations do not trump the Fifth Amendment to the US Constitution and settled case law.

Even if, however, the 20 March 2013 hearing were somehow to be deemed to be Cadet Doolen's due process hearing on separation, he was not afforded the requisite due process at that Hearing.

Ex Parte interviews

USMA Regulations provide that at a Conduct Hearing, the Cadet has the right to "question and cross-examine witnesses." Section 105 (j) of Chapter 1, USCC Regulation 351-1; see also, Hagopian v Knowlton, supra; Wassen v. Trowbridge, supra. Here, the 20 March 2013 Hearing Officer, Major Carignan, following the close of the 20 March 2013 Hearing, "personally met" with two witnesses, *ex-parte*, and "off the record" (*i.e.*, Captain Elizabeth Easton-Ferenzi and SFC Kellen Rowley), and relied on what they said (according to him) to discount the sworn testimony of Cadet Doolen and witnesses who testified in his favor on the demerits he challenged. Cadet Doolen was not present when Major Carignan met with these witnesses; nor do we know what was said. All Major Carignan says in his "Summarized Report" dated 26 March 2013 is that he met with them and, following "additional information" provided by these two individuals (one of whom was asked to appear at the Hearing but did not do so), that Major Carignan "made [his] final ruling on this [demerit] challenge." Cadet Doolen was thereby denied his right to question and cross –examine these witnesses. This, by itself, without more, renders the entire proceeding a nullity.

Cadet Doolen was also denied his rights to "examine all records and documents to be considered by the CI" as well as his right to have a reasonable period of time to prepare a defense." Yes, Cadet Doolen was provided notice of the 20 March 2013 Hearing on 13 March, at which time he could challenge demerits awarded to him; but he was not provided some the statements that were to be used against him until he walked into the Hearing room on 20 March, 2013. Putting aside the fact that one cannot cross-examine a written statement (a denial of Cadet Doolen's right to cross-examine witnesses), handing Cadet Doolen written statements that would be considered and used against him at the very start of the Hearing, with no opportunity for him to review them in advance of the Hearing, denied him his fundamental rights to "examine all records"... and "to have a reasonable period of time to prepare a defense."

But what about the "record" which the Conduct Hearing Officer "certified" was "complete and accurate"? While any confidence in the accuracy of Major Carignan's "certification" is immediately made subject to doubt when one notes that he got the name of the Cadet[1], his Company assignment[2]and the date of the Hearing[3] wrong, the fundamental flaws of the so called "record" run much deeper.

Section 114, at subsections (j), (l) and (m) of Chapter 1, USCC Regulation 351-1, mandate that there be a record of any Conduct Hearing in the form of a "hearing transcript". Section 114, which is headed "Responsibilities of the Regulations and Discipline Officer, USCC" states, at subsection 'j" that he is to "coordinate as necessary with the IO to ensure timely completion of the hearing transcript ... and receipt of original and one copy." Subsection "l" of Section 114 states that the R&D Officer shall, "upon receipt of the original and one copy of the transcript from the IO, forward a copy to the SJA for initial legal review." Subsection "m" of

[1] The name of the Cadet is "Isiah M." Doolen, not "Samuel J." Doolen.
[2] Isiah Doolen was assigned to Company "B1", not "B3".
[3] The Hearing was on 20 March 2013, and not 26 March 2013.

Section 114 states: "Upon receipt of the transcript and initial legal review from SJA [the R& D Officer shall] determine if there is legal objection to further processing. If not, and if the Commandant determines that the case should go to the Superintendent, [then the R&D Officer shall] finalize the Commandant's recommendation as a forwarding document, sending the original of the transcript with all exhibits and the SJA review back to the SJA." (Emphasis supplied.) Furthermore, the "checklist" of "Instructions [for] Conduct Investigating Officer" has an entry for the Investigating Officer to check which reads: "Arrange for tape recording of the proceedings with the Regulations and Discipline Officer." Upon information and belief, Major Carignan, the Conduct Investigating Officer (who also served as the Conduct Hearing Officer[4]) did not "check" that entry as ever having been completed.

On March 10, 2014, LTC Jacqueline Emanuel, Esq., Deputy Staff Judge Advocate, responded by email to our inquiry first made on January 24, 2014, as to whether a tape recording had been made of the 20 March 2013 Hearing, and whether there was any verbatim record of the proceeding. LTC Emanuel admitted in that email that "the [20 March 2013] Conduct hearing was not recoded and there is no verbatim transcript of the proceedings."

What is the consequence of the Academy's failure to make a record of the 20 March 2013 Proceeding? Case law requires that the failure to make a record of the proceeding, and the inability of the Academy to produce a hearing transcript in violation of required procedures, requires that the Hearing be regarded as a nullity. Matter of Parkinson v. New York State Dep't of Correctional Services, 191 AD2d 635, 636, 595 NYS2d 230 (1993); Matter of Gittens v. Sullivan, 151 AD2d 481, 542 NYS2d 272 (1989). Here, Major Carignan's error- filled and self-styled "Summarized Report of Proceedings" can in no way be deemed to serve as a legitimate substitute of the required "hearing transcript." (Ref, Section 114 (j) of Chapter 1, USCC Regulation 351-1)

****************************************

Your legal counsel in the Office of the Staff Judge Advocate may take the position that the failure of the Academy to provide Cadet Doolen with copies of statements of witnesses against him in advance of the 20 March 2013 Hearing (as well as other statements relied on by the Commandant to recommend separation which were not even in existence at the time of the 20 March 2013 Hearing) was of no consequence and does not render the proceedings invalid since Cadet Doolen, by memorandum dated 25 April 2013, was advised that he would be permitted to personally review the "record" of the Conduct Investigation, including post-Hearing documents, and could also, in that regard, submit within five days, a written "rebuttal" to the Superintendent to defend against his proposed separation, which was noticed to him for the first time in the aforesaid memorandum dated 25 April 2013.

---

[4] The legality of the "Investigating Officer" in this matter, also serving as the "Conduct Hearing Officer, is questionable and suspect. The applicable USMA Regulations appear to provide that these functions be carried out by two different individuals.

Any position taken by your legal counsel that Cadet Doolen's due process rights were preserved, and not violated, because he had the opportunity to submit a written "rebuttal" to the so-called "record" upon which his separation was recommended by the Superintendent, is fundamentally flawed for several reasons:

First, the right of Cadet Doolen to question and cross-examine witnesses in connection with his proposed separation is a fundamental right, which cannot be denied him. Being given the opportunity to submit a written rebuttal to "the record" cannot serve as a substitute to questioning and cross-examining witnesses. Cadet Doolen cannot cross-examine a document.

Second, even worse, the "record," such as it is, does not even contain written statements of witnesses used against him. Major Carignan, the 20 March Hearing Officer, admittedly engaged in post-Hearing, *ex-parte*, and off the record meetings with at least two "witnesses" against Cadet Doolen, but no record, other than Major Carignan's two and a half line reference in his 26 March "Summarized Report" of his receipt of "additional [unspecified] information", exists. Major Carignan did not even write a Memo to File or create any other "record" of the "additional information" provided to him, "after which [Major Carignan] made [his] final ruling on [Cadet Doolen's] challenge [to the demerits]." (See Summarized Report of Proceeding" dated 26 March 2013. (Or is the correct date actually "25 March, 2013," the date in the covering memorandum from Major Carignan to the Commandant of Cadets?) What is that: triple hearsay? Actually, it's not hearsay[5] at all, because there is not even an actual statement. All that exists is Major Carignan's oblique reference in his "Summarized Report" to "additional [unspecified] information" he received from "witnesses" *ex parte*, after the conclusion of the 20 March 2013 'Hearing". We realize and appreciate that the Federal Rules of Evidence do not apply in these proceedings; but at some point, the due process requirements of the Fifth Amendment to the United States Constitution place some limitations as to what can be considered.

Third, and as discussed above, there was no actual "record" or "hearing transcript" of the 20 March 2013 proceedings, as mandated by Section 114(j), (l) and (m) of Chapter 1, USCC Regulation 351-1. All that exists as a "record" for possible judicial review is the Conduct Hearing Officer's typed version of his personal "Summarized Report" of the proceedings (which happily, for Cadet Doolen's defense against his separation, makes reference to the Hearing Officer's wrongful post-Hearing, *ex-parte* and of- the- record meetings with two "witnesses," who Cadet Doolen never - - at any time -- ever had the opportunity to confront, question or cross –examine).

In sum, it cannot be the law that a Conduct Hearing on Cadet Doolen's challenge to certain demerits, and the consequences which flow from it, be permitted to stand when:

1) There is no tape recording or "hearing transcript' of the proceeding, contrary to the Academy's own requirements; and

[5] Hearsay is an out of court statement offered to prove the truth of the matter asserted.

2) where, as here, the hearing is conducted off-the- record by an individual who has, upon information and belief, zero training on how to conduct a due process proceeding; and, where the Conduct Hearing Officer
3) fails to follow the Academy's own procedures, including the due process requirements of settled law; and who
4) interviews witnesses, after the conclusion of the so-called "Hearing," not in the presence of Cadet Doolen, and without the benefit of any the record (and without even setting down in writing his version of what was said and by whom, not that that would make things right); and who
5) then relies on those unsworn, of- the- record, and post-hearing, *ex parte* "conversations" (which are nowhere detailed except that those conversations provided unspecified "additional information") upon which the Conduct Hearing Officer relied to reject the sworn testimony of multiple witnesses who spoke at the "Hearing" in favor of the Cadet on the issue of the demerits; and who
6) further permits testimony (again, at the of- the- record "Hearing") on matters other than the limited topic of the demerits that was to be the subject of the hearing; and then who
7) submits his recommendation to uphold the award of the excessive demerits to the Commandant, together with a further recommendation outside the purview of the purpose of the Hearing in his self-styled "Summarized Report" in which, in addition to all the foregoing, he gets the name of the Cadet, the duty Company of the Cadet, together with the date of the actual Hearing, wrong.

A comment on the recommendation on "recoupment." In a memorandum dated November 13, 2013, you recommended to the Assistant Secretary of the Army for Manpower and Reserve Affairs, based on an "investigation" by a Major Brian Miller and his determination that, among other things, Cadet Doolen had "willfully breached" his service agreement, and that Cadet Doolen should be required to reimburse the Government in the amount of $203,160." How and when did Major Miller make that determination? Upon what evidence did Major Miller rely to conclude that Cadet Doolen had "willfully breached" his service agreement? Was Cadet Doolen provided a due process hearing in that regard, with respect to a financial penalty which could potentially put him in servitude to the Government for the rest of his life?

**D. Remedy Requested:**

On account of the foregoing multiple material failures on the part of the Academy in connection with the 20 March 2013 Conduct Hearing, including the failure to provide Cadet a fair Hearing with respect to the award of excessive demerits from which flowed the Superintendent's recommendation to separate Cadet Doolen, with recoupment; and the complete failure to provide Cadet Doolen any notice or hearing whatsoever on the separate issue of separation, we respectfully ask that you promptly reverse and rescind the

recommendation previously made to the Secretary of the Army to separate Cadet Doolen from the Academy (with recoupment), and promptly so notify the Secretary of the Army to that effect.

We respectfully submit this letter request, with full reservation of our rights to add, modify or otherwise revise it, inasmuch we have yet to receive responses from a number of FOIA Request we have submitted to the Academy. We fully expect that records turned over to us pursuant to those FOIA requests will further substantiate the failures of the Academy to provide the due process to which Cadet Doolen was entitled, as set forth above, as well as disclose additional and different failures of the Academy to provide the due process to Cadet Doolen in connection with his proposed separation from the Academy, with recoupment.

Please let me know if you have any questions. Of course, I would be pleased to meet with you or your designee to discuss our request for relief, or any other possible mutually agreeable resolution of this matter, without the need for us to seek judicial review of the Academy's actions in Federal court.

Very truly yours

Edward G. Williams

Cc: Office of the Staff Judge Advocate
*Attn:* LTC Jacqueline Emanuel, Esq.

Hon. Claire McCaskill
U.S. Senator for Missouri



*Attorneys and Counselors at Law*

One Exchange Plaza
55 Broadway, Suite 1501
New York, NY 10006
Tel: (212) 239-5500
Fax: (212) 239-7030

March 13, 2014

**Via Email and First Class Mail**
Robert.caselen@usma.edu

Lt. Gen, Robert L. Caslen, Jr.
Superintendent
United States Military Academy
West Point, NY 10996

**Re: Isiah Doolen Class of 2013**

Dear General Caslen:

We are attorneys for Isiah Doolen, Class of 2013.

Your predecessor as Superintendent, Lt. Gen David H. Huntoon, Jr., by memorandum to the Secretary of the Army dated May 13, 2013, recommended that Isiah Doolen, Class of 2013, be separated from the Academy. This was done without the benefit of a separation Hearing being afforded to Cadet Doolen

By your memorandum dated November 13, 2013, to the Assistant Secretary of the Army for Manpower and Reserve Affairs, you approved: (1) a "determination" made by a Major Brian Miller without the benefit of a hearing provided to Mr. Doolen, that Mr. Doolen had "willfully breached" his service agreement, and (2) Major Miller's recommendation that Mr. Doolen be required to reimburse the Government in the amount of $203,160.00.

The purpose of this letter is to request that, on account of the failure of the Academy to comply with settled case law pertaining to the due process requirements of the Fifth Amendment of the US Constitution in connection with Cadet Doolen's proposed separation, as well as the gross violations of the USMA's self-imposed rules and regulations applicable to Conduct Hearings, discussed more fully below, you promptly and sua sponte, advise the Secretary of the Army that you are withdrawing the previously transmitted recommendations to separate Mr. Doolen, with recoupment.

Further to that, we ask that you take such other actions to permit Mr. Doolen to be permitted to rejoin the Academy, and to provide him the opportunity to do whatever may further be required of him in order for him to graduate and be commissioned as an officer in the United States Army.

**A. <u>Fifth Amendment and Case Law Due Process Requirements:</u>**

The due process requirements of the Fifth Amendment of the US Constitution, as applied to the USMA are set forth in a number of cased decided the US Court of Appeals for the Second Circuit and presumably are well known to the Academy. Hagopian v Knowlton, 346 F. Supp 29 (SDNY 1972), aff'd, 470 F2d 201 (2d Cir. 1972); see also, Wassen v. Trowbridge, 382 F.2d 807 (2d Cir. 1967). These cases, and others (e.g., Andrews v. Knowlton, 509 F.2d 898 (2d Cir. 1975), not only require that the Cadet be afforded a hearing, but that the hearing be a "fair hearing" (Hagopian, supra at pp. 204 and 211). That includes the right to personally appear, to present evidence, as well as to call, question and cross-examine witnesses.

As detailed fully below, Cadet Doolen did not get a "fair hearing."

**B. <u>USMA's Own Separately Self-Imposed Requirements:</u>**

A number of documents set forth the responsibilities/ obligations of the Academy, through the Investigating Officer and / or Conduct Hearing Officer, and others, to provide the requisite due process to a Cadet in connection with an award of excessive demerits.

Those documents include, but are not necessarily limited to, the following:

(1) Chapter 1, USCC Regulation 351-1, dated 15 May 2001;

(2) A three page (undated) "Instructions [to] Conduct Investigating Officer" which a "checklist" of things the Investigating Officer must do in connection with conducting a Conduct Investigation and Hearing; and

(3) A Memorandum to Cadet Isiah Doolen dated 21 February 2013 Delroy A. Patrick, the Regulations and Discipline Officer, and which memo sets forth certain rights Cadet Doolen had with respect to him being referred to a Conduct Investigation.

We have asked the Academy, through FOIA Request, for other rules, regulations or other writings, which may set forth USMA's own requirements relative to a Conduct Investigation and Hearing, but have not yet received responses to all of our FOIA Requests relative to this topic. Accordingly, we may supplement this list of USMA self-imposed requirements if and when we receive additional documents.

We will not recount here all the requirements the USMA and its personnel must follow in a Conduct Investigation and/or hearing. They are set forth in the above listed documents and the relevant rules and regulations (and others which may be produced in response to our FOIA Requests).

Suffice to say at this point, however, where military "regulations prescribe [ ] specific steps to be taken to insure due process, they must be substantially observed."

Friedberg v. Resor, 453 F.2d 935, 938 (2d Cir. 1971; United States ex rel Donhum v. Resor, 436 F.2d 751 (2d Cir. 1971); Smith v. Resor, 406 F.2d 141, 145 (2d Cir. 1969); see also, Hagopian v. Knowlton, 470 F.2d 201 at Fn. 23 (2d Cir. 1972).

**C. USMA's Failure to Comply**

Cadet Doolen was never provided an in-person Hearing, with all the due process safeguards as required by the Fifth Amendment and applicable case law, with respect to his proposed separation from the US Military Academy. In fact he was never provided notice of his proposed separation until after his 20 March 2013 Conduct Hearing, and was never provided a due process hearing with respect to the same.

Furthermore, Cadet Isiah Doolen did not get a fair Hearing, when he challenged the demerits awarded him, which was to be the subject of the Conduct Hearing administered by Major Timothy Carignan on March 20, 2013. It was from this unfair Hearing, which was convened for the purpose to permit Cadet Doolen to challenge demerits given him, that the subsequent recommendation to separate, with recoupment, flowed. But, again, no hearing was ever noticed or provided to Cadet Doolen with respect to separation and / or recoupment.

The Conduct Investigation and 20 March 2013 Hearing, according to the USMA's own rules and regulations, pertained to Cadet Doolen receiving 90 demerits for the period September 2012 through January 2013, which surpassed the 72 demerits allowed for that period for a first class (i.e., senior year) cadet. (See Memo dated 4 February 2013 from Captain Elizabeth Eaton-Ferenzi to the Brigade Tactical Officer). By Memorandum dated 19 February 2013, Colonel Jeffrey Lieb, Deputy Commandant, appointed Major Timothy R. Carignan, a Major in the Physical Education Department of the Academy, to serve as the Investigating Officer for a Conduct Investigation. According to that same memo, the purpose of the Conduct Investigation was to "make findings concerning the reported conduct deficiency of Cadet Isiah M. Doolen, Company B, First Regiment, class of 2013."

There is no mention in this, or any other memo, that the subject of the 20 March 2013 Conduct Hearing was to make a determination (or recommendation) as to whether Cadet Doolen should be separated from the Academy.

Cadet Doolen challenged the award of some 20 demerits which he received in connection with the system - wide breakdown of a computerized battalion maintenance tracker system, which resulted in his inability to update the electronic tracker in a timely fashion. For this, Cadet Doolen was awarded 20 demerits, even though every maintenance issue had already been submitted to the TACNCO for action. If the challenged award of 20 demerits were set aside, as sought in this Hearing by Cadet Doolen, he would not exceed his allowance for demerits for the demerit period and would, therefore, not be found to be deficient in conduct.

As noted, the 20 March 2013 Conduct hearing, according to the 21 February 2013 Memorandum provided Cadet Doolen by Regulations and Discipline Officer, Delroy A Patrick, was to give Cadet Doolen the opportunity, at the Hearing, to "challenge issues with respect [his] conduct history". As explained to Cadet Doolen in that same memorandum, "Witnesses may

not be called either by you or by the CI with regard to whether you should be retained or separated; nor will witness statements [on that subject] be introduced." In a March 1, 2013 response, Cadet Doolen wrote he intended to challenge the 20 demerits he was awarded for an alleged offense that took place on 11 January 2013.

Thus, it is clear, from the USMA's own documents that the subject matter of the 20 March 2013 Conduct Hearing was to pertain to Cadet Doolen's challenge to demerits that had been awarded him during the relevant period, and not to whether he should be separated or not.

In short, the 20 March 2013 Hearing was not, nor can it be deemed, a "separation hearing."

But, in violation of the Academy's rules, and without notice to Cadet Doolen, the 20 March 2013 Hearing, such as it was (discussed in detail below), morphed into forbidden territory, upon which the Commandant (and then your predecessor Superintendent) relied to recommend to the Secretary of the Army, without the requisite due process hearing with respect thereto, that Cadet Doolen be separated and to repay the Government over $200,000 in "educational expenses."

It must be conceded by the USMA that Cadet Doolen received no Notice of, or opportunity for, an in-person due process hearing on his proposed separation. That, by itself, renders the recommendation to the Secretary to the Army subject to be overturned upon judicial review. Hagopian v. Knowlton, 470 F.2d 201 (2d Cir. 1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694 (1972).

The fact that USMA Regulations provide that a Cadet found deficient in conduct are subject to various sanctions, including separation, does not permit the USMA to so act. The Cadet must still be afforded notice and opportunity to be heard on any proposed separation. ] Army regulations do not trump the Fifth Amendment to the US Constitution and settled case law.

Even if the 20 March 2013 hearing were somehow to be deemed Cadet Doolen's due process hearing on separation, he was not afforded the requisite due process at that Hearing.

USMA Regulations provide that at a Conduct Hearing, the Cadet has the right to "question and cross-examine witnesses." Section 105 (j) of Chapter 1, USCC Regulation 351-1. Here, the 20 March 2013 Hearing Officer, Major Carignan, following the close of the 20 March 2013 Hearing, "personally met" with two witnesses, ex-parte, and "off the record" (i.e., Captain Elizabeth Easton-Ferenzi and SFC Kellen Rowley), and relied on what they said (according to him) to discount the sworn testimony of Cadet Doolen and witnesses who testified in his favor on the demits he challenged. Cadet Doolen was not present when Major Carignan met with these witnesses; nor do we know what was said. All Major Carignan says in his "Summarized Report" dated 26 March 2013 is that he met with them and, following "additional information" provided by these two individuals (one of whom was asked to appear at the Hearing but did not do so), that Major Carignan "made [his] final ruling on this [demerit] challenge." Cadet Doolen was thereby denied his right to question and cross –examine these witnesses. This, by itself, without more, renders the entire proceeding a nullity.

Cadet Doolen was also denied his rights to "examine all records and documents to be considered by the CI" as well as his right to have a reasonable period of time to prepare a defense." Yes, Cadet Doolen was provided notice of the 20 March 2013 Hearing on 13 March, at which time he could challenge demerits awarded to him, but: (a) he was not provided some the statements that were to be used against him until he walked into the Hearing room on 20 March, 2013 thereby depriving him the opportunity to prepare a defense to those statements. Putting aside the fact that one cannot cross-examine a written statement (a denial of Cadet Doolen's right to cross-examine witnesses), handing Cadet Doolen written statements that would be considered and used against him at the very start of the Hearing, with no opportunity to review them in advance of the Hearing, denied him his fundamental rights to "examine all records"... and "to have a reasonable period of time to prepare a defense."

But what about the "record" which the Conduct Hearing Officer "certified" was "complete and accurate"? While any confidence in the accuracy of Major Carignan's "certification" is immediately made subject to doubt when one notes that he got the name of the Cadet wrong ("Cadet Samuel J. Doolen") as well as his Company assignment (Company "B3" instead of Company "B1); and even referred to the Hearing having taken place on "26 March 2013" when in fact it was held on 20 march 2013), the fundamental flaws of the so called "record" run much deeper.

Section 114, at subsections (j), (l) and (m) of Chapter 1, USCC Regulation 351-1, mandate that there be a record of any Conduct Hearing in the form of a "hearing transcript". Section114, which is headed "Responsibilities of the Regulations and Discipline Officer, USCC" states, at subsection 'j" that he is to "coordinate as necessary with the IO to ensure timely <u>completion of the hearing transcript</u> ... and receipt of original and one copy." Subsection "l" of Section 114 states that the R&D Officer shall, "upon receipt of <u>the original and one copy of the transcript</u> from the IO, forward a copy to the SJA for initial legal review." Subsection "m" of Section 114 states: "Upon receipt of the transcript and initial legal review from SJA determine if there is legal objection to further processing. If not, and if the Commandant determines that the case should go to the Superintendent, [then the R&D Officer shall] finalize the Commandant's recommendation as a forwarding document, sending <u>the original of the</u> transcript with all exhibits and the SJA review back to the SJA." (Emphasis supplied) Furthermore, the "checklist" of "Instructions [for] Conduct Investigating Officer" has an entry for the IO to check which reads: "Arrange for tape recording of the proceedings with the Regulations and Discipline Officer." Upon information and belief, Major Carignan, the Conduct Investigating Officer (who also served as the Conduct Hearing Officer) did not "check" that entry as having been completed.

On March 10, 2014, LTC Jacqueline Emanuel, Esq., Deputy Staff Judge Advocate, responded by email to our inquiry first made on January 24, 2014, as to whether a tape recording had been made of the 20 March 2013 Hearing, and whether there was any verbatim record of the proceeding. LTC Emanuel admitted in that email that "the [20 March 2013] Conduct hearing was not recoded and there is no verbatim transcript of the proceedings."

What is the consequence of the Academy's failure to make a record of the 20 March 2013 Proceeding? Case law requires that the failure to make a record of the proceeding, and the inability of the Academy to produce a hearing transcript in violation of required procedures, requires that the Hearing be regarded as a nullity. Matter of Parkinson v. New York State Dept of Correctional Services, 191 AD2d 635, 636, 595 NYS2d 230 (1993); Matter of Gittens v. Sullivan, 151 AD2d 481, 542 NYS2d 272 (1989). Here, Major Carignan's error- filled and self-styled "Summarized Report of Proceedings" can in no way be deemed to serve as a legitimate substitute of the required "hearing transcript." (Ref, Section 114 9J) of Chapter 1, USCC Regulation 351-1)

**************************************

Your legal counsel in the Office of the Staff Judge Advocate may take the position that the failure of the Academy to provide Cadet Doolen with copies of statements of witnesses against him in advance of the20 March 2013 Hearing (as well as other statements relied on by the Commandant to recommend separation which were not even in existence at the time of the 20 March 2013 Hearing) was of no consequence and does not render the proceedings invalid since Cadet Doolen, by memorandum dated 25 April 2013, was advised that he would be permitted to personally review the "record" of the Conduct Investigation, including post-Hearing documents, and could also, in that regard, submit within five days, a written "rebuttal" to the Superintendent to defend against his proposed separation, which was noticed to him for the first time in the aforesaid memorandum dated 25 April 2013.

Any position taken by your legal counsel in that regard is fundamentally flawed for several reasons:

Frist, the right of Cadet Doolen to question and cross-examine witnesses in connection with his proposed separation is a fundamental right which must be provide). Cadet Doolen cannot cross-examine a document.

Second, even worse, the "record," such as it is, did not even contain written statements of witnesses against him. Major Carignan, the 20 March Hearing Officer, admittedly engaged in post-Hearing, ex-parte, and off the record meetings with at least two "witnesses" against Cadet Doolen, but no record (other than Major Carignan's version, other than a two and a half line reference in his 26 March "Summarized Report" to "additional information")he received from her exists. Major Carignan did not even write up a Memo to File or any other "record" of the "additional information" she provided him, "after which [Major Carignan} made [his] final ruling on [Cadet Doolen's] challenge." (See Summarized Report of Proceeding" dated 26 March 2013 (or is the correct date "25 March, 2013," the date in the covering memorandum from Major Carignan to the Commandant of Cadets)? What is that: triple hearsay? Actually, it's not hearsay at all, because there is no written statement. We realize that the Federal Rules of Evidence do not apply in these proceedings, but at some point, the due process requirements of the Fifth Amendment to the United States Constitution place some limitations as to what can be considered.

Third, and as discussed above, there was no "record" or "hearing transcript" of the 20 March 2013 proceedings, as mandated by Section 114(j), (l) and (m) of Chapter 1, USCC Regulation 351-1. All that exists as a "record" for possible judicial review is the Conduct Hearing Officer's typed version of his personal "Summarized Report" of the proceedings (which happily, for Cadet Doolen's defense against his separation, makes reference to the Hearing Officer's wrongful post-Hearing, ex-parte and off the record meetings with two "witnesses," who Cadet Doolen never—at any time -- ever had the opportunity to confront, question or cross – examine).

In sum, cannot be the law that a Conduct Hearing on Cadet Doolen's challenge to certain demerits, and the consequences which flow from it, be permitted to stand when:

1) There is no tape recording or "hearing transcript' of the proceeding, contrary to the Academy's own requirements, and
2) where, as here, the hearing is conducted off-the- record by an individual who has, upon information and belief, zero training on how to conduct a due process proceeding, and where the Conduct Hearing Officer
3) fails to follow the Academy's own procedures, including the due process requirements of settled law; and who
4) interviews witnesses, after the conclusion of the so-called "Hearing," not in the presence of Cadet Doolen, and without the benefit of any the record (and without even setting down in writing his version of what was said and by whom, not that that would make things right); and who
5) then relies on those unsworn, of- the- record, and post-hearing, ex parte "conversations" (which are nowhere detailed except that those conversations provided unspecified "additional information") upon which the Conduct Hearing Officer relied to reject the sworn testimony of multiple witnesses who spoke at the "Hearing" in favor of the Cadet on the issue of the demerits; and who
6) further permits testimony (again, at the off the record "Hearing") on matters other than the limited topic of the demerits that was to be the subject of the hearing; and then who;
7) submits his recommendation to uphold the award of the excessive demerits to the Commandant, and a further recommendation outside the purview of the purpose of the Hearing, in his self-styled "Summarized Report" in which, in addition to all the foregoing, he gets the name of the Cadet and the duty Company of the Cadet, together with the date of the Hearing, wrong.

A comment on the recommendation on "recoupment." In a memorandum dated November 13, 2013, you recommended to the Assistant Secretary of the Army for Manpower and Reserve Affairs, that based on an "investigation" by a Major Brain Miller and his determination that, among other things, Cadet Doolen had "willfully breached" his service agreement, Cadet Doolen should be required to reimburse the Government in the amount of $203,160." How and when did Major Miller make that determination? Upon what evidence did Major Miller rely to conclude that Cadet Doolen had "willfully breached" his service

agreement? Was Cadet Doolen provided a due process hearing in that regard, with respect to a financial penalty which could potentially put him in servitude to the Government for the rest of his life?

**D. Remedy Requested:**

On account of the foregoing multiple material failures on the part of the Academy in connection with the 20 March 2013 Conduct Hearing, including the failure to provide Cadet a fair Hearing with respect to the award of excessive demerits from which flowed the Supernatant's recommendation to separate Cadet Doolen, with recoupment; and the complete failure to provide Cadet Doolen any notice or hearing whatsoever on the separate issue of separation, we respectfully ask that you promptly reverse and rescind the recommendation previously made to the Secretary of the Army to separate Cadet Doolen from the Academy (with recoupment), and promptly so notify the Secretary of the Army to that effect.

We respectfully submit this letter request, with full reservation of our rights to add, modify or otherwise revise it, inasmuch we have yet to receive responses from a number of FOIA Request we have submitted to the Academy. We fully expect that records turned over to us pursuant to those FOIA requests will further substantiate the failures of the Academy to provide the due process to which Cadet Doolen was entitled, as set forth above, as well as disclose additional and different failures of the Academy to provide the due process to Cadet Doolen in connection with his proposed separation from the Academy, with recoupment.

Please let me know if you have any questions.

Thank you for your attention to this matter.

Very truly yours,

Edward G. Williams

A. L.

Cc: Office of the Staff Judge Advocate
*Attn:* LTC Jacqueline Emanuel, Esq.

Hon. Claire McCaskill
U.S. Senator for Missouri

**Lykling, Aaron L MAJ USARMY HQDA OTJAG (US)**

**From:** Isiah Doolen [idoolen13@icloud.com]
**Sent:** Monday, February 24, 2014 5:50 PM
**To:** Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)
**Subject:** CDT Doolen- Request for Delay of Findings
**Attachments:** CDT Doolen- Request for Delay of Findings.pdf

Sir,

Please see my attached request for a delay of findings. I added in an additional matter that involves my attorney and his conferment with the Academy. He needs time to speak with the Academy about procedural issues. I do not know how much time he will need, but please consider my request. We are trying to resolve issues at the lowest level possible. Essentially, giving the Superintendent time to review grievances and potentially change his recommendation. New evidence has continued to surface and will continue to surface, making an extension necessary and appropriate. Thank you.

Very Respectfully,

Isiah Doolen

2/24/14

To whom it may concern:

I would like to request for a decision, regarding my case of separation from the United States Military Academy, delayed pending the report of a forensic psychologist. I have sought out a mental health evaluator/forensic psychologist to examine the claims of my chain of command. I feel her report will weigh heavily in my favor. I would ask that you please make a delay regarding my case so that my attorney can confer with Academy officials regarding procedural issues involving my case. Please understand that everything is being done to rectify any of the wrongs done by the Academy at the lowest level possible. I hope that this request can be seen as an understanding that the Academy's disciplinary system is not designed to be legalistic and punitive, and that I fully understand said design. I have chosen to send this request, without the aid of my attorney, as a matter of respect for the system, and with the belief that people deserve a second chance to revisit their wrongs and change.

Very Respectfully,

Isiah M. Doolen

**Lykling, Aaron L MAJ USARMY HQDA OTJAG (US)**

**From:** Isiah Doolen [idoolen13@icloud.com]
**Sent:** Monday, March 03, 2014 11:45 AM
**To:** Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)
**Cc:** Chris_Holland@mccaskill.senate.gov
**Subject:** Mental Health Evaluation Report
**Attachments:** CDT Doolen - Mental Health Evaluation.pdf

Sir,

As promised, attached is the completed mental health evaluation report. I was going through my files that the Academy's SJA released to my attorney, apparently they are the same files that were sent to your office to be assessed, and I couldn't find the DA Form 3822 that was completed by Dr. Lucille Larney. The DA Form 3822 was filled out for the first mental health evaluation that I was given while at the Academy.

Very Respectfully,

Isiah Doolen

KINGSLEY PSYCHOLOGICAL ASSOCIATES

## PSYCHOLOGICAL EVALUATION

Client Name: ISIAH DOOLEN

Client DOB: June 1, 1988

Date of Evaluation: February 21, 2014

Date of Report: March 1, 2014

**IDENTIFICATION AND REFERRAL**

Isiah Doolen is a twenty-five year old, Caucasian male, self-referred for a psychological evaluation because "I was given a fit for duty evaluation in May 2013, and I feel like there were some statements made in that evaluation that may not have been interpreted correctly. I think my chain of command may have had more influence on that evaluation than she should have. Some of the language in the evaluation was the exact language she used in the document she prepared before the evaluation." The purpose of this evaluation was to determine if Mr. Doolen was fit to return to the United States Military Academy and be allowed to graduate.

Mr. Doolen was informed about the purpose of the evaluation and the limits of confidentiality. He was specifically told that the information he shared with me and any information I learned about him would be included in this report, and a copy of the report would be shared with his attorney and any other individuals potentially involved in the decision to allow him to return to the United States Military Academy.

**SOURCES OF DATA**

The following corroborating sources were reviewed:

1. Email correspondences between Isiah Doolen and myself
2. A copy of the memorandum dated March 25, 2013, referencing the investigation of Mr. Doolen including the Summarized Report of Proceedings
3. Character reference memorandums dated February 2013
4. A copy of the allegations made by Isiah Doolen, including supporting documents (50 pages)
5. Explanation of circumstances that led to Mr. Doolen's separation from West Point (63 pages)

*A Service of Burrell Behavioral Health*
1342 E. KINGSLEY, STE. A • SPRINGFIELD, MISSOURI 65804 • 417/761-5850 • FAX 417/761-5851
*An Equal Opportunity Employer / Services provided on a nondiscriminatory basis.*

000614

6. Chronological records of medical care authored by Joshua Hain, M.D.
7. Memorandum authored by Elizabeth S. Eaton-Ferenzi, CPT, AV, Tactical Officer, B1, USCC, dated April 1, 2013, Recommendations for Final Disposition on Conduct Investigation for Cadet Isiah M. Doolen
8. A copy of a letter dated May 3, 2013, authored by Eric L. Mayer
9. A copy of the memorandum that outlines expectations of Cadets with respect to academics
10. Copies of Developmental Counseling Forms
11. Copies of evaluations of Cadet Isiah Doolen, dated February and March 2013
12. Major Carignan's typed written notes from his interview of LTC Jeffrey Cunningham, CDT Lauren Helliger, CDT Ashli Carlson, and Mr. and Mrs. Carl and Connie Doolen
13. A copy of the Legal Review of Conduct Investigation dated March 29, 2012, authored by Anthony O. Pottinger, CPT, JA
14. Mr. Doolen's Rebuttal to Separation from the United States Military Academy
15. A copy of the Adult Psychosocial History form completed by Mr. Doolen on January 22, 2014
16. Results of the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) administered on January 22, 2014
17. Results of the Personality Assessment Inventory (PAI) administered on January 22, 2014

**BACKGROUND INFORMATION**

The following information was obtained from an interview with Mr. Doolen. Mr. Doolen provided several corroborating documents to confirm some of the information he provided. The following is based on Mr. Doolen's report unless specifically indicated. He was considered a reliable historian.

Mr. Doolen was born on [redacted] 1988, in [redacted] New Mexico. He is the only child born to Carl and Connie Doolen. He has two older half-brothers. His parents remained married and reside in [redacted] Missouri. When asked his father's occupation, Mr. Doolen said, "He's retired, but he was in construction." His mother is also retired. Prior to her retirement, she was an administrator for social security. He described a good relationship with both parents.

When asked to describe his childhood he stated, "It was good. No issues. My parents always cared about me." During his childhood, his household included his parents and his middle brother. His family frequently moved to accommodate his mother's employment. He added, "She worked for them (social security) for

forty years and was often promoted. We moved when she got a promotion." He spent his adolescence and most of his adulthood in [redacted] Ohio. Four months ago, his family moved to [redacted] Missouri. He denied any physical or sexual abuse during his childhood. Collateral sources noted that his father had anger issues, but Mr. Doolen never shared this with me.

In regard to education, Mr. Doolen graduated from high school in 2006. He maintained a "B" average while attending high school. He was enrolled in a few advanced placement classes. Throughout school, he ran cross country and track. During his senior year, his family moved to [redacted] New Mexico, and he enrolled in the New Mexico Military Institute. He completed his senior year of high school at the Institute and two years of college. Mr. Doolen described easily establishing friendships during school and stated, "I had a lot of friends."

In 2008, Mr. Doolen graduated from the New Mexico Military Institute with an Associates Degree. Following, in 2009, he enrolled in the United States Military Academy, West Point. He attended four years at this school, but was prematurely separated from the school two weeks shy of graduation. Regarding this incident he said, "I exceeded my demerit amount by 18 demerits. Thus, a conduct investigation was started, and they found that I was deficit in conduct based on the results of the investigation and the conduct hearing that was held." Consequently, he was dismissed from the school on May 17, 2013.

Mr. Doolen is currently single; he has never been married. He does not have any children. He has been in two long term relationship; he dated someone for five years. He ended this relationship because "I met another cadet, and we started dating. I definitely had a lot of problems with that relationship (referencing the cadet)." He elaborated that they frequently fought. He added, "She would get really mad if I made friends with someone. That's why we broke up, she got mad because I added someone to my Facebook. She sent me some really mean text messages over spring break leave. She threatened to turn me in for an honor offense...She made a lot of threats against me, and this was while we were still together. I have text messages that are awful. I saved them."

Mr. Doolen has never held formal employment. His parents have financially supported him through all of his schooling. He was awarded a scholarship and stipend at New Mexico Military Institute. He also received a stipend at the United States Military Academy. Since his dismissal from the United States Military Academy, he has spent free time attempting to get reinstated in the Academy. He is determined to return to the United States Military Academy and complete his education.

Regarding use of illicit substances, Mr. Doolen denied ever using any illicit substances. He also candidly said that he has consumed alcohol and added, "I don't drink anymore. I just don't want to drink anymore." He has never used tobacco products.

In 2010, Mr. Doolen was diagnosed with attention deficit disorder without hyperactivity. He was prescribed Strattera. This medication was not helpful, and it was changed to Concerta. Because he could not tolerate the Concerta, it was changed to Adderall XR. Initially, he was prescribed 5 mg of Adderall twice a day, and that was changed to 10 mg twice a day. Currently, he is taking 10 mg of Adderall daily.

In May 2013, Mr. Doolen began experiencing anxiety and panic attacks. He was also having "really bad nightmares." He sought treatment from his general physician, and was prescribed Xanax for his anxiety and temazepam for sleep difficulties. The temazepam was discontinued because he was allergic to it. The Xanax was changed to Xanax XR. He also began individual therapy; he saw two different therapists to address his anxiety. He continues to take the Xanax XR but stopped attending individual therapy. He noted that the anxiety is related to his recent experiences at the Academy, and the decision to separate him from the Academy.

**INFORMATION FROM COLLATERAL SOURCES**

Available for my review was a memorandum dated March 25, 2013, prepared by Timothy R. Carignan, MAJ MI, DPE Instructor. Based on his investigation, Major Carignan recommended suspended separation through a delayed graduation (December 2013). He also recommended that Mr. Dooling attend anger and emotional management training, be assigned a military position (PL) to "showcase his improvements), and provide robust, directed mentorship opportunities. The reader is referred to the Summarized Report of Proceedings for a full account of Major Carignan's investigation. I have highlighted some areas of interest from this report. Major Carignan interviewed Mr. Dooling's mother. He noted that she said "...her son would always be the one to defend the underdog regardless of the consequences, and that he would always jump in to the defense of the weaker." Major Carigan interpreted this comment as "The more I learn of CDT Doolen, the more I feel this statement fits him to a tee...making emotionally-driven decisions 'regardless of the consequences' and 'jumping in' to his own peril." Captain Carignan also noted that three of Mr. Doolen's references "provided testimony that did his character more harm than good."

According to the memorandum authored by Elizabeth S. Eaton-Ferenzi, CPT, AV, Tactical Officer, B1, USCC, dated April 1, 2013, she recommended Mr. Doolen be separated from the United States Military Academy and discharged from the Army with recoupment. Captain Eaton-Ferenzi described Mr. Doolen as "selfish, impulsive, and devoid of accountability and personal responsibility. He consistently demonstrates a lack of desire to follow basic instructions or take ownership of his actions." She added that Mr. Doolen reacts to discipline with "apathy, at a minimum, often blaming his immediate peers and supervisors for holding him accountable to accepted standards. His accusations are often interlaced with deceptive personal agendas and attacks rather than valid claims." Captain Eaton-Ferenzi voiced concerns about Mr. Doolen's anger management, poor decision making skills, and impulsive behavior. She also noted that Mr. Doolen had ample opportunities to address these issues through counseling but was "unreceptive." She added, "The aforementioned issues have stunted Cadet Doolen's ability to learn, grow, and mature as a cadet and future officer. I firmly believe that Cadet Doolen lacks the fundamental makings of a professional and competent officer." She indicated that during the period from November 2012 to February 2013, Mr. Doolen committed "more than one major error in judgment," yet she did not list these errors. She also commented that because of these errors, Mr. Doolen is not prepared to be a commissioned officer and allowing him to become one and "lead Soldiers in combat would be a dereliction of duty that would surely endanger the lives of those he would be responsible for."

CDT Edwin Lee said this about one of the incidents in question "I personally observed the incidence which result him a battalion board during the 1st semester. From my perspective, his argument with BN CSM was not a respect issue. He attempted to defend my classmates who tried to inform BN CSM why our company fall out and returned to the barrack for company activity. BN CSM's response on my classmate was negative that my classmate was defenseless because of CSM's position and authority. CDT Doolen approached professionally, but his approach provoked BN CSM to put him in trouble."

I reviewed several character references provided by Mr. Doolen. These references used descriptors such as "he (Mr. Doolen) generally exhibited the respect due to the officers and other cadets involved in our training...I have never seen any behavior or attitudes that would lead me to question Cadet Doolen's ability to lead soldiers in the Army...His leadership ability was very noticeable during class exercises. He has been decisive when he needed to be and supportive of his classmates when they were in charge...I believe that despite CDT Doolen's previous errors in judgment, he will make a good professional officer. He has learned from his mistakes and will be able to use



the lessons learned in the future, whether for himself or his soldiers...Cadet Doolen's critical thinking skills and logical thought combined with motivation produce significant developmental results. Cadet Doolen will be a good Army officer, and has demonstrated this potential by displaying his leadership abilities inside and outside the classroom...I believe CDT Doolen is ready to lead this nation's most precious resource today...Cadet Doolen is fully aware of his own shortcomings, and he has committed himself to developing his character and proving that he can become a fine officer once he graduates."

Medical records from the United States Army indicated that Mr. Doolen was diagnosed with attention deficit disorder (ADD) by Joshua Hain, M.D. Prior to this, he had no psychiatric history. He initially presented to the clinic because of difficulty concentrating and irritability. He was prescribed three medications for the ADD but responded most favorably to Adderall. Once stabilized on the Adderall, he reported feeling significantly better. He was more focused, less irritable, and improved overall general mood. Interestingly, medical records noted he was not impulsive and described him as "motivated, intelligent, and dedicated to self-improvement."

In response to the allegations, Mr. Doolen provided two documents which he provided for my review. The first document was a response to the allegations made against him. This document spans 63 pages. For the sake of brevity, I am not going to provide a synopsis of this entire document. However, I encourage the reader of my report to review this document. It provides several pieces of supporting evidence prepared by Mr. Doolen to demonstrate he was wrongly separated from the United States Military Academy. The second document references his concern about "an abuse of authority and discretion, retaliation, and reprisal by my CTO, CPT Eaton-Ferenzi; my company tactical NCO SFC Rowley; and my regimental tactical officer, LTC Cross." Again, for the sake of brevity, I will not provide a synopsis of this information. In this 50 page document, Mr. Doolen supports his allegations with various documentation.

Available for my review were copies of Developmental Counseling Forms. Based on my review of these documents, Mr. Doolen was referred for developmental counseling. Each session addressed a separate issue. An example of an issue addressed was to delineate what the term flagged means or what privileges you may or may not lose as a result of being flagged.

In February and March 2013, Mr. Doolen was evaluated by his supervisors and instructors. For the most part, these individuals positively rated Mr. Doolen. A few offered negative comments. Below is a brief summary of some of those evaluations. Mr. Doolen's evaluation completed by Josiah T. Grover MAJ

indicated that Mr. Doolen was performing adequately in every area he was assessed. In response to potential, Major Grover stated, "I have seen nothing to suggest that CDT Doolen would not serve with distinction in the Army and consequently would raise no objection to having him serve in my battalion." He was also evaluated by Thomas Sherlock, Ph.D., and the results were the same. Regarding potential, Dr. Sherlock stated, "CDT Doolen has significant potential which often remains latent. He must consistently apply himself to reach his potential. For example, he must engage in substantive classroom discussions more frequently that (sic) is now the case." Daniel Lorenzen also rated Mr. Doolen as average. He stated, "CDT Doolen is simply another student in my class. He's neither stellar nor a problem...he may not follow instructions all that well." Dr. Chaco rated Mr. Doolen as "has not demonstrated an impressive performance thus far..." Regarding performance, she indicated that he was last in her class. Her evaluation included a few negative comments about Mr. Doolen. Regarding potential she said, "...Cadet Doolen has not shown me evidence of potential for service as an exemplary officer. My observations of both his academics and leadership performance as a trip CIC do not offer grounds for many positive comments. Based on this, I would hesitate to see him as a lieutenant in my battalion." However, she added that she had only observed Mr. Doolen for six weeks. Lt Col John Hagen, Ph.D., described Mr. Doolen as "...I find him to be an average cadet who has the potential for solid service as an officer in the Army. He has not stood out in my assessments as being exemplary or as being significantly deficient in the characteristics of an officer. I would not have a problem with him serving as a lieutenant in my squadron or group but I would not be actively seeking him out to serve me." On March 12, 2013, Lt Col John Hagan sent an email to MAJ Carignan indicating that Mr. Doolen was late turning in an assignment for his class and was at risk of failing his class. He also noted that he had contacted Mr. Doolen, and Mr. Doolen assured him that he would turn in the assignment that day. There is no follow up indicating if Mr. Doolen ever completed the assignment. Major Ruth Mower provided an evaluation of Mr. Doolen dated March 18, 2013. Overall, her evaluation was very complimentary of Mr. Doolen and she said, "...he has unlimited potential...I absolutely would be glad to have him as one of my subordinates on day...That being said, I understand he is young and young cadets can and do make mistakes...Hopefully, if Isiah is found to be in the wrong he can (and I believe will) learn from his mistake and will become a better, future officer for it."

**BEHAVIORAL OBSERVATIONS**

Mr. Doolen presented as an appropriately dressed, polite, Caucasian male. He drove himself to the appointment, and no one accompanied him. He arrived 15 minutes early for his appointment. He was administered two psychological tests

several weeks prior to the clinical interview, and he worked diligently on both tests.

Mr. Doolen appeared his stated age of 25. Throughout my interview with him, he appeared calm. There was no evidence of anxiety or depression. He easily and comfortably answered questions posed to him.

Facial expressions were normal. For the most part, he maintained a serious demeanor. As noted, his mood was normal and affect congruent to his mood. He established good eye contact. Speech was organized and goal directed. He elaborated on most responses. Intelligence was judged to be average based on his use of vocabulary and responses to questions. Thoughts were logical and organized.

When asked to describe his sleep Mr. Doolen said, "I wake up a lot throughout the night. So, it's not very consistent." Regarding his appetite he said, "I would say it's fairly consistent. I would say I have lost some weight because of all the running I've been doing, but that's normal." He denied past and current suicidal thoughts. He also denied any homicidal thoughts.

**INCIDENT**

Regarding the incident that led to his separation Mr. Doolen said, "The 19th of January went by. I was the duty officer so I had to go by and check the rooms and make sure everyone was in their room. I was in charge of taps. It's when everybody, essentially had to be in their room, and they weren't allowed to leave until 5 am. I was in my dress uniform. It's important to know that because I had my dress gray uniform on, and the top portion zips, and underneath are suspenders and a white t shirt. I went to talk to my girlfriend. I was mad at my classmates for going down there after they had been drinking. One of them was essentially telling her that she shouldn't be with me. He liked her, and he was intoxicated when he was telling her this. His friend was also there, and I thought he was out of line. I was going down there to tell him I thought he was out of line. I was preparing for an altercation so I took my dress gray top off. Before that happened, my girlfriend, N[Redacted PII] said, I don't think it's a good idea for you to go down there. She went and got her squad leader, and her squad leader approached me and told me to go back to my room. I wasn't argumentative. I wasn't disrespectful. I simply said, N[Redacted PII] is this what you want? What I meant by that was are you sure everything is okay now. Then I went to my room. They thought it was inappropriate for me to take off my dress gray top. They thought I was going over there to get in an altercation. That's not what I was going to do.

I was simply going over there to say this is out of line to go there, intoxicated. My chain of command said there were other actions I could have taken. My chain of command said I was impulsive." As a result of this incident, Mr. Doolen was given thirty days loss of privileges, thirty days room restrictions, and 30 demerits. Up until March 7, Mr. Doolen had been restricted to his room for a total of 60 days.

Mr. Doolen candidly said that he has an anger problem. He added, "Part of the reason I was diagnosed with ADD was because I got irritated easily. That's why I self-referred myself to Behavioral Management to address this. I have in the past thrown things, hit things. I've never hurt anyone, but I have broken my hand by hitting a wall." This incident occurred while he was enrolled in the Academy. Mr. Doolen has a plate in his hand from this incident. Mr. Doolen also noted that when angry, he does not use offensive language, but does make sarcastic comments which sometimes provokes others to lash out. He added, "I realize my sarcasm upsets others. I don't think I do it on purpose, and I think sometimes others don't understand me and tend to take it the wrong way."

**PSYCHOLOGICAL TESTING**

Mr. Doolen was administered the MMPI-2 and the PAI as a measure of his personality and emotional functioning. Review of the validity scales of the MMPI-2 indicated that the profile should be considered valid and interpretable. The MMPI-2 Administration and Scoring Manual states that a T score below 80 on the VRIN and TRIN, and T score below 120 on the F-r, in inpatient or outpatient settings, should be considered valid. First, the results of the test did not indicate the presence of a mental illness. Second, Mr. Doolen produced a profile typical of someone interested in law enforcement which include military personnel. He endorsed items suggestive of impulsivity and a tendency to be a risk taker. His profile was also indicative of narcissistic tendencies. Again, this is a characteristic often seen in protocols of law enforcement officers. Individuals that produce profiles similar to Mr. Doolen's are viewed as likable and personable.

The results of the PAI were valid and consistent with the MMPI-2 results. The results of the PAI also did not indicate the presence of any psychopathology. Interestingly, the results of the testing did suggest some evidence of a low self-esteem while tending to blame himself for failures. Sometimes it's helpful to review significant items. Although the results of the testing indicated no significant problems with anger management, Mr. Doolen answered true to the following statement, people are afraid of my temper. I questioned Mr. Doolen

about this and he said, "In my numerous chain of command reports, there are statements that my chain of command fears I will put soldier's lives at risk as a result of their perceptions of my anger and impulsivity, which is why I answered true to that question."

**DIAGNOSTIC FORMULATION**

***Attention Deficit Disorder***

Based on Mr. Doolen's report and records available for review, he meets the criteria for attention-deficit/hyperactivity disorder (ADHD). Medical records indicated that Mr. Doolen was diagnosed with attention deficit disorder at the United States Military Academy. Prior to this, he had no psychiatric history. He initially presented to the clinic because of difficulty concentrating and irritability. He was prescribed three medications for the ADHD but responded most favorably to Adderall. Once stabilized on the Adderall, he reported feeling significantly better. He was more focused, less irritable, and improved overall general mood. During my interview with Mr. Doolen, he endorsed problems with inattention, poor concentration, increased distractibility, and global learning problems. Thus, in my opinion, he also meets the criteria for ADHD.

**DIAGNOSIS**

According to the criteria set forth in the *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition, Text Revision, Mr. Doolen's diagnoses are as follows:

Attention-Deficit/Hyperactivity

**OPINION**

According to the information provided to me by Mr. Doolen, it was recommended he be permanently separated from the United States Military Academy. However, based on the investigation conducted by Major Carignan, he recommended suspended separation through a delayed graduation (December 2013). He also recommended that Mr. Dooling attend anger and emotional management training, be assigned a military position (PL) to "showcase his improvements), and provide robust, directed mentorship opportunities. Subsequently, Elizabeth S. Eaton-Ferenzi, CPT, AV, Tactical Officer, B1, USCC, submitted a memorandum dated April 1, 2013, and recommended Mr. Doolen be separated from the United States Military Academy and discharged from the

Army with recoupment. Although I do not purport to be familiar with the United States Military Academy's policies for discharge from the Academy, based on my review of the available corroborating sources, there was no grounds for the final decision. Based on my understanding of the situation, the Academy ignored the neutral fact finder's, Major Carignan, investigation findings and instead relied on Tactical Officer's, Elizabeth S. Eaton-Ferenzi, CPT, AV, interpretation and observations to reach its final decision. More importantly, this final decision ignored the majority of opinions offered by character witnesses, instructors, and supervisors familiar with Mr. Doolen.

In my opinion, Mr. Doolen meets the criteria for a diagnosis of attention-deficit/hyperactivity disorder, and this is consistent with his medical records from the United States Military Academy. Currently, his condition is managed with medication, and this is consistent with information included in his military records. The records noted he was feeling significantly better, and was more focused, less irritable, and had an overall improved mood. These same medical records noted that Mr. Doolen was not impulsive and described him as "motivated, intelligent, and dedicated to self-improvement." Mr. Doolen candidly said that he has an anger problem. He also indicated that he sought mental health treatment to address his irritability and anger.

There were several notations in the documents suggesting Mr. Doolen would be successful in the military and a good leader. As noted, Major Carignan interviewed Mr. Doolen's mother and she said "...her son would always be the one to defend the underdog regardless of the consequences, and that he would always jump in to the defense of the weaker. Major Carigan interpreted this comment as "The more I learn of CDT Doolen, the more I feel this statement fits him to a tee...making emotionally-driven decisions 'regardless of the consequences' and 'jumping in' to his own peril." Granted, I did not interview Ms. Doolen. I did interview Mr. Doolen, and it was clear from his description of the incident that he did favor the underdog and defended them (his peers/classmates), because he cares about his peers and supervisees, and not because he is inclined to make "emotionally-driven decisions." More importantly, CDT Edwin Lee said this about one of the incidents in question "I personally observed the incidence which result him a battalion board during the 1st semester. From my perspective, his argument with BN CSM was not a respect issue. He attempted to defend my classmates who tried to inform BN CSM why our company fall out and returned to the barrack for company activity. BN CSM's response on my classmate was negative that my classmate was defenseless because of CSM's position and authority. CDT Doolen approached professionally, but his approach provoked BN CSM to put him in trouble." As his

mother noted, Mr. Doolen "would always jump in to the defense of the weaker" a characteristic expected of a good leader. Based on my reading of the documents this was not an "emotionally driven decision," but rather exemplified Mr. Doolen's willingness to defend the honor of his classmates.

Captain Carignan also noted that three of Mr. Doolen's references "provided testimony that did his character more harm than good." As noted, I reviewed several character references provided by Mr. Doolen. I also reviewed Captain Carignan's typed notes from the character references he considered negative. First, the character references Captain Carignan cites include a few negative comments, but they also portray Mr. Doolen in a positive light as well. There were eight other character references, which I read, that used glowing descriptors to illustrate Mr. Doolen's leadership abilities. These character statements describe an effective leader that was committed to improving himself and defending the honor of his subordinates.

Finally, I reviewed several evaluations of Mr. Doolen prepared by his supervisors and instructors. For the most part, these evaluations were very positive. There were some classes in which Mr. Doolen performed better in than others. The most negative evaluation came from an instructor that had interacted with Mr. Doolen for only six weeks. All of these evaluations included statements about Mr. Doolen's potential for leadership. Although there were some less favorable impressions of Mr. Doolen's leadership abilities, the majority of his instructors and supervisors noted he would be an effective leader in the Army. One evaluation was most telling, "...he has unlimited potential...I absolutely would be glad to have him as one of my subordinates on day...That being said, I understand he is young and young cadets can and do make mistakes...Hopefully, if Isiah is found to be in the wrong he can (and I believe will) learn from his mistake and will become a better, future officer for it."

Based on my reading of the available documents, it seems the decision to recommend separation from the United States Military Academy was based on the recommendation of Elizabeth S. Eaton-Ferenzi, CPT, AV, Tactical Officer, B1, USCC. Captain Eaton-Ferenzi described Mr. Doolen as "selfish, impulsive, and devoid of accountability and personal responsibility. He consistently demonstrates a lack of desire to follow basic instructions or take ownership of his actions." This comment is in direct contradiction to comments made by Mr. Doolen's supervisors, instructors, and character references. She also said that Mr. Doolen reacts to discipline with "apathy, at a minimum, often blaming his immediate peers and supervisors for holding him accountable to accepted standards. His accusations are often interlaced with deceptive personal

agendas and attacks rather than valid claims." Again, this is contradictory to comments made by others that have interacted with Mr. Doolen. Captain Eaton-Ferenzi voiced concerns about Mr. Doolen's anger management, poor decision making skills, and impulsive behavior which according to medical records from the United States Military Academy have been addressed with medication. More importantly, Mr. Doolen admits he has an anger problem, and he has sought treatment to address it. Last, she noted that Mr. Doolen had ample opportunities to address these issues through counseling but was "unreceptive." She added, "The aforementioned issues have stunted Cadet Doolen's ability to learn, grow, and mature as a cadet and future officer. I firmly believe that Cadet Doolen lacks the fundamental makings of a professional and competent officer." Others disagree with Captain Eaton-Ferenzi and view Mr. Doolen as willing and able to learn from his mistakes and committed to improving himself to become an effective leader in the military.

Given the above, in my opinion, Mr. Doolen is fit to return to the United States Military Academy. He should be provided an opportunity to return and complete his education.

If you need further assistance, please contact me at 417-761-5850.

Christina A. Pietz, Ph.D., ABPP
Licensed Psychologist
Board Certified in Forensic Psychology



OFFICE OF THE SUPERINTENDENT
UNITED STATES MILITARY ACADEMY
WEST POINT, NEW YORK 10996-5000

MAJA-MJ

13 NOV 2013

MEMORANDUM THRU DEPUTY CHIEF OF STAFF, G-1 (DAPE-MPO-AP), 300 ARMY PENTAGON, WASHINGTON, DC 20310

FOR ASSISTANT SECRETARY OF THE ARMY FOR MANPOWER AND RESERVE AFFAIRS (SAMR-HR), 111 ARMY PENTAGON, WASHINGTON, DC 20301

SUBJECT: Recommendation for Recoupment – Former Cadet Isiah Doolen, Class of 2014

1. I recommend that action be initiated to recoup the cost of Cadet Doolen's education in the amount of $203,160.. Cadet Doolen was found to deficient in conduct for exceeding his six-month demerit-with-tour allowance. Consequently, the Former Superintendent recommended that he be separated from USMA and discharged from the US Army with an Honorable Discharge certificate.

2. An Investigating Officer, MAJ Brian Miller, determined that the debt incurred by former Cadet Doolen is valid and rationally based, that he was on notice of his military service obligation, and that he willfully breached his service agreement. MAJ Miller recommended that former Cadet Doolen reimburse the Government in the amount of $203,160. I approve MAJ Miller's findings and recommendations, which are included in the enclosed report of investigation.

3. I request that you initiate action to recoup the cost of former Cadet Doolen's education in the amount of $203,160.

Encl
as

ROBERT L. CASLEN, JR.
Lieutenant General, US Army
Superintendent



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
646 SWIFT ROAD
WEST POINT, NY 10996-1905

MAJA-MJ 12 November 2013

MEMORANDUM FOR Superintendent, USMA, West Point, NY 10996

SUBJECT: Recoupment of Educational Expenses – Cadet Isiah Doolen, Class of 2014

1. **PURPOSE**. To obtain the Superintendent's recommendation regarding the recoupment of former Cadet Doolen's educational expenses.

2. **DISCUSSION**.

a. Cadet Doolen was deficient in conduct for exceeding his six-month demerit-with-tour allowance. Consequently, the former Superintendent recommended that he be separated from USMA and discharged from the US Army with an Honorable Discharge certificate. Pursuant to the Assistant Secretary of the Army (Manpower and Reserve Affairs) delegation of authority memorandum dated 6 May 2013, a recoupment investigation was directed.

b. On 24 June 2013, an Investigating Officer (IO), MAJ Brian Miller, was appointed to conduct an informal investigation to determine whether the basis and amount of Cadet Doolen's alleged debt was valid. The IO found:

(1) Cadet Doolen was on notice of his military service obligation and the financial recoupment requirement when he signed his service agreement;

(2) Cadet Doolen failed to fulfill his obligation to serve;

(3) Separation was the result of deficiency in conduct for exceeding his six-month demerit-with-tour allowance. This separation was a result of the cadet's misconduct; and

(4) The debt incurred by Cadet Doolen, which totaled $203,160, was rationally based.

c. Cadet Doolen acknowledged notice of this investigation on or about 1 July 2013. In an undated letter, he disputed the validity of the debt (see Exhibit 3).

d. The IO's legal advisor's legal review is located at TAB 1, and a copy of the investigation is attached at TAB 2.

MAJA-MJ
SUBJECT: Recoupment of Educational Expenses -- Cadet Isiah Doolen, Class of 2014

3. **LEGAL ANALYSIS.**

a. The AR 15-6 investigation regarding the alleged educational debt to the United States incurred by Cadet Doolen is legally sufficient.

b. The AR 15-6 investigation complied with all legal requirements. There were no procedural errors or irregularities with a material, adverse effect on any substantive right. Sufficient evidence supports the findings of the IO, and the recommendations are consistent with the findings.

c. After careful consideration of the file and the Respondent's submission, I agree with the IO's findings and recommendations.

4. **RECOMMENDATIONS.**

a. Based on the above, I make the following recommendations:

(1) That you approve the IO's findings and recommendations by signing the enclosed DA Form 1574 at TAB B. The signature area is located at Section VIII of the DA Form 1574.

(2) That you return the investigation to my office for transmission to HQDA.

b. If you do not recommend recoupment, you may indicate such in Section VIII of the DA Form 1574.

Keith C Well

Encls
as

KEITH C. WELL
COL, JA
Staff Judge Advocate



OFFICE OF THE COMMANDANT
UNITED STATES MILITARY ACADEMY
WEST POINT, NEW YORK 10996

MACC

MEMORANDUM FOR Lieutenant General Robert L. Caslen, Jr., Superintendent, United States Military Academy, West Point, New York 10996

SUBJECT: Recommendation for Final Disposition of Recoupment Investigation for Cadet Isiah Doolen, Class 2014

1.  The purpose of this memorandum is to recommend Cadet Isiah Doolen's separation from USMA and the recoupment of his educational expenses.

2.  On or about 21 February 2013, a Conduct Investigation (CI) was initiated based on Cadet Doolen exceeding his six-month demerit limit. These demerits were received between 15 September 2012, and 19 January 2013, for Cadet Doolen's errors in judgment, failing to comply with regulations, and delinquency in accountability. On or about 26 March 2013, an investigating officer found Cadet Doolen deficient in conduct. The chain of command recommended Cadet Doolen be separated from USMA based on a comprehensive review of his conduct and performance while at the Academy.

3.  Both during the CI and after its completion, Cadet Doolen committed several major disciplinary infractions. On 10 April 2013, Cadet Doolen received a Battalion-level board for his destruction of Government property in his barracks room. He received 30 hours, 30 demerits, 30 days restriction, and 30 days loss of all privileges for his actions. Then on 8 May 2013, while still on restriction and serving the punishment from his 10 April 2013, board, Cadet Doolen reportedly was at his ex-girlfriend's barracks room and entered without permission. He was inebriated and used profane language, refused to leave when asked, and allegedly assaulted his ex-girlfriend.

4.  Cadet Doolen performed below average in all three developmental areas of the West Point Leader Development system during the second term of AY 12-13. Overall, he was meeting minimal standards academically. He had a 2.20 overall Grade Point Average with a 2.165 Academic Program Score (cumulative), a 2.43 Military Program Score (cumulative), and a 2.27 Military Program Score (cumulative). However, most recently during Term 13-2, his overall Grade Point Average for the Term fell to 1.74 with an Academic Grade Point Average of 1.58, a Military Program Score of 1.29, and a Physical Program score of 1.90. These averages all fall below the minimum standard of 2.00. Cadet Doolen also received a grade of "F" in Military Development. That failing grade, and his performance overall, would have been reviewed by the Academic Board to determine if he was academically deficient.

MACC
SUBJECT: Recommendation for Final Disposition of Recoupment Investigation for Cadet Isiah Doolen, Class 2014

5. I've personally met with Cadet Doolen and discussed the nature of his separation and potential for future service. While Cadet Doolen exhibits a desire to serve in the Army in any capacity, I do not support this course of action. Cadet Doolen's well documented pattern of misconduct, impulsivity, and anger management issues are not in keeping with the Army values and have the potential to put others at risk. Cadet Doolen had multiple developmental opportunities in his forty-seven months at USMA and ample time to address his shortcomings. He repeatedly failed to do so. A call to active duty would not be appropriate.

6. I have carefully reviewed the findings and recommendations of the investigating officer and concur with the recommendation to hold Cadet Doolen liable for recoupment of his educational expenses.

7. Please feel free to contact me with any questions or concerns at 845-938-3103.

8 NOV 13
DATE

RICHARD D. CLARKE
Brigadier General, US Army
Commandant of Cadets

MAJA-AL                                                          23 July 2013

MEMORANDUM THRU Chief of Staff, United States Military Academy, West Point, New York 10996

FOR Superintendent, United States Military Academy, West Point, New York 10996

SUBJECT: Legal Review - Army Regulation 15-6 Investigation of Former Cadet Isiah Doolen, Class of 2013 – Educational Debt to the United States

1. Purpose. To provide a legal review of the Army Regulation 15-6 Investigation conducted by MAJ Brian Miller, the Investigating Officer, into the potential Educational Debt owed by Former Cadet Isiah Doolen.

2. Conclusion. The AR 15-6 investigation conducted by MAJ Miller complies with all legal requirements. There are no procedural errors or irregularities with any material, adverse effect on the Former Cadet's substantive rights. Sufficient evidence supports the findings of the investigating officer, and the recommendations are legally unobjectionable.


                                            MICHAEL R. SANDBERG
                                            CPT, JA
                                            Administrative and Civil Law Attorney

000633



**DEPARTMENT OF THE ARMY**
UNITED STATES MILITARY ACADEMY
607 Cullum Rd
WEST POINT, NY 10996-1905

REPLY TO
ATTENTION OF

June 27, 2013

Mr. Isiah Doolen
1326 Granite Ct.
Nixa, MO 65714

Dear Mr. Doolen:

I have been appointed by the Superintendent of the United States Military Academy as an Investigating Officer to conduct an informal investigation under the procedures of AR 15-6 and pursuant to 10 USC 2005. This investigation is in regard to the recoupment of debt owed for your educational costs while at the Academy. I will conduct an investigation to determine whether you were aware of the reimbursement requirement and whether the debt is rationally based. Prior to doing so, I will consider any statements, testimony, or evidence, either physical or documentary, that you submit to me.

Attached you will find the following documents: a memorandum from the Directorate of Resource Management which calculates the debt owed to the government for educational costs as $203,160 (Enclosure 1); a copy of the Agreement to Serve that you signed when you began your career as a Cadet (Enclosure 2); a copy of the separation action which officially separated you from the Academy (Enclosure 3); a memorandum of notification that I have prepared for you to execute and return to me outlining your decisions with regard to my investigation (Enclosure 4); and a memorandum explaining how the total reimbursement figure was calculated (Enclosure 5).

In accordance with the Privacy Act, you are not required to provide information to me; however, if you choose to do so, this information may be used by me in preparing my findings of fact and recommendations, and may be disclosed to members of the Department of Defense who have an official need to know the information for the performance of their duties. The information may be disclosed to others in accordance with the provisions of the Privacy Act.

I request that you acknowledge receipt of this notification, and indicate whether or not you dispute the validity of this debt. Please complete the attached memorandum and mail to me at the stated address within ten calendar days of your receiving it. Please include any information you wish me to consider at that time as well. If I receive no response, I will close out my investigation and forward it to the Superintendent for review.

Sincerely,

BRIAN MILLER
MAJ, U.S. Army
Investigating Officer

Enclosures

2

**Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)**

**From:** Johnson, Scott R MAJ USARMY (US)
**Sent:** Monday, August 26, 2013 9:42 AM
**To:** Landry, Brigitte L LTC USARMY HQDA DCS G-1 (US)
**Subject:** FW: Separation File (UNCLASSIFIED)
**Attachments:** ISO-8859-1"CDT Doolen- Whistleblower Questionnaire (2).pdf; ISO-8859-1"CDT Doolen- Mental Health WBR Questionnaire edited.pdf; ISO-8859-1"CDT Doolen- Evidentiary Documentation (5).pdf

Classification: UNCLASSIFIED
Caveats: NONE

Ma'am,

See the email below. Not sure if you have received this packet yet.

Scott

-----Original Message-----
From: Isiah Doolen [mailto:idoolen13@icloud.com]
Sent: Tuesday, August 20, 2013 3:06 PM
To: Johnson, Scott R MAJ USARMY (US)
Cc: doolen3994@yahoo.com; concepcion.doolen@ssa.gov
Subject: Separation File

Sir,

I'm sure that your office has received my separation file from West Point, and since that time I have prepared numerous other documents regarding, and contending my separation from the Academy. I was told by the Superintendent, in a redress that I had sent him, that you're the person to contact regarding any additional matters I wish to be reviewed. Please see the attached documents.

Very Respectfully,

Cadet Isiah Doolen

Classification: UNCLASSIFIED
Caveats: NONE

000635



PRESS FIRMLY TO
FROM:
CBR SCREENED
DEC 2_ '13
Pentagon
#43 PFPA
U.S. POSTAGE
$5.60
PRIORITY MAIL
UNITED STATES POSTAL SERVICE
DATE REC'D
For Domestic and International Use
DEC 2_ '13
At Pentagon
CBR SCREENED
#43 PFPA
From CASSARA, W.
918 HUNTING HORN WAY W.
EVANS, GA. 30809
TO Assistant Secretary of the Army
(MNRA)
Col. E. McEachearn
111 Army Pentagon Room 2E469
Washington, D.C. 20310
UNITED STATES POSTAL SERVICE
This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. Packaging is not for resale. EP14F © U.S. Postal Service; 2013; All rights reserved.
July 2013

Cdt Isiah Doolen
USMA x-cadet

417-449-7321

**DATA REQUIRED BY THE PRIVA**

**AUTHORITY:** Title 10, USC, Section 3020

**PRINCIPAL PURPOSE:** To secure sufficient information to make inquiry into the matters presented and to provide a response to the requester(s) and/or take action to correct deficiencies.

**ROUTINE USES:** Information is used for official purposes within the Department of Defense; to answer complaints or respond to requests for assistance, advice or information; by Members of Congress and other Government agencies when determined by The Inspector General to be in the best interest of the Army; and in certain cases in trial by court martial other military matters authorized by the Uniform Code of Military Justice.

**DISCLOSURE OF THE SOCIAL SECURITY NUMBER AND OTHER PERSONAL INFORMATION IS VOLUNTARY. HOWEVER, FAILURE TO PROVIDE COMPLETE INFORMATION MAY HINDER PROPER IDENTIFICATION OF THE REQUESTER, ACCOMPLISHMENT OF THE REQUESTED ACTION(S) AND RESPONSE TO THE REQUESTER.**

Whistleblower Reprisal Questionnaire

**You have made an allegation of reprisal. We need the following information to further evaluate your allegation. Answer these questions to the best of your ability and with as much detail as possible. Further, provide copies of any documents you believe support your allegation.**

Your Name: CDT, Doolen, Isiah, A (Rank, Last, First, Middle Initial)

SSN: Redacted PII 7694

Unit: USCC, 1st Regiment, 1st BN, B Co (Spell out)

Phone Number: 214 455 4907 (home, work or both)

**1. What protected communications did you make?** *[Explanation: A protected communication is (1) Any lawful communication to a Member of Congress or an IG; or (2) A communication in which a member of the Armed Forces communicates information that the member reasonably believes evidences a violation of law or regulation, including sexual harassment or unlawful discrimination, mismanagement, gross waste of funds or other resources, an abuse of authority, or a substantial and specific danger to public health or safety when such communication is made to any of the following: (a) A member of Congress, an IG, or a member of a DoD audit, inspection, investigation, or law enforcement organization, or (b) Any other person or organization (including any person or organization in the chain of command)*

Over the course of the term period 13-2, I had numerous issues with my chain of command. Many of those issues were addressed in some form of protected communication, disclosure, or activity. I submitted numerous complaints regarding my company tactical team's violation of law and regulation, abuse of authority, and the fact that reprisal and retaliation was a commonality after I brought to light such issues. Further evidence in this questionnaire will show where I have made complaints to the Office of the Inspector General at West Point and my chain of command (RXO, RTO, BTO, and the investigating officer for my conduct investigation) as they were authorized to receive such complaints through established regulations and administrative procedures. There were also points in time when I would go to members of my cadet chain of command and request that they personally sit in on counseling sessions with my company tactical team and me because I did not trust that a factual detailing of what would be said in these counseling sessions would be elaborated properly at a later date. Often my company tactical team and even my investigating officer for my conduct investigation would twist and turn my allegations, or the arguing of the excessiveness of my punishments as simply me not taking ownership for my actions. My company tactical team's actions, regarding the TAPs allegation and the reprisal showed towards me following protected communication, clearly reflect multiple violations of law and regulation (my reasonable belief).

**2. To whom did you make the protected communication?**

As mentioned in question 1, I made numerous protected communications, disclosures, and personnel actions over the course of the term period 13-2. These types of actions were revealed to the Office of the Inspector General, my chain of command (SFC. Rowley, CPT. Eaton Ferenzi, LTC. Cross, Col. DeAntona, Maj. Carginan), and since I have been separated from the Academy, Senator McCaskill, Senator Blunt, Congressman Pearce, and both the former and current Superintendents of the United States Military Academy.

**3. When and where did you make the protected communication?**

I consulted with the IG on multiple occasions regarding my company tactical team. Over Spring Break (week of 08 March, 2013) my parents drove me to the IG's office to discuss these continuous patterns of harassment towards me by my company tactical team. Many of the figures provided in question 4 answer the questions of when and where protected communication was made.

**4. What matters were addressed in the protected communication?** *[Explain the details of your complaint; include what, where and why.]*

a) "When Congress first enacted the Whistleblower Protection Act (WPA) in 1989, it stated that the intent of the legislation was to strengthen and improve protection for the rights of Federal employees, to prevent reprisals, and to help eliminate wrongdoing within the Government by — (1) mandating that employees should not suffer adverse consequences as a result of prohibited

personnel practices [my company and regimental tactical officers' disposition regarding my separation with recoupment] ; and (2) establishing ... that while disciplining those who commit prohibited personnel practices may be used as a means by which to help accomplish that goal, the protection of individuals who paramount consideration."[1] Figures 1, 2, 3, 4, and my written email to CPT. Eaton-Ferenzi, notifying her that I would be reporting her to the IG, adequately summarize the details of my complaint. For further clarification, each figure has been annotated with a footnote describing the nature of what is being presented and how it relates to the law, regulations, and policy.

To elaborate further, the intent of the Whistleblower Protection Act is to provide safeguards against personnel action. Personnel action, as outlined by the mandates of the WPA, are: "A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences – i) a violation of any law, rule, or regulation, or ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety…".[2] I'd like to note that the mandates of the WPA cite specifically that an applicant has to "reasonably believe" that an act evidences a violation of any of the previously mentioned. While the email that was sent to my company tactical officer, CPT Eaton-Ferenzi, may not be considered protected communication, it is still considered a protected activity, or more so, a protected disclosure. Protected disclosure was defined further by Congress so as to clarify the ubiquity of what protected disclosure is considered; it was defined so as to eliminate any barriers that would "limit the necessary flow of information from employees with information of government wrong doing".[3] My intent was to notify CPT Eaton-Ferenzi that I reasonably believed she abused her authority as my commanding officer by giving me punishment that was often excessive in nature, or wrongly initiated in the first place (i.e. the TAPs allegation).

-----Original Message-----
From: Doolen, Isiah M CADET MIL USA USMA
Sent: Wednesday, March 20, 2013 11:42 PM
To: Eaton, Elizabeth S CPT MIL USA USMA
Cc: Carlson, Ashli N CADET MIL USA USMA; Steffy, Barton R CADET MIL USA USMA; Crofford, Clifford D CADET MIL USA USMA; 'concepcion.doolen@ssa.gov'

Subject: IG

Ma'am,

---

1 "CRS Report for Congress: The Whistleblower Protection Act: An Overview" (CRS-1)

2 Ibid.

3 Ibid.

I wanted to let you know that I'm going to bring all of the conduct matters that you have brought up against me to IG. I feel like the punishment you gave me in regards to the supply maintenance tracker was a double dipping of demerits in which you categorized all of the issues that I had prior to that in to one lump charge, but then proceeded to punish me for those issues on separate occasions so that the demerits would be multiplicative. You then had CDT Schubert write me a COR for missing class because I went to talk to the RXO about Spring Break. I think the issue with that is that you are wanting to make it seem as though it been a CDT generated issue and that you were merely acting on a chain of command action and not an issue that you brought up on your own (what I believe to be a retaliatory measure for me talking to the RXO about my perceptions of you). Much like my conduct, there is a clear pattern with what is going on here, and that is that every time I have stubbed my toe, you have been there watching to make sure that I am getting punished. To me, this is becoming an issue of harassment; it's like walking on egg shells.

Very Respectfully,

Cadet Isiah Doolen



REPLY TO ATTENTION OF

DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
WEST POINT, NEW YORK 10996

MACC-O-RD

MEMORANDUM FOR Commandant of Cadets, ATTN: Regulations and Discipline Officer, USCC

SUBJECT: Referral to a Conduct Investigation

1. I acknowledge receipt of the basic letter. I understand my rights as explained in the basic letter and have made the following decisions:

a. I (do not waive) (waive) appearance before a conduct investigation.

b. I (will) (will not) request legal counsel to assist in the preparation of my case.

c. I (intend to raise the following issue/challenges related to my conduct history) (I will not raise any issues about my conduct history):*

| DATE OF OFFENSE | DESCRIPTION OF OFFENSE | DEMERITS |
|---|---|---|
| 11 Jan 13 | Failure to Comply I. E., Failed to meet BN suspense | 20 |

*NOTE: Continue on reverse if more space is needed.

**Figure 1 - Referral to a CI and my decisions regarding challenging conduct issues**[4]

[4] U.S.C. Title 10 – Armed Forces - (b)- Prohibition of Retaliatory Personnel Actions. – (1) No person may take (or threaten to take) an unfavorable personnel action, or withhold (or threaten to withhold) a favorable personnel action, as a reprisal against a member of the armed forces for making or preparing (B) a communication that is described in subsection (c) (2) and that is made (or prepared to be made) to – (iv) any person or organization in the chain of command; or (v) any other person or organization designated pursuant to regulations or other established administrative procedures for such communications. Yet, refer to the numerous statements of my IO and CPT-Eaton-Ferenzi regarding my accusations, challenges, and appeals.

USMA FORM 2-3; NOT for use in summarized proceedings

**RECORD OF FORMAL PROCEEDINGS UNDER ARTICLE 10, CADET DISCIPLINARY CODE**

Level of Proceeding(check one): Company ☐ Battalion ☐ Regimental ■ Brigade ☐

*SEE NOTES ON REVERSE BEFORE COMPLETING FORM*

| a. Cadet Name (Last, First, MI) | b. Class | c. SSN | d. Unit | e. Corps Squad/DCA Club: Yes (No) |
|---|---|---|---|---|
| DOOLEN, ISIAH | 2013 | - 9644 | B-1 | Notification sent? YES NO N/A |

**NOTIFICATION:**

1. I am considering whether you should be punished under Article 10, CDC, for the following misconduct:

On 8 March 2013, you are believed not to have been in your Barracks Room after TAPS.

Article 1, CDC, Failure to Comply with Regulations, Orders, Instructions
Article 3, CDC, Delinquent in Accountability
Article 7, CDC, Error in Judgment

2. You have several rights under this Article 10 proceeding. First I want you to understand I have not yet made a decision whether or not you will be punished. I will not impose punishment unless I am convinced by a preponderance of the evidence that you committed the offense(s). You may request a person to speak on your behalf. You may present witnesses or other evidence to show why you shouldn't be punished at all (matters of defense) or why punishment should be very light (matters of extenuation and mitigation). I will consider everything you present before deciding whether I will impose punishment or the type and amount of punishment I will impose. **MAX Punishment = 35 Demerits, 80 Extra-Duty Hours, 45 Days of Restriction, 60 Days Withdrawal of Privileges and Reduction in Rank to one or more lower ranks.**

3. Your hearing will proceed ~~on~~ no earlier than 26Mar2013 (date/time/location; at least 48 hours) You have until then to prepare any matters for your defense.

| DATE: 22MAR2013 TIME: 1009 | NAME, GRADE, AND ORGANIZATION OF COMMANDER (OR DESIGNATED REPRESENTATIVE) Elizabeth S. Eaton-Ferenzi, CPT, AV, TAC B-1 | SIGNATURE [signature] |
|---|---|---|

**HEARING:**

3. Having been afforded the opportunity to prepare for this hearing, my decisions are as follows: (initial appropriate blocks, date, and sign)
a. A person to speak on my behalf [IMD] Is requested [ ] Is not requested.
b. Matters in defense, mitigation, and/or extenuation: [ ] Are not presented [IMD] Will be presented in person [ ] Are attached.

| DATE 28Mar13 | NAME AND GRADE OF CADET Isiah Doolen, CDT, CO B-1, CL 2013 | SIGNATURE [signature] |
|---|---|---|

**IMPOSITION OF PUNISHMENT:**

4. In this hearing, all matters presented in defense, mitigation, and/or extenuation, having been considered, the following punishment is imposed:
a. X Admonition/Reprimand b. 80 Extra-Duty(hours) c. 45 Restriction (Days) d. Reduction in Rank to: PFC (rank) e. Other______
f. Withdrawal of Privileges: (circle one) (ALL) or AS SPECIFIED: ______ for 50 days.
g. Suspension (paragraph(s)): ______; to be automatically remitted if not vacated before ______ (date)
h. Demerits: 35
5. You are advised of your right to appeal to BTO within 3 calendar days. An appeal made after that time may be rejected as untimely. Punishment is effective immediately unless otherwise stated above.

| DATE 28 Mar 2013 | NAME, GRADE, AND ORGANIZATION OF COMMANDER John D. Cross, LTC, IN, RTO | SIGNATURE [signature] |
|---|---|---|

**APPEAL:**

6. (initial appropriate block, date, and sign)
a. [ ] I do not appeal b. [IMD] I appeal and do not submit additional matters. c. [ / ] I appeal and submit additional matters.

| DATE 29Mar13 | NAME AND GRADE OF CADET Isiah Doolen, CDT, CO B-1, CL 2013 | SIGNATURE [signature] |
|---|---|---|

7. After consideration of all matters presented in appeal, the appeal is:
[ ] Denied [ ] Granted as follows:

| DATE | NAME, GRADE, AND ORGANIZATION OF COMMANDER Joseph P. DeAntona, COL, AD, Brigade Tactical Officer | SIGNATURE |
|---|---|---|
| 8. I have seen the action taken on my appeal. | DATE | SIGNATURE |

9. ALLIED DOCUMENTS AND/OR COMMENTS.

USMA Form 2-3 (Aug 99)

**Figure 2 - TAPs allegation charge sheet - Note my checked desire to appeal[5]**

[5] 5 U.S.C.§ 2302 (p.186) (9) take or fail to take, or threaten to take or fail to take, any personnel action against any employee or applicant for employment because of – (A) the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation – (i) with regard to remedying a violation of paragraph (8) or (ii) other than violation of paragraph (8). I appealed this board in accordance with the reasoning given in Figure 4 and further elaborated in this questionnaire.



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
WEST POINT, NY 10996

MACC-O-1-B 28 March 2013

MEMORANDUM THRU Tactical Officer, Bravo Company, First Regiment, United States Corps of Cadets, West Point, New York 10996
Regimental Tactical Officer, First Regiment, United States Corps of Cadets, West Point, New York 10996

FOR Regimental Tactical Officer, United States Corps of Cadets, West Point, New York 10996

SUBJECT: CDT Doolen statement for regimental board in regards to TAPs allegation (08 March 2013)

1. Sir, The only evidence against me in this board is the sworn statement of SFC Rowley in which he stated the following:

> "I then went to Doolen's room in Ike Barracks, and saw that he was not there. I called his cell number again, as well. There was no answer. I then returned to Lee Barracks and saw that he was not in that room either, and that it was still a mess."

In subsequent conversations with SFC Rowley, he clarified that he did not enter my Ike Barracks room (IKE 114) after TAPs. Instead, after TAPs he knocked on the door and there was no answer. Additionally, the evidence surrounding his clarified statement negates a finding against me. SFC Rowley did not report me as being absent from TAPs check to CGR or the OC. He did not even secure the Ike master key to gain entrance into my Barracks room to verify my presence.

2. Sir, the points as stated above speak central to the allegations against me. Since there is a great deal of uncertainty on these crucial points, I respectfully request that no finding against me is made.

3. Point of contact for this memorandum is the undersigned at 214-455-4907

ISIAH DOOLEN
CDT, 2013
Company B, 1st Regiment, USCC

**Figure 3 - Evidentiary submission to LTC. Cross at my regimental board for the TAPs allegation**[6]

[6] U.S.C. Title 10 – Armed Forces - (b)- Prohibition of Retaliatory Personnel Actions. – (1) No person may take (or threaten to take) an unfavorable personnel action, or withhold (or threaten to withhold) a favorable personnel action, as a reprisal against a member of the armed forces for making or preparing (B) a communication that is described in subsection (c) (2) and that is made (or prepared to be made) to – (iv) any person or organization in the chain of command; or (v) any other person or organization designated pursuant to regulations or other established administrative procedures for such communications.

he item is digitally signed and cannot be altered. G to do for you?)
~~Misleading/intent to deceive on a sworn state~~ment by a TAC NCO (E-7)

INFORMATION PERTAINING TO THIS REQUEST *(Background. Use additional sheets if necessary; list enclosures if applicable.)*

SFC. Rowley's Sworn Statement:

See Enclosure A.

SFC. Rowley's statement is not true in that he never opened my door at 2330 to check and see if I was in my room or not. He has admitted verbally, with witnesses to account for his statements, that the door was locked and that I did not answer the door, which does not account for whether or not I was in my room. USCC SOP requires cadets to lock their door after 2315. Furthermore, in regards to questioning, Chapter 3 - Investigations and Disciplinary Hearing Procedures, "Cadets should not be questioned about potential violations of this regulation for, which there does not already exist reasonable cause to indicate that a delinquency was committed. For example, it would not be proper to ask a cadet whether he or she had been drinking alcohol merely because he or she was reported absent from taps inspection". According to the procedures and guidelines for USMA, my rights have been violated in regards to me being questioned about where I was for TAPs given that there was no prior evidence to suggest that I was not in my room. The fact that my door was locked for TAPs is a compliance with USCC SOP. No evidence indicates that I was not in my room, but there is ample evidence that suggests that I was in my room. As a cadet, I still have rights under UCMJ, and those rights indicate that I have the ability to not answer interrogatory questions (Article 31). Furthermore, I feel my UCMJ rights to keep quiet have been used against me to determine a matter of guilt in regards to the TAPs allegation. LTC Cross, 1st regiment RTO, made the following statement, to the effects of: "This is a fucking yes or no question, were you in your room for TAPs". After not saying anything for a while, he said to the effects of "I do not want you to have to lie, you can choose not to answer this, but if you do choose not to answer then I will assume the answer to be no and you will be found guilty". I still chose not to answer. Witnesses in the room will attest to LTC. Cross' assertions. Additionally, SFC. Rowley's statement has been used as "overwhelming" evidence to punish me for not being in my room (his statement is misleading and does not verify anything in regards to me being in my room or not).

I do ☑ I do not ☐ consent to release my personal information outside of IG channels (but within DoD official channels) in order to resolve the matters listed above. I understand that if I do not agree to release my personal information, my request for assistance may go unresolved.

This information is submitted for the basic purpose of requesting assistance, correcting injustices affecting the individual, or eliminating conditions considered detrimental to the efficiency or reputation of the Army. Those who knowingly and intentionally provide false statements on this form are subject to potential punitive and administrative action (UCMJ Art 107, 18 USC 1001).

| SIGNATURE | DATE *(YYYYMMDD)* |
|---|---|
| DOOLEN.ISIAH.MATTHEW.1293726639 | 20130328 |

**Figure 4 - Protected communication to the IG regarding SFC Rowley's lie on his sworn statement as it pertained to the TAPs allegation**[7]

7 U.S.C. Title 10- Armed Forces – (2) A communication described in this paragraph is a communication in which a member of the armed forces complains of, or discloses information that the member reasonably believes constitutes evidence of, any of the following: **(A) a violation of law or regulation,** including a law or regulation prohibiting sexual harassment or unlawful discrimination. In my appeal to the BTO, I told the BTO that I had been in my room and that I had locked the door to my Ike barracks room as per the USCC SOP. SFC. Rowley's claim that he saw that I wasn't in my room is a factual impossibility given that it was locked. I use the term factual impossibility as defined in Article 80 of the UCMJ.

**5. What are the unfavorable personnel actions alleged by the complaint?**
*[Explanation: A specific act of reprisal is an unfavorable personnel action that was either threatened or carried out as a result of a soldier's complaint to a Member of Congress, an IG, a law enforcement official, or the chain of command. An unfavorable personnel action is any action that affects, or has the potential to affect, a soldier's position or career. Specific examples are: performance evaluations, transfer or reassignment, changes to duties or responsibilities, disciplinary or other corrective actions, denial of reenlistment or separation, decisions concerning awards, promotions or training, decisions concerning pay or benefits, referrals for mental health evaluation. Depending on circumstances (i.e. was the action discretionary), unfavorable personnel action may include: actions taken as a result of an investigation (does not include initiation of an investigation), and revocation of: access to classified material, authorization to carry weapons, flying status, and Personnel Reliability Program certification.]*

On 28 March, 2013 CPT Eaton-Ferenzi trumped up charges regarding whether or not I was in my room on the night of 08 March, 2013. This action took place following negative communication to the regimental executive officer pertaining to my perceptions of her. Further unfavorable personnel actions that were taken against me in regards to protected communication and rights to challenge and appeal, involved **separation with recoupment**, despite being told by my company tactical team that they would back me on my conduct investigation, and despite the recommendation of my investigating officer.[8].

**6. Who are the responsible Army official(s) that you allege to have taken or threatened the unfavorable personnel action?**

In my assessment of my collected counseling statements, punishments, and findings for separation following protected communication, disclosure, and activity, my allegations of unfavorable personnel action are directed towards SFC. Kellen Rowley, CPT. Elizabeth Eaton-Ferenzi, and LTC. John Cross.

**7. When and where were the unfavorable personnel actions against you taken or threatened?**

Please refer to question 5 in which details regarding question 7 are already elaborated.

**8. When did you first become aware of the unfavorable personnel action?**

I first became aware of unfavorable personnel action on the morning of 09 March, 2013. CPT. Eaton-Ferenzi had approached me questioning me where I had been the night before simply because I had failed to answer the door to my room. Also, note that SFC. Rowley came by my room 30 minutes after TAPs, and that my door was locked as per the USCC SOP. I invoked my right to not answer because being an honor representative, I understood the following:

[8] Reference "CDT Doolen- Evidentiary Documentation (5)"

**108. Regulations and Honor**
1) Questioning. Individuals asking official questions incur the significant responsibility of ensuring their questions are proper. In determining propriety, a questioner must have evidence indicating that a breach of regulations has occurred and/or a reasonable cause to believe that the cadet being questioned was involved in the breach or has knowledge of the involvement of others in the breach of regulations.

108. Regulations and Honor also aligns itself with Chapter 3 of USCC Regulations: "Cadets should not be questioned about potential violations of this regulation for which there does not already exist a reasonable cause to indicate that a delinquency was committed. For instance, it would not be proper to ask a cadet whether he or she had been drinking alcohol merely because he or she was reported absent from inspection."

CPT Eaton-Ferenzi, in her approach on the morning of 09 March, 2013, stated to me that SFC Rowley had seen that I was not in my room. This was a direct contradiction to what he had said to me on the phone that same morning. On the phone SFC. Rowley had told me that he had knocked on my door, the door was locked, that I had not answered, and that he left with the assumption that I was "knocked out". Yet, Figure 4 and CPT Eaton-Ferenzi's statement to me on the morning of 09 March, 2013, regarding SFC. Rowley, reflects a contradiction to SFC. Rowley's verbal claim; nonetheless, the actions of SFC. Rowley were confirmed via telephonic communication, in the presence of TDS attorney, CPT. Todd Chard. At the time of the telephonic communication with SFC. Rowley, a witness was present to note what was specifically said during the conversation between CPT. Chard and SFC. Rowley. The witness to the conversation was the Academy's dietician.

On 08 March, the day the TAPs incident took place, I had gone to the 1st regiment RXO to discuss issues that I was having with CPT. Eaton-Ferenzi, as annotated in my email to her on 20 March, 2013, and to attempt to persuade the regimental tactical officer to reconsider his disposition regarding my taking of Spring Break leave. The RXO had told me it was improper for me to not notify CPT Eaton-Ferenzi prior to speaking with him about my perceptions of her. I had feared speaking with her because I did not want to face any acts of reprisal or retaliation, which turns out is something that I had every right to fear. He told me that I should go speak to her about my issues with her, or else he would notify her that I had gone by to speak with him. Later on that night SFC. Rowley came by my room to apparently notify me of what my privileges would be for Spring Break. This seemed inappropriate considering that it was 30 minutes after TAPs. It also was suspect considering that it happened after I had made complaints about her to the RXO.

Events following 08 March, 2013, clearly reflected a shift in the attitude of my company tactical team and the regimental tactical officer. The basis for my claim rests on circumstantial evidence regarding an approval of an exception to policy to take Spring Break leave, something my company tactical team approved, and email communication, something that occurred prior to the TAPs allegation:



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
WEST POINT, NY 10996

MACC-O-1-B 04 March 2013

MEMORANDUM THRU Tactical Officer, Bravo Company, First Regiment, United States Corps of Cadets, West Point, New York 10996
Regimental Tactical Officer, First Regiment, United States Corps of Cadets, West Point, New York 10996

FOR Brigade Tactical Officer, United States Corps of Cadets, West Point, New York 10996

SUBJECT: Exception to Policy for Spring Break

1. SUBJECT: CDT Doolen requests permission to take Spring Break from 8-17 March 2013

2. DISCUSSION:

Who: Cadet Doolen requests permission to take Spring Break Leave.
What: Spring Break leave with girlfriend down to Florida. He has a plane ticket to fly out of JFK airport at 1855 on 08March. He and his girlfriend will arrive in Tampa at 22:06 PM in which they will be picked up by his girlfriend's aunt and uncle. His return tickets are for 17March in which he will depart Tampa at 0700 and arrive at La Guardia airport at 0943.
When: 8-17 March 2013 after last duty of the day.
Where: 350 Coral Creek Drive, Placida, Florida
Why: Cadet Doolen has already spent a considerable amount of money on his Spring Break plans and has shown a great deal of resolve in terms of performing better. For almost 54 days he has served on room restriction, marched hours, and struggled with the fact that he does not know whether he will be able to graduate with his classmates, which is why the 9 days of leave will serve as a nice reprieve for him and allow him to regain the momentum necessary to finish strong.

3. Academic/Physical/Military –
Academic – Cadet Doolen is currently passing all of his classes and has no issues in terms of academic deficiencies.

Physical – Cadet Doolen has made up all 3 of the APFTs that he was behind on. He passed the IOCT on 3/1/13 with a time of 3:21. Dramatic improvement has been shown physically, especially after having mono and hand surgery. Some other physical achievements performed by Cadet Doolen recently include running 45 miles for the regimental running competition (2nd most in the company), and scoring 100 points for the regimental cardio competition.

Military- His military performance is recovering, and he has not received any negative feedback since the last incident that caused him to receive a battalion board (19Jan13). He has been performing his duties and his military tasks in a timely manner. Cadet Doolen has done a better job of communicating with his TACs on issues regarding his job as the company S4. 07March will mark the end of his punishment in terms of room restriction and loss of privileges. He has marched all of his hours and has displayed a behavior pattern of positive reform.

Extracurricular Activities – Cadet Doolen is currently training for the Bear Mountain 50 mile ultramarathon in May, which is a race that he ran last year as well. He has also signed up as a volunteer for the Boy Scout trading post and the Camporee.

4. Point of contact for this memorandum is the undersigned at 214-455-4907

ISIAH DOOLEN
CDT, 2013
Company B, 1st Regiment, USCC

**From:** Doolen, Isiah M CADET MIL USA USMA
**Sent:** Wednesday, March 06, 2013 6:00 PM
**To:** Eaton, Elizabeth S CPT MIL USA USMA
**Subject:** RE: ETP

Ma'am,

Will you also please mention though that I came to you guys multiple times about taking my APFTs and that I also scored relatively well on those? I'm not sure what the firstie average for the APFT is, but I am assuming that my scores aren't below that. Also, I have been on top of my duties in terms of S4 stuff. Here is the email I received from Cliff:

Doolen,

Can we please crush C1 this week in terms of issue point? I hate that Jean Roman beats us every week! (HTML)

Otherwise, keep up the good work here. We are one of two companies who haven't been late

Very Respectfully,

Clifford Crofford

Commander, B-1

USCC

I have done what is expected of me in terms of my physical pillars, but I would also say that there aren't a ton of people who could've taken 2 APFTs, an IOCT, and completed the final for Combatives all in the same week; not to mention, I didn't cut back on my workouts that week just because I had all of that stuff going on. I'm honestly getting on a new level physically that I feel is above the standard. This is preparation I'm taking upon myself not because I am in trouble, but because I want to graduate and I understand what is going to be expected of me physically when I get to my unit, especially as an Armor officer. My grades have improved and that is because I took the time to go talk to all of my instructors to receive extra help. I have a CI, but I feel like I have been working hard. I was staying on top of things before I found out I wasn't going to get Spring Break, so it's not a fair assessment to say that I'm really improving because I have other motives. Ma'am, I'm not sure what I can possibly do to get back into good graces because I just feel like all of the good things I am doing is going relatively unnoticed (no disrespect or attitude intended here). Tomorrow I am helping pace a classmate for an APFT that he is taking, and this is despite

the extreme amount of work that I have this week. Granted, I am not doing this for recognition. I am training for that 50 miler, I have done well in regimental competitions (which reflects positively on the company), and I am doing other extracurricular activities. Taking Spring Break is incredibly important to me and I would honestly appreciate some extra support on this because I feel like I've earned that. CI aside, I think that it's pretty accurate to say that I am far from being a trouble cadet for you now.

I understand your perspective as well. You came into this company and you did not know me, and all you saw were things to influence you negatively. I had a period of time where things were stacking up, and I also see where that is a dilemma, but I was punished for that. You even told me yourself that you considered it excessive that I lose Spring Break as well. Now it just seems like there are a bunch of qualms arising in terms of your approval for this ETP. I am working hard and will continue to work hard. Please trust that I will not let you down.

Very Respectfully,

Cadet Isiah Doolen

-----Original Message-----
From: Eaton, Elizabeth S CPT MIL USA USMA
Sent: Wednesday, March 06, 2013 5:08 PM
To: Doolen, Isiah M CADET MIL USA USMA
Subject: ETP

Isiah,

I took your ETP up to the RXO's office and found out that I need to be the one to submit the memo (my sig block, et al). Therefore, I need to take what you wrote and mold it into a memo from me and submit it up the chain. I have TAC Huddle tomorrow at 1000 hours and will bring it with me to that meeting for the boss to review.

Some of the tweaks I plan on making: I do not think it's a good idea to write in there that you already purchased a ticket, etc., as that comes off the wrong way (at least to me). I am going to stick to the facts; your current status regarding the three pillars, your punishment (complete as of 07MAR), etc. But I will be upfront with my "weak" or "moderate" approval as your standing is what is expected of a Firstie right now (at this point on your 47-month journey) and the boss will go from there.

I updated all the slides for the meeting tomorrow and highlighted some of your most recent accomplishments physically. I also annotated that even though you

are showing as an "F" for law, that I rec'd a note from your law professor stating you currently have a "D" as you went in and corrected your WPR with him.

Will let you know what's going on tomorrow. We are behind the power curve a bit too as they are building CGR rosters right now for Spring Break, which I didn't realize. I would have disapproved this last week anyhow without you being in good academic standing and complete with all physical requirements.

Standby for an update tomorrow around lunch.

V/r,

CPT E-F

Elizabeth S. Eaton-Ferenzi

CPT, AV

USCC, Tactical Officer, B1

elizabeth.eaton@usma.edu

Work: 845-938-2905

BB: 845-476-1440

**9. What reasons if any did any of the responsible Army official(s) give you for taking or withholding the personnel action(s)?**

As mentioned previously, multiple incidents occurred over the term period 13-2. My first allegation against CPT Eaton-Ferenzi involved the fact that the punishment she had given me in regards to the supply maintenance tracker was excessive. Please refer to the following:

During testimony given by both CDT Doolen and CDT Heiliger during the CI hearing, I learned that the task to update the Battalion tracker was also not met by the A1 Company Supply Officer CDT Micah Gunselman. I called A1 and spoke with SFC Boudreau and learned that CDT Gunselman received a Cadet Observation Report and 5 demerits for his failure to meet the Battalion suspense in 11 January 2013. SFC Boudreau also gave positive character reference of CDT Gunselman stating that he was a good and reliable cadet and that CDT Gunselman had exhibited no other conduct anomalies, either behavioral or supply-related, prior to the incident or since. This is not the case concerning CDT Doolen. I have determined that even though the punishment received by the A1 Supply Officer for the same infraction was less than what CDT Doolen received, it is my assessment that the B1 TAC team justifiably acted within USCC regulation and without prejudice to enforce the tougher punishment against CDT Doolen.

**Figure 5 - Punishment Comparison between A1's Supply Officer and CDT Doolen**

a) Information in Figure 5 reveals that CDT Micah Gunselman received a lesser punishment than I did. Also, in a discussion I had with CDT Ashli Carlson days after my conduct hearing, she mentioned that according to written guidelines and company policy set forth for staff members, a failure to meet a suspense date, first offense, was a counseling statement regarding the infraction, not the 20 hour and 20 demerit punishment that I had received. Currently, I do not have a copy of this document; however, CPT. Eaton-Ferenzi should have one. The justification for the excessive punishment is denoted in Figure 5. This action because it occurred before the protected communication is not what I'm arguing is reprisal, the reprisal is reflected in Figure 9. What I'm arguing is that the excessiveness of the punishment is an abuse of authority. When I would argue the excessiveness or challenge the excessiveness of my punishments, those arguments and challenges would be used against me to undermine my character. To me this completely contradicts due process, and creates a slippery slope in which unsubstantiated claims are all is needed to take action against someone.

b) Issues pertaining to punishment regarding the TAPs allegation is incredibly unclear to me, and it was also unclear to my CDT 1SG, Barton Steffy. CDT Steffy told me that he had asked the regimental tactical officer, during my regimental board, what evidence that they had in regards to the incident. According to CDT Steffy, the RTO told him that he only had to believe that I was not in my room. Figure 2 displays the charge sheet for the TAPs allegation; it states that "On 8 March 2013, you are believed not to have been in your Barracks room after TAPs". No evidence from the investigating officer, CPT Eaton-Ferenzi, was presented to prove that I was not in my room. I did notify my tactical officer, prior to my regimental board, that my tactical NCO's statement was false. She then explained to me that if his statement was indeed false that the cameras in the hallway would point out such a falsity. Coincidentally, the cameras for the night were either not on, were not working, or my company tactical officer merely decided to not comb the hours of time lapsed video footage. Despite the lack of camera usage, CPT Eaton-Ferenzi merely had to ask him whether or not his statement was false.[9]

---

9 http://www.westpoint.edu/ig/SiteAssets/SitePages/Leaders%20Resources/Military%20Leader%20Class.ppthttp://w

I argue that the damage from the TAPs allegation was irreparable and was used against me in my company and regimental tactical officers' final disposition regarding my separation from the Academy with recoupment. CPT Eaton's and LTC. Cross's disposition was submitted (1 April, 2013) four days after my regimental board (28 March, 2013) for the TAPs allegation. It is also incredibly suspicious that CPT Eaton-Ferenzi did nothing to investigate the matters pertaining to my accusations regarding SFC Rowley's lies and his multiple violations of the UCMJ.

### 10. Why do you believe the action was in reprisal and not for the reasons given?

As I had clarified in Question 9, punishments were often excessive and harsher than those of my peers, which is something that is confirmed by Maj. Carginan in Figure 5. My IO, CPT Eaton-Ferenzi, and LTC Cross all discuss the fact that I have either challenged or appealed punishments. They discuss the fact that I attack those who hold me accountable for my actions; yet, much of the summarized report written by my investigating officer, and the disposition written by CPT Eaton-Ferenzi and LTC. Cross, are unsubstantiated. Who do I personally attack, and on what grounds are they making such claims? Are they saying that it is wrong that I call them out on trumping up a regimental board, or that I call them out on giving me excessive punishment in comparison to other cadets? Perhaps, they are referring to my submission to LTC Cross during my regimental board where I call SFC Rowley out for lying on a sworn statement (Figure 5). Regardless, it seems almost an impossibility that they would be able to remain impartial and give me a fair assessment in regards to whether or not I should be separated with recoupment. Why such a severe departure from the recommendation of my investigating officer? Why was I called out multiple times in my investigating officer's report for challenging or appealing punishments, a right that I was afforded? My response to Question 11 will help substantiate my claims.

### 11. Did any of the responsible Army official(s) ever mention your protected communications in discussions about the personnel actions?

In figure 6, CPT Eaton-Ferenzi specifically states the following: "His [CDT Doolen] reaction in each disciplinary situation has been one of apathy at a minimum, often blaming his immediate peers and supervisors for holding him accountable to accepted standards". She never elaborates or cites specific examples, which is unsubstantiated. She further states that "He [CDT Doolen] often waits until consequences escalate to a point that is personally intolerable to him

---

ww.westpoint.edu/ ig/SiteAssets/SitePages/Leaders%20Resources/Military%20Leader%20Class.ppt slide 45- COMMANDERS: IF AN ALLEGATION SURFACES IN YOUR UNIT, YOU MUST AT LEAST INQUIRE INTO IT. YOU MUST GATHER THE FACTS AND TAKE APPROPRIATE ACTION BASED ON THE FACTS. -Investigations are based completely on the facts. IO's must avoid personal opinion or speculation during the investigative process. IOs can be empathetic, without being sympathetic. Know the difference and remain objective. THE IO'S FUNCTION IS TO GATHER THE FACTS OBJECTIVELY AND WITHOUT BIAS OF ANY KIND. THE IO PRESENTS THE FACTS TO THE COMMANDER WHO IS RESPONSIBLE FOR DECIDING WHAT IS APPROPRIATE ACTION.

before deciding to challenge or appeal".[10] The fact that I have ever decided to challenge or appeal a punishment should have no weight in her disposition regarding my separation with recoupment. Anything that I ever decided to challenge, as it pertained to my conduct hearing, and that was not considered an article 10 punishment, was perfectly within my rights to challenge as I saw fit. CPT Eaton-Ferenzi also mentioned my appealing of punishments, yet, the only punishment I ever chose to appeal was my regimental board in regards to the TAPs allegation. Furthermore, because LTC. Cross and CPT. Eaton-Ferenzi shared the same written disposition, he in essence condoned the crass statement regarding the fact that I had challenged and appealed punishments. Not only were the challenges of my punishments mentioned by my company tactical officer and regimental tactical officer in their disposition regarding my separation with recoupment, but they were also used against me in my investigating officer's summarized report. Maj. Carignan mentioned the fact that "during our meetings together and during the CI hearing, CDT Doolen continued to accuse his TAC team of being excessive in their punishment for this infraction [11 January] and that the January boards were piled upon him to build a case against him". Is it not my right to challenge, according to administrative procedures? Yet despite being afforded that right, it was held against me as an act of capriciousness. Without liberty, man is a syncope, incapable of acting upon the words of the Constitution; words that guarantee men inalienable rights. Please refer to figures 5, 6, and 8.

During our meetings together and during the CI hearing, CDT Doolen continued to accuse his TAC team of being excessive in their punishment for this infraction and that the January boards were piled upon him to build a case against him. Having met personally with both CPT Eaton-Ferenzi and with SFC Rowley on 22 March 2013 to discuss the issues of receiving supply data, the functionality of the editgrid system, the potential excessive punishment for the 11 January 2013 Company board, and the alleged piling on, it is my evaluation that the accusations and additional information brought forth by CDT Doolen have no merit. These attempts serve only as examples of his unwillingness to take responsibility for his actions and of his tendency to place blame on other for the situation in which he finds himself.

**Figure 5 – Excerpt (p.2) from my investigating officer's summarized report following my conduct hearing[11]**

[10] Note in figure 6 where both my IO and CPT. Eaton-Ferenzi have concurring sentiments regarding my challenging of punishments. I would also like to note that in an email to me on 22 March, 2013, his delay of findings regarding my deficiency in conduct status. This was 2 days after my submission

[11] "A Comprehensive Guide for Investigating Officers" – b. Findings are clear and concise statements of fact hat can be readily deduced from evidence in the record. Each finding must be based on the evidence and should reference the exhibit (s) (marked alphabetically in the order that they are discussed in the find that supports it. You should fix dates, places, persons, and events, definitely and accurately. In developing findings, you may rely on the facts and any reasonable inferences that may be drawn from those facts. Each finding must be supported by a greater weight of the evidence than supports a contrary conclusion, that is, evidence which, after considering all evidence presented, points to a particular conclusion as being more credible and probable than any other conclusions

subsequent B1 maintenance and supply success was due in part to her aggressive assistance in the company supply process.

Lastly, the timing of this challenge is suspect. For nearly two months CDT Doolen chose not to challenge the 11 January 2013 finding. His challenge, which is his legal right, came only after he was faced with the conduct investigation (1 March 2013). Based on my review, no evidence was ever satisfactorily raised or claim sufficiently substantiated to warrant a determination that CDT Doolen's challenge had any merit.

**Figure 6 - IO's phrasing of my challenging of punishments, seemingly scathing[12]**

Firstly, I would like to elaborate the numerous issues regarding Figures 5 and 6. The investigating officer mentions that my claims have no merit, yet, he never cites why they have no merit. He relied merely on the word of my company tactical team, while discrediting my word. Is this what I am lead to believe is considered due process? Lawfully I am entitled to challenge my punishments, but if I challenge my punishments, and those challenges are used against my character, then the effectiveness of a conduct hearing is moot. I submitted documentation (something he shrugged off) and witnesses to my investigating officer regarding the maintenance tracker issue. The documentation submitted to him shows where edit grid was an issue corps wide, thus disproving CDT Heiliger's claim that my supply NCO and I were locked out of edit grid because someone else was accessing it. Also, it seems outrageous to me that two out of the three supply officers in the battalion submitted this maintenance tracker issue in late (it was never even determined at the CI hearing what was considered a late submission) merely because we were both using it at the same time. Please refer to figure 7:

(preponderance of evidence standard). Findings are no place for personal opinion. There should be no "I believe" but rather there should be "I find."

12 5 U.S.C.§ 2302 (p.186) (9) take or fail to take, or threaten to take or fail to take, any personnel action against any employee or applicant for employment because of – (A) the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation – (i) with regard to remedying a violation of paragraph (8) or (ii) other than violation of paragraph (8).



From: Eliasen, Nathaniel W CADET MIL USA USMA
Sent: Sat 1/5/2013 9:15 AM
To: Adkins, Justin R CADET MIL USA USMA; Bell, Seth W CADET MIL USA USMA; Cobbs, Brian B CADET MIL USA USMA; Dillard, Keenan P CADET MIL USA USMA; Essary, Clinton L CADET MIL USA USMA; Fatool, Samuel M CADET MIL USA USMA; Haddock, Paul F CADET MIL USA USMA; Hamilton, Grace A CADET MIL US USA USMA; Holder, William F CADET MIL USA USMA; Howell, Cabot M CADET MIL US USA USMA; Kilroy, Kyle J CADET MIL USA USMA; Kim, Sung-hoon W CADET MIL USA USMA; Kincade, Cartavious CADET MIL USA USMA; Matheson, Oliver J CADET MIL USA USMA; Matthews, Michael A CADET MIL USA USMA; Mccarthy, Emily B CADET MIL USA USMA;
Cc:
Subject: Notes!

Trooper Staff,

Please ignore the previous message. I hit send prematurely. A few notes...

- Memos- I have reviewed memos and will be coming around to visit everyone with notes. Please address all memos to
  - "MEMORANDUM FOR Company F-3, United States Corps of Cadets, 745 Brewerton Road, West Point, NY 10997"
- Editgrid(1200 Sunday)- It sucks and continues to be down. Please make a weekly tracker for your job on excel using the same guidance as before. Email me the completed document. Note the dead line has been pushed back because of the technical issues
- Slides (1200 Sunday)- Continue to make job slides and send them to Cody for the METL brief.
- Tracker- As tasks are done, continue checking off the tracker.

Any questions, let me know.

XOXO Nate

See more about: Eliasen, Nathaniel W CADET MIL USA USMA.

**Figure 7 - An email sent to one of my friends, CDT Justin Adkins, notifying him and the rest of the regiment (3rd) that edit grid was down. This is an email that I had forwarded to my investigating officer[13]**

I would also like to point out, in regards to figure 5, that my investigating officer spoke with my company tactical team two days after I had submitted the email to CPT Eaton-Ferenzi notifying her that I would be reporting my believed abuse of authority by her to the IG. As a result of edit grid being down and also because my supply NCO and I were ahead of the regiment in regards to collecting maintenance issues in the company, my company tactical NCO, who is also the

13 Chapter 5, USCC Regulation 351-1, g. Findings, states "The findings of the IO must be supported by a greater weight of the evidence than that which supports a contrary conclusion, that is, evidence which, after considering all evidence presented, points to a particular conclusion as being more credible and probable than any other conclusion, The weight of the evidence is not determined by the number of witnesses or volume of exhibits, but by considering all the evidence and evaluating such factors as the consistency or inconsistency of various items of evidence, the witness' demeanor, opportunity for knowledge, information possessed, ability to recall and relate events, and other indications of veracity".

building commandant, received said issues personally and promptly. I would like to point out the following email, which is something that I find incredibly odd:

-----Original Message-----
From: Carignan, Timothy R MAJ MIL USA USMA
Sent: Friday, March 22, 2013 8:06 AM
To: Doolen, Isiah M CADET MIL USA USMA
Subject: CI timeline

CDT Doolen,

I have officially requested an extension from R&D that would give me until next Tuesday to complete my findings based upon the items brought forth in the hearing this passed Wednesday. As such, you will not be receiving my findings today.

MAJ C

v/r,

Tim Carignan

MAJ, MI

Instructor/Senior Recruiting Officer

Department of Physical Education

United States Military Academy

West Point, NY 10996

timothy.carignan@usma.edu

845.938.5634 (o)

Maj. Carignan, 7 days following his requested time extensions submitted his final summarized report on 29 March, 2013.

---

DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
WEST POINT, NY 10996

MACC-O-1-B

01 April 2013

Fully concur w/ CPT Eaton. CDT Doolen is not fit to lead our Soldiers, despite over 7 years of preparation. [initials] 2 Apr 13

MEMORANDUM THRU

Regimental Tactical Officer, First Regiment, United States Corps of Cadets, West Point, New York 10996
Brigade Tactical Officer, United States Corps of Cadets, West Point, New York 10996

FOR Commandant of Cadets, United States Corps of Cadets, West Point, NY 10996

SUBJECT: Recommendation for Final Disposition on Conduct Investigation for Cadet Isiah M. Doolen, Company B, First Regiment, Class of 2013.

1. I recommend that Cadet Doolen be immediately separated from the United States Military Academy and discharged from the Army with recoupment. While I concur with many of the findings of Cadet Doolen's Conduct Investigation, I differ on the recommendations. This recommendation is based on my personal observations of his comprehensive performance over the Fall 2012 – Spring 2013 academic year as the B1 Company Tactical Officer.

2. Cadet Doolen's behavior is selfish, impulsive, and devoid of accountability and personal responsibility. He consistently demonstrates a lack of desire to follow basic instructions or take ownership of his actions. His reaction in each disciplinary situation has been one of apathy at a minimum, often blaming his immediate peers and supervisors for holding him accountable to accepted standards. His accusations are often interlaced with deceptive personal agendas and attacks rather than valid claims. This demonstrates an unacceptable level of maturity for the officer corps, especially since he is 24 years old and has already participated in approximately 8 years of officer development training at the New Mexico Military Institute, the United States Military Academy Preparatory School, and the United States Military Academy. He often waits until consequences escalate to a point that is personally intolerable to him before deciding to challenge or appeal. His individual desires often trump his judgment to follow the rules and regulations of the Academy. When coupled with his anger management issues, this equates to poor decision-making skills and impulsive behavior. Cadet Doolen has been given multiple opportunities to rehabilitate himself through developmental counseling, yet he remains unreceptive. The aforementioned issues have stunted Cadet Doolen's ability to learn, grow, and mature as a cadet and future officer. I firmly believe that Cadet Doolen lacks the fundamental makings of a professional and competent officer.

3. Cadet Doolen has committed more than one major error in judgment from November 2012 through February 2013 resulting in a Conduct Investigation. During this time frame his infractions, though seemingly not egregious in nature, have revealed much deeper character and leadership flaws. As a First Class Cadet, his patterns of selfish and immature behavior demonstrate that he is not prepared to be a commissioned officer. Allowing Cadet Doolen to receive a commission and lead Soldiers in combat would be a dereliction of duty that would surely endanger the lives of those he would be responsible for. As a former company commander, I would certainly not accept his behavior as a second lieutenant in my unit. If Cadet Doolen were to serve as a junior enlisted Soldier he would pose the same risks and contribute to a toxic environment within his unit. In an era of fiscal restraint coupled with the Army's desire to enact end-strength reduction while maintaining quality personnel, Cadet Doolen should be separated from the United States Military Academy and discharged from the Army with recoupment.

**Figure 8- CPT Eaton and LTC. Cross's disposition regarding my separation with recoupment**

**12. Did anyone tell you that they overheard any of the responsible Army official(s) discussing your protected communications? If so, who, and when?**

No, nobody had reported such an act.

**13. Who else could provide information to verify your testimony or clarify the reasons for the personnel action(s)?**

CDT Ashli Carlson can testify to the fact that CPT Eaton-Ferenzi had made the comment that they were going to back me in regards to the conduct investigation. This was a comment she had made before the TAPs allegation, and something that CPT Eaton-Ferenzi had mentioned to me as well.

**14. Do you have any documents or other evidence to show or explain why the action was improper or unjustified?**

Documentation and evidence is provided throughout the questionnaire showing where actions have been improper or unjust. Also, I have made submissions to the West Point IG's office entitled "CDT Doolen - Evidentiary Documentation (5)," and "CDT Doolen- Matters for Congressional Inquiry," that elaborates on the multiple issues regarding troubles that I have had with my chain of command. CDT Ashli Carlson had notified me that company policy, regarding staff members and their roles, indicated that a first time offense for not meeting a suspense would be a counseling statement, not the 20 hour 20 demerit punishment that I received.

**15. Do you have any evidence that you were treated differently from others in similar circumstances? If so, give specific examples.**

I had not heard of any issues regarding others in the company facing similar punishments. It is hard to believe that I could have been the only one in the company committing infractions; especially regarding the meeting of suspense dates.

**DATA REQUIRED BY THE PRIVACY ACT OF 1974**

---

**AUTHORITY:** Title 10, USC, Section 3020

**PRINCIPAL PURPOSE:** To secure sufficient information to make inquiry into the matters presented and to provide a response to the requester(s) and/or take action to correct deficiencies.

**ROUTINE USES:** Information is used for official purposes within the Department of Defense; to answer complaints or respond to requests for assistance, advice or information; by Members of Congress and other Government agencies when determined by The Inspector General to be in the best interest of the Army; and in certain cases in trial by court martial other military matters authorized by the Uniform Code of Military Justice.

DISCLOSURE OF THE SOCIAL SECURITY NUMBER AND OTHER PERSONAL INFORMATION IS VOLUNTARY.  HOWEVER,
FAILURE TO PROVIDE COMPLETE INFORMATION MAY HINDER PROPER IDENTIFICATION OF THE REQUESTER,
ACCOMPLISHMENT OF THE REQUESTED ACTION(S) AND RESPONSE TO THE REQUESTER.

## PRIVACY ACT INFORMATION RELEASE FORM

I, _Isiah  M  Dooley_ , SSN [Redacted PII] -7694 ,

**(Print** First, Middle Initial, Last Name)

(DO) / **DO NOT**  (circle one) authorize access or release of any inspector general
records pertaining to me.

(Signature and Date)

# DATA REQUIRED BY THE PRIVACY ACT OF 1974

**AUTHORITY:** Title 10, USC, Section 3020

**PRINCIPAL PURPOSE:** To secure sufficient information to make inquiry into the matters presented and to provide a response to the requester(s) and/or take action to correct deficiencies.

**ROUTINE USES:** Information is used for official purposes within the Department of Defense; to answer complaints or respond to requests for assistance, advice or information; by Members of Congress and other Government agencies when determined by The Inspector General to be in the best interest of the Army; and in certain cases in trial by court martial other military matters authorized by the Uniform Code of Military Justice.

**DISCLOSURE OF THE SOCIAL SECURITY NUMBER AND OTHER PERSONAL INFORMATION IS VOLUNTARY. HOWEVER, FAILURE TO PROVIDE COMPLETE INFORMATION MAY HINDER PROPER IDENTIFICATION OF THE REQUESTER, ACCOMPLISHMENT OF THE REQUESTED ACTION(S) AND RESPONSE TO THE REQUESTER.**

## Whistleblower Reprisal Questionnaire

**You have made an allegation of reprisal. We need the following information to further evaluate your allegation. Answer these questions to the best of your ability and with as much detail as possible. Further, provide copies of any documents you believe support your allegation.**

Your Name: CDT, Doolen, Isiah, M (Rank, Last, First, Middle Initial)

SSN: Redacted PII-7694

Unit: USCC, 1st Regiment, 1st BN, B Co (Spell out)

Phone Number: 214-455-4407 (home, work or both)

**1. What protected communications did you make?** *[Explanation: A protected communication is (1) Any lawful communication to a Member of Congress or an IG; or (2) A communication in which a member of the Armed Forces communicates information that the member reasonably believes evidences a violation of law or regulation, including sexual harassment or unlawful discrimination, mismanagement, gross waste of funds or other resources, an abuse of authority, or a substantial and specific danger to public health or safety when such communication is made to any of the following: (a) A member of Congress, an IG, or a member of a DoD audit, inspection, investigation, or law enforcement organization, or (b) Any other person or organization (including any person or organization in the chain of command) designated under Component regulations or other established administrative procedures to receive such communications. (DoDD 7050.6)]*

1

Over the course of the term period 13-2, I had numerous issues with my chain of command. Many of those issues were addressed in some form of protected communication, disclosure, or activity. I submitted numerous complaints regarding my company tactical team's violation of law and regulation, abuse of authority, and the fact that reprisal and retaliation was a commonality after I brought to light such issues. Further evidence in this questionnaire will show where I have made complaints to the Office of the Inspector General at West Point and my chain of command (RXO, RTO, BTO, and the investigating officer for my conduct investigation) as they were authorized to receive such complaints through established regulations and administrative procedures.

**2. To whom did you make the protected communication?**

As mentioned in question 1, I made numerous protected communications, disclosures, and personnel actions over the course of the term period 13-2. These types of actions were revealed to the Office of the Inspector General, my chain of command (SFC. Rowley, CPT. Eaton Ferenzi, LTC. Cross, Col. DeAntona, Maj. Carginan), and since I have been separated from the Academy, Senator McCaskill, Senator Blunt, Congressman Pearce, and both the former and current Superintendents of the United States Military Academy.

**3. When and where did you make the protected communication?**

I consulted with the IG on multiple occasions regarding my company tactical team. Over Spring Break (week of 08 March, 2013) my parents drove me to the IG's office to discuss these continuous patterns of harassment towards me by my company tactical team. Email communication was sent to my company tactical officer on 20 March, 2013 in which I called her out on abusing her authority in giving me excessive punishment regarding a battalion maintenance tracker suspense date. On 28 March, 2013, I filed protected communication against my company tactical team and my regimental tactical officer my regimental board for allegedly being out of my room for TAPs. At my regimental board I had submitted an evidentiary document to LTC. Cross stating that SFC Rowley's statement was false and he could not have seen that I was not in my room because I was in my room and had locked my door from the inside; however, I was still given punishment for something that was unsubstantiated and did not match the qualifications for preponderance of evidence. I appealed my regimental board and was acquitted of the charges by the brigade tactical officer.

**4. What matters were addressed in the protected communication?** ***[Explain the details of your complaint; include what, where and why.]***
Please refer to the following email and screenshots regarding the matters addressed in the protected communication.

```
-----Original Message-----
From: Doolen, Isiah M CADET MIL USA USMA
Sent: Wednesday, March 20, 2013 11:42 PM
To: Eaton, Elizabeth S CPT MIL USA USMA
Cc: Carlson, Ashli N CADET MIL USA USMA; Steffy, Barton R CADET MIL USA
```

USMA; Crofford, Clifford D CADET MIL USA USMA; 'concepcion.doolen@ssa.gov'
Subject: IG

Ma'am,

I wanted to let you know that I'm going to bring all of the conduct matters that you have brought up against me to IG. I feel like the punishment you gave me in regards to the supply maintenance tracker was a double dipping of demerits in which you categorized all of the issues that I had prior to that in to one lump charge, but then proceeded to punish me for those issues on separate occasions so that the demerits would be multiplicative. You then had CDT Schubert write me a COR for missing class because I went to talk to the RXO about Spring Break. I think the issue with that is that you are wanting to make it seem as though it been a CDT generated issue and that you were merely acting on a chain of command action and not an issue that you brought up on your own (what I believe to be a retaliatory measure for me talking to the RXO about my perceptions of you). Much like my conduct, there is a clear pattern with what is going on here, and that is that every time I have stubbed my toe, you have been there watching to make sure that I am getting punished. To me, this is becoming an issue of harassment; it's like walking on egg shells.

Very Respectfully,

Cadet Isiah Doolen



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
WEST POINT, NY 10996

MACC-O-1-B

28 March 2013

MEMORANDUM THRU Tactical Officer, Bravo Company, First Regiment, United States Corps of Cadets, West Point, New York 10996
Regimental Tactical Officer, First Regiment, United States Corps of Cadets, West Point, New York 10996

FOR Regimental Tactical Officer, United States Corps of Cadets, West Point, New York 10996

SUBJECT: CDT Doolen statement for regimental board in regards to TAPs allegation (08 March 2013)

1. Sir, The only evidence against me in this board is the sworn statement of SFC Rowley in which he stated the following:

> "I then went to Doolen's room in Ike Barracks, and saw that he was not there. I called his cell number again, as well. There was no answer. I then returned to Lee Barracks and saw that he was not in that room either, and that it was still a mess."

In subsequent conversations with SFC Rowley, he clarified that he did not enter my Ike Barracks room (IKE 114) after TAPs. Instead, after TAPs he knocked on the door and there was no answer. Additionally, the evidence surrounding his clarified statement negates a finding against me. SFC Rowley did not report me as being absent from TAPs check to CGR or the OC. He did not even secure the Ike master key to gain entrance into my Barracks room to verify my presence.

2. Sir, the points as stated above speak central to the allegations against me. Since there is a great deal of uncertainty on these crucial points, I respectfully request that no finding against me is made.

3. Point of contact for this memorandum is the undersigned at 214-455-4907

ISIAH DOOLEN
CDT, 2013
Company B, 1st Regiment, USCC

**Figure 1 - Evidence presented to LTC. Cross at my Regimental Board**



he item is digitally signed and cannot be altered. G to do for you?)

Misleading, intent to deceive on a sworn statement by a TAC NCO (E-7)

INFORMATION PERTAINING TO THIS REQUEST (Background. Use additional sheets if necessary; list enclosures if applicable.)

SFC. Rowley's Sworn Statement:

See Enclosure A.

SFC. Rowley's statement is not true in that he never opened my door at 2330 to check and see if I was in my room or not. He has admitted verbally, with witnesses to account for his statements, that the door was locked and that I did not answer the door, which does not account for whether or not I was in my room. USCC SOP requires cadets to lock their door after 2315. Furthermore, in regards to questioning, Chapter 3- Investigations and Disciplinary Hearing Procedures, "Cadets should not be questioned about potential violations of this regulation for, which there does not already exist reasonable cause to indicate that a delinquency was committed. For example, it would not be proper to ask a cadet whether he or she had been drinking alcohol merely because he or she was reported absent from taps inspection". According to the procedures and guidelines for USMA, my rights have been violated in regards to me being questioned about where I was for TAPs given that there was no prior evidence to suggest that I was not in my room. The fact that my door was locked for TAPs is a compliance with USCC SOP. No evidence indicates that I was not in my room, but there is ample evidence that suggests that I was in my room. As a cadet, I still have rights under UCMJ, and those rights indicate that I have the ability to not answer interrogatory questions (Article 31). Furthermore, I feel my UCMJ rights to keep quiet have been used against me to determine a matter of guilt in regards to the TAPs allegation. LTC Cross, 1st regiment RTO, made the following statement, to the effects of: "This is a fucking yes or no question, were you in your room for TAPs". After not saying anything for a while, he said to the effects of "I do not want you to have to lie, you can choose not to answer this, but if you do choose not to answer then I will assume the answer to be no and you will be found guilty". I still chose not to answer. Witnesses in the room will attest to LTC. Cross' assertions. Additionally, SFC. Rowley's statement has been used as "overwhelming" evidence to punish me for not being in my room (his statement is misleading and does not verify anything in regards to me being in my room or not).

I do ☑ I do not ☐ consent to release my personal information outside of IG channels (but within DoD official channels) in order to resolve the matters listed above. I understand that if I do not agree to release my personal information, my request for assistance may go unresolved.

This information is submitted for the basic purpose of requesting assistance, correcting injustices affecting the individual, or eliminating conditions considered detrimental to the efficiency or reputation of the Army. Those who knowingly and intentionally provide false statements on this form are subject to potential punitive and administrative action (UCMJ Art 107, 18 USC 1001).

| SIGNATURE | DATE (YYYYMMDD) |
|---|---|
| DOOLEN.ISIAH.MATTHEW. Redaction PII | 20130328 |

**Figure 2 - Protected communication to the IG following my regimental board**

**5. What are the unfavorable personnel actions alleged by the complaint?**
*[Explanation: A specific act of reprisal is an unfavorable personnel action that was either threatened or carried out as a result of a soldier's complaint to a Member of Congress, an IG, a law enforcement official, or the chain of command. An unfavorable personnel action is any action that affects, or has the potential to affect, a soldier's position or career. Specific examples are: performance evaluations, transfer or reassignment, changes to duties or responsibilities, disciplinary or other corrective actions, denial of reenlistment or separation, decisions concerning awards, promotions*

*or training, decisions concerning pay or benefits, referrals for mental health evaluation. Depending on circumstances (i.e. was the action discretionary), unfavorable personnel action may include: actions taken as a result of an investigation (does not include initiation of an investigation), and revocation of: access to classified material, authorization to carry weapons, flying status, and Personnel Reliability Program certification.]*

As a result of protected communication, CPT Eaton-Ferenzi gave me a command directed mental health evaluation

**6. Who are the responsible Army official(s) that you allege to have taken or threatened the unfavorable personnel action?**

CPT Eaton-Ferenzi

**7. When and where were the unfavorable personnel actions against you taken or threatened?**

The unfavorable action was taken against me on 06 May, 2013.

**8. When did you first become aware of the unfavorable personnel action?**

In a written address to the Superintendent, on 25 July, 2013, I discussed the components that were analyzed and used to recommend my separation from the Academy. Upon further research into AR 210-26. 6-23, I then recognized the issue regarding my command directed mental health evaluation. Reference is given there to DODD 6490.1 and DODI 6490.4. After referring to said references, I then questioned the merits of the mental health evaluation that was given to me.

**9. What reasons if any did any of the responsible Army official(s) give you for taking or withholding the personnel action(s)?**

CPT Eaton-Ferenzi told me that she was recommending me for a mental health evaluation, or so it seemed, as something that was normal in procedure. She never went in to detail regarding the evaluation, and I was never given a counseling form.

**10. Why do you believe the action was in reprisal and not for the reasons given?**

I believe that the action was reprisal because CPT Eaton-Ferenzi addresses my anger management issues in Figure 3. She mentions that such issues have "stunted my ability to learn, grow, and mature as a cadet and a future officer". Approximately 28 days from the date of her written disposition, CPT Eaton-Ferenzi recommended me for a mental health evaluation. At the time, I felt that my evaluation was unwarranted or at least suspect, which is something that I had

mentioned to CPT Eaton-Ferenzi. She made it seem as though such a directive was a normal procedure to ensure that I was receiving proper treatment. Based on Department of Defense Instruction 6490.04, Commanders are authorized to direct mental health evaluations if they believe in good faith that such an evaluation is necessary; however, such an evaluation seemed to lack merit, not only because of the aforementioned, but because I had authorized my psychologist in CPD, Dr. Spiegel, the unlimited release of information regarding my progress in my sessions with her.[1] The same release was granted to Dr. Joshua Hain as well. Given that such information was released, coupled with the fact that Dr. Hain had waived my diagnosis of Attention Deficit Disorder (ADD) for commissioning, I question the intentions of CPT Eaton-Ferenzi. I lacked the knowledge, at the time, to recognize the extent of the inappropriateness of such a request. Furthermore, my attorney, Mr. Eric Mayer, was hired merely to deal with the issues regarding my conduct investigation. Based on the services we hired him for, he would not have picked up on the unwarranted mental health evaluation. Please refer to my attorney's assessment of my punishments regarding my conduct investigation, and compare the assessment to CPT Eaton-Ferenzi's disposition:

**1. He engaged in a heated argument with a classmate who happened to occupy a leadership position (Cadet CSM). September 2012. 30 demerits**

**2. He was not present for a lunch formation. December 2012. 5 demerits**

**3. He did not sign his BRADSO contract by the posted suspense. 5 demerits.**

**4. He failed to update the battalion maintenance tracker by the suspense. 20 demerits.**

**5. He was out of his room after Taps while on restriction. 30 demerits.**

**The allegations of misconduct from September 2012 to January 2013 are minor, non-violent, and two of them indicate, at worst, forgetfulness or a bit of procrastination.**

- **The verbal altercation that occurred between CDT Doolen and the Battalion CSM was initiated because CDT Doolen believed that the CDT CSM was acting unprofessionally and unreasonably toward another cadet. CDT Doolen intended to**

[1] DoDI 6490.04, March 4, 2013, 3, a. - b. Commanders and supervisors who in good faith believe a subordinate Service member may require a mental health evaluation are authorized to direct an evaluation under this instruction or take other actions consistent with the procedures in Enclosure 3. In these circumstances, a command directed mental health evaluation (MHE) has the same status as any other military order.

**correct the situation immediately. Unfortunately, the discussion unreasonably escalated, but never turned physical. However, we should not forget that this was, in essence, a heated discussion between two classmates. For this, he received a heavy punishment that included 30 demerits.**

- **In December 2012, he failed to be present at lunch formation. However, he was working with a lab group on a project that required his attention and absence from formation. Unfortunately, he did not make the necessary coordination because he forgot to do so. This is not an act of blatant misconduct but a very minor miscommunication**
- **He accepts his failure to sign the BRADSO contract and makes no excuses for this mistake.**
- **The matter involving the battalion maintenance tracker is a complicated one. Essentially, CDT Doolen and his supply cadet NCO waited until the last night before the suspense to update the tracker. At the time they attempted to update it with their company information, the system was not available. Yet, every maintenance issue had already been submitted to the TAC NCO for action, making the electronic maintenance tracker a mere formality. While CDT Doolen accepts responsibility for failing to properly manage the time constraints of this project, the punishment is excessive for an act that, in essence, constitutes simple procrastination that did not harm the wellbeing and/or comfort of other cadets.**
- **In his final misconduct of the period, CDT Doolen was away from his room after Taps. However, the circumstances mitigate the severity of the conduct. At the time of the misconduct, CDT Doolen received an emotional and frantic message from his**

**recently-ex-girlfriend. He was still emotionally attached to her, and she indicated that she was presently harassed by other cadets. He immediately responded to the situation to discover that it was not as she had communicated. Upon discovering this, he immediately withdrew back to his room. Again, while he knows he was wrong, the punishment is excessive considering the circumstances surrounding the underlying misconduct.**

Are the aforementioned offenses really so egregious in nature that they would lead an individual to believe that I was not fit for duty, or mental unstable? Therefore, on August 5, 2013, I realized there were injustices perpetrated against me by my company tactical officer regarding the evaluation. CPT Eaton-Ferenzi's intentions, I recognize, were vicious in nature, reflected punitively, and were solely intended as further retaliation. The punitive factor being that CPT Eaton-Ferenzi wanted me separated under additional terms in accordance with AR 210-26. 6-23; she even questioned whether or not I was fit to take term end exams, which had I not of been able to take them, would have prevented me from arguing for a certificate of completion.[2] Since 01 April, 2013, she had been making statements regarding my anger management issues and impulsive behavior. Please refer to figure 3, the disposition written by CPT Eaton-Ferenzi and LTC Cross:

---

[2] AR 210-26. 6-23 – A cadet who exhibits behavior or characteristics that make retention undesirable may be separated from the Military Academy. Specific bases for separation under this paragraph include the following: a. A Personality disorder (not amount to disability allowing medical separation) that interferes with assignment to or the performance of duty, when diagnosed as being a deeply ingrained maladaptive pattern of behavior of long duration that interferes with the cadet's ability to perform duty, so severe that the cadet's ability to function effectively in the military environment is significantly impaired. The diagnosis of personality disorder must have been established by a psychiatrist, doctoral-level clinical psychologist or doctoral-level clinical social worker privileged to conduct mental health evaluations for DOD components. Mental health evaluations will be conducted by such persons in accordance with DODD 6490.1 and DODI 6490.4.



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
WEST POINT, NY 10996

MACC-O-1-B

01 April 2013

Fully concur w/ Co TAC. CDT Doolen is not fit to lead our Soldiers, despite over 7 years of preparation. 2 Apr 13

MEMORANDUM THRU

Regimental Tactical Officer, First Regiment, United States Corps of Cadets, West Point, New York 10996
Brigade Tactical Officer, United States Corps of Cadets, West Point, New York 10996

FOR Commandant of Cadets, United States Corps of Cadets, West Point, NY 10996

SUBJECT: Recommendation for Final Disposition on Conduct Investigation for Cadet Isiah M. Doolen, Company B, First Regiment, Class of 2013.

1. I recommend that Cadet Doolen be immediately separated from the United States Military Academy and discharged from the Army with recoupment. While I concur with many of the findings of Cadet Doolen's Conduct Investigation, I differ on the recommendations. This recommendation is based on my personal observations of his comprehensive performance over the Fall 2012 – Spring 2013 academic year as the B1 Company Tactical Officer.

2. Cadet Doolen's behavior is selfish, impulsive, and devoid of accountability and personal responsibility. He consistently demonstrates a lack of desire to follow basic instructions or take ownership of his actions. His reaction in each disciplinary situation has been one of apathy at a minimum, often blaming his immediate peers and supervisors for holding him accountable to accepted standards. His accusations are often interlaced with deceptive personal agendas and attacks rather than valid claims. This demonstrates an unacceptable level of maturity for the officer corps, especially since he is 24 years old and has already participated in approximately 8 years of officer development training at the New Mexico Military Institute, the United States Military Academy Preparatory School, and the United States Military Academy. He often waits until consequences escalate to a point that is personally intolerable to him before deciding to challenge or appeal. His individual desires often trump his judgment to follow the rules and regulations of the Academy. When coupled with his anger management issues, this equates to poor decision-making skills and impulsive behavior. Cadet Doolen has been given multiple opportunities to rehabilitate himself through developmental counseling, yet he remains unreceptive. The aforementioned issues have stunted Cadet Doolen's ability to learn, grow, and mature as a cadet and future officer. I firmly believe that Cadet Doolen lacks the fundamental makings of a professional and competent officer.

3. Cadet Doolen has committed more than one major error in judgment from November 2012 through February 2013 resulting in a Conduct Investigation. During this time frame his infractions, though seemingly not egregious in nature, have revealed much deeper character and leadership flaws. As a First Class Cadet, his patterns of selfish and immature behavior demonstrate that he is not prepared to be a commissioned officer. Allowing Cadet Doolen to receive a commission and lead Soldiers in combat would be a dereliction of duty that would surely endanger the lives of those he would be responsible for. As a former company commander, I would certainly not accept his behavior as a second lieutenant in my unit. If Cadet Doolen were to serve as a junior enlisted Soldier he would pose the same risks and contribute to a toxic environment within his unit. In an era of fiscal restraint coupled with the Army's desire to enact end-strength reduction while maintaining quality personnel, Cadet Doolen should be separated from the United States Military Academy and discharged from the Army with recoupment.

**Figure 3 - CPT Eaton's and LTC Cross's dispostion regarding my separation with recoupment**

Another issue is that on 01 April, 2013, CPT Eaton-Ferenzi mentioned in her disposition that I have anger management issues, which is something that she is clinically unable to diagnose. Had she of made such a statement after recommending me for a mental health evaluation, and if the mental health evaluation favored such a statement, then I can see where that would have been acceptable. Instead, her claim was based on the fact that I had self-referred myself to CPD for

anger management issues.[3] Figure 3 is something akin to an evaluation of my overall conduct, performance, character, and demeanor; as such, it should be given scrutiny under AR 623-3, 3-24, b.

**11. Did any of the responsible Army official(s) ever mention your protected communications in discussions about the personnel actions?**

No mentioning was made of my protected communications.

**12. Did anyone tell you that they overheard any of the responsible Army official(s) discussing your protected communications? If so, who, and when?**

No

**13. Who else could provide information to verify your testimony or clarify the reasons for the personnel action(s)?**

No, because she didn't even tell me what her reasoning was for giving me a mental health evaluation.

**14. Do you have any documents or other evidence to show or explain why the action was improper or unjustified?**

None

**15. Do you have any evidence that you were treated differently from others in similar circumstances? If so, give specific examples.**

I do not. I would imagine that cases similar to mine could be compared and analyzed. How many cadets who have gone through conduct investigations have been given mental health evaluations?

**DATA REQUIRED BY THE PRIVACY ACT OF 1974**

---

**AUTHORITY:** Title 10, USC, Section 3020

[3] AR 623-3, 3-24, b. – A rated soldier who voluntarily seeks mental health counseling or is entered into a mental health care program for behavioral health issues that have not been detected by the chain of command will not be penalized by mention of this participation in a behavioral health treatment program in an evaluation report.

**PRINCIPAL PURPOSE:**    To secure sufficient information to make inquiry into the matters presented and to provide a response to the requester(s) and/or take action to correct deficiencies.

**ROUTINE USES:**    Information is used for official purposes within the Department of Defense; to answer complaints or respond to requests for assistance, advice or information; by Members of Congress and other Government agencies when determined by The Inspector General to be in the best interest of the Army; and in certain cases in trial by court martial other military matters authorized by the Uniform Code of Military Justice.

**DISCLOSURE OF THE SOCIAL SECURITY NUMBER AND OTHER PERSONAL INFORMATION IS VOLUNTARY.  HOWEVER, FAILURE TO PROVIDE COMPLETE INFORMATION MAY HINDER PROPER IDENTIFICATION OF THE REQUESTER, ACCOMPLISHMENT OF THE REQUESTED ACTION(S) AND RESPONSE TO THE REQUESTER.**

## PRIVACY ACT INFORMATION RELEASE FORM

I, _Isiah   M   Doulen_____ , SSN  [Redacted PII] 7694 ,
   (Print First, Middle Initial, Last Name)

(DO) / DO NOT  (circle one) authorize access or release of any inspector general records pertaining to me.

_____ 08/15/13
   (Signature and Date)

12

12

000671

May 11, 2008

Honorable Senator Bingaman:

First, I want to thank you for providing me with a nomination to the United States Military Academy. Even though I did not get in directly to the USMA, I have been offered admission to the West Point Preparatory School, which is as close as I can get to West Point, at this time, without actually being there.

At the time of my nomination interview, I expressed to your Academy Board my desire for a military career, a goal which is still of utmost importance to me. I feel a West Point education is one that will offer me an opportunity to give-back to this great country and its people in a way that I would not be able to if I attended any other university, even though this means delaying not only a 2nd Lieutenant commission but also the length of time it will take me to get a Bachelor of Science degree.

The reason I am writing to you, Senator, is because I feel my appointment to USMAPS may be in jeopardy. Yesterday, I graduated from New Mexico Military Institute (NMMI) in Roswell, NM. Had I not been offered an appointment to USMAPS, I would have commissioned as a 2nd Lieutenant in the Army. I am a member of the NM National Guard and have never served in a federal capacity or on active duty.

My family and I are very distraught over an incident, which I need to disclose to you. Last Monday, May 5, 2008, I signed an Internet petition that has been circulating among NMMI alumni, parents of cadets, NMMI cadets and others, calling for the resignation of Admiral Ellison as the NMMI President. The petition articulates specific reasons why this should happen. In order to better explain my situation, if you would like, you can view this petition at the following website:

http://www.ipetitions.com/petition/NMMI_Ellison_Exit/

I am providing this information to show I only exercised my First Amendment rights when I signed this petition, and my signing this petition in no way violates the United Code of Military Justice articles. I signed the petition as a civilian fully aware I was doing nothing wrong.

I was admonished by Lieutenant Colonel Jeff Cunningham, my NMMI SROTC Military Science professor and an Army officer, for exercising my rights; so I agreed not to sign any more petitions. I was told by LTC Cunningham, the following:

"If I were commissioning this Friday (said to me on Monday prior to commissioning) I could've put myself in jeopardy of commissioning." He then referenced several UCMJ Articles which I would have violated if I was a commissioned officer, namely Articles 88, 89, and 133. Since this incident, this matter has been brought to the attention of several Army superiors, and my family and I have been very worried that my offer of admission to USMAPS will be withdrawn or that I will not be granted disenrollment from SROTC or National Guard to attend the West Point Preparatory School. Senator, the UCMJ Articles do not apply to me, and even if they did, I in no way violated any of the following articles:

- Any **commissioned officer** who uses contemptuous words against the President, the Vice President, Congress, the Secretary of Defense, the Secretary of a military department, the Secretary of Transportation, or the Governor or legislature of any State, Territory, Commonwealth, or possession in which he is on duty or present shall be punished as a court-martial may direct. (Article 88)
- Any person subject to this chapter who behaves with disrespect toward his superior commissioned officer shall be punished as a court-martial may direct. (Article 89)
- Any commissioned officer, cadet, or midshipman who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct. (Article 133)

Whether the admonishment was in violation of my civil rights is another issue. I was, until yesterday, a civilian cadet at a state-supported school (NMMI is structured as a military school, but it is not an arm of the National Guard or the US Army). As such, I feel it was my right to sign the Internet petition, if I so chose. I believe the admonishment was meant to intimidate me into removing my name from the petition and as a scare tactic for other cadets.

My peers, friends, and family can vouch for my integrity. Not once in my duration at NMMI have I been deemed a liar. I don't cheat, I work hard, and do what is asked of me, and that is evident with everything I did to help out our SROTC program as well as my National Guard Battalion. My character isn't something that should be attacked, can be attacked, or should be tolerated to be attacked. I am 19 years old and do not wish my reputation tarnished in such a manner that I am perceived as an unfavorable cadet candidate for West Point.

Senator, I would like reassurance that my appointment is safe and that my disenrollment from SROTC and National Guard will occur so that I can continue to focus on my future. My family and I would also appreciate receiving official word on my disenrollment as soon as possible. I am very grateful for any actions you can take to resolve this matter.

Respectfully and with many thanks,

Isiah Matthew Doolen
PO Box 4383
Roswell, NM  88201
(575) 623-9959 Home
(806) 392-3132 Cell
Email: idoolen06@hotmail.com
or doolen3994@yahoo.com

**Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)**

**From:** Isiah Doolen [idoolen13@icloud.com]
**Sent:** Thursday, January 16, 2014 1:21 PM
**To:** Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)
**Cc:** David Metz
**Subject:** Re: Statement Rough Draft (UNCLASSIFIED)

Sir,

I appreciate the response. There is another matter I would like to bring up as well, and that involves what LTC (R) Cunningham said regarding my commissioning from NMMI. I spoke with NMMI alumnus, Mr. Metz, and he said he would be willing to write a recommendation on my behalf or answer questions regarding the matters involving LTC (R) Cunningham. He is cc'd in this email as well.

Very Respectfully,

Isiah Doolen

Sent from my iPhone

> On Jan 16, 2014, at 11:26 AM, "Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)" <reginald.l.barnes10.mil@mail.mil> wrote:
>
> Classification: UNCLASSIFIED
> Caveats: NONE
>
> Mr. Doolen,
> Acknowledge receipt. I will contact 2LT Baudoindajoux or you, should I have questions after I have reviewed the packet.
>
> 2LT Baudoindajoux,
> What is your military email?
>
>
> LTC Reginald L. Barnes
> RC Officer Accessions Policy Integrator DCS, G-1, DMPM (DAPE-MPO-AP)
> Army Pentagon, Room 1C353
> Phone: 703.695.6644
> DSN: 312.225.6644
> Fax 703.695.5987
> Email: reginald.l.barnes10.mil@mail.mil
>
> ----------------------------------------------------------------------
> --------------------------------
>
> Warning: This email message may contain information protected by Army Regulation 20-1 and/or the Privacy Act. It is intended only for the individual s or entity to which it is addressed. Any review, dissemination, or copying of this communication by anyone other than the intended recipient is strictly prohibited.
>
>
>
>

> -----Original Message-----
> From: Isiah Doolen [mailto:idoolen13@icloud.com]
> Sent: Thursday, January 16, 2014 9:01 AM
> To: Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)
> Cc: Landry, Brigitte L LTC USARMY HQDA DCS G-1 (US);
> h.baudoin@yahoo.com; Chris_Holland@mccaskill.senate.gov
> Subject: Fwd: Statement Rough Draft
>
> Sir,
>
> LTC Landry told me you were working my case. I received a statement from Hunter Baudoindajoux regarding my January 11, 2013 punishment. His sentiments were never annotated by my investigating officer, despite the fact he stated what he wrote below at my conduct hearing. He also validates what I have written in my numerous rebuttals. As to any questions pertaining to his statement, he can be reached at 850-559-5558. I also cc'd him in this email.
>
> Very Respectfully,
>
> Isiah Doolen
>
> Sent from my iPad
>
> Begin forwarded message:
>
>
>
> From: Hunter Bo <h.baudoin@yahoo.com>
> Date: January 16, 2014, 7:36:52 AM CST
> To: "idoolen13@icloud.com" <idoolen13@icloud.com>
> Subject: Statement
> Reply-To: Hunter Bo <h.baudoin@yahoo.com>
>
>
>
>
>
> During the AY 13-1, I, 2LT Hunter Baudoindajoux, was the platoon leader for Cadet Isiah Doolen. His role in the platoon was section leader, while his role in the company was supply officer. At the beginning of the semester, in early January of 2013, CDT Doolen compromised in three incidences. The first was disobeying the policy of having the door 90 degrees open with a female in the room. The second was missing a class over confusion of location. The third incident was not meeting the suspense as outlined by the Company XO for supply and maintenance issues.
>
> The first two incidents were dealt with at the lowest level and essentially merited a verbal warning. The third incident resulted in a company board with 20 hours and 20 demerits - 14 days room restriction and loss of privileges. The board was for the third incident only, with a rather harsh punishment for the "isolated incident". While talking with the company commander about CDT Doolen's board, it was explicitly stated the punishment was so harsh because he had been messing up/ forming a pattern of bad behavior.
>
> As CDT Doolen's first line supervisor, I was
> informed by neither the Xo or the Co about Cadet Doolen missing any
> other suspenses. As such, it was in my opinon, that the punishment
> seemed harsh for the suspense incident when the other two incidents
> were not formally included on the board. Granted, it is at the

> discretion of the TAC to determine the punishment. However, without
> the other two incidents being formally included, the punishment seemed
> excessive
>
>
>
> Hunter P Baudoindajoux
>
> 2LT, IN
>
>
>
> Classification: UNCLASSIFIED
> Caveats: NONE
>
>

FW USMA Superintendent Response to Redress 15 1254 JAN 2014(UNCLASSIFIED).txt
From: Landry, Brigitte L LTC USARMY HQDA DCS G-1 (US)
Sent: Wednesday, January 15, 2014 12:54 PM
To: Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)
Subject: FW: USMA Superintendent Response to Redress (UNCLASSIFIED)
Signed By: brigitte.l.landry.mil@mail.mil

Classification: UNCLASSIFIED
Caveats: NONE

-----Original Message-----
From: Isiah Doolen [mailto:idoolen13@me.com]
Sent: Wednesday, January 15, 2014 12:47 AM
To: Landry, Brigitte L LTC USARMY HQDA DCS G-1 (US)
Subject: Fwd: USMA Superintendent Response to Redress (UNCLASSIFIED)

Ma'am,

The email below is the response from COL Well. Can all of this still be added to my separation packet please? Thank you and I apologize for flooding your inbox.

Very Respectfully,

Isiah Doolen

Sent from my iPad

Begin forwarded message:

From: Isiah Doolen <idoolen13@icloud.com>
Date: January 7, 2014, 5:35:31 PM CST
To: "Well, Keith C COL MIL USA USMA" <Keith.Well@usma.edu>
Subject: Re: USMA Superintendent Response to Redress (UNCLASSIFIED)

Sir,

I am just wondering why I did not receive an interim response per AR 27-10?

Very Respectfully,

Isiah Doolen

Sent from my iPhone

On Jan 7, 2014, at 5:23 PM, "Well, Keith C COL MIL USA USMA" <Keith.Well@usma.edu> wrote:

Classification: UNCLASSIFIED

FW USMA Superintendent Response to Redress 15 1254 JAN 2014(UNCLASSIFIED).txt

Caveats: NONE

Cadet Doolen,

The response to your request for redress was in the distribution system as early as 20 December 2013. However, due to LTG Caslen's official travel and reduced staffing level during the holiday period, the response was not signed until 31 December and was not processed for delivery to you until today.

Respectfully, COL Keith Well

-----Original Message-----

From: Isiah Doolen [mailto:idoolen13@icloud.com]

Sent: Tuesday, January 07, 2014 4:11 PM

To: Well, Keith C COL MIL USA USMA

Cc: Ghostlaw, Deadra CIV USA USMA

Subject: Fwd: USMA Superintendent Response to Redress (UNCLASSIFIED)

Sir,

I am just now receiving a response for a request for redress that I filed on 14 December 2013. According to AR 27-10, I should have received an interim response notifying me that the Superintendent's response would be late:

b. Response by the commanding officer.

A commanding officer receiving a request for redress submitted under this regulation will respond, in writing, in a timely manner so that the complainant will receive the response within 15 days. (Subparas 19-10a and 19-11b, both below, may be used as a guide in determining action on the request.) If a final response within 15 days is not possible, an interim response will be provided that indicates the estimated date of a final response.

Very Respectfully,

Isiah Doolen

FW USMA Superintendent Response to Redress 15 1254 JAN 2014(UNCLASSIFIED).txt
Begin forwarded message:

From: "Ayvazian, Brett MAJ MIL USA USMA" <Brett.Ayvazian@usma.edu>

Date: January 07, 2014 3:29:59 PM

To: "idoolen13@icloud.com" <idoolen13@icloud.com>,"Ghostlaw, Deadra CIV USA USMA" <Deadra.Ghostlaw@usma.edu>

Subject: USMA Superintendent Response to Redress (UNCLASSIFIED)

Classification: UNCLASSIFIED

Caveats: NONE

Mr. Doolen -

Please see attached response to your request from LTG Caslen. A hardcopy was mailed to you as well today.

FW USMA Superintendent Response to Redress 15 1254 JAN 2014(UNCLASSIFIED).txt

Respectfully,

MAJ Brett A. Ayvazian

Secretary of the General Staff

United States Military Academy

Taylor Hall, Building 600, Room 211

West Point, NY 10996

Comm: (845) 938-4200

Page 5

000681

FW USMA Superintendent Response to Redress 15 1254 JAN 2014(UNCLASSIFIED).txt

Mobile: (413) 388-7696

It's pronounced A-VAY-ZEE-AN

Classification: UNCLASSIFIED

Caveats: NONE

Classification: UNCLASSIFIED

Caveats: NONE

Classification: UNCLASSIFIED
Caveats: NONE

Page 6

000682

FW USMA Superintendent Response to Redress 15 1254 JAN 2014(UNCLASSIFIED).txt

Page 7

000683

From: Landry, Brigitte L LTC USARMY HQDA DCS G-1 (US)
Sent: Wednesday, January 15, 2014 12:53 PM
To: Isiah Doolen
Cc: Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)
Subject: RE: USMA Superintendent Response to Redress (UNCLASSIFIED)
Signed By: brigitte.l.landry.mil@mail.mil

Classification: UNCLASSIFIED
Caveats: NONE

Hello,
LTC Barnes is working your packet and I am assisting. Thanks for the email we will contact you as we need more info.
v/r
LTC Landry

-----Original Message-----
From: Isiah Doolen [mailto:idoolen13@me.com]
Sent: Wednesday, January 15, 2014 12:39 AM
To: Landry, Brigitte L LTC USARMY HQDA DCS G-1 (US)
Subject: Fwd: USMA Superintendent Response to Redress (UNCLASSIFIED)

Ma'am,

I don't know if you received the Superintendent's response to my request for redress but it is attached along with an email exchange I had with his SJA. I've drafted a formal Article 138, but I am waiting for my attorney to give me the green light. I have it ready to be sent to the Army Chief of Staff.

Very Respectfully,

Isiah Doolen

Sent from my iPad

Begin forwarded message:

> From: "Isiah Doolen" <idoolen13@icloud.com>
> Date: January 7, 2014, 3:10:56 PM CST
> To: keith.well@usma.edu
> Cc: deadra.ghostlaw@usma.edu
> Subject: Fwd: USMA Superintendent Response to Redress (UNCLASSIFIED)
>
> Sir,
>
> I am just now receiving a response for a request for redress that I filed on 14 December 2013. According to AR 27-10, I should have received an interim response notifying me that the Superintendent's response would be late:
>
> b. Response by the commanding officer.
>
> A commanding officer receiving a request for redress submitted under this
>
> regulation will respond, in writing, in a timely manner so that the complainant will receive the response within 15 days.
>
> (Subparas 19-10a and 19-11b, both below, may be used as a guide in

determining action on the request.) If a final

response within 15 days is not possible, an interim response will be provided that indicates the estimated date of a final

response.

Very Respectfully,

Isiah Doolen

Begin forwarded message:

From: "Ayvazian, Brett MAJ MIL USA USMA" <Brett.Ayvazian@usma.edu>
Date: January 07, 2014 3:29:59 PM
To: "idoolen13@icloud.com" <idoolen13@icloud.com>,"Ghostlaw, Deadra CIV USA USMA" <Deadra.Ghostlaw@usma.edu>
Subject: USMA Superintendent Response to Redress (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Doolen -

Please see attached response to your request from LTG Caslen. A hardcopy was mailed to you as well today.

Respectfully,

MAJ Brett A. Ayvazian

Secretary of the General Staff

United States Military Academy

Taylor Hall, Building 600, Room 211

West Point, NY 10996

Comm: (845) 938-4200

Mobile: (413) 388-7696

It's pronounced A-VAY-ZEE-AN

RE USMA Superintendent Response to Redress 15 1253 JAN 2014 (UNCLASSIFIED).txt

Classification: UNCLASSIFIED
Caveats: NONE

Classification: UNCLASSIFIED
Caveats: NONE

Page 3

000686

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

**§ 2005. Advanced education assistance: active duty agreement; reimbursement requirements**

(a) The Secretary concerned may require, as a condition to the Secretary providing advanced education assistance to any person, that such person enter into a written agreement with the Secretary concerned under the terms of which such person shall agree—

(1) to complete the educational requirements specified in the agreement and to serve on active duty for a period specified in the agreement;

(2) that if such person fails to complete the education requirements specified in the agreement, such person will serve on active duty for a period specified in the agreement;

(3) that if such person does not complete the period of active duty specified in the agreement, or does not fulfill any term or condition prescribed pursuant to paragraph (4), such person shall be subject to the repayment provisions of section 303a(e) of title 37; and

(4) to such other terms and conditions as the Secretary concerned may prescribe to protect the interest of the United States.

(b) The Secretary concerned shall determine the period of active duty to be served by any person for advanced education assistance to be provided such person by an armed force, except that if the period of active duty required to be served is specified under another provision of law with respect to the advanced education assistance to be provided, the period specified in the agreement referred to in subsection (a) shall be the same as the period specified in such other provision of law.

(c) As a condition of the Secretary concerned providing financial assistance under section 2107 or 2107a of this title to any person, the Secretary concerned shall require that the person enter into the agreement described in subsection (a). In addition to the requirements of paragraphs (1) through (4) of such subsection, the agreement shall specify that, if the person does not complete the education requirements specified in the agreement or does not fulfill any term or condition prescribed pursuant to paragraph (4) of such subsection, the person shall be subject to the repayment provisions of section 303a(e) of title 37 without the Secretary first ordering such person to active duty as provided for under subsection (a)(2) and sections 2107(f) and 2107a(f) of this title.

(d) In this section:

(1) The term "advanced education" means education or training above the secondary school level but does not include technical training provided to a member of the armed forces to qualify such member to perform a specified military function, to workshops, or to short-term training programs.

(2) The term "assistance" means the direct provision of any course of advanced education by the Secretary concerned, reimbursement by the Secretary concerned for any course of advanced education provided by another department or agency of the Federal Government, or the payment, in whole or in part, by the Secretary concerned for any course of advanced education provided by any public or private educational institution or other entity, but such term does not include the payment for any course of advanced education which is paid for under chapter 106 or 107 of this title.

(3) The term "cost of advanced education" means those costs which are, under regulations prescribed by the Secretary concerned, directly attributable to the education of the person to whom a course of advanced education is provided, including the cost of tuition and other fees (or, if none is charged, an amount determined by the Secretary concerned to be a reasonable charge for the education provided), the cost of books, supplies, transportation, and miscellaneous expenses, and the cost of room and board, but such term does not include pay or allowances under title 37 or a stipend under section 2121 of this title.

(Added Pub. L. 96–357, § 2(a), Sept. 24, 1980, 94 Stat. 1180; amended Pub. L. 98–94, title X, § 1003(b)(1), title XII, § 1268(10), Sept. 24, 1983, 97 Stat. 656, 706; Pub. L. 100–180, div. A, title XII, § 1231(17), Dec. 4, 1987, 101 Stat. 1161; Pub. L. 101–510, div. A, title V, § 534, Nov. 5, 1990, 104 Stat. 1564; Pub. L. 103–160, div. A, title V, § 573(a), Nov. 30, 1993, 107 Stat. 1673; Pub. L. 109–163, div. A, title VI, § 687(c)(2), Jan. 6, 2006, 119 Stat. 3333.)

AMENDMENTS

2006—Subsec. (a)(3). Pub. L. 109–163, § 687(c)(2)(A), added par. (3) and struck out former par. (3) which read as follows: "that if such person, voluntarily or because of misconduct, fails to complete the period of active duty specified in the agreement, or fails to fulfill any term or condition prescribed pursuant to clause (4), such person will reimburse the United States in an amount that bears the same ratio to the total cost of advanced education provided such person as the unserved portion of active duty bears to the total period of active duty such person agreed to serve; and".

Subsecs. (c) to (h). Pub. L. 109–163, § 687(c)(2)(B)–(D), added subsec. (c), redesignated former subsec. (e) as (d), and struck out former subsecs. (c), (d), and (f) to (h) relating to the obligation to reimburse the United States under an advanced education assistance agreement in subsec. (c), the effect of a discharge in bankruptcy under title 11 in subsec. (d), requirements for providing financial assistance in subsec. (f), failure to complete a period of active duty specified in an agreement in subsec. (g), and modification of agreements by the Secretary concerned in subsec. (h).

1993—Subsecs. (g), (h). Pub. L. 103–160 added subsecs. (g) and (h).

1990—Subsec. (a)(3). Pub. L. 101–510, § 534(1), inserted "or fails to fulfill any term or condition prescribed pursuant to clause (4)," after "agreement,".

Subsec. (f)(1). Pub. L. 101–510, § 534(2), inserted "or fails to fulfill any term or condition prescribed pursuant to clause (4) of such subsection," after "agreement,".

1987—Subsec. (e). Pub. L. 100–180, § 1231(17), inserted "The term" after each par. designation and revised first word in quotes in each par. to make initial letter of such word lowercase.

1983—Subsec. (c). Pub. L. 98–94, § 1268(10)(A), struck out "of this section" after "subsection (d)" and "subsection (a)".

Subsec. (d). Pub. L. 98–94, § 1268(10)(A), struck out "of this section" after "subsection (a)".

Subsec. (e). Pub. L. 98–94, § 1268(10)(B), substituted a colon for a dash after "In this section" preceding par. (1).

Subsec. (f). Pub. L. 98–94, § 1003(b)(1), added subsec. (f).

EFFECTIVE DATE OF 1993 AMENDMENT

Section 573(b) of Pub. L. 103–160 provided that:

"(1) Subsection (g) of section 2005 of title 10, United States Code, as added by subsection (a), shall apply with respect to persons separated from the Armed Forces after the end of the six-month period beginning on the date of the enactment of this Act [Nov. 30, 1993].

"(2) Subsection (h) of such section, as added by subsection (a), shall apply with respect to persons separated from the Armed Forces after the date of the enactment of this Act."

EFFECTIVE DATE OF 1983 AMENDMENT

Section 1003(b)(2) of Pub. L. 98-94 provided that: "The amendment made by paragraph (1) [amending this section] shall apply with respect to agreements entered into after September 30, 1983."

SAVINGS PROVISION

For savings provision relating to payment or repayment of any bonus, incentive pay, special pay, or similar pay obligated to be paid before Apr. 1, 2006, under a provision of this section amended by section 687(c) of Pub. L. 109-163, see section 687(f) of Pub. L. 109-163, set out as a note under section 510 of this title.

**§2006. Department of Defense Education Benefits Fund**

(a) There is established on the books of the Treasury a fund to be known as the Department of Defense Education Benefits Fund (hereinafter in this section referred to as the "Fund"), which shall be administered by the Secretary of the Treasury. The Fund shall be used for the accumulation of funds in order to finance armed forces education liabilities on an actuarially sound basis.

(b) In this section:

(1) The term "armed forces education liabilities" means liabilities of the armed forces for benefits under chapter 30 or 33 of title 38 and for Department of Defense benefits under paragraphs (3) and (4) of section 510(e) and chapters 1606 and 1607 of this title, including funds provided by the Secretary of Homeland Security for education liabilities for the Coast Guard when it is not operating as a service in the Department of the Navy.

(2) The term "normal cost", with respect to any period of time, means the total of the following:

(A) The present value of the future benefits payable from the Fund for amounts attributable to increased amounts of educational assistance authorized under section 3015(d) of title 38 to persons who were not on active duty on July 1, 1985, and who during such period enter on active duty.

(B) The present value of the future benefits payable from the Fund for amounts attributable to educational assistance authorized under subchapter III of chapter 30 of title 38 to persons who were not on active duty on July 1, 1985, and who during such period—

(i) enter a fourth year of active duty, in the case of persons eligible for basic educational assistance under section 3011 of such title; or

(ii) enter a period of service that will establish entitlement to such educational assistance under section 3021(b) of such title, in the case of persons eligible for basic educational assistance under section 3012 of such title.

(C) The present value of the future Department of Defense benefits payable from the Fund (including funds from the Department in which the Coast Guard is operating) for educational assistance under chapters 1606 and 1607 of this title to persons who during such period become entitled to such assistance.

(D) The present value of future benefits payable from the Fund for the Department of Defense portion of payments of educational assistance under subchapter II of chapter 30 of title 38 attributable to increased usage of benefits as a result of transfers of entitlement to basic educational assistance under section 3020 of that title during such period.

(E)[1] The present value of future benefits payable from the Fund for educational assistance under paragraphs (3) and (4) of section 510(e) of this title to persons who during such period become entitled to such assistance.

(E)[1] The present value of any future benefits payable from the Fund for amounts attributable to increased amounts of educational assistance authorized by section 3316 of title 38.

(c) There shall be deposited into the Fund the following, which shall constitute the assets of the Fund:

(1) Amounts paid into the Fund by the Secretary of Defense and the Secretary of the Department in which the Coast Guard is operating under subsection (f).

(2) Any amount appropriated to the Fund.

(3) Any return on investment of the assets of the Fund.

(d) The Secretary of the Treasury shall transfer from the Fund to the Secretary of Veterans Affairs such amounts as may be necessary to enable the Secretary of Veterans Affairs to make required payments of armed forces education liabilities. The Secretary of the Treasury, the Secretary of Defense, the Secretary of the Department in which the Coast Guard is operating, and the Secretary of Veterans Affairs shall enter into an agreement as to how and when, and the amounts in which, such transfers shall be made. Except for investments under subsection (h), amounts in the Fund may not be used for any purpose other than transfers as described in this subsection.

(e)(1) The Secretary of Defense shall carry out periodic actuarial valuations of the educational programs described in subsection (b)(1).

(2) Based on the most recent such valuation, the Secretary of Defense shall estimate the normal cost for the next fiscal year.

(3) If at the time of any such valuation there has been a change in benefits under an education program described in subsection (b)(1) that has been made since the last such valuation and that increases or decreases the present value of benefits payable from the Fund, the Secretary of Defense shall determine an amortization methodology and schedule for the liquidation of the unfunded liability (or negative

[1] So in original. Two subpars. (E) have been enacted.

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

word "another". The words "were appointed with respect to", "of the former district", "as additional numbers", "at such academy for the Representative", "temporarily", and "in attendance at such academy under an appointment from such former district" are omitted as surplusage. The words "the district in which his domicile so falls" are substituted for the words "of the latter district". The words "to include him" are substituted for 10:1091-1 (18 words before proviso). The words "However, the number as so increased" are substituted for 10:1091-1 (1st 13 words of proviso). The words "if he fails to become a cadet" are inserted for clarity.

**§ 4348. Cadets: agreement to serve as officer**

(a) Each cadet shall sign an agreement with respect to the cadet's length of service in the armed forces. The agreement shall provide that the cadet agrees to the following:

(1) That the cadet will complete the course of instruction at the Academy.

(2) That upon graduation from the Academy the cadet—

(A) will accept an appointment, if tendered, as a commissioned officer of the Regular Army or the Regular Air Force; and

(B) will serve on active duty for at least five years immediately after such appointment.

(3) That if an appointment described in paragraph (2) is not tendered or if the cadet is permitted to resign as a regular officer before completion of the commissioned service obligation of the cadet, the cadet—

(A) will accept an appointment as a commissioned officer as a Reserve for service in the Army Reserve or the Air Force Reserve; and

(B) will remain in that reserve component until completion of the commissioned service obligation of the cadet.

(4) That if an appointment described in paragraph (2) or (3) is tendered and the cadet participates in a program under section 2121 of this title, the cadet will fulfill any unserved obligation incurred under this section on active duty, regardless of the type of appointment held, upon completion of, and in addition to, any service obligation incurred under section 2123 of this title for participation in such program.

(b)(1) The Secretary of the Army may transfer to the Army Reserve, and may order to active duty for such period of time as the Secretary prescribes (but not to exceed four years), a cadet who breaches an agreement under subsection (a). The period of time for which a cadet is ordered to active duty under this paragraph may be determined without regard to section 651(a) of this title.

(2) A cadet who is transferred to the Army Reserve under paragraph (1) shall be transferred in an appropriate enlisted grade or rating, as determined by the Secretary.

(3) For the purposes of paragraph (1), a cadet shall be considered to have breached an agreement under subsection (a) if the cadet is separated from the Academy under circumstances which the Secretary determines constitute a breach by the cadet of the cadet's agreement to complete the course of instruction at the Academy and accept an appointment as a commissioned officer upon graduation from the Academy.

(c) The Secretary of the Army shall prescribe regulations to carry out this section. Those regulations shall include—

(1) standards for determining what constitutes, for the purpose of subsection (b), a breach of an agreement under subsection (a);

(2) procedures for determining whether such a breach has occurred; and

(3) standards for determining the period of time for which a person may be ordered to serve on active duty under subsection (b).

(d) In this section, the term "commissioned service obligation", with respect to an officer who is a graduate of the Academy, means the period beginning on the date of the officer's appointment as a commissioned officer and ending on the sixth anniversary of such appointment or, at the discretion of the Secretary of Defense, any later date up to the eighth anniversary of such appointment.

(e)(1) This section does not apply to a cadet who is not a citizen or national of the United States.

(2) In the case of a cadet who is a minor and who has parents or a guardian, the cadet may sign the agreement required by subsection (a) only with the consent of a parent or guardian.

(f) A cadet or former cadet who does not fulfill the terms of the agreement as specified under subsection (a), or the alternative obligation imposed under subsection (b), shall be subject to the repayment provisions of section 303a(e) of title 37.

(Aug. 10, 1956, ch. 1041, 70A Stat. 243; Pub. L. 88–276, § 5(a), Mar. 3, 1964, 78 Stat. 153; Pub. L. 88–647, title III, § 301(9), Oct. 13, 1964, 78 Stat. 1072; Pub. L. 98–525, title V, §§ 541(a), 542(b), Oct. 19, 1984, 98 Stat. 2529; Pub. L. 99–145, title V, § 512(a), Nov. 8, 1985, 99 Stat. 623; Pub. L. 101–189, div. A, title V, § 511(b), title XVI, § 1622(e)(5), Nov. 29, 1989, 103 Stat. 1439, 1605; Pub. L. 104–106, div. A, title V, § 531(a), Feb. 10, 1996, 110 Stat. 314; Pub. L. 109–163, div. A, title VI, § 687(c)(9), Jan. 6, 2006, 119 Stat. 3335; Pub. L. 111–84, div. A, title X, § 1073(a)(29), Oct. 28, 2009, 123 Stat. 2474; Pub. L. 111–383, div. A, title V, § 554(a), Jan. 7, 2011, 124 Stat. 4221.)

HISTORICAL AND REVISION NOTES

| Revised section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 4348 ......... | 10:1092c. | June 30, 1950, ch. 421, § 3, 64 Stat. 304. |

The word "agreement" is substituted for the word "articles". The words "Hereafter", "appointed to the United States Military Academy", "engage", and 10:1092c (1st 25 words of clause (2)) are omitted as surplusage. The word "separated" is substituted for the words "discharged by competent authority". The words "if he is permitted to resign" are substituted for the words "in the event of the acceptance of his resignation", since a resignation is effective only when accepted. The first 31 words of clause (3) are substituted for 10:1092c (last 29 words of clause (3)). The last sentence is substituted for the words "with the consent of his parents or guardian if he be a minor, and if any he have".

Case 7:16-cv-08606-VB Document 47-4 Filed 01/26/18 Page 143 of 171

AMENDMENTS

2011—Subsec. (a)(4). Pub. L. 111–383 added par. (4).

2009—Subsec. (f). Pub. L. 111–84 substituted "subsection (a)" for "section (a)".

2006—Subsec. (f). Pub. L. 109–163 added subsec. (f).

1996—Subsec. (a)(2)(B). Pub. L. 104–106 substituted "five years" for "six years".

1989—Subsec. (a)(2)(B). Pub. L. 101–189, §511(b), substituted "six years" for "five years".

Subsec. (d). Pub. L. 101–189, §1622(e)(5), inserted "the term" after "In this section,".

1985—Pub. L. 99–145 amended section generally. Prior to amendment, section read as follows:

"(a) Each cadet who is a citizen or national of the United States shall sign an agreement that he will—

"(1) unless sooner separated from the Academy, complete the course of instruction at the Academy;

"(2) accept an appointment and, unless sooner separated from the service, serve as a commissioned officer of the Regular Army or the Regular Air Force for at least the five years immediately after graduation; and

"(3) accept an appointment as a commissioned officer as a Reserve for service in the Army Reserve or the Air Force Reserve and, unless sooner separated from the service, remain therein until at least the sixth anniversary and, at the direction of the Secretary of Defense, up to the eighth anniversary of his graduation, if an appointment in the regular component of that armed force is not tendered to him, or if he is permitted to resign as a commissioned officer of that component before that anniversary.

If the cadet is a minor and has parents or a guardian, he may sign the agreement only with the consent of the parents or guardian.

"(b) A cadet who does not fulfill his agreement under subsection (a) may be transferred by the Secretary of the Army to the Army Reserve in an appropriate enlisted grade and, notwithstanding section 651 of this title, may be ordered to active duty to serve in that grade for such period of time as the Secretary prescribes but not for more than four years."

1984—Subsec. (a). Pub. L. 98–525, §541(a), struck out ", unless sooner separated," in introductory text before "he will"; inserted in cl. (1) "unless sooner separated from the Academy,"; and inserted ", unless sooner separated from the service," in cls. (2) and (3).

Subsec. (a)(3). Pub. L. 98–525, §524(b), substituted "at least the sixth anniversary and, at the direction of the Secretary of Defense, up to the eighth anniversary" for "the sixth anniversary".

1964—Pub. L. 88–647 designated existing provisions as subsec. (a) and added subsec. (b).

Subsec. (a)(2). Pub. L. 88–276 substituted "five" for "three".

EFFECTIVE DATE OF 1996 AMENDMENT

Section 531(e) of Pub. L. 104–106 provided that: "The amendments made by this section [amending this section and sections 6959 and 9348 of this title] apply to persons first admitted to the United States Military Academy, United States Naval Academy, and United States Air Force Academy after December 31, 1991."

EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by section 511(b) of Pub. L. 101–189 applicable to persons who are first admitted to one of the military service academies after Dec. 31, 1991, see section 511(e) of Pub. L. 101–189, as amended, set out as a note under section 2114 of this title.

EFFECTIVE DATE OF 1985 AMENDMENT

Section 512(e) of Pub. L. 99–145 provided that: "The amendments made by subsections (a), (b), and (c) [amending this section and sections 6959 and 9348 of this title] (other than with respect to the authority of the Secretary of a military department to prescribe regulations)—

"(1) shall take effect with respect to each military department on the date on which regulations prescribed by the Secretary of that military department in accordance with subsection (d) [set out below] take effect; and

"(2) shall apply with respect to each agreement entered into under sections 4348, 6959, and 9348, respectively, of title 10, United States Code, that is entered into on or after the effective date of such regulations and shall apply with respect to each such agreement that was entered into before the effective date of such regulations by an individual who is a cadet or midshipman on such date."

EFFECTIVE DATE OF 1984 AMENDMENT

Section 541(d) of Pub. L. 98–525 provided that: "The amendments made by this section [amending this section and sections 6959 and 9348 of this title] shall apply with respect to agreements entered into under section 4348, 6959, or 9348 of title 10, United States Code, before, on, or after the date of the enactment of this Act [Oct. 19, 1984]."

EFFECTIVE DATE OF 1964 AMENDMENT; OBLIGATED PERIOD OF SERVICE

Section 5(c) of Pub. L. 88–276 provided that: "The amendments made by this section [amending this section, sections 6959 and 9348 of this title, and section 182 of Title 14, Coast Guard] shall apply only with respect to cadets and midshipmen appointed to the service academies and the Coast Guard Academy after the date of enactment of this Act [Mar. 3, 1964], and shall not affect the obligated period of service of any cadet or midshipman appointed to one of the service academies or the Coast Guard Academy on or before the date of enactment of this Act."

REGULATIONS IMPLEMENTING 1985 AMENDMENT

Section 512(d) of Pub. L. 99–145 provided that: "The Secretary of each military department shall prescribe the regulations required by section 4348(c), 6959(c), or 9348(c), as appropriate, of title 10, United States Code (as added by the amendments made by subsections (a), (b), and (c)) not later than the end of the 90-day period beginning on the date of the enactment of this Act [Nov. 8, 1985]."

SAVINGS PROVISION

For savings provision relating to payment or repayment of any bonus, incentive pay, special pay, or similar pay obligated to be paid before Apr. 1, 2006, under a provision of this section amended by section 687(c) of Pub. L. 109–163, see section 687(f) of Pub. L. 109–163, set out as a note under section 510 of this title.

DEPARTMENT OF DEFENSE POLICY ON SERVICE ACADEMY AND ROTC GRADUATES SEEKING TO PARTICIPATE IN PROFESSIONAL SPORTS BEFORE COMPLETION OF THEIR ACTIVE-DUTY SERVICE OBLIGATIONS

Pub. L. 109–364, div. A, title V, §533, Oct. 17, 2006, 120 Stat. 2206, provided that:

"(a) POLICY REQUIRED.—

"(1) IN GENERAL.—Not later than July 1, 2007, the Secretary of Defense shall prescribe the policy of the Department of Defense on—

"(A) whether to authorize graduates of the service academies and the Reserve Officers' Training Corps to participate in professional sports before the completion of their obligations for service on active duty as commissioned officers; and

"(B) if so, the obligations for service on active duty as commissioned officers of such graduates who participate in professional sports before the satisfaction of the obligations referred to in subparagraph (A).

"(2) REVIEW OF CURRENT POLICIES.—In prescribing the policy, the Secretary shall review current policies, practices, and regulations of the military departments on the obligations for service on active duty as commissioned officers of graduates of the service academies and the Reserve Officers' Training

Corps, including policies on authorized leaves of absence and policies under excess leave programs.

"(3) CONSIDERATIONS.—In prescribing the policy, the Secretary shall take into account the following:

"(A) The compatibility of participation in professional sports (including training for professional sports) with service on active duty in the Armed Forces or as a member of a reserve component of the Armed Forces.

"(B) The benefits for the Armed Forces of waiving obligations for service on active duty for cadets, midshipmen, and commissioned officers in order to permit such individuals to participate in professional sports.

"(C) The manner in which the military departments have resolved issues relating to the participation of personnel in professional sports, including the extent of and any reasons for, differences in the resolution of such issues by such departments.

"(D) The recoupment of the costs of education provided by the service academies or under the Reserve Officers' Training Corps program if graduates of the service academies or the Reserve Officers' Training Corps, as the case may be, do not complete the period of obligated service to which they have agreed by reason of participation in professional sports.

"(E) Any other matters that the Secretary considers appropriate.

"(b) ELEMENTS OF POLICY.—The policy prescribed under subsection (a) shall address the following matters:

"(1) The eligibility of graduates of the service academies and the Reserve Officers' Training Corps for a reduction in the obligated length of service on active duty as a commissioned officer otherwise required of such graduates on the basis of their participation in professional sports.

"(2) Criteria for the treatment of an individual as a participant or potential participant in professional sports.

"(3) The effect on obligations for service on active duty as a commissioned officer of any unsatisfied obligations under prior enlistment contracts or other forms of advanced education assistance.

"(4) Any authorized variations in the policy that are warranted by the distinctive requirements of a particular Armed Force.

"(5) The eligibility of individuals for medical discharge or disability benefits as a result of injuries incurred while participating in professional sports.

"(6) A prospective effective date for the policy and for the application of the policy to individuals serving on such effective date as a commissioned officer, cadet, or midshipman.

"(c) APPLICATION OF POLICY TO ARMED FORCES.—Not later than December 1, 2007, the Secretary of each military department shall prescribe regulations, or modify current regulations, in order to implement the policy prescribed by the Secretary of Defense under subsection (a) with respect to the Armed Forces under the jurisdiction of such Secretary."

### § 4349. Cadets: organization of Corps; service; instruction

(a) The Corps of Cadets shall be divided into companies, as directed by the Superintendent, for the purpose of military instruction. Each company shall be commanded by a commissioned officer of the Army.

(b) A cadet shall perform duties at such places and of such type as the President may direct.

(c) The course of instruction at the Academy is four years.

(d) The Secretary of the Army shall so arrange the course of studies at the Academy that cadets are not required to pursue their studies on Sunday.

(e) The Corps of Cadets shall be trained in the duties of members of the Army, shall be encamped at least three months in each year, and shall be trained in all duties incident to a camp.

(Aug. 10, 1956, ch. 1041, 70A Stat. 243.)

HISTORICAL AND REVISION NOTES

| Revised section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 4349(a) ..... | 10:1105 (less last sentence). | R.S. 1322. |
| 4349(b) ..... | 10:1102. | R.S. 1323. |
| 4349(c) ..... | 10:1043. | Mar. 30, 1920, ch. 112 (1st par., less provisos, under "Miscellaneous"), 41 Stat. 548. |
| 4349(d) ..... | 10:1044. | |
| 4349(e) ..... | 10:1105 (last sentence). | R.S. 1324. |

In subsection (a), the word "commissioned" is inserted for clarity; 10:1105 (2d sentence) is omitted as obsolete.

In subsection (b), the word "perform" is substituted for the words "be subject at all times to do". The words "of such type" are substituted for the words "on such service".

In subsection (e), the words "members of the Army" are substituted for the words "private soldier, noncommissioned officer, and officer". The words "taught and" are omitted as surplusage.

### § 4350. Cadets: clothing and equipment

(a) The Secretary of the Army may prescribe the amount to be credited to a cadet, upon original admission to the Academy, for the cost of his initial issue of clothing and equipment. That amount shall be deducted from his pay. If a cadet is discharged before graduation while owing the United States for pay advanced for the purchase of required clothing and equipment, he shall turn in so much of his clothing and equipment of a distinctive military nature as is necessary to repay the amount advanced. If the value of the clothing and equipment turned in does not cover the amount owed, the indebtedness shall be canceled.

(b) Under such regulations as the Secretary may prescribe, uniforms and equipment shall be furnished to a cadet at the Academy upon his request.

(Aug. 10, 1956, ch. 1041, 70A Stat. 244.)

HISTORICAL AND REVISION NOTES

| Revised section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 4350(a) ..... | 10:1149a. | Aug. 31, 1918, ch. 166, §9 (17th through 22d words), 40 Stat. 957. |
| 4350(b) ..... | 10:1106. | Aug. 22, 1951, ch. 340, §1, 65 Stat. 196. |

In subsection (a), the words "while owing the United States for pay advanced for the purchase of" are substituted for the words "who is indebted to the United States on account of advances of pay to purchase". The words "as is necessary to repay the amount advanced" are substituted for the words "to the extent required to discharge such indebtedness".

In subsection (b), the word "accouterments" is omitted as surplusage. The words "by the Government" and "such restrictions and" are omitted as surplusage. The words "at cost" are omitted to reflect Title IV of the National Security Act of 1947, as amended (63 Stat. 585), which authorized the Secretary of Defense to prescribe regulations governing the use and sale of certain inventories at cost, including applicable administrative expenses. (See opinion of the Assistant General Counsel (Fiscal Matters) of the Office of the Secretary of Defense, January 4, 1955.)



1978—Subsec. (c). Pub. L. 95–485 substituted "September 1980" for "September 1978".

1977—Subsec. (a). Pub. L. 95–114 amended subsec. (a) to provide for the reinstatement of special pay provisions for veterinarians for each month on active duty beginning on or after Oct. 1, 1977.

Subsecs. (b), (c). Pub. L. 95–114 reenacted subsec. (b) without change and added subsec. (c).

1973—Subsec. (a). Pub. L. 93–64 substituted "July 1, 1975" for "July 1, 1973" wherever appearing.

1971—Subsec. (a). Pub. L. 92–129 substituted "July 1, 1973" for "July 1, 1971" wherever appearing.

1967—Subsec. (a). Pub. L. 90–40 substituted "July 1, 1971" for "July 1, 1967" wherever appearing.

1963—Subsec. (a). Pub. L. 88–2 substituted "July 1, 1967" for "July 1, 1963" wherever appearing.

EFFECTIVE DATE OF 1999 AMENDMENT

Pub. L. 106–65, div. A, title VI, §616(b), Oct. 5, 1999, 113 Stat. 652, provided that: "The amendments made by subsection (a) [amending this section] shall take effect on October 1, 1999, and shall apply with respect to months beginning on and after that date."

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–114 effective Oct. 1, 1977, see section 4 of Pub. L. 95–114, set out as a note under section 302a of this title.

EFFECTIVE DATE OF 1973 AMENDMENT

Amendment by Pub. L. 93–64 effective July 1, 1973, see section 206 of Pub. L. 93–64, set out as a note under section 401 of this title.

**§303a. Special pay: general provisions**

(a) The Secretary of Defense, with respect to the Army, Navy, and Air Force, and the Secretary of Health and Human Services, with respect to the Public Health Service, shall prescribe regulations for the administration of sections 301d, 302 through 302j, and 303 of this title.

(b)(1) Except as provided in paragraph (2) or as otherwise provided under a provision of this chapter, a commissioned officer in the Regular or Reserve Corps of the Public Health Service is entitled to special pay under a provision of this chapter in the same amounts, and under the same terms and conditions, as a commissioned officer of the armed forces is entitled to special pay under that provision.

(2) A commissioned medical officer in the Regular or Reserve Corps of the Public Health Service (other than an officer serving in the Indian Health Service) may not receive additional special pay under section 302(a)(4) of this title for any period during which the officer is providing obligated service under the following provisions of law:

(A) Section 338B of the Public Health Service Act (42 U.S.C. 254l–1).

(B) Section 225(e) of the Public Health Service Act, as that section was in effect before October 1, 1977.

(C) Section 752 of the Public Health Service Act, as that section was in effect between October 1, 1977, and August 13, 1981.

(c) Special pay authorized under sections 301d, 302 through 302j, and 303 of this title is in addition to any other pay or allowance to which an officer is entitled. The amount of special pay to which an officer is entitled under any of such sections may not be included in computing the amount of any increase in pay authorized by any other provision of this title or in computing retired pay, separation pay, severance pay, or readjustment pay.

(d) The Secretary of Defense shall conduct a review every two years of the special pay for health professionals authorized by sections 301d, 302 through 302j, and 303 of this title.

(e) REPAYMENT OF UNEARNED PORTION OF BONUSES AND OTHER BENEFITS WHEN CONDITIONS OF PAYMENT NOT MET; TERMINATION OF ENTITLEMENT TO UNPAID AMOUNTS.—(1)(A) Except as provided in paragraphs (2) and (3), a member of the uniformed services who receives a bonus or similar benefit and whose receipt of the bonus or similar benefit is subject to the condition that the member continue to satisfy certain eligibility requirements shall repay to the United States an amount equal to the unearned portion of the bonus or similar benefit if the member fails to satisfy the eligibility requirements and may not receive any unpaid amounts of the bonus or similar benefit after the member fails to satisfy the requirements, unless the Secretary concerned determines that the imposition of the repayment requirement and termination of the payment of unpaid amounts of the bonus or similar benefit with regard to the member would be contrary to a personnel policy or management objective, would be against equity and good conscience, or would be contrary to the best interests of the United States.

(B) The Secretary concerned may establish, by regulations, procedures for determining the amount of the repayment required under this subsection and the circumstances under which an exception to the required repayment may be granted. The Secretary concerned may specify in the regulations the conditions under which an installment payment of a bonus or similar benefit to be paid to a member of the uniformed services will not be made if the member no longer satisfies the eligibility requirements for the bonus or similar benefit. For the military departments, this subsection shall be administered under regulations prescribed by the Secretary of Defense.

(2)(A) If a member of the uniformed services receives a sole survivorship discharge, the Secretary concerned—

(i) shall not require repayment by the member of the unearned portion of any bonus, incentive pay, or similar benefit previously paid to the member; and

(ii) may grant an exception to the requirement to terminate the payment of any unpaid amounts of a bonus, incentive pay, or similar benefit if the Secretary concerned determines that termination of the payment of the unpaid amounts would be contrary to a personnel policy or management objective, would be against equity and good conscience, or would be contrary to the best interests of the United States.

(B) In this paragraph, the term "sole survivorship discharge" means the separation of a member from the Armed Forces, at the request of the member, pursuant to the Department of Defense policy permitting the early separation of a

member who is the only surviving child in a family in which—

(i) the father or mother or one or more siblings—

(I) served in the Armed Forces; and

(II) was killed, died as a result of wounds, accident, or disease, is in a captured or missing in action status, or is permanently 100 percent disabled or hospitalized on a continuing basis (and is not employed gainfully because of the disability or hospitalization); and

(ii) the death, status, or disability did not result from the intentional misconduct or willful neglect of the parent or sibling and was not incurred during a period of unauthorized absence.

(3)(A) If a member of the uniformed services dies or is retired or separated with a combat-related disability, the Secretary concerned—

(i) shall not require repayment by the member or the member's estate of the unearned portion of any bonus or similar benefit previously paid to the member; and

(ii) shall require the payment to the member or the member's estate of the remainder of any bonus or similar benefit that was not yet paid to the member, but to which the member was entitled immediately before the death, retirement, or separation of the member, and would be paid if not for the death, retirement, or separation of the member.

(B) Subparagraph (A) does not apply if the death or disability of the member is the result of the member's misconduct.

(C) The amount to be paid under subparagraph (A)(ii) shall be equal to the full amount specified by the agreement or contract applicable to the bonus or similar benefit as if the member continued to be entitled to the bonus or similar benefit following the death, retirement, or separation.

(D) Amounts to be paid to a member or the member's estate under subparagraph (A)(ii) shall be paid in a lump sum not later than 90 days after the date of the death, retirement, or separation of the member, whichever applies.

(E) In this paragraph, the term "combat-related disability" has the meaning given that term in section 1413a(e) of title 10.

(4) An obligation to repay the United States under this subsection is, for all purposes, a debt owed the United States. A discharge in bankruptcy under title 11 does not discharge a person from such debt if the discharge order is entered less than five years after—

(A) the date of the termination of the agreement or contract on which the debt is based; or

(B) in the absence of such an agreement or contract, the date of the termination of the service on which the debt is based.

(5) In this subsection:

(A) The term "bonus or similar benefit" means a bonus, incentive pay, special pay, or similar payment, or an educational benefit or stipend, paid to a member of the uniformed services under a provision of law that refers to the repayment requirements of this subsection.

(B) The term "service", as used in paragraph (4)(B), refers to an obligation willingly undertaken by a member of the uniformed services, in exchange for a bonus or similar benefit offered by the Secretary of Defense or the Secretary concerned—

(i) to remain on active duty or in an active status in a reserve component;

(ii) to perform duty in a specified skill, with or without a specified qualification or credential;

(iii) to perform duty at a specified location; or

(iv) to perform duty for a specified period of time.

(Added Pub. L. 96–284, §5(a), June 28, 1980, 94 Stat. 592; amended Pub. L. 96–513, title V, §506(6), Dec. 12, 1980, 94 Stat. 2919; Pub. L. 100–140, §2(b)(1), Oct. 26, 1987, 101 Stat. 831; Pub. L. 101–189, div. A, title VII, §§705(b), 706(b), Nov. 29, 1989, 103 Stat. 1472, 1473; Pub. L. 101–510, div. A, title VI, §611(d), title XIII, §1322(c)(2), title XIV, §1484(c)(1), Nov. 5, 1990, 104 Stat. 1577, 1672, 1716; Pub. L. 102–484, div. A, title X, §1054(a)(3), Oct. 23, 1992, 106 Stat. 2502; Pub. L. 104–106, div. A, title VI, §614(b), Feb. 10, 1996, 110 Stat. 361; Pub. L. 104–201, div. A, title VI, §615(c)(3), Sept. 23, 1996, 110 Stat. 2546; Pub. L. 106–398, §1 [[div. A], title VI, §§628(b), 634(a)], Oct. 30, 2000, 114 Stat. 1654, 1654A–155, 1654A–159; Pub. L. 109–163, div. A, title VI, §687(a)(1), (e)(1), Jan. 6, 2006, 119 Stat. 3326, 3336; Pub. L. 110–317, §2(a), Aug. 29, 2008, 122 Stat. 3526; Pub. L. 110–417, [div. A], title VI, §651(a), (b), Oct. 14, 2008, 122 Stat. 4495; Pub. L. 111–84, div. A, title VI, §617(a), Oct. 28, 2009, 123 Stat. 2354; Pub. L. 111–383, div. A, title X, §1075(c)(1), Jan. 7, 2011, 124 Stat. 4372.)

REFERENCES IN TEXT

Section 225(e) of the Public Health Service Act, as that section was in effect before October 1, 1977, referred to in subsec. (b)(2)(B), is section 225(e) of act July 1, 1944, ch. 373, which was classified to section 234(e) of Title 42, The Public Health and Welfare, prior to repeal by Pub. L. 94–484, title IV, §408(b)(1), Oct. 12, 1976, 90 Stat. 2281, effective Oct. 1, 1977.

Section 752 of the Public Health Service Act, as that section was in effect between October 1, 1977, and August 13, 1981, referred to in subsec. (b)(2)(C), is section 752 of act July 1, 1944, ch. 373, title VII, as added Pub. L. 94–484, title IV, §408(b)(1), Oct. 12, 1976, 90 Stat. 2284; amended Pub. L. 95–626, title I, §113(b), Nov. 10, 1978, 92 Stat. 3563; Pub. L. 96–76, title II, §202(a), (b), Sept. 29, 1979, 93 Stat. 582, which was classified to section 294u of Title 42, The Public Health and Welfare. Section 752 was renumbered section 338B of act July 1, 1944, and amended, by Pub. L. 97–35, title XXVII, §2709(a), (c), Aug. 13, 1981, 95 Stat. 908, 909. It was subsequently renumbered section 338C of act July 1, 1944, and further amended, and is now classified to section 254m of Title 42.

AMENDMENTS

2011—Subsec. (e)(3)(B). Pub. L. 111–383 inserted "of" after "result".

2009—Subsec. (e)(1)(A). Pub. L. 111–84, §617(a)(1), substituted "paragraphs (2) and (3)" for "paragraph (2)".

Subsec. (e)(1)(B), (2). Pub. L. 111–84, §617(a)(5), redesignated subpar. (B), relating to sole survivorship discharge, as par. (2). Former par. (2) redesignated (3).

Subsec. (e)(3) to (5). Pub. L. 111–84, §617(a)(2)–(4), redesignated pars. (2) to (4) as (3) to (5), respectively, and,

in par. (5)(B), substituted "paragraph (4)(B)" for "paragraph (3)(B)" in introductory provisions.

2008—Subsec. (e). Pub. L. 110–417, §651(a)(1), inserted "; Termination of Entitlement to Unpaid Amounts" after "Met" in heading.

Subsec. (e)(1). Pub. L. 110–417, §651(a)(2)(A), which directed substitution of "(A) Except as provided in paragraph (2), a member" for "A member", could not be executed because of prior amendment by 110–317. See below.

Pub. L. 110–317, §2(a)(1), substituted "(A) Except as provided in paragraph (2), a member" for "A member".

Subsec. (e)(1)(A). Pub. L. 110–417, §651(a)(2)(B), substituted "the eligibility requirements and may not receive any unpaid amounts of the bonus or similar benefit after the member fails to satisfy the requirements, unless the Secretary concerned determines that the imposition of the repayment requirement and termination of the payment of unpaid amounts of the bonus or similar benefit with regard to the member would be contrary to a personnel policy or management objective, would be against equity and good conscience, or would be contrary to the best interests of the United States" for "the requirements, except in certain circumstances authorized by the Secretary concerned".

Subsec. (e)(1)(B). Pub. L. 110–417, §651(a)(3), redesignated par. (2) as subpar. (B) of par. (1) relating to sole survivorship discharge.

Pub. L. 110–317, §2(a)(2), redesignated par. (2) as subpar. (B) of par. (1) relating to the Secretary establishing procedures for determining the amount of the repayment required under subsec. (e).

Subsec. (e)(2). Pub. L. 110–417, §651(b), added par. (2). Former par. (2) redesignated subpar. (B) of par. (1) relating to sole survivorship discharge.

Pub. L. 110–317, §2(a)(3), added par. (2). Former par. (2) redesignated as subpar. (B) of par. (1) relating to the Secretary establishing procedures for determining the amount of the repayment required under subsec. (e).

2006—Pub. L. 109–163, §687(e)(1), substituted "Special pay: general provisions" for "Special pay: health professionals; general provisions" in section catchline.

Subsec. (e). Pub. L. 109–163, §687(a)(1), added subsec. (e).

2000—Pub. L. 106–398, §1 [[div. A], title VI, §628(b)], substituted "302j" for "302h" wherever appearing.

Subsecs. (b) to (d). Pub. L. 106–398, §1 [[div. A], title VI, §634(a)], added subsec. (b) and redesignated former subsecs. (b) and (c) as (c) and (d), respectively.

1996—Pub. L. 104–201 substituted "302h" for "302g" wherever appearing.

Pub. L. 104–106 substituted "302 through 302g," for "302, 302a, 302b, 302c, 302d, 302e," wherever appearing.

1992—Subsec. (b). Pub. L. 102–484 struck out "301d," after "such sections".

1990—Subsec. (a). Pub. L. 101–510, §§611(d), 1484(c)(1), inserted "301d," after "sections" and substituted "and 303" for "303, and 311".

Subsec. (b). Pub. L. 101–510, §611(d), inserted "301d," after "sections" wherever appearing.

Subsec. (c). Pub. L. 101–510, §§611(d), 1322(c)(2), 1484(c)(1), inserted "301d," after "sections", substituted "and 303" for "303, and 311", and struck out at end "A report shall be submitted to the Congress not later than September 30, 1982, of the results of the first such review, and a report shall be submitted to the Congress not later than September 30 of each second year thereafter on the results of the review for the preceding two-year period."

1989—Pub. L. 101–189 inserted "302d, 302e," after "302c," wherever appearing.

1987—Pub. L. 100–140 inserted "302c," after "302b," wherever appearing.

1980—Subsec. (a). Pub. L. 96–513, §506(6)(A), struck out reference to sections 302c and 313 of this title.

Subsec. (b). Pub. L. 96–513, §506(6)(B), (C), struck out reference to section 302c of this title and inserted reference to separation pay.

EFFECTIVE DATE OF 2008 AMENDMENT

Amendment by Pub. L. 110–317 applicable with respect to any sole survivorship discharge granted after Sept. 11, 2001, see section 10 of Pub. L. 110–317, set out as a note under section 2108 of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 2006 AMENDMENT

Pub. L. 109–163, div. A, title VI, §687(a)(2), Jan. 6, 2006, 119 Stat. 3327, as amended by Pub. L. 109–364, div. A, title X, §1071(e)(6), Oct. 17, 2006, 120 Stat. 2401, provided that: "In the case of a provision of law amended by subsection (b), (c), or (d) of this section [amending sections 301b, 301d, 301e, 302, 302a, 302b, 302d to 302h, 302j, 307a, 308, 308b, 308c, 308g to 308i, 309, 312, 312b, 314 to 319, and 321 to 327 of this title, sections 510, 2005, 2007, 2105, 2123, 2130a, 2173, 2200a, 4348, 6959, 9348, 16135, 16203, 16303, and 16401 of Title 10, Armed Forces, and section 182 of Title 14, Coast Guard], paragraph (3) of subsection (e) of section 303a of title 37, United States Code, as added by this subsection, shall apply to any case commenced under title 11, United States Code, after March 30, 2006."

EFFECTIVE DATE OF 1987 AMENDMENT

Amendment by Pub. L. 100–140 effective Oct. 26, 1987, and applicable to pay periods beginning on or after such date, see section 2(c) of Pub. L. 100–140, set out as an Effective Date note under section 302c of this title.

EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–513 effective Sept. 15, 1981, see section 701 of Pub. L. 96–513, set out as a note under section 101 of Title 10, Armed Forces.

### §303b. Waiver of board certification requirements

(a) CERTIFICATION INTERRUPTED BY CONTINGENCY OPERATION.—A member of the armed forces described in subsection (b) who completes the board certification or recertification requirements specified in section 302(a)(5), 302b(a)(5), 302c(c)(3), or 302c(d)(4) of this title before the end of the period established for the member in subsection (c) shall be paid special pay under the applicable section for active duty performed during the period beginning on the date on which the member was assigned to duty in support of a contingency operation and ending on the date of that certification or recertification if the Secretary of Defense determines that the member was unable to schedule or complete that certification or recertification earlier because of that duty.

(b) ELIGIBLE MEMBERS DESCRIBED.—A member of the armed forces referred to in subsection (a) is a member who—

(1) is a medical or dental officer or a non-physician health care provider;

(2) has completed any required residency training; and

(3) was, except for the board certification requirement, otherwise eligible for special pay under section 302(a)(5), 302b(a)(5), 302c(c)(3), or 302c(d)(4) of this title during a duty assignment in support of a contingency operation.

(c) PERIOD FOR CERTIFICATION.—The period referred to in subsection (a) for completion of board certification or recertification requirements with respect to a member of the armed forces is the 180-day period (extended for such additional time as the Secretary of Defense de-

**Army Regulation 210–26**

Installations

# United States Military Academy

**Rapid Action Revision (RAR) Issue Date: 6 September 2011**

Headquarters
Department of the Army
Washington, DC
9 December 2009

UNCLASSIFIED

Headquarters
Department of the Army
Washington, DC
9 December 2009

***Army Regulation 210–26**

**Effective 24 December 2009**

Installations

## United States Military Academy

By Order of the Secretary of the Army:

RAYMOND T. ODIERNO
*General, United States Army*
*Chief of Staff*

Official:

JOYCE E. MORROW
*Administrative Assistant to the Secretary of the Army*

**History.** This publication is a rapid action revision (RAR). The RAR is effective 20 September 2011. The portions affected by this RAR are listed in the summary of change.

**Summary.** This regulation incorporates existing direction and guidance from the Secretary of the Army for the general governance and operating policies of the United States Military Academy.

**Applicability.** This regulation applies to the active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. It also applies to those individuals assigned, appointed, or detailed to the United States Military Academy.

**Proponent and exception authority.** The proponent of this regulation is Deputy Chief of Staff, G-1. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25-30 for specific guidance.

**Army management control process.** This regulation contains management control provisions but does not identify key management controls that must be evaluated.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from Deputy Chief of Staff, G-1 (DAPE-MPO-AP), 300 Army Pentagon, Washington, D.C. 20310-0300.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directed to the Office of the Deputy Chief of Staff, G-1 (DAPE-MPO-AP), 300 Army Pentagon, Washington, DC 20310-0300.

**Distribution.** This publication is available in electronic media only and is intended for command level D for the active Army and the U.S. Army Reserve.

**Contents** (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*

*Section I*
*General, page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
Mission • 1–5, *page 1*
Administration and supervision • 1–6, *page 1*

*This regulation supersedes AR 210–26, dated 29 October 2008. This edition publishes a rapid action revision of AR 210–26.

UNCLASSIFIED

### 6–14. Other major misconduct offenses

A cadet who commits an offense punishable under the UCMJ by confinement for a term of 6 months or more may be separated from the Military Academy and awarded punishments under paragraph 6–4 of this regulation.

### 6–15. Procedures for processing major misconduct offenses

*a.* Cadets subject to separation or other adverse action under the provisions of this section of this regulation may, at the discretion of the Superintendent, be tried by court-martial if the conduct constitutes a violation of the UCMJ, be referred to a hearing before an investigating officer under the provisions of this paragraph, or be considered under procedures set forth in paragraph 6–4c of this regulation.

*b.* Should the Superintendent elect to proceed under the provisions of this paragraph, cadets concerned will be directed to appear as respondents before an investigating officer appointed by the Superintendent. The investigating officer will conduct an investigation of the matter in accordance with procedures approved by the Superintendent.

*c.* Upon completion of the investigation, the investigating officer will submit the record of the proceedings, including his or her findings and recommendations, to the Superintendent for action pursuant to paragraph 7–3 of this regulation.

## Section III
## Honor and Discipline

### 6–16. Violation of the Cadet Honor Code

*a.* The Cadet Honor Code states: "A cadet will not lie, cheat, or steal, or tolerate those who do." The Superintendent will establish and maintain a system to administer the Cadet Honor Code.

*b.* Honor investigative hearings will be convened by the Commandant under the provisions of the Cadet Honor Committee Procedures. Upon completion of the record of the proceedings, including the findings and recommendations, they will be reviewed by the Staff Judge Advocate, forwarded for recommendations by the Commandant, provided to the cadet respondent for rebuttal and comment, and finally sent to the Superintendent for action pursuant to paragraph 7–3 of this regulation.

*c.* Cadets who are found to have violated the Cadet Honor Code will normally be separated from the Military Academy; however, they may, at the discretion of the Superintendent, be retained or returned to the next lower class. They may also be awarded punishments under paragraph 6-4 of this regulation

*d.* Cadet Honor Committee Procedures must be approved by the Superintendent. Copies of such procedures and amendments thereto will be forwarded for information to Headquarters, Department of the Army, and will reference this paragraph.

### 6–17. Cadet Disciplinary System

*a.* Subject to the approval of the Superintendent, the Commandant will establish, publish, and administer a cadet disciplinary system. The system will include means to monitor each cadet's conduct, punishment for conduct deficiency, and instruction on the standards of conduct expected and required. Copies of the approved system and subsequent amendments will be forwarded for information to Headquarters, Department of the Army, and will reference this paragraph.

*b.* Conduct investigations will be convened by the Commandant under the provisions of the Cadet Disciplinary System. Before separating a cadet for conduct deficiency, he or she will be afforded a hearing to determine whether the cadet is deficient in conduct. If after such a hearing a cadet has been found deficient in conduct, the Commandant will review the report of proceedings. The Commandant may retain the cadet (with or without probation), or recommend to the Superintendent that the cadet be separated or suspended from the Military Academy.

*c.* In cases of conduct deficiency where a report of proceedings and the recommendations of the Commandant are forwarded for action, the Superintendent may, under the procedures in paragraph 7-3 of this regulation, take one or more of the following actions:

(1) Direct retention (with or without probation).

(2) Direct transfer to a lower class.

(3) Direct suspension from the Military Academy.

(4) Recommend separation to the Secretary of the Army.

*d.* If the Superintendent recommends separation, he or she may immediately, or at any time prior to the Secretary's action on the case, suspend the cadet. The Superintendent may also suspend any of the above actions under such terms and conditions as deemed appropriate.

Army Regulation 612–205

Personnel Processing

# Appointment and Separation of Service Academy Attendees

Headquarters
Department of the Army
Washington, DC
15 May 1983

Unclassified

Headquarters
Department of the Army
Washington, DC
15 May 1983

*Army Regulation 612–205

Effective 15 June 1983

Personnel Processing

## Appointment and Separation of Service Academy Attendees

By Order of the Secretary of the Army:

B. C. MEYER
*General, United States Army*
*Chief of Staff*

Official:

ROBERT M. JOYCE
*Major General, United States Army*
*The Adjutant General*

**History.**

**Summary.** This revised publication contains instructions on the disposition of personnel records and on the separation of cadet candidates from the US Military Academy Preparatory School. It further describes the admission process of nonactive duty Reserve Component personnel.

**Applicability.** This regulation applies to the Active Army, the Army National Guard, and the US Army Reserves.

**Proponent and exception authority.** Not applicable

**Impact on New Manning System.** This regulation does not contain information that affects the New Manning System.

**Army management control process.** Not applicable

**Supplementation.** Supplementation of this regulation is prohibited unless prior approval is obtained by HQDA (DAPC-OPP-PM), ALEX VA 22332.

**Interim changes.** Interim changes to this regulation are not official unless they are authenticated by the Adjutant General. Users will destroy interim changes on their expiration dates unless sooner superseded or rescinded.

**Suggested Improvements.** The proponent agency of this regulation is the US Army Military Personnel Center. Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to HQDA(DAPC-OPP-PM), ALEX VA 22332.

**Distribution.** DISTRIBUTION:
To be distributed in accordance with DA Form 12-9A requirements for AR, Personnel Processing.
Active Army - B
ARNG - D
USAR - D

**Contents** (Listed by paragraph and page number)

*Section I*
*Introduction, page 1*
Purpose. • 1, *page 1*
References • 2, *page 1*
Explanation of abbreviations • 3, *page 1*
Responsibilities • 4, *page 1*

*Section II*
*Admission Processing, page 1*
Active Duty Army personnel • 5, *page 1*
Nonactive duty Reserve Component personnel • 6, *page 1*

*Section III*
*Separation, page 1*
Separation of cadets from the US Military Academy • 7, *page 1*
Separation of US Army personnel for physical disability from Service academies other than the US Military Academy • 8, *page 2*
Separation of cadet candidates from the US Military Academy Preparatory School (USMAPS) • 9, *page 2*
Disposition of enlisted personnel separated from Service academies for other than physical disqualifications. • 10, *page 3*

**Appendix A.** References, *page 5*

*This regulation supersedes AR 612-205, 1 May 1982.

**Table 3**
**USMA cadet separation policies—Continued**

| Rule | If separation action is started | and the cadet | and | then |
|---|---|---|---|---|
| 2 | | entered USMA from USMAPS as an Invitational Reservist[1] | | the cadet will be discharged. |
| 3 | | entered USMA from any Regular component of any military service | has 6 or more months remaining in ETS[2] | the cadet will be returned to his or her former status for completion of any prior service obligation.[3] |
| 4 | | | has less than 6 months remaining to ETS[2] | the cadet will be relieved from active duty and transferred to Army Reserve for completion of any prior service obligation (Note 3) |
| 5 | | entered USMA as a Reserve Component member | | he or she will be processed per Regs USMA, paragraph 10.01a(6).[3] |
| 6 | After commencement of the third academic year (junior year) but before commencement of the fourth academic year (senior year) | is separated or resigns | | he or she will be transferred to the Reserve as an E–3 (or appropriate grade) for 2 years and may be ordered to active duty for not less than 2 years, or discharged from the Army if transfer to the Reserve is inappropriate.[3,4] |
| 7 | after commencement of the fourth academic year (senior year) | | | he or she will be transferred to the Reserve as an E–4 (or appropriate grade) for 3 years and may be ordered to active duty for not less than 2 years, or discharged from the Army if transfer to the Reserve is [3,4] |
| 8 | because the cadet has completed the course | declines appointment as a commissioned officer | | he or she will be transferred to the Reserve as an E–4 and ordered to active duty for 4 years. |
| 9 | because of unsuitability for military service as contemplated by AR 635–200 | | | he or she will be discharged. |

Notes:
[1] Invitational Reservists are civilians invited to enlist in the USAR specifically to attend the USMAPS (AR 140–111, para 2–6f).
[2] Service at USMA is credited toward fulfillment of any prior service obligation.
[3] However, if the separation authority determines that the cadet is being separated from the Academy because of demonstrated unsuitability unfitness, or physical disqualification from military service, the cadet will be discharged from the Army.
[4] Each case will be reviewed individually. The Superintendent will recommend to the Secretary of the Army that the cadet be either transferred to the Reserve with further recommendation regarding order to AD or that the cadet be discharged from the Army if such action is appropriate.

Department of Defense
# DIRECTIVE

**NUMBER 1332.23**
February 19, 1988
Certified Current as of November 21, 2003
*Incorporating Change 1, September 20, 2011*

ASD(FM&P)

SUBJECT: Service Academy Disenrollment

References:
(a) DoD Directive 1332.23, "Service Academy Separations," May 9, 1968 (hereby cancelled)
(b) Title 10, United States Code, Sections 516; 651; 2005; 2005(c), (d), and (f)(2); 4348(a) through (c); 6959(a) through (c); and 9348(a) through (c), as amended by Public Law 99-145, Section 512
(c) ~~DoD 7220.9-M, "Accounting Manual," October 1983~~ *DoD 7000.14-R, Volume 1 "General Financial Management Information, Systems, and Requirements," February 3, 2011*
(d) through (j), see enclosure 1

1. REISSUANCE AND PURPOSE

This Directive reissues reference (a) to:

1.1. Update uniform policies and reporting procedures for disenrolling U.S. Military, Naval, and Air Force Academy cadets and midshipmen before completing the course of instruction or after graduation if they do not accept or are not offered appointments as commissioned officers.

1.2. Establish reimbursement policies for cadets and midshipmen failing to complete their required active duty period when called to active duty, and for those not called to active duty.

2. APPLICABILITY

This Directive applies to ~~the Office of the Secretary of Defense (OSD)~~, the Military Departments (here*in*after referred to collectively as "DoD Components"); cadets and



midshipmen attending the U.S. Military Academy, West Point, New York; the U.S. Naval Academy, Annapolis, Maryland; and the U.S. Air Force Academy, Colorado Springs, Colorado (here*in*after referred to as "Service academies"). The term "Military Services," as used herein, refers to the Army, the Navy, the Air Force, and the Marine Corps.

3. DEFINITIONS

Terms used in this Directive are defined in enclosure 2.

4. POLICY

It is DoD Policy that:

4.1. Active duty service is the primary means of reimbursement for education.

4.2. Cadets and midshipmen disenrolling or those disenrolled from a Service academy normally shall be called to active duty in enlisted status.

4.3. Individuals failing to complete the required active duty period or who are ordered by the Secretary of the Military Department concerned to reimburse the United States under 10 U.S.C. 2005 (reference (b)) ordinarily shall be required to reimburse the Government for education costs commensurate with time remaining on the active duty obligation when discharged.

5. RESPONSIBILITIES

5.1. The Assistant Secretary of Defense (Force Management and Personnel) (ASD(FM&P)) shall:

5.1.1. Establish overall DoD policy and provide guidance for the conduct and administration of a uniform Service academy disenrollment policy.

5.1.2. Resolve matters of conflict that may arise among the Military Departments on Service academy disenrollments.

5.2. The Secretaries of the Military Departments shall:

5.2.1. Comply with this Directive.

5.2.2. Prescribe a written agreement when providing a Service academy appointment to qualifying persons who agree to conditions in subparagraphs 6.2.1.1. through 6.2.1.4., below, and are otherwise qualified.

5.2.3. Prescribe regulations on the following:

5.2.3.1. A breach of a cadet's and/or midshipman's "agreement to serve" for the purpose of ordering that individual to active duty.

5.2.3.2. Procedures for determining whether such a breach has occurred.

5.2.3.3. Standards for determining the period of time for which a person may be ordered to serve on active duty under paragraph 6.1., below. (See 10 U.S.C 4348(c), 6959(c), and 9348(c) (reference (b)).)

5.2.4. Establish and maintain jointly developed, uniform accounting procedures for accumulating the cost of education at their respective Service academy. These procedures shall be consistent with DoD ~~7220.9-M~~ *7000.14-R-VI* and DoD ~~Directive 5010.38~~ *Instruction 5010.40* (references (c) and (d)). A standard method for computing reimbursement of the cost of education shall be in these procedures, and accounts receivable shall be recorded under the following:

5.2.4.1. When a cadet or midshipman disenrolls or is disenrolled from a Service academy, establish an accounts receivable for the cost of education.

5.2.4.2. Reduce the accounts receivable proportionately each month as the required period of active duty is served.

5.2.5. Prescribe the repayment procedures of an individual's outstanding debt so that the total amount due, interest rate based on 10 U.S.C. 2005(f)(2) (reference (b)), monthly repayment schedules, repayment method, and other information clearly shall be explained in writing to the debtor.

5.2.6. Ensure that proper credit management and debt collection procedures are followed under DoD ~~Directive 7045.13~~ *7000.14-R, Volume 7a* (reference (e)), to include prescribing repayment procedures of an individual's outstanding Service academy loan obligation.

## 6. PROCEDURES

The following procedures shall be used when a cadet or midshipman is disenrolled from a Service academy:

6.1. Ordering Disenrolled Academy Cadets and Midshipmen to Active Enlisted Service

6.1.1. A cadet or midshipman entering a Service academy directly from civilian status assumes a Military Service obligation (MSO) of 8 years, under 10

U.S.C. 651 (reference (b)) and DoD Directive 1304.25 (reference (f)). If an appointment is terminated before graduation due to a cadet's or midshipman's breaching his or her agreement, or if a cadet or midshipman refuses to accept a commission following graduation, the MSO shall be equivalent to the period for which the member is ordered to serve on active duty or in the Reserve component in an applicable enlisted status. He or she may be ordered to active duty for a period not to exceed 4 years under sections 4348(b), 6959(b), and 9343(b) of reference (b). The following policies apply to cadets or midshipmen disenrolled from a Service academy entering the Service academy directly from civilian status:

6.1.1.1. Fourth and Third Classmen (First and Second Years). A fourth or third classman disenrolling shall have no active duty obligation.

6.1.1.2. Second Classmen (Third Year). A second classman resigning before the start of the second class academic year or disenrolling for cause resulting from actions that occurred only before the start of the second class academic year shall be discharged as if he or she were a fourth or third classman.

6.1.1.3. Second or First Classmen (Third and Fourth or Subsequent Years). Any second or first classman who is disenrolled and who, for reasons of demonstrated unsuitability, unfitness, or physical disqualification, is not suited for enlisted Military Service, shall be discharged in accordance with the current Military Service regulations that implement this Directive. Other second or first class cadets and midshipmen disenrolling after the beginning of the second class academic year, but before completing the course of instruction, may be transferred to the Reserve component in an enlisted status and ordered to active duty for not less than 2 years, but not more than 4 years, under 10 U.S.C. 4348(b), 6959(b), or 9348(b) (reference (b)).

6.1.1.4. Any first classman completing the course of instruction and declining to accept an appointment as a commissioned officer may be transferred to the respective Reserve component in an enlisted status and ordered to active duty for 4 years or transferred to a Reserve component under sections 4348(b), 6959(b), and 9348(b) of reference (b) and in accordance with DoD Directive 1235.10 (reference (g)).

6.1.2. The disposition of cadets and midshipmen entering a Service academy from the Regular or Reserve component of any Military Service and then not completing the program shall be determined under section 516 of reference (b), as follows:

6.1.2.1. Fourth and Third Classmen (First and Second Years). If disenrolled before the beginning of the second class academic year, the cadet's or midshipman's Military Service commitment shall be equal to the time not served on the original enlistment contract, with all service as a cadet or midshipman counted as service under that contract. Those individuals with less than 1 year remaining in the



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
WEST POINT, NEW YORK 10996

REPLY TO
ATTENTION OF

MACC-O-RD 15 May 2001

USCC Regulation No. 351-1

PROCEDURES FOR CONDUCT INVESTIGATIONS
UNDER THE CADET DISCIPLINARY SYSTEM

1. This regulation provides procedural guidance for participants in the conduct review/investigation process and is intended for internal use within the Cadet Disciplinary System for the United States Corps of Cadets. The intent of these procedures is to provide a fair and non-judicial method of investigating, and if needed, disciplining cadets who violate regulations or otherwise fail to maintain good order and discipline IAW the standards expected and required of members of the Corps.

2. The procedures outlined in this regulation do not confer any rights on individuals other than those rights specifically identified herein as rights of respondents.

3. All changes to this regulation must be approved by the Superintendent and forwarded to Headquarters, Department of the Army, IAW paragraph 10.11 of Regulations for the United States Military Academy.

4. This Regulation is effective 15 May 2001.

/ Original Signed/
ERIC T. OLSON
Brigadier General, USA
Commandant of Cadets

DISTRIBUTION:
Special

*This regulation supersedes USCC Regulation No. 351-1 dated 16 August 1993.

120. Maximum Punishments Under Article 10.

| Commanding Officer | Admonition or Reprimand | Demerit Award* | Extra Duty Tours | Withdrawal of Privileges | Restriction | Reduction in Rank |
|---|---|---|---|---|---|---|
| **Summarized:** | | | | | | |
| Platoon Leader** | Yes | 10 | 10 | 7 Days | 7 Days | No |
| CDT Commander*** | Yes | 10 | 10 | 7 Days | 7 Days | No |
| Company Tactical Officer*** | Yes | 10 | 10 | 7 Days | 7 Days | No |
| **Company Grade:** | | | | | | |
| Company Tactical Officer | Yes | 20 | 20 | 30 Days | 14 Days | To one lower rank; CPL or below |
| Battalion Tactical Officer | Yes | 30 | 30 | 30 Days | 30 Days | To one lower rank; SGT and below |
| **Field Grade:** | | | | | | |
| Regimental Tactical Officer | Yes | 35 | 80 | 60 Days | 45 Days | To one or more lower ranks |
| Brigade Tactical Officer | Yes | 35 | 100 | 90 Days | 60 Days | To one or more lower ranks |
| Commandant | Yes | 35 | 120 | 120 Days | 90 Days | To one or more lower ranks |

* Commanders do not award demerits. The demerit award is automatic and matches the award of tours for a maximum of 35 demerits ( e.g. 1 demerit per 1 tour)
** Only when authority is delegated by the Company Commander.
*** Baseline punishment for a violation of Article 3, Delinquency in Accountability (for being absent or late), or Article 5, Delinquency in Academic Requirements or Reports, is 5 demerits and 5 extra duty tours and the loss of privileges for the following Saturday after punishment is imposed.

(1) The Commandant reviews those cases forwarded thru the chain of command to him for decision. If the IO makes a finding that a cadet is deficient the case will be referred to the Commandant. The Commandant will review the CI findings and other "whole person" information regarding the cadet. In the event the Commandant elects not to place the cadet on probation, he will then make a recommendation to the Superintendent.

(2) The Commandant's determination that a cadet's record of performance does not warrant retention may result in his recommendation to separate the cadet.

(3) The Commandant's determination that a cadet's record of performance does warrant retention may result in the cadet being placed on conduct probation or a recommendation to the Superintendent to suspend, turn back, place on suspended separation, or retain (with or without probation) the cadet.

b. Superintendent's Actions. UP paragraphs 10.12 and 8.14c, Regulations USMA, the Superintendent, upon receiving the Commandant's recommendation, may direct retention (with or without probation), suspension from USMA, direct that the cadet be placed on suspended separation, direct the cadet be turned back to a lower class, or recommend to the Secretary of the Army that a cadet be separated from the Military Academy. If the Superintendent recommends separation, he may immediately suspend the cadet from the Military Academy, pending final action on the case by the Secretary of the Army.

c. Action by the Secretary of the Army (SA). The SA may direct separation, suspension, probation or retention with no action. In the unusual case wherein the SA elects to retain a cadet recommended for separation by the Superintendent because of a declared deficiency in conduct standing, the following provisions apply to that cadet upon his or her return to USMA: previous demerits and board awards given the cadet, which the SA does not rescind, remain in effect when the cadet's disciplinary case is resolved. In other words, the cadet's demerit record for the past six months or his or her board awards are not automatically erased upon an SA decision to retain the cadet.

**119. Cadet Disciplinary Code.**

**General: Use of the Cadet Disciplinary Code.** This chapter provides general categories, or articles, to distinguish infractions of USCC SOP for disposition under the Cadet Disciplinary System. When an infraction involves several articles, the commander should choose the most appropriate one for processing under Article 10. Article 10 is the authority given to commanders to impose punishment and the type and amount of punishment the commander may impose.

**Article 1. Failure to comply with Regulations, Orders, Instructions**
Failure to comply with oral or written regulations, orders, or instructions through laxness, ignorance, or neglect. The disobedience of orders and regulations normally is more serious than a mistake in judgment. Orders are given with the expectation of compliance both in spirit and in letter.

**Article 2. Failure to Perform Duty**
Failure to perform a duty, failing to assume a responsibility, evading a regulation permitting other cadets under one's command or control to evade their responsibility or regulations, and overlooking or failing to report breaches of regulations are all delinquencies which indicate poor motivation and a low concept of duty.

**Article 3. Delinquency in Accountability**

a. Self-disciplined cadets who possess a strong sense of duty also report as ordered and maintain themselves within the spirit and intent of regulations. The cadet who willfully absents him or herself from the cadet area or post limits does not display the degree of self-discipline expected of cadets or future officers. The individual cadet is responsible for being present for duty and on time.

b. Cadets must learn to allow sufficient time for unknown circumstances and unforeseen delays in reporting. Being on time when a group or unit may be delayed because of an individual's tardiness, such as a return trip formation, is more important than being on time to an activity which affects only the individual. The seriousness

of tardiness is only partly indicated by the length of time involved. Tactical officers also consider the amount of judgment exercised by the cadet in attempts to report for duty.

c. Accountability Involving Lateness: Cadets are late when they arrive after the class, formation, or activity has started but before it is dismissed or ends; or after the Command Fall In has been given at a formation but before the accountability report is rendered by the immediate supervisor. d. Accountability Involving Absence: Cadets are absent when they fail to be at a prescribed location or place of duty during specified times.

**Article 4. Unsatisfactory in Appearance: Personal, Room, and Equipment**
Appearance is a significant indicator of individual pride and unit discipline, morale, and esprit. For these reasons, cadets are responsible to ensure they meet and maintain the standards IAW the USCC SOP regarding their personal condition and appearance, as well as the condition and appearance of rooms and equipment. Cadets are expected to maintain an appearance appropriate for officers and cadets at all times.

**Article 5. Delinquency for Academic Requirements or Official Reports**
The proper preparation and timely submission of official communications, records, reports, and academic writing/homework requirements at the Military Academy develop habits and attention to detail which are prerequisites to successful officership. Therefore, cadets should always prepare accurate and complete reports, academic papers, and required homework exercises and submit them on time. Academic instructors must be careful to differentiate between those deficiencies, which are solely academic in nature and should result in a lower academic grade and those which reflect a failure of duty or an obvious laxness in the accomplishment of such a duty.

**Article 6. Unsatisfactory Behavior**
Those standards of manner, decorum, and conduct expected of a commissioned officer and a gentleman or lady are expected of cadets at all times. Unsatisfactory behavior is any behavior that is prejudicial to the good order and discipline within the Corps of cadets, and behavior that brings discredit upon the Corps, USMA, and the US Army. Reflecting discredit is defined as actions or words which would bring criticism against an organization; this requires that the individual is identifiable as a member of the Corps of Cadets or the U. S. Army.

**Article 7. Error in Judgment.**
Cadets are expected to exercise good judgment at all times including cases not covered by instructions or cases in which orders are obviously illegal or inappropriate. Errors in judgment under this article are those decisions or actions by a cadet that cause serious effects. Decisions made under these circumstances reflect a cadet's maturity, initiative, experience, common sense, and ability to learn from past mistakes.

**Article 8. Failure in Security or Property Accountability and Safety**
Failure to properly account for, safeguard, and/or secure property. Cadets are responsible to properly maintain and safeguard all government property and their own personal high dollar value property. Examples of such property include but are not limited to: military - radios, TA-50, training aids; personal property - CD players, compact disks, wrist watches, check books and cameras.

**Article 9. General Article**
All other behaviors, disorders and neglects prejudicial to good order and discipline in the Corps of Cadets or Armed Forces and all conduct of a nature to bring discredit upon the Corps of Cadets or Armed Forces.

**Article 10. Commanding Officer Authority to Impose Punishment**
Under authority of the Commandant, USCC, commanders within USCC may impose one or more of the following disciplinary punishments upon members of his or her command:

**120. Maximum Punishments Under Article 10.**

| Commanding Officer | Admonition or Reprimand | Demerit Award* | Extra Duty Tours | Withdrawal of Privileges | Restriction | Reduction in Rank |
|---|---|---|---|---|---|---|
| **Summarized:** | | | | | | |
| Platoon Leader** | Yes | 10 | 10 | 7 Days | 7 Days | No |
| CDT Commander*** | Yes | 10 | 10 | 7 Days | 7 Days | No |
| Company Tactical Officer*** | Yes | 10 | 10 | 7 Days | 7 Days | No |
| **Company Grade:** | | | | | | |
| Company Tactical Officer | Yes | 20 | 20 | 30 Days | 14 Days | To one lower rank; CPL or below |
| Battalion Tactical Officer | Yes | 30 | 30 | 30 Days | 30 Days | To one lower rank; SGT and below |
| **Field Grade:** | | | | | | |
| Regimental Tactical Officer | Yes | 35 | 80 | 60 Days | 45 Days | To one or more lower ranks |
| Brigade Tactical Officer | Yes | 35 | 100 | 90 Days | 60 Days | To one or more lower ranks |
| Commandant | Yes | 35 | 120 | 120 Days | 90 Days | To one or more lower ranks |

* Commanders do not award demerits. The demerit award is automatic and matches the award of tours for a maximum of 35 demerits ( e.g. 1 demerit per 1 tour)
** Only when authority is delegated by the Company Commander.
*** Baseline punishment for a violation of Article 3, Delinquency in Accountability (for being absent or late), or Article 5, Delinquency in Academic Requirements or Reports, is 5 demerits and 5 extra duty tours and the loss of privileges for the following Saturday after punishment is imposed.

**121. Demerit Allowance Table.**

**DEMERIT ALLOWANCE TABLE FROM USCC REGULATION 351-2**

**Fourth Class Year**

| Aug-Jan | Sep-Feb | Oct-Mar | Nov-Apr | Dec-May | Jan-Jun |
|---|---|---|---|---|---|
| 144 | 144 | 144 | 144 | 144 | 144 |

**Transition from Fourth to Third Class**

| Feb-Jul | Mar-Aug | Apr-Sep | May-Oct | Jun-Nov | Jul-Dec |
|---|---|---|---|---|---|
| 138 | 132 | 126 | 120 | 114 | 108 |

**Third Class Year**

| Aug-Jan | Sep-Feb | Oct-Mar | Nov-Apr | Dec-May | Jan-Jun |
|---|---|---|---|---|---|
| 108 | 108 | 108 | 108 | 108 | 108 |

**Transition from Third to Second Class**

| Feb-Jul | Mar-Aug | Apr-Sep | May-Oct | Jun-Nov | Jul-Dec |
|---|---|---|---|---|---|
| 105 | 102 | 99 | 96 | 93 | 90 |

**Second Class Year**

| Aug-Jan | Sep-Feb | Oct-Mar | Nov-Apr | Dec-May | Jan-Jun |
|---|---|---|---|---|---|
| 90 | 90 | 90 | 90 | 90 | 90 |

**Transition from Second to First Class**

| Feb-Jul | Mar-Aug | Apr-Sep | May-Oct | Jun-Nov | Jul-Dec |
|---|---|---|---|---|---|
| 87 | 84 | 81 | 78 | 75 | 72 |

**First Class Year**

| Aug-Jan | Sep-Feb | Oct-Mar | Nov-Apr | Dec-May | Jan-Jun |
|---|---|---|---|---|---|
| 72 | 72 | 72 | 72 | 72 | 72 |

Note:

(a) Fourth class cadets enter the demerit system on the day after they arrive in their letter companies during Reorganization Week.

(b) Demerits received by New Cadets during Cadet Basic Training do not count against these allowances.

(c) Periods of summer leave are included in the demerit periods and allowances for all classes.

(d) The Jan-Jun allowance for First class cadets is computed as if Jun were a full duty month.

(e) Each period runs from the first calendar day of the first month shown through the last calendar day of the last month shown.

**Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)**

**From:** Isiah Doolen [idoolen13@me.com]
**Sent:** Friday, January 24, 2014 3:22 PM
**To:** Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)
**Subject:** NMMI

Sir,

The emails below adequately supplement what Mr. Metz wrote. My mother and I did not push for any kind of investigation and as I mentioned in prior rebuttals, I never knew an investigation had occurred. I wrote Senator Bingaman's office, at the time, to ask whether my appointment to USMAPS was in jeopardy. The response I received was no. In fact, I just found recently that a liaison from the Senator's office told my mother that I was probably going to be a direct admit to the Academy. Regardless, my time at NMMI was marked by continuous improvement and development. I had four nominations to USMA. My performance in ROTC was excellent. Lastly, my final semester at NMMI was ended with a 3.54 GPA. I chose to leave out LTC (R) Cunningham's remarks to me because as I have mentioned before, I am choosing to focus on my future. Frankly, his remarks do nothing to put him in a good light.

Very Respectfully,

Isiah Doolen

Sent from my iPad

**Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)**

**From:** Metz, David [d.metz@tcu.edu]
**Sent:** Friday, January 24, 2014 2:40 PM
**To:** Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)
**Cc:** Isiah Doolen (idoolen13@icloud.com)
**Subject:** FW: OML For ROTC Graduating Class of 2008 (UNCLASSIFIED)
**Attachments:** NMMI Doolen Senator Bingaman Letter 0508.doc

LTC Barnes:

Attached is a background item which may also be informative for you.

Cadet Isiah Doolen, in response to rising attrition and falling retention and enrollment after a retired USN Officer took over as superintendent of Isiah's school, founded and edited an unofficial cadet newspaper called The Corps Roast, which called attention to - and published irrefutable facts on - the enrollment and morale issues attributable to the school's leadership. Isiah also joined with over 800 of the school's alumni, parents and patrons in signing an Internet petition calling for the resignation of the superintendent.

Right before graduation from the junior college, Cadet Officer Isiah Doolen was called before the PMS (who was about to retire and was applying for a civilian job at the school in the commandant's office) and was admonished for his above actions and - per what Cadet Doolen reported (which, to me was credible) - was told that had he done the above after commissioning, he would have been subject to UCMJ. Such would be a dubious conclusion for two reasons: 1) Cadet Doolen, even if he had accepted the commission upon graduation, would not really have been on active duty or even have been fully processed for active duty when he was on the newspaper staff and when he signed the petition; and 2) (per a former JAG officer who was consulted at the time) the mere student (and pre-commissioning) involvement with a school newspaper and the signing of an Internet petition calling for the removal of a school official would hardly have been cause for any action based on UCMJ.

All this was 7 or 8 years ago; but more recently, Isiah had asked a member of the school's staff for a letter of recommendation and was told it would be forthcoming. Following the assurance that a recommendation would be forthcoming, the offer was suddenly withdrawn with the explanation that the person promising to write a letter had consulted with staff (perhaps in the commandant's office) and would no longer help Isiah.

A conclusion could easily be drawn that a grudge against Mr. Doolen was still held for his long-ago involvement in the school newspaper, the signing of an Internet petition, and Isiah's writing to US Senator Jeff Bingaman for help. This all seems to be punishing Isiah for having earlier exercised the basic American right of free speech - something that we, as officers fight to uphold.

Mr. Doolen has always seemed to be a straight-arrow young man, someone who has high intellect and high morals, and someone who will stand up for himself and his principles.

I was not privy to any of the above personal conversations or confrontations, but I believe Isiah and his mother (a just-retired 40-year Federal Civil Servant).

With every good wish to you, Mr. Isiah Doolen the United States Army and USMA,

David Metz

*****

Retired TCU Southwest Region Director of Admission

NMMI 1963 High School Grad & 1965 Junior College Grad (with 2LT Commission)

USAREUR, 8th Infantry Division: 1968-1970

NMMI Alumni Association Life Member

NMMI Admission Office: 1971-1979

---

From: Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)
[mailto:reginald.l.barnes10.mil@mail.mil]
Sent: Thursday, January 23, 2014 2:06 PM
To: Isiah Doolen
Cc: Metz, David
Subject: RE: Statement Rough Draft (UNCLASSIFIED)

Classification: UNCLASSIFIED

Caveats: NONE

Roger, I understand you wish for Mr. Metz to provide comments. Standing by to receive.

LTC Reginald L. Barnes

RC Officer Accessions Policy Integrator

DCS, G-1, DMPM (DAPE-MPO-AP)

Army Pentagon, Room 1C353

Phone: 703.695.6644

DSN: 312.225.6644

Fax 703.695.5987

Email: reginald.l.barnes10.mil@mail.mil

----------------------------------------------------------------------------------------------

Warning: This email message may contain information protected by Army Regulation 20-1 and/or the Privacy Act. It is intended only for the individual s or entity to which it is addressed. Any review, dissemination, or copying of this communication by anyone other than the intended recipient is strictly prohibited.

-----Original Message-----

From: Isiah Doolen [mailto:idoolen13@icloud.com]

Sent: Thursday, January 16, 2014 1:21 PM

To: Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)

Cc: David Metz

Subject: Re: Statement Rough Draft (UNCLASSIFIED)

Sir,

I appreciate the response. There is another matter I would like to bring up as well, and that involves what LTC (R) Cunningham said regarding my commissioning from NMMI. I spoke with NMMI alumnus, Mr. Metz, and he said he would be willing to write a recommendation on my behalf or answer questions regarding the matters involving LTC (R) Cunningham. He is cc'd in this email as well.

Very Respectfully,

Isiah Doolen

Sent from my iPhone

> On Jan 16, 2014, at 11:26 AM, "Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)" <reginald.l.barnes10.mil@mail.mil> wrote:

>

> Classification: UNCLASSIFIED

> Caveats: NONE

>

> Mr. Doolen,

> Acknowledge receipt. I will contact 2LT Baudoindajoux or you, should I have questions after I have reviewed the packet.

>

> 2LT Baudoindajoux,

> What is your military email?

>

>

> LTC Reginald L. Barnes

> RC Officer Accessions Policy Integrator DCS, G-1, DMPM (DAPE-MPO-AP)

> Army Pentagon, Room 1C353

> Phone: 703.695.6644

> DSN: 312.225.6644

> Fax 703.695.5987

> Email: reginald.l.barnes10.mil@mail.mil

>

> ----------------------------------------------------------------------

> --------------------------------

>

> Warning: This email message may contain information protected by Army Regulation 20-1 and/or the Privacy Act. It is intended only for the individual s or entity to which it is addressed. Any review, dissemination, or copying of this communication by anyone other than the intended recipient is strictly prohibited.

>

>

>

>

> -----Original Message-----

> From: Isiah Doolen [mailto:idoolen13@icloud.com]

> Sent: Thursday, January 16, 2014 9:01 AM

> To: Barnes, Reginald L LTC USARMY HQDA DCS G-1 (US)

> Cc: Landry, Brigitte L LTC USARMY HQDA DCS G-1 (US);

> h.baudoin@yahoo.com; Chris_Holland@mccaskill.senate.gov

> Subject: Fwd: Statement Rough Draft

>

> Sir,

>

> LTC Landry told me you were working my case. I received a statement from Hunter Baudoindajoux regarding my January 11, 2013 punishment. His sentiments were never annotated by my investigating officer, despite the fact he stated what he wrote below at my conduct hearing. He also validates what I have written in my numerous rebuttals. As to any questions pertaining to his statement, he can be reached at 850-559-5558. I also cc'd him in this email.

>

> Very Respectfully,

>

> Isiah Doolen

>

> Sent from my iPad

>

> Begin forwarded message:

>

>

>

> From: Hunter Bo <h.baudoin@yahoo.com>

> Date: January 16, 2014, 7:36:52 AM CST

> To: "idoolen13@icloud.com" <idoolen13@icloud.com>

> Subject: Statement

> Reply-To: Hunter Bo <h.baudoin@yahoo.com>

>

>

>

>

>

> During the AY 13-1, I, 2LT Hunter Baudoindajoux, was the platoon leader for Cadet Isiah Doolen. His role in the platoon was section leader, while his role in the company was supply officer. At the beginning of the semester, in early January of 2013, CDT Doolen compromised in three incidences. The first was disobeying the policy of having the door 90 degrees open with a female in the room. The second was missing a class over confusion of location. The third incident was not meeting the suspense as outlined by the Company XO for supply and maintenance issues.

>

> The first two incidents were dealt with at the lowest level and essentially merited a verbal warning. The third incident resulted in a company board with 20 hours and 20 demerits - 14 days room restriction and loss of privileges. The board was for the third incident only, with a rather harsh punishment for the "isolated incident". While talking with the company commander about CDT Doolen's board, it was explicitly stated the punishment was so harsh because he had been messing up/ forming a pattern of bad behavior.

>

> As CDT Doolen's first line supervisor, I was

> informed by neither the Xo or the Co about Cadet Doolen missing any

> other suspenses. As such, it was in my opinon, that the punishment

> seemed harsh for the suspense incident when the other two incidents

> were not formally included on the board. Granted, it is at the

> discretion of the TAC to determine the punishment. However, without
> the other two incidents being formally included, the punishment seemed
> excessive
>
>
>
> Hunter P Baudoindajoux
>
> 2LT, IN



**DEPARTMENT OF THE ARMY**
**UNITED STATES MILITARY ACADEMY**
**WEST POINT, NY 10996**

MACC-O-1-B 25 July 2013

MEMORANDUM FOR Superintendent, United States Military Academy, West Point, New York 10996

SUBJECT: CDT Doolen address to the Superintendent of the United States Military Academy regarding Separation

1. SUBJECT

Based on Army regulations, the United States Code of Military Justice, guidelines from the Office of the Inspector General at West Point, the United States Corps of Cadet Regulations, and matters regarding questioning as they relate to the Cadet Honor Code, the following actions have been initiated: Congressional Inquiry into my reinstatement as a Cadet, a redress of wrongs, and a formal Article 138 Complaint. I would like to submit additional matters of evidence to the Superintendent to hopefully rectify matters regarding my separation with recoupment from the United States Military Academy. Special case matters will be referenced in this documentation to serve as a precedential guideline.

**Summary of Offense**

I was separated from the Academy for deficiency in conduct after receiving 90 demerits as of 19 January, 2013, 18 demerits in excess of the 72-demerit allowance for a first class cadet. Separation from the Academy deprives me not only of my college education and a commission into the Army, but it also taxes me in the form of $203,000 in recoupment. I argue that this punishment is excessive when considering matters of precedence, and the recommendation of my investigating officer for my conduct investigation. Furthermore, I argue the procedural due process regarding my separation from the Academy was flawed in many aspects:

1) "The accumulation of demerits as a result of several individual awards may activate the other aspects of the disciplinary system with which this case deals. If a cadet exceeds his demerit allowance for a month or for the entire demerit period, the Tactical Officer is directed to interview the cadet to determine that all awards are correct and just and to have the cadet sign a form to that effect".[1] This action was not taken in accordance with Cadet Regulations. Rather, I was counseled on past infractions, and on an impending infraction that, if I was awarded enough demerits, would initiate a conduct investigation (Refer to Figure 1 and 2). When I would attempt to argue the validity of my punishments in regards to infractions, my attempts were merely shrugged off as a lack of acceptance of ownership and ultimately used against my character. I

[1] http://openjurist.org/470/f2d/201/hagopian-v-knowlton

believe that it is easy to see where this would become burdensome, and after a while, viewed as a futile effort to continue to contend charges in vain. It is also necessary to note the burden of stress (military duties, academic work, and issues regarding my personal life) when determining why matters for redress were not brought up sooner.

**DEVELOPMENTAL COUNSELING FORM**
For use of this form, see FM 6-22; the proponent agency is TRADOC.

**DATA REQUIRED BY THE PRIVACY ACT OF 1974**

| | |
|---|---|
| AUTHORITY: | 5 USC 301, Departmental Regulations; 10 USC 3013, Secretary of the Army |
| PRINCIPAL PURPOSE: | To assist leaders in conducting and recording counseling data pertaining to subordinates. |
| ROUTINE USES: | The DoD Blanket Routine Uses set forth at the beginning of the Army's compilation of systems or records notices also apply to this system. |
| DISCLOSURE: | Disclosure is voluntary. |

**PART I - ADMINISTRATIVE DATA**

| Name (Last, First, MI) | Rank/Grade | Date of Counseling |
|---|---|---|
| DOOLEN, ISIAH M. | Cadet | 28 January 2013 |

| Organization | Name and Title of Counselor |
|---|---|
| Company B, 1st Regiment, United States Corps of Cadets | EATON-FERENZI, ELIZABETH S., CPT / B1 TAC Officer |

**PART II - BACKGROUND INFORMATION**

Purpose of Counseling: (Leader states the reason for the counseling, e.g. Performance/Professional or Event-Oriented counseling, and includes the leader's facts and observations prior to the counseling.)

Event-oriented counseling: pattern of behavior and lack of discipline within the first 3 weeks of the 13-2 Academic Year at USMA
1. missed S4 suspense given by BN S4 (11JAN) - COR & resultant Company Board
2. missed BRADSO signing suspense given by MAJ Cheatham; Armor branch rep (10JAN) OR & resultant summarized Company Board
3. wrong uniform; sweater as on the spot corrected by the Commandant and 1st REG RTO (15JAN) - verbal counseling
4. cadet (female) in barracks room without door open; OC/TAC Officer caught this (06JAN) - verbal counseling
5. unexcused absence from class (06JAN)
6. out after TAPS while on restriction (20JAN) - BN Board pending

**PART III - SUMMARY OF COUNSELING**
**Complete this section during or immediately subsequent to counseling.**

Key Points of Discussion:

Purpose of Counseling: Review your conduct and behavior from the past three weeks. Review the expectations of you as a Cadet and future leader. Additionally, discuss upcoming potential repercussions and consequences of your conduct.

Your pattern of conduct has resulted in a series of Company boards; 2 x summarized, 1 x company grade. You have received several walking hours and demerits as a consequence. Your latest infraction happened on 20 JAN and you are awaiting a BN Board. Your BN board is for being out after TAPS. You were and are flagged (meaning you are at a loss of privileges as per the USCC SOP).

You currently have 60 demerits. 72 demerits is the maximum number of demerits that if you are at or exceed, automatically triggers a conduct investigation. The maximum punishment for a BN Board is 30 demerits, 30 walking hours, 30 days withdrawal of privileges, and 30 days restriction.

Bottom Line: Your behavior and conduct has been unacceptable. As a Firstie, you should be setting the example of what right looks like in actions, words and deeds.

Areas of Focus for Expectations of an Officer:
Leadership; BE, KNOW, DO. Set the example for others to follow
Time management
Taking ownership for any issues that arise individually or with your unit
Communication with your chain of command; including meeting suspense dates

**OTHER INSTRUCTIONS**

This form will be destroyed upon: reassignment (other than rehabilitative transfers), separation at ETS, or upon retirement. For separation

**Figure 1. Pre-CI Counseling Front side**

**Plan of Action** *(Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below))*

NLT 08 February 2013 complete the following (turn in a 3 to 5 page typed document to the TAC Team):

1. Answer the question - what does taking ownership of your actions and responsibilities as a leader mean to you?
   - How do you perceive your role and responsibilities as a Firstie?
   - How do you perceive your role and responsibilities as the company S4?
   - What does taking ownership of your roles and responsibilities look like? What actions are manifested?
   - Have you ever had to lead a subordinate who did not take ownership of their actions? If so, how did you react to them? What was your perception of them as a Cadet and a leader?

**Session Closing:** *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees/disagrees and provides remarks if appropriate.)*

Individual counseled: [X] agree [ ] disagree with the information above.

Individual counseled remarks:

Signature of Individual Counseled: [signature] Date: 1-29-13

**Leader Responsibilities:** *(Leader's responsibilities in implementing the plan of action.)*

Continue to teach, coach, mentor Cadet
Be available, as necessary

Signature of Counselor: [signature] Date: 24 JAN 13

**PART IV - ASSESSMENT OF THE PLAN OF ACTION**

**Assessment:** *(Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*

Counselor: ______ Individual Counseled: ______ Date of Assessment: ______

**Note: Both the counselor and the individual counseled should retain a record of the counseling.**

**Figure 2 Pre-CI Counseling Back side**

I would like to note that the agreement of this counseling form was an acknowledgement that there was a possibility of an impending conduct investigation, an acknowledgement of my

number of demerits at the time, and an acknowledgement that I would abide by the plan of action. In no way does this counseling form serve the satisfaction of requirements in accordance with Cadet Regulations. I did not, and still do not agree with certain punishments that I had received leading to my conduct investigation. As mentioned previously, I accrued 90 demerits after a battalion board on 19 January, 2013. On 04 February, 2013, I was officially notified of my conduct investigation.

a) Events as outlined by Mr. Eric Mayer (Attorney) in a rebuttal to the Superintendent, LTG. Huntoon:

**1. He engaged in a heated argument with a classmate who happened to occupy a leadership position (Cadet CSM). September 2012. 30 demerits**

**2. He was not present for a lunch formation. December 2012. 5 demerits**

**3. He did not sign his BRADSO contract by the posted suspense. 5 demerits.**

**4. He failed to update the battalion maintenance tracker by the suspense. 20 demerits.**

**5. He was out of his room after Taps while on restriction. 30 demerits.**

**The allegations of misconduct from September 2012 to January 2013 are minor, non-violent, and two of them indicate, at worst, forgetfulness or a bit of procrastination.**

- **The verbal altercation that occurred between CDT Doolen and the Battalion CSM was initiated because CDT Doolen believed that the CDT CSM was acting unprofessionally and unreasonably toward another cadet. CDT Doolen intended to correct the situation immediately. Unfortunately, the discussion unreasonably escalated, but never turned physical. However, we should not forget that this was, in essence, a heated discussion between two classmates. For this, he received a heavy punishment that included 30 demerits.**
- **In December 2012, he failed to be present at lunch formation. However, he was working with a lab group on a project that required his attention and absence from formation. Unfortunately, he did not make the necessary coordination because he**

**forgot to do so. This is not an act of blatant misconduct but a very minor miscommunication**

- **He accepts his failure to sign the BRADSO contract and makes no excuses for this mistake.**
- **The matter involving the battalion maintenance tracker is a complicated one. Essentially, CDT Doolen and his supply cadet NCO waited until the last night before the suspense to update the tracker. At the time they attempted to update it with their company information, the system was not available. Yet, every maintenance issue had already been submitted to the TAC NCO for action, making the electronic maintenance tracker a mere formality. While CDT Doolen accepts responsibility for failing to properly manage the time constraints of this project, the punishment is excessive for an act that, in essence, constitutes simple procrastination that did not harm the wellbeing and/or comfort of other cadets.**
- **In his final misconduct of the period, CDT Doolen was away from his room after Taps. However, the circumstances mitigate the severity of the conduct. At the time of the misconduct, CDT Doolen received an emotional and frantic message from his recently-ex-girlfriend. He was still emotionally attached to her, and she indicated that she was presently harassed by other cadets. He immediately responded to the situation to discover that it was not as she had communicated. Upon discovering this, he immediately withdrew back to his room. Again, while he knows he was wrong, the punishment is excessive considering the circumstances surrounding the underlying misconduct.**

I have highlighted two offenses above that I believe were overlooked as excessive in nature despite the fact that I had argued these offenses at my conduct hearing. Chapter 1, USCC