Regulation 351-2, Table 1-1, Level of Punishment Guideline annotates the nature of offenses and the level at which those offenses should be adjudicated. The two offenses that I highlighted are both Type IV offenses (Company level). Given the nature and type of offenses, punishment was indeed excessive: 1) the verbal altercation, in its nature of offense, regarded behavior, such behavior that was of Type IV, Disrespect/disobedient. I received a battalion board for this and was given max punishment, 30 hours and 30 demerits. 2) the battalion maintenance tracker issue, in its nature of offense, regarded Duty, such behavior that was of Type IV, Failure to do duty (minor). I received a company level board and was given max punishment for an offense that was classified as minor, 20 hours and 20 demerits. Please refer to figure 3.

CHAPTER 1, USCC Regulation 351-2

TABLE 1-1
LEVEL OF PUNISHMENT GUIDELINE

| Nature of offense | Type I (BDE or REGS USMA) | Type II (Regimental level) | Type III (Battalion level) | Type IV (Company level) |
|---|---|---|---|---|
| Withhold | Sex/Drugs/Alcohol related | | | |
| | Crimes/Hazing | | | |
| | Outside reports | | | |
| | Unauthorized POV (Underclass) | | | |
| Academic | | Improper documentation | Failure to submit (4 +) | Failure to submit (1,2,3) |
| Accountability | | TAPS-not in barracks | TAPS-not in company | TAPS not in room |
| | | Sunday/Acct formation >3 hrs | Acct formation 1-3 hours | Acct formation <1 hour |
| | | Absent for movements (A/N) | Routine formation (major) | Routine formation (minor) |
| | | | Class absence (4 +) | Class absence (1, 2, 3) |
| | | | Class/assignment late(5 +) | Class/assignment late(2,3,4) |
| Appearance | | Reflecting poorly on USMA | Major or multiple infractions | Minor infractions |
| | | | Barracks closeout | Room unprepared for insp |
| Behavior | | Major PDA | Improper conduct in lecture | Obscene language |
| | | Disrespect towards faculty | PDA (minor or innocent) | Check not honored |
| | | Horseplay (major)e.g. fire alarm, injuries | Horseplay (minor) bday party | Disrespect/disobedient |
| | | Fraternization (major) | Improper relationship | Falling out |
| Duty | | Failure to report major regs | Duty (multiple offenses) | Failure to do duty (minor) |

1-14

Figure 3 - Table 1-1

b) My sentiments regarding my punishments were not sentiments that reflected a mere lack of ownership, or direct personal attacks against those holding me accountable; furthermore, arguing the excessiveness of a punishment and arguing the nullification of a punishment completely are two different things. When arguing the excessiveness of a punishment, I in essence acknowledge that punishment was necessary, therefore taking ownership, but also acknowledge that the

6

000719

punishment was not necessary to the extent that it was given. In fact, I felt so strongly about the excessiveness of my punishments that I consulted with the IG on multiple occasions regarding my company tactical team, contradicting my tactical officer's claim in Figure 10 that "[I] often wait until consequences escalate to a point that is personally intolerable to [me] before deciding to challenge or appeal". I would also like to point out that such a statement reflects angst over the fact that I have ever challenged or appealed a punishment (retaliatory). CPT Eaton-Ferenzi mentions my appealing of punishments, yet, the only punishment I ever chose to appeal was my regimental board in regards to the TAPs allegation. Over Spring Break (week of 08 March 2013) my parents drove me to the IG's office to discuss these continuous patterns of harassment towards me by my company tactical team. Please refer to the following email and figure 4 (note the dates of my protected communication and compare that to the date of the disposition written by my company and regimental tactical officers on 01 April, 2013):


-----Original Message-----

From: Doolen, Isiah M CADET MIL USA USMA

Sent: Wednesday, March 20, 2013 11:42 PM

To: Eaton, Elizabeth S CPT MIL USA USMA

Cc: Carlson, Ashli N CADET MIL USA USMA; Steffy, Barton R CADET MIL USA

USMA; Crofford, Clifford D CADET MIL USA USMA; 'concepcion.doolen@ssa.gov'

Subject: IG


Ma'am,


I wanted to let you know that I'm going to bring all of the conduct

matters that you have brought up against me to IG. I feel like the

punishment you gave me in regards to the supply maintenance tracker was a

double dipping of demerits in which you categorized all of the issues that

I had prior to that in to one lump charge, but then proceeded to punish me

for those issues on separate occasions so that the demerits would be

multiplicative. You then had CDT Schubert write me a COR for missing class

because I went to talk to the RXO about Spring Break. I think the issue

000720

with that is that you are wanting to make it seem as though it been a CDT
generated issue and that you were merely acting on a chain of command
action and not an issue that you brought up on your own (what I believe to
be a retaliatory measure for me talking to the RXO about my perceptions of
you). Much like my conduct, there is a clear pattern with what is going on
here, and that is that every time I have stubbed my toe, you have been
there watching to make sure that I am getting punished. To me, this is
becoming an issue of harassment; it's like walking on egg shells.


Very Respectfully,


Cadet Isiah Doolen

---

he Item is digitally signed and cannot be altered. *(Is to do for you?)*
~~indicating intent to accuse via a sworn statement~~ by a TAC NCO (E-7)

**INFORMATION PERTAINING TO THIS REQUEST** *(Background. Use additional sheets if necessary; list enclosures if applicable.)*
SFC. Rowley's Sworn Statement:

**See Enclosure A.**

SFC. Rowley's statement is not true in that he never opened my door at 2330 to check and see if I was in my room or not. He has
admitted verbally, with witnesses to account for his statements, that the door was locked and that I did not answer the door, which
does not account for whether or not I was in my room. USCC SOP requires cadets to lock their door after 2315. Furthermore, in
regards to questioning, Chapter 3 - Investigations and Disciplinary Hearing Procedures, "Cadets should not be questioned about
potential violations of this regulation for, which there does not already exist reasonable cause to indicate that a delinquency was
committed. For example, it would not be proper to ask a cadet whether he or she had been drinking alcohol merely because he or
she was reported absent from taps inspection". According to the procedures and guidelines for USMA, my rights have been
violated in regards to me being questioned about where I was for TAPs given that there was no prior evidence to suggest that I was
not in my room. The fact that my door was locked for TAPs is a compliance with USCC SOP. No evidence indicates that I was not
in my room, but there is ample evidence that suggests that I was in my room. As a cadet, I still have rights under UCMJ, and those
rights indicate that I have the ability to not answer interrogatory questions (Article 31). Furthermore, I feel my UCMJ rights to
keep quiet have been used against me to determine a matter of guilt in regards to the TAPs allegation. LTC Cross, 1st regiment
RTO, made the following statement, to the effects of: "This is a fucking yes or no question, were you in your room for TAPs".
After not saying anything for a while, he said to the effects of "I do not want you to have to lie, you can choose not to answer this,
but if you do choose not to answer then I will assume the answer to be no and you will be found guilty". I still chose not to answer.
Witnesses in the room will attest to LTC. Cross' assertions. Additionally, SFC. Rowley's statement has been used as
"overwhelming" evidence to punish me for not being in my room (his statement is misleading and does not verify anything in
regards to me being in my room or not).

| I do ☐  | ☑ I do not | consent to release my personal information outside of IG channels (but within DoD official channels) in order to resolve the matters listed above. I understand that if I do not agree to release my personal information, my request for assistance may go unresolved. |

This information is submitted for the basic purpose of requesting assistance, correcting injustices affecting the individual, or eliminating conditions
considered detrimental to the efficiency or reputation of the Army. Those who knowingly and intentionally provide false statements on this form are
subject to potential punitive and administrative action (UCMJ Art. 107, 18 USC 1001).

| SIGNATURE | **DOOLEN.ISIAH.MATTHEW.1293726639** | DATE *(YYYYMMDD)* 20130328 |

---

**Figure 4- Complaint to IG following regimental board for TAPs Allegation**

Given the nature of my offenses leading to my conduct investigation, the submission of protected
communication, and a pattern of unethical behavior on behalf of my company tactical team and

000721

regimental tactical officer, I argue that the recommendation of my separation with recoupment from the Academy be reevaluated. For the sake of specificity, I will ask that reference be given to my initial submission to Senator Claire McCaskill's office, addressed as "CDT Doolen-Matters for Congressional Inquiry". My company tactical team's actions, regarding the TAPs allegation and the reprisal showed towards me following protected communication, clearly reflect multiple violations of law and regulation. The merits of my claim can, at the very least, and ironically so, be validated at the bottom of Figure 4 where it discusses the potential punitive and administrative actions that be taken in regards to false statements. SFC. Rowley's violations of UCMJ articles 80, 107, and 131 should be investigated with the weight that those violations deserve. Consider the implications of his lie and the amount of money that I am being required to pay in recoupment ($203,000).

c) In the court case, Philips v. O Marsh, Mary Ann Philips brought suit against the defendant (United States Military Academy) involving a statement elicited in violation of her right against self-incrimination. She further argued that the statement elicited was improperly relied upon in the proceedings which culminated in her separation from the Academy.[2] As I have stated on multiple occasions, my rights afforded to me were violated regarding self-incrimination as it relates to the TAPs allegation. While Mary Ann Philips was unable to argue the basis for her separation from the Academy, my challenges for separation are numerous. I argued the excessiveness of at least two of my charges at my conduct hearing, requested investigation of those charges by the IG, challenged the fact that reprisal was indeed an issue regarding the recommendation for separation with recoupment from the Academy, and I argue that a punishment for the TAPs allegation was imposed against me because of my desire to remain silent. The issue regarding the TAPs allegation was not overturned until after the recommendation for separation with recoupment was sent through the chain of command and up to the brigade tactical officer.

I argue that the damage from the TAPs allegation was irreparable and was used against me in my company and regimental tactical officers' final disposition regarding my separation from the Academy with recoupment. CPT Eaton's and LTC. Cross's disposition was submitted (1 April, 2013) 4 days after my regimental board (28 March, 2013) for the TAPs allegation. This was something that I was unable to properly emphasize at my conduct hearing given that the conduct hearing was held the day prior to my regimental board for the TAPs allegation. I did, however, notify my tactical officer, prior to my regimental board, that my tactical NCO's statement was false. She then explained to me that if his statement was indeed false that the cameras in the hallway would point out such a falsity. Coincidentally, the cameras for the night were either not on, were not working, or my company tactical officer merely decided to not comb the hours of time lapsed video footage. Despite the lack of camera usage, CPT Eaton-Ferenzi merely had to ask him whether or not his statement was false. In the case of Philips v. O Marsh, the following ruling was decreed: "Whether we call it a waiver or a failure to exhaust remedies matters not, for

---

[2] http://openjurist.org/687/f2d/620/phillips-v-o-marsh

000722

it amounts to the same thing. Had she [Philips] objected to the use of her statement, the Academy might either have cured the alleged violation by independent evidence (which was ample) or altered the charge to one of several others (also ample). Instead, it took her at her word that there was no factual, legal or constitutional issue involved". [3] This case shows where the Academy would have taken action on behalf of Philips had she acknowledged the factual, legal, and constitutional issues regarding her separation prior to being completely separated.

Documentation from my summarized conduct hearing denotes where I have consistently argued the validity of my demerits and the actions of my company tactical team. Since the standard of proof for administrative investigations consists of preponderance of evidence, I argue that there is overwhelming evidence showing where the TAPs allegation was improperly initiated and used against me in regards to my conduct investigation.[4]Essentially, I not only called my tactical NCO a liar by stating that it was a factual impossibility that he saw that I was not in my room, but I also filed protected communication against him and CPT Eaton-Ferenzi. Given the volume of the aforementioned, it seems unlikely that they would continue to be able to remain impartial.

d) Regarding the aforementioned matters of complaint, and given my situation of separation from the Academy, demands for due process should have been greater than in normal circumstances regarding disciplinary issues. I cite the following to support my claim:

"The demands of due process, however, are greater when the accumulation of demerits subjects the cadet to the severe sanction of expulsion rather than a form of milder discipline, see Farrell v. Joel, supra, 437 F.2d at 162. Cf. Opp Cotton Mills, Inc. v. Administrator, 312 U.S. 126, 152-153, 657, 61 S. Ct. 524, 536, 85 L.Ed. 624 (1941) ("The demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective.") Although the Court in Wasson declined to apply automatically the hearing requirements set forth in Dixon v. Alabama State Bd. of Educ., 294 F.2d 150 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961) (expulsion of a civilian student for misconduct from a tax-supported college) to the expulsion of a cadet from a military service academy, it did make plain that a fair hearing would be required at some point before a cadet could be separated".[5]Essentially, the Academy needs to determine and clarify ubiquitous language. What constitutes fair? Is fairness objective or subjective?

The informality of the conduct investigation hearing militates against the right to representation at a formal, adversarial hearing to argue the grounds of separation, which is akin to the argument made in the case, Hagopian v. Knowlton. I contend that due process would have afforded me the

---

[3]   Ibid.

[4]   "A Comprehensive Guide for Investigating Officers," 1) Objective Test: The test is not whether you suspect the individual but whether a reasonable IO, knowing the same things that you know, should have suspected the individual of committing the crime.

[5]   http://openjurist.org/470/f2d/201/hagopian-v-knowlton

10

000723

opportunity to argue expulsion from the Academy with the presence of legal counsel; it would have further enabled me to properly elaborate and point out issues regarding violations of procedure and protocol, army regulation, guidelines regarding commanders and investigating officers, and lastly, violations of ethics, while avoiding the reprimand against my character for doing so. The aforementioned should be considered both objectively and subjectively fair; it passes the litmus test of whether or not this is the kind of treatment I would expect if I were in a similar situation. Consider the implication it has for a Cadet who is already being accused of not taking responsibility for his/her actions, and then expecting them to argue his/her own case to a superior who has the power to determine the fate of his/her cadet career. For the previously mentioned rationale, this is why a formal, adversarial board is essential.

2) At the conclusion of my conduct investigation, a conduct hearing took place to determine the validity of charges in regards to my proficiency in conduct. The hearing that took place was in no way a determinant for separation from the academy, and as such, was not a means for me to argue my retention at the Academy. LTG. David Huntoon, former superintendent of USMA, was not bound to the recommendations of my investigating officer, he chose freely and willingly to separate me with recoupment; therefore, the basis for my claim that the conduct hearing was not a determinant for separation is validated on these grounds. The investigating officer recommended me to be a December graduate. More so, this hearing was merely an informal procedure in accordance with AR 15-6, Chapter 4. "An informal investigation differs from a formal investigation in that the investigating officer (IO) follows the informal procedures set forth in Chapter 4 of AR 15-6 rather than the formal procedures specified in Chapter 5. In addition, there are no respondents designated in an informal investigation, so no one is entitled to the rights of a respondent, such as notice of the proceedings, an opportunity to participate, representation by counsel, or the right to call and cross-examine witnesses. Because of these differences, an informal investigation can be conducted more quickly than a formal investigation, and it uses fewer resources".[6] A formal board proceeding is typically adversarial in nature with the presence of counsel--such as an administrative separation board, or Academic Board, where 3 or more officers preside over the proceeding, lawyers for each side present evidence and summations, and they make findings in a very controlled and marshaled environment. Respondents in board proceedings are always afforded the opportunity to secure the presence of a military attorney (from TDS or Legal Assistance) or civilian counsel. For the previously mentioned reasons, I argue that this hearing was not sufficiently adequate in ensuring that I was granted due process.

a) Proper protocol was not followed regarding the use of witnesses at my conduct hearing. Chapter 1, USCC Regulation 351-1, 111 (b.), "Witnesses testifying will be those who have knowledge of the conduct of the individual under investigation. For witnesses that have departed, written statement may be obtained and considered. Witnesses for character reference or

---

[6]

http://www.google.com/url?sa=t&rct=j&q=&esrc=s&frm=1&source=web&cd=4&ved=0CEQQFjAD&url=http%3A%2F%2Fwww.westpoint.edu%2FFig%2FSiteAssets%2FSitePages%2FInvestigations%2FA%2520Comprehensive%2520Guide%2520for%2520Investigating%2520Officers%2520edited.doc&ei=loJsUevwCIe28wSN4IDACw&usg=AFQjCNHHqKGG6sL3WB82ocvhb2Pz_37ZAg&sig2=3iH3oMTGtjbCIuPTAEYn8g&bvm=bv.49478099,d.eWU&cad=rja

000724

to discuss the respondent's performance will not be called to testify at the hearing". Yet, LTC. Hagen was called in as a witness to testify, not in regards to my conduct, but in regards to my performance. Chapter 3, USCC Regulation 351-1, Figure 3-3, provides a certificate regarding telephonic testimony. In my investigating officer's report, regarding my deficiency in conduct, he used telephonic testimony from LTC (R) Jeffry Cunningham. Please refer to the **Certificate: Telephonic Testimony**:



Figure 3-3
**CERTIFICATE: TELEPHONIC TESTIMONY**

CERTIFICATE

On (date) , I spoke telephonically with (title, name) , located at (complete address, including zip code) , telephone number (include area code), concerning matters pertaining to the Conduct Investigation which is convening to hear the case of Cadet (cadet's name here) . (Person called) provided sworn testimony requested by (the deficient cadet's name) . (The Conduct Investigation Investigating OfficerPresident). Cadet (name here) (was present) (waived right to be present) during the telephonic conversation, and Cadet agreed to accept the telephonic communication as evidence.

I certify that the following is an accurate summary of the testimony provided by (person called)

(SUMMARY)

(Signature Block)
Investigating Officer

I have reviewed this summary and do/do not desire to question/crossexamine (the individual called) further. (I was present/waived right to be present during the telephone conversation and asked all pertinent questions at that time.)

(Signature Block)
(The deficient cadet)

12

**000725**

I did not agree to accept the telephonic communication as evidence in my conduct investigation, and was never afforded the option to cross examine. In fact, I argued some of the merits of what LTC (R) Cunningham had to say regarding my performance at NMMI; however, I did mention him as a potential character reference prior to reading my investigating officer's report. My rationale behind using LTC (R) Cunningham as a character reference was based on the fact that he provided me with a nomination to West Point through his discretion as my former Professor of Military Science (ROTC). Furthermore, as my NMMI transcripts will annotate, my performance, not only in the ROTC program, but my overall performance at NMMI, was above average. I was in the top third of my class at NMMI, and in a final counseling session with LTC (R) Cunningham, he told me that had I of commissioned with my class I would have been a distinguished military graduate.



Figure 5 - NMMI Transcript – Note my Military Science and Military PT grades

13

000726



Figure 6 - NMMI Transcript cont. – In my final semester I earned a 3.53, yet I was recalled as only an average student

LTC (R) Cunningham further mentioned that part of the reason that I did not commission from NMMI was because I was facing possible trouble regarding "Alumni Chatter," which was not the case. My leave of absence from the ROTC program was initiated on 15 May, 2008; however, that is not the reflective date of when I had learned that I would be attending USMAPS. What LTC (R) Cunningham forgot to mention is that despite knowing months beforehand that I would be attending USMAPS, I had decided to stay in the program and continue performing my duties as the Master of Fitness trainer, and also as the Land Navigation CIC for the Spring field training exercise, this was after being afforded the option to immediately begin my leave of absence. Two of my classmates at the time, CDTs Ternosky and Adamson, had been granted appointments to the Merchant Marine Academy; they then initiated their leave of absence from the ROTC program immediately. As already mentioned, I had that option as well, which would have acquitted me of all of my duties as they related to the ROTC program. Records for USMAPS will also indicate the date of my notification that I was appointed to USMAPS and verify what I had mentioned previously. All of this is information that would have come out had I of been afforded the right to cross examine LTC (R) Cunningham. This is information that would have provided greater depth into my character, that despite being able to leave the program, I stayed and continued to perform my duties in an above average manner (as reflected by my Military Science and Military PT grades).

14

b) Chapter 1, USCC Regulation 351-1, 112, the types of documentary evidence consists of material pertaining to the conduct of the individual under investigation. In regards to figure 4, the hypothesis of CPT Eaton-Ferenzi is neither pertinent nor proper to use as written testimony. This is further supported in "A Comprehensive Guide for Investigating Officers," a guide released by the Inspector General's Office at West Point. Presented here is a citation directly from said guide: "a. Investigation – A duly authorized, systematic, detailed examination to uncover facts and determine the truth of the matter. They are not criminal proceedings in which proof beyond a reasonable doubt is required. Rather, the standard of proof that applies is proof by a preponderance of the evidence. Investigations require formal collection of evidence, taking of (sworn) testimony from complainants, witnesses and subjects, and documentation of the findings in a report of investigation". It is almost an absurdity that my cadet career, my life, and the issuance of a $203,000 debt are open to mere speculation that is hardly supported by any evidence.

c) Chapter 5, USCC Regulation 351-1, g. Findings, states "The findings of the IO must be supported by a greater weight of the evidence than that which supports a contrary conclusion, that is, evidence which, after considering all evidence presented, points to a particular conclusion as being more credible and probable than any other conclusion, The weight of the evidence is not determined by the number of witnesses or volume of exhibits, but by considering all the evidence and evaluating such factors as the consistency or inconsistency of various items of evidence, the witness' demeanor, opportunity for knowledge, information possessed, ability to recall and relate events, and other indications of veracity". Reflected in Figure 7 below is an excerpt from the IO's report as it relates to CPT Eaton-Ferenzi's hypothesis, something based merely on conjecture, and extremely damaging to my character.

15

000728

hearing, 20 March 2013, CDT Doolen provided a character witness statement from CDT ███ that fully supported CDT Doolen and indicated that they had been dating since November 2012. So, I believe CDT Doolen either led his mother to believe that the break up was harder on him than it really was, or that she interwove some of her own personal feelings about the break up into how CDT Doolen was handling it. Nor do I feel this is an incident CDT Doolen in repressing. Therefore, it is my determination that the break up is not a factor contributing to his sub-standard actions.

Lastly, CPT Eaton-Ferenzi articulated an interesting hypothesis with me, one that both she and SFC Rowley formed based on their previous and current experience and expertise, one very similar to one that I formulated on my own prior to their sharing. They have determined that CDT Doolen has performed marginally much longer than his record shows. They say that the recent increase in CDT Doolen's infractions is partly due to the fact that, since January 2013, Company B1 has a full TAC team present in their respective roles, together in authority over him. CPT Eaton-Ferenzi mentioned that in the Fall of 2012, she had been away on pregnancy and post-pregnancy leave, leaving all of the TAC duties to her then TAC NCO, SFC Boudreau. Additionally, she mentioned that in an earlier TAC experience, CDT Doolen's TAC Officer had been away from USMA for part of the time due to ILE commitments, again leaving the bulk of the company duties during that time to one person, the TAC NCO. She and SFC Rowley postulate that if CDT Doolen had had full TAC coverage during these earlier times, more of his poor conduct and irresponsibility would have been earlier identified and documented instead of just a few short months before his scheduled commissioning. CPT Eaton-Ferenzi and SFC Rowley further assess that within the timeframe and scope of this investigation CDT Doolen's infractions were not committed because of some recent, momentous change in his perspective or attitude, say as the result of a major family or personal emergency or significant situation. They theorize, rather, that his attitudes and perspectives have been more publicly revealed as a result of his being more frequently caught and punished for his sub-standard actions. I agree with their theory.

My assessment as a former SSG(P) and commissioned officer with nearly 20 years of combined experience is that CDT Doolen is not yet representative of the kind of leader ready to don the rank of Second Lieutenant in the United States Army. I have a daughter in college and a son in high school. My son longs to get through high school and to enter military service. I cringe at the thought of him in the platoon of an unchanged 2LT Doolen. As a father, I would not want this reality and would fight to ensure that it did not happen. I fear that should CDT Doolen commission before successfully completing the recommendations listed above, his platoon's safety, readiness, training, and lives would be at risk. Additionally, the toxic attitude he matter-of-factly expressed against LTC (R) Cunningham from NMMI has no place in the Army and must be remediated before commissioning. I like CDT Doolen, and our conversations and meetings have been positive, but I cannot, nor will not, rate him as proficient when basic leader principles are routinely violated and flagrantly resisted.

From examination of the evidence, verbal and written testimony, and discussions with CDT Doolen and witnesses, I recommend that CDT Doolen be retained at USMA past his graduation date until December 2013 in order for him to undergo necessary anger and emotional management training, and to put into practice these to-be-learned behavioral techniques and procedures in a more demanding military role, much like one with which he will immediately be

10

**Figure 7- CPT Eaton's hypothesis used in my IO's conduct report**

Throughout most of my cadet career I have had a full tactical team. A few months of collective absence of my tactical officers are aberrational and do not support the hypothesis of CPT Eaton

000729

Ferenzi. Her hypothesis is non-sequitur, as I will point out. Please refer to Figure 8

### REGS & DISCIPLINE

Home | Software Change Request | Staff/Fac Portal | Log Off

### MILSUM Report

as of 5 Feb 13

| Name: DOOLEN ISIAH M | Class: 2013 | | Co/Regt: B1 | Prior Co/Regt: B4 | Current CS: |
| USMA ID: C39038851 | RedCst: OTHER/UNKNOWN | | Gender: MALE | Staus: ACTIVE | |

| SUMMER TRAINING | | | MILITARY PROGRAM RECORD | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Acad Yr | Activity | Completed | Term Period | Military Activity | Position | Rtr | Int Rtr | Sr Rtr | Tac Rtr | Lu Grd | Activity Weight | MPS Term | MPS Cum |
| 10 | CBTNC | | 10-0 | MD100 | CBT MOS | | | | | B+ | 2.0 | 3.33 | 3.33 |
| 11 | AA | | 10-1 | MD101 | MOS | A | A | | A- | A+ | 2.5 | 3.67 | 3.52 |
| | CFTVR | | 10-2 | MD102 | MOS | D | D | | D | D | 2.5 | 2.50 | 2.82 |
| | AA | | 10-2 | MS100 | | | | | | B | 7.5 | 2.50 | 2.82 |
| 12 | CTLT | | 11-0 | MD200 | CFT MOS | A | C | | B | B | 7.0 | 5.00 | 2.88 |
| 13 | CLDTF | | 11-1 | MD201 | TM LDR | B | B | B | B+ | B+ | 3.0 | 2.86 | 2.87 |
| | APCS | | 11-1 | MS200 | | | | | | B- | 7.5 | 2.86 | 2.87 |
| | SGR | | 11-2 | MD202 | TM LDR | B | B | B- | B | B | 3.0 | 3.00 | 2.88 |
| | | | 12-0 | MD400 | | | | | | P | 0.0 | 0.00 | 2.88 |
| | | | 12-1 | MD301 | SQD LDR | B | B | B- | B | B | 7.5 | 3.00 | 2.90 |
| | | | 12-2 | MD302 | CO STF N-4 | B | A | A+ | C | B | 7.5 | 2.84 | 2.89 |
| | | | 12-2 | MS300 | | | | | | B- | 7.5 | 2.84 | 2.89 |
| | | | 13-0 | MD410 | SG REG AS3 | | | | | P | 0.0 | 2.33 | 2.77 |
| | | | 13-0 | MD300 | SG REG AS3 | | | | | C+ | 15.0 | 2.33 | 2.77 |
| | | | 13-1 | MD401 | TNG OFF | B | B | A- | D | C | 10.0 | 2.00 | 2.68 |

| MAJOR AWARDS | | | CONDUCT RECORD (Demerits / Tours) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Offense Code | Offense Date | Demerits/ Tours | AcadYr | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr 35/100 | May | Jun |
| 1 | 17 Apr 10 | 35 / 100 | 10 | | | | | | | | | | | | |
| 1 | 19 Oct 11 | 20 / 20 | 11 | | | | | | | | | | | | |
| 1 | 15 Sep 12 | 30 / 30 | 12 | | | 20/20 | | | | | 10/10 | | | | |
| 1 | 11 Jan 13 | 20 / 20 | 13 | | | 30/30 | | | 5/5 | 55/55 | | 2/2 | | | |
| 1 | 19 Jan 13 | 30 / 30 | | | | | | | | | | | | | |

| CONDUCT STATUS | | | | |
|---|---|---|---|---|
| | Hearing | | Action | Ending |
| Type | Date | | Taken | Date |
| | | | | |

| CPR PROFILE | ACOM-UH | ACOM-LH | CtrOfMass | BCOM-Rtn | BCOM-NoRtn |
|---|---|---|---|---|---|
| All CPRs (written ON this cadet:) | 8 | 16 | 10 | 4 | 2 |
| Chain of Command CPRs: | 5 | 8 | 5 | 0 | 0 |
| Peer & Subordinate CPRs: | 3 | 4 | 2 | 0 | 2 |
| Staff & Faculty CPRs: | 0 | 0 | 1 | 0 | 0 |
| Other CPRs: | 0 | 0 | 0 | 0 | 0 |

https://apps.usma.edu/usec/regs_disc/milsum-3.cfm?tgtcdt=%291%3B%2F%3CS%5FC%24PZK%3E%0A...   2/5/2013

**Figure 8 - Military Summary Report - Denoting that my military performance has been beyond marginal**

My military performance has remained consistently above average; in fact, the report above will reflect that there was a decline in my military GPA even when I did not have a full tactical team; if her hypothesis were true, then it can be reasonably deduced that the inverse would occur. CPT Eaton Ferenzi was away on pregnancy leave, yet she returned a couple of weeks before the end of the semester, around the same time final grades were to be inputted into the system. Notice that for the term period 13-1 my tactical team gave me a rating of a D. My only major offense for the semester was on 15 September, 2012. The Tac letter grade of a D is an extreme contradiction to the letter grades recommended by my rater, intermediate rater, and senior rater. I will admit that I am not aware of the amount of influence that she had or did not have in regards to my grade that I received. At best, CPT Eaton Ferenzi's hypothesis accounts for, and I am being favorable towards her in regards to this estimation, 6 months total of not having a full tactical team (12.5% of my time at the Academy). This kind of unsupported evidence should be moot in its intent and purpose. She is arguing and questioning the evaluation of my prior tactical teams in

17

**000730**

regards to my ability to lead and become a commissioned officer. Furthermore, she is speculating that at any given point throughout my cadet career, I would have exceeded my demerit limit, as outlined in Chapter 1, USCC Regulation 351-2, Table 1-4 <u>Demerit Allowance Table</u>, had I of had a full tactical team at all times. Her statement is trite given that the demerit limits for each class changes, and given that my MILSUM report is relatively clean of any major offenses. The investigating officer, and according to regulations, cannot merely make a statement such as "I agree, with their theory;" his statement should have included "I find" (Please use the footnote for specificity).[7]

**CHAPTER 1, USCC Regulation 351-2**

TABLE 1-4

**DEMERIT ALLOWANCE TABLE**

| | Aug-Jun | Sep-Feb | Oct-Mar | Nov-Apr | Dec-May | Jan-Jun |
|---|---|---|---|---|---|---|
| **Fourth Class Year** | 144 | 144 | 144 | 144 | 144 | 144 |
| **Transition from Fourth to Third Class** | | | | | | |
| Feb-Jul / Jul-Dec | 138 | 132 | 126 | 120 | 114 | 108 |
| | Feb-Jul | Mar-Aug | Apr-Sep | May-Oct | Jun-Nov | Jul-Dec |
| **Third Class Year** | | | | | | |
| | Aug-Jan | Sep-Feb | Oct-Mar | Nov-Apr | Dec-May | Jan-Jun |
| | 108 | 108 | 108 | 108 | 108 | 108 |
| **Transition from Third to Second Class** | | | | | | |
| | Feb-Jul | Mar-Aug | Apr-Sep | May-Oct | Jun-Nov | Jul-Dec |
| | 105 | 102 | 99 | 96 | 93 | 90 |
| **Second Class Year** | | | | | | |
| | Aug-Jan | Sep-Feb | Oct-Mar | Nov-Apr | Dec-May | Jan-Jun |
| | 90 | 90 | 90 | 90 | 90 | 90 |
| **Transition from Second to First Class** | | | | | | |
| | Feb-Jul | Mar-Aug | Apr-Sep | May-Oct | Jun-Nov | Jul-Dec |
| | 87 | 84 | 81 | 78 | 75 | 72 |
| **First Class Year** | | | | | | |
| | Aug-Jan | Sep-Feb | Oct-Mar | Nov-Apr | Dec-May | Jan-Jun |
| | 72 | 72 | 72 | 72 | 72 | 72 |

Note: (a) Fourth class cadets enter the demerit system on the day after they arrive in their letter companies during Reorganization Week.
(b) Demerits received by New Cadets during Cadet Basic Training do not count against these allowances.
(c) Periods of summer leave are included in the demerit periods and allowances for all classes.
(d) The Jan-Jun allowance for First class cadets is computed as if Jun were a full duty month.
(e) Each period runs from the first calendar day of the first month shown through the last calendar day of the last month shown.

1-18

---

[7]   "A Comprehensive Guide for Investigating Officers" – b. Findings are clear and concise statements of fact hat can be readily deduced from evidence in the record. Each finding must be based on the evidence and should reference the exhibit (s) (marked alphabetically in the order that they are discussed in the find that supports it. You should fix dates, places, persons, and events, definitely and accurately. In developing findings, you may rely on the facts and any reasonable inferences that may be drawn from those facts. Each finding must be supported by a greater weight of the evidence than supports a contrary conclusion, that is, evidence which, after considering all evidence presented, points to a particular conclusion as being more credible and probable than any other conclusions (preponderance of evidence standard). Findings are no place for personal opinion. There should be no "I believe" but rather there should be "I find."

000731

3) Generalities in regards to the overall write-up by my investigating officer support my sentiments that I have had for a while, and those sentiments reflect on a system that is incredibly sacrosanct.

this particular supply issue. When CDT Doolen and his Company Supply NCO, CDT Bartkowski, attempted at the last minute to meet the suspense, the maintenance tracker document on editgrid was temporarily locked because another user had opened it and was editing it. This prevented CDT Doolen from completing his task. CDT Heiliger testified during the CI hearing that the maintenance section of editgrid has been fully operational since the time she took over her role at the start of the semester. She also testified that when this situation occurs and someone else is editing the maintenance tracker, the editgrid system provides that locked-out user with a number of actions including identifying the name of the person currently on the system, the option to open up an edit only version of the tracker, and the opportunity to wait or send a message to the person logged-on to the tracker. Lastly, CDT Heiliger stated that usually when this happens, folks walk down the hall to go ask each other to get off the system so someone else can use it. None of these options, it seems, were used by CDT Doolen to complete his task. Instead, CDT Doolen testified to reporting the information prior to the suspense to his chain of command, specifically SFC Rowley, but confirmed that his actual task was to complete the tracker on editgrid; this he did not do. Had prior planning prevailed and had meeting the suspense been more of a priority for CDT Doolen earlier in the process, given the details of the tasking as I understand them and as witnessed by me via multiple witnesses, he would have been able to meet the suspense.

During testimony given by both CDT Doolen and CDT Heiliger during the CI hearing, I learned that the task to update the Battalion tracker was also not met by the A1 Company Supply Officer CDT Micah Gunselman. I called A1 and spoke with SFC Boudreau and learned that CDT Gunselman received a Cadet Observation Report and 5 demerits for his failure to meet the Battalion suspense in 11 January 2013. SFC Boudreau also gave positive character reference of CDT Gunselman stating that he was a good and reliable cadet and that CDT Gunselman had exhibited no other conduct anomalies, either behavioral or supply-related, prior to the incident or since. This is not the case concerning CDT Doolen. I have determined that even though the punishment received by the A1 Supply Officer for the same infraction was less than what CDT Doolen received, it is my assessment that the B1 TAC team justifiably acted within USCC regulation and without prejudice to enforce the tougher punishment against CDT Doolen.

During our meetings together and during the CI hearing, CDT Doolen continued to accuse his TAC team of being excessive in their punishment for this infraction and that the January boards were piled upon him to build a case against him. Having met personally with both CPT Eaton-Ferenzi and with SFC Rowley on 22 March 2013 to discuss the issues of receiving supply data, the functionality of the editgrid system, the potential excessive punishment for the 11 January 2013 Company board, and the alleged piling on, it is my evaluation that the accusations and additional information brought forth by CDT Doolen have no merit. These attempts serve only as examples of his unwillingness to take responsibility for his actions and of his tendency to place blame on other for the situation in which he finds himself.

Testimony given by CDT Heiliger during the CI hearing showed that since the 11 January 2013 Company board, B1 has been ranked between 2nd and 5th place (4 companies tied for 2nd place) out of nine companies for supply actions, and 2nd place out of nine companies for maintenance actions. She also stated that she felt compelled to assist CDT Doolen more than any other company staff member to complete his supply and maintenance tasks, and that part of the

2

**Figure 9 - Depiction of maintenance tracker issue as viewed by the IO**

Figure 9 depicts the maintenance tracker issue as viewed by the IO and my tactical team; it shows that when I have attempted to argue the excessiveness of my punishments, I have been

19

000732

accused of being unwilling to take responsibility for my actions. Once again I will emphasize the following: arguing the excessiveness of a punishment and arguing the nullification of a punishment are two completely different things. When arguing the excessiveness of a punishment, I in essence acknowledge that punishment was necessary, therefore taking ownership, but also acknowledge that the punishment was not necessary to the extent that it was given. Anytime that I had been placed in a situation that involved my word versus the word of my company tactical team, the prevalence went to the tac team. Often, as Figure 9 clearly outlines, I was receiving punishments that were harsher than my peers, something my investigating officer acknowledges. The use of excessive punishment was often validated based on the fact that I was a marginal performer, or that I had committed prior infractions. However, the offense for the maintenance tracker occurred on 11 January, 2013, only a week into the new semester. On what grounds did I deserve such a harsh punishment; especially, considering that I had submitted maintenance issues to my tactical NCO who was also the building commandant?

CPT. Eaton-Ferenzi denies double dipping me on demerits for the supply maintenance tracker, yet figure 9 directly contradicts her claim (I received a harsher punishment). Please refer back to pages 7 and 8 regarding the email I wrote to CPT Eaton-Ferenzi. Also, in a discussion I had with CDT Ashli Carlson days after my conduct hearing, she mentioned that according to written guidelines and company policy set forth for staff members, a failure to meet a suspense date, first offense, was a counseling statement regarding the infraction, not the 20 hour and 20 demerit punishment that I had received. Currently, I do not have a copy of this document; however, CPT. Eaton-Ferenzi should have one.

a) My character, along with my conduct and performance, were all components that were analyzed and ultimately used to recommend my separation from the Academy with recoupment. I agree that I was given a hearing in regards to my accumulation of demerits in accordance with AR 210-26, Chapter 6-17. Cadet Disciplinary System, section b. Conduct Investigations. This section specifically states that "Conduct investigations will be convened by the Commandant under the provisions of the Cadet Disciplinary system. Before separating a cadet for conduct deficiency, he or she will be afforded a hearing to determine whether the cadet is deficient in conduct. If after such a hearing a cadet has been found deficient in conduct, the Commandant will review the report of the proceedings". Reading further into Chapter 6, and given the extent to which my character and ability to manage my anger were questioned, I argue that I should have been afforded another hearing, separate of the conduct hearing to defend my character and my ability to manage my anger. Specifically, 6-23. Personality disorder or lack of qualification for service became an issue regarding my potential to even serve as an enlisted soldier in the Army following my separation from the Academy. According to AR 210-26, Chapter 6-23, Section b. "Demonstrated lack of qualification for further service as a cadet or as an officer in the U.S Army, based on factors such as, but not limited to, the following: 3) The cadet has demonstrated character or behavior characteristics not compatible with satisfactory continued service as a cadet or as an officer in the United States Army". Section c. "The fact that such

000733

behavior or characteristics, or manifestations thereof, may constitute or support specific grounds for punishment or separation under other provisions of this regulations does not preclude separation action under this paragraph. Section d. "Prior to forwarding a recommendation for separation under this paragraph to the Department of the Army, the cadet concerned will be afforded a hearing in the same manner as for cases of misconduct. This hearing will also consider whether the basis for separation resulted from a willful act or omission on the part of the cadet (7-9b)". Please see Figure 10.

---



**DEPARTMENT OF THE ARMY**
UNITED STATES MILITARY ACADEMY
WEST POINT, NY 10996

MACC-O-1-B                                                                  01 April 2013

MEMORANDUM THRU

Regimental Tactical Officer, First Regiment, United States Corps of Cadets, West Point, New York 10996

Brigade Tactical Officer, United States Corps of Cadets, West Point, New York 10996

FOR Commandant of Cadets, United States Corps of Cadets, West Point, NY 10996

SUBJECT: Recommendation for Final Disposition on Conduct Investigation for Cadet Isiah M. Doolen, Company B, First Regiment, Class of 2013.

1. I recommend that Cadet Doolen be immediately separated from the United States Military Academy and discharged from the Army with recoupment. While I concur with many of the findings of Cadet Doolen's Conduct Investigation, I differ on the recommendations. This recommendation is based on my personal observations of his comprehensive performance over the Fall 2012 – Spring 2013 academic year as the B1 Company Tactical Officer.

2. Cadet Doolen's behavior is selfish, impulsive, and devoid of accountability and personal responsibility. He consistently demonstrates a lack of desire to follow instructions or take ownership of his actions. His reaction in each disciplinary situation has been one of apathy at a minimum, often blaming his immediate peers and supervisors for holding him accountable to accepted standards. His accusations are often interlaced with deceptive personal agendas and attacks rather than valid claims. This demonstrates an unacceptable level of maturity for the officer corps, especially since he is 24 years old and has already participated in approximately 8 years of officer development training at the New Mexico Military Institute, the United States Military Academy Preparatory School, and the United States Military Academy. He often waits until consequences escalate to a point that is personally intolerable to him before deciding to challenge or appeal. His individual desires often trump his judgment to follow the rules and regulations of the Academy. When coupled with his anger management issues, this equates to poor decision-making skills and impulsive behavior. Cadet Doolen has been given multiple opportunities to rehabilitate himself through developmental counseling, yet he remains unreceptive. The aforementioned issues have stunted Cadet Doolen's ability to learn, grow, and mature as a cadet and future officer. I firmly believe that Cadet Doolen lacks the fundamental makings of a professional and competent officer.

3. Cadet Doolen has committed more than one major error in judgment from November 2012 through February 2013 resulting in a Conduct Investigation. During this time frame his infractions, though seemingly not egregious in nature, have revealed much deeper character and leadership flaws. As a First Class Cadet, his patterns of selfish and immature behavior demonstrate that he is not prepared to be a commissioned officer. Allowing Cadet Doolen to receive a commission and lead Soldiers in combat would be a dereliction of duty that would surely endanger the lives of those he would be responsible for. As a former company commander, I would certainly not accept his behavior as a second lieutenant in my unit. If Cadet Doolen were to serve as a junior enlisted Soldier he would pose the same risks and contribute to a toxic environment within his unit. In an era of fiscal restraint coupled with the Army's desire to enact end-strength reduction while maintaining quality personnel, Cadet Doolen should be separated from the United States Military Academy and discharged from the Army with recoupment.

**Figure 10 - CPT Eaton Memorandum**

CPT Eaton-Ferenzi's written memorandum appears to me to be more of a scathing ad hominem attack rather than anything distinctly verified by facts. Figure 10 confirms what I had mentioned in section 3, subsection a. of this document. In my investigating officer's summarized report, and contrary to CPT Eaton-Ferenzi, he stated the following: "CDT Doolen's mom's last comment to me during our telephone conversation was a bit telling to me as it, I believe, revealed the true man I have been ordered to investigate. She stated her belief that her son would always be the one to defend the underdog regardless of the consequences, and that he would always jump in to the defense of the weaker. The more I learn of CDT Doolen, the more I feel this statement fits him to a tee…making emotionally-driven decisions "regardless of the consequences" and "jumping in" to his own peril". I believe that the outline of my offenses by my attorney, Mr. Eric Mayer, address the situations that the previously mentioned apply. Lastly, I ask that you please read the following:



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
WEST POINT, NY 10996

MACC-O-1-B                                                                 21 June 2013

MEMORANDUM FOR Under Secretary of the Army, 101 Army Pentagon, Washington, DC 20310-0101

SUBJECT: CDT Doolen presentation for the Under Secretary of the Army

1. The purpose of this presentation is to outline numerous issues that occurred over the course of the 6 months that I was undergoing my conduct investigation. While you have undoubtedly received my complaint of wrongs pursuant to Article 138 UCMJ, I am submitting to you additional matters to be reviewed at your leisure. Indubitably, you are a busy man, which means I want to take up as little of your time as possible.

2. Three years ago, then Brigadier General William E. Rapp spoke to the Corps of Cadets after replacing his predecessor. He referred to the United States Military Academy (USMA) as a National treasure. Sir, I could not agree more. Since leaving the Academy, I have felt nothing but remorse, anger, and despair. All of which are feelings that I direct towards myself. Without a doubt, I was blessed beyond belief. I was granted the opportunity to walk the grounds of those who helped shape and structure this great Nation. What an honor. Even as I write this to you, I tear up, and I beg that you please give me another chance. My complaint of wrongs is a point of admonishment, and so the presentation succeeding this, but I would also like to ask that you read this, as it is a glimpse at my upmost sincerity. I will do whatever it takes to be admitted back to the Academy as soon as possible. Place me in leadership positions for the remainder of the summer. Give me the hardest, toughest, and most challenging position that you have to throw at me because I will not fail. Should you afford me the opportunity to reenter the Academy, I will rise to greatness. Sir, I have lived and breathed failure, and I know what a detriment my actions have, not only on myself, but on others. Should you award me the opportunity to return as a Cadet, I promise the following: I will achieve no less than a 3.0 GPA; max my final APFT as a Cadet; enter in the soldier mentorship program, also known as SLDP; I will speak to the entire Corps of Cadets during Reorganization Week about the honor and privilege that they have had awarded to them by being able to wake up each morning, dawn the USMA uniform, and know that they will one day be able to lead America's sons and daughters. Sir, being a Cadet at the United States Military Academy is not a right; it is an honor and a privilege. Once again, I ask that you please reinstate me as a Cadet and award me the opportunity to show you my true sincerity first hand.

3. Please see the enclosure to this memorandum, entitled "Presentation to the Under Secretary of the Army".

4. POC for this memorandum is the undersigned at 214-455-4907 or via email at idoolen13@icloud.com.

ISIAH DOOLEN
CDT, 2013
Company B, 1st Regiment, USCC

**Figure 11 - Intro Memo to the Under Secretary of the Army**

22

000735

2. POC for this memorandum is the undersigned at 214-455-4907 or via email at idoolen13@icloud.com.

ISIAH DOOLEN
CDT, 2013
Company B, 1st Regiment, USCC

23



OFFICE OF THE SUPERINTENDENT
**UNITED STATES MILITARY ACADEMY**
WEST POINT, NEW YORK  10996-5000

MAJA-MJ

MEMORANDUM FOR Headquarters, Department of the Army, G-1 (ATTN: DAPE-MPO-AP), Washington, DC  20301-0300

SUBJECT:  Separation of Cadet Isiah Doolen, Company B-1, Class of 2013

1.  The record of proceedings of the Conduct Investigation (CI) and allied documents in the case of Cadet Isiah Doolen, Company B-1, Class of 2013, are forwarded pursuant to AR 210-26.

2.  I have carefully reviewed the record of proceedings and allied documents in this case, and I have approved the finding that Cadet Doolen is deficient in conduct for exceeding his six-month demerit-with-tour allowance.

3.  Based upon my review of the entire case file, I recommend that Cadet Doolen be separated from the United States Military Academy and discharged from the United States Army with an Honorable Discharge certificate in accordance with AR 612-205.  A call to active duty would not be appropriate in this case.

4.  In accordance with AR 210-26, I request that you direct an AR 15-6 investigation to determine if Cadet Doolen has breached his service agreement and whether he should be required to reimburse his educational costs.  Depending on the results of that investigation, I will recommend whether recoupment should be initiated.

5.  Cadet Doolen entered the Academy from civilian status.  He was in the Army reserves from 2008 to 2009.  His service documents are at TAB 1.  I have suspended Cadet Doolen from the Academy pending the final decision in his case.  Pursuant to Title 10, Section 702, United States Code, and AR 612-205, Cadet Doolen's pay and allowances will be stopped upon his departure from West Point.  Cadet Doolen's status will then be:  authorized leave of absence without pay and allowances pending separation.

Encls
as

DAVID H. HUNTOON, JR.
Lieutenant General, US Army
Superintendent

**000737**

**ACTION**

**Cadet Isiah Doolen, Company B-1, Class of 2013**

The following actions are taken with respect to the findings of the Investigating Officer in the Conduct Investigation of Cadet Isiah Doolen, Company B-1, Class of 2013:

a. The finding that Cadet Doolen is deficient in conduct for exceeding his six-month demerit-with-tour allowance, is approved.

b. The complete case file will be forwarded to Headquarters, Department of the Army, with a recommendation that Cadet Doolen be separated from the United States Military Academy and discharged from the United States Army with an Honorable Discharge certificate.

c. A call to active duty would not be appropriate. Therefore, I will additionally recommend that Headquarters, Department of the Army, direct that an AR 15-6 investigation be conducted to determine if Cadet Doolen has breached his service agreement and whether he should be required to reimburse his educational costs.

d. Cadet Doolen is immediately suspended from the United States Military Academy until final action on his case is taken by Headquarters, Department of the Army.

e. In accordance with Title 10, Section 702, United States Code, and AR 612-205, Cadet Doolen's pay and allowances will be stopped upon his departure from West Point. Cadet Doolen's status will then be: authorized leave of absence without pay and allowances pending separation.


13 May 2013
_____
DATE


DAVID H. HUNTOON, JR.
Lieutenant General, US Army
Superintendent

MACC

MEMORANDUM FOR Superintendent, United States Military Academy, West Point, NY 10996

SUBJECT: Recommendation for Disposition of Conduct Investigation for Cadet Isiah Doolen, Company B, First Regiment, Class of 2013

1. See attached Legal Review by SJA for background and legal opinion.

2. USCC Regulation 351-1, *Procedures for Conduct Investigations under the Cadet Disciplinary System*, requires you to make recommendations for final disposition to the Superintendent. Please indicate them below.

_____ **I concur with the findings that the Respondent is deficient in conduct and recommend:**

_____ that the Respondent be separated from the Military Academy and transferred to the U.S. Army Reserve and ordered to active duty, with enrollment in the Academy Mentorship Program

_____ that the Respondent be separated from the Military Academy and transferred to the U.S. Army Reserve and ordered to active duty, but not be enrolled in the Academy Mentorship Program

_____ that the Respondent be separated from the Military Academy and discharged from the Army

_____ that the Respondent be separated from the Military Academy, but have the separation suspended until _____

_____ that the Respondent be Turnback to a lower class _____

_____ that the Respondent be suspended from the Military Academy until _____

_____ Enrollment in one of the following Mentorship Programs: _____ SLDP _____ ASAP

_____ With recoupment for educational expenses.

_____ Loss of Security Clearance

_____ Type of Discharge: _____

_____ **I disapprove the finding of the Investigation Officer and find the Respondent is proficient in conduct.**

3. POC is the undersigned at 938-3104.

DATE _25 APR_

RICHARD D. CLARKE
Brigadier General, USA
Commandant of Cadets



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

**REPLY TO
ATTENTION OF**

MACC-RD                                                                                   25 April 2013

MEMORANDUM FOR Cadet Isiah Doolen, Company B, First Regiment, Class of 2013, USCC, West Point, New York 10996

SUBJECT: Commandant's and CoC Recommendations and Legal Review Regarding the Conduct Investigation on Cadet Isiah Doolen.

1. The attached Commandant's and COC recommendations and legal review regarding your Conduct Investigation are provided to you for comment.

2. Should you desire to provide comment on the review, please do so by *1600* hours, on *30 April 13.*

3. I waive the 3 day preparation period to provide comment on the review, so packet can be expedited to the Superintendent for final action. Date_____ Signature_____

4. Failure to provide comments by the above-stated time will be deemed a waiver of your right to submit comment. You may request an extension to submit your request; any such request should be in writing.

5. The Superintendent may consider matters from your personnel, disciplinary, and academic records without referral to you for comment; you may review these files upon request to the appropriate custodian at USCC and the Office of the Dean.

Encl

DELROY A. PATRICK
Regulation & Discipline Officer


I hereby acknowledge receipt of Commandant's and COC recommendations and legal review at *1600* hours, on *25 April 2013.*

ISIAH DOOLEN
Respondent
Company B-1, Class of 2013

**000740**

MACC-O

MEMORANDUM FOR Commandant, United States Military Academy, West Point, NY 10996

SUBJECT: Recommendation for Disposition of Conduct Investigation for Cadet Isiah Doolen, Company B, First Regiment, Class of 2013

1. See attached Legal Review by SJA for background and legal opinion.

2. USCC Regulation 351-1, *Procedures for Conduct Investigations under the Cadet Disciplinary System*, requires you to make recommendations for final disposition to the Superintendent. Please indicate them below.

_(initialed)_ **I concur with the findings that the Respondent is deficient in conduct and recommend:**

_____ that the Respondent be separated from the Military Academy and transferred to the U.S. Army Reserve and ordered to active duty, with enrollment in the Academy Mentorship Program

_____ that the Respondent be separated from the Military Academy and transferred to the U.S. Army Reserve and ordered to active duty, but not be enrolled in the Academy Mentorship Program

_(initialed)_ that the Respondent be separated from the Military Academy and discharged from the Army

_____ that the Respondent be separated from the Military Academy, but have the separation suspended until _____

_____ that the Respondent be Turnback to a lower class _____

_____ that the Respondent be suspended from the Military Academy until _____

_____ Enrollment in one of the following Mentorship Programs: _____ SLDP _____ ASAP

_(initialed)_ With recoupment for educational expenses.

_____ Loss of Security Clearance

_____ Type of Discharge: _____

_____ **I disapprove the finding of the Investigation Officer and find the Respondent is proficient in conduct.**

3. POC is the undersigned at 938-6004.

DATE _19 April 13_

JOSEPH P. DEANTONA
Colonel, AD
Brigade Tactical Officer



**DEPARTMENT OF THE ARMY**
UNITED STATES MILITARY ACADEMY
WEST POINT, NY 10996

MACC-O-1-B                                                          01 April 2013

*Fully concur w/ CTAC*
*CDT Doolen is not fit to lead*
*or Soldiers, despite more*
*than a year of preparation*
*JDC*
*2 Apr '13*

MEMORANDUM THRU

Regimental Tactical Officer, First Regiment, United States Corps of Cadets, West Point, New York 10996

Brigade Tactical Officer, United States Corps of Cadets, West Point, New York 10996

FOR Commandant of Cadets, United States Corps of Cadets, West Point, NY 10996

SUBJECT: Recommendation for Final Disposition on Conduct Investigation for Cadet Isiah M. Doolen, Company B, First Regiment, Class of 2013.

1. I recommend that Cadet Doolen be immediately separated from the United States Military Academy and discharged from the Army with recoupment. While I concur with many of the findings of Cadet Doolen's Conduct Investigation, I differ on the recommendations. This recommendation is based on my personal observations of his comprehensive performance over the Fall 2012 – Spring 2013 academic year as the B1 Company Tactical Officer.

2. Cadet Doolen's behavior is selfish, impulsive, and devoid of accountability and personal responsibility. He consistently demonstrates a lack of desire to follow basic instructions or take ownership of his actions. His reaction in each disciplinary situation has been one of apathy at a minimum, often blaming his immediate peers and supervisors for holding him accountable to accepted standards. His accusations are often interlaced with deceptive personal agendas and attacks rather than valid claims. This demonstrates an unacceptable level of maturity for the officer corps, especially since he is 24 years old and has already participated in approximately 8 years of officer development training at the New Mexico Military Institute, the United States Military Academy Preparatory School, and the United States Military Academy. He often waits until consequences escalate to a point that is personally intolerable to him before deciding to challenge or appeal. His individual desires often trump his judgment to follow the rules and regulations of the Academy. When coupled with his anger management issues, this equates to poor decision-making skills and impulsive behavior. Cadet Doolen has been given multiple opportunities to rehabilitate himself through developmental counseling, yet he remains unreceptive. The aforementioned issues have stunted Cadet Doolen's ability to learn, grow, and mature as a cadet and future officer. I firmly believe that Cadet Doolen lacks the fundamental makings of a professional and competent officer.

3. Cadet Doolen has committed more than one major error in judgment from November 2012 through February 2013 resulting in a Conduct Investigation. During this time frame his infractions, though seemingly not egregious in nature, have revealed much deeper character and leadership flaws. As a First Class Cadet, his patterns of selfish and immature behavior demonstrate that he is not prepared to be a commissioned officer. Allowing Cadet Doolen to receive a commission and lead Soldiers in combat would be a dereliction of duty that would surely endanger the lives of those he would be responsible for. As a former company commander, I would certainly not accept his behavior as a second lieutenant in my unit. If Cadet Doolen were to serve as a junior enlisted Soldier he would pose the same risks and contribute to a toxic environment within his unit. In an era of fiscal restraint coupled with the Army's desire to enact end-strength reduction while maintaining quality personnel, Cadet Doolen should be separated from the United States Military Academy and discharged from the Army with recoupment.

MACC-O-1-B
SUBJECT: Recommendation for Final Disposition on Conduct Investigation for Cadet Isiah M. Doolen,
Company B, First Regiment, Class of 2013.

4.  POC is the undersigned at x2905 or elizabeth.eaton@usma.edu

*Elizabeth A. Eaton-Ferenzi*
ELIZABETH S. EATON-FERENZI
CPT, AV
Tactical Officer, B1, USCC

23



**DEPARTMENT OF THE ARMY**
UNITED STATES MILITARY ACADEMY
WEST POINT, NY 10996

MACC-O-1-B                                                                           03 MAY 2013

*8FE Untimely 1300hrs Due on 03 Handed in at 1530.*

MEMORANDUM THRU Tactical Officer, Bravo Company, First Regiment, United States Corps of Cadets, West Point, New York 10996

Regimental Tactical Officer, First Regiment, United States Corps of Cadets, West Point, New York 10996

Brigade Tactical Officer, United States Corps of Cadets, West Point, New York 10996

Commandant, United States Military Academy, West Point, New York 10996

FOR Superintendent, United States Military Academy, West Point, New York 10996

SUBJECT: Rebuttal to Separation from the United States Military Academy

1. SUBJECT: CDT Doolen's Rebuttal to Separation from the United States Military Academy

2. DISCUSSION:

I understand that my behavior over the course of the past 6 months is what has warranted the recommendation of separation from the United States Military Academy. For the past 7 years, I have been completely immersed in a military environment. I have given time and effort and I submit this rebuttal, or rather, plea in an effort to ask for my life back. I write this in an effort to outline the road that I have taken thus far, and the road that I intend to take to become the kind of leader who can lead soldiers in a time of peace and in war. As someone who has loved running for as long as I can remember, the following quote encapsulates the drive I have to hopefully sway your decision about my future:

"The possibilities in racing tactics are almost unlimited, as in a game of chess, for every move there is a counter, for every attack there is a defence...The runner's greatest asset, apart from essential fitness of body, is a cool and calculating brain allied to confidence and courage. Above all, he must have a will to win." – Franz Stampfl

In 2005, I entered New Mexico Military Institute (NMMI) as a senior in high school. Despite everything that I thought I wanted at the time, my parents knew that sending me to NMMI would expose me to the best type of environment to enable me to develop into a true leader of character. Over the course of the year at NMMI, I grew to appreciate the military lifestyle. After my graduation from high school in 2006, and after a substantial amount of thought, I decided to join NMMI's Early Commissioning Program via ROTC and attend for an additional two years of junior college. As a young man who had entered NMMI at the age of 17, I had become completely enthralled and captivated by the splendor of military life.

Over the course of my time at NMMI and in ROTC, I underwent numerous positive changes. I realized through multiple leadership laboratories and field training exercises that standing in

000744

front of a platoon as a platoon leader was no easy task. I learned that to lead my peers was also no easy task; and there were times when uncertainties in my leadership reflected in my command presence and the amount of technical and tactical knowledge that I exhibited. In the summer of 2007, I attended the Leadership Development and Assessment Course (LDAC) at Fort Lewis, Washington. That summer was one of the best summers that I have had in terms of finally reconciling my ability to comprehend the tactical and technical components of leadership with the command presence required.

I knew that I had the ability to do well both in my military life and academic life, which is something my performance reflected. Although I gained more confidence in my leadership abilities, and while there was a dramatic improvement in my general performance at NMMI, I knew that I was nowhere close to being mature enough to become a commissioned officer. After applying to multiple schools (Baylor, TCU, Norwich, and USMA), and gaining admittance to these other universities, I turned down my commission two months prior to commissioning to attend USMAPS. I turned down my commission despite the fact that I did not know if I would even be accepted to attend West Point. That did not matter because I knew that I wanted more than anything to attend. I knew that if any institution on this planet would mold me into the kind of officer I wanted to be, it would be West Point. I went through USMAPS with prior experience in ROTC and simultaneous membership with the National Guard, which proved to be invaluable to me. Successfully completing USMAPS saw my entrance into West Point and has led me down the road I have traveled so far.

When I entered West Point as a new cadet, I came in eager with desire to be the best I could be, and I believe that my military grade in Beast and my grade that 1st semester of Plebe year accurately reflected that desire. I helped my classmates out when I could, listened to my chain of command and abided by their orders despite being older than most of them (my attitude remained positive). My commitment towards development extended to me joining the Sandhurst team. I was also selected as the Battalion S3 for PPW. Even prior to then, at the end of Beast, every squad is tasked to pick a new cadet squad leader for the end of Beast challenge. As a new cadet during Beast, with two weeks left to spare, I exhibited that I could excel by passing off my knowledge, a feat surpassed only by CDT Sean Flint (A1). That motivation, coupled with my knowledge set, placed me in the position of new cadet squad leader. To me, even to this day, it was an honor that I was held in such esteem by my peers. Since then my performance has been less than desirable for which I accept full responsibility. I believe that was the result of an alcohol board that I had plebe year, a loss in judgment that cost me dearly.

As Major Gade told my Leader's Challenge class earlier this year, character 'x' the moment = the outcome. Never has such a simple equation been more applicable. My character at the moment equaled the outcome of several of my friends/company mates/peers getting in trouble. At the time, I was 21 and able to buy alcohol, and instead of saying no, I chose the easier wrong over the harder right. Never had I felt such a feeling of remorse. I saw where everything that I did from then on could be viewed through a negative lens. For me, it was the hardest thing to reconcile, all of the positive things that I had done prior to that incident had been completely nullified. All anybody could see was the cadet who lacked the character to do the right thing.

000745

Rather than act with the maturity of an adult and pick myself up off the ground, I allowed my own attitude to keep me down.

I went into Buckner that summer with every intention to do as well as I had done in Beast, which is a task I felt I accomplished. As a member of squad, I was an asset. I used my knowledge gained through ROTC and the National Guard to aid my squad leader in guiding my squad. I was able to take charge as a team leader, and lead my team with confidence because I knew what my abilities were. Although reconndo events were not the most popular, I realized that the events were required of me anyway, so I needed to do the best I could. At the end of the summer, I heard my name called as one of the few cadets who actually received the award. I felt pride because I knew the award was something I had earned. I even ran the 10k over again so that I could receive the award. Once Buckner was over with, and going into a new school year, there were many issues that I had to deal with, including: completing my punishment for the alcohol incident, managing a troubled plebe, and trying to maintain my grades. I overcame almost all of my difficulties that semester, which shows a conviction towards overcoming adversity. While I did not receive a passing grade in Physics 'I' that semester, I retook the class next semester and passed with a B~ I believe that troubled times only made me stronger, and despite the adversity I faced at the time, I worked hard to remain at the academy. I showed that my resolve would not be broken.

During Cow year, I struggled physically. A physical injury, in the form a broken hand, proved to be a burden that whole year; as a result, I was unable to take an APFT or IOCT. One of the biggest positives I had that year in regards to physical fitness was a decision to sign up for a 50 miler. From January to May, I spent time training. My finishing time was 12 hours and 5 minutes, and I finished 105th out of 234 people. Finishing that 50 miler proved that hard work, dedication, and motivation is enough to prevail over almost anything. During my 50 miler there were two times I wanted to quit, during the 25th and during the 36th mile. I remember my body completely shutting down and to continue running was onerous; however, despite wanting to quit, I continued. I view West Point as a 50 mile ultramarathon. Right now I am on the 36th mile, my body is shutting down on me, hope seems forlorn; yet, I know that quitting is not an option. I have given up so much to be at West Point (an earlier commission), and I have done so much to remain at West Point. I give my assurance that even though I have hit a rough point in my journey that I am taking the right measures to change and to remain at West Point. My emotions have gotten the better of me at times, but I am currently undergoing anger management to better handle my emotions. I believe the following best describes the aforementioned:

"I claim not to have controlled events, but confess plainly that events have controlled me."- Abraham Lincoln to Albert G. Hodges, April 4, 1864

Abraham Lincoln's remark accurately depicts how I have reacted to events. At all times, no matter the situation, I am the one who controls my own actions, and ultimately, my own destiny. I have been blatantly emotional about numerous issues, those emotions have gotten me in trouble, but those are the same kind of emotions and convictions that have urged me to help others and to care about others. At every expense to myself, I have sought to help others because

ultimately that is what is expected of Army officers and leaders of character. Perhaps, my greatest fault has been an inability to gauge my emotions and to control events.

Sun Tzu wrote of creating a 'death ground' – a place where an army is backed up against some geographical feature like a mountain, a river, or a forest and has no escape route. Often I have found myself backed against the proverbial wall. I have been in situations where passing a class, or overcoming a challenge such as running a 50 miler seemed almost unlikely, but I overcame. When I am doing a physical event, being backed against the wall is not the answer; it's about facing that wall and running through it. For instance, during Cow year I went in to my IT 305 TEE with a D, but my teacher LTC. Stoker, had more faith in me than I had in myself. He showed me what it meant to be a leader, and provided me with the motivation to have faith in myself. I have rarely encountered a teacher, with as much determination to help me excel. My Physics teacher, Maj. Godshall, was also a true motivator. At the time I was taking IT 305, I was also taking LG 362, which I was failing at the time. LTC. Stoker provided me with information as to how I could improve my grade in that class as well. Ultimately, I passed both classes. My grade in IT 305 went from a D to a C+ because I had gotten a 289/300 on my TEE. I don't think passing those classes would have been an easy feat without his support.

I conclude with the following sentiments:

A. I am willing to endure any administrative measure short of separation in order to prove that I am capable of being a leader of character in the Army. This includes graduation in December or placement in the Class of 2014. I am not asking that you grant me additional privileges or benefits, but I am asking that you give me a chance to prove my worth, even if it is under greater scrutiny and higher standards.

B. My conduct investigation contained references to my time at NMMI. While I do not purport to have been a perfect Cadet there, I was not under investigation or suspension, and I was scheduled to graduate on-time. Unfortunately, my decision to leave NMMI in favor of placement at USMA did anger members of my cadre and cause hard-feelings. I did not realize the extent of those hard feelings until the interview by the investigating officer. For this reason, I ask that you not consider those negative comments, as they have no bearing on my current status as a USMA Cadet.

C. While I know my conduct has been subpar on occasion, the demerits I received over the time-period in question are not criminal, do not involve the use of alcohol, and are occasional errors in judgment and innocent mistakes by me. For instance, I know that I should have acted more rationally with my CSM. However, I believed my classmate to be acting inappropriately at the time, and I wanted to inform him of this fact at the time. Unfortunately, the situation escalated, and I know I was part of that. Additionally, I made a mistake with the maintenance tracker and missed a suspense. This was largely due to procrastination, and I felt that I could still accomplish the task at the last minute. Unfortunately, technical problems prevented me from doing so. Knowing this, I have endeavored to be more proactive, and I learned from each of these events.

000747

At no time did my actions cause harm or place anyone in a position to be harmed. While I take responsibility for my actions, please note the nature and quality of those actions along with the fact that I learned very valuable, hard lessons from all of this.

D. I know I can do better as a Cadet and future Officer. I know that my conduct since September 2012 carries consequences. However, I ask that those consequences still allow me a chance to graduate from the school I love.

3. Point of contact for this memorandum is the undersigned at 214-455-4907

Encl.
1. Letter from Mr. Eric Mayer

ISIAH DOOLEN
CDT, 2013
Company B, 1st Regiment, USCC

000748

**The Mayer Law Office**
Military and Veteran Representation

9393 West 110th Street
51 Corporate Woods, Suite 500, #5062
Overland Park, Kansas 66210

MilitaryAdvocacy.com
Office: (785) 262-9371
Fax: (785) 246-7052

May 3, 2013

LTG David Huntoon
Via Mr. Delroy Patrick at delroy.patrick@usma.edu

Re: Cadet Isiah Doolen Conduct Investigation

Dear LTG Huntoon:

The purpose of this letter is to supplement the rebuttal memo submitted by Cadet Isiah Doolen for his Conduct Investigation that is currently pending final adjudication.

We request that you take action in a manner that affords CDT Doolen a second chance at obtaining a commission from USMA. This includes, but is not limited to, December graduation or placement in the Class of 2014.

Each individual instance of alleged misconduct that contributed to his excessive demerits constitutes an act of low-level misconduct.

1. He engaged in a heated argument with a classmate who happened to occupy a leadership position (Cadet CSM). September 2012. 30 demerits.
2. He was not present for a lunch formation. December 2012. 5 demerits.
3. He did not sign his BRADSO contract by the posted suspense. 5 demerits.
4. He failed to update the battalion maintenance tracker by the suspense. 20 demerits.
5. He was out of his room after Taps while on restriction. 30 demerits.

The allegations of misconduct from September 2012 to January 2013 are minor, non-violent, and two of them indicate, at worst, forgetfulness or a bit of procrastination.

The verbal altercation that occurred between CDT Doolen and the Battalion CSM was initiated because Doolen believed that the Cadet CSM was acting unprofessionally and unreasonably toward another cadet. Doolen intended to correct the situation immediately. Unfortunately, the discussion unreasonably escalated, but never turned physical. However, we should not forget that this was, in essence, a heated discussion between two classmates. For this, he received a heavy punishment that included 30 demerits.

**000749**

2

In December 2012, he failed to be present at lunch formation. However, he was working with a lab group on a project that required his attention and absence from formation. Unfortunately, he did not make the necessary coordinations because he forgot to do so. This is not an act of blatant misconduct but a very minor miscommunication.

He accepts his failure to sign the BRADSO contract and makes no excuses for this mistake.

The matter involving the battalion maintenance tracker is a complicated one. Essentially, CDT Doolen and his supply cadet NCO waited until the last night before the suspense to update the tracker. At the time they attempted to update it with their company information, the system was not available. Yet, every maintenance issue had already been submitted to the TACNCO for action, making the electronic maintenance tracker a mere formality. While CDT Doolen accepts responsibility for failing to properly manage the time constraints of this project, the punishment is excessive for an act that, in essence, constitutes simple procrastination that did not harm the wellbeing and/or comfort of others.

In his final misconduct of the period, CDT Doolen was away from his room after Taps. However, the circumstances mitigate the severity of the conduct. At the time of the misconduct, CDT Doolen received an emotional and frantic message from his recently-ex-girlfriend. He was still emotionally attached to her, and she indicated that she was presently harassed by other cadets. He immediately responded to the situation to discover that it was not as she had communicated. Upon discovering this, he immediately withdrew back to his room. Again, while he knows he was wrong, the punishment is excessive considering the circumstances surrounding the underlying misconduct.

The investigating officer for the conduct investigation evaluated Isiah's conduct from a neutral, dispassionate perspective. He clearly balanced the needs of the Army and USMA with those of CDT Doolen. After evaluating Isiah's performance as a USMA Cadet, prepster, and NMMI student, he concluded that CDT Doolen should be afforded an opportunity to rehabilitate himself as a December graduate. The fact that this opinion comes from an neutral fact-finder who personally evaluated the alleged misconduct and engaged in face-to-face discussions with CDT Doolen should be given the greatest consideration and weight in this matter.

3

Separation from USMA will have a profound effect upon CDT Doolen's future and family. He faces an unbelievably-large debt to the government which he must repay for years (possibly decades). This is a huge impediment to future success and quality of life.

As with most cadets, CDT Doolen's family is emotionally invested in his status at West Point. Because of both the conduct investigation and possible separation, his parents experience a great deal of stress and discomfort. For his father, a septuagenarian, this has been particularly difficult as he faces this situation and the possible realities of assisting his son with an extremely large debt to the federal government. In short, we ask that you recognize that the serious second and third-order effects of this decision mandate the exhaustion of all possibilities short of separation. At this point, delayed graduation and additional opportunities to succeed (or fail) have not been attempted, but they deserve a chance.

As you know, every Army officer experiences adversity. The truly exceptional ones learn from mistakes and become stronger. Isiah deserves a chance to show that he has these qualities. If he does, he will be an unbelievable asset to the Army and a terrific leader of Soldiers. All he needs is a chance.

Very truly yours,

Eric L. Mayer



# DEPARTMENT OF THE ARMY
### UNITED STATES MILITARY ACADEMY
#### 646 SWIFT ROAD
#### WEST POINT, NY 10996-1905

MAJA-MJ                                                         29 March 2012

MEMORANDUM THRU

Regulations & Discipline Officer, United States Corps of Cadets, United States Military Academy,
    West Point, New York 10996
Commandant of Cadets, United States Corps of Cadets, United States Military Academy,
    West Point, New York 10996

FOR Superintendent, United States Military Academy, West Point, New York 10996

SUBJECT: Legal Review of Conduct Investigation – Cadet Isiah M. Doolen, Company B-1,
Class of 2013

1. Purpose. To provide a legal review of the Conduct Investigation (CI) of Cadet Isiah M.
Doolen, Company B-1, Class of 2013.

2. Discussion.

    a. The Investigating Officer (IO), MAJ Timothy R. Carignan, found Cadet Doolen
(Respondent) deficient in conduct for exceeding his six-month demerit-with-tour allowance. The
disciplinary awards affirmed by the IO are as follows:

| DATE OF OFFENSE (Date of Award) | DELINQUENCY | AWARD |
|---|---|---|
| 15 SEP 12 (17 SEP 12) | Art.7 –Error in Judgment (Disrespect of a Senior Cadet Non-Commissioned Officer). | 30 demerits |
| 10 DEC 12 (13 DEC 12) | Art. 1, 3, 7 – Failure to comply with Regulations, Orders, Instructions; Delinquency in accountability, Error in Judgment (failed to report to lunch formation and commemoration ceremony). | 5 demerits |
| 10 JAN 13 (22 JAN 13) | Art. 1, 7 – Failure to comply with Regulations, Orders, Instructions; Error in Judgment (failed to sign BrADSO contract by suspense). | 5 demerits |
| 11 JAN 13 (16 JAN 13) | Art. 1, 7 – Failure to comply with Regulations, Orders, Instructions; Error in Judgment (failed to meet a BN suspense). | 20 demerits |
| 19 JAN 13 (24 JAN 13) | Art. 1, 3, 7 – Failure to Comply with Regulations, Orders, Instructions; Delinquency in Accountability, Error in Judgment (left room after TAPs while on | 30 demerits |

MAJA-MJ
SUBJECT:  Legal Review of Conduct Investigation – Cadet Isiah M. Doolen, Company B-1,
Class of 2013

| | restriction). | |
|---|---|---|

b.  The CI was held on 26 March 2013.  The Respondent reviewed the packet and did challenge, in part, the contents of the packet.  After considering the Respondent's matters, the IO found that the disciplinary actions listed above were properly constituted, reviewed, and approved, and the IO affirmed the awards.

c.  The IO recommends that Cadet Doolen be separated from the United States Military Academy, but that the separation be suspended, that Cadet Doolen be turned back to graduate in December 2013; that Cadet Doolen be mandated to attend regularly scheduled anger and emotional management training with CPD, be assigned to a military position (PL) to showcase his improvements, and for the Chain of Command to provide robust, directed mentorship opportunities for Cadet Doolen.

3.  Rules and Analysis.

a.  All demerit awards are within the limits established by USCC Regulation 351-1.

b.  There was no error that had a material adverse effect on the Respondent's rights.

c.  The conduct deficiency is supported by substantial evidence and by a greater weight of evidence than supports a contrary conclusion.

d.  The proceedings were conducted in accordance with law and regulation, and complied with legal requirements.

e.  You are not bound by this determination.  You must reach your own conclusions based upon your independent evaluation of the record.

4.  Superintendent's Responsibilities.

a.  Review the entire case file, including chain of command recommendations and any matters offered by the Respondent, in accordance with AR 210-26, paragraph 7-3, before taking action in this case.

b.  You may approve the finding that the Respondent is deficient in conduct if you determine that it is supported by a greater weight of evidence than supports a contrary conclusion.

c.  You may disapprove the deficiency finding for any reason you deem appropriate.

d.  In making your determination, you may consider any relevant information, as long as the information is provided to the Respondent for consideration and rebuttal.

000753

MAJA-MJ
SUBJECT:  Legal Review of Conduct Investigation – Cadet Isiah M. Doolen, Company B-1, Class of 2013

e.  If you approve the finding that the Respondent is deficient in conduct, you may:

(1)  Recommend to the Assistant Secretary of the Army (Manpower & Reserve Affairs) that the Respondent be separated from the Academy, transferred to the US Army Reserve as an E-4 for three years, and called to active duty for three years, with or without enrollment in the Academy (Army) Mentorship Program;

(2)  Recommend to the Assistant Secretary of the Army (Manpower & Reserve Affairs) that the Respondent be separated from the Academy and discharged from the Army, with possible recoupment;

(3)  Direct a suspended separation (with or without enrollment in SLDP);

(4)  Turn the Respondent back; and / or

(5)  Suspend the Respondent from the Academy.

f.  A copy of the case file, including this legal review and the Commandant's recommendation, will be provided to the Respondent.

5.  Recommendation.

a.  Review the complete case file, especially the five disciplinary awards contained herein; and

b.  Withhold taking action on this case pending receipt of the Respondent's reply (if any).  The requisite documents for your action will be provided at the appropriate time.

FOR THE STAFF JUDGE ADVOCATE:

Encls
as

ANTHONY O. POTTINGER
CPT, JA
Chief, Military Justice

3

# CI - TABLE of CONTENTS

## CDT Isiah Doolen, B1/13

| TAB | DOCUMENT | ACTION BY: | (Initial when present) |
|---|---|---|---|
| A | **CI PACKET :** | | |
| | Transmittal of CI Proceedings | IO | |
| | Summary of Proceedings | IO | |
| | Convening CI Memo | IO | |
| | Other CI documents | IO | |
| | IO Processing Checklist | IO | |
| | Investigating Officer Appointment Orders | R&D | KS |
| | | | |
| B | **CONDUCT REVIEW** | | |
| | Deficiency in Conduct memo/ | R&D | KS |
| | Cadet Acknowledgment to R&D | CADET | |
| C | Cadet Referral to CI Memo | R&D | |
| D | Privacy Act Statement | R&D | |
| E | BTO Memo | R&D | |
| | RTO Memo | TAC | |
| | TAC Memo | TAC | |
| | Cadet COC Memos | TAC | |
| | ID Memo | TAC | |
| | Cadet CRB | TAC | |
| | Demerits Review | R&D | |
| | Military Summary | R&D | |
| F | 5th Article | R&D | |
| | 4th Article | R&D | |
| | 3rd Article | R&D | |
| | 2nd Article | R&D | |
| | 1st Article | R&D | |
| G | Evaluations: DMI, DPE, O/Dean | R&D | KS |

24A



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MACC-P                                                                                          25 March 2013

MEMORANDUM FOR Commandant of Cadets, United States Corps of Cadets, West Point,
New York 10996

SUBJECT: Transmittal of Conduct Investigation (CI) Proceeding, Cadet M. Isiah Doolen,
Company B1, Class of 2013

1.  Transmitted herewith is the record of proceedings of the CI which convened on 26 March
2013 to hear matters pertaining to the conduct deficiency of Cadet Isiah M. Doolen, Bravo
Company, 1st Regiment, Class of 2013. CDT Doolen received two Battalion-level Article 10
boards, one Company-level Article 10 board, and two Summarized offenses resulting in 90
demerits within a 6-monther period, 18 more than the allowable 72 demerits over the same time
period for Firsties.

2.  The CI investigated Cadet Doolen's pattern of behavior and finds him *deficient* in conduct.
For a detailed discussion of my rationale, please see the enclosed Summarized Report of
Proceedings.

My finding is based upon reviewing the five documented infractions, witness statements from
instructors, peers, and others referencing CDT Doolen's performance and character, personal and
telephonic interviews, as well as discussions with CDT Doolen in my office and with him and
called witnesses during the conduct investigation hearing itself.

3. Based upon my review of all evidence, I recommend suspended separation through a delayed
graduation (DEC 2013):

    a.  Mandate regularly scheduled anger and emotional management training with CPD,

    b.  Assign a military position (PL) to showcase his improvements,

    c.  Provide robust, directed mentorship opportunities.

4.  A Summarized Report of Proceeding is attached, as well as Cadet Doolen's conduct record.
All exhibits offered or considered as evidence in the CI are listed and indexed accordingly.

MACC-P
SUBJECT:  Transmittal of Conduct Investigation (CI) Proceeding, Cadet Samuel J. Doolen, Company B3, Class of 2013

5.  I authenticate and certify that the attachments to this transmittal of CI proceedings are complete and accurate and that the findings and recommendations are correct.

TIMOTHY R. CARIGNAN
MAJ, MI
DPE Instructor

Encls
1. Summary of Proceedings
2. CI Appointment Memo
3. Exhibits A thru G
    A. Written Character References from Cadets (9)
    B. Written Character References and Testimonials from Staff and Faculty at USMA (11)
    C. Written Character References from Outside USMA (1)
    D. Telephonic Testimony from TACs (3)
    E. Telephonic Testimony from References from Outside USMA (2)
    F. Personal Interviews with Cadet Chain of Command (2)
    G. Counseling Statements from CDT Doolen's TAC file (5)
    H. Center for Personal Development Authorization for Disclosure of Information (1)
4. IO Processing Checklist

2

# SUMMARIZED REPORT OF PROCEEDINGS
Cadet Isiah Doolen, Class of 2013, Co. B1, USCC
Conduct Investigation, 26 March 2013

I. SUMMARY OF CONDUCT RECORD REVIEW. I reviewed two Battalion and one Company Board / Article 10 actions and two Summarized actions for a total of 90 demerits, 80 tour hours (6 suspended, 30 granted amnesty), 66 days restriction, and 66 day withdrawal of privileges. All disciplinary actions were awarded in accordance with the USCC Regulation 351-2, dated May 2001.

II. ISSUES/ CHALLENGES BY THE CADET.

CDT Doolen challenged the ruling and punishment of his 11 January 2013 Company board where he failed to meet a Battalion suspense (updating the maintenance tracker for his company on editgrid) and thereby violated CDC Articles 1 (Failure to Comply with Regulations, Orders, Instructions) and 7 (Error in Judgment). The punishment given was 20 extra duty hours (6 suspended), 14 days restriction, 14 days loss of privileges, and 20 demerits. I discussed the details of his challenge during five separate meetings with CDT Doolen between 8 and 20 March 2013. I had telephone conversations about this incident with his TAC Officer CPT Elizabeth Eaton-Ferenzi on 8 March 2013, his TAC NCO and current Building Commandant SFC Kellen Rowley on 18 March 2013, and the former Building Commandant and current A1 TAC NCO SFC Daniel Boudreau on 21 March 2013. On 19 March 2013, I held two interviews with CDT leaders to discuss the incident, one with CDT Lauren Heiliger, the Battalion Supply Officer, and the other with CDT Ashli Carlson, B1 Company XO. I received written input from CDT Stephen Bartkowski, B1 Company Supply NCO, on 19 March 2013. The issue was discussed at the CI hearing held at 1600 on 21 March 2013 where CDTs Hunter Baudoindajoux, Ashli Carlson, and Doolen provided additional information. I met with CPT Eaton-Ferenzi and SFC Rowley on 22 March 2013 to discuss this additional information, after which I made my final ruling on this challenge.

Based on my review of the details surrounding this infraction, it is my determination that CDT Doolen's challenge has no merit. CDT Doolen, as the B1 Company Supply Officer, failed to meet this Battalion suspense due to his irresponsibility and failure to properly plan. Four of the five witness statements provided concerning this incident detailed the repeated reminders and forewarnings given to CDT Doolen by CDTs Heiliger and Carlson and his TAC team during the 5-day period leading up to the suspense date. CDT Doolen's own testimony to me on 18 March 2013 confirmed his receipt and complete understanding of the tasking from CDT Heiliger approximately five days prior to the suspense date. Both he and CDT Heiliger could not recollect what date CDT Heiliger had set for the suspense or what date the task was given to CDT Doolen, but everyone with whom I discussed this information indicated that the task was given early in January 2013, approximately five days prior to the suspense date. The four aforementioned statements also identified CDT Doolen's lack of responsiveness to their repeated reminders, his failure to communicate troubles up the chain of command, and his irresponsibility concerning

000758

this particular supply issue. When CDT Doolen and his Company Supply NCO, CDT Bartkowski, attempted at the last minute to meet the suspense, the maintenance tracker document on editgrid was temporarily locked because another user had opened it and was editing it. This prevented CDT Doolen from completing his task. CDT Heiliger testified during the CI hearing that the maintenance section of editgrid has been fully operational since the time she took over her role at the start of the semester. She also testified that when this situation occurs and someone else is editing the maintenance tracker, the editgrid system provides that locked-out user with a number of actions including identifying the name of the person currently on the system, the option to open up an edit only version of the tracker, and the opportunity to wait or send a message to the person logged-on to the tracker. Lastly, CDT Heiliger stated that usually when this happens, folks walk down the hall to go ask each other to get off the system so someone else can use it. None of these options, it seems, were used by CDT Doolen to complete his task. Instead, CDT Doolen testified to reporting the information prior to the suspense to his chain of command, specifically SFC Rowley, but confirmed that his actual task was to complete the tracker on editgrid; this he did not do. Had prior planning prevailed and had meeting the suspense been more of a priority for CDT Doolen earlier in the process, given the details of the tasking as I understand them and as witnessed to me via multiple witnesses, he would have been able to meet the suspense.

During testimony given by both CDT Doolen and CDT Heiliger during the CI hearing, I learned that the task to update the Battalion tracker was also not met by the A1 Company Supply Officer CDT Micah Gunselman. I called A1 and spoke with SFC Boudreau and learned that CDT Gunselman received a Cadet Observation Report and 5 demerits for his failure to meet the Battalion suspense in 11 January 2013. SFC Boudreau also gave positive character reference of CDT Gunselman stating that he was a good and reliable cadet and that CDT Gunselman had exhibited no other conduct anomalies, either behavioral or supply-related, prior to the incident or since. This is not the case concerning CDT Doolen. I have determined that even though the punishment received by the A1 Supply Officer for the same infraction was less than what CDT Doolen received, it is my assessment that the B1 TAC team justifiably acted within USCC regulation and without prejudice to enforce the tougher punishment against CDT Doolen.

During our meetings together and during the CI hearing, CDT Doolen continued to accuse his TAC team of being excessive in their punishment for this infraction and that the January boards were piled upon him to build a case against him. Having met personally with both CPT Eaton-Ferenzi and with SFC Rowley on 22 March 2013 to discuss the issues of receiving supply data, the functionality of the editgrid system, the potential excessive punishment for the 11 January 2013 Company board, and the alleged piling on, it is my evaluation that the accusations and additional information brought forth by CDT Doolen have no merit. These attempts serve only as examples of his unwillingness to take responsibility for his actions and of his tendency to place blame on other for the situation in which he finds himself.

Testimony given by CDT Heiliger during the CI hearing showed that since the 11 January 2013 Company board, B1 has been ranked between 2nd and 5th place (4 companies tied for 2nd place) out of nine companies for supply actions, and 2nd place out of nine companies for maintenance actions. She also stated that she felt compelled to assist CDT Doolen more than any other company staff member to complete his supply and maintenance tasks, and that part of the

2

**000759**

subsequent B1 maintenance and supply success was due in part to her aggressive assistance in the company supply process.

Lastly, the timing of this challenge is suspect. For nearly two months CDT Doolen chose not to challenge the 11 January 2013 finding. His challenge, which is his legal right, came only after he was faced with the conduct investigation (1 March 2013). Based on my review, no evidence was ever satisfactorily raised or claim sufficiently substantiated to warrant a determination that CDT Doolen's challenge had any merit.

III. WITNESS CALLED.

The following witnesses provided statements in person at the hearing on 20 March 2013. They are listed in order of their testimony.

- CDT Lauren Heiliger
- CDT Ashli Carlson
- CDT Hunter Baudoindajoux
- MAJ Frank Scherra
- Lt Col John O. Hagen
- CDT Justin Adkins

The following witnesses provided written character statements for CDT Doolen. They are listed in the order they appear in the CI packet.

From CDT Doolen's peers (Exhibit A):

- CDT Stephen Bartkowski
- CDT Hunter Baudoindajoux
- CDT Thomas Ankenbauer
- CDT Justin Adkins
- CDT Jeremy Madany
- CDT Michael Carrion
- CDT Thomas Dunn
- CDT ████████
- CDT Edwin Lee

The following personnel provided written statements regarding CDT Doolen's character, from the perspective of an instructor (Exhibit B):

- MAJ Josiah Grover, HI302
- Dr. Thomas Sherlock, SS375
- Lt Col John O. Hagen, SS476 (2 separate written statements)
- Mr. Daniel Lorenzen, PE360
- LTC Tania, Chacho, SS486
- MAJ Rachelle Macon, PE450 (PE450 peer evaluation document on CDT Doolen)

3

**000760**

- LTC Geoffrey Stoker IT305
- MAJ Ruth Mower, SS374
- Mr. Timothy Goetz, PE117
- MAJ Marschean, PH201

From references outside USMA (Exhibit C):

- Jan Olesinski, Cross Country Coach, NMMI

The following witnesses provided telephonic statements regarding CDT Doolen (Exhibit D):

- CPT Elizabeth Eaton-Ferenzi, B1 TAC Officer
- SFC Kellen Rowley, B1 TAC NCO, Lee Barracks Building Commandant
- SFC Daniel Boudreau, A1 TAC NCO, Former Lee Barracks Building Commandant

The following witnesses provided telephonic statements regarding CDT Doolen from references outside USMA (Exhibit E):

- Mr. and Mrs. Carl and Connie Doolen – parents of CDT Isiah Doolen
- LTC (R) Jeffry Cunningham, PMS, New Mexico Military Institute (NMMI)

The following witnesses conducted a personal interview with me regarding CDT Doolen (Exhibit F):

- CDT Lauren Heiliger
- CDT Ashli Carlson
- CPT Elizabeth Eaton-Ferenzi
- SFC Kellen Rowley

Included in this summary report is CDT Doolen's additional counseling documentation that I requested of his TAC for incidents which occurred within the scope of the CI (Exhibit G).

## IV. INVESTIGATING OFFICER'S DIALOG WITH THE CADET ABOUT HIS BEHAVIOR.

After showing up to our first meeting with a grimy, oily patrol cap, and the worst of excuses for its condition, I hoped that this was not a precursor of what I would find during my investigation. But, in some instances, it was. CDT Doolen and I met 1st hour during the compressed schedule of 8 March 2013 at 0630. We met and talked about his case. We then agreed to meet back in my office during 3rd hour, which he had open starting at 0840, but CDT Doolen failed to show up. He had instead gone to his TAC and requested to go speak with the RTO without ever contacting me ahead of time to request a reprieve from our appointment. By 0900 on day one of the investigation, CDT Doolen had not made a very good initial impression. After spending six sessions with him, I have determined that my initial impression of the man is a close representation to the demeanor, perspective, and character exhibited during his infractions and occasionally while discussing his case with me in my office. USMA grade

4

records show that CDT Doolen is an average cadet. His instructor character references generally show an average focus and a slipping potential.

His infractions, though, are not so egregious that recovery and learning from them en route to becoming a productive, successful lieutenant in the U.S. Army is not a foregone conclusion. Yet despite this collection of rather minor infractions over this short period of time, I find that he is resistant, rather than totally committed, to taking full responsibility for his actions, as evidenced by his recent errors in judgment, the rapidity of his most recent infractions, and his less-than-full commitment to his responsibilities as noted in testimony by some of his peers and most of his instructors. This is troubling, especially for a Firstie two months from commissioning. Troubling still is that he has allowed his feelings towards the consequences of his actions, combined with his self expressed "not-what-I-had-anticipated" USMAPS and USMA experiences, to jade his perspective and, at times, taint his decision making ability with splashes of apathy, irrationality, and carelessness. This is most witnessed when CDT Doolen is faced with a decision where he allows his personal feelings to override the right, tough decision he knows he must make as a leader. I do not believe that he has learned from his mistakes; he has expressed to me, and to others including his TAC Officer, that he feels that this entire investigation is a farce and that he is fully ready now to enter the force as a Second Lieutenant, expressions with which I do not agree.

## V. FINDINGS.

(1) Much of documentary evidence, testimony, and statements indicate that Cadet Doolen is found to be deficient. The disciplinary actions were properly constituted, reviewed and approved. The actions were not in excess of the guidelines established by the USCC Regulation 351-2.

(2) I recommend that the chain-of-command take the following actions: I recommend suspended separation through a delayed graduation (DEC 2013).

a. Mandate regularly scheduled anger and emotional management training through the Center for Personal Development for the duration of his time at West Point. This could include any referral to on or off-post counseling that would help CDT Doolen recognize early when his emotions start to cloud his judgment, regulate these emotions to normal levels, and eventually learn to regularly make sound decision under duress.

b. Assign CDT Doolen a military position over the summer and during the Fall semester that will help him work through his weak areas and allow him to put into practice his behavioral management skills. Perhaps assign him as a company PL to allow him to experience a close approximation of what he will face upon commissioning. The PL role is filled with opportunity to work through problems under duress, time constraints, conflicting personalities, and with minimal resources. Establishing a good track record of handling such adversity will indicate his readiness to enter the active force.

c. Provide robust, directed mentorship opportunities to CDT Doolen. I recommend entering him into a weekly SLDP-type mentorship program to continue his leader development one-on-one with an active duty mentor for the remainder of his time at West Point.

(3) My rationale is as follows:

To start, discussion must be heard of CDT Doolen's pre-USMA experiences and of his family background and upbringing in order to gain full understanding of my decision to find him deficient. CDT Doolen comes from a family heritage rich in service to our nation. His mother told me of CDT Doolen's uncles, grandparents, and other relatives who have served a number of honorable years in the active military, many during the time when CDT Doolen was still a young boy. This was how he fell in love with the idea of military service himself and pursued it in all haste. Since then, he has been involved in a military-type environment through a military high school, ROTC at New Mexico Military Institute (NMMI), USMAPS at Fort Monmouth, and here at USMA for roughly eight years. I was very surprised to hear "eight years." Eight years is a lot of time in pursuit of a goal, the goal of officership. Eight years is a lot of time to learn the ropes of leadership, duty, respect, selfless service, honor, integrity, and personal courage, and become a solid, confident future leader in the Army. Eight years provided a lot of time for CDT Doolen to put into practice the solid leadership he lived through, was the recipient of, and witnessed in the senior officers around him along every step of the way. But his actions captured in written form over the past six months and attitudes expressed in my office and during the CI hearing reflect much less than what eight years of solid development can do for a future Army leader bent on commissioning.

Both CDT Doolen and his mother testified of CDT Doolen's success and robust involvement in leadership opportunities while at NMMI. Both said he excelled while testimony from NMMI about this success was mixed. Of the four folks I reached out to at NMMI at CDT Doolen's request, only two responded, of which only one, his cross-country coach Jan Olesinski, had positive comments to share. She commented that he was one of the most committed runners she has ever coached; this suggests great fortitude and commitment on his part. CDT Doolen told me early on of his deep interest in running and beamed with pride when he shared his training plan for his upcoming ultra-long races. Coach Olesinski also stated that he always smiled and always had an outstanding uniform. That last part surprised me a bit as I recalled his dirty cap at our first meeting. Surely a person with all that military-type experience, with such exposure to the chain of command, and knowing the importance of acting like and looking like a leader as witnessed by Coach Olesinski, would have known how reporting with a dirty cap and failing to keep a scheduled meeting with a senior officer all on the first day of a conduct investigation would be viewed.

The second witness from NMMI, whose name was provided to me by CDT Doolen, recalled CDT Doolen as an average student who got into trouble from time to time. The testimony of LTC (R) Jeffry Cunningham, current Professor of Military Science at NMMI, specifically tells of a CDT Doolen young, inexperienced, and of bad judgment. I engaged in a telephone conversation with LTC (R) Cunningham at 1300 on 19 March 2013 in my office while CDT Doolen was also there going through investigation documents. Admittedly, LTC(R) Cunningham was a bit off guard and had to take a minute to recall Isiah and his actions and performance there. Once on track, he stated that CDT Doolen did well enough academically to be in the top third of his class (this is in direct contradiction of Mrs. Connie Doolen's and CDT Doolen's testimony that he would have been the distinguished military graduate had he commissioned out of NMMI), but was otherwise unremarkable. LTC (R) Cunningham recalled distinctly that CDT Doolen had decided not to commission upon graduation from NMMI. The next part of the

000763

conversation was started with LTC (R) Cunningham stating something similar to "In order to be completely honest with you, I need to be honest with you…" I really did not know what to expect from that statement, but I quick assesses tap-dancing a bit, maybe a bit reluctant about what he was going to share. As LTC (R) Cunningham continued, he gave details about "a bit of trouble" that CDT Doolen had gotten himself into near the graduation timeline. He explained that CDT Doolen, while at NMMI, was involved in what he termed as "alumni chatter" regarding the retired Navy Admiral who was serving as the Superintendent of NMMI at the time. The gist of the comments was that the alumni were not keen on this Navy Admiral as the Superintendent. LTC (R) Cunningham then went on to state that CDT Doolen had "jumped on the bandwagon" online with this alum and with the statements made against the Navy Admiral. CDT Doolen was counseled by LTC (R) Cunningham for his participation in this activity. At this point, LTC (R) Cunningham wanted me to clearly understand that this was due to CDT Doolen's youth and inexperience and then statement something to the effect that "we all made some dumb mistakes when we were young." But then he stated that CDT Doolen had taken the situation even further by taking his counseling documentation and the details of the counseling meeting with LTC (R) Cunningham to the same alumni group mentioned above and had the information posted online. Some undetermined online, subsequent comments were made and information was passed through the alumni group. LTC (R) Cunningham stated that the results of CDT Doolen's further actions rose to such a level that the NMMI Superintendent decided to order an Article 15-6 investigation into the entire situation, citing potential undue influence and possible inappropriate counseling on the part of LTC (R) Cunningham. LTC (R) Cunningham stated that a "colonel" from outside NMMI had to be brought in to adjudicate the case. LTC (R) Cunningham was ultimately cleared of all charges in the case. He lastly indicated that this was part of the reason why CDT Doolen did not commission at NMMI. When I hung up the phone and confronted CDT Doolen about the information from LTC (R) Cunningham, he said something very close to, "oh, that colonel. He's just still upset over what happened. That's the only reason why he brought that up." I just about dropped out of my chair at the ignorance of his statement and the flippancy of his attitude. What made matters worse was that CDT Doolen acted as if he had no clue as to just how insulting and ill-mannered his comments were regarding this accomplished senior officer. This gave me what I later determined to be as an early glimpse of the true CDT Doolen and clearly displayed the nexus of his conduct issues, his at-times selfish, self-serving attitude. The claim that CDT Doolen did not commission partly because of this incident is the only part of LTC (R) Cunningham's testimony that CDT Doolen denies. Both CDT Doolen and his mother have testified that CDT Doolen simply decided not to commission two weeks before commissioning date because he felt he just was not ready and that he needed more time to train and mature.

Back to CDT Doolen's family. CDT Doolen comes from a mixed family experience. Both his mom (58) and dad (71) were married previously then divorced. His parents each had one son already when they married each other, bringing their families together. His brothers were 9 and 28 respectively when CDT Doolen was born. His brothers are now 31 and 50 and he does not have a close relationship with either, but he is very close with his mom and dad. CDT Doolen testified that while he was growing up at home, his father often lost his temper or had a lack of patience when dealing with him. My own similar experience allows me to empathize with CDT Doolen. He stated that he likely got his lack of patience and short-tempered responses from his father.

7

Testimony from CDT Doolen's mother also told of how he lost focus when he moved from NMMI to USMAPS and then on to USMA. She said that he had certain expectations of USMAPS and USMA and that his experiences at both institutions did not match his expectations – all confirmed by CDT Doolen's own testimony. Mrs. Doolen stated that this tainted Isiah's perspectives on preparing for military service. She told of his dissatisfaction when he was moved from Company E4 to Company B1, and that he had a very difficult time adjusting to the company TAC leadership. She further reported that CDT Doolen had always had a difficult time coping with change. She mentioned that he could be impulsive during training but that when he was with real troops, like during Cadet Leadership Development Training, he felt comfortable and felt like he finally fit in. According to CDT Doolen's military records, he did perform well at CLDT. CDT Doolen's mom's last comment to me during our telephone conversation was a bit telling to me as it, I believe, revealed the true man I have been ordered to investigate. She stated her belief that her son would always be the one to defend the underdog regardless of the consequences, and that he would always jump in to the defense of the weaker. The more I learn of CDT Doolen, the more I feel this statement fits him to a tee… making emotionally-driven decisions "regardless of the consequences" and "jumping in" to his own peril. During our fourth meeting together, CDT Doolen agreed with all of the characterizations of him in the statement provided by his mother.

CDT Doolen has indicated that he wants to learn from his mistakes so that he will be a better Officer. But wanting to learn and actually committing to learn are two very different things. He has verbally committed to work on being more honest with himself, to work to overcome his anger issues and emotional outbursts, and to be more accountable to those under his charge and to leaders above him, but evidence to show this is short and will take time. As of this writing, he has self-referred to the Center for Personal Development (CPD) for two sessions to work on anger management with Dr. Hain, and he has met with Dr. Spiegel from CPD on two occasions over Spring Break, so he is seeking and receiving help. This was confirmed by Dr. Speigel at CPD after securing a release of information memorandum from CDT Doolen (Exhibit H). According to Dr. Spiegel, having only met with CDT Doolen on two occasions, it was still a bit too early to give any type of evaluation of CDT Doolen or his progress.

When CDT Doolen and I met one-on-one, aside from around details of his case, our discussions have centered on overcoming adversity, leadership style and adaptability, others' perspectives of our actions and their ramifications, and persistent professionalism. We have discussed the effects on unit cohesiveness and troop readiness when leaders fail to emulate these attributes or demand them of their troops. He does admit to having difficulty coping well with change, confirmed by his mother's testimony, and that his inability to cope only fuels his resistance towards it and towards decisions made against him with which he does not agree.

CDT Doolen admits to being a perennially average student with occasional and recent academic disappointments. He has only one semester at USMA, the Fall of his Plebe year, where he has not failed or earned a D in one of his course, yet he accepts where he is academically. He achieved the most academic success while at NMMI. But when asked about his weaknesses as a cadet, his academic performance was absent from his comments. Aptly, most of his stated weaknesses were relational in nature, confirmed by other testimony. This leads me to believe that he understands that he does have interpersonal problems. Testimony bears that he has the largest relational challenges when those in authority over him, press him, demand of him, or make

000765

judgments or decisions against him. Testimony also shows that he has a habit of allowing his emotions to trump proper actions. He does say that he likes to work with people, which I assess to mean he like to work with his peers.

The feedback from CDT Doolen's academic instructors is lop-sided. Some instructors, MAJ Mower, MAJ Grover, and MAJ Scherra commend or have no issues with his class performance, conduct, leadership, sense of duty, and potential. Other instructors, LtCol Hagen, LTC Stoker, Mr. Goetz, Dr. Sherlock, Mr. Lorenzen, and LTC Chacho express that CDT Doolen is not fully committed, was or is a marginal performer, does not follow directions well, a person they would not want in their unit, or a person who should not become a Second Lieutenant. The instructors that did provide negative comment also pointed out at least one positive attribute or rendered a neutral sentiment towards CDT Doolen. CDT Doolen freely states that he is not the best student, but he does find it easier to do the work for classes he most enjoys.

What I also found very interesting was that CDT Doolen had provided to me name of those he would like to have submit character references on his behalf, yet three of these, Lt Col Hagen, LTC (R) Cunningham, and CDT Heiliger all provided testimony that did his character more harm than good. This calls into question his ability to make good judgment regarding interpersonal relationships, an assessment early identified in CDT Doolen and found in multiple instructor character references.

All nine of the peer character statements written in support of CDT Doolen speak positively about his professionalism and potential for future service in the Army. One-third, however, make specific acknowledgement of his struggle in certain areas and of his efforts to overcome his weaknesses. His 18 cadet chain of command evaluations on his CPR Profile have him rated five times as center of mass, eight as above center mass – lower half, and five as above center mass – upper half. Yet only one character reference came from a cadet who was ever in authority over him. His peer and subordinate evaluations on his CPR Profile send an even more mixed message. Forty percent (6 of 15) of his evaluations from peers and subordinates rate him as either Below Center Mass – Retain (4) or Below Center Mass – Do Not Retain (2), while nearly forty-seven percent (7 of 15) rate him as Above Center Mass – Upper Half (3) or Above Center Mass – Lower Half (4).

Early on, while looking into CDT Doolen's experience outside USMA, his mother provided some information that I thought, at the time, would prove a much bigger contributor to CDT Doolen's poor decision-making and frequent January infractions. His mother told me that CDT Doolen's back home girlfriend of five years had called off their relationship in January 2013. His mother told me that this break up was very hard on CDT Doolen because it was a very serious relationship and because he and his girlfriend had once been engaged. At the surface, this sounded to me like a significant family issue that could have been disruptive enough to get inside CDT Doolen's decision cycle and cause some bad decisions. So, I specifically asked CDT Doolen about any significant hometown or other personal or family situations or incidents that may have caused him problems over the past six months. I also asked him to provide details about any difficult relationship he may be having with family or friends. The only difficult relationships he mentioned were those between him and his older brothers. Surprisingly, he mentioned nothing about his old girlfriend. In fact, early on in our discussions, he voluntarily mentioned his current girlfriend, CDT ▮▮▮▮▮▮▮ She came up in conversation because she provided a sworn statement for his 19 January 2013 Battalion board. The day before the CI

9

hearing, 20 March 2013, CDT Doolen provided a character witness statement from CDT ███ that fully supported CDT Doolen and indicated that they had been dating since November 2012. So, I believe CDT Doolen either led his mother to believe that the break up was harder on him than it really was, or that she interwove some of her own personal feelings about the break up into how CDT Doolen was handling it. Nor do I feel this is an incident CDT Doolen in repressing. Therefore, it is my determination that the break up is not a factor contributing to his sub-standard actions.

Lastly, CPT Eaton-Ferenzi articulated an interesting hypothesis with me, one that both she and SFC Rowley formed based on their previous and current experience and expertise, one very similar to one that I formulated on my own prior to their sharing. They have determined that CDT Doolen has performed marginally much longer than his record shows. They say that the recent increase in CDT Doolen's infractions is partly due to the fact that, since January 2013, Company B1 has a full TAC team present in their respective roles, together in authority over him. CPT Eaton-Ferenzi mentioned that in the Fall of 2012, she had been away on pregnancy and post-pregnancy leave, leaving all of the TAC duties to her then TAC NCO, SFC Boudreau. Additionally, she mentioned that in an earlier TAC experience, CDT Doolen's TAC Officer had been away from USMA for part of the time due to ILE commitments, again leaving the bulk of the company duties during that time to one person, the TAC NCO. She and SFC Rowley postulate that if CDT Doolen had had full TAC coverage during these earlier times, more of his poor conduct and irresponsibility would have been earlier identified and documented instead of just a few short months before his scheduled commissioning. CPT Eaton-Ferenzi and SFC Rowley further assess that within the timeframe and scope of this investigation CDT Doolen's infractions were not committed because of some recent, momentous change in his perspective or attitude, say as the result of a major family or personal emergency or significant situation. They theorize, rather, that his attitudes and perspectives have been more publicly revealed as a result of his being more frequently caught and punished for his sub-standard actions. I agree with their theory.

My assessment as a former SSG(P) and commissioned officer with nearly 20 years of combined experience is that CDT Doolen is not yet representative of the kind of leader ready to don the rank of Second Lieutenant in the United States Army. I have a daughter in college and a son in high school. My son longs to get through high school and to enter military service. I cringe at the thought of him in the platoon of an unchanged 2LT Doolen. As a father, I would not want this reality and would fight to ensure that it did not happen. I fear that should CDT Doolen commission before successfully completing the recommendations listed above, his platoon's safety, readiness, training, and lives would be at risk. Additionally, the toxic attitude he matter-of-factly expressed against LTC (R) Cunningham from NMMI has no place in the Army and must be remediated before commissioning. I like CDT Doolen, and our conversations and meetings have been positive, but I cannot, nor will not, rate him as proficient when basic leader principles are routinely violated and flagrantly resisted.

From examination of the evidence, verbal and written testimony, and discussions with CDT Doolen and witnesses, I recommend that CDT Doolen be retained at USMA past his graduation date until December 2013 in order for him to undergo necessary anger and emotional management training, and to put into practice these to-be-learned behavioral techniques and procedures in a more demanding military role, much like one with which he will immediately be

10

faced as a Second Lieutenant. He has yet to develop the requisite leadership and relational skills that will help him successfully serve the Army and those under his charge.  This is where solid mentorship comes in. Once fully committed to meeting the standard and demonstrating consistent progress toward that end, he may then start to display the potential to become a successful leader of Soldiers.

TIMOTHY R. CARIGNAN
MAJ, MI
DPE Instructor

11

000768

Carignan, Timothy R MAJ MIL USA USMA

| | |
|---|---|
| From: | Bartkowski, Stephen R CADET MIL USA USMA |
| Sent: | Monday, March 18, 2013 6:31 PM |
| To: | Carignan, Timothy R MAJ MIL USA USMA |
| Subject: | RE: CDT Doolen feedback |

MAJ Carignan,

I am CDT Doolen's subordinate this semester and serve as the company supply/maintenance NCO for B1.  I was directly involved in the incident in question because it was his and my responsibility as the supply team to complete the tracker updates for the BN.  The reason we did not meet the suspense is because there was initial confusion when assuming our responsibilities in the company.  The requirements were not clearly communicated to our level and I was under the impression that updates and work order requests needed to be submitted through the TAC team rather than the BN S4.  Additionally, the email from the BN S4 requesting an update failed to provide a way for me to update the tracker.  It took more than one attempt to be given the network location of the tracker, and once CDT Doolen and I had access to it, it would only work intermittently.  The problem with the tracker was eventually fixed, but it was not able to be saved while more than one user had a copy of it open on their computer.

CDT Doolen did not complete his duties by the BN suspense due to complications in communication from the chain of command.  After this initial failure, CDT Doolen and I have not had issues performing our duties as the supply team.  Often times he completes a tasking before I get to my computer and see that it was assigned to us.

Unfortunately, I do not have copies of the emails between myself and the BN S4 because I deleted them weeks ago and never anticipated this to be an issue.  If you have any questions about my remarks or need them submitted in another format please contact me via email or phone (412-657-0499).  I have a rather busy day tomorrow and it is unlikely I will be able to call or stop by your office during business hours, but will be available later in the afternoon and evening if you need anything or would like to meet or speak on the phone.  Hope this helps with the investigation.

Very Respectfully,

1

000769

CDT Stephen Bartkowski
USMA 2014, CO B1


-----Original Message-----
From: Carignan, Timothy R MAJ MIL USA USMA
Sent: 18 March, 2013 15:32
To: Bartkowski, Stephen R CADET MIL USA USMA
Subject: CDT Doolen feedback

CDT Bartkowski,


My name is MAJ Tim Carignan and I am the Investigating Officer for a conduct investigation of CDT Isiah Doolen. One of his infraction was a company board involving his failure to meet a BN suspense on 11 Jan 2013. I am writing to you about this particular incident and about your interactions with CDT Doolen and his general role in the supply chain. I am requesting that you provide me feedback (written, via a visit to my office, or via phone call) today or tomorrow so that I can move forward with this investigation. Thank you.



MAJ C


v/r,

Tim Carignan

MAJ, MI

Instructor/Senior Recruiting Officer

Department of Physical Education

United States Military Academy

West Point, NY 10996

2

000770



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996-1792

**REPLY TO
ATTENTION OF**

MACC-O-3-D

27 February 2013

MEMORANDUM FOR: Investigating Officer, United States Military Academy, West Point, NY 10996

SUBJECT: Character Reference for CDT Isiah Doolen

1. The purpose of this memorandum is to provide a character statement on behalf of Cadet Isiah Doolen, company B-1, Class of 2013.

2. I am currently 4th Platoon, Bravo Company, 1st Regiment, Platoon Leader. CDT Doolen is 4th Platoon Section Leader. As such, I work directly with him, while the Platoon Sergeant deals directly with the Squad leader. We meet several times during the week to discuss the needs and status of 4th Platoon's Section.

3. One part of Professionalism in the Army is the practice of knowing the right thing and doing it. Another part of Army Professionalism is owning up to one's mistakes and learning from them. CDT Doolen has made several mistakes over the past couple of months. There is no denying these facts. However, as my subordinate, I believe he has displayed professionalism. In his mistakes, he took full responsibility and since then, has learned from them. When discussing various incidents, he admitted his guilt and has made clear efforts to do the right thing. As many officers have said, West Point is designed to be a laboratory for leadership. I believe that despite CDT Doolen's previous errors in judgment, he will make a good professional officer. He has learned from his mistakes and will be able to use the lessons learned in the future, whether for himself or his soldiers.

4. CDT Doolen is very knowledgable as a leader. His leadership is very common sense based. From what I have seen, CDT Doolen shows care and consideration for his subordinates. I think that, like all cadets and leaders, there is always room for development. CDT Doolen has developed and will continue to develop in the future.

5. I know that CDT Doolen's personal life has been rough over the past year and he was dealing with a great deal. Considering the position he is coming from, it is understandable for him to misstep at some point. I do not think that what CDT Dooeln has done warrants any serious reaction. I would serve with him any day here or in the big Army. I think that when CDT Doolen gets to the force, he will be a great asset to his soldiers and his unit.

6. Point of contact for this memorandum is CDT Baudoindajoux at (850)-559-5558 or at e-mail at Hunter.Baudoindajoux@usma.edu.

//Original Signed//
Hunter Baudoindajoux
CDT LT
USCC, B1, Class of 2013

000771



**DEPARTMENT OF THE ARMY**
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996-1792

REPLY TO
ATTENTION OF

MACC-O-3-F                                                                    28 FEB 2013

MEMORANDUM FOR Cadet Advisory Board, United States Military Academy, West Point, NY 10996

SUBJECT: Character Reference for CDT Isiah Doolen

1.  The purpose of this memorandum is to provide a character statement on behalf of Cadet Isiah Doolen, company B-1, Class of 2013.

2.  My name is Cadet Justin Adkins and I am an Administrative, Community Service, and FCDT Officer in Company F3 of the USCC.  I have known CDT Doolen for almost a year; we met because we have mutual friends.

3.  Professionalism in the purview of an Army Officer means putting the needs and goals of the organization of which one is a part ahead of one's own.  CDT Doolen has never given me any reason to doubt his dedication to selfless service.

4.  While everyone can benefit from further leadership development, I believe CDT Doolen is ready to lead this nation's most precious resource today.

5.  In my opinion, CDT Doolen's greatest asset is his unwaivering willingness to help those around him without asking for anything in return.  Cadets at West Point are busy every second of every day; they don't have much free time.  Despite this fact, there are several occasions on which I have seen CDT Doolen give of his time, the most valuable resource a cadet has.  For instance, last May, one of our mutual friends was behind schedule closing out his room for summer leave.  Despite having his own tasks to complete, CDT Doolen went out of his way to help his classmate.  This is but one instance in which CDT Doolen has helped others without asking for anything in return.

6. Point of contact for this memorandum is CDT Adkins at (972)-489-6383 or at e-mail at Justin.Adkins@usma.edu.

                                        //Original Signed//
                                        JUSTIN R. ADKINS
                                        CDT LT
                                        USCC, F3, Class of 2013



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996-1792

REPLY TO
ATTENTION OF

MACC-O-3-A                                                          26 FEB 2013

MEMORANDUM FOR: Investigating Officer, United States Military Academy, West Point, NY 10996

SUBJECT: Character Reference for CDT Isiah Doolen

1.   The purpose of this memorandum is to provide a character statement on behalf of Cadet Isiah Doolen, company B-1, Class of 2013.

2.   I am currently the Company Commander for Company Alpha, 1st Battalion, 3rd Regiment. I first met Cadet Doolen during the summer of 2010 over Cadet Field Training when he was in my platoon. I see him occasionally around cadet area and talk briefly with him about twice a month.

3.   Professionalism in the Army is the ability to act in a mature manner and demonstrate the appropriate respect and courtesy due to both subordinates and superiors. In my interactions with Cadet Doolen, he generally exhibited the respect due to the officers and other cadets involved in our training.

4.   Cadet Doolen's performance as a rotational team leader during Cadet Field Training was solid, and demonstrated not only the technical and tactical competency expected of us as PFCs, but also made certain to look after the other PFCs on his team and their wellbeing.

5.   In all my experiences and interactions with Cadet Doolen, I have never seen any behavior or attitudes that would lead me to question Cadet Doolen's ability to lead soldiers in the Army.

6. Point of contact for this memorandum is CDT Thomas Ankenbauer at 845.667.9651 or at e-mail at Thomas.ankenbauer@usma.edu.

//Original Signed//
THOMAS G ANKENBAUER
CDT CPT
USCC, A-3, Class of 2013

000773



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996-1792

REPLY TO
ATTENTION OF

MACC-O-3-D                                                                27 FEB 2013

MEMORANDUM FOR: Investigating Officer, United States Military Academy, West Point, NY 10996

SUBJECT: Character Reference for CDT Isiah Doolen

1.  The purpose of this memorandum is to provide a character statement on behalf of Cadet Isiah Doolen, company B-1, Class of 2013.

2.  I am currently a the 4th platoon platoon leader in B2. Cadet Doolen and I have had two classes together-one last semester and one this semester. Last semester, we worked on the EV450 term project together, and because of the extensive amount of time I spent working with him, I feel qualified to accurately assess his character.

3.  Cadet Doolen has always demonstrated professionalism by striving to improve not only himself, but also those around him, especially those on his team. Cadet Doolen seeks constant development, and from working with him, achieves this through competency. Professionalism entails this level of dedication, as well as a the ability to actually apply motivation towards practical ends. Cadet Doolen's critical thinking skills and logical thought combined with motivation produce significant developmental results.

4.  Cadet Doolen will be a good Army officer, and has demonstrated this potential by displaying his leadership abilities inside and out of the classroom. For example. He spoke confidently and in an informed manner during class briefs, to include the project presentation to our instructor, CPT Sotosanchez last semester. He also successfully led a class discussion in our Security Seminar, taught by LTC Chacho, on a difficult subject.

6. Point of contact for this memorandum is CDT Madany at Jeremy.madany@usma.edu.

//Original Signed//
Jeremy Madany
CDT LT
USCC, B2, Class of 2013



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
West Point, New York 10996-1792

**REPLY TO
ATTENTION OF**

MACC-O-1-G                                                                                            28 FEB 2013

MEMORANDUM FOR : Investigating Officer, United States Military Academy, West Point, NY 10996

SUBJECT: Character Reference for CDT Isiah M. Doolen

1.  The purpose of this memorandum is to provide a character statement on behalf of Cadet Isaiah Doolen, company B-1, Class of 2013.

2.  I am currently Company Commander for Company G-3. I initially met Cadet Doolen during Cadet Candidate Basic Training at Fort Monmouth in 2009. CDT Doolen and I have been good friends ever since our time at the prep school. Over the past five years I have gotten to know CDT Doolen very well.

3.  Professionalism in the Army is held in higher regard than in other professions. Due to the nature of chosen profession we must adhere to strict standards to ensure that we have the full trust and confidence or our superiors, subordinates, and our peers. A profession can be defined as a calling, and I find that to be more true in our chosen profession than in others due to the nature of the tasks we will be one day called to do. Cadet Doolen has always been committed to becoming a commissioned leader in the profession of arms. He has always been one to go further than what he is asked to do, which is a hallmark trait of every great officer that I have known.

4.  After seeing Cadet Doolen's demonstrated leadership among his peers I have felt fully confident in believing that he will one day develop into a great leader. He has the ability to motivate his classmates to do things that are unpopular among the majority, even though the majority knows it is the correct thing to do. This is possibly one of the more difficult things for a leader at this Academy to accomplish, and the fact that Cadet Doolen can do this speaks volumes of the position he holds among his peers. When it comes to Cadet Doolen's potential for development the sky is the limit.

5.  Cadet Doolen is fully aware of his own shortcomings, and he has committed himself to developing his character and proving that he can become a fine officer once he graduates. He has shown the ability to motivate his peers in a way that not many Cadets can since his time at the prep school. He has been one to take full responsibility for his actions. This is an important trait for any officer, because it demonstrates the ability to analyze one's own behavior and make improvements even when others are not there to make corrections.

6. Point of contact for this memorandum is CDT Michael Carrion at (254)-371-7493 or at e-mail at michael.carrion@usma.edu.

//Original Signed//

CDT Michael Carrion
USCC, G-3, Class of 2013

**000775**



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MACC-1-B                                                         1 March 2013

MEMORANDUM FOR: , Investigating Officer, United States Military Academy, West Point, New York 10996

SUBJECT: Character Statement for CDT Isiah Doolen, Company B-1, Class of 2013

1. CDT Isiah Doolen and I met through two mutual friends in my company. This was early November of 2012. We began dating shortly after and have been ever since.

2. A leader has many qualities which can easily be seen and developed at West Point. At this institution, we are taught that throughout our four years, we are to learn how to lead through a process of learning in every manner. The three pillars which are the basis for this learning are of academic, military and physical means. Cadet Doolen is fit in all three areas, predominantly physically and militarily. His physical prowess is shown specifically by his avid and skilled running. Cadet Doolen has participated in countless races and runs throughout his time at West Point, along with a test of mental and physical fortitude, the 50 Mile Bear Mountain run. Cadet Doolen spent all of winter and spring of 2012 training for this race, and he competed in May 2012. His determination and desire to run it even faster has driven him to enter the race again for 2013; he has been training for months. Cadet Doolen's military leadership began when he started school at the New Mexico Military Institute for high school and for two years of college. He was offered an early commission in 2009, but turned it down so that he could attend West Point. His dedication to this institution is evident.

3. Cadet Doolen possesses many of the attributes which show his undeniable ability to be an officer. He is constantly trying to improve himself in every way, while he is simultaneously balancing the challenges that West Point gives him. He looks at all of these challenges and uses them as a means of becoming a good officer. His road to becoming an officer has been longer than the average person's, so he has seen numerous qualities of leadership which are both admirable and undesirable. A few of his own qualities include his clear dedication, constant desire to improve, respect for other people and himself, and the possession of the personal fortitude required to recover from detrimental events.

4. Point of contact for this memorandum is the undersigned at ▮▮▮▮▮▮@usma.edu or 813-394-1240.

CDT, 2015
USCC, Company C3



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
West Point, New York 10996-1792

**REPLY TO
ATTENTION OF**

MACC-O-3-D                                                                                27 FEB 13

MEMORANDUM FOR: Investigating Officer, United States Military Academy, West Point, NY 10996

SUBJECT: Character Reference for CDT Isiah Doolen

1.   The purpose of this memorandum is to provide a character statement on behalf of Cadet Isiah Doolen, company B-1, Class of 2013.

2.   I am currently a CDT LT in Company B2. I met CDT Doolen during a Plebe math class and have been acquainted with him since.

3.   Professionalism in the Army requires three key attributes; character, competence, and commitment. To my knowledge CDT Doolen has always been exemplary in these three areas. I have never doubted CDT Doolens character. Once I got to know CDT Doolen, he struck me as a guy who knew what his convictions were and would stand by them. I have seen these convictions correlate strongly to the seven Army values. CDT Doolen has been a loyal friend and I have always seen him help those around him. CDT Doolen is a competent leader and has always given me good advice when I needed it. CDT Doolen is also very commited to the Army profession. He has told me stories of his time at the New Mexico Military Institute and at the Prepetory School, and they all speak to his commitment to officership.

4.   The primary interaction between CDT Doolen and myself has been in the classroom. CDT Doolen is a natural leader who peers are quick to follow, and a strong teammate. His leadership ability was very noticeable during class exercises. He has been decisive when he needed to be and supportive of his classmates when they were in charge. We all have room for future development and learning and I believe CDT Doolen has internalized this moto of life-long learning.

5.   One such example of CDT Doolens commitment to his fellow peers and charcter to go above and beyond came when we shared the same Economics class during Yearling year. Economics was a very difficult class for me and CDT Doolen noticed this, yet he still chose me as his partner for the culminating course project worth a large percentage of our overall grade. CDT Doolen took the time to make sure that I understood all of the concepts applied to the project. His additional time spent aiding me contributed towards my passing the project and the class. I would consider it a priviledge to serve along side CDT Doolen in any unit.

6. Point of contact for this memorandum is CDT Dunn at 701-771-8682 or e-mail at Thomas.Dunn2@usma.edu.

//Original Signed//
Thomas Dunn
CDT LT
USCC, B2, Class of 2013

**000777**



**REPLY TO
ATTENTION OF**

DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996-1792

MACC-O-3-D                                                                                    1 FEB 2013

MEMORANDUM FOR: Cadet Advisory Board, United States Military Academy, West Point, NY 10996

SUBJECT: Character Reference for CDT Isiah Doolen

1.   The purpose of this memorandum is to provide a character statement on behalf of Cadet Isiah Doolen, company B-1, Class of 2013.

2.   What is your current position in the Corps and how do you know CDT Doolen?

Currently, I am a 1st Platoon Sergeant in company B1 and CDT Doolen was my first line supervisor during the last semester as the training officer. I have been observing him closely since the second semester in my Yuk year as a fellow company mate and worked closely as we had to supervise parades, drill, march-on and details.

From my observation, neither he is the best or very consistent cadet I ever met. After realizing his inconsistency in the beginning of semester, he made a significant improvement on communication and handling all tasking on time. He empowered me to provide full support when I needed exact numbers for parades and takings. With his support, our company won the best brigade review on 13 OCT 12. As the result, the training staff was rewarded with PMI and TAC NCO personally recognized our achievement. More importantly, he was aware that I had put more effort than he did and he was humble enough to refuse the reward. Rather than taking advantage of it, he recognized me and offered his reward to me. This shows his character and personal courage to accept humility. They are fundamental aspects that our institution strives inculcate to every cadet.

Even though he was not consistent all time which put him troubles, he cared about me as an individual. Knowing that I am a weak writer, he was available for help to proofread. With his dedication to make corrections on my writing assignments, I was able to earn very high grades in two of my classes in DS310 and SS307.

3.   Define professionalism as it relates to the Army. To the best of your knowledge has CDT Doolen ever given you cause to doubt his professionalism or future professionalism as a commissioned officer?

Professionalism in the Army is very wide definition, but the foundation is based on the seven army values and soldier's creed. The seven army values describes characters every individual should strive for while soldier's creed explicitly layout individual's responsibility as a professional solider.

My initial assessment on CDT Doolen was pessimistic. However, over a year of assessment on him, he has potential and qualification to become a commissioned officer. There are some areas that he lacks especially consistency on completing tasking on time, but his approach to complete tasks is innovative. He attempted to establish better communication as the first line supervisor by having a meeting prior to sending tasking and parade roster to the company. Furthermore, he also incorporated some features in technology using share point website to allow staffs in company to utilize for updating information. He has an aspiration to lead and learn from his mistakes. His humbleness and aspiration to lead troops will

eventually develop him not to repeat same mistakes. I believe he is aware the consequence of not completing tasking on time. Because of his self-awareness, he has potential to learn and develop as a commissioned officer.

4. Please describe CDT Doolen's leadership ability. Do you see room for future development to learn?

His leadership ability is described in the second paragraph from statement 3.

5. Is there anything else important that you want to add? Are there any stories you can recall that demonstrate CDT Doolen's character?

I personally observed the incidence which result him a battalion board during the 1st semester. From my perspective, his argument with BN CSM was not a respect issue. He attempted to defend my classmate who tried to inform BN CSM why our company fall out and returned to the barrack for company activity. BN CSM's response on my classmate was negative that my classmate was defenseless because of CSM's position and authority. CDT Doolen approached professionally, but his approach provoked BN CSM to put him a trouble

6. Point of contact for this memorandum is CDT Edwin Lee at (845)667-9539 or at e-mail at Edwin.Lee@usma.edu.

//Original Signed//
Lee, Edwin
CDT SGT
USCC, B1, Class of 2014

2

**000779**



**REPLY TO
ATTENTION OF**

**DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

MADN-HIST                                                                20 February 2013

MEMORANDUM FOR RECORD

SUBJECT: Evaluation for Cadet Isiah Doolen, Company B-1, Class of 2013

1. **Performance:** CDT Doolen's performance in the classroom thus far has been adequate. His grades place him slightly above the average in his section.

2. **Conduct:** CDT Doolen has conducted himself in accordance with USCC regulation and instructor policies in the classroom.

3. **Leadership:** CDT Doolen has contributed in a positive fashion in the classroom.

4. **Teamwork and Selflessness:** CDT Doolen participates as an active contributor while doing group work.

5. **Interpersonal Skills:** CDT Doolen seems to get along well with his classmates—I have seen nothing to suggest otherwise.

6. **Sense of Duty:** CDT Doolen generally shows up to class having done the work expected of him.

7. **Appearance:** CDT Doolen's appearance and bearing have been in accordance with USCC regulation and my expectations.

8. **Potential:** I have seen nothing to suggest that CDT Doolen would not serve with distinction in the Army and consequently would raise no objection to having him serve in my battalion.

9. The POC for this request is the undersigned at: (845) 938-4820 or josiah.grover@usma.edu.


JOSIAH T. GROVER
MAJ, FA-59
Department of History



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
West Point, New York 10996

MADN-SOC                                                    20 February 2013

MEMORANDUM THRU

LTC Heidi Urban, Executive Officer, Department of Social Science
LTC Tania Chacho, Director, Comparative Politics Program

FOR Mrs. Katrina Stamp, Regulations and Discipline Assistant

SUBJECT: Evaluation of the Performance of Cadet Isiah Doolen, Company B-1

1. Performance: Cadet Doolen was enrolled last semester in my course, ss475, Democracy and Democratization. He received a "B" in the course and did not have any academic, respect, or disciplinary issues. Cadet Doolen is now enrolled in ss375, my course on Russia and its Neighbors. It is relatively early in the semester, so my assessment is incomplete. Cadet Doolen's major problem thus far in the class was his failure to submit a graded event on time without appropriate notification. He has since submitted the assignment. I have counseled him on this issue.

2. Conduct: Acceptable levels of performance in the classroom

3. Teamwork and Selflessness: Average levels of performance in the classroom

4. Interpersonal Skills: Average levels of performance in the classroom

5. Sense of Duty: Adequate

6. Appearance: Professional

7. Potential: CDT Doolen has significant potential which often remains latent. He must consistently apply himself to reach his full potential. For example, he must engage in substantive classroom discussions more frequently that is now the case.

2. POC for this memorandum is the undersigned, x2864

THOMAS SHERLOCK, PH.D.
Professor of Political Science

DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
WEST POINT, NEW YORK 10996

MADN-SOC                                                    22 February 2013

MEMORANDUM FOR RECORD

SUBJECT:  Evaluation of Cadet Isiah Doolen, Company B-1, Class of 2013

1. **Performance:**  Cadet Doolen is a cadet in the L1 section of my SS476 Conflict Analysis and
Resolution course.  This course is structured as a seminar in which cadets are expected to
actively participate in the guided discussion.  As of the 6-week grade point, Cadet Doolen's
performance in my class has been satisfactory but not remarkable.  He engages in the
conversation when directly addressed and appears to actively follow the discussion, but very
rarely does he initiate ideas or questions.  Cadet Doolen received a "D" on the analysis paper
which was assigned for Lesson 8 (section average was C+).  The low grade was the result of a
lack of application of course material to the provided case, an indication that Cadet Doolen is not
as familiar with the course readings as he should be.  I do not believe the low grade will be
reflective of future performance by Cadet Doolen.  My personal assessment is the he will be able
to successfully complete this course.

2. **Conduct and Appearance:**  Based upon my observation of Cadet Doolen during classes and
a recent academic trip, I find him to be a professional cadet who appropriately conducts himself
in academic settings and who maintains a professional appearance.  I have not noted any
behaviors or indications of unprofessionalism.

3. **Leadership and Interpersonal Skills:** I recently assigned Cadet Doolen as the CIC for an
academic all-day trip to the UN that included two sections of my course plus a class section from
a different course.  Prior to the trip, Cadet Doolen and I discussed his responsibilities for
maintaining accountability and handling ration money.  His performance as CIC For this trip was
satisfactory but not remarkable.  Cadet Doolen used section marchers to assure accountability at
each stop and he submitted required ration forms.  However, he took a passive approach to
leading the trip, requiring me to approach him to get status or to initiate actions.  Consequently
he came across more as a helpful member of the trip section that as its CIC.  I would have been
more impressed had he regularly sought me out to let me know status or how he was handling
the problem with the missing ration slip (an administrative problem that he is still resolving).
Finally is did observe that he interacted with other members of the trip in an appropriate and
professional manner.

4. **Sense of Duty:**  I have not observed any behaviors nor seen Cadet Doolen in any situations
that provide me with an assessment of his sense of duty, either positive or negative.

5. **Potential:**  Based upon my limited experience in working with Cadet Doolen, I find him to be
an average cadet who has the potential for solid service as an officer in the Army.  He has not
stood out in my assessments as being exemplary or as being significantly deficient in the

000782

characteristics of an officer.  I would not have a problem with him serving as a lieutenant in my squadron or group but I would not be actively seeking him out to serve with me.

6.  If you have any further questions concerning Cadet Doolen's performance in my class, please contact me at either john.hagen@usma.edu or 845-938-4001.

//signed//

Lt Col John O. Hagen, PhD., USAF
Asst. Professor of International Relations

FROM TELEPHONE CONVERSATION WITH LT COL HAGEN 8 MAR 1100:

IMPROVED PARTICIPATION IN CLASS SINCE 22 FEB.

LT COL HAGEN FEELS CDT DOOLEN IS JADED A BIT DUE
TO CDT DOOLEN'S EXPECTATIONS NOT BEING MET BY HIS
USMA ARMY EXPERIENCE, BUT ~~FEELS HE~~ REITERATED
POINTS IN PARA. #5 ABOVE.

MAJ CARIGNAN, TIMOTHY R.

000783

**Carignan, Timothy R MAJ MIL USA USMA**

| | |
|---|---|
| From: | Hagen, John O LTCOL MIL USA USMA |
| Sent: | Tuesday, March 12, 2013 12:40 PM |
| To: | Carignan, Timothy R MAJ MIL USA USMA |
| Subject: | RE: VIEW IN HTML - conduct investigation on CDT Isiah Doolen |

Hello Tim,

I might have spoken too soon on my assessment of Cadet Doolen when I
spoke with you this past Friday morning.  On Friday, Cadet Doolen had
a paper due to me at 1600 that was worth 15% of his grade.  On a
previous paper assignment, he had been 2 days late in his submission
that resulted in a failing assignment  grade due to points lost for
poor quality as well as for being late.  Since that previous
assignment Cadet Doolen and I had spoken about his performance in my
class and at West Point in general, and as I mentioned to you on the
phone, I believed he recognized his situation and would be putting
forward the needed effort to successfully finish the semester.  Well,
it is Tuesday afternoon and I have yet to see Cadet Doolen's paper
that was due this past Friday.   Despite repeated emails to remind him
that he risked failing this assignment, Cadet Doolen never contacted
me after Friday to inform me as to when he would turn his paper in.
As of today, with only 60% of the possible grade points still
available to him on this paper, I called CGR and Mr. Doolen answered
the phone.  He said he would turn the paper in today but was able to
provided no rationale for why it was delinquent.  If this is a
harbinger of his remaining performance in this semester, I do not see
him successfully passing my course and I am having serious doubts as
to how committed he is to successful completion of his course of
study.

I am also writing to RSVP and say  will be attending the hearing on 20
March.

Regards,

000784

JOH

Lt Col John O. Hagen, PhD., USAF

Dept. of Social Sciences

Rm 209, Lincoln Hall (Bldg 607)

US Military Academy at West Point

O: 845-938-4001 (DSN: 688)

M: 334-546-5466

From: Carignan, Timothy R MAJ MIL USA USMA
Sent: Friday, March 08, 2013 9:58 AM
To: Goetz, Timothy R CIV USA USMA; McVan, John T CIV USA USMA;
McKenna, Laura L MAJ MIL USA USMA; Macon, Rachelle MAJ MIL USA USMA;
Grover, Josiah T MAJ MIL USA USMA; Lorenzen, Daniel K CIV USA USMA;
Chacho, Tania M LTC MIL USA USMA; Scherra, Franklin B MAJ MIL USA
USMA; Vargo, Steven P CPT MIL USA USMA; Sherlock, Thomas Dr CIV USA
USMA; Hagen, John O LTCOL MIL USA USMA
Subject: VIEW IN HTML - conduct investigation on CDT Isiah Doolen

Ladies and Gentlemen,

2

**000785**



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
West Point, New York 10996

**REPLY TO
ATTENTION OF**

Department of Physical Education                    February 22, 2013

MEMORANDUM FOR RECORD

SUBJECT: Evaluation for Cadet Isiah Doolen, Company B1, Class of 2013

1. **Performance:** CDT Doolen currently has a C in the course. He earned an F on his pop quiz and a C+ on his midterm exam. in the course. He is currently 6% points below the course average.

2. **Conduct:** CDT Doolen has been well mannered and respectful in class this round. I also had Cadet Doolen last round. He was supposed to drop the course around lesson 6 for his illness and finally dropped the course on lesson 17 after two consecutive COR's for Failure to perform his duties.

3. **Leadership:** I have not evaluated CDT Doolen in this area.

4. **Teamwork and Selflessness:** CDT Doolen worked diligently with his peers and stayed on task when the class was given training time.

5. **Interpersonal Skills:** I was not able to observe much about CDT Doolen in this area other than he asks pertinent questions when appropriate.

6. **Sense of Duty:** CDT Doolen understood that his place of duty was in the classroom. He reported to class as performed to standard while there.

7. **Appearance:** CDT Doolen's manner of appearance was in accordance with USMA standards.

8. **Potential:** CDT Doolen is simply another student in my class. He's neither stellar nor a problem. However, based on my experience with him last round and his failure to drop the class despite repeated emails to him and one to his TAC my observations of CDT Doolen lead me to believe that he may not follow instructions all that well.

Daniel Lorenzen, Instructor/Director of Combatives
Department of Physical Education



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MADN-SOC                                                                          22 February 2013

MEMORANDUM FOR RECORD

SUBJECT: Evaluation for Cadet Isiah Doolen, Company B-1, Class of 2013

1. Overall, Cadet Isiah Doolen has not demonstrated an impressive performance thus far in
SS486, the capstone course for his major (Comparative Politics). Academically, at the six week
grade point, he ranks last out of the 13 cadets currently in the class, and his performance as the
CIC during a recent class trip left room for improvement.

2. **Performance:** Over the last 15 lessons, Cadet Doolen has participated in class discussions on
three occasions. He is quiet, which makes it hard to know his grasp of the material. He stays
alert during the discussion, but is not a regular contributor to the seminar. On several occasions,
I have observed that he just has a pen and a blank piece of paper in class; he neglected to bring
the required readings, or any notes that he took previously. This limited his ability to participate,
and made me question whether he had done the preparatory work needed to engage in our
seminar discussion. His only graded event thus far in the course is a short (2-page) paper on his
desired country and topic, worth only 5% of his overall course grade. His submission did not
fulfill the requirements laid out in the syllabus and discussed during our class sessions, so he
earned a 33 out of 50 points (66%) on this assignment. He came to see me for AI on 22
February, and after our discussion, said he would resubmit the assignment to ensure that he was
on track for the 7 March paper submission.

2. **Conduct:** As mentioned above, Cadet Doolen is quiet in class. There have been no issues
with his in-class conduct, although I have spoken with him about his need to participate more
during class. He has assured me that he will do so in the future, and I look forward to this.
Consistent, informed seminar participation constitutes 20% of his grade, and thus far, his three
comments have not earned many points.

3. **Leadership:** Cadet Doolen was the CIC for two classes during a daylong academic trip to
the United Nations that occurred on 13 February 2013. In three separate lessons prior to the trip,
I offered him the opportunity to address the class in order to provide administrative information
about the trip, but he said he had nothing to discuss. He did email the class the day's itinerary,
which he received from Lt Col John Hagan, the SS476 instructor on the trip. In class, I
discussed the day's events, including the CGR meeting time. Lt Col Hagan also met with Cadet
Doolen the day prior to the trip, to go over all of the details. At about 0600 on the morning of
the trip, I received a text from Cadet Doolen asking me what time to meet at CGR. Coming
from the CIC, this surprised and dismayed me; clearly, he had not remembered or copied down
the information from me or Lt Col Hagan. When asked, Cadet Doolen performed headcounts to

**000787**

provide us with accountability. Cadet Doolen did not have the rations money available to hand out on 13 Feb; he said that there was a mix-up at the disbursement point, and he is working to rectify this. As of 19 February, he did not have a rations roster available for cadet signatures, but promised to bring it to our next class on Thursday, 21 February. All in all, while there was nothing egregious about his performance as CIC that affected the trip, there was certainly opportunity for improvement.

4. **Teamwork and Selflessness:** In class, there have been a few opportunities for group work, and Cadet Doolen's performance has been unremarkable.

5. **Interpersonal Skills:** From my observations, Cadet Doolen has no issues interacting with his classmates. His dealings with me have been professional; I have no issues with his attitude or interactions.

6. **Sense of Duty:** Based on his class performance thus far, CDT Doolen could improve in this area. He has not provided consistent evidence of class preparation, and needs to work on taking initiative when placed in a leadership role.

7. **Appearance:** Cadet Doolen has always been in the correct uniform, and I have not noticed any negative issues with his appearance.

8. **Potential:** Unfortunately, at this time, Cadet Doolen has not shown me evidence of potential for service as an exemplary officer. My observations of both his academics and leadership performance as a trip CIC do not offer grounds for many positive comments. Based on this, I would hesitate to see him as a lieutenant in my battalion. To be fair, I have only had the opportunity to observe him for six weeks, and he certainly has the time to develop further as the semester progresses. But, based strictly on what he has shown thus far, I do harbor doubts about his potential for future distinguished service.

TANIA M. CHACHO, Ph.D.
LTC, MI/FA47
Academy Professor
Director of the Comparative Politics Program



**PE450 - Army Fitness Development**
**Peer Evaluations and Instructor Feedback**

Group Name: BROS

*SECTION I. Assign a grade to each member of your group for the categories listed below. Remember that students with EXCUSED absences should not be penalized for class absences out of their control, but all students were specficially briefed that it was their responsibility to work with their group to ensure that they would make up for the work missed in other parts of the lab or UPTP project in order to contribute equally.*

| | MAX POINTS POSSIBLE | Peer #1 - Madany | Peer #2 - Gillis | Peer #3 - McLoughlin | Peer #4 - Williams | Peer #5 - Rowland |
|---|---|---|---|---|---|---|
| Military Bearing and Professionalism in Briefs and Lab Execution | 5 | 5 | 5 | 4 | 4 | 5 |
| Attendance for Group Meetings/Discussions Outside of Class | 5 | 2 | 2 | 3 | 5 | 5 |
| Contribution to the Overall Workload | 5 | 2 | 3 | 3 | 2 | 4 |
| Timeliness of Work Submitted to the Group | 5 | 2 | 3 | 3 | 2 | 5 |
| Quality of Work Submitted to the Group | 5 | 2 | 5 | 4 | 3 | 5 |
| Teamwork and Cooperation | 5 | 4 | 4 | 3 | 3 | 5 |
| Leadership Qualities and Level of Initiative in Regards to the Group Projects | 5 | 2 | 2 | 4 | 2 | 4 |
| Overall Attitude While Participating in Group Projects and Meetings | 5 | 4 | 5 | 3 | 4 | 4 |
| | 40 | 23 | 29 | 27 | 25 | 37 |
| | | | | 28.20 | | |

*SECTION II. Add any comments of significance to ensure that I have an accurate picture of how each team member contributed to the overall success of the group. Feel free to use specific examples from Lab or UPTP group meetings that you encountered throughout this course. Please use this space to recognize individual(s) who went way above and beyond, as well as group members who might not have pulled their fair share of the weight throughout this course.*

| NAME: | COMMENTS: |
|---|---|
| Doolen, Isiah | Often difficult to reach, did not contribute as much. |

000789

## PE450 - Army Fitness Development
## Peer Evaluations and Instructor Feedback

|  | |
|---|---|
|  | He did the least amount of work for the group. He also didn't show up sometimes, and he didn't tell anyone that he wasn't going to be there. |
|  | Was willing to help, but lacked initiative to contribute. While I understand he did not have a laptop for the first few lessons, he could have made the difference up later on |
|  | Contributed to the group, but maybe not as much as others. This, however, I don't think is because of not willing to help, but because others took initiative and completed a lot of the work |
|  | Had a good attitude |

000790

**Carignan, Timothy R MAJ MIL USA USMA**

| | |
|---|---|
| From: | Mower, Ruth A MAJ MIL USA USMA |
| Sent: | Monday, March 18, 2013 3:07 PM |
| To: | Carignan, Timothy R MAJ MIL USA USMA |
| Subject: | RE: VIEW IN HTML - conduct investigation on CDT Isiah Doolen |

Hello Tim,

I would be glad to talk to you as well over the phone (I tried to call but you were out of the office), but my written comments are below (as of now I will not be able to make the 1600 hearing on 20MAR13):

-Performance: Isiah performed well in SS374 (Politics & Governments of Japan & The Koreas) where I had him for class. He almost always came to class with the readings completed (and freely admitted when he had NOT done the readings/could not answer the questions I asked which is also noteworthy), and actively answered questions without having to be called on.

-Conduct: Isiah always stayed awake in class, which is noticeable since many cadets at times even fall asleep in spite of their best intentions depending on if they are having a Thayer week or not (plus, I know this is also noteworthy b/c Isiah would train for very long distance runs and still remained awake for class). Also, he always raised his hand, waited to be called on, and let others complete their comments before answering or countering what they had to say. Therefore, he was always professional in his decorum and behavior.

-Leadership: Isiah was a junior when I had him for class, and since most of the other cadets in SS374 were seniors, I did not explicitly view him in a leadership position. However, I could tell the potential for leadership was there because he stood up constantly in class for what he thought was the right answer even if those who outranked him did not believe in what he did (i.e. he has the willingness to not follow blindly).

-Teamwork: But though Isiah would not let others sway his opinion, he did work quite well with his fellow classmates and always was professional and courteous towards them.

1

-Selflessness: Isiah would frequently admit when he had mis-spoken or was wrong on an exam, quiz, etc.  Therefore, he did not place pride ahead of his duties in class/his studies, which attests to his selfless nature.  Plus, when he thought he was not observed I heard him helping other cadets with what the right answers were during group study time periods, which also attests to his selfless nature and the fact that he did not have to be the one to gain credit for the right answer when the group(s) presented the answers.

-Interpersonal Skills: As indicated in my answers above Isiah works wells with others, actively listens, and then personally responds to those around him.

-Sense of Duty: Isiah in class knew what was expected of him and performed accordingly; he was never absent from class without official reason, and always let me know in advance where he was going to be even if he could not make class/knew when and where his sense of duty was regarding class.

-Appearance: Isiah always appeared for class in a serviceable uniform, and did not noticeably ever appear that he needed to shave, shower, etc. which is not always the case with some of my cadets.

-Potential:  Based on my time in class with Isiah, and even when I see him now out of class/around West Point in general, he has unlimited potential.  He always takes the time to greet and talk to me when we pass each other (instead of crossing the street to avoid contact, saluting, etc.), and while he might not have received the highest academic grade in SS374 I absolutely would be glad to have him as one of my subordinates one day.  That being said, I understand he is young and young cadets can and do make mistakes (I am not entirely sure why this conduct board is being held for based off of what you wrote in your e-mail).  Hopefully, if Isiah is found to be in the wrong he can (and I believe will) learn from his mistake and will become a better, future officer for it.

Please let me know if you have any other questions, or would like additional clarification on any of the answers that I provided above.

Respectfully,
Ruth A. Mower
MAJ, EN

2



DEPARTMENT OF THE ARMY
UNITED STATES MILITARY ACADEMY
West Point, NY 10996

REPLY TO
ATTENTION OF

MADN-EECS                                                                 18 March 2013

MEMORANDUM FOR RECORD

SUBJECT:  Evaluation of Cadet Isiah M. Doolen, Company B-1, Class of 2013

1.  Performance.  Isiah earned a C+ (77.04%) in AY12-2 IT305, Theory and Practice of Military
Information Technology Systems.  He started poorly, earning a C, F, and F on the first three graded
assignments, so that he had an F (57.75%) after the first 35% of the course was complete.  Prior to the
TEE his grade was a D (69.29%).  To his credit, Isiah applied tremendous effort and achieved an A-
(90.33%) on the comprehensive TEE (82.97% course average).

2.  Conduct.  Isiah conducted himself appropriately during class periods.  While not quick to engage
during every class, he was always willing to attempt a reasoned response and there were times that he
contributed greatly to the topic of discussion.

3.  Leadership.  I did not observe his leadership ability in class room activities.

4.  Teamwork and Selflessness.  Isiah's demonstrated IT305 teamwork was a bit below average.  My only
basis to judge teamwork is from the group-reported percentage of effort during the two group projects.
Teams of 3 collectively submit a work break-out per partner totaling 100%.  Assigning 33.33% to each
member would indicate equal work.  Isiah was assigned 20% for the first team project and 30% for the
second team project.

5.  Interpersonal Skills.  Isiah has good interpersonal skills.  He displayed no difficulty interacting with
his classmates and me during each class meeting.

6.  Sense of Duty.  Despite his poor start, Isiah demonstrated with e-mail communications, AI attendance,
and submission of an extra credit assignment, that he cared about successfully completing IT305 and was
willing to work hard to do it.

7.  Appearance.  Isiah presented a proper military appearance during all IT305 lessons.

8.  Potential.  I believe Isiah has the ability to complete USMA requirements and serve successfully in the
Army as a commissioned officer.

GEOFFREY M. STOKER
LTC, FI (FA53)
Instructor, EECS

Carignan, Timothy R MAJ MIL USA USMA

From:           Goetz, Timothy R CIV USA USMA
Sent:           Friday, March 08, 2013 12:31 PM
To:             Carignan, Timothy R MAJ MIL USA USMA
Subject:        RE: VIEW IN HTML - conduct investigation on CDT Isiah Doolen

MAJ Carignan,

I had CDT Doolen in my PE117 Military Movement class.  After looking
over CDT Doolen's PE117 grade card again it was clear to me that CDT
Doolen never went above and beyond to improve himself within the
course.  He never attended any of the Additional Instructor sessions
that were offered and never made this course a priority.

Hope this information is useful,

Thank you,
Tim

-----Original Message-----
From: Carignan, Timothy R MAJ MIL USA USMA
Sent: Friday, March 08, 2013 9:58 AM
To: Goetz, Timothy R CIV USA USMA; McVan, John T CIV USA USMA;
McKenna, Laura L MAJ MIL USA USMA; Macon, Rachelle MAJ MIL USA USMA;
Groover, Josiah T MAJ MIL USA USMA; Lorenzen, Daniel K CIV USA USMA;
Chacho, Tania M LTC MIL USA USMA; Scherra, Franklin B MAJ MIL USA
USMA; Vargo, Steven P CPT MIL USA USMA; Sherlock, Thomas Dr CIV USA
USMA; Hagen, John O LTCOL MIL USA USMA
Subject: VIEW IN HTML - conduct investigation on CDT Isiah Doolen

Ladies and Gentlemen,

Greetings. I am emailing you for input reference CDT Isiah Doolen's
character, from your perspective as his instructor. I am the IO for a
conduct investigation on CDT Doolen. Please let me know if you'd
prefer that I call you, if you'd rather provide written perspective,
or if you'd rather not provide anything (more). If providing input,
please reference the following eight topics: Performance, Conduct,
Leadership, Teamwork and Selflessness, Interpersonal Skills, Sense of
Duty, Appearance, and Potential. Thank you.

1

000794

me: DOOLEN, ISIAH MATTHEW

Date: 05 Feb 13

MAJ Marschean
Date: 5 Jan 11 NAME: Doolen, I. E4,2013

FOR OFFICIAL USE ONLY - PRIVACY ACT DATA

05 Jan 2011

MAJOR: Comparative Politics
Reason for submission: Failed PH201
Recommendation: Retain, repeat PH201

Potential: CDT Doolen has the potential to do well here at USMA and as an officer in the Army. While his maturity level has improved relative to the beginning of the semester, he could stand to heighten it further. I☐m certain that with a bit of focused effort that he☐ll be able to achieve a level of maturity that will carry him far. He should be afforded the opportunity to repeat PH201.

Performance: End term 11-1: ACOM-UH (5), ACOM-LH (5), COM (4), BCOM-rtn (2), BCOM-noRtn (0). CDT Doolen☐s overall performance has improved considerably since the start of the semester. His subordinate was a true leadership challenge and he worked with him to help him☐ bring most of his grades up. According to his squad leader he was one of the best Team Leaders my squad. Additionally, he was failing multiple classes at the beginning of the semester and was able to pull all of them up by the end of the semester except for PH201.

Conduct: Average. CDT Doolen generally conducted himself well this semester. While serving room restriction for an offence from AY 10-2, CDT Doolen ignored the rules of his restriction and had to be corrected by his chain of command to ensure he fully understood the SOP regarding room restriction. Once he was corrected he abided by the rules. Additionally, his ADAPT counselor provided the TAC I'm with positive feedback regarding their counseling sessions and his progress.

Leadership: Average. Despite CDT Doolen☐s academic struggles, he always found time to work with his subordinate who was a leadership challenge and help him to bring his own grades up. Without CDT Doolen☐s guidance and assistance his Plebe might have chosen to quit or failed out of the Academy.

Teamwork and Selflessness: Average. One of his peers noted that CDT Doolen gets easily frustrated at others and tends to blame them for his problems. He complains and often gets so frustrated that he cannot respond to adversity well. He needs to work on his patience, which will come with time. The time he spent working with his Plebe is indicative of his selflessness during a time when he too was struggling.

Interpersonal Skills: Average to Below Average. CDT Doolen has a tendency to close himself off to those who hold him accountable. An increase in his maturity level, as noted by a peer, would certainly help him to interact and respond to everyone in a more adult-like and professional manner. A peer also noted he needs to understand that everyone works differently and that no one type of leadership is right. Although he has experienced many different types of leadership he needs to be more open minded to what might not be the way he would do things.

Sense of Duty: Average. CDT Doolen☐s sense of duty with respect to his subordinate is strong. On occasion however, he failed to notify his chain of command and an instructor of his whereabouts if he was not able to make a scheduled hard time.

Appearance: Average. CDT Doolen is generally an average Cadet in appearance. He did receive demerits/punishment for what his PL referred to as deplorable room standards and for and unsatisfactory uniform during an inspection. When told to correct the issues, he corrected them in a timely manner.

Major Conduct Violations NONE
Minor - None
FLAGS ☐ completing SLDP-A program
RTO Comments
Concur with TAC...Retain, repeat PH201.

05 Jan 2011

000795



Search Mail    Search Web

INBOX    CONTACTS    CALENDAR    RE: USMA Cadet Isia...

Compose    Delete    Move    Spam    Actions

Inbox (4)
Conversations
Drafts
Sent
Spam (5)
Trash (7)

FOLDERS
doctorate corresp...
Drafts
orders

APPLICATIONS

Internet Exple

What you can tr
* You are not

RE: USMA Cadet Isiah Doolen

From : Olesinski, Jan

To : tim carignan

MAJ Tim Carignan,

Today this morning I found an email about cadet Isiah Doolen. I hope that this is not too late to write few words about Isiah.
Cadet Doolen was one of my student athletes here at New Mexico Military Institute. I had an opportunity to coach him for one year. Isiah ran cross country and track. During the cross country season he did outstanding job. He was my second runner and leader of my team. When I said outstanding, I am not talking about the times or places during races, I am talking about his personality and character. He was one of the most committed runners I have ever coached. His dedication to the sport was observed not only during sport activities, but also during his free time. To become a better runner besides giving 110 % during practice he really studied the science of running. He would watch movies, read books try to do as much as possible so he could improve his running techniques and reduce his times.
As a cadet, he was one of the sharpest cadets at NMMI. To this day I remember his uniforms being outstanding. Every time when I saw him on the campus he was smiling and he was very optimistic about school and his future.
When I found out that he would be attending the United States Military Academy I was very happy for him and I was sure that this was the right place for him. I don't know what happen or why he is in trouble, but I believe that he deserves a second chance. I have coached and taught at NMMI for over 25 years and I realize being at Military school we must hold students to higher levels of right and wrong. I do not nor would not do this for just any student however I do believe he is worth saving. I hope this letter will carry some consideration for this young man. If I can be of any further assistance in this matter please feel free to contact me at 575-624-8284. Thank you for your time.

Jan Olesinski
NMMI Cross Country Coach

From: tim carignan [mailto:thecarignanclan@yahoo.com]
Sent: Monday, March 18, 2013 5:23 PM
To: Olesinski, Jan; Cunningham, Jeffry
Cc: Timothy R MAJ MIL USA USMA Carignan
Subject: USMA Cadet Isiah Doolen

LTC(R) Cunningham and Coach Olesinski,

000796

Telephonic interview with CPT Elizabeth Eaton-Ferenzi at 1240 on 8 March

I engaged in a telephone call with CPT Eaton-Ferenzi at 1240 on 8 March reference CDT Doolen and his meeting with her mid-morning that day. This unscheduled meeting with CDT Doolen and his TAC conflicted with an appointment CDT Doolen had previously scheduled with me to meet and further discuss his case. According to CPT Eaton-Ferenzi, CDT Doolen met with her to try one last time to appeal to the RTO to let him go on Spring Break. After having talked with CPT Eaton-Ferenzi, CDT Doolen wanted to go to the RTO to plead his case, but by the time he and CPT Eaton-Ferenzi got to the RTO's office, CDT Doolen had changed his tune and, rather than plead his case for Spring Break leave, he reiterated to the RTO that he was working hard to make things right (or something to that effect).

CPT Eaton-Ferenzi indicated that CDT Doolen has made a series of mistakes in quick succession in January that really led him to the conduct investigation. She stated that CDT Doolen still has a lot to learn to be a successful leader in the Army. She was obviously frustrated having committed so much time to assist him in his development yet having him act in this manner unbecoming of a Firstie.

TIMOTHY R. CARIGNAN
MAJ, MI

Investigating Officer

SFC Rowley phone call on 3/18/2013 at 1540

SFC Rowley stated that CDT Lauren Heiliger came to him to let him know about CDT Doolen's difficulty in meeting the BN supply suspense (as described in the 11JAN2013 Company board). SFC Rowley then stated that CDT Heiliger again reminded CDT Doolen to get the task done, but it still did not get done. SFC Rowley then decided to speak with CDT Doolen about the suspense and highly encouraged him to get it done. The next day SFC Rowley reported that CDT Doolen stated that the computer program used to meet the suspense was down (not working)...which led to his company board. SFC Rowley views CDT Doolen as irresponsible when faced with meeting suspenses and often pushes blame on others when things go wrong for him. SFC Rowley further states that CDT Doolen is driven by emotions and "flies off the handle" rather than dealing with difficult situations calmly. SFC Rowley states that over his 5 months of experience in interacting with CDT Doolen that CDT Doolen goes through peaks and valleys of emotional outbursts. Lastly, SFC Rowley feels that CDT Doolen is not a lost cause, but that CDT Doolen needs more development such as entering into a mentoring program, more anger management training. SFC Rowley also recommended CDT Doolen be placed in a new leadership position (supervised) that would require him to daily work and interact with seniors and subordinates i.e. Plt ldr position. SCF Rowley recommends this occur over the summer of during the Fall of 2013. Once development is shown, CDT Doolen could graduate in Dec 2013.

MAJ Tim Carignan
MAJ, MI

SFC Daniel Boudreau phone call on 3/21/2013

SFC Daniel Boudreau was the former Building Commandant for Lee Barracks. At the change of the semesters between Fall 2012 and Spring 2013, SFC Boudreau relinquished the role to the B1 TAC NCO SFC Kellen Rowley. At the time of the 11 January 2013 failed Battalion suspense by CDT Doolen, SFC Boudreau was still in the process of training-up SFC Rowley as his replacement. When CDT Heiliger came to SFC Boudreau to guidance, he told he to write CORs on the two company supply officers who failed to meet the suspense. SFC Boudreau had no direct contact with CDT Doolen about the incident aside from attending his Company board about the issue. I talked with SFC Boudreau about the A1 company punishment for their supply officer who had failed to meet the Battalion suspense like CDT Doolen. A1 TAC leadership gave CDT Gunselman a Cadet Observation Report and 5 demerits for his failure to meet the Battalion suspense in 11 January 2013. SFC Boudreau also gave positive character reference of CDT Gunselman stating that he was a good and reliable cadet and that CDT Gunselman had exhibited no other conduct anomalies, either behavioral or supply-related, prior to the incident or since. I attempted to contact MAJ James McGee, A1 TAC Officer, but he was in the hospital and then placed on two weeks quarters. I felt that the information provided by SFC Boudreau was sufficient to help me make my decision regarding CDT Doolen's challenge.

MAJ Tim Carignan
MAJ, MI
Investigating Officer

Telephonic interview with Mr. and Mrs. Carl and Connie Doolen at 1430 on 13 March 2013

I called CDT Doolen's parents and ended up speaking with his mother mostly. His mom has 39 year in civilian federal service of some kind. She is in charge of 600 personnel division at her work. Neither she nor her husband has any military service, but Mrs. Doolen spoke highly of their rich family heritage of military service (CDT Doolen's uncles, grandparents, and some other relatives) and how this service inspired CDT Doolen to also serve his country and extend the family legacy of military service. The questions below were posed to his mother during the phone conversation.

-What was Isiah interested in growing up? Sports? Activities?

Mrs. Doolen stated that CDT Doolen was always very interested in running and that he did high school track and cross country, and competed regionally and in state-wide competitions. CDT Doolen attended a military high school high school and then two years junior college at New Mexico Military Institute (NMMI). He was very active in leadership and served as a master of physical fitness; he really enjoyed NMMI. One week away from commissioning from NMMI CDT Doolen determine that he was still not ready to commission and instead elected to attend USMA (via USMAPS). According to his mom, he would have been the distinguished military graduate at NMMI decided to graduate there.

After answering this question, Mrs. Doolen extemporaneously started discussing why she thought CDT Doolen was having difficulties. She stated that when he had to move from Company E4 to B1, he started having more difficulties. She indicated that the company change in leadership was difficult for CDT Doolen to take. She stated that CDT Doolen has historically had a hard time coping with change. She mentioned that he can be impulsive during training and that he has been working in this military-type setting for eight years. She stated that when he went to CLDT, the real Army, that he finally felt comfortable and fit in and performed very well, but that the process of getting through USMAPS and USMA was wearing on him so close to the finish line.

-How is his relationship with both mother and father? Brothers?

Mrs. Doolen considered CDT Doolen an "only child" from a close-knit family. His next oldest is 9 yrs older and he has an older brother in his 50s.

-Have any of these relationships ever or recently been significantly strained?

There has been no recent significantly disruptive activity in his immediate family to cause him to have this recent stint of misconduct. However, his mother shared with me that his girlfriend of five years just broke up with him in January. His mom stated that the relationship was very serious and that CDT Doolen and his girlfriend had once be engaged. The break-up hit CDT Doolen very hard. Mrs. Doolen stated her son has been dating his current girlfriend, CDT Natalie Daly, for 3 months.

-How would you characterize his character or demeanor as a teen, while at college, at prep school, and at West Point and has there been much change between these timeframes?

Mrs. Doolen stated she noticed that her son lost his focus when he went to USMAPS and USMA. She said that he had certain expectations for both USMAPS and USMA and that his experiences at both institutions did not equal his expectations. This has tainted his perspective on preparing for military service, in her opinion.

-Is there anyone you know of locally who could talk with me about Isiah? Maybe a coach or HS teacher or other mentor?

Mrs. Doolen gave me the names of two folks from NMMI, Professor Hensen and a retired CPT Stiles, who was in charge of prep program at NMMI. Both of these individuals are no longer on the staff at NMMI and I could not find these personnel to contact them.

Mrs. Doolen is obviously concerned about the results of this CI and stated so to me. In an effort to show her concern further she stated that her son would not be able to survive it if he had to stay until December.

Her last comment to me was one that indicated her belief that her son would always be the one to "defend of the underdog" regardless of the consequences, that he would always jump to the defense of the weaker.

TIMOTHY CARIGNAN
MAJ, MI
INVESTIGATING OFFICER

Telephonic interview with LTC (R) Jeffry Cunningham, PMS at New Mexico Military Institute at 1300 on 19 March 2013

Given his name as a character reference from CDT Doolen, I engaged in a telephone conversation with LTC (R) Jeffry Cunningham, PMS at New Mexico Military Institute (NMMI) at 1300 on 19 March 2013. Admittedly, LTC(R) Cunningham was a bit off guard and had to take a minute to recall Isiah and his actions and performance there. He stated that CDT Doolen did well academically and thought he was in the top third of his class (this is in direct contradiction of Mrs. Connie Doolen's and CDT Doolen's testimony that he would have been the distinguished military graduate had he commissioned out of NMMI). LTC (R) Cunningham mentioned too that CDT Doolen had decided not to commission out of NMMI. The next part of the conversation was started with a statement similar to "in order to be completely honest with you, I need to be honest with you." I really did not know what to expect from that statement. But as LTC (R) Cunningham continued, he gave details about "a bit of trouble" that CDT Doolen had gotten himself into. He explained that CDT Doolen, while at NMMI, was involved in what he termed as "alumni chatter" regarding the retired Navy Admiral who was serving as the Superintendent of NMMI at the time. The gist of the comments was that the alumni were not keen on this Navy Admiral as the Supe. LTC (R) Cunningham then went on to state that CDT Doolen had "jumped on the bandwagon" online with this alum and with the statements made against the Navy Admiral. CDT Doolen was counseled by LTC (R) Cunningham for his participation in this activity. At this point, LTC (R) Cunningham wanted me to clearly understand that this was due to Isiah's youth and inexperience and then statement something to the effect that "we all made some dumb mistakes when we were young." He then stated that CDT Doolen had taken the situation even further by bringing his counseling documentation to the alumni group and that this information was posted online and subsequent comments were made. LTC (R) Cunningham stated that the results of this further activity was that the NMMI Superintendent ordered a 15-6 investigation into the entire event, citing potential undue influence and inappropriate counseling on the part of LTC (R) Cunningham. The LTC was ultimately absolved from the case. He lastly indicated that this was part of the reason why CDT Doolen did not commission at NMMI, a claim that CDT Doolen denies.

TIMOTHY R. CARIGNAN

MAJ, MI

Investigating Officer

Personal interview with CDT Lauren Heiliger, BN S4 Officer, at 1251 on 19 March 2013

CDT Heiliger indicated that she had sent to her Company Supply Officers the time to update the battalion maintenance tracker on editgrid.com some five days before the suspense date. She shared that one features of the editgrid program is that if one user (a company supply officer or NCO) is online and working in the program, the rest (all other company supply officers) are locked-out until the logged on person logs out of the program. For this and other reasons, suspenses are given days in advance to all time for company supply officers to complete their mission of meeting the suspense. She also shared that the program shows which user is logged if you try to log on but you find the system locked. She indicated that CDT Doolen could have simply gone to the person who was logged into the program and asked them to log out so that he could get his work done. She stated that she sent three reminders to CDT Doolen specifically about meeting the BN suspense. Since she could not get in touch with CDT Doolen after repeated attempts, CDT Heiliger coordinated with CDT Bartkowski to try to help him get it done . SFC Boudreau was acting BN TAC NCO at the time. CDT Heiliger explained the situation to him and SFC Boudreau also tried to get into contact with CDT Doolen but could not. SFC Boudreau then suggested that CDT Heiliger write up a COR on those Company Supply Officers who did not meet the Battalion suspense, Companies A1 and B1. She did this. She let me know that her recollection of the incident above is the best that she can remember, and that in general terms, a responsible, proactive company leader would have had enough time to get this suspense completed by the due date.

*TPC*

*DIRECTED*

*CONFIRMED BY TELEPHONIC DISCUSSION w/ SFC BOUDREAU AT 1025 on 22 MARCH 2013*

TIMOTHY R. CARIGNAN
MAJ, MI

INVESTIGATING OFFICER

**000803**

Personal interview with CDT Ashli Carlson, B1 Company XO, at 1351 on 19 March 2013

CDT Carlson cites two issues which led to CDT Doolen failing to meet this battalion suspense: 1) a failure to update superiors on the lack of progress in trying to complete the mission until after the fact, which left them with little flexibility, and 2) a general lack of responsible and failed basic leadership. She did indicate the his overall performance as the B1 Company Supply Officer was average to above average at best, but that missing this suspense was not indicative of a senior cadet in a lead role. She attributes part of the B1 success, however, to her self-interjection into the company's supply process to ensure task completion – more than she has to do for other companies, and more then she thinks she should for Firstie in this position and for a leader two months from becoming a Second Lieutenant. Lastly, she assesses that CDT Doolen quite often thinks and acts "in the moment" and does not reflect on or consider of the effects of his actions long-term – a statement CDT Doolen has even admitted to himself.

TIMOTHY R. CARLONAN
MAJ, MI

INVESTIGATING OFFICER

# DEVELOPMENTAL COUNSELING FORM
For use of this form, see FM 6-22; the proponent agency is TRADOC.

## DATA REQUIRED BY THE PRIVACY ACT OF 1974

| | |
|---|---|
| **AUTHORITY:** | 5 USC 301, Departmental Regulations; 10 USC 3013, Secretary of the Army. |
| **PRINCIPAL PURPOSE** | To assist leaders in conducting and recording counseling data pertaining to subordinates. |
| **ROUTINE USES:** | The DoD Blanket Routine Uses set forth at the beginning of the Army's compilation of systems or records notices also apply to this system. |
| **DISCLOSURE:** | Disclosure is voluntary. |

## PART I - ADMINISTRATIVE DATA

| Name *(Last, First, MI)* | Rank/Grade | Date of Counseling |
|---|---|---|
| DOOLEN, ISIAH M. | Cadet | 04 February 2013 |

| Organization | Name and Title of Counselor |
|---|---|
| Company B, 1st Regiment, United States Corps of Cadets | EATON-FERENZI, ELIZABETH S., CPT / B1 TAC Officer |

## PART II - BACKGROUND INFORMATION

**Purpose of Counseling:** *(Leader states the reason for the counseling, e.g. Performance/Professional or Event-Oriented counseling, and includes the leader's facts and observations prior to the counseling.)*

Event-oriented counseling: Exceeding 6-month demerit limit

## PART III - SUMMARY OF COUNSELING
Complete this section during or immediately subsequent to counseling.

Key Points of Discussion:

Purpose of Counseling: Conduct Investigation notification

You currently have 6 demerits, which exceeds the 6-month demerit limit for your class and grade. This automatically triggers a conduct review and possible conduct investigation as per USCC Regulation 351-1.

Your continued pattern of misconduct has been indicated by multiple negative CORs, Article 10 boards, and inattention to detail or ability to follow instructions.

## OTHER INSTRUCTIONS
This form will be destroyed upon: reassignment *(other than rehabilitative transfers)*, separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

DA FORM 4856, AUG 2010          PREVIOUS EDITIONS ARE OBSOLETE.          APD PE v1.00ES

**Plan of Action** *(Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below)*

An MFR will be submitted from the TAC Team to the RTO recommending a Conduct Review for exceeding the 6-month demerit limit. This may result in a Conduct Investigation. If so, I highly suggest you delve into 351-1 on the Regulations and Discipline site to read your rights.

**Session Closing:** *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees/disagrees and provides remarks if appropriate.)*

Individual counseled: ☑ I agree   ☐ disagree with the information above.
Individual counseled remarks:

Signature of Individual Counseled: _____   Date: 2-4-13

**Leader Responsibilities:** *(Leader's responsibilities in implementing the plan of action.)*

Signature of Counselor: *Elizabeth Esta Fox*   Date: 04 FEB 2014

**PART IV - ASSESSMENT OF THE PLAN OF ACTION**

**Assessment:** *(Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*

Counselor: _____   Individual Counseled: _____   Date of Assessment: _____

**Note:** Both the counselor and the individual counseled should retain a record of the counseling.

*REVERSE, DA FORM 4856, AUG 2010*                                    APD PE v1.00ES

000806

## DEVELOPMENTAL COUNSELING FORM
For use of this form, see FM 6-22; the proponent agency is TRADOC.

### DATA REQUIRED BY THE PRIVACY ACT OF 1974

| | |
|---|---|
| AUTHORITY: | 5 USC 301, Departmental Regulations; 10 USC 3013, Secretary of the Army. |
| PRINCIPAL PURPOSE: | To assist leaders in conducting and recording counseling data pertaining to subordinates. |
| ROUTINE USES: | The DoD Blanket Routine Uses set forth at the beginning of the Army's compilation of systems or records notices also apply to this system. |
| DISCLOSURE: | Disclosure is voluntary. |

### PART I - ADMINISTRATIVE DATA

| Name (Last, First, MI) | Rank/Grade | Date of Counseling |
|---|---|---|
| DOOLEN, ISIAH M. | Cadet | 28 January 2013 |

| Organization | Name and Title of Counselor |
|---|---|
| Company B, 1st Regiment, United States Corps of Cadets | EATON-FERENZI, ELIZABETH S., CPT / B1 TAC Officer |

### PART II - BACKGROUND INFORMATION

Purpose of Counseling:  (Leader states the reason for the counseling, e.g. Performance/Professional or Event-Oriented counseling, and includes the leader's facts and observations prior to the counseling.)

Event-oriented counseling: pattern of behavior and lack of discipline within the first 3 weeks of the 13-2 Academic Year at USMA
1. missed S4 suspense given by BN S4 (11JAN) - COR & resultant Company Board
2. missed BRADSO signing suspense given by MAJ Cheatham; Armor branch rep (10JAN) OR & resultant summarized Company Board
3. wrong uniform; sweater as on the spot corrected by the Commandant and 1st REG RTO (15JAN) - verbal counseling
4. cadet (female) in barracks room without door open; OC/TAC Officer caught this (06JAN) - verbal counseling
5. unexcused absence from class (06JAN)
6. out after TAPS while on restriction (20JAN) - BN Board pending

### PART III - SUMMARY OF COUNSELING
Complete this section during or immediately subsequent to counseling.

Key Points of Discussion:

Purpose of Counseling:  Review your conduct and behavior from the past three weeks.  Review the expectations of you as a Cadet and future leader.  Additionally, discuss upcoming potential repurcussions and consequences of your conduct.

Your pattern of conduct has resulted in a series of Company boards; 2 x summarized, 1 x company grade.  You have received several walking hours and demerits as a consequence.  Your latest infraction happened on 20 JAN and you are awaiting a BN Board.  Your BN board is for being out after TAPS.  You were and are flagged (meaning you are at a loss of privileges as per the USCC SOP).

You currently have 60 demerits.  72 demerits is the maximum number of demerits that if you are at or exceed, automatically triggers a conduct investigation.  The maximum punishment for a BN Board is 30 demerits, 30 walking hours, 30 days withdrawal of privileges, and 30 days restriction.

Bottom Line:  Your behavior and conduct has been unacceptable.  As a Firstie, you should be setting the example of what right looks like in actions, words and deeds.

Areas of Focus for Expectations of an Officer:
Leadership; BE, KNOW, DO.  Set the example for others to follow
Time management
Taking ownership for any issues that arise individually or with your unit
Communication with your chain of command; including meeting suspense dates

### OTHER INSTRUCTIONS
This form will be destroyed upon:  reassignment (other than rehabilitative transfers), separation at ETS, or upon retirement.  For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

DA FORM 4856, AUG 2010          PREVIOUS EDITIONS ARE OBSOLETE.          APD PE v1.00ES

**Plan of Action**   *(Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below)*

NLT 08 February 2013 complete the following (turn in a 3 to 5 page typed document to the TAC Team):

1. Answer the question – what does taking ownership of your actions and responsibilities as a leader mean to you?
   - How do you perceive your role and responsibilities as a Firstie?
   - How do you perceive your role and responsibilities as the company S4?
   - What does taking ownership of your roles and responsibilities look like? What actions are manifested?
   - Have you ever had to lead a subordinate who did not take ownership of their actions? If so, how did you react to them? What was your perception of them as a Cadet and a leader?

**Session Closing:**   *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees/disagrees and provides remarks if appropriate.)*

Individual counseled:   ☑ agree   ☐ disagree with the information above.

Individual counseled remarks:

Signature of Individual Counseled: _____   Date: 1-29-13

**Leader Responsibilities:**   *(Leader's responsibilities in implementing the plan of action.)*

Continue to teach, coach + mentor Cadet
Be available as necessary

Signature of Counselor: _____   Date: 29 JAN 13

**PART IV - ASSESSMENT OF THE PLAN OF ACTION**

**Assessment:**   *(Did the plan of action achieve the desired results? This session is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*

Counselor: _____   Individual Counseled: _____   Date of Assessment: _____

**Note:  Both the counselor and the individual counseled should retain a record of the counseling.**

*REVERSE, DA FORM 4856, AUG 2010*                                         APD PE v1.00ES

# DEVELOPMENTAL COUNSELING FORM
For use of this form, see FM 6-22; the proponent agency is TRADOC.

## DATA REQUIRED BY THE PRIVACY ACT OF 1974

**AUTHORITY:** 5 USC 301, Departmental Regulations; 10 USC 3013, Secretary of the Army.

**PRINCIPAL PURPOSE:** To assist leaders in conducting and recording counseling data pertaining to subordinates.

**ROUTINE USES:** The DoD Blanket Routine Uses set forth at the beginning of the Army's compilation of systems of records notices also apply to this system.

**DISCLOSURE:** Disclosure is voluntary.

## PART I - ADMINISTRATIVE DATA

| Name (Last, First, MI) | Rank/Grade | Date of Counseling |
|---|---|---|
| DOOLEN, ISIAH M. | Cadet / 2013 | 22 JAN 2013 |

| Organization | Name and Title of Counselor |
|---|---|
| Company B, 1st Regiment, United States Corps of Cadets | EATON-FERENZI, ELIZABETH S., CPT / B1 TAC Officer |

## PART II - BACKGROUND INFORMATION

**Purpose of Counseling:** (Leader states the reason for the counseling, e.g. Performance/Professional or Event-Oriented counseling, and includes the leader's facts and observations prior to the counseling.)

- Initial counseling Spring Term (First Classmen): expectations and areas of focus
- Graduation and Commissioning: requirements and expectations

## PART III - SUMMARY OF COUNSELING
Complete this section during or immediately subsequent to counseling.

**Key Points of Discussion:**

As a future officer in the United States Army, I expect you to start thinking like an officer now. That means planing ahead and thinking about 2nd, 3rd, and 4th order effects of decisions you make. You have less than 5 months remaining at the academy. Know and be the standard. Work hard, be safe, and have fun.

As the Company S4 you are in charge of logistics to include rations, uniforms, maintenance, and resourcing the company to name a few. This job can be as impactful to the Company as you make it.

Non-Negotiables:
1. Communication and Accountability - ensure you are communicating with your CoC. Use appropriate tools to sign in and out.
2. Live an honorable life; integrity, cadet honor code, doing the right thing even when no one is looking.
3. Treat everyone with dignity and respect; golden rule, zero toleration for hazing.
4. Study like your life depends on it; time management, utilize resources, ask for help when/if needed.
5. Adhere to and enforce standards; uniform and appearance, rooms, customs and courtesies.
6. Have a positive attitude; approach each challenge with a "can do" attitude. Your subordinates will mimic you.
7. Discipline and Fitness; take ownership of your physical fitness, be disciplined, set goals, track your progress, and ensure you push yourself daily in your workouts. DO NOT LET THE IOCT, APFT, or AWCP come between you and graduation/commissioning. You have additional privileges as Firsties, but you are still responsible for your physical fitness.
8. Read and be intimately familiar with the USCC SOP, USMA Policy letters, and rules and regulations of the Academy.

It is your responsibility to be professional, timely in your assignments and tasks, and have a great Firstie year. I charge you with training the Cows and Yearlings to successfully take the reins after your departure. I also charge you with leaving the company in a better state than when you arrived. Ensure you pay close attention to the sensing session conducted in the Fall and put a plan of action into motion to help assuage some of the problem areas and reinforce the strong areas.

We will meet in person at least once a semester for more in-depth and personalized counseling.

## OTHER INSTRUCTIONS
This form will be destroyed upon: reassignment (other than rehabilitative transfers), separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

**DA FORM 4856, AUG 2010**          PREVIOUS EDITIONS ARE OBSOLETE.          APD PE v1.00ES

**Plan of Action** *(Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below)*

NLT 01 March 2013 complete the following (turn in a typed document, double-spaced, 12 Times New Roman font, no less than 1 page, no more than 3 pages):

1. A list of strengths and weaknesses (should have a minimum of two in each category) and a plan of action to reinforce strengths and to work on your weaknesses.

2. Write down what you have enjoyed most about USMA as well as one thing you have struggled with or disliked.

3. Identify one area you're unsure about regarding entering active duty service and also identify what you are most looking forward to.

4. Describe the ways in which you have grown and developed the most while he at the Academy; what area(s) did you grow in (moral, physical, academically, maturity), and who helped you the most (professors, coaches, TACs, your peers)? How has that impacted the type of leader you have become and hope to be when you enter the officer profession of the United States Army?

**Session Closing:** *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees/disagrees and provides remarks if appropriate.)*

Individual counseled: [X] I agree   [ ] disagree with the information above.
Individual counseled remarks:

Signature of Individual Counseled: _____   Date: 1-22-13

**Leader Responsibilities:** *(Leader's responsibilities in implementing the plan of action.)*

Signature of Counselor: *Elizabeth Eaton-Ferenz*   Date: 22 Jan 2013

**PART IV - ASSESSMENT OF THE PLAN OF ACTION**

**Assessment:** *(Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*

Counselor: _____   Individual Counseled: _____   Date of Assessment: _____

**Note:  Both the counselor and the individual counseled should retain a record of the counseling.**

REVERSE, DA FORM 4856, AUG 2010                                                   APD PE v1.00ES

000810

# DEVELOPMENTAL COUNSELING FORM
For use of this form, see FM 6-22; the proponent agency is TRADOC.

## DATA REQUIRED BY THE PRIVACY ACT OF 1974

**AUTHORITY:** 5 USC 301, Departmental Regulations; 10 USC 3013, Secretary of the Army.

**PRINCIPAL PURPOSE:** To assist leaders in conducting and recording counseling data pertaining to subordinates.

**ROUTINE USES:** The DoD Blanket Routine Uses set forth at the beginning of the Army's compilation of systems of records notices also apply to this system.

**DISCLOSURE:** Disclosure is voluntary.

## PART I - ADMINISTRATIVE DATA

| Name (Last, First, MI) | Rank/Grade | Date of Counseling |
|---|---|---|
| DOOLEN, ISIAH M. | Cadet | 17 December 2012 |

| Organization | Name and Title of Counselor |
|---|---|
| Company B, 1st Regiment, United States Corps of Cadets | EATON-FERENZI, ELIZABETH S., CPT / B1 TAC Officer |

## PART II - BACKGROUND INFORMATION

**Purpose of Counseling:** (Leader states the reason for the counseling, e.g. Performance/Professional or Event-Oriented counseling, and includes the leader's facts and observations prior to the counseling.)

Event-oriented counseling: pattern of behavior and lack of discipline

1. missed mandatory lunch formation on 10 December 2012

## PART III - SUMMARY OF COUNSELING
Complete this section during or immediately subsequent to counseling.

**Key Points of Discussion:**

Purpose of Counseling: Review the expectations of you as a Cadet regarding mandatory formations and events. You did not attend mandatory lunch formation on 10 December 2012. You have been late in the past to formation and your Chain of Command has addressed it with you. This time you are receiving a summarized Article 10 from your Tactical Officer; 5 demerits and 8 extra-duty (hours). You are already flagged, with loss of privileges as a result of your academic performance

As a Cadet, not showing up to mandatory formation is unacceptable. As a Firstie, you should be setting the example of what right looks like in actions, words and deeds. This includes being at the right place at the right time.

Non-Negotiables as per your initial counseling included:
1. Communication and Accountability - ensure you are communicating with your CoC. Use appropriate tools to sign in and out.
2. Live an honorable life; integrity, cadet honor code, doing the right thing even when no one is looking.
3. Treat everyone with dignity and respect; golden rule, zero toleration for hazing.
4. Study like your life depends on it; time management, utilize resources, ask for help when/if needed.
5. Adhere to and enforce standards; uniform and appearance, rooms, customs and courtesies.
6. Have a positive attitude; approach each challenge with a "can do" attitude. Your subordinates will mimic you.
7. Discipline and Fitness; take ownership of your physical fitness, be disciplined, set goals, track your progress, and ensure you push yourself daily in your workouts. DO NOT LET THE IOCT, APFT, or AWCP come between you and graduation/commissioning. You have additional privileges as Firsties, but you are still responsible for your physical fitness.
8. Read and be intimately familiar with the USCC SOP, USMA Policy letters, and rules and regulations of the Academy.

Areas of Focus for Expectations of an Officer:
Leadership; BE, KNOW, DO. Set the example for others to follow
Time management
Taking ownership for any issues that arise individually or with your unit
Communication with your chain of command; including meeting suspense dates

## OTHER INSTRUCTIONS

This form will be destroyed upon: reassignment (other than rehabilitative transfers), separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

**DA FORM 4856, AUG 2010**          PREVIOUS EDITIONS ARE OBSOLETE.          APD PE v1.00ES

**Plan of Action**   *(Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below)*

NLT 21 December 2012 complete the following (turn in a typed document to the TAC Team):

1. 2 page paper as to what type of leader you hope to be as a 2LT in the United States Army. How do discipline and timeliness tie into that on an individual basis and as a unit?

**Session Closing:**   *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees/disagrees and provides remarks if appropriate.)*

Individual counseled: ☑ I agree   ☐ disagree with the information above.
Individual counseled remarks:

Signature of Individual Counseled: _____   Date: 12-17-12

**Leader Responsibilities:**   *(Leader's responsibilities in implementing the plan of action.)*

Signature of Counselor: *Elizabeth A. Eaton-Ferenz*   Date: 17 December 2012

**PART IV - ASSESSMENT OF THE PLAN OF ACTION**

**Assessment:**   *(Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*

Counselor: _____   Individual Counseled: _____   Date of Assessment: _____

**Note: Both the counselor and the individual counseled should retain a record of the counseling.**

*REVERSE, DA FORM 4856, AUG 2010*                              APD PE v1.00ES

# DEVELOPMENTAL COUNSELING FORM
For use of this form, see FM 6-22; the proponent agency is TRADOC.

## DATA REQUIRED BY THE PRIVACY ACT OF 1974

**AUTHORITY:** 5 USC 301, Departmental Regulations; 10 USC 3013, Secretary of the Army.

**PRINCIPAL PURPOSE:** To assist leaders in conducting and recording counseling data pertaining to subordinates.

**ROUTINE USES:** The DoD Blanket Routine Uses set forth at the beginning of the Army's compilation of systems or records notices also apply to this system.

**DISCLOSURE:** Disclosure is voluntary.

## PART I - ADMINISTRATIVE DATA

| Name (Last, First, MI) | Rank/Grade | Date of Counseling |
|---|---|---|
| DOOLEN, ISIAH M. | 2013 | 19 NOV 12 |

| Organization | Name and Title of Counselor |
|---|---|
| COMPANY B-1, USCC | EATON-FERENZI, ELIZABETH, CPT / TAC OFFICER |

## PART II - BACKGROUND INFORMATION

**Purpose of Counseling:** (Leader states the reason for the counseling, e.g. Performance/Professional or Event-Oriented counseling, and includes the leader's facts and observations prior to the counseling.)

Notification of Academic Program Deficiency. 10 Week Grade: F in EV402 and SS377

## PART III - SUMMARY OF COUNSELING
Complete this section during or immediately subsequent to counseling.

**Key Points of Discussion:**

You are past the 10 week point for academics, this means that any failing grades will result in an Academic Flag and reduction in current privileges.

You should notice a flag appear on your CIS (within the next 24-48 hrs). The restrictions with this flag are as follows:

Your passes are now restricted. You are no longer able to take pass (to include walking privileges) in accordance with the USCC SOP.

Special Passes will only be allowed under emergency conditions.

You no longer have OPPs.

You will also have to comply with the Company Academic Policy for additional study requirements and supervision.

Additionally,

Your chain of command can help you! There are tutors, Center for Enhanced Performance, B1 Academic staff, and AI's with instructors. Seek help, but no one will hold your hand— you must put in effort. I recommend that you immediately seek help from the team around you and make academics the singular focus of your existence, at least temporarily until your head is above water. This flag is not necessarily as much punitive (to punish you for getting a bad grade) as it is protective (to avoid you ruining your academic standing by overwhelming yourself with social and extracurricular activities).

You owe me a plan of action to improve this grade.

## OTHER INSTRUCTIONS
This form will be destroyed upon: reassignment (other than rehabilitative transfers), separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

**DA FORM 4856, AUG 2010**     PREVIOUS EDITIONS ARE OBSOLETE.     APD PE v1.00ES

000813

**Plan of Action** *(Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below)*

What is your plan of action to improve your grade in this course?

EV450: Keep CPT. Enton updated on progress in the class. Ensure that I go in for AT when I need help. Complete all assignments to the best of my ability.

SS377: Keep CPT Enton updated on my progress in the class. Speak with my teacher and go in for AT. Start my policy paper earlier and send in early to receive feedback. Participate in class.

**Session Closing:** *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees/disagrees and provides remarks if appropriate.)*

Individual counseled: ☒ I agree ☐ disagree with the information above.
Individual counseled remarks:

Signature of Individual Counseled: _____ Date: 20 Nov 12

**Leader Responsibilities:** *(Leader's responsibilities in implementing the plan of action.)*

Signature of Counselor: _____ Date: 20 NOV 2012

PART IV - ASSESSMENT OF THE PLAN OF ACTION

**Assessment:** *(Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*

Counselor: _____ Individual Counseled: _____ Date of Assessment: _____

**Note: Both the counselor and the individual counseled should retain a record of the counseling.**

REVERSE, DA FORM 4856, AUG 2010                                              APD PE v1.00ES

000814



**CENTER FOR PERSONAL DEVELOPMENT**
UNITED STATES MILITARY ACADEMY
WEST POINT, NEW YORK 10996

**AUTHORIZATION FOR DISCLOSURE OF INFORMATION**

| Name (Last, First, MI): Doolen, Tsiah | Cadet SSN: Redaction PII | |
|---|---|---|
| Date of Birth (YYYYMMDD): 1988 06 01 | CO/REG: B/1 | CLASS: 2013 |

I AUTHORIZE ☒CPD PROVIDERS   ☐ CCU/CCCU COUNSELORS   ☐ Other Agency: _____

☒ To release my information to: MAJ Carignan
_____
_____

☒ And also receive my information from the same.

**I AM REQUESTING A RELEASE OF INFORMATION FOR THE FOLLOWING REASONS:**

For BTD to know I am seeking to
refine my emotional state

☐ At the request of the individual (is all that is required if you do not wish to state a specific purpose).

**INFORMATION TO BE RELEASED** ("no restrictions" is all that is required if you do not wish to describe specific information):

Case Status, Coordination Status w/ Dr Hain
Evaluation results, Recommendations,
Progress towards treatment goals

☐ No Restrictions.

| Authorization Start Date (YYYYMMDD): 2013 05 31 | Authorization Expiration Date (YYYYMMDD): 2013 03 14 |
|---|---|

I understand that:

a. I have the right to revoke this authorization at any time.  My revocation must be in writing and provided to CPD.  I am aware that if I later revoke this authorization, the person(s) I herein name will have disclosed my protected information on the basis of this authorization.

b. If I authorize my protected health information to be disclosed to someone who is not required to comply with federal privacy protection regulations, then such information may be re-disclosed and would no longer be protected.

c. I have the right to inspect and receive a copy of my own protected health information to be disclosed, in accordance with the requirements of the federal privacy protection regulations found in the Privacy Act and 45 CFR §164.524.

I request and authorize the named provider(s)/organization to release the information described above to the named individual(s)/organization indicated.

| Cadet Signature: | Date (YYYYMMDD): 2013 08 14 |
|---|---|

v. 2012.10

000815

# INSTRUCTIONS
## CONDUCT INVESTIGATING OFFICER

### Investigating Officer Checklist

1. **Receive the following material from Regulations and Discipline Officer:**

   ✓ MEMORANDUM, Deficient in Conduct, w/all endorsements and Encls.

   ✓ MEMORANDDUM, Conduct Investigating Officer Appointment Orders.

   ✓ Copies of all pertinent Disciplinary Actions, Letter fo Reprimand, Evaluations etc.

   ✓ Any other pertinent documents

2. **Meet with the Cadet to determine the following:**

   ✓ Whether the cadet will challenge the IO for cause. Notify the Regulations and Discipline Officer immediately of any challenge.

   ✓ Finalize list of Issues to Discuss with the Cadet and or witness(es).

3. **Complete the following:**

   ✓ Establish a date, time and place to convene.

   ___ Arrange for tape recording of the proceedings with the Regulations and Discipline Officer.

   ✓ Establish a list of winesses to be called (see Fig 3-6).

   ✓ Resolve any objections to material that has been reviewed by the cadet.
       (Reconduct after the cadet has reviewed all peformance evaluations.)

   ✓ If necessary, arragne a meeting with the cadet to resolve quesitons concerning availability of witnesses, acceptability of statements in-lieu of appearance before CI, objections to material, etc. (See Fig 3-3 for Written Testimony and Fig 3-4 for Telephonic Testimoney).

**000816**

# INSTRUCTIONS
*Continued*

4. <u>Notify the cadet in writing of the following:</u>

   ✓ Date, time and location the CI will convene; uniform to be worn (see Fig 3-5).

   ✓ Witnesses to be called by the IO (see Fig 3-6).

   ✓ Provide the cadet with letter notifying his or her witnesses of the date, time, place, and uniform for the hearing (see Fig 3-2). It is the cadet's responsibility to deliver the letter and ensure the presence of the witnesses that he/she requested for the CI. The IO must deliver letters addressed to witnesses that he/she is calling to the CI.

   ✓ Receive and act on any requests from the cadet that may result in a delay in convening the hearing. Such requests will be made and answered in writing (see Fig 3-7). Notify the Regulations and Discipline Officer prior to any changes in the schedule.

   ✓ Ensure the presence of witnesses to be called by the IO.

   ✓ Coordinate with the cadet Concerning the order in which witnesses will testify.

   ✓ Check with the Regulations and Discipline Officer for an update on the cadet's conduct record.

   ✓ Prepare the meeting place

   ✓ Ensure that all documentary evidence to be considered is abailable and that the cadet has reviewed it.

   ✓ Ensure that the cadet and any witnesses are excused from the room during all closed sessions (deliberations).

   ✓ Announce the recommendation that will be made to the chain of command regarding the Cadet's status and disposition.

   ✓ Prepare a Transmittal of Conduct Investigation Proceedings (see Fig 3-8), original and two copies, with enclosures.

# INSTRUCTIONS

*Continued*

4. **Notify the cadet in writing of the following (continued):**

✓ Have the cadet report to the Regulations and Discipline Officer to receive his/her copy of the transmittal letter with enclosures.  Do not send this material through distribution.

✓ Inform the cadet to submit, in writing, to the Commandant, any rebuttal to performance evaluations submitted in conjuction with the CI to the Regulations and Discipline Officer.  The Regulations and Discipline Officer will attach any rebuttal to the CI and evaluations going to the Commandant for decision/recommendation.

✓ Return all CI documents and materials to the Regulations and Discipline Office when complete.

CARIGNAN, TIMOTHY P.
MAJ, MI
INVESTIGATING OFFICER



OFFICE OF THE COMMANDANT
UNITED STATES MILITARY ACADEMY
WEST POINT, NEW YORK 10996-1602

MACC-S                                                    19 February 2013

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT:  Conduct Investigation Officer Appointment

1.  In accordance with paragraph 114f, Chapter 1, USCC Regulation 351-1, dated 15 May 2001,
the following officer is appointed to serve as the Investigating Officer (IO) for a Conduct
Investigation (CI).

              MAJ Timothy R Carignan
              Agency:  DPE
              Phone:   x5634

2.  The purpose of the CI is to make findings concerning the reported conduct deficiency of
Cadet Isaih M. Doolen, Company B, First Regiment, Class of 2013.

3.  The Conduct Investigation will convene on or about 21 ~~January~~ February 2013 and must be completed
NLT 05 March 2013.

                              JEFFREY C. LIEB
                              COL, FA
                              Deputy Commandant

DISTRIBUTION:
Regs & Discipline Officer
CDT Doolen
MAJ Carignan

**000819**



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MACC-O-RD                                                                         21 February 2013

MEMORANDUM FOR

Regimental Tactical Officer, First Regiment, USCC
Tactical Officer, Company B-1, USCC

FOR Cadet Isiah M. Doolen, Company B, First Regiment, USCC, West Point, New York 10996

SUBJECT:  Notification of Deficient in Conduct Status

1.  As a result of exceeding six month demerit allowance, the Brigade Tactical Officer has determined that you are Deficient in Conduct.  Furthermore, the Commandant has referred you to a Conduct Investigation.  This action is being taken in accordance with USCC Regulation 351-2, The Cadet Disciplinary System, dated 15 May 2001, and the status is effective immediately.

2.  A copy of all relevant disciplinary actions is enclosed.  A copy of this endorsement will be provided to your Regimental and Company Tactical Officer.  Please inspect these enclosures with your Company Tactical Officer for concerns pertaining to your Conduct Deficiency.

3.  POC is the undersigned at x4702.

FOR THE COMMANDANT:

DELROY A. PATRICK
Regulations and Discipline Officer



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MACC-O-RD                                                                    21 February 2013

MEMORANDUM THRU

Tactical Officer, Company B-1, USCC
Regimental Tactical Officer, First Regiment, USCC

FOR Regulations and Discipline Officer, USCC

SUBJECT:  Notification of Deficient in Conduct Status

I have been informed of my Deficient in Conduct Status on this date and I have been provided
a copy of this memorandum with enclosures.

Encl.                                                    Isiah M. Doolen
                                                         Respondent
                                                         Company B-1, Class of 2013
                                                         United States Corps of Cadets

2-46



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MACC-O-RD                                                        21 February 2013

MEMORANDUM FOR Cadet Isiah Doolen, Company B-1, Class of 2013, USCC

SUBJECT: Referral to a Conduct Investigation

1. You are hereby notified that you are being referred to a conduct investigation (CI) which will make findings concerning your reported conduct deficiency for **Exceeding six month demerit allowance.**

2. You have the right to request that the CI convene, or to waive appearance before the CI. If you waive appearance, the Commandant of Cadets will maintain your deficient in conduct status and take action or make appropriate recommendations with regard to your retention or separation. If you elect to appear before the CI, you have the following rights:

  a. To receive written notice of the reported conduct deficiency and a list of all offenses and awards of demerits that resulted in the deficiency being reported. Your regiment should already have accomplished this; notify this office if you do not have these documents and they will be provided.

  b. To have a reasonable period of time to prepare a defense; that is, about five working days during the academic year and about three working days during periods when there are no academic attendance required. As there are no other major actions concerning you at this time, **the CI will convene on or about 21 February 2013.**

  c. To seek advice and assistance of legal counsel in the preparation of your case. Counsel may be civilian legal counsel at no expense to the government, or a military lawyer assigned to the Defense Section of the Office of the Staff Judge Advocate, USMA, or both. Legal counsel will not be present during the CI hearing.

  d. To be present during the hearing, except during deliberations.

  e. To testify or remain silent. Remaining silent does not preclude introducing evidence, questioning or cross-examining witnesses, but does preclude your having to answer questions.

  f. To challenge the investigating officer (IO) for cause. The IO will rule on challenges.

  g. To examine all records and documents to be considered by the CI, including the TAC File.

  h. To object to evidence. Subject only to certain limitations which you should discuss with legal counsel, anything which in the minds of reasonable persons is relevant and material to an issue may be accepted as evidence. These proceedings are administrative in nature and therefore the CI is not bound by the rules of evidence prescribed for trials by court martial. The IO will make determinations concerning evidence.

MACC-O-RD (351-17e)
SUBJECT:  Referral to a Conduct Investigation

   i.  To raise any issues related to your conduct history.  You may not challenge any punishments under Article 10 because you have had the opportunity for a hearing on each individual disciplinary case.

   j.  To call reasonably available witnesses to support the challenges or issues related to your conduct history.

   k.  To question and cross-examine witnesses.

   l.  To present relevant written evidence in support of challenges or issues related to your conduct history.

   m.  To present your own oral and/or written argument in support of challenges of any boards and case for retention.

   n.  To receive a complete copy of the CI report of proceedings, with the letter of transmittal and all enclosures.

   o.  To be notified of witnesses who will be called by the CI.

3.  Your witnesses may include cadets, officers, or other reasonably available persons with knowledge of the demerits you intend to challenge.  Government funds are not authorized for the appearance of civilian witnesses.  The CI IO will assist you in notifying your witnesses to be present; however, it is your responsibility to ensure that they are present.  The IO will provide you with additional assistance if you request it in this regard.

4.  Witnesses will not be called either by you or by the CI with regard to whether you should be retained or separated, nor will witness statements be introduced.  This issue will be resolved by the Commandant on the basis of your overall cadet record and on the basis of written evaluations obtained by you and by the CI.  See Chapter 5, USCC Regulation 351-1 dated 15 May 2001, for information concerning these evaluations.

5.  You may waive any, all, or none of the above rights.

6.  If you intend to raise issues or challenges related to your conduct history, indicate so on the attached endorsement form which has been prepared for you.  Also indicate that you do or do not waive appearance before the CI; that you will or will not seek legal counsel; and the names of any witnesses you desire to appear in support of challenges of demerits.  **Return one copy of the endorsement form to the Regulations and Discipline Officer not later than** ~~29 Feb 12~~ *1 Mar 13* .  Retain the other copy of this letter and the endorsement for your records.

7.  If you desire legal counsel, call extension 4541, Office of Defense Counsel, Office of the Staff Judge Advocate, USMA, to make an appointment.

FOR THE COMMANDANT:


Encl
Endorsement                                    DELROY A. PATRICK
                                               Regulations and Discipline Officer


Signature of Cadet _____   Date Rec'vd  22·Feb·13



**REPLY TO
ATTENTION OF**

DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
WEST POINT, NEW YORK 10996

MACC-O-RD

MEMORANDUM FOR Commandant of Cadets, ATTN: Regulations and Discipline Officer, USCC

SUBJECT: Referral to a Conduct Investigation

1. I acknowledge receipt of the basic letter. I understand my rights as explained in the basic letter and have made the following decisions:

    a. I (do not waive) (waive) appearance before a conduct investigation.

    b. I (will) (will not) request legal counsel to assist in the preparation of my case.

    c. I (intend to raise the following issue/challenges related to my conduct history) (I will not raise any issues about my conduct history):*

| DATE OF OFFENSE | DESCRIPTION OF OFFENSE | DEMERITS |
|---|---|---|
| 11 Jan 13 | Failure to Comply I.E., Failed to meet BN suspense | 20 |

*NOTE: Continue on reverse if more space is needed.

000824

MACC-O-RD (351-17e)
SUBJECT: Referral to a Conduct Investigation

d. I request that (the following witnesses) (no witnesses) appear in support of my challenges of regimental boards:*

| NAME | CLASS/ RANK | COMPANY/ DEPARTMENT |
|------|------------|--------------------|
| CDT Bortkowski | 2014 / C/SGT | B1 |
| CDT Heiliger | 2013 / C/LT | A1 / BN S4 |

e. I request that the following individuals be requested to furnish information on my performance as a cadet. All have had direct recent opportunities to observe me.

| NAME | CLASS/ RANK | COMPANY/ DEPARTMENT |
|------|------------|--------------------|
| Maj. Griswold | SOSH / Maj. | SOSH |
| LTC Stoker | LTC | IT |
| Maj. Mower | Maj | SOSH |

2. I have retained a copy of this endorsement and of the basic letter.

Signature: _____ Date: 3-1-2013
Isiah Doolen
Respondent
Company B-1, Class of 2013
United States Corps of Cadets

*NOTE: Continue on reverse side if more space is needed.

000825

2개

# PRIVACY ACT STATEMENT

**AUTHORITY:** 10 USC section 3013 and Regulations, USMA

**PURPOSE:** The requested information will be used in evaluating your challenge to the disciplinary awards in question, and will form a basis for recommendations concerning disposition of this matter.

**ROUTINE USES:** Used by the Investigating Officer, appointing authority, and reviewing authorities in determining the facts in this matter, and in determining the facts in this matter, and in determining the appropriate action to be taken based on those facts. This information may be disclosed to members of the Department of Defense who need access to the information as part of their official duties. This information may be incorporated into your official personnel files, and may constitute the basis for adverse administrative or punitive action.

Disclosure is voluntary; failure to provide the requested information will result in decisions being made in this matter without the benefit of this information.

I hereby acknowledge being informed of the foregoing information concerning the Privacy Act.

████████

(Signature)

Isiah M. Doolen
Respondent
Company B-1, Class of 2013
United States Corps of Cadets

████████

(Date)

MACC-O-RD                                                    13 February 2013

MEMORANDUM FOR Brigade Tactical Officer

SUBJECT: Conduct Review Options for Cadet Isaih M. Doolen, B-1, Class of 2013 (Exceeding six month demerit allowance).

1. IAW USCC USCC Regulation 351-2, Chapter 5, Conduct Status and Investigation, you have the following options regarding conduct reviews that are required under conditions set forth in paragraphs 502-505.

    _____A. You may approve a CoC recommendation of, or personally determine, **Proficient**.

    _____B. You may approve a CoC recommendation of, or personally determine, **Deficient in Conduct**, and direct formal remediation by the CoC. (Please write in any special terms for the remediation in the "comments" section below.)

    _____C. You may approve a CoC recommendation of, or personally determine, **Deficient in Conduct** and forward recommendation to the Commandant for **Conduct Probation in Lieu of a Conduct Investigation.**

    _____D. You may approve a CoC recommendation of, or personally determine, **Deficient in Conduct and Refer to Conduct Investigation.** If you feel efforts at remediation are not considered appropriate, you may forward a recommendation to the Commandant to convene a Conduct Investigation to review the deficient conduct and recommend disposition to the CoC.

2. Comments/Special terms for Remediation:

                        KATRINA N. STAMP
                        Regulations & Discipline Assistant, USCC

Encl
Conduct Review Packet